# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 06-319** |
| **v.** | : | **DATE FILED: February 6, 2007** |
| **VINCENT J. FUMO** | : | **VIOLATIONS:** |
| **RUTH ARNAO,** | | **18 U.S.C. § 371 (conspiracy to commit mail and** |
| **a/k/a "Ruth Rubin"** | | **wire fraud - 2 counts)** |
| **LEONARD P. LUCHKO** | : | **18 U.S.C. § 371 (conspiracy to defraud the United** |
| **MARK C. EISTER** | | **States - 1 count)** |
| | : | **18 U.S.C. § 371 (conspiracy to obstruct justice - 1** |
| | | **count)** |
| | : | **18 U.S.C. § 1341 (mail fraud - 60 counts)** |
| | | **18 U.S.C. § 1343 (wire fraud - 41 counts)** |
| | : | **18 U.S.C. § 1512(b)(2)(B) (obstruction of justice -** |
| | | **9 counts)** |
| | : | **18 U.S.C. § 1512(c)(1) (obstruction of justice - 2** |
| | | **counts)** |
| | : | **18 U.S.C. § 1519 (obstruction of justice - 21** |
| | | **counts)** |
| | : | **26 U.S.C. § 7206(1) (false tax return - 2 counts)** |
| | | **26 U.S.C. § 7206(2) (aiding and assisting the filing** |
| | : | **of a false tax return - 2 counts)** |
| | | **18 U.S.C. § 2 (aiding and abetting)** |
| | : | **18 U.S.C. § 981 (criminal forfeiture)** |

# S U P E R S E D I N G   I N D I C T M E N T

## <u>TABLE OF CONTENTS</u>

<u>Count(s)</u>                                                                                     <u>Page</u>

1              Conspiracy to Commit Mail and Wire Fraud -
               Pennsylvania Senate Employees, Contractors, and Assets). . . . . . . . . . . . . . . . . 1

               Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

               The Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

               Manner and Means.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                         A.      Political Activities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                                 i.      Use of Senate Employees as Campaign Aides.. . . . . . . . . 10

                                 ii.     Senate Contractor No. 1.. . . . . . . . . . . . . . . . . . . . . . . . . 14

                                 iii.    Senate Contractor No. 2 and Senate Contractor
                                         No. 3.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

                                 iv.     Computer Services.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                         B.      Personal Services.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                                 i.      Person No. 19.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                                 ii.     Person No. 21.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                                 iii.    The Farm.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

                                 iv.     Senate Contractor No. 5.. . . . . . . . . . . . . . . . . . . . . . . . 44

                                 v.      Other Employees.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

                                         a.      Person No. 22.. . . . . . . . . . . . . . . . . . . . . . . . . . 45

                                         b.      Person No. 16.. . . . . . . . . . . . . . . . . . . . . . . . . . 46

                                         c.      Person No. 8.. . . . . . . . . . . . . . . . . . . . . . . . . . . 47

                                         d.      Drivers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Count(s)                                                                    Page

                        e.      Computer Aides.. . . . . . . . . . . . . . . . . . . . . . . . . 52

                        f.      Harrisburg employees.. . . . . . . . . . . . . . . . . . . 58

            C.      Diversion of Senate Equipment.. . . . . . . . . . . . . . . . . . . . . . . 60

    Overt Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

2-5     Mail Fraud - Senate of Pennsylvania. . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

6-33    Mail Fraud - Senate of Pennsylvania. . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

34-64   Wire Fraud - Pennsylvania Senate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

65      Conspiracy to Commit Mail and Wire Fraud -
        Citizens Alliance for Better Neighborhoods. . . . . . . . . . . . . . . . . . . . . 87

    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    The Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

    Manner and Means.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

            A.      Purchases of Consumer Goods.. . . . . . . . . . . . . . . . . . . . . . . 96

            B.      Vehicles for Personal Use and Use of Senate
                    District Office.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

                    i.      Town and Country Minivan.. . . . . . . . . . . . . . . . . . . 102

                    ii      Other Vehicles.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

            C.      Tasker Street Office Improvements and Cell
                    Phones for Senate Office and Staff.. . . . . . . . . . . . . . . . . . 107

            D.      Personal Use of Citizens Alliance's Employees.. . . . . . . . . 110

- ii -

Count(s)                                                                                           Page

    E.     Bulldozer and Other Farm Equipment.. . . . . . . . . . . . . . . . . . 117

    F.     Political Polling... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

        i.     The Kiley Polls.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

        ii.    The Global Polls.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

        iii.   False and Omitted IRS Tax Filings... . . . . . . . . . . . . . . 124

        iv.   Efforts to Thwart Investigation and
              Conceal the Fraud.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

    G.    Jubelirer Lawsuit... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

    H.    Ventnor Dunes Project.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

    I.     Cuba Trips Funded by Citizens Alliance.. . . . . . . . . . . . . . . . . . 137

        i.     The November 2001 Trip of FUMO
              and Senate Contractor No. 5... . . . . . . . . . . . . . . . . . . 138

        ii.    The February 2002 Trip of Person No. 29
              and Person No. 32. . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

        iii.   September 2002 Trip of Person No. 33
              and Person No. 34... . . . . . . . . . . . . . . . . . . . . . . . . . . 139

        iv.   Additional Payments by Citizens Alliance
              to Cuba Alliance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

    J.     Bristol Township War Dog Memorial.. . . . . . . . . . . . . . . . . . . . 140

    K.    Other Improper Expenditures by Citizens Alliance.. . . . . . . . . . 142

Overt Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

66-75     Mail Fraud - Citizens Alliance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Count(s)                                                                                      Page

76-90          Mail Fraud - Citizens Alliance.......................................... 167

91-98          Wire Fraud - Citizens Alliance. ........................................ 172

99             Conspiracy to Obstruct the Internal Revenue Service...................... 175

100            False Tax Return -- 2002 Form 990 of Citizens. ......................... 178

101            Aiding and Assisting the Filing of a False Tax Return --
               2002 Form 990 of Citizens

102            Filing a False Tax Return -- 2002 Form 1120 of CA Holdings, Inc.......... 180

103            Aiding and Assisting the Filing of a False Tax Return --
               2002 Form 1120 of CA Holdings, Inc.. .................................. 181

104-106        Mail Fraud - Independence Seaport Museum. ............................ 182

107-108        Wire Fraud - Independence Seaport Museum. ........................... 191

109            Conspiracy to Obstruct Justice.......................................... 193

110-141        Obstruction of Justice. ............................................... 231

               Notice of Forfeiture.................................................. 263

               Table of Unnamed Persons and Entities in Superseding Indictment.......... 265

<u>**COUNT ONE**</u>

**(Conspiracy to Commit Mail and Wire Fraud -
Pennsylvania Senate Employees, Contractors, and Assets)**

**THE GRAND JURY CHARGES THAT:**

<u>**Introduction**</u>

1.   At all times relevant to this superseding indictment:

a.   Defendant VINCENT J. FUMO was a member of the Senate of the Commonwealth of Pennsylvania ("the Senate").  He was elected on or about April 3, 1978, to fill an unexpired term in the First Senatorial District, which included areas of Philadelphia, and then elected to a full term in 1980 and every four years thereafter through the 2004 election.  In 1985, he became the chairman of the Senate Democratic Appropriations Committee ("SDAC"), a position which provided him with control of millions of dollars each year which he could dispense at his discretion for legislative purposes.

b.   FUMO maintained his principal district office at 1208 Tasker Street in South Philadelphia, as well as one or more satellite offices in other parts of the district at various times.  The main function of the district offices was to provide services to constituents who requested assistance regarding governmental matters.  FUMO maintained a staff of a dozen or more employees at the Tasker Street office, who were compensated by the Senate.

c.   FUMO also oversaw a large staff in Harrisburg of the SDAC.  These Senate employees assisted the SDAC in the annual review of the state budget, and many other legislative matters.  In total, FUMO was, at times, directly responsible for the employment and supervision of over 90 Senate employees.

d.  FUMO was recognized as a Senator with significant power and influence in political affairs in the City of Philadelphia and the Commonwealth of Pennsylvania, not only with respect to Senate affairs, but with regard to elections for and control of other local, state, and national offices.  FUMO gained this influence by, in part, supporting the candidacies of individuals for various public offices, and encouraging the selection of allies for non-elective offices.

e.  As a public official and member of the Senate, FUMO was obligated to avoid the use of Senate funds and resources for his personal benefit, or for the purpose of assisting his campaigns for public office and the political campaigns of other candidates he supported.  In part, Senators were prohibited from using Senate employees, during their compensated work hours, to serve the personal needs of a Senator, or to assist a political campaign for public office.  Senators were further prohibited from requiring, as a condition of their employment, that Senate employees perform such tasks on behalf of a Senator after working hours.  Such use of Senate funds and resources for non-legislative purposes was contrary to the interests of the Senate.  Indeed, it was a crime under state law for a member of the Senate to use state funds for personal or political benefit.  Specifically, Section 1103(a) of the Public Official and Employee Ethics Act, 65 Pa. C.S.A. § 1103(a), stated:  "No public official or public employee shall engage in conduct that constitutes a conflict of interest."  Section 1102 of the Act defined "conflict of interest" as follows:

> Use by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated.  The term does not include an action having a de minimis economic impact or which affects to the

same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

f.  FUMO was a man of substantial means and varied interests.  He was a director and the largest individual shareholder of a local bank which had been founded by his grandfather.  He was paid as much as $1 million per year by a law firm to which he was of counsel.  He also sat on the board of the Independence Seaport Museum ("ISM"), reflecting his interest in maritime affairs and history.  At times relevant to this case, he owned four homes -- a 33-room mansion in the Spring Garden area of Philadelphia, at 2220 Green Street; a beach home with an ocean view in Margate, New Jersey, at 108 South Kenyon Avenue; a 100-acre farm in Halifax, Pennsylvania, near Harrisburg; and a multi-million dollar oceanfront home in Jupiter Island, Florida.  He owned condominiums in Ventnor, New Jersey, and connected docks, at which he kept boats that he owned; and owned rental properties in the Philadelphia area.  Prior to purchasing the farm, FUMO also resided at a home occupied by Senate Contractor No. 4 in Hummelstown, Pennsylvania.  FUMO spent lavishly to support his lifestyle.

g.  Besides relying on his income and assets to support his lifestyle, FUMO regularly endeavored to gain personal benefits and gratuities from others, including entities over which he had influence, such as the Senate; a nonprofit organization he established and controlled, Citizens Alliance for Better Neighborhoods ("Citizens Alliance") (the victim of a fraud addressed in Counts 65-98 of this superseding indictment); and the  Independence Seaport Museum (the victim of a fraud addressed in Counts 104-108 of this superseding indictment).

- 3 -

FUMO stated to a close confidante his philosophy that a person is best advised to spend "other people's money."  FUMO often referred to this goal by the acronym "OPM."

### The Conspiracy

2.  From in or about August 1991 to the date of this superseding indictment, at Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

**VINCENT J. FUMO**

conspired and agreed, together with Ruth Arnao (charged elsewhere in this superseding indictment), Leonard P. Luchko (charged elsewhere in this superseding indictment), Mark C. Eister (charged elsewhere in this superseding indictment), and with others known and unknown to the grand jury, to commit an offense against the United States, that is, to knowingly devise a scheme to defraud the Senate of the Commonwealth of Pennsylvania, and to obtain money and property of the Senate by means of false and fraudulent pretenses, representations, and promises, and to use the United States mails, commercial interstate carriers, and interstate wire communications to further the scheme to defraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

### Manner and Means

It was part of the conspiracy that:

3.  Defendant VINCENT J. FUMO systematically, routinely, and improperly used the funds and resources of the Senate for his personal and political benefit.  He directed that Senate employees and contractors employed by the Senate serve him in any manner he desired, throughout the regular workday and at all hours of the day and night, to further his political goals and attend to his personal wants.  FUMO used his Senate staff in order to maintain the political

- 4 -

position he preferred, as an active participant in numerous political campaigns as well as his

own.  He also used his Senate staff in order to maintain the lifestyle he preferred: residing in four

homes in three different states, one of which was a historic 33-room mansion requiring extensive

refurbishment and maintenance; traveling extensively for pleasure throughout each year; and

operating a commercial and residential farm.

4.  While many Senate employees at FUMO's Tasker Street and Harrisburg

offices performed legitimate work in furtherance of the Senate's functions, FUMO padded his

staff, particularly at the Tasker Street office, with superfluous employees, some of whom were

FUMO's friends, or who were retained and compensated with Senate funds to serve FUMO

politically and personally, and who performed little or no legitimate Senate work.

5.  With respect to the political campaigns of FUMO and those FUMO supported,

FUMO used the Senate staff in the Tasker Street office as campaign workers, during regular

business hours.  They performed these tasks throughout the Senate district office.  One Senate

employee, whose salary steadily increased from $30,000 per year in 2001 to $46,481 currently,

for many years was given virtually no Senate duties at all; instead, she was delegated to organize

FUMO's political fundraisers, handle his political mailings, and pay FUMO's personal bills,

among other political and personal tasks.

6.  FUMO used numerous Senate employees to attend to his many personal needs.

Secretaries and aides handled all of his personal finances, and myriad personal tasks.  Several of

the many examples of this abuse of Senate funds are as follows.  For a period of approximately

two years or longer, one $31,000 a year Senate aide was used as FUMO's housekeeper, cleaning

his Spring Garden mansion approximately once a week during time compensated by the Senate.

Another Senate assistant spent much of the first 18 months of his tenure as the "project manager" for the refurbishment of FUMO's mansion.  FUMO had three drivers on his payroll (two in Philadelphia and one in Harrisburg), and when they were not driving FUMO to all of his Senate, political, and personal events and appointments, they continually ran personal errands for him. When FUMO took an annual vacation in Martha's Vineyard, Massachusetts, Senate aides drove two vehicles there for him from the Philadelphia area, loaded with the luggage of FUMO and his guests, while the FUMO party traveled on a private plane.  At the end of the vacation, Senate staffers (and, on occasion, Person No. 5,[1] an employee of a Senate contractor) returned to Martha's Vineyard to drive the vehicles home.  When FUMO acquired a Harrisburg-area farm in 2003, he delegated a number of Senate employees to undertake the numerous tasks involved in establishing the farm as a residential and commercial enterprise.  He also gave Senate equipment, including laptop computers, to non-Senate employees, including girlfriends, family members, his personal valet, and Senate contractors, and then delegated Senate computer aides to assist those people as well as perform their Senate duties.

       7.  This conduct, and the subservience FUMO attracted and exploited, was summed up in an e-mail authored by Leonard P. Luchko, a computer technician assigned to the Tasker Street office.  On or about August 24, 2003, Luchko sent an e-mail to his nominal

---

[1]    A table describing the persons and entities referred to by number in this superseding indictment is attached as an addendum at the conclusion of the superseding indictment.

supervisor, complaining that FUMO had found out that staffers in Harrisburg were aware of a

new DSL line given only to the Tasker office.  The e-mail stated in part:[2]

> It saddens me that some of our people don't think of [Person No. 1] and me as members
> of the SDCS [Senate Democratic Computer Services] team.  I am sure at times it must
> seem to them that we are premadonnas down here because we seem to get everything we
> want and don't have to deal with any of the red tape that goes along with requests for
> hardware and software.  I just wish they could see all of the bullshit [Person No. 1] and I
> have to go through every single day then they would understand why we get the so called
> special treatment.  This of course is not possible because what happens at Tasker Street
> stays at Tasker Street!

> Yes I would like to see their reaction when they are told to support the Senator his family,
> girlfriends and business associates along with the staff their friends and their kids 24
> hours a day.

> I would like to see their reaction when they are told to drive cars back from Martha's
> Vineyard on a Sunday.

> I would like to see their reaction if they had to go to Florida for a week and stay in the
> middle of nowhere and work 12 hours a day.

> I would like to see their reaction when they are told to drive people to get their hair done.

> I would like to see their reaction when they are told to take out the trash or unload a
> tracker trailer.

> I would like to see their reaction if they had to wrap 150 VJF bobble head dolls and mail
> them.

> I would like to see their reaction when they go on vacation and have to take a phone,
> Blackberry and a laptop with them and are required to check email a minimum of 4 times
> a day.

> I would like to see their reaction when they have to inform the Senator that they will not
> be available between the hours of 7 and 10 on a Saturday night because they want to go to
> the movies.

---

[2]      All of the e-mails and other materials quoted in this superseding indictment bear
the same spelling, punctuation, grammar, etc., as found in the originals of these documents,
except where brackets have been used in order to exclude the actual names of uncharged persons
and entities from appearing in the excerpt.  For example: [Person No. 1].

Yes I would like to see their reaction when they are told to be available to drive to the shore and wire a yacht for internet access on Labor Day weekend but are not told which day just be available and ready to go.

And I would REALLY like to see their reaction when they get screamed at for something that they have absolutely no control over like the internet being down. Then maybe just maybe they would understand why we have a DSL line.

PS I love my job and wouldn't trade it for any job in the Senate!

8. FUMO not only abused the Senate purse by paying employees who solely or partially did personal and political work for him, but further defrauded the Senate by overpaying employees who did both official and personal tasks. Such loyal employees were rewarded for their efforts by being classified in higher-paying jobs which paid significantly greater amounts than justified by the actual Senate tasks for which they were hired. As chairman of the SDAC, FUMO sat on the Senate Committee on Management Operations which approved the Senate's pay classification system, which FUMO then ignored in compensating certain employees on his staff. These employees were elevated to high-level positions, even though they never did any of the tasks required for those jobs according to Senate requirements. In this manner, FUMO assured the loyalty of the employees on whom he relied to carry out any personal or political task he asked, however inappropriate.

9. The Senate's Chief Clerk was a nonpartisan financial professional who was charged with responsibility for administering the Senate's finances and its personnel classification and pay management plan. In processing requests by members of the Senate to classify their Senate employees into the appropriate job classifications, the Senate's Chief Clerk expected that each member would accurately – and honestly – describe the duties of Senate employees. However, FUMO never disclosed to the Chief Clerk that many of his employees did

not do the jobs in which they were classified, nor did FUMO disclose the extensive personal and political tasks they performed on his behalf and at his direction.

10. Besides using Senate employees for his personal and political benefit, FUMO abused his authority to use Senate funds to hire "contractors" for legislative-related tasks. For example, FUMO gave a Senate contract, which ultimately reached over $40,000 a year, to a private investigator. The investigator's duty, purportedly, was to act as an investigator for the SDAC on issues relevant to pending legislation. But while the investigator assisted with a few such tasks, in the main FUMO assigned him personal and political missions, such as conducting surveillance on FUMO's former wife and girlfriends, as well as the new boyfriends whom ex-girlfriends acquired; and endeavoring to learn derogatory information regarding FUMO's political rivals. All of this was compensated with Senate money.

11. Similarly, FUMO gave Senate contracts, which reached over $130,000 a year, to political consultants who assisted FUMO in numerous political races. And FUMO used Senate contracts to compensate two close friends who were paid Senate money -- collectively totaling over $430,000 over five years -- but who did little or no Senate work at all.

12. FUMO, Arnao, Luchko, Eister and numerous other co-conspirators extensively used the United States mail, commercial interstate carriers such as Federal Express and UPS, and interstate wire communications such as faxes and e-mail, among other means of communication, in furtherance of the scheme to defraud the Senate. In part, the checks and/or pay stubs for all Tasker Street employees, representing a substantial amount of illicit compensation for personal and political tasks, were sent biweekly by overnight mail from Harrisburg to the Tasker Street office.

- 9 -

13.  In all, FUMO's fraudulent and extensive use of Senate resources for personal and political benefit caused a loss to the Senate substantially in excess of one million dollars.

14.  A portion of the activity in furtherance of this conspiracy is further explained here:

**A.     Political Activities.**

**i.     Use of Senate Employees as Campaign Aides.**

15.  Senate employees in the Tasker Street office were used extensively, during regular business hours, to assist defendant VINCENT J. FUMO in his campaigns for public office, and to assist the campaigns of other candidates he supported, including members of the Philadelphia City Council, and a candidate for the 2002 nomination for Governor of Pennsylvania.[3]  In part, Senate employees handled FUMO's campaign account and required campaign filings, organized and staffed FUMO's fundraisers, and otherwise assisted in campaign fundraising, all during regular working hours and in exchange for their compensation from the Senate.  They also, at various times, handled the campaign finance accounts of members of the Philadelphia City Council with whom FUMO was aligned, also in the course of their Senate employment.

16.  Ruth Arnao was a Senate employee classified as an "Executive Assistant III," a high-level executive position in the Senate's pay classification hierarchy.  She was paid an annual salary of $95,216 at the time of her retirement on or about September 29, 2004.  In reality, she did little work for the Senate, and instead occupied her time, during regular business hours,

---

[3]      This superseding indictment does not allege that any of the political candidates who may have benefitted from FUMO's use of Senate resources on their behalf was aware of FUMO's misuse of Senate resources in this manner.

as the treasurer of FUMO's campaign committee, Fumo for Senate ("FFS"), as the executive

director of Citizens Alliance, and in organizing FUMO's personal affairs.  Beginning in

approximately 1999, Arnao had an assistant to help her with her work.  That assistant, though

paid by the Senate, also was given virtually no legitimate Senate work.  Instead, this aide handled

personal and political matters for FUMO, and for members of Philadelphia's City Council with

whom FUMO was closely aligned, and also handled the financial affairs of the Citizens Alliance

nonprofit organization.

      17.  For a period of time in 2001 and 2002, two individuals, Person No. 9 and

Person No. 15, shared the role of Arnao's assistant.  On or about February 14, 2002, Arnao wrote

a memorandum to them to specify the duties to be shared.  Virtually nothing listed related to

legislative tasks, constituent service, or any other legitimate Senate business.  The memorandum

stated:

> I have prepared a chart of duties for both of you.  They are as follows:
>
> [Person No. 15]:  write and send out all VJF personal bills, FFS and [City Councilperson], reconcile all bank statements of checkbooks you use, input all expenditures for campaigns into cers, special occasion permits, VJF weekly sheet, new personal utility bill sheet VJF wants filled out each month (see me for it), I would like you help when you are able to to work with us on the campaigns etc., to answer my phone calls when [Person No. 9] isn't here, every day to print or send me newspaper articles pertaining to FUMO, council, governor's race etc.
>
> [Person No. 9]:  write and send out all Citizens Accts., learn to reconcile citizens bank statements, input all cers contributions, will be active in all political functions, bank deposits for contributions, champ and lo, will print out filings from cers, answer all my phone calls, work with acct when needed for citizens.
>
> [Person No. 15] and [Person No. 9], if and when there are problems with it, the two of you will try to find and fix the campaign filings together.

Our work day is from 9 to 5 with exception to election time. I will only ask for time from you when absolutely needed. If you need to come in late or early just let me know.

Lunch is for one hour per day in most cases I don't really care what time either of you go but if I am not here I need one of you here at all times. Should you need to take an extended lunch please let me know.

On the vacation sheets, please give them to me first and then I will hand them in to [the office chief of staff]. [Person No. 15] you have 5 weeks vaca and [Person No. 9] you have three weeks.

I will work with both of you and I want all three of us to be team. This is very important to me. Between the three of us we do most of the VERY important work in this office. I am proud of all that we accomplish and I want you guys to feel the same way.

18. Although Person No. 15 spent almost all of her time on these personal and political matters during the year before her June 28, 2002 departure from Senate employment, she was nonetheless paid a salary of $38,046 by the Senate in the position of Administrative Officer III.

19. When Person No. 15 left the Tasker office in late June 2002, Person No. 9 continued to handle all of the tasks listed in Arnao's memorandum. In part, Person No. 9 wrote all checks for FUMO's personal bank account, Fumo for Senate account, and Citizens Alliance accounts. She also acted as the treasurer, during her normal Senate work hours, of the campaign committee of a member of Philadelphia's City Council who was closely aligned with FUMO. She organized the collection of pledges and monies paid at FUMO's annual fundraisers, and sent numerous mailings and made numerous related phone calls. When FUMO ran for reelection in 2004, she spent the entire month before the election working on the campaign during her regular working hours, in the Senate office, and did likewise for other candidates favored by FUMO.

20. Person No. 9 and other Senate employees in the Tasker office used resources of the Senate, including a Federal Express account paid by the Senate, to further FUMO's campaigns and other political efforts.

21. During FUMO's reelection campaign in 2004, a number of Senate employees and Senate contractors held regular meetings, during business hours, in the Tasker Street office, and delegated political tasks to Senate workers. Person No. 9 maintained minutes of these meetings.

22. After the federal investigation became known to FUMO in late 2003 and early 2004, he began to change many of his illegal practices. In part, Person No. 9's job began to change. In 2004, she was relieved of her work for Citizens Alliance. Later, she began to do Fumo for Senate work at home at night, and was paid separately by FFS for this work. Previously, Person No. 9, like Person No. 15 before her, received no compensation other than her Senate salary for her work. Then, Person No. 9 began to receive $80 per month from FFS in or about November 2004, increased to $100 in or about February 2005, and $1,000 in or about October 2005. On the labor-intensive days that she sent invitations for fundraisers, she began to take vacation days from the Senate office. She discontinued her payment of campaign bills for the City Councilperson. She continued, however, to pay FUMO's personal bills at work.

23. During the time period that Person No. 9 exclusively handled FUMO's personal and political work during regular office hours, beginning in 2001, she was classified as a Legislative Assistant III, and then in the higher positions of Research Analyst II and Legislative Support LS1; her pay reached over $46,000 per year in 2006. All of these positions are supposed to involve legislative research and similar tasks, but Person No. 9 did no such work. Further,

FUMO caused false statements regarding Person No. 9's employment to be submitted to the office of the Chief Clerk of the Senate to justify the inaccurate classifications, such as a statement dated December 10, 2001, which falsely described Person No. 9's job duties as follows: "Assist with constituent services. Review and prepare correspondence. Attend meetings with Senator. Research legislation."

      **ii.**    **Senate Contractor No. 1.**

      24. On behalf of the Senate Democratic Appropriations Committee, FUMO entered into contracts with numerous non-Senate employees, for services which purportedly benefitted the SDAC. In reality, FUMO used many of these contractors' services for personal and political tasks. This was a fraud with respect to a substantial amount of Senate funds.

      25. One such contractor was Senate Contractor No. 1, a retired police inspector who acted as a private investigator. Senate Contractor No. 1 became an SDAC contractor in 1999. The annual contracts through June 30, 2004, simply stated, "To purchase the services of [Senate Contractor No. 1], Private Investigator for the services of providing information analysis and consultation to the staff of the Senate Appropriations Committee (D)." After the federal criminal investigation began, the contracts beginning July 1, 2004, were more detailed, but similarly described the services as involving investigatory and research assistance to the Committee regarding legislative matters.

      26. Pursuant to these contracts, Senate Contractor No. 1 was paid the following amounts by the Senate from 2001 through 2005:

      2001   $31,975
      2002   $46,800
      2003   $42,500

- 14 -

2004   $43,337
2005   $40,575

27.  Pursuant to these contracts, Senate Contractor No. 1 did perform some investigative services related to state matters, including a handful of background investigations. However, these tasks collectively would not justify even the amount Senate Contractor No. 1 was paid during just one year of the contract.  Rather, what Senate Contractor No. 1 spent most of his time doing, for which he was compensated by the Senate, was personal and political work assigned to him by FUMO.

28.  When Senate Contractor No. 1 first undertook an assignment for FUMO, he submitted a detailed bill, as was his standard practice, but FUMO's Senate office secretary in Harrisburg, Person No. 18, instructed him to only submit an invoice each month for the amount due, without any detail or further explanation.  Thus, in every month that followed, Senate Contractor No. 1 complied, simply billing the number of hours needed to obtain the amount allotted under his Senate contract for that month, with the notations, "Invoice as Per Senate Purchase Contract," and then, "Total Amount Due."  This practice continued until 2004, when FUMO's SDAC counsel, Person No. 10, told him he should also include the date and number of hours he worked, and describe the work as "research."  Person No. 10 also told Senate Contractor No. 1 that he should not provide further detail.

29.  Senate Contractor No. 1 in truth was inappropriately compensated for political and personal tasks.  In part, he spent a substantial amount of time trying to learn derogatory information about various FUMO rivals, including a Pennsylvania gubernatorial candidate, a member of Philadelphia's City Council, a union official, a House leader in

Harrisburg, and others.  For instance, on or about Wednesday, August 15, 2001, at 3:30 p.m.,

Person No. 19 (a Senate employee at Tasker Street who spent a considerable amount of time,

during regular working hours, assisting the 2002 gubernatorial campaign of the candidate whom

FUMO supported) wrote to FUMO:

> Senator, the . . . Campaign brought to my attention that their was an article in
> Philadelphia Inquirer Mag about [the candidate's opponent] building a new home in
> Ocean City.  I haven't been able to find the article but, I'd like to snoop around and see if
> we can dig up some info like are the contractors being used union etc.  Can I used [Senate
> Contractor No. 1] to do this?  PA Thank you.

FUMO answered, "Absolutely!  And I wonder where he is getting the money????  TY[.]"[4]

30.  Senate Contractor No. 1 then conducted an extensive investigation, for which

he was compensated as part of the Senate contract.  He reported back to FUMO on or about

August 31, 2001, with detailed information about the acquisition and construction of the house in

question in Ocean City.  FUMO replied, "Please check out all of the contractors and sub

contractors and see if they are union employers."  On or about September 7, 2001, Senate

Contractor No. 1 wrote to FUMO, Person No. 19, and Person No. 20 (FUMO's chief of staff in

Philadelphia), that he spoke to many union representatives and residents in Ocean City, and he

reported the results of his inquiries.  Person No. 19 wrote to FUMO, "Senator, what do you want

to d with this information?  Do you want to give it to the [campaign favored by FUMO] or do we

want to do something with it.  PA Thank you."  FUMO replied, "I will handle it."

31.  As part of the Senate contract, Senate Contractor No. 1 spent many months

investigating Person No. 50, a union official who became a major political rival of FUMO and a

---

[4]      FUMO habitually closed his e-mails with the terms "PA" and "TY," standing for
"please advise" or "please answer," and "thank you."

potential electoral opponent for FUMO or a member of Philadelphia's City Council whom

FUMO supported.  Senate Contractor No. 1 endeavored to gather negative material about Person

No. 50's business affairs and relationships.  In part, Senate Contractor No. 1 investigated two

bars that FUMO believed were owned by the official in order to determine the amount invested

in the bars and to identify his business partners.  Senate Contractor No. 1 also investigated

whether Person No. 50 actually owned a house in Wildwood, New Jersey that was titled in the

name of a third party, and conducted inquiries regarding others affiliated with Person No. 50.

        32.  As part of these extensive efforts, Senate Contractor No. 1 hired another

private investigator, Person No. 51, to help him.  On or about February 22, 2002, Senate

Contractor No. 1 sent a fax to the assistant, Person No. 51, asking him to do surveillance at one

of the official's bars in Philadelphia.  The purpose of the surveillance was to determine who

would attend a political meeting there during a specific time.  For two hours, Person No. 51 sat

outside the bar and videotaped everyone coming or going.  When he was finished, he met Senate

Contractor No. 1 on a side street near the base of the Ben Franklin Bridge and gave him the

original 8 mm videotape.  Senate Contractor No. 1 paid Person No. 51 in cash.

        33.  Senate Contractor No. 1 then gave the tape to an employee at the Senate

office on Tasker Street.  In turn, FUMO's staff placed the tape in a Federal Express package sent

on or about February 26, 2002, to FUMO, who was vacationing at his home in Florida, at 130

North Beach Road, Hobe Sound, FL 33455.

        34.  Senate Contractor No. 1 used Person No. 51's assistance on other political

assignments from FUMO.  At one point in 2002, Senate Contractor No. 1 obtained funds from a

staff member in FUMO's Senate office, in order to pay Person No. 51, and receive

- 17 -

reimbursement for some of his own expenses.  Senate Contractor No. 1 received the money after

he complained to Person No. 20, FUMO's Philadelphia chief of staff, about all the work he had

been doing.  Person No. 20 at first told Senate Contractor No. 1 that the money from the Senate

contract was all that Senate Contractor No. 1 would get, but then relented.  Senate Contractor No.

1 received a total of an additional $3,250, which came from the account of CA Holdings Inc., a

subsidiary of Citizens Alliance (thus representing a fraud on Citizens Alliance addressed later in

this superseding indictment).

      35.  Senate Contractor No. 1 spent hundreds of hours performing many other

political and campaign-related jobs for FUMO throughout the years, which, with the exception of

a $2,500 payment from a Fumo-controlled PAC on or about April 25, 2003, and a $5,000

payment from Fumo for Senate on or about October 19, 2004, were compensated only through

his Senate contract.  The $5,000 payment occurred when, after FUMO was aware of the

investigation, Person No. 20, who was FUMO's chief of staff in the Tasker Street office, handed

Senate Contractor No. 1 that check unexpectedly, stating that the check was to cover all the

political work Senate Contractor No. 1 had done.  However, this amount was entirely inadequate

for this purpose, as FUMO well knew, and was given as part of a larger effort by FUMO to

attempt to cover his tracks as the federal investigation of FUMO intensified.

      36.  The many political tasks performed by Senate Contractor No. 1 over the years

included, among many others, the following:

    --      In or about the spring of 2002, FUMO asked Senate Contractor No. 1 to conduct

            surveillance at the Philadelphia City Council chambers to identify and videotape a

            person, believed to be aligned with the rival union official, Person No. 50, who

was distributing fliers attacking FUMO's City Council ally and questioning the financing of Citizens Alliance, the nonprofit organization which FUMO controlled.

--    FUMO assigned Senate Contractor No. 1 to surveil a large campaign sign, supporting the gubernatorial candidate FUMO favored, from May 2, 2002 to May 4, 2002, at the Riverview Plaza on Delaware Avenue in Philadelphia. Senate Contractor No. 1 was told that the banner may be stolen because it was posted across from the headquarters of a union that was supporting the opposing candidate. Senate Contractor No. 1 retained Person No. 51 for this task, which took 22 hours.

--    Senate Contractor No. 1 acted as a bodyguard for a City Council candidate favored by FUMO on election day in the spring of 2003, and conducted many investigations about that candidate's opponent.

--    He extensively investigated FUMO's 2004 Senate primary opponent, and also a supporter of the opponent who started a web site called DumpFumo.com.

--    He investigated a candidate for Pennsylvania Supreme Court, who was opposed to a candidate favored by FUMO, to try to get adverse information about him to use against him in the campaign.

37. At the same time, FUMO gave assignments to Senate Contractor No. 1 regarding personal matters as well. These related to FUMO's ex-wife, two of FUMO's subsequent girlfriends, and others. Senate Contractor No. 1 received no compensation for these

tasks other than the funds paid by the Senate, and he performed these tasks in order to retain the Senate contract.

38.  For example, FUMO had Senate Contractor No. 1 determine whom FUMO's ex-wife was dating after their divorce.  Senate Contractor No. 1 completed the surveillance as requested and identified the individual who was dating FUMO's ex-wife.

39.  After FUMO broke up with another girlfriend in 2002, FUMO directed Senate Contractor No. 1 to surveil the woman on approximately six occasions, for six to ten hours each time.  In part, he was told to identify her companions and activities and to contact local police to have her arrested if it appeared that she was driving while intoxicated.  In addition, FUMO, using Senate employees, also endeavored to revoke the Pennsylvania driver's license of the woman's new boyfriend, based on a conviction for drunk driving.

40.  Similarly, in 2005, FUMO directed Senate Contractor No. 1 to conduct surveillance and an investigation regarding another former girlfriend and her new boyfriend.

41.  FUMO also directed Senate Contractor No. 1 to conduct these additional personal tasks as part of his Senate contract:

--    FUMO asked Senate Contractor No. 1 to obtain private medical information regarding a relative of FUMO.

--    Senate Contractor No. 1 researched property values in Martha's Vineyard at FUMO's request.

--    After FUMO became aware of the federal investigation, he directed Senate Contractor No. 1 to conduct numerous sweeps for electronic listening devices at the Tasker Street office, Harrisburg farm, and Green Street residence, as well as at

the offices of City Councilpersons aligned with FUMO, and the home of Ruth

Arnao.

**iii.**    **Senate Contractor No. 2 and Senate Contractor No. 3.**

42.  Another contract recipient was Senate Contractor No. 2, a political consultant

who was extensively involved in the campaigns of FUMO and others whom FUMO supported.

He received a Senate contract in or about 1999, which provided:

> To purchase the services of [Senate Contractor No. 2] to provide analysis and advise
> Committee staff and the Chairman on issues pertinent to the City of Philadelphia and
> other local government bodies relating to their operations.  Interact with community
> organizations in regard to the impact of government finance on these organizations.
> Provide liaison with elected and appointed officials, as well interact with business
> community.  Attend meetings from time to time in this regard with Chairman and other
> staff.  Provide analysis on such other projects as the Chairman and Executive Director
> requests.

The contract changed in 2004 (after FUMO became aware of the federal investigation), and a

more extensive letter agreement also was attached, which also called only for legislative tasks

benefitting the Senate.  Pursuant to the annual contracts, Senate Contractor No. 2 was paid the

following amounts from 2000 through 2005:

|      |          |
|------|----------|
| 2000 | $73,500  |
| 2001 | $75,000  |
| 2002 | $75,000  |
| 2003 | $80,000  |
| 2004 | $80,000  |
| 2005 | $80,000  |

43.  During these years, Senate Contractor No. 2 assisted FUMO extensively and

continuously in the campaigns of FUMO and many others whom FUMO supported.  However,

during this time, Senate Contractor No. 2 received only a few small payments from Fumo for

Senate and from another political action committee controlled by FUMO.  Moreover, during

- 21 -

those years, Senate Contractor No. 2 was not paid by the other candidates for whom he worked

extensively on FUMO's behalf.  Rather, Senate Contractor No. 2 was largely compensated only

by the Senate contract for all of this political work on FUMO's behalf.  While Senate Contractor

No. 2 at times assisted FUMO on matters related to legislative issues, those efforts did not justify

the amounts he was paid by the Senate, and a significant amount of the compensation Senate

Contractor No. 2 received from the Senate was for political campaign work.

      44.  Another political aide, Senate Contractor No. 3,[5] was paid up to $55,000 per

year under a contract with the SDAC arranged by FUMO, which purported that Senate

Contractor No. 3 would provide consulting services regarding legislative matters.  However, in

reality, Senate Contractor No. 3 almost exclusively aided FUMO on political campaigns.

      45.  The fact that Senate Contractor No. 3, along with Senate Contractor No. 2,

worked almost entirely on political campaigns for FUMO is evident in an e-mail exchange in

early May 2003.  At that time, Senate Contractor No. 3, at FUMO's behest, was working full-

time in support of a City Council candidate FUMO supported, and was compensated only by the

Senate contract.  When the rival candidate's campaign raised a question about this, FUMO's

Harrisburg chief of staff, Person No. 17, wrote to Senate Contractor No. 3 to learn the facts.

When asked to identify the legislative projects he had worked on, Senate Contractor No. 3

replied that there were not any.  On or about May 2, 2003, Senate Contractor No. 3 informed

Person No. 17 that he generally attended a community event on FUMO's behalf "every other

---

[5]    Senate Contractor No. 3 was referred to in the original indictment in this matter as Person No. 5.  In this superseding indictment, he is referred to only as Senate Contractor No. 3. A different person has been designated Person No. 5 in this superseding indictment.  With this exception, all other designations used in the original indictment are unchanged.

week or so," wrote letters of recommendation, and answered constituent letters "generally to constituents who want to know who their elected officials are or how they can access governmental services." Notably, he added: "The work I've done for [Senate Contractor No. 2] has been almost entirely political in nature -- relating to the campaign last fall or for the city council races here." Senate Contractor No. 3 thus confirmed the political work of two people, himself and Senate Contractor No. 2, whom FUMO was fraudulently paying with Senate money.

       iv.    **Computer Services.**

      46. FUMO also used the assistance of computer technicians compensated by the Senate to assist his and others' campaigns.

      47. For example, Person No. 1 was a Senate employee assigned to provide information technology assistance at the Tasker Street office. Person No. 1 was occasionally delegated, as part of the time for which he was compensated by the Senate, to assist in political campaigns. In part, Person No. 1 spent considerable time setting up phone banks for an election day operation on behalf of a presidential candidate FUMO supported in 2004 (a lengthy assignment coordinated on FUMO's behalf by Senate Contractor No. 2); installed software in the campaign office of a Congressional candidate FUMO supported; installed software in a Democratic campaign office; set up computers and performed other tasks assisting FUMO's favored gubernatorial candidate in 2002; and set up numerous loudspeakers for automobiles to be used by FUMO or others he favored for campaign purposes.

B.    **Personal Services**.

48.  FUMO made extensive and continuous use of Senate employees and resources to perform myriad tasks to benefit his personal life.

i.    **Person No. 19.**

49.  Person No. 19, during his entire tenure as FUMO's special Senate assistant from 1997 through August 2002, worked on numerous and varied non-Senate tasks, including political campaigns, matters on behalf of Citizens Alliance, and an 18-month stint serving in nearly a full-time capacity as the project manager who coordinated the work of contractors and laborers who were involved in the expansive restoration and refurbishment of FUMO's mansion at 2220 Green Street in Philadelphia.

50.  Person No. 19 was paid $29,000 per year as of January 1, 1998, as a Legislative Assistant III; he ultimately earned $45,857 as a Research Analyst III.  He left Senate employment on or about August 9, 2002.  His job classifications involved high-level legislative research.  None involved personal or political tasks on behalf of a Senator, and FUMO never disclosed to the Senate that Person No. 19 did any such work.

51.  Soon after being hired, Person No. 19 was assigned by FUMO to oversee the refurbishment of the mansion at 2220 Green Street.  Built in 1884 by Samuel S. Fleisher, a noted civic leader and patron of the arts in Philadelphia, it had been converted in the 1960s into apartments.  After FUMO purchased the property in or about 1994, he endeavored to restore it to a single-family mansion to be used as his residence, and for lavish entertaining.  FUMO wanted to return the house to its original splendor, but also modernize it.  This entailed knocking down walls, restoring the woodwork, removing layers of paint that hid gold leaf accents, adding central

air conditioning and modern wiring, and building a garage, a wine cellar, a gun range, and a rear courtyard.

52. For the first 18 months of his employment by the Senate, Person No. 19 spent approximately 80% of his time on this job, coordinating and supervising the numerous construction contractors. He received no payment other than his Senate salary.

53. In later years, Person No. 19 became involved in policy matters, and the Green Street work diminished in its intensity and scope. But FUMO continued to present frequent requests for assistance related to the house, and Person No. 19 responded to all of them as part of his work duties. Available e-mails confirm and show more broadly that FUMO made demands on Senate employees regarding everything in his life, from the significant to the trivial. A small sample of these e-mails concerning the Green Street house, during just one 2½-month period after the major refurbishment of the mansion was finished, are the following sent by FUMO to Person No. 19 (in each instance, Person No. 19 performed the task that was delegated to him):

-- Saturday, October 21, 2000, at 6:23 p.m.:

I need the following:

Sidewalk heat hooked up
All heaters checked and make sure they are ready for winter
3rd Fl. guest bath:
        Sink - repair drain, and loose faucet knob
        Toiler - when you flush, it keeps running
2nd Fl. Master bath:
        Jacuzzi tub - neck jets are not working properly & drain does not
The have all of the bathrooms check out, toilets, etc.

- 25 -

-- Wednesday, October 25, 2000, at 5:05 p.m. (copy to secretary Person No. 22):

> I want a locksmith to come to Green Street and change all of the locks, the day that [FUMO's wife] moves out. Ideally I would like to have a Master key that works both Green St. and the shore, with separate keys for both locations. I also want al of [her] codes and any one else she has in the alarm system removed that day as well. PA ASAP TY

-- Thursday, November 9, 2000, at 11:17 a.m.:

> Please get the repairs started there now. See if we can start painting now as well. We don't have to wait until 12-1-00 to start fixing.

> Did the fix the leak on Tuesday?

-- Friday, November 10, 2000, at 9:43 a.m.:

> [Person No. 19], please make up a schedule of what has to be done in Green Street and when it will be started and completed, etc. Please let me see this ASAP.

-- Monday, November 13, 2000, at 10:38 a.m.:

> We also need the lighting on the front f the house fixed. We probably need new bulbs and [Person No. 37, a contractor] to adjust the switches.

> Also, please tell [Person No. 37] that the TV signals are very bad with a lot of interference on the regular channels as well as some of the TV monitors. Further he was supposed to add a monitor to the 2 in the garage that would have the garage inside camera on it. We will need PJ to build another holder for it.

> The front door intercom is filled with static again as well.

> The window sill in the 3rd floor guest room where I sleep needs to be repainted and PJ has to fix the baseboard in the corner as well.

> Please add all of these items, as well as the ones I e-mailed you before about, to the list so we don't forget any of them.

-- Saturday, November 18, 2000, at 11:22 p.m. (copy to Person No. 22):

> Have all of the outside water lines been turned off and DRAINED. This should be done at the shore house and the dock and at Green Street as well. THE TEMPERATURE IS SUPPOSED TO GO DOWN TO 18 ON

- 26 -

THANKSGIVING!!!  So this has to be done IMMEDIATELY!!!  Please tell Bob and PJ.

-- Friday, November 24, 2000, at 6:55 p.m.:

I would like a plan of attack in place including a schedule of who is going to do what when!  This would include, PJ, the plumber and [Person No. 37] if necessary.

-- Saturday, December 2, 2000, at 12:18 p.m.:

I need a granite top on the "filing cabinet" between the M/br and the dressing room.  I would like it to match the marble on the sink as close as possible.  PA TY

I also need the mirror installed in the security closet as well.  TY

-- Monday, December 4, 2000, at 9:58 a.m.:

I need keys to the house.  Not the master but regular keys!  And I also need garage door openers!  Does [Person No. 21, a Senate aide who cleaned FUMO's house] have a key and new opener?

-- Monday, December 4, 2000, at 11:38 a.m.:

I want EXTERNAL Electric meter readers installed on Green Street for BOTH the gas and electric meters so I don't have to deal with people wanting to come in and read meters.

Also, I want the gas lamp in the front of the house fixed once and for all.  Do whatever you have to to find out who at the Academy of Music handles their maintainance and get our's to work like their's.  I don't care what it costs.  Get parts made if you have to.

Also, add these to the list.

-- Thursday, December 7, 2000, at 10:48 a.m.:

There area a lot of lights out on the deck and in the rear yard that have to be replaced.  Also, I need a section of the rope lighting repairs in the rotunda.  We have 300' of it in the closet on top of the washer/dryer on the 2nd floor.  I also need a dimmer switch put on the chandelier in the vestibule.  Maybe the same kind that [Person No. 37] has on the sconces so we can operate it on the system as well as directly.  And I need [Person No. 22, FUMO's Senate secretary] +/or

[Person No. 15, a Senate aide] to come up and label with the label maker, every switch plate so we know what it does.

-- Monday, December 11, 2000, at 11:48 a.m. (entitled, ("LEAKS!!!!!!!!!!!!!!!!! FUCK-FUCK-FUCK!!!!!!!!!!!!!")):

[FUMO's girlfriend, Person No. 39] tells me that she saw a small leak in the tunnel AGAIN!!!!  WE HAVE TO STOP THIS ASAP!!!!!

-- Monday, December 18, 2000, at 5:55 p.m.:

We are still having trouble with the front door intercom.  It is unclear and has a lot of hum.  Please get this fixed ASAP.  Also when are we getting the new cameras installed?  PA TY

-- Monday, December 18, 2000, at 10:23 p.m.:

The hum in the phone lines is getting worse.  Please have [Person No. 37] fix it. Also I want an operating portable working on each floor:

             Basement - Family room
             1st Floor - Kitchen
             2nd Floor - VJF Office
             3rd Floor - Gun Room
             4th Floor - Pool room near back room

-- Wednesday, December 20, 2000, at 9:16 p.m.:

Please have PJ put a weather strip on the bottom of the vestibule door.  And also remember to tell the plumber that in the winter it is freezing in the vestibule because the radiator doesn't get hot enough in there.

-- Thursday, December 21, 2000, at 11:23 p.m.:

The thermostat on the first floor near the powder room does not control the heat on that floor properly!  In fact the radiators get very hot when the thermostat doesn't call for it and I then have to turn on the air conditioning to get the temperature down.  Please have both [Person No. 37] and the plumber check this out for me.

Also, please remember to tell PJ that the closet looks great EXCEPT for the side that faces the stairs.  It looks pretty shitty and not the kind of quality work that he usually does.  PA

Finally, the painter was here for hours today and all he did was put a coat or 2 of white paint on the closet! There are a lot of things that he can do while he is waiting for the paint to dry. I think he is really wasting a lot of time! I don't think Bobby is aware of this.

-- Thursday, December 28, 2000, at 11:31 a.m.:

I now understand that they fucking part can't get until next week. That is ridiculous! Find out where the damn factor is and call them direct and order a whole new motor, etc. and have it Fed Ex's directly to us NOW!!!!

-- Sunday, December 31, 2000, at 9:52 a.m.:

I have no idea how the snow melting system ultimately worked in Green Street. However, when I left @ 7:00 AM on the 30th the back (on Brandywine St.) was wonderful but the front (on Green St. and the walkway up to the steps) was not working. Please find out what went wrong here and get it fixed before the next snow storm!

**ii.    Person No. 21.**

54. FUMO used Person No. 21, a Senate clerk, to clean his house approximately once per week between 2000 and 2002. During these years and at other times, Person No. 21 was also regularly dispatched to FUMO's houses in Philadelphia and Margate, New Jersey, to meet repairpersons during the workday and for other tasks. Many other Senate employees over the years were sent to FUMO's houses for similar tasks.

55. Person No. 21 worked for the Senate from 1990 to 2003. As of December 27, 2001, she was promoted to Clerk Typist IV, and paid $31,464 per year, at which her salary remained until she left Senate employment as of January 16, 2003. Nowhere in Person No. 21's personnel file did FUMO disclose to the Chief Clerk of the Senate that Person No. 21 performed the personal tasks which FUMO assigned to her.

56. FUMO's use of Person No. 21 to perform non-Senate duties on his behalf is reflected in a number of available e-mails. For example, on or about Friday, April 6, 2001, at 7:31 p.m., FUMO sent this e-mail to Person No. 19, another Senate aide: "The toilets on the 4th floor and the basement do not work! The on on the 4th floor won't stop running when you flush it. The one in the basement doesn't flush at all! Please get these fixed ASAP. PA TY[.]" Person No. 19 replied, "Senator, the plumber came out but, [Person No. 21] couldn't wait so they couldn't fix anything. I'll have him out on Wed when [Person No. 21]'s there again." FUMO answered, "Where the fuck was she and why couldn't she wait?"

57. On or about March 25, 2001, FUMO wrote an e-mail (subject: "Green Street") to Person No. 16, one of the Senate aides who organized and assisted FUMO's personal life (in a communication which was joined by FUMO's girlfriend, Person No. 39):

FUMO:                  I think we need a really good house cleaning. [Person No. 21] does not do much when she is here! (We should talk about that as well.) In the meantime, have [Person No. 22, FUMO's Senate secretary in Philadelphia] get Oswald's guys up here for a big cleaning. PA TY

[Person No. 16]:      ok but to hear [Person No. 21] talk about it, your house has never been this clean. In fact that is exactly what she said.

FUMO:                  Well do me a favor and call [Person No. 39] and see what she suggests has to be done. I know it's cleaner than when [FUMO's ex-wife and a prior maid] were here, but that is not saying a lot! PA TY

[Person No. 16]:      In another e mail, [Person No. 22, Fumo's secretary] suggests we wait 2 weeks till the 4th floor is complete.

[Person No. 39]:      [Person No. 16], I think [Person No. 22] is right. The house is surface kept up, but the wood floors, wood walls, sconces, etc. need to be kept also. Vince has such a beautiful house and beautiful pieces and he has worked hard to make it that way, that at

least once a month a professional should come in and do the heavy work.

58.  Subsequently, Person No. 21 began to receive checks for $100 on approximately a monthly basis from Champion Investments, an account handled by a Senate employee which paid expenses related to FUMO's house and also his real estate investments. The checks were, for the most part, written between 2000 and 2002, and compensated Person No. 21 for additional cleaning work at FUMO's beach house at 108 South Kenyon Avenue in Margate.  These checks, however, did not pay her for the personal services she provided for FUMO during the regular Senate workday, including weekly cleaning services at FUMO's home in Philadelphia, which were compensated by the Senate.

59.  Person No. 21 later filed for a disability retirement from the Senate.  In or about May 2002, FUMO hired Person No. 23, a non-Senate employee, to replace her as his housecleaner.  During regular work hours, Senate employee Ruth Arnao met Person No. 23 at FUMO's house at 2220 Green Street in Philadelphia.  Arnao showed Person No. 23 how FUMO liked his clothes folded, and his bed made.  Arnao instructed Person No. 23 to then go to the Senate office, where they would discuss price.  Person No. 23 went there, was paid for the first day, and they agreed on $100 each time, which she later picked up in cash each time at the Senate office.

60.  During the summer of 2002, Person No. 23 also met Person No. 21.  Person No. 21 showed her how the job was performed.  Person No. 21 showed Person No. 23 a few things that Arnao did not, including how to clean the elevator, and where the cleaning supplies were located.

iii.    **The Farm.**

61.  On or about January 7, 2003, FUMO completed the $515,000 purchase of a 99.9 acre farm located at 670 So. River Road in Halifax, Pennsylvania, which is approximately 18 miles north of the State Capitol.  FUMO's ambition was to establish a profitable farm with livestock and agriculture.  To do this, he used the assistance of several SDAC employees in Harrisburg, and a Senate contractor paid $45,000 or more per year.

62.  At first, one Senate employee who was extensively involved was Person No. 27, a budget analyst with more than 20 years of Senate service.  At the time of his retirement from the Senate on or about June 25, 2003, Person No. 27 was earning an annual salary of $118,031.

63.  E-mails from FUMO to Person No. 27 provide examples of FUMO's repeated use of his employees for personal needs at the farm.  They include these:

-- Friday, December 27, 2002, at 10:37 a.m.:

> Were are we with the Farm Planner?  I want to start laying out the pastures, and pond and barn locations, etc.!!!  Also, I am thinking about raising Alpacas.  I understand that they can be very profitable.

-- Wednesday, January 8, 2003, at 5:19 p.m.:

> I understand that I am entitled to receive $4,200/year from the "Government" if I don't plant on the farm.  Please find out where we apply for this, and if this number is correct, and what deal we have to sign on to get it.

> Also, please find out if we do this, can we still grow food for our own animals?

-- Saturday, March 15, 2003, at 10:43 a.m.:

> Remember that we need to discuss what kind of "outbuildings" (Garages, Feed storage, workshop, etc.) that we need and where they should go.  We also need to have them tell us what kind of tractor we should get as well.

Person No. 27, in turn, provided FUMO with regular reports regarding laying out the pastures

and fields, planting and fertilizing of vegetation, care and feeding of livestock, rehabilitation of

existing structures, fencing, creation of a pond, and design of barns.  Person No. 27 conducted

this research and held meetings with knowledgeable persons during regular Senate working

hours.  Person No. 27 was not compensated for this work other than through his Senate salary.

        64.  By the end of March 2003, Person No. 27 was spending nearly all of his time

during the workday on tasks related to the development of the farm, without any objection from

FUMO.  However, on or about March 27, 2003, Person No. 17, who was the executive director

of the SDAC and was not involved at the time in the conspiracy to misuse Senate resources,

objected to Person No. 27's abandonment of necessary Senate work.  When FUMO was advised

of this, FUMO wrote an e-mail to Person No. 27, stating in part, "Your duties to the committee

come absolutely FIRST and FOREMOST.  I only asked you to help with the farm because I

though it was something that you might enjoy doing on your own.  But I cannot and will not pay

you with taxpayer money to do work on the farm.  So please give me a memo of who you have

contacted on stuff regarding that and I will take over the project completely."

        65.  In response, Person No. 27 explained that the work could only be done during

the business day, and opined that he was best qualified to do it.  He added, "If I have some

cooperation I can meet my obligation to the Committee and get the farm stuff done too."  FUMO

replied, "OK You just MUST put your committee work before anything like the farm."

        66.  Person No. 17 believed that the matter was resolved, and that Person No. 27

had returned to full-time Senate work.  But unbeknownst to Person No. 17, Person No. 27 then

continued working on farm-related matters, and FUMO continued to regularly assign farm-

related tasks to Person No. 27, as if nothing had happened.  Further, even though Person No. 27

stated his plan to retire from the Senate in June 2003, and offered to help FUMO with the farm

thereafter, FUMO instead instructed Person No. 27 to bring another Senate employee, Person No.

26, up to speed to take over.  On or about Wednesday, April 2, 2003, at 1:13 p.m., FUMO's

Harrisburg secretary, Person No. 18, wrote to Person No. 27:

> Vince called while you were at your meeting and asked me to ask you to send him the
> drawings for the Cattle Run and Horse Barn.  Also, he would like to know when the guy
> is going over to plant.
>
> He asked that you start getting [Person No. 26] involved in the farm stuff so that when
> you retire he can take over.
>
> Thanks,
>
> P.S.  i sent an e-mail because I was afraid that I would forget to tell you.

67.  Person No. 27 carried out this directive, thus assuring that FUMO would

continue to receive assistance at the Senate's expense in developing the farm after Person No. 27

retired.  For example, on or about Friday, May 16, 2003, at 9:34 a.m., Person No. 27 wrote to

FUMO, with a copy to Person No. 26:  "[Person No. 26] and I met yesterday with representatives

of PPL to get their thoughts on how to best deliver underground electrical service to the various

buildings on the farm property."

68.  Person No. 26's assigned Senate duties were to drive FUMO when FUMO

was in Harrisburg, and other ministerial tasks, involving the processing of invoices of Senate

contractors, the handling of routine constituent requests, and the delivery of paperwork at the

State Capitol.  In the late summer of 2003, Person No. 26 moved onto the farm property with his

family, and began to spend significant amounts of his time on the farm during regular Senate hours.

69.    FUMO used other Senate employees to assist when concerns arose regarding Person No. 26's performance on the farm.  On or about Monday, October 6, 2003, at 12:57 p.m., FUMO's Senate secretary in Harrisburg, Person No. 18, wrote to FUMO:  "I took [Person No. 3, a Senate budget analyst] with me.  She was shocked at the condition of the stalls and horses.  I've asked her to e-mail you her concerns."  At 1:11 p.m., Person No. 3, a $39,000 per year budget analyst on the Harrisburg staff, sent a detailed e-mail to FUMO, with a copy to Person No. 18, reporting what she and Person No. 18 saw at the farm on "Friday afternoon."  She stated that the horses and stalls were in poor condition.  At 2:45 p.m., Person No. 18 wrote to FUMO, "I am going to leave here at 3 and go up to check on the horses.  I am going to tell [Person No. 26] that we are going and to tell his children to have the stalls cleaned, the horses groomed, and their hooves picked.  I left a message for the vet asking him to call me back regarding the horses.  I'm also going to tell [Person No. 26] that we will e going up daily to check on their condition and make sure that everything is in order.  Bunch of lazy asses."  FUMO replied, "Great!  TY."

70.    That night, at 7:22 p.m., FUMO wrote an e-mail to Person No. 17, his executive director, who had earlier objected to Person No. 27's work on the farm during the spring budget season.  FUMO wrote, "are you in the Harrisburg area?  We have a problem with [Person No. 26].  I hate to bother you but he is 'your guy'!  PA asap[.]"

71.    At 8:40 p.m., Person No. 17 wrote an e-mail to FUMO, now accepting the use of a Senate employee as a farm worker:

[Person No. 18] said there is a list of chores that need to be done on a daily basis. That is your list and we need to tell [Person No. 26] that that is what you want done and that [Person No. 18] and [Senate Contractor No. 4] and me if necessary, will inspect. They should maintain a checklist and understand that until you are satisfied that they are properly executing the routine, and are confidtnt that they will follow though they will be supervised. He must agree to do that or we find someone else.

Finally, he is one whose life has been improved 1000 percent because of you. He owes it to you to do it your way. I feel my job here is too make him understand that.

He is a little thick.

[Person No. 26]'s problm is that he eats a lot of crap from [his wife] and he doesn't drive the ship. We have to sit on him a little.

72. FUMO responded, "I would appreciate it if you would get to the bottom of all of this. [Person No. 26] e-mailed me that he wants me to meet with him and [his wife] alone. I do not intend to do that. I would prefer that you meet with them for me. Check with [Senate Contractor No. 4] and [Person No. 18] first. This is Extremely disappointing to me and yes, you are right: No good deed goes unpunished!"

73. The huff was resolved two days later, when FUMO agreed (through his Senate employees) to pay Person No. 26's wife $200 a week. Person No. 26's family also lived at the farm rent-free. However, Person No. 26 continued to carry out farm-related tasks during Senate hours, and to receive no separate compensation himself. Further, as promised, Person No. 18 and Person No. 3 went to the farm during Senate working hours, at first daily for many weeks, then less frequently as they became satisfied that Person No. 26 and his family were properly performing the farm work.

74. FUMO's Senate secretary in Harrisburg, Person No. 18, became extensively involved in managing farm matters for FUMO, as part of her regular job. She also received no

separate compensation for this work.  As of June 12, 2003, she earned $76,123 per year, as an

Executive Assistant IV, and then was promoted to Legislative Support LS3 as of June 10, 2004,

at $82,593 per year.

       75.  This is a sample of FUMO's correspondence with Person No. 18 and others,

in which he pervasively relied on Senate employees to manage his personal farm:

-- Sunday, May 4, 2003, at 5:29 p.m. (FUMO to Person No. 16, a Senate aide in
Philadelphia):

    Have [Person No. 18] or [Person No. 26] get the PO Box so it is convient for
    someone to check it on a regular basis.

-- Tuesday, July 15, 2003, at 11:38 a.m. (in discussions surrounding the purchase of large
fuel tanks for the farm, Person No. 18 wrote to FUMO):

    [Person No. 26] hasn't actually seen these tanks.  I am going to take a ride to
    Dillsburg either today or tomorrow and look at them, get the specs, etc

-- Wednesday, August 6, 2003 at 11:07 a.m. (Person No. 18 wrote to FUMO regarding
the sale to FUMO of a neighboring farm property):

    Ed just called that the [seller's] attorney returned the sales agreement signed and
    virtually unchanged.  [Person No. 26] is on his way down to pick it up.  You need
    to sign it and return it to Ed with a check for $200.  Should I sign your name and
    get a check from [Person No. 9, the Senate employee who handled FUMO's
    personal account]?"

FUMO replied, "Yes, Please do!!!!"

-- Saturday, August 16, 2003, at 5:40 p.m. (FUMO to Person No. 18):

    Did they do the borings at the farm last week?  Do we have a start date for the
    cattle barn construction yet?  Where are we with the pasture fencing?

-- Wednesday, September 3, 2003, at 10:34 a.m (FUMO to Person No. 18):

    Did [Person No. 26] go and check out the horse barn that Conestoga Builders built
    so we can decide on ordering our's?  BTW, when does construction start again?

-- Friday, September 5, 2003, at 9:35 a.m. (FUMO to Person No. 18):

Did [Person No. 26] ever check out the Horse Barn that Conestoga builders built?

Did they install "Quick Books" on your computer yet?

Also, did [Person No. 42, a farm contractor] find out about the Geothermal heating system for the run in barn?  We are going to install automatic watering units in each of the stalls in the horse barn.  Is there anything that has to be done while they are building it for this?

Where are we with the electricity stuff?

-- Friday, September 12, 2003, at 1:19 p.m. (FUMO to Person No. 18 and Person No. 26):

We need to do the following ASAP:
1 - Set up the Run in barn for the horses
2 - Buy hay and feed, etc.
3 - Buy buckets and other supplies for feeding and watering the horses
4 - Buy 2 saddles, bridles and whatever else we need for the horses as well.
5 - Get busy with the fencing ASAP
Anything else you can think of?

-- Saturday, September 13, 2003, at 11:28 p.m. (FUMO to Person No. 18 and Person No. 26, and to Philadelphia Senate employees Arnao, Person No. 16, and Person No. 22):

We have to send [Person No. 25, one of FUMO's Philadelphia drivers] to Paulsboro, NJ to pay the balance of $5,200 (including delivery) for the horses, this week.  However, we have to coordinate this with [Person No. 26] since he has to get the barn ready as well as buy straw, oats, bridles, etc. so he can receive them properly this week.

-- Tuesday, September 30, 2003, at 8:15 a.m. (FUMO to Person No. 18, copy to Person No. 26):

Where are we with the electricity at the farm?  If we need [Person No. 10, FUMO's SDAC counsel] to call PECO, please have him do that today!  Also, when is the farmer going to cut the corn and plant our grass?  We really have to get this done NOW.  Also, we need to start the fencing so that we can have a place where we can allow the horses to graze and run around, etc.

-- Monday, October 6, 2003, at 10:48 p.m. (FUMO to Person No. 18):

> [Person No. 18] what outstanding balances are still remaining on the farm?
> Cattle Barn
> Horse Barn
> Fencing
> Well drilling
> Corral Fencing
> Anything else???

-- Sunday, November 30, 2003, at 1:39 p.m. (FUMO to Person No. 18, Person No. 26, copy to Senate Contractor No. 4):

> Please make sure that they get the corn out of all of the remaining fields and get them planted by the end of next week!!!!

-- Wednesday, January 7, 2004, at 10:19 a.m. (Person No. 18 to FUMO):

> [Person No. 26] and I just spoke with [Person No. 41] from Penn State regarding the boer goats. We both feel very good about the goats after talking to [Person No. 41]. He said you want the buck to be 100% boer (and this one is), but that you do NOT want the doe's to be 100% boer. He said that you want them to be mixed boer and dairy goat, even though we are breeding them for meat sale. This is because the doe's job is to have kids and if she is 100% boer she will not have the good milk that a mixed doe has and her babies will weigh less and grow more slowly than the mixed breed. He said that usually the kids are 9 months old when you sell them and that they weigh between 50 and 80 pounds. Goat meat is selling for around $8/pound. We have to decide quickly if we want these goats, as she has other offers, but is willing to give us first choice.

FUMO replied:

> OK. Get her a check. Also, I have 3 estimates for fencing that were FAXED here. What are they for? PA

-- Monday, January 12, 2004, at 10:20 a.m. (after a long update to FUMO on various farm matters, Person No. 18 wrote the following):

> Also, [Person No. 26] met with [Person No. 41] from Penn State who showed him where the best place is for the goats. [Person No. 41] is going to come into the office next week and sit down with you, me and [Person No. 26] and show all of us what he thinks is the best place for the goats.

-- Thursday, April 29, 2004, at 9:05 a.m. (FUMO to Person No. 18 and Person No. 26):

>    Is Conestoga ready to do the goat barns starting May 1 AS PROMISED???  Please start calling them TODAY!!!

>    I also want al of the fencing done in the next week or so, including the wood fencing around the riding ring and around the horse barn!!!

When Person No. 18 replied that Conestoga said construction would not begin until the second or third week of May, due to recent rains, FUMO answered,

>    Get on his ass.  That is NOT acceptable!!!  We need those done NOW!!!  And from now on when we sign with them, I want a penalty clause if they don't finish by a certain date! . . . Tell him that I am REALLY pissed off and am thinking of suing them this time based on their representations to us!!!

-- Friday, April 30, 2004, at 10:24 a.m. (Person No. 18 to FUMO):

>    Do you still want to do the sure foot rubber stuff for the riding ring?  [Person No. 26] just talked to the guy.  We need 8 tons of the stuff.  The cost if $2500.  It takes about a week for them to get it to us. [Person No. 42] says that we are ready for it anytime.  Should we order it?

FUMO replied, "Yes."

-- Thursday, May 20, 2004, at 10:17 a.m. (after a long update to FUMO about farm issues, Person No. 18 wrote the following):

>    Also, I have to supply a site plan to the appraiser.  Either [Person No. 26] or I will take it over to them today.

    76.  In or about December 2004, as the investigation intensified, FUMO caused

Person No. 26 and his family to move off the farm.  In the meantime, Person No. 18 continued

her work supervising farm matters, now principally aided by Person No. 42, a local contractor.

For instance, on Tuesday, February 1, 2005, at 3:41 p.m., Person No. 18 wrote to FUMO:

"[Person No. 42] and i have been going back and forth all day talking about the best way to

market the goats.  i.e., sell them at market, sell them to a butcher, sell them outright for breeding.

Any thoughts on the poor goats??"

        77.  Throughout 2003 and 2004, FUMO also was aided in the management of the

farm by Senate Contractor No. 4, an old friend of FUMO who received a total of more than

$280,000 from the Senate between 1999 and 2004 pursuant to a contract arranged by FUMO for

which Senate Contractor No. 4 did little or no actual Senate work.

        78.  The contract with Senate Contractor No. 4 became effective in 1999.  It

provided that Senate Contractor No. 4's firm would provide consulting services to FUMO

regarding the fiscal and operational analysis of intrastate transportation issues.  The annual

contracts called for payments of $150 per hour, up to a stated limit.  While the limit increased

annually, the hourly rate did not; Senate Contractor No. 4 just billed more hours in order to

obtain the full contract amounts.   The payments, beginning on July 1 of each year, were:

        1999   $50,000
        2000   $60,000
        2001   $66,000
        2002   $66,000
        2003   $45,000

        79.  Through August 2002, Senate Contractor No. 4's monthly invoices to the

Senate simply stated "services rendered" and provided a total number of hours.  Beginning in

September 2002, Senate Contractor No. 4 provided an itemization of where he allegedly worked,

simply stating a location (either a Senate office or his supposed office) and a total number of

hours.  Senate Contractor No. 4 never provided any specification of what he purportedly did, and

in fact, he provided little or no services to the Senate at all.  The Senate has no documentation

regarding any work that Senate Contractor No. 4 ever did pursuant to this contract, such as reports or notes.

80.  The state contract was not renewed after June 30, 2004, after the investigation was underway.

81.  During the time that this contract was in effect, Senate Contractor No. 4 assisted in overseeing FUMO's farm.  For example, on or about Sunday, February 23, 2003, FUMO sent an e-mail to Person No. 16, a Philadelphia aide, regarding efforts to evict the previous tenant at the farm:

> Well let [Senate Contractor No. 4] work on it.  I do NOT want to get into a position where we have to start the whole fucking process all over again.  And because of their history I think that is what they are up to!!!
>
> . . . .
>
> BE VERY CAREFUL to keep all communications between you and them and as soon as [Senate Contractor No. 4] gets home, let him handle this.  From the tone of her e-mail she seems to assume that we, YOU, have granted her an extension.  Make sure you answer this to say that you did NO SUCH THING!!  And that [Senate Contractor No. 4] is still the only one authorized to handle any and all issues regarding this property!!!

82.  Similarly, on or about Thursday, July 17, 2003, at 2:03 p.m., after Person No. 18 described to FUMO developments regarding a new cattle barn, and asked, "Our portion of the site preparation is that we must have a flat, level dirt pad.  They will do all the rest.  Who do I contact about preparing the dirt pad?"  FUMO answered, "[Senate Contractor No. 4] and [Person No. 42]."

83.  Senate Contractor No. 4 was not compensated for his work on the farm other than through what he received from the lucrative Senate contract, which paid him an average of about $5,000 each month.  However, at the same time that he began to take on an active role at

- 42 -

the farm, Senate Contractor No. 4 also received, beginning in April 2003, a $10,000 a month

check from the Pennsylvania Turnpike Commission ("PTC") as part of a lucrative consulting

contract.  This contract was awarded to Contractor No. 4 by the PTC within two months after

Senate Contractor No. 5, a member of FUMO's inner circle of friends and the boyfriend (later

husband) of Ruth Arnao, was elected chairman of the PTC.  Despite total payments of $220,000

to Senate Contractor No. 4 between April 2003 and December 2004, the Pennsylvania Turnpike

Commission has no records reflecting that any work was ever performed by Senate Contractor

No. 4 on that contract, either.

       84.  Besides Person No. 18, Person No. 26, Person No. 27, and Senate Contractor

No. 4, FUMO also used other Senate employees as needed with farm tasks.  Among these, as

noted, was Person No. 3, a budget analyst, who accompanied Person No. 18 on daily trips to the

farm in the fall of 2003.  Person No. 3 also assisted FUMO in researching the price of goat meat,

during the Senate workday.  On or about Tuesday, September 14, 2004, at 9:53 a.m., Person No.

3 wrote to FUMO:

> Dear Senator, Attached is the report from yesterday's sale.  The goat prices are towards
> the bottom of the page.  [Person No. 26] told me he sold 9 goats including 3 babies(kids).
> I do not know what type the other 6 were.  Again I apologize for the misunderstanding
> yesterday.  Let me know if there is anything else you need me to do.

Another budget analyst, at FUMO's direction, investigated whether cows could be imported from

Italy, and the requirements to obtain a license to slaughter animals at FUMO's farm.

       85.  Person No. 11, a Senate aide in Harrisburg, also assisted FUMO in

establishing the farm, when asked.  On or about Tuesday, September 23, 2003, at 11:27 a.m., he

wrote a long e-mail to FUMO, with a copy to FUMO's SDAC counsel, regarding discussions

with the solicitor in the township where the farm was located, concerning development issues. He began, "I spoke to the TWP solicitor at length this morning about your plans for the farm." He stated, "I am going to visit the farm tomorrow (unless you are going out there today and would rather so me yourself) to take some pictures of the area where you want to build so that I can better visualize what you want to do. Next I am going to meet with the TWP solicitor as well as a Democratic TWP Supervisor who, I am told by my friend, will be a tremendous help in this endeavor. Before this meeting would it be possible for you to give me a rough sketch of where on the property you want to build it? It will be helpful to have as much detail as possible so the solicitor and the supervisor have a fairly good idea of what we want to do and so they are able to help us as much as possible." He concluded, "I will personally shepard this entire project and guarantee the success of the project." FUMO replied, "OK TY See me."

86.    FUMO also used a Philadelphia Senate aide, Person No. 16, and his Philadelphia Senate secretary, Person No. 22, to coordinate various farm-related tasks. For instance, on or about Monday, April 7, 2003, FUMO wrote to these two, "Do we have insurance on the farm yet???"

87.    Person No. 8, another Senate employee at Tasker Street, handled the farm bank account and wrote all the checks necessary to pay the bills associated with the farm.

iv.    **Senate Contractor No. 5.**

88.    Arnao's long-time boyfriend (and later her husband), Senate Contractor No. 5, also was a close friend of FUMO. He, like Senate Contractor No. 4, became a Senate contractor, and also did little or no Senate work in exchange for the large sums of Senate money that FUMO awarded to him under an SDAC contract.

- 44 -

89.  Senate Contractor No. 5 owned and managed a business in Philadelphia which provided services to attorneys and law firms, including court filing, process serving, and court reporting.  The Senate contract FUMO arranged with this firm provided:

> To purchase professional services to the Democratic Appropriations Committee to include, but not limited to research, analysis and make recommendations on legislative matters, assist on constituent services.
>
> Payment to be billed by invoice for these services performed.
>
> Consultant is to be reimbursed for expenses incurred to these services.

90.  The annual amount paid was $30,000 per year, beginning on October 1, 1999, and concluding on September 30, 2004.  Every month, Senate Contractor No. 5's firm simply sent an invoice for "services rendered," with the amount due that month.  It thus collected $150,000 in Senate money, without ever specifying any work that it ever did.

91.  Neither the Senate nor Senate Contractor No. 5's firm possesses any documentary evidence, such as notes and reports, showing that he or his firm ever provided any "research, analysis [or] recommendations on legislative matters," or anything related to constituent services.  In fact, as FUMO well knew, Senate Contractor No. 5 did little or no actual Senate work at all.

     **v.**    **Other Employees.**

92.  FUMO kept numerous other Senate employees continually busy in serving his personal needs, and rewarded them for their loyalty.  Some examples follow.

     **a.**    **Person No. 22.**

93.  Person No. 22 was FUMO's long-time secretary in the Senate office in Philadelphia.  Like the many other FUMO employees to whom FUMO delegated personal

chores, Person No. 22 coordinated countless personal tasks for FUMO, during regular work hours, yet was compensated solely through her Senate salary. Further, she acted as a coordinator in assuring that other Senate employees were delegated as needed to serve FUMO's personal wants, such as by running errands for him, driving his vehicles to other states as needed, and meeting and escorting repairpersons at his homes.

94. FUMO richly compensated Person No. 22 for her long-term willingness to perform any personal task he asked. Person No. 22 was classified in increasingly high-level administrative and legislative positions, rising from a salary of $60,796 per year in 1999 to $75,829 in 2006.

        **b.**      **<u>Person No. 16</u>.**

95. Person No. 16 was a close and long-time friend of FUMO, and also a ward leader in FUMO's Senatorial district. FUMO assigned her to high-level Senate positions. She was classified as Executive Assistant III as of June 15, 2000, at $69,159 per year, at the same time that she also collected a paycheck from the School District of Philadelphia as a full-time, 40-hour per week truant officer. When she retired from the School District in or about June 2001, she was promoted by FUMO to Executive Assistant IV, at $76,074 per year, increased to $81,599 on June 13, 2002, and $90,983 as of June 12, 2003. She was then promoted to Chief of Staff CS3 as of June 10, 2004, at $103,266 per year, increased to $107,912 as of June 9, 2005, and $113,518 as of June 8, 2006.

96. Although Person No. 16 held these positions, and met with constituents and performed some other legitimate Senate work, she did not did not act as a chief of staff, and was not even present in the Senate office for a portion of the year. When she was present in the

Senate office, she also spent time responding to FUMO's requests for personal assistance, and attending to political matters.

         c.      **Person No. 8.**

       97.  Just as Person No. 9 and Person No. 15 served Ruth Arnao in carrying out personal and political tasks for FUMO, Person No. 8 performed the same role under the control of Person No. 16.  Person No. 8 also was overcompensated by being promoted to positions whose responsibilities she did not fulfill.

       98.  Person No. 8 followed the track shared by Person No. 9 of being classified in jobs of increasing importance involving legislative research and assistance, which she never actually performed.  She was classified as Legislative Assistant III as of June 15, 2000, at $32,305 per year.  To obtain this job classification, FUMO caused a written justification to be submitted to the Senate on or about July 24, 2000, which falsely described Person No. 8's job duties as follows:

> Assumes lead role in execution of functions incidental to needs of chairman.  Develops legislation.  Responds to constituent needs for information.  Analyzes facts for significance + relationship.  Good organizational knowledge.  Ability to communicate clearly + concisely.

Throughout her employment with the Senate, Person No. 8 never developed legislation and infrequently responded to constituent needs.

       99.  Person No. 8 was then promoted to increasingly more senior legislative positions, ultimately earning $51,190 per year as of June 8, 2006.  The positions she held, with job duties involving legislative research and policy development, were never fulfilled by Person No. 8.

100.  In truth, Person No. 8 worked only as an administrative aide to Person No. 16, handling Person No. 16's personal affairs, and some of FUMO's as well.  Person No. 8 handled a number of inappropriate matters on Senate time.  She handled the bank account for expenses related to FUMO's farm; arranged the purchases of numerous firearms for FUMO; wrote checks related to FUMO's boats; wrote personal checks for Person No. 16; and wrote checks for the "Sen-Zia" real estate investment account jointly held by FUMO and Person No. 16.  Person No. 16 (called "Zia," Italian for aunt) and FUMO ("Sen") together owned a property at 2527 South 13th Street, Philadelphia, Pennsylvania.

### d.    Drivers.

101.  FUMO consistently had the use of a leased Cadillac, which, as permitted by Senate rules, was paid for by the Senate.  In addition, he used several Senate employees as drivers.  In Philadelphia, the drivers were Person No. 24 and Person No. 25.  In Harrisburg, the driver was Person No. 26.

102.  The Senate had no rule against hiring a driver to aid a Senator on official business.  However, FUMO used the Senate drivers to drive him to personal and political events as well.  Further, FUMO used the Senate drivers, like many of his other Senate employees, as personal servants, and delegated to them any personal task he needed when they were not driving him around.  Given that FUMO needed only one driver at a time, and spent very significant parts of the year outside of Pennsylvania altogether, there were extensive periods of time when each of the drivers was unoccupied with his principal role.

103.  The Senate drivers were required to take FUMO to personal and political meetings during the day and evening hours.  Person No. 24 and Person No. 25, along with other

Senate employees and Person No. 5, at various times drove two vehicles (including vehicles purchased by Citizens Alliance) to and from Martha's Vineyard, so that FUMO and his guests could fly by private plane each summer and arrive to find vehicles and their luggage waiting for them. Person No. 24 or Person No. 25 was first dispatched to the Philadelphia-area homes of FUMO's friends who went on the trips, to pick up their luggage. Person No. 24 or Person No. 25 then drove the luggage to Margate, New Jersey, where vehicles were packed for the drive north.

104. Once a week, during the workday (typically on a Wednesday), Person No. 24 or Person No. 25 made a 30-mile roundtrip, from FUMO's home in Philadelphia to the home of FUMO's attorney and close personal friend in Haverford, Pennsylvania, in order to transport FUMO's shirts to the attorney's home to be laundered and pressed.

105. Person No. 24 and Person No. 25 also did some shopping for FUMO, and at times drove his daughter to school and other locations. They regularly delivered packages of personal merchandise to FUMO's houses that had been shipped to Citizens Alliance or the Tasker Street office. They regularly were sent to FUMO's homes to wait for or escort repairpersons and contractors. They were compensated for all of their work only by the Senate.

106. Many e-mails confirm such tasks. For instance, on or about Tuesday, October 12, 1999, at 11:28 p.m., FUMO wrote to Person No. 8, a Senate aide: "Please have [Person No. 24] get me a box of ammo for [his girlfriend Person No. 39's] gun and I will take it to the shore with me on Thursday." In another example, on Monday, December 18, 2000, at 6:05 p.m., FUMO wrote to Person No. 39:

> [Person No. 24] and [Person No. 25] just bought a box of candles here at Green Street.
> However, they are 3" in diameter and 6" high. The ones we currently have in the
> fireplaces are 3" in diameter and 3" HIGH!!!

- 49 -

She replied, "I don't know who told them to buy that size.  All the candles in the fireplaces are 3 X 3."

107.  FUMO began to relent in his extensive use of these employees for personal purposes only after he became aware of media interest and the federal investigation.  In an e-mail to his ex-wife on or about Tuesday, February 15, 2005, at 2:45 p.m., FUMO, who was vacationing in Florida, wrote that he had no one available to drive their daughter to two doctor appointments.  He wrote, in part:  "Since the Inquirer and the Feds are all over my ass, I want to keep the use of staff for these things at an absolute minimum."

108.  Besides driving FUMO, the three drivers performed few other Senate duties. Person No. 24 and Person No. 25, when not driving FUMO, did little else, besides running errands as requested by FUMO or other Senate employees.  Person No. 26, in Harrisburg, when he was not driving FUMO or working on FUMO's farm during the workday, was responsible for the ministerial processing of invoices of Senate contractors, the handling of routine constituent requests, and the delivery of paperwork at the State Capitol.

109.  While no Senate job classification referred to acting as a personal driver for a Senator, the roles filled by the drivers most closely fit that of a "Legislative Clerk Messenger," for whom the maximum pay was no greater than $23,786.  That job was defined as follows: "This classification performs messenger and clerical services involving the pick up and delivery of mail and other materials, as well as errand-running, document processing and office machine operation within departments of the Senate.  An employe in this classification receives supervision from an immediate supervisor."

110.  Instead, Person No. 24, who served FUMO the longest, was classified as of June 14, 2001, as Administrative Officer IV, at $45,760 per year, increased to $47,819 as of June 13, 2002, and $50,588 as of June 12, 2003.  A statement FUMO caused to be submitted to the Senate's Chief Clerk on or about January 4, 2001, explaining Person No. 24's duties, was entirely false:

> [Person No. 24] provides liasion function with city personell, constituents + district official, while maintaining relationship with city officials.  He reviews materials prepared by caucus leadership + assists in management of purchasing + inventory of supplies. [Person No. 24] has the requisite of 4 yrs of experience working in a complex + diverse office.

111.  Person No. 24 was then promoted to Constituency Relations CR4 on February 11, 2004; his pay as of June 10, 2004 was $52,969 per year, increased to $55,617 per year as of June 9, 2005, and $60,344 as of June 8, 2006.

112.  Person No. 24 did not perform either role.  According to the Senate pay classification guide, which was approved by a committee on which FUMO sat, an Administrative Officer IV is expected to "administer[] a multifarious vital department or regional office." According to the guide, the position of Constituency Relations CR4 involves "the most complex administrative duties and oversees others performing less complex administrative duties." Person No. 24 never did this work.

113.  Similarly, Person No. 25 was classified in administrative positions of increasing importance, and his salary increased from $30,069 per year as of June 15, 2000, to $39,717 as of June 8, 2006.  In a statement that FUMO caused to be submitted to the Senate's Chief Clerk regarding Person No. 25's duties, dated July 24, 2000, FUMO falsely described Person No. 25's job duties as follows:  "Does complex administrative staff assignments.

- 51 -

Performs research + studies with findings + recommendations.  Reviews + replies to routine

correspondence.  Possesses thorough knowledge of sources of info, methods + techniques in

administrative research."  What Person No. 25 principally did, like Person No. 24, was drive the

Senator and run personal errands for him.  FUMO never disclosed these true facts to the Senate.

114.  Similarly, Person No. 26, the driver in Harrisburg, was compensated for far

more substantial Senate responsibilities than he performed.  FUMO caused several descriptions

of Person No. 26's work over the years to be submitted to the Senate's Chief Clerk, none of

which ever referred to his basic role as a driver or which made reference to his chores at the

FUMO farm, as described earlier.

115.  Like Person No. 25, Person No. 26 was classified in administrative officer

positions, and his salary ranged from $35,896 per year as of June 15, 2000, to $49,266 as of

June 9, 2005.  A statement FUMO caused to be submitted to the Senate's Chief Clerk on or

about September 2, 2005, falsely described Person No. 26's job duties as follows:

> [Person No. 26] assists the Senator and Chief of Staff by responding to complex
> constituent inquiries and requests for assistance.  His broad knowledge of the bureaucracy
> and enables him to respond creatively and independently, with minimal guidance and
> supervision, and in keeping with the office policies relevant to these matters.

All of Person No. 26's positions were supposed to involve significant administrative and

managerial tasks, none of which he ever performed.

### e.    **Computer Aides**.

116.  FUMO was the designee of the Senate Minority Leader to oversee Senate

Democratic Computer Services (SDCS), an entity which provided computer assistance to all

Democratic members of the Senate.  Of all the Senators in the Democratic caucus, only FUMO

had SDCS employees specially assigned to assist his office alone. One such employee was Leonard P. Luchko, who, along with Person No. 1, was assigned exclusively to assist the Tasker Street office in Philadelphia. In addition, Person No. 5 provided similar services; he was the employee of a Senate contractor which had a contract to perform computer tasks at FUMO's direction. FUMO also used Luchko, Person No. 1, and Person No. 5 for numerous personal tasks, to help himself, his family, and his friends. Luchko, Person No. 1, and Person No. 5 performed many of these tasks during regular working hours, and received no separate compensation for any of them.

117. As Luchko wrote in the e-mail quoted in paragraph 7 above, he and Person No. 1 were on constant call for all manner of personal chores. They serviced Arnao's computers at her shore residence. Person No. 1 worked on the computers of FUMO's daughter at the Green Street home. Person No. 1 traveled to Florida three times, for four or five days each time, to install a weather station and computer and satellite equipment at FUMO's home. Person No. 1 also did work for one of FUMO's girlfriends, for political campaigns as directed by FUMO during work hours, and for FUMO's Senate contractors who also were improperly given Senate equipment.

118. Person No. 1 installed a GPS device in several of Fumo's personal vehicles, in New Jersey and Florida, and in the Toyota 4Runner of FUMO's girlfriend. In an e-mail on or about Tuesday, March 5, 2002, at 10:37 p.m., FUMO wrote to Person No. 1 that the GPS in the girlfriend's vehicle was still not working. Person No. 1 responded at 11:01 p.m. that he had just received a new card for it and could install it when it was available. FUMO replied: "Maybe on Sunday or Monday. Did we get the one in the van fixed as well?"

119.  FUMO made repeated demands for personal electronics services from his

Senate aides, including the following:

-- Sunday, December 14, 2003, at 8:50 p.m. (FUMO to Arnao, Person No. 22, Luchko, Person No. 37, and the son of Arnao's then-boyfriend) (subject: "Green St. Family room TV"):

Can someone fix this fucking thing.  Now everytime I turn the system ON, the amplifier does not go on and the TV reads NO SIGNAL until I use the TV remoe and go to Video 6.  In addition the Left speaker in the top is "crackling" constantly!!!!!!!!!!!!!!!!!!!!!!!!

PLEASE GET THIS FIXED NOW!!!!!

At 9:11 p.m., Luchko replied:

Boss I feel your pain there is nothing worse than your TV not working properly and a crackling speaker can really get on your nerves fast.  But my knowledge of TV sound systems is very limited however I did forward your email to [Person No. 1] he has a instinct for all types of electronics maybe he has some ideas.

Eight minutes later, FUMO replied, "TERRIFIC!"

At 9:25 p.m., Person No. 1 wrote:

I'll take a look tomorrow.  If I can't fix it on the spot I'll find a local shop that can.

FUMO immediately replied, "TY."

-- January 7, 2004, at 3:57 p.m. (Arnao to Senate drivers (Person No. 24 and Person No. 25), copy to FUMO):

Can you guys look and see a place for VJF to get a radar detector put into his van in Florida.  Find one similar to the place you take it to here.  Let me know please do this by tomorrow.  Thanks.

At 5:12 p.m., FUMO replied, with a copy to Luchko and Person No. 1:

Alos ask Lenny & [Person No. 1].

-- Thursday, March 4, 2004, at 9:43 a.m. (subject: "888 stereo," referring to one of FUMO's boats):

- 54 -

Person No. 1:   I was planning on going to Margate to check out the boat for the new stereo and to replace your laptop. Will I be able to get to the boat? If the boat is accessible, I'll go today or tomorrow.

FUMO:   Check with [Person No. 29, a FUMO friend] on that. If the boat isn't available yet, don't go down. Ruth can bring back the laptop this weekend.

-- Friday May 2, 2004, at 12:54 a.m. (FUMO to Person No. 1 about the "888" boat):

[Person No. 1], I saw the 888 today. She can be boarded now. Please make arrangements with [Person No. 22, FUMO's Senate secretary] +/or [Person No. 29] to go down asap and see what we need to get the electronics up and running. Thanks, VJF

-- Monday, June 7, 2004, at 10:24 a.m. (subject: "XM installs"):

Person No. 1:   The installs are done at Green St. and Kenyon Ave., I just got the adapters for the Cadillac and will finish it as soon as I can have the car for an hour or two. I'm going to start on the boat today and plan to be there all day today and tomorrow. Except for the antenna and remote wires, all else should be done tomorrow. Is the boat at the dock or at Monmouth ave [the location of FUMO's condominiums and docks in Ventnor]?

FUMO:   No it is still at the marina. Do you remember how to get there?

Person No. 1:  Does it have power?

FUMO:   There should be battery power on board.

Person No. 1:  Where are the keys for it?

FUMO:   On board.

Person No. 1:  If the boat is going to be at Monmouth Ave soon I'd rather work on it in daylight, the barn that it's in is pretty dark. If it's not moving this week let me know and I'll get started on it. If it's at Holtz boat works, I have the directions.

FUMO:   They are probably going to bring her over today or tomorrow so maybe you should wait until she is at Monmouth Ave. OK?

- 55 -

-- Monday, August 18, 2004, at 8:54 p.m. (Luchko to Person No. 1):

> You are not going to believe this.  Her wants us to check that fucking boat out on the 30th of this month that is the Saturday of Labor Day weekend.

120.  When FUMO began a relationship with a new girlfriend in 2004 (Person No. 43), Luchko and Person No. 1, along with Mark C. Eister, a Senate computer aide assigned to FUMO's staff in Harrisburg, endeavored to provide her with computer assistance, at FUMO's direction.  On or about Wednesday, October 13, 2004, at 10:50 p.m., Luchko wrote to Eister: "The Bosses girl is going to be using his wireless networks she uses Voicenet should she change her port settings to 2525 also to avoid conflicts like he had.  I need this ASAP."

121.  In endeavoring to assure Internet access for Person No. 43, they then had a technical discussion of the fact that there was no problem at Green Street, where there was a Voicenet account, but might be at the shore, where Comcast provided the service.  Luchko said, "he is going to want it fixed."  On or about Sunday, October 17, 2004, Luchko then reported to FUMO (copy to Eister and Person No. 1):

> This is the plan for tomorrow I will go to Green Street and coordinate with Mark in Harrisburg and solve this network problem you are having I want to leave [Person No. 1] at Tasker Street to finish up your phone and fix any problems you are still having . . . . I then will leave [Person No. 43's] laptop there and will see how things go on Monday night provided she stays over.  PA  Then on Wednesday or Thursday I want to take her laptop down the shore and check everything down there are make sure we don't run into the same problem If that fits in with your schedule.

122.  On or about Wednesday, December 15, 2004, Luchko became involved in another personal project for one of FUMO's children.  At 7:58 p.m., FUMO wrote to Person No. 37, a security alarm and electronics contractor, with a copy to Senate aides Arnao, Person No. 16, and Person No. 22:

Where are we with [the child's] TV?  She tells me that we have been waiting for parts since September????

I want this up and running once and for all asap.

I understand that [FUMO's ex-wife] has not yet ordered the digital cable service because she is waiting for you to get it hooked up!!!

What goes?  I thought this was donew weeks and weeks ago???

      123.   Arnao replied at 8:23 p.m., with a copy to Luchko:

Don't forget she wants the new lap top computer wireless I did talk to lenny about it but I want to make sure that we are moving ahead on this and I don't want you not having something to give her on Christmas.

FUMO immediately answered:

Yes, does Lenny know what she wants?  I think she wants a Sony Viao but I don't know what kind.  I know it has to have built in wireless.  Then we will need wi-fi units hooked up in her house as well.

Luchko responded at 8:34 p.m.:

I will start looking at Sony's tonight and I will have a selection for you tomorrow.  How many floors in [the daughter's] house?  We need to know what type of high speed access she has.  And what floor it comes into the house.  If we are lucky we might be able to get away with one device.

      124.   FUMO forwarded this e-mail to his ex-wife, and she and Luchko began a

correspondence the next morning about the technical requirements.  Finally, on or about Friday,

December 17, 2004, at 10:43 a.m., Luchko wrote to the ex-wife (copy to FUMO and Person No.

1):  "We have the Wireless router when can we go over the house to hook it up?"  She replied

(with a copy to FUMO and Person No. 1) that she was free on Saturday from 7:15 to 9:30 a.m.,

or "[p]erhaps one day next week, I can meet you at my home...Let me know the earliest or latest

time in the AM you can do it any day."

125.  Luchko and Person No. 1 also continually serviced the computers at Citizens Alliance, even though it was not a Senate entity.  This continued even after the investigation began.  On or about Thursday, January 27, 2005, at 4:33 p.m., Person No. 1 wrote to Luchko, "When we're going to CA we are not to tell the receptionists where we are going.  [Person No. 22, FUMO's secretary] asked me to tell you..."

126.  In Senate personnel records, Luchko and Person No. 1 were appropriately classified in positions related to computer maintenance and network support.  However, none of their job descriptions related to the provision of personal assistance to a Senator, including technology assistance provided to the Senator's family and friends, and FUMO never disclosed to the Senate that they performed these tasks.

127.  Person No. 5 served FUMO's office, beginning in 1999, as an employee of a company which had a lucrative contract to provide computer services to FUMO's office and SDCS.  Person No. 5 was regularly called upon by FUMO to provide computer services to FUMO's family and friends, and to provide other personal tasks, such as delivering one of FUMO's boats from the New Jersey shore to a Philadelphia warehouse, and driving a vehicle back to New Jersey from Martha's Vineyard.  Once, on or about Christmas Eve (a day off), Person No. 5 was called to FUMO's Green Street home along with other Senate employees to set up poinsettias all around the house for a Christmas party FUMO was having that evening.

**f.      Harrisburg employees.**

128.  FUMO also used other SDAC employees in Harrisburg when needed to attend to his personal needs.  Person No. 10, FUMO's SDAC counsel, as will be discussed later in this superseding indictment with respect to the fraud on Citizens Alliance, spent a substantial

amount of time furthering FUMO's effort to help defeat the construction of dunes near FUMO's shore home, which FUMO feared would block his ocean view.

129.   In or about November and December 2001, Person No. 10 also assisted FUMO's girlfriend, Person No. 39, a New Jersey resident, in a dispute she had with AT&T regarding the assignment of her business telephone number.  In one e-mail, on or about Thursday, November 15, 2001, at 10:00 a.m., Person No. 10 wrote to FUMO, "The matter concerning [Person No. 39's] business phone number has gotten really complicated and I want to spell out the series of events that took place according to AT&T."  He then wrote a very detailed two-page summary.

130.   The next day, at 9:19 p.m., Person No. 10 wrote instructions to Person No. 39.  In part, he said:

> There is not much I can do about this over the weekend since all of my AT&T contacts are not going to be in the office.  However, this is the way I suggest we handle things. Monday fax to me the past bill records ([fax number]) and I will make sure they get to the appropriate people at AT&T.  I will push the issue hard with them, but you should not expect a resolution of this mess for at least a week, and even then I cannot guarantee success.

> . . . .  In addition, tell your attorney exactly what has occurred with the 888 number and ask him to call me at work ([Person No. 10's number at SDAC]).  I will help him put together a comprehensive letter to AT&T explaining the situation with your former partner and we will take that letter to AT&T to push for the return of his number.

131.   On Monday, November 26, 2001, FUMO sent an e-mail to an attorney at a private law firm, asking "Can you please call [Person No. 10], Esq. in my Harrisburg office ([Person No. 10's number at SDAC]) TODAY and get the letter together that he needs for AT&T so he can get the 888 line back to [Person No. 39's] company asap."

132.  On Monday, December 10, 2001, FUMO wrote to Person No. 39, "BTW, I have [Person No. 10] preparing the pleading to go into Court this week on the phone number, etc."

**C.    Diversion of Senate Equipment.**

133.  FUMO required his staff not only to serve the computer needs of FUMO's associates, family, and friends, but to unlawfully provide them with Senate equipment to use.

134.  For instance, FUMO gave a girlfriend, Person No. 39, a laptop computer owned by the Senate, and Luchko, Person No. 1, and Person No. 5 then provided her with computer assistance, in the regular course of their Senate jobs.  FUMO also provided Person No. 39 with an e-mail address on FUMO's Senate server.  Later, at FUMO's direction, his staff provided computer assistance to another girlfriend, Person No. 43.

135.  On or about Thursday, May 25, 2000, at 10:50 a.m., a Senate computer aide wrote to one girlfriend, Person No. 39 (at her fumo.com address):  "The PC is ready.  Lenny loaded all the software.  When you have a chance, let me know when you might want to pick it up or if you need further assistance."  Then, in June 2002, when they broke up for the first time, FUMO asked the woman to return the laptop to the Senate.

136.  FUMO also supplied a computer to his personal valet, Person No. 44, when he was hired in or about February 2004.  The valet was given a fumo.com address, and FUMO then used it to communicate with the valet continuously.  Luchko provided the computer to the valet, and serviced it as needed.  At the outset, on or about February 10, 2004, at 11:56 p.m., Person No. 1 wrote to Luchko (subject: "[Valet]'s laptop"):

The boss is leaving with [the valet] back to Florida Friday, he wants us to have his laptop fixed before he leaves.  I'm not coming in Friday so if I don't have the restore disk tomorrow you'll need to do it Thursday/Friday morning.  Just to get it working it only needs Windows and the card insatlled for internet access, he's been using the boss's laptop here and only uses it to surf...

137.  Luchko and Person No. 1 also provided Senate equipment to Citizens Alliance, at FUMO's direction, and provided service as necessary.

138.  Luchko and Eister also gave computers and phones to FUMO's Senate contractors, which they knew was a violation of Senate rules.  For example, on or about Wednesday, July 2, 2003, at 11:51 a.m., Luchko wrote to his nominal boss at Senate Democratic Computer Services:  "I have a question for you as you know sometimes the Senator has me 'Lend' equipment to people who work for him."  Luchko asked, in giving a new computer to a Senate contractor, who should sign for it.  The boss, Person No. 4, replied that Luchko definitely should not, and he should ask FUMO or Ruth Arnao to sign instead.  She added, "WE DEFINATELY don't want [the contractor] to sign for it since that would be against the law (duh) to give SEnate equipment knowingly to non senate employees."

**Overt Acts**

In furtherance of the conspiracy, defendant VINCENT J. FUMO, and others known and unknown to the grand jury, committed the following overt acts in the Eastern District of Pennsylvania, and elsewhere:

139.  On or about June 14, 1999, defendant VINCENT J. FUMO caused the Senate Democratic Appropriations Committee to enter into Service Purchase Contract No. 209665 with Senate Contractor No. 2, with a total contract award of $73,500.

- 61 -

140.  On or about June 21, 1999, defendant VINCENT J. FUMO caused the Senate Democratic Appropriations Committee to enter into Service Purchase Contract No. 209663 with Senate Contractor No. 1, with a total contract award of $32,000.

141.  On or about August 6, 1999, defendant VINCENT J. FUMO approved the job title and an increase in the salary of Person No. 24, and transmitted the approval form to the Chief Clerk of the Senate.

142.  On or about August 6, 1999, defendant VINCENT J. FUMO approved the job title and an increase in the salary of Person No. 25, and transmitted the approval form to the Chief Clerk of the Senate.

143.  On or about September 9, 1999, defendant VINCENT J. FUMO caused the Senate Democratic Appropriations Committee to enter into Service Purchase Contract No. 209664 with Senate Contractor No. 5, with a total contract award of $30,000.

144.  On or about July 13, 2000, defendant VINCENT J. FUMO approved the job title and an increase in the salary of Ruth Arnao, and transmitted the approval form to the Chief Clerk of the Senate.

145.  On or about July 31, 2000, defendant VINCENT J. FUMO caused the Senate Democratic Appropriations Committee to enter into Service Purchase Contract No. 209822 with Senate Contractor No. 4, with a total contract award of $60,000.

146.  On or about August 27, 2001, defendant VINCENT J. FUMO approved the job title and an increase in the salary of Person No. 16, and transmitted the approval form to the Chief Clerk of the Senate.

147.  On or about September 13, 2001, defendant VINCENT J. FUMO approved a newly reclassified job title and an increase in the salary of Person No. 15, and transmitted the approval form to the Chief Clerk of the Senate.

148.  On or about January 7, 2002, defendant VINCENT J. FUMO approved the job title and an increase in the salary of Person No. 21, and transmitted the approval form to the Chief Clerk of the Senate.

149.  On or about February 26, 2002, defendant VINCENT J. FUMO caused to be sent a Federal Express next day shipment from FUMO's district office at 1208 Tasker Street, Philadelphia, PA, to FUMO's home at 130 N. Beach Road, Hobe Sound, FL  33455, containing a video surveillance tape made by Person No. 51 at the direction of Senate Contractor No. 1.

150.  On or about March 5, 2002, defendant VINCENT J. FUMO sent an e-mail to Person No. 1, with a copy to FUMO's girlfriend, Person No. 39, informing Person No. 1 that the GPS device which Person No. 1 installed in Person No. 39's vehicle was still not working.

151.  On or about March 6, 2002, defendant VINCENT J. FUMO caused paycheck No. 38070 issued by Sovereign Bank for Person No. 15 and paycheck no. 38059 issued by Sovereign Bank for Person No. 21 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

152.  On or about March 20, 2002, defendant VINCENT J. FUMO caused paycheck No. 45819 issued by Sovereign Bank for Person No. 15 and paycheck no. 45808 issued by Sovereign Bank for Person No. 21 to be sent by Federal Express from the State Capitol in

Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

153.  On or about April 3, 2002, defendant VINCENT J. FUMO caused paycheck no. 52914 issued by Sovereign Bank for Person No. 19, paycheck no. 52906 issued by Sovereign Bank for Person No. 21, paycheck no. 52916 issued by Sovereign Bank for Person No. 24, and a paystub for Person No. 25 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

154.  On or about April 3, 2002, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 25 into an account at United Savings Bank.

155.  On or about April 17, 2002, defendant VINCENT J. FUMO caused paycheck no. 9681927 issued by M&T Bank for Person No. 19, paycheck no. 9681920 issued by M&T Bank for Person No. 21, paycheck no. 9681929 issued by M&T Bank for Person No. 24, and a paystub for Person No. 25 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

156.  On or about May 1, 2002, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 22 into her account at Pennsylvania State Employees Credit Union.

157.  On or about May 15, 2002, defendant VINCENT J. FUMO caused paycheck no. 72003 issued by Sovereign Bank for Person No. 19 and a paystub for Ruth Arnao to be sent

- 64 -

by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

158.  On or about May 29, 2002, defendant VINCENT J. FUMO caused paycheck no. 10564071 issued by Wachovia Bank for Person No. 19 and a paystub for Ruth Arnao to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

159.  On or about June 1, 2002, Senate Contractor No. 1 mailed an Invoice for $5,200 to Person No. 17, Senate Appropriations Committee (D), Room #545, Main Capital Building, Harrisburg, Pennsylvania 17120-3001, for services rendered from May 1, 2002 through May 31, 2002.

160.  On or about June 12, 2002, defendant VINCENT J. FUMO sent an e-mail to Person No. 39 asking Person No. 39 to return Senate computer equipment and a beeper which he had provided to her, and informing her that she would be removed from the fumo.com server.

161.  On or about June 14, 2002, defendant VINCENT J. FUMO caused check no. 04422715 in the amount of $5,200 to be mailed by the Pennsylvania State Treasury to Senate Contractor No. 1 at P.O. Box 371, Flourtown, PA 19031.

162.  On or about July 10, 2002, defendant VINCENT J. FUMO caused paycheck no. 3293745 issued by Ameriserv Bank for Person No. 16 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

163.  On or about July 24, 2002, defendant VINCENT J. FUMO caused paycheck no. 10661566 issued by Wachovia Bank for Person No. 16 to be sent by Federal Express from

- 65 -

the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

164. On or about August 7, 2002, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 10 into his account at Pennsylvania State Employees Credit Union.

165. On or about August 21, 2002, defendant VINCENT J. FUMO caused a paystub for Ruth Arnao to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

166. On or about September 4, 2002, defendant VINCENT J. FUMO caused the Senate Democratic Appropriations Committee to enter into Service Purchase Contract No. 220693 with Senate Contractor No. 3, with a total contract award of $42,000.

167. On or about September 16, 2002, Senate Contractor No. 5 caused invoice no. PSF44691, requesting payment of $2,350 for services rendered by Senate Contractor No. 5 in August 2002, to be mailed to Senate Democratic Appropriations Committee (D), Room 545, Main Capitol Building, Harrisburg, Pennsylvania.

168. On or about November 13, 2002, defendant VINCENT J. FUMO approved a newly reclassified job title and an increase in the salary of Person No. 9, and transmitted the approval form to the Chief Clerk of the Senate.

169. On or about January 8, 2003, defendant VINCENT J. FUMO caused paycheck no. 150223 issued by Sovereign Bank for Person No. 1 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

170.  On or about January 8, 2003, defendant VINCENT J. FUMO sent an e-mail to Person No. 27, asking Person No. 27 to investigate FUMO's entitlement to a $4,200 government grant for not planting on the farm.

171.  On or about January 22, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting from the clearing of salary check no. 79774 issued to Person No. 1.

172.  On or about February 23, 2003, defendant VINCENT J. FUMO sent an e-mail to Person No. 16 informing her that Senate Contractor No. 4 "is still the only one authorized to handle any and all issues regarding [the farm] property," and will address issues relating to the eviction of the previous tenant of the property.

173.  On or about March 5, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 27 into his account at Pennsylvania State Employees Credit Union.

174.  On or about March 19, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 27 into his account at Pennsylvania State Employees Credit Union.

175.  On or about April 2, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting from clearing of salary check no. 4803718 issued to Person No. 9.

176.  On or about April 2, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 27 into his account at Pennsylvania State Employees Credit Union.

177.  On or about April 16, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 27 into his account at Pennsylvania State Employees Credit Union.

178.  On or about April 16, 2003, defendant VINCENT J. FUMO caused paycheck no. 4819254 issued by National City Bank for Person No. 9 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

179.  On or about April 21, 2003, Senate Contractor No. 3 sent a Federal Express package, charged to the Senate account, from FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to the Strategy Group, 730 No. Franklin St., Ste 601, Chicago, IL 60610, containing information related to the campaign of a Philadelphia City Council candidate supported by FUMO.

180.  On or about April 22, 2003, Person No. 9 sent a Federal Express package, charged to the Senate's account, from FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to a candidate for county commissioner in Connellsville, Pennsylvania, containing a $2,500 contribution from Fumo for Senate to the candidate.

181.  On or about April 30, 2003, defendant VINCENT J. FUMO caused paycheck no. 11233952 issued by Wachovia Bank for Person No. 9, to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

182.  On or about May 2, 2003, Senate Contractor No. 3 sent a Federal Express package, charged to the Senate account, from FUMO's district office at 1208 Tasker Street,

Philadelphia, Pennsylvania, to the Strategy Group, 730 No. Franklin St., Ste 601, Chicago, IL 60610, containing information related to the campaign of a Philadelphia City Council candidate supported by FUMO.

183.  On or about May 2, 2003, Senate Contractor No. 3 sent an e-mail to Person No. 17, advising, in part, that "The work I've done for [Senate Contractor No. 2] has been almost entirely political in nature -- relating to the campaign last fall or for the city council races here."

184.  On or about August 6, 2003, defendant VINCENT J. FUMO caused paycheck no. 5035709 issued by National City Bank for Person No. 24, and a paystub for Leonard P. Luchko to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

185.  On or about September 3, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting from the clearing of salary check no. 5035709 issued to Person No. 25.

186.  On or about September 3, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting from the clearing of salary check no. 5035711 issued to Person No. 16.

187.  On or about September 3, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting from the clearing of salary check no. 5035694 issued to Person No. 26.

188.  On or about August 20, 2003, defendant VINCENT J. FUMO caused paycheck no. 44794923 issued by Fulton Bank for Person No. 16, paycheck no. 44794921 issued by Fulton Bank for Person No. 24, and paystubs for Person No. 25 and Leonard P. Luchko to be

sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

189.  On or about August 31, 2003, Senate Contractor No. 5 caused invoice no. PSF47338, requesting payment of $2,300 for services rendered by Senate Contractor No. 5 in August 2003, to be mailed to Senate Democratic Appropriations Committee (D), Room 545, Main Capitol Building, Harrisburg, Pennsylvania.

190.  On or about September 3, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 18 into her account at CoreStates Hamilton Bank.

191.  On or about September 3, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting from the clearing of salary check no. 5073359 issued to Person No. 26.

192.  On or about October 1, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 18 into her account at CoreStates Hamilton Bank.

193.  On or about October 15, 2003, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 18 into her account at CoreStates Hamilton Bank.

194.  On or about January 2, 2004, defendant VINCENT J. FUMO sent an e-mail to Person No. 18 and Person No. 26 regarding the status of the concrete in the horse barn, the Gator, and the backhoe and other tractor attachments.

195. On or about January 7, 2004, Person No. 18 sent an e-mail to FUMO regarding Person No. 18's investigation concerning boer goats.

196. On or about January 7, 2004, Ruth Arnao sent an e-mail to Person No. 24 and Person No. 25, with a copy to FUMO, asking them to find a place for FUMO "to get a radar detector put into his van in Florida," to which FUMO replied, with a copy to Leonard Luchko and Person No. 1, "Alos ask Lenny & [Person No. 1]."

197. On or about January 7, 2004, defendant VINCENT J. FUMO caused a paystub for Person No. 8 and Person No. 22 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

198. On or about January 15, 2004, defendant VINCENT J. FUMO sent an e-mail to Person No. 22, asking her to send to FUMO in Florida by Federal Express, or otherwise arrange for delivery of "a coil of the yellow jacketed wire ( 4 conductor ) that we used for all of the speaker connections down here."

199. On or about January 21, 2004, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 8 into her account at Police and Fire Credit Union.

200. On or about January 28, 2004, defendant VINCENT J. FUMO approved the job title and an increase in the salary of Person No. 26, and transmitted the approval form to the Chief Clerk of the Senate.

201.  On or about January 29, 2004, defendant VINCENT J. FUMO approved the job title and an increase in the salary of Person No. 9, and transmitted the approval form to the Chief Clerk of the Senate.

202.  On or about January 29, 2004, defendant VINCENT J. FUMO approved the job title and an increase in the salary of Person No. 24, and transmitted the approval form to the Chief Clerk of the Senate.

203.  On or about February 4, 2004, defendant VINCENT J. FUMO caused paystubs for Person No. 1 and Ruth Arnao to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

204.  On or about February 18, 2004, defendant VINCENT J. FUMO caused paystubs for Person No. 1 and Ruth Arnao to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

205.  On or about February 18, 2004, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Person No. 1 into his account at Commerce Bank.

206.  On or about March 5, 2004, defendant VINCENT J. FUMO responded to an e-mail sent by his girlfriend, Person No. 39, which asked if Person No. 1 or Leonard Luchko would "be able to look at my computer on Monday?", stating, "I think so.  Just let them know."

207.  On or about April 12, 2004, Person No. 9 sent a Federal Express package, charged to the Senate's account, from FUMO's district office at 1208 Tasker Street,

Philadelphia, Pennsylvania, to JEF Associates, 893 Dewey St., West Springfield, MA 01089, containing a $6,500 payment for phone bank services for FUMO's reelection campaign.

208.  On or about April 14, 2004, defendant VINCENT J. FUMO approved an increase in the salary of Leonard P. Luchko, and transmitted the approval form to the Chief Clerk of the Senate.

209.  On or about April 14, 2004, defendant VINCENT J. FUMO approved an increase in the salary of Person No. 1, and transmitted the approval form to the Chief Clerk of the Senate.

210.  On or about April 19, 2004, Person No. 9 sent a Federal Express package, charged to the Senate's account, from FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to D4 Creative Group, 161 Reverington Ave., Ste. 1001, Philadelphia, PA 19127, containing a $10,000 payment for media assistance for FUMO's reelection campaign.

211.  On or about April 20, 2004, Person No. 9 sent a Federal Express package, charged to the Senate's account, from FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to Lester Telemarketing, 19 Business Park Drive, Branford, CT 06405, containing a $3,300 payment for research services related to FUMO's reelection campaign.

212.  On or about May 12, 2004, defendant VINCENT J. FUMO caused paycheck no. 5444908 issued by National City Bank for Person No. 9 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

213.  On or about May 25, 2004, defendant VINCENT J. FUMO sent an e-mail to Person No. 18, regarding the renewal of Senate contracts for Senate Contractor Nos. 1, 2, and 4.

214.  On or about May 26, 2004, defendant VINCENT J. FUMO caused paycheck no. 47231171 issued by Fulton Bank for Person No. 9 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

215.  On or about November 3, 2004, Senate Contractor No. 2 sent an e-mail to defendant VINCENT J. FUMO providing an analysis of the November 2, 2004 election, its significance with respect to certain candidates for office, and the impact of the results on future races.

216.  On or about December 8, 2004, defendant VINCENT J. FUMO caused paystubs for Person No. 8 and  Leonard P. Luchko to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

217.  On or about December 22, 2004, defendant VINCENT J. FUMO caused a paystub for Person No. 8 to be sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania.

218.  On or about December 22, 2004, defendant VINCENT J. FUMO caused an interstate wire transmission through National City Bank in Ohio, resulting in the direct deposit of salary for Leonard Luchko into his account at Citizens Bank.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FIVE

### (Mail Fraud - Senate of Pennsylvania)

**THE GRAND JURY FURTHER CHARGES THAT:**

### Introduction

1.  Paragraphs 1 and 3-138 of Count 1 of this superseding indictment are incorporated here.

### The Scheme to Defraud

2.  Between in or about August 1991, and the date of this superseding indictment, defendant

### VINCENT J. FUMO

devised and intended to devise a scheme to defraud the Senate of the Commonwealth of Pennsylvania (the "Senate"), and to obtain money and property from the Senate by means of knowingly false and fraudulent pretenses, representations, and promises.

3.  It was the object of the scheme described in paragraph 2 for defendant VINCENT J. FUMO to use resources of the Senate, including its employees, contractors, and equipment, for his personal and political benefit.

### Manner and Means

4.  It was part of the scheme to defraud that defendant VINCENT J. FUMO engaged in the manner and means described in paragraphs 3-138 of Count 1 of this superseding indictment.

5.  On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendant

- 75 -

**VINCENT J. FUMO,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, knowingly caused to be delivered by the United States Postal Service,

according to the directions thereon, the items described below:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 2 | June 1, 2002 | Invoice for $5,200 mailed by Senate Contractor No. 1 to Person No. 17, Senate Appropriations Committee (D), Room #545, Main Capital Building, Harrisburg, Pennsylvania 17120-3001, for services rendered from May 1, 2002 through May 31, 2002. |
| 3 | June 14, 2002 | Check no. 04422715 in the amount of $5,200 mailed from Harrisburg, Pennsylvania to Senate Contractor No. 1 at P.O. Box 371, Flourtown, PA 19031. |
| 4 | September 16, 2002 | Invoice no. PSF44691 requesting payment of $2,350 for services rendered by Senate Contractor No. 5 in August 2002, mailed to Senate Democratic Appropriations Committee (D), Room 545, Main Capitol Building, Harrisburg, Pennsylvania. |
| 5 | August 31, 2003 | Invoice no. PSF47338 requesting payment of $2,300 for services rendered by Senate Contractor No. 5 in August 2003, mailed to Senate Democratic Appropriations Committee (D), Room 545, Main Capitol Building, Harrisburg, Pennsylvania. |

All in violation of Title 18, United States Code, Section 1341.

## COUNTS SIX THROUGH THIRTY-THREE

### (Mail Fraud - Senate of Pennsylvania)

**THE GRAND JURY FURTHER CHARGES THAT:**

### Introduction

1. Paragraphs 1 and 3-138 of Count 1 of this superseding indictment are incorporated here.

### The Scheme to Defraud

2. Between in or about August 1991, and the date of this superseding indictment, defendant

### VINCENT J. FUMO

devised and intended to devise a scheme to defraud the Senate of the Commonwealth of Pennsylvania (the "Senate"), and to obtain money and property from the Senate by means of knowingly false and fraudulent pretenses, representations, and promises.

3. It was the object of the scheme described in paragraph 2 for defendant VINCENT J. FUMO to use resources of the Senate, including its employees, contractors, and equipment, for his personal and political benefit.

### Manner and Means

4. It was part of the scheme to defraud that defendant VINCENT J. FUMO engaged in the manner and means described in paragraphs 3-138 of Count 1 of this superseding indictment.

5. On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendant

- 77 -

**VINCENT J. FUMO,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, knowingly caused to be delivered by Federal Express, a commercial

interstate carrier, according to the directions thereon, the items described below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 6 | February 26, 2002 | Federal Express next day shipment from FUMO's district office at 1208 Tasker Street, Philadelphia, PA to FUMO's home at 130 N. Beach Road, Hobe Sound, FL 33455, containing a video surveillance tape made by Person No. 51 at the direction of Senate Contractor No. 1. |
| 7 | March 6, 2002 | Paycheck No. 38070 issued by Sovereign Bank for Person No. 15 and paycheck no. 38059 issued by Sovereign Bank for Person No. 21 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 8 | March 20, 2002 | Paycheck No. 45819 issued by Sovereign Bank for Person No. 15 and paycheck no. 45808 issued by Sovereign Bank for Person No. 21 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 9 | April 3, 2002 | Paycheck no. 52914 issued by Sovereign Bank for Person No. 19, paycheck no. 52906 issued by Sovereign Bank for Person No. 21, paycheck no. 52916 issued by Sovereign Bank for Person No. 24, and paystub for Person No. 25 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 10 | April 17, 2002 | Paycheck no. 9681927 issued by M&T Bank for Person No. 19, paycheck no. 9681920 issued by M&T Bank for Person No. 21, paycheck no. 9681929 issued by M&T Bank for Person No. 24, and paystub for Person No. 25 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |

| 11 | May 15, 2002 | Paycheck no. 72003 issued by Sovereign Bank for Person No. 19 and paystub for Ruth Arnao sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 12 | May 29, 2002 | Paycheck no. 10564071 issued by Wachovia Bank for Person No. 19 and paystub for Ruth Arnao sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 13 | July 10, 2002 | Paycheck no. 3293745 issued by Ameriserv Bank for Person No. 16 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 14 | July 24, 2002 | Paycheck no. 10661566 issued by Wachovia Bank for Person No. 16 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 15 | August 21, 2002 | Paystub for Ruth Arnao sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 16 | January 8, 2003 | Paycheck no. 150223 issued by Sovereign Bank for Person No. 1 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 17 | April 16, 2003 | Paycheck no. 4819254 issued by National City Bank for Person No. 9 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 18 | April 21, 2003 | Federal Express package sent by Senate Contractor No. 3, on the Senate account, from FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to the Strategy Group, 730 No. Franklin St., Ste. 601, Chicago, IL 60610, containing information related to the campaign of a Philadelphia City Council candidate supported by FUMO. |

| 19 | April 22, 2003 | Federal Express package, charged to the Senate's account, sent from Person No. 9 at FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to a candidate for county commissioner in Connellsville, PA, containing a $2,500 contribution from Fumo for Senate to the candidate. |
| --- | --- | --- |
| 20 | April 30, 2003 | Paycheck no. 11233952 issued by Wachovia Bank for Person No. 9 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 21 | May 2, 2003 | Federal Express package sent by Senate Contractor No. 3, on the Senate account, from FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to the Strategy Group, 730 No. Franklin St., Ste 601, Chicago, IL 60610, containing information related to the campaign of a Philadelphia City Council candidate supported by FUMO. |
| 22 | August 6, 2003 | Paycheck no. 5035709 issued by National City Bank for Person No. 24, and paystub for Leonard P. Luchko sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 23 | August 20, 2003 | Paycheck no. 44794923 issued by Fulton Bank for Person No. 16, paycheck no. 44794921 issued by Fulton Bank for Person No. 24, and paystubs for Person No. 25 and Leonard P. Luchko sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 24 | January 7, 2004 | Paystub for Person No. 8 and Person No. 22 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 25 | February 4, 2004 | Paystubs for Person No. 1 and Ruth Arnao sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 26 | February 18, 2004 | Paystubs for Person No. 1 and Ruth Arnao sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |

| 27 | April 12, 2004 | Federal Express package, charged to the Senate's account, sent from Person No. 9 at FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to JEF Associates, 893 Dewey St., West Springfield, MA 01089, containing a $6,500 payment for phone bank services for FUMO's reelection campaign. |
| 28 | April 19, 2004 | Federal Express package, charged to the Senate's account, sent from Person No. 9 at FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to D4 Creative Group, 161 Reverington Ave., Ste. 1001, Philadelphia, PA 19127, containing a $10,000 payment for media assistance for FUMO's reelection campaign. |
| 29 | April 20, 2004 | Federal Express package, charged to the Senate's account, sent from Person No. 9 at FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania, to Lester Telemarketing, 19 Business Park Drive, Branford, CT 06405, containing a $3,300 payment for research services related to FUMO's reelection campaign. |
| 30 | May 12, 2004 | Paycheck no. 5444908 issued by National City Bank for Person No. 9 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 31 | May 26, 2004 | Paycheck no. 47231171 issued by Fulton Bank for Person No. 9 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 32 | December 8, 2004 | Paystub for Person No. 8 and  Leonard P. Luchko sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |
| 33 | December 22, 2004 | Paystub for Person No. 8 sent by Federal Express from the State Capitol in Harrisburg, Pennsylvania to FUMO's district office at 1208 Tasker Street, Philadelphia, Pennsylvania. |

All in violation of Title 18, United States Code, Section 1341.

## COUNTS THIRTY-FOUR THROUGH SIXTY-FOUR

### (Wire Fraud - Pennsylvania Senate)

**THE GRAND JURY FURTHER CHARGES THAT:**

### Introduction

1.  Paragraphs 1 and 3-138 of Count 1 of this superseding indictment are incorporated here.

### The Scheme to Defraud

2.  Between In or about August 1991, and the date of this superseding indictment, defendant

### VINCENT J. FUMO

devised and intended to devise a scheme to defraud the Senate of the Commonwealth of Pennsylvania (the "Senate"), and to obtain money and property from the Senate by means of knowingly false and fraudulent pretenses, representations, and promises.

3.  It was the object of the scheme described in paragraph 2 for defendant VINCENT J. FUMO to use resources of the Senate, including its employees, contractors, and equipment, for his personal and political benefit.

### Manner and Means

4.  It was part of the scheme to defraud that defendant VINCENT J. FUMO engaged in the manner and means described in paragraphs 3-138 of Count 1 of this superseding indictment.

5.  On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendant

- 82 -

**VINCENT J. FUMO,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 34 | March 5, 2002 | E-mail from FUMO to Person No. 1, with a copy to FUMO's girlfriend, Person No. 39, informing Person No. 1 that the GPS device which Person No. 1 installed in Person No. 39's vehicle was still not working. |
| 35 | April 3, 2002 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 25 into his account at United Savings Bank. |
| 36 | May 1, 2002 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 22 into her account at Pennsylvania State Employees Credit Union. |
| 37 | June 12, 2002 | E-mail from FUMO to Person No. 39 asking Person No. 39 to return Senate computer equipment and a beeper which he had provided to her, and informing her that she would be removed from the fumo.com server. |
| 38 | August 7, 2002 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 10 into his account at Pennsylvania State Employees Credit Union. |
| 39 | January 8, 2003 | E-mail from FUMO to Person No. 27, asking Person No. 27 to investigate FUMO's entitlement to $4,200 government grant for not planting on the farm. |
| 40 | January 22, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting from clearing of salary check no. 79774 issued to Person No. 1. |

| 41 | February 23, 2003 | E-mail from FUMO to Person No. 16 informing her that Senate Contractor No. 4 "is still the only one authorized to handle any and all issues regarding [the farm] property," and will address issues relating to the eviction of the previous tenant of the property. |
|----|----|----|
| 42 | March 5, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 27 into his account at Pennsylvania State Employees Credit Union. |
| 43 | March 19, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 27 into his account at Pennsylvania State Employees Credit Union. |
| 44 | April 2, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 27 into his account at Pennsylvania State Employees Credit Union. |
| 45 | April 2, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting from clearing of salary check no. 4803718 issued to Person No. 9. |
| 46 | April 16, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 27 into his account at Pennsylvania State Employees Credit Union. |
| 47 | May 2, 2003 | E-mail from Senate Contractor No. 3 to Person No. 17, advising, in part, that "The work I've done for [Senate Contractor No. 2] has been almost entirely political in nature -- relating to the campaign last fall or for the city council races here." |
| 48 | August 6, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting from clearing of salary check no. 5035709 issued to Person No. 25. |
| 49 | August 6, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting from clearing of salary check no. 5035711 issued to Person No. 16. |

| 50 | August 6, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting from clearing of salary check no. 5035694 issued to Person No. 26. |
|----|----------------|----|
| 51 | September 3, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting from clearing of salary check no. 5073359 issued to Person No. 26. |
| 52 | September 3, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 18 into her account at CoreStates Hamilton Bank. |
| 53 | October 1, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 18 into her account at CoreStates Hamilton Bank. |
| 54 | October 15, 2003 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 18 into her account at CoreStates Hamilton Bank. |
| 55 | January 2, 2004 | E-mail from FUMO to Person No. 18 and Person No. 26 regarding the status of the concrete in the horse barn, the Gator, and the backhoe and other tractor attachments. |
| 56 | January 7, 2004 | E-mail from Person No. 18 to FUMO regarding Person No. 18's investigation concerning boer goats. |
| 57 | January 7, 2004 | E-mail from Ruth Arnao to Person No. 24 and Person No. 25, with a copy to FUMO, asking them to find a place for FUMO "to get a radar detector put into his van in Florida," to which FUMO replied, with a copy to Leonard Luchko and Person No. 1, "Alos ask Lenny & [Person No. 1]." |
| 58 | January 15, 2004 | E-mail from FUMO to Person No. 22, asking her to send to FUMO in Florida by Federal Express, or otherwise arrange for delivery of "a coil of the yellow jacketed wire ( 4 conductor ) that we used for all of the speaker connections down here." |
| 59 | January 21, 2004 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 8 into her account at Police and Fire Credit Union. |
| 60 | February 18, 2004 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Person No. 1 into his account at Commerce Bank. |

- 85 -

| 61 | March 5, 2004 | E-mail from Person No. 39 to FUMO asking if Person No. 1 or Leonard Luchko would "be able to look at my computer on Monday?", to which FUMO answered, "I think so.  Just let them know." |
| 62 | May 25, 2004 | E-mail from FUMO to Person No. 18, regarding the renewal of Senate contracts for Senate Contractor Nos. 1, 2, and 4. |
| 63 | November 3, 2004 | E-mail from Senate Contractor No. 2 to FUMO providing an analysis of the November 2, 2004 election, its significance with respect to certain candidates for office, and the impact of the results on future races. |
| 64 | December 22, 2004 | Interstate wire transmission through National City Bank in Ohio, resulting in direct deposit of salary for Leonard Luchko into his account at Citizens Bank. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT SIXTY-FIVE

**(Conspiracy to Commit Mail and Wire Fraud -
Citizens Alliance for Better Neighborhoods)**

**THE GRAND JURY FURTHER CHARGES THAT:**

### Introduction

1. Paragraphs 1 and 3-138 of Count 1 of this superseding indictment are incorporated here.

2. At all times relevant to this superseding indictment:

a. Citizens Alliance for Better Neighborhoods ("Citizens Alliance") was a nonprofit organization, which, on or about August 13, 1999, received tax-exempt status pursuant to Section 501(c)(3) of the Internal Revenue Code. The organization was founded in or about 1991, by employees of defendant VINCENT J. FUMO's district office located at 1208 Tasker Street in Philadelphia. The original name of the organization was the First District Environmental Defense Fund, and it was later changed to Citizens Alliance for Better Neighborhoods.

b. On or about December 12, 1994, in amended articles of incorporation filed with the Commonwealth of Pennsylvania by defendant RUTH ARNAO and two other Senate employees, the purposes of the nonprofit organization were stated as follows:

> To promote public health, housing, safety and education in the City and County of Philadelphia. Such purposes shall be accomplished, in part, by contributing to the improvement, maintenance and control of appropriate sanitation and other conditions that could endanger public health and safety. Such purposes shall be accomplished, in part, through the acquisition of real estate and/or equipment to be used in the provision of housing, the provision of educational facilities or to be used directly in the furnishing of services. Such purposes shall be accomplished, in part, through the performance of

- 87 -

activities which may include, but are not limited to, investigation, research, examination, training, demonstrations and direct provisions of services.

Besides limiting the nonprofit organization's activities to the City and County of Philadelphia, the articles stated that the organization "shall not carry on any activities not permitted to be carried on by a corporation exempt from Federal Income tax under Internal Revenue code Section 501(c)(3) or corresponding provisions of any subsequent Federal tax laws." Further, the articles provided that "[n]o part of the net earnings of the corporation shall inure to the benefit of any member, trustee, director, officer, or any private individual (except that reasonable compensation may be paid for services rendered to or on behalf of the corporation). . . ."

c. In its early years, Citizens Alliance was supported primarily by state grants obtained by FUMO. It used those funds to provide many services, primarily to residents of South Philadelphia in FUMO's district, such as street sweeping, graffiti removal, tree trimming, snow shoveling, and assistance to senior citizens. Over time, Citizens Alliance acquired a substantial amount of equipment, including, among others, street sweepers, trash trucks, pickup trucks, a dump truck, Bobcats, a backhoe, and a "cherry-picker." The equipment was stored in a garage Citizens Alliance acquired at 1131-1137 Wharton Street, in South Philadelphia. At any given time, Citizens Alliance employed approximately 5-10 laborers, who were paid approximately $60-80 each for an eight-hour day.

d. FUMO used his considerable power and influence as the chairman of the Senate Democratic Appropriations Committee to obtain and to attempt to obtain grants to fund the various expenditures of Citizens Alliance from a variety of public and non-public sources. For example, as a result of FUMO's influence and efforts on its behalf, Citizens

Alliance received substantial state grants from the Pennsylvania Department of Community and Economic Development ("DCED"), the joint committee of the Philadelphia Industrial Development Corporation and the Penn's Landing Corporation known as "PPJOC," and others. Between 1991 and 2002, Citizens Alliance received almost $15 million in public grants from these sources.

      e. In or about 1998, Citizens Alliance's fortunes improved considerably when FUMO persuaded PECO Energy Corp. to begin making annual donations to Citizens Alliance of $1 million, which ultimately occurred over a period of seven years. In or about 2002, PECO donated an additional $10 million to Citizens Alliance in payment of its prior commitment to FUMO that it would bury the utility lines in FUMO's Spring Garden neighborhood, a promise it found itself unable to fulfill. FUMO had filed a lawsuit in his individual capacity and in his capacity as a state senator against PECO, to challenge the benefits sought by PECO during the state's deregulation of electricity services. In a settlement, FUMO demanded various concessions, including these payments to Citizens Alliance. With this money, Citizens Alliance embarked on substantial new endeavors. In part, during the ensuing years, Citizens Alliance acquired a number of properties on and near Passyunk Avenue in South Philadelphia, in an effort to revitalize that neighborhood; supported the establishment of the Christopher Columbus Charter School and Independence Charter School in Philadelphia; and developed a property at 201 Spring Garden Street in Philadelphia to serve as an "incubator" for new high-tech firms.

      f. In 1999 and again in 2000, on the heels of his successful litigation settlement with PECO in which PECO had paid or had agreed to pay to Citizens Alliance a total of approximately $17 million, FUMO demanded that Verizon Pennsylvania, Inc. contribute $15

million to Citizens Alliance in order to resolve litigation before the Public Utility Commission in which FUMO had intervened in November 1998 in his capacity as both a senator and as a ratepayer.  Verizon declined to make the requested contribution to Citizens Alliance, however.

g.  In or about 1999, defendant RUTH ARNAO became the executive director of Citizens Alliance, replacing another Senate employee who had served in this role. ARNAO continued to serve as an aide in FUMO's Senate district office.  While earning a substantial salary from the Senate (although she did little Senate work), ARNAO also received a significant amount of money from Citizens Alliance.  In addition to her Senate salary, she was paid $24,999.78 by Citizen Alliance's subsidiary, CA Holdings, in 2002, and $52,769.18 in 2003.

h. Citizens Alliance also had a board of directors, but until media reports began to raise questions about the operation of Citizens Alliance in late 2003, the board rarely -- if ever -- met.

i.  Citizens Alliance created for-profit subsidiaries in order to handle several of the ventures it undertook after the influx of PECO money began.  Citizens Alliance created a holding company it named CA Holdings Inc., which, in turn, controlled the following subsidiaries, among others:

-- 1210 Enterprises, Inc., which owned the site of the Senate district office at 1208 Tasker Street.

-- Hi Tech Ventures, Inc., which owned the site at 201-217 Spring Garden Street.

-- Passyunk Avenue Revitalization, Inc., which owned redevelopment properties on and around Passyunk Avenue.

--    Moya Ventures, Inc., which owned a parking lot at 13th and Oregon Avenue.

--    Pine Tree Realty, Inc., which owned 326 Durfor Street and 1143-45 Tasker Street.

--    Eastern Leasing, Inc., which acquired a number of Citizens Alliance's vehicles.

These were not, however, true subsidiaries.  Pursuant to federal law, a tax-exempt nonprofit corporation may own a for-profit subsidiary, but the accounts of such a subsidiary must be kept separate, and transactions between the parent and the subsidiary must be at arm's length.  In Citizen Alliance's case, while accounts were maintained separately, ARNAO and her assistants simply transferred money between and among accounts depending on where it was needed.  In addition, there was no separate corporate management structure in any of these subsidiaries, as ARNAO, at FUMO's direction, controlled and managed the affairs of each of the Citizens Alliance subsidiaries.

j.  Although ARNAO had day-to-day control of Citizens Alliance's operations, it was ARNAO's Senate employer, FUMO, who exercised ultimate authority and directed and approved all significant projects undertaken by Citizens Alliance in which he had a personal interest.  From the earliest days of its creation, as made clear by an August 12, 1991 internal memorandum circulated to FUMO and members of his staff who were actively involved in its creation, FUMO expected to receive political benefits from the charitable work performed by Citizens Alliance in the Senatorial district which he represented.  The memorandum outlined a number of activities in which the newly formed nonprofit would engage, including the identification of potential funding sources and acquisition of street cleaning and other equipment, and identified, as a "necessary next step," the following activity: "Arrange to get magnetized

signs developed that can be affixed to sides of vehicles to credit VJF for the campaigns or contact local sign painters to permanently paint sides of vehicles."

k.  FUMO also endeavored to establish and maintain Citizens Alliance in order to receive credit and obtain benefits for other political purposes (in violation of federal law and the terms of Citizens Alliance's articles of incorporation).  On or about September 13, 2001, Person No. 19, a legislative aide in FUMO's Senate office, wrote an e-mail to FUMO suggesting that Citizens Alliance should expand its charitable activities and retain more professional management.  FUMO replied, in part:

> Yes, that would be nice but then it would cost us a lot more and CONFIDENTIALLY (only because I trust you) if we had such a person and tried to do some of the things that are political that we do, we would now have someone else "in our tent" and we would be subject to his blackmail if they so chose to do it.

The aide's suggestions were never implemented.

## The Conspiracy

3.  From in or about August 1991 to in or about December 2005, at Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendants

### VINCENT J. FUMO and RUTH ARNAO

conspired and agreed, together with each other, and with others known and unknown to the grand jury, to commit an offense against the United States, that is, to knowingly devise a scheme to defraud Citizens Alliance, and to obtain money and property of Citizens Alliance by means of false and fraudulent pretenses, representations, and promises, and to use the United States mails, commercial interstate carriers, and interstate wire communications to further the scheme to defraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

**Manner and Means**

It was part of the conspiracy that:

4.    Defendants VINCENT J. FUMO and RUTH ARNAO used funds and resources of Citizens Alliance for their personal benefit.  In addition, FUMO, with ARNAO's assistance, used funds of Citizens Alliance to support political causes he favored.  All of this conduct violated Citizens Alliance's status as a tax-exempt nonprofit organization, and deprived Citizens Alliance of funds which it could have used to carry out its charitable mission in the City and County of Philadelphia.

5.    Consistent with his preference of spending "other people's money" ("OPM"), FUMO arranged for Citizens Alliance to purchase numerous items for his personal benefit. Among many such purchases, Citizens Alliance paid for a huge number of power and other tools, equipment, and hardware costing more than $75,000, that FUMO (a tool aficionado) personally received and placed at his various residences and other properties; Citizens Alliance purchased and paid for 19 Oreck vacuum cleaners and floor machines, for more than $6,500, which went to every floor of FUMO's Green Street mansion, his home in Florida, and other places; and it paid for shopping sprees at the Jersey shore, during the summer months, when FUMO and ARNAO went to Sam's Club, Home Depot, and Lowe's locations near Atlantic City to stock up on tens of thousands of dollars of goods for their summer residences.

6.    Citizens Alliance supplied FUMO and his Senate office in Philadelphia with expensive vehicles (despite the fact that FUMO always had a leased Cadillac paid for by the Senate).  Citizens Alliance purchased a new, fully loaded $36,000 minivan that was given to FUMO to use as his personal vehicle.  It purchased a new, fully appointed, $55,000 SUV,

complete with navigation devices and video screens, for use by FUMO's drivers at the

Philadelphia Senate office.  It also purchased a new $25,000 Jeep for ARNAO's use, and other

vehicles to be described below.

7.  Citizens Alliance also became the owner and landlord of 1208 Tasker Street,

the building in which FUMO's Senate district office was located, and then spent lavishly to

furnish and appoint FUMO's office to an extent that far exceeded the typical Senate allowance

for the office of a member of the Senate.  Although the Senate paid no more than $18,000 per

year in rent to Citizens Alliance, beginning in 1999, Citizens Alliance spent over $600,000 to

renovate and furnish the Tasker Street property.  Further, this office also served as FUMO's

campaign office and 39th Ward headquarters, yet for most of the relevant period FUMO's

campaign committee paid no rent at all.  Citizens Alliance also paid for cell phones and pagers

for many of FUMO's Senate employees in Philadelphia, and for FUMO's adult daughter.

8.  As with his Senate staff (addressed in Count 1 of this superseding indictment),

FUMO used Citizens Alliance's employees as his personal servants.  The Citizens Alliance

laborers were at his beck and call.  They routinely traveled during work hours to the New Jersey

shore, where they repaired and painted FUMO's dock and deck, and undertook other

construction tasks at the Ventnor location, picked up trash, and provided other assistance.  They

were repeatedly dispatched to FUMO's mansion on Green Street, to pick up trash, clear snow,

power-wash his deck, deliver his substantial amount of Christmas decorations, and more.  They

traveled to the Harrisburg-area farm and FUMO's prior residence in Hummelstown, to deliver

Citizens Alliance equipment and other personal items obtained by FUMO.  For the most part,

FUMO did not pay for any of this assistance.

9.   The equipment purchased by Citizens Alliance which FUMO used at his farm for extended periods of time included a bulldozer, obtained by Citizens Alliance in 2003 at a cost of $27,000 (plus another $16,000 for repairs that were needed a few months after the purchase), because FUMO needed to clear parts of the farm; a backhoe; a lawn tractor; a dump truck; a Polaris ATV (all-terrain vehicle); and a Ford F-150 pickup truck.

10.   FUMO used Citizens Alliance money not only to enrich himself, but also to further political goals, in violation of the federal limitations on Citizens Alliance's activities as a 501(c)(3) tax-exempt charitable organization.  In part, Citizens Alliance paid over $250,000 for political polling which FUMO desired to gauge the strength of various elected officials and candidates.  It paid $20,000 so that FUMO could surreptitiously sponsor a lawsuit against a Senate rival.  It paid for expenses of the private investigator FUMO used to assist a 2002 Pennsylvania gubernatorial campaign.  It spent approximately $60,000 to support the efforts of a grassroots group which endeavored to stop the government's construction of dunes at the New Jersey shore, which FUMO feared would block his ocean view from his Margate home.  And it paid for other programs outside Philadelphia, such as $50,000 for the construction of a "war dog" memorial in Bucks County, because those endeavors stood to reflect positively on candidates whom FUMO supported in those areas.

11.   In furtherance of the conspiracy, FUMO and ARNAO regularly made and caused to be made false statements to Citizens Alliance's accountants, to tax authorities, and to others, in order to conceal the inappropriate use of the nonprofit organization's resources. Further, neither FUMO nor ARNAO disclosed to Citizens Alliance's board of directors the

- 95 -

material fact that Citizens Alliance's assets were used in the manner described in this superseding indictment.

12. FUMO and ARNAO and other co-conspirators extensively used the United States mail, commercial interstate carriers such as Federal Express and UPS, and interstate wire communications such as faxes and e-mail, among other means of communication, in furtherance of the scheme to defraud Citizens Alliance.

13. In all, FUMO's and ARNAO's fraudulent and extensive use of Citizens Alliance resources for personal and political benefit caused a loss to Citizens Alliance substantially in excess of one million dollars.

14. A portion of the activity in furtherance of this conspiracy is further explained here:

**A.     Purchases of Consumer Goods.**

15. Citizens Alliance paid for tens of thousands of dollars of goods for FUMO, and additional items for ARNAO. The items purchased for FUMO usually were delivered to Citizens Alliance's warehouse, but then picked up by one of FUMO's Senate employees and taken to his district office or one of his homes.

16. These purchases served, in part, FUMO's expressed preference to stock each of his homes with many identical goods, including tools. FUMO was a licensed electrician and collected a vast number of tools, including expensive power tools, at his residences.

17. Some items were purchased using American Express, Visa, Discover, and Home Depot credit cards, the bills for which were paid by Citizens Alliance.

18. From in or about May 2000 to in or about June 2002, during the course of this conspiracy, FUMO and ARNAO used such credit cards to purchase goods at the New Jersey shore for their personal use. On numerous occasions, FUMO called ARNAO (who owned a condominium unit at 6601 Monmouth Avenue in Ventnor, the property where FUMO kept his boats), and accompanied her or arranged to meet her at Sam's Club or Home Depot near Atlantic City. They then purchased thousands of dollars of personal goods, which ARNAO charged on a Citizens Alliance credit card or a Discover Card for which Citizens Alliance ordinarily paid the bills.

19. The items purchased at Sam's Club were typically groceries or other personal items used by FUMO and ARNAO at the shore. For example, on or about May 26, 2000, they acquired, and Citizens Alliance paid for $1,477.20 worth of cleaning products (Mr. Clean, Lysol, mops, etc.); home health products (band-aids, cortisone, neosporin, Tylenol, sinus caplets, shampoos, etc.); drills and drill sets; batteries and film; DVDs and books; and two chaise lounges (at $114.98 each).

20. There was similar activity at the Home Depot and Lowe's stores in Egg Harbor Township, about 10 miles from FUMO's and ARNAO's shore residences. On a number of days, particularly those in the summer months, between December 1999 and 2002, there were substantial charges at these stores for a great variety of hardware, lighting, tools, and other items. For example, the charge of $1,317.04 on or about Sunday, September 2, 2001, placed on a Home Depot credit card at the Egg Harbor store, consisted of items described on the receipt as follows: side apron, neon tape, staples, CPSHARP, retractable knife, tape, holster, temp guide, drilling s, crayon, right angle, 14 pc. Bungee, 3 cable cuffs, bulk recip, reciprocating blade, 12 pc. Router,

key access, padlock, cable w/ke, grounding bar, router, wrench, book, key-sc1, 3 breakers, 16 in.

bracket, 12 in. bracket, subpanel, 40 in. track, 80 in. track, and BBD Heat.  The total amount of

goods paid for by Citizens Alliance during these years at the Egg Harbor Lowe's and Home

Depot stores was over $10,000.

     21.   Other items were purchased for FUMO by Citizens Alliance by mail order.

The orders were often placed by Person No. 9, a Senate employee, paid only by the Senate, who

carried out many tasks for Citizens Alliance at the direction of ARNAO during regular Senate

working hours.  Person No. 9 would then pay the bills for the products, at ARNAO's direction,

using Citizens Alliance funds.  Person No. 9 (like Person No. 15 before her) also would pay the

Citizens Alliance credit card bills, and maintain Citizens Alliance's bank accounts, under

ARNAO's direction.

     22.   FUMO instructed ARNAO to make these purchases, and to use Citizens

Alliance or Senate employees to deliver them to his homes.  For example, on or about June 12,

1999, FUMO sent an e-mail to ARNAO that instructed her what to purchase and how it should

be delivered to his property at Ventnor, New Jersey: "We need the following from Grangers [a

hardware distributor FUMO preferred].  Please have them shipped to the office or the Wharton

ST. garage and then have the boys deliver it to the dock garage ASAP."

     23.   Similarly, on or about Monday, July 28, 2003, FUMO wrote to Senate

Contractor No. 4, the Senate contractor who oversaw FUMO's farm:  "Tell [Person No. 42, a

farm contractor] to look at the Granger catalog and let me know what Air Compressor he wants."

A short time later, on or about August 11, 2003, Person No. 9 ordered an air compressor, for

$642.50, along with a steel creeper, service jack, and tire inflator/gauge, all totaling $1,001.25

with shipping and tax, from Grainger in Mt. Laurel, New Jersey.  The items were shipped to

Citizens Alliance on Wharton Street in Philadelphia, and paid for by Citizens Alliance.

      24.  In total, from 1999 through 2004, there were over 900 separate charges on

Citizens Alliance's credit cards, totaling over $75,000, for all manner of tools and hardware,

purchased from Home Depot, Lowe's, Grainger's, and mail order companies.  Almost all of the

tools were for FUMO's personal use; Citizens Alliance would not even have any use for the vast

majority of them.  The purchases included a huge list of specialized power tools and electrical

equipment which were never needed by Citizens Alliance's laborers, who, in their daily work,

predominantly used only shovels, rakes, hedge trimmers, chain saws, and, in the winter, snow

blowers.  In contrast, one list of items purchased by Citizens Alliance and ultimately delivered to

FUMO included: cabinets, a workbench, a coil roofing nailer, roofing nails, a thermostat, a glue

gun, volt meter, voltage detector, electrical tester, titanium drill sets, storage boxes, laptop

computer case, electrician's knife, can wrench, multi-functioning pocket tools, high intensity

LED flashlight, laser infrared thermometer, grease gun holder, 28-pocket electrical maintenance

tool carrier, and many others.  Another item purchased by Citizens Alliance for FUMO was a

book called "The Encyclopedia of Country Living."

      25.  Besides tools, Citizens Alliance paid for numerous other consumer goods for

FUMO, for which it had no use.  For example, it paid $3,929.90 for mosquito magnets purchased

from Frontgate in 2000 and 2001; $124.91 for accessories for a turkey fryer, purchased from

Cabela's on or about September 18, 2001; $1,032.40 for two eagle lamps purchased from

Horchow Collection, on or about October 11, 2002 (FUMO collected eagles and decorated his

office with them); $3,555.82 for accessories for a Polaris ATV and a Ford pickup truck,

purchased from Cabela's on or about July 2, 2003, and used on the farm; $449.99 for a meat saw and grinder purchased from Northern Tool and Equipment on or about August 14, 2003, which could be used by FUMO on his farm; and $171.06 for tiki torches and votives purchased from Frank's Nursery on or about October 8, 2003.

26.  Citizens Alliance also purchased many expensive vacuum cleaners.  Between on or about March 1, 2000 and on or about May 21, 2002, Citizens Alliance purchased 17 Oreck vacuum cleaners and two Oreck floor machines, from various vendors (one in Avon-by-the-Sea, New Jersey, two online purchases, and three separate purchases from a vendor in Cherry Hill), for a total of $6,556.53.  Each floor machine cost approximately $500, and each vacuum cleaner cost between $250 and $400.  These vacuum cleaners, which were not needed or used by Citizens Alliance, were sent to FUMO's Green Street home, one for each floor, and to his other properties, including in Florida; in addition, the floor buffer was kept at FUMO's Philadelphia mansion, and an Oreck vacuum cleaner was used in the Senate office.

27.  Citizens Alliance also purchased for FUMO's use very expensive paint which was imported from Holland, and which sold for approximately $100 per U.S. gallon.  Citizens Alliance then spent thousands of dollars to buy dozens of units of this paint, which was given to FUMO to use at his home, to ARNAO to use at her homes in Philadelphia and Ventnor, and to FUMO's girlfriend, Person No. 39, for painting her condominium in New Jersey.  Some of the paint was also used in the Tasker Street office.  None of this paint was needed or used by Citizens Alliance in its ordinary efforts to remove graffiti and improve Philadelphia neighborhoods.

28.  Citizens Alliance paid the telephone bill at ARNAO's Florida home (for all months, whether ARNAO was present there or not).

**B.**      **Vehicles for Personal Use and Use of Senate District Office.**

29.  Citizens Alliance also paid over $350,000 to provide a fleet of vehicles to FUMO and his staff, and to maintain and insure these vehicles.  Citizens Alliance even paid for much of the gasoline for the vehicles.  Citizens Alliance had a large number of vehicles, ranging from street sweepers to pickup trucks, which it used in its daily work cleaning streets, picking up trash, and performing other beautification tasks.  FUMO and ARNAO, however, directed the purchase of other vehicles, several of them luxury vehicles, solely for the personal use of themselves and members of FUMO's Senate staff, which had nothing to do with Citizens Alliance's work, and were never used by Citizens Alliance's employees.  In fact, the availability and use of Citizens Alliance's vehicles by members of FUMO's Senate staff was so prolific and so widely known that it triggered an office-wide memorandum prepared by Person No. 16 to all staff members on or about January 26, 2000:

> There are too many of us here for each of us to make requests on our own when we are dealing with much used agencies.  This problem has arisen before.  From now on, ALL requests for Citizens Alliance personnel and machinery MUST go thru Ruth Arnao.
>
> In addition, our vehicles are being commandeered without any kind of control causing much aggravation.  From now on, all keys will be kept locked up in Ruth's office.
>
> Ruth is to make a sign in and out sheet for anyone who needs to use them.  Staff can see either Ruth or [Person No. 15, ARNAO's aide].
>
> Thanks for your cooperation.

FUMO, ARNAO, and members of FUMO's staff continued to make extensive use of Citizens Alliance's vehicles in the years that followed.

- 101 -

30.  Several of these vehicles were purchased through a subsidiary of Citizens Alliance, Eastern Leasing, Inc., which never leased anything, and engaged in no transactions other than the acquisition of vehicles for FUMO and ARNAO's benefit.  Eastern Leasing had no separate management, and was controlled by ARNAO at FUMO's direction.

### i.  Town and Country Minivan.

31.  Through its subsidiary, Eastern Leasing, Inc. (which received the funds from Citizens Alliance), Citizens Alliance purchased a new, silver 2001 Chrysler Town and Country from Metro Chrysler Plymouth Jeep Subaru in Philadelphia for $36,697.53 on or about March 19, 2001.  The vehicle was top-of-the-line, with leather seats; trip computer; memory settings for multiple drivers for the driver's seat, radio, and mirrors; and a four-disc CD changer. Chrysler made a full line of minivans, including the Dodge Caravan and larger Dodge Grand Caravan.  The Town and Country was a luxury version of the Dodge Grand Caravan, sold under the Chrysler brand.  The model purchased by Eastern Leasing had virtually every available option, making it the top of the Chrysler line.  Moreover, on or about June 26, 2001, Eastern Leasing paid another $1,404.50 for a navigation system and radar detector to be installed by another vendor.

32.  The minivan was almost exclusively used by FUMO.  He used it extensively while in summer residence at the Jersey shore, and at other times of the year.  In addition, the minivan was regularly driven by Senate employees to Martha's Vineyard, Massachusetts to be used by FUMO, ARNAO, and a group of their friends during their annual August vacation there.

33.  While driving the minivan, FUMO was involved in an accident in front of his Margate home on or about Friday, May 25, 2001.  Eastern Leasing made a claim on its insurance company, and paid the deductible for the repairs.

**ii      Other Vehicles.**

34.  Besides the minivan, Citizens Alliance (usually through the Eastern Leasing subsidiary) acquired a number of other vehicles for use by ARNAO, FUMO's Senate drivers, and others who worked at the Tasker Street office.  It also paid numerous bills for maintenance and repairs, and substantial amounts for insurance.  Senate drivers, Person No. 24 and Person No. 25, took the vehicles for service and drove certain ones regularly.  They were listed as drivers on Citizens Alliance's insurance policy, though they were never employed by Citizens Alliance and had no duties with respect to it.  During 2004 alone, the premiums paid on the four superfluous vehicles Citizens Alliance then owned (an F-150, Jeep Wrangler, the Town and Country, and a Cadillac Escalade) totaled approximately $21,776.

35.  Prior to 1996, Citizens Alliance purchased a Chevy Suburban which was used by FUMO and his Senate staff.  Subsequently, many more vehicles were purchased for the same purpose.  The grand total for the purchase, improvement, and upkeep of eight vehicles owned by Citizens Alliance but used by FUMO and his Senate staff members, including the Town and Country, from 1996 through 2004, was over $350,000.  Not all were owned at the same time.  Citizens Alliance's ownership of this fleet of vehicles is reflected in the following schedule:

3-29-96 to 7-14-97 --  1996 Ford Explorer

7-14-97 to 7-22-98 --  1996 Ford Explorer
                       1997 Ford Expedition

|                      |                             |
|----------------------|-----------------------------|
| 7-22-98 to 5-7-99 -- | 1996 Ford Explorer          |
|                      | 1997 Ford Expedition        |
|                      | 1998 Ford Ranger            |
|                      |                             |
| 5-7-99 to 3-16-00 -- | 1997 Ford Expedition        |
|                      | 1998 Ford Ranger            |
|                      | 1999 Ford F-150             |
|                      |                             |
| 3-16-00 to 3-19-01 -- | 1998 Ford Ranger           |
|                      | 1999 Ford F-150             |
|                      | 2000 Lincoln Navigator      |
|                      |                             |
| 3-19-01 to 5-18-02 -- | 1998 Ford Ranger           |
|                      | 1999 Ford F-150             |
|                      | 2000 Lincoln Navigator      |
|                      | 2001 Chrysler Town and Country |
|                      |                             |
| 5-18-02 to 1-16-03 -- | 1998 Ford Ranger           |
|                      | 1999 Ford F-150             |
|                      | 2000 Lincoln Navigator      |
|                      | 2001 Chrysler Town and Country |
|                      | 2002 Jeep Wrangler          |
|                      |                             |
| 1-16-03 to 3-19-03 -- | 1999 Ford F-150            |
|                      | 2000 Lincoln Navigator      |
|                      | 2001 Chrysler Town and Country |
|                      | 2002 Jeep Wrangler          |
|                      |                             |
| 3-19-03 to 3-5-04 -- | 1999 Ford F-150             |
|                      | 2001 Chrysler Town and Country |
|                      | 2002 Jeep Wrangler          |
|                      | 2003 Cadillac Escalade      |
|                      |                             |
| 3-5-04 to 7-26-05 -- | 2001 Chrysler Town and Country |
|                      | 2002 Jeep Wrangler          |
|                      | 2003 Cadillac Escalade      |

36.  Specifically, the 1996 Ford Explorer was purchased by Citizens Alliance from Pacifico Ford for approximately $36,618 on or about March 29, 1996.  The same week, a radar detector costing $588.50 was purchased and installed.  This vehicle was mainly driven by

FUMO's former chief of staff (and later a member of Philadelphia's City Council) in the Senate office, and that person's adult son, Person No. 30.

37.  The 1997 Ford Expedition was purchased by Citizens Alliance from Chapman Ford Sales for approximately $21,477 on or about July 14, 1997.  It was primarily driven by Senate driver Person No. 24, and also was taken to Martha's Vineyard.  Over the years, Person No. 24, FUMO's principal driver in Philadelphia, almost always had a Citizens Alliance vehicle available for his personal use, even though Person No. 24 never did any work for Citizens Alliance.  The Expedition was sold in 2000, when Citizens Alliance, now flush with money from PECO, purchased a luxurious Lincoln Navigator SUV to replace it.

38.  Citizens Alliance purchased a green 1998 Ford Ranger from Pacifico Ford for $21,069 on or about July 22, 1998.  A handwritten note in Pacifico's file states:  "Senator Fumo wants this vehicle will call you today for price."  A copy of ARNAO's license also was in the file.  This vehicle was kept for three summers at FUMO's Ventnor condominiums, where it was used as a construction vehicle for materials being purchased at Home Depot and Lowe's in connection with repairs and renovation work at the property.  In the winter months, it was kept at 1208 Tasker Street and used by various Senate employees and contractors, as well as FUMO's daughter.  On or about October 21, 2000, Senate Contractor No. 2, FUMO's political aide, received a ticket in Tredyffrin Township, Chester County for driving this vehicle with an expired inspection.  Citizens Alliance paid the $93.50 ticket on November 3, 2000, with funds from a grant account.

39.  A white 1999 Ford F-150 was purchased by Citizens Alliance from Holman Auto on or about May 7, 1999 for $17,195.50.  The 1996 Explorer was traded in as part of the

purchase.  Beginning in 2003, this pickup truck was exclusively used at FUMO's Harrisburg-area farm.

40.  Eastern Leasing purchased a black 2000 Lincoln Navigator from Northeast Lincoln Mercury in Philadelphia on or about March 16, 2000, for $52,788.90.  The price included a video player system, two headrest video screens, 2 wireless headphones, a TV tuner with antenna, and a DVD player.  The vehicle also was loaded, with, among other features, leather seats, climate controlled front seats, a power moonroof (a $1,495 option), and a 6-disc CD changer.  ARNAO picked up the vehicle.  In messages left with the dealer, she identified herself as being from "Sen. Fumo's office."  On or about September 18, 2000, a GPS system was installed, for $1,769.78.  The Navigator replaced the Expedition, which Citizens Alliance sold at that time.  Senate drivers, Person No. 24 and Person No. 25, then primarily drove the Navigator. The Navigator also went to Martha's Vineyard to be used during FUMO and ARNAO's annual August vacation there.

41.  Eastern Leasing purchased a yellow Jeep Wrangler from Metro Chrysler Plymouth Jeep Subaru for $25,630.47 on or about May 18, 2002.  This vehicle was then primarily driven by ARNAO.  At FUMO's direction, ARNAO had fog lights installed on top of the vehicle and had a winch installed (which can be used to pull a boat out of the water). Citizens Alliance paid the bill of $1,007.94 for these accessories on or about February 21, 2003. FUMO's Senate driver, Person No. 24, picked up the Jeep at Metro after the accessories were added.   The board of directors of Citizens Alliance did not at the time approve the purchase of a vehicle for the executive director of Citizens Alliance, and ARNAO did not regularly travel from

the Tasker Street office in connection with her Citizens Alliance duties. Rather, this vehicle was most often employed for her personal use.

42. A Cadillac Escalade was purchased by Eastern Leasing from Ferraro Cadillac-Buick in Springfield, Pennsylvania, for $34,635, on or about March 19, 2003. The Navigator was traded in. The price of the Escalade was $54,135, less $19,500 for the trade-in. The only optional equipment added to this fully-loaded luxury vehicle was a satellite navigation system ($1,995) and a trailer package ($190). The vehicle was picked up by Person No. 24, FUMO's Senate driver. The primary driver for the Escalade was Person No. 30, the son of a City Councilman and FUMO ally. Person No. 30 became more involved in Citizens Alliance's affairs over the years, ultimately joining FUMO's staff and replacing ARNAO as executive director of Citizens Alliance.

**C.    Tasker Street Office Improvements and Cell Phones for Senate Office and Staff.**

43. Citizens Alliance spent additional hundreds of thousands of dollars to improve the offices and lives of the Senate employees at FUMO's Tasker Street district office.

44. Citizens Alliance purchased the property at 1208 Tasker Street for $225,000 from the bank of which FUMO was a director, on or about December 31, 1998. Previously, the bank had occupied the upper floors of the building, and FUMO's Senate office was in the basement. When Citizens Alliance purchased the building, the Senate office expanded to include most of the building.

45. Pursuant to the Senate's rules and practices, the Senate paid reasonable rent for a member's district office, and additional funds for furnishing the office. Typical furniture for a Senator's office and conference room cost approximately $8,500. As for building

- 107 -

alterations, the Chief Clerk of the Senate preferred that members rent office space which did not require alterations. Where alterations were needed, the Chief Clerk required that the landlord pay, and the Senate would reimburse reasonable expenses over a 4-8 year period unless the alterations were nominal.

46. FUMO and ARNAO caused Citizens Alliance to ignore all of these limitations and practices, and instead spend with abandon for FUMO's benefit. In exchange, Citizens Alliance received only a modest monthly rent, and did not seek to obtain from the Senate the modest sums it would pay for renovations and furnishings, despite the fact that the lease agreement provided that the Senate was obligated to pay for alterations and improvements to the premises. Between 1999 and 2004, Citizens Alliance spent more than $600,000 on the property, for refurbishment; extensive electrical, telecommunications, and plumbing work; interior furnishings; and many other expenditures. For example, Citizens Alliance paid over $42,000 to a firm called Cabinetry by Robert for a variety of custom high-end office and conference room furnishings (including, among others, a gun cabinet and built-in bookshelves) and refinishing; spent over $6,600 for mahogany doors; paid Whitemarsh Interiors more than $22,000 for lavish office furniture; and paid $1,431.60 for a Subzero refrigerator for FUMO's office. Citizens Alliance also spent approximately $100,000 to create a six-space parking lot for the Tasker Street property, for the exclusive use of FUMO and select members of his staff. During the same period from 1999 to 2004, the Senate paid only $12,000 to $18,000 per year in rent.

47. FUMO maintained not only his district office there, but also his campaign office. The Senate specifically did not pay rent to Citizens Alliance for a 2,002-square foot area

in the building which was supposed to be used as a campaign office.  But even though FUMO's

staff occasionally used this space, Citizens Alliance received no rent for it from anyone.  Fumo

for Senate, a political action committee controlled by FUMO, paid no rent at all to Citizens

Alliance from June 2001 to March 2004, until after the existence of the criminal investigation

became known to FUMO.

48.  FUMO and ARNAO also used Citizens Alliance money to provide cell

phones and pagers for several members of FUMO's Senate staff and others.  Such phones were

supplied to, among others, the key Senate employees who managed FUMO's personal life (his

secretary, Person No. 22; his drivers, Person No. 24 and Person No. 25; his close friend and aide,

Person No. 16; and ARNAO).  In the meantime, the Citizens Alliance workers on the street

advancing the charitable mission of Citizens Alliance themselves most often had no phones.  At

one time, there were two or three given to the crew, but these were taken away and replaced with

walkie-talkies, which were unreliable.  The Citizens Alliance phones were eventually taken away

from the Senate employees in or about 2004, after FUMO and ARNAO became aware of the

existence of the federal grand jury investigation.

49.  In addition, beginning in or about August 1998, Citizens Alliance paid for a

pager for FUMO's adult daughter, and beginning in or about November 1999, it paid for a cell

phone for her, even though she never worked for or provided any services to Citizens Alliance.

Between in or about August 1998 and January 2003, Citizens Alliance paid over $3,000 for the

cell phone and pager given to FUMO's daughter.

**D.**    **Personal Use of Citizens Alliance's Employees.**

50.  Much as FUMO used Senate employees as his personal servants, he did the same, to an extraordinary degree, with the workmen employed by Citizens Alliance.  This continued throughout the conspiracy, until in or about 2004, when, after the investigation began, FUMO told an employee that he could no longer use the workers.  The employee recalled that FUMO said this was because "the fuckin' feds are on me.  Something like that, to that effect. . . . The feds are watching me . . . ."

51.  FUMO and ARNAO did not pay the Citizens Alliance employees anything for their assistance other than the regular pay received by the workers from Citizens Alliance.

52.  Citizens Alliance employees performed the following tasks, among others, related to the vacation properties owned by FUMO, ARNAO, and some of their close friends and allies at the New Jersey shore:

a.  During the summer months, Citizens Alliance regularly dispatched a trash truck or pickup truck from Philadelphia to pick up trash at FUMO's house on Kenyon Avenue in Margate, and at the condominium units at 6601 Monmouth Avenue in Ventnor (where FUMO maintained his dock and ARNAO had a unit).  The trash pick-ups occurred at least once a week, and proceeded even though the municipalities of both Margate and Ventnor provided regular trash service.  The Citizens Alliance employees would take the trash to a BFI facility that Citizens Alliance used for trash disposal on Delaware Avenue in Philadelphia.  The City of Philadelphia paid the bill for Citizens Alliance's trash disposal there.

b.  FUMO used a portion of the second floor of Citizens Alliance's warehouse on Wharton Street to store his personal possessions.  He paid Citizens Alliance $50

per month for that (one of the few things for which he reimbursed Citizens Alliance).  FUMO's

storage space at various times included a huge array of items, including Christmas decorations,

boating equipment, a treadmill, a moped, a Mercedes convertible, and a great deal of furniture.

Every summer, Citizens Alliance employees were dispatched to take kayaks, patio furniture, and

other beach equipment from the storage area to the Margate and Ventnor locations.  When they

arrived, they cleaned the furniture and hosed down the deck or porch where the furniture was to

be placed.  At the end of the summer, the same items were retrieved from the two locations in

Citizens Alliance vehicles, and were returned to Citizens Alliance, where they were stored for the

winter.

c.  On one occasion, two Citizens Alliance employees spent two days

painting the dock area at Monmouth Avenue.  They picked up the paint at Old City Paints in

Philadelphia, where the order had already been placed and paid for on Citizens Alliance's

account.

d.  At ARNAO's direction, several employees spent a full day painting one

of the Monmouth condominiums.

e.  Citizens Alliance employees built a shed at the Ventnor location in or

about the summer of 2001.

f.  On many occasions, employees performed various other tasks at the

Monmouth Avenue condominiums and dock in Ventnor, including pulling weeds, sweeping up,

and power washing the dock area.  Citizens Alliance employees also moved a hot tub at

Monmouth Avenue and other heavy furniture at FUMO's beach house at Kenyon Avenue.

g.  Citizens Alliance employees regularly delivered packages from Citizens Alliance's garage in Philadelphia to FUMO's condominium unit at Ventnor.  A Citizens Alliance employee also picked up building supplies from Home Depot on Delaware Avenue in Philadelphia and took them to the shore.

h.  Citizens Alliance employees took Citizens Alliance's cherry picker to the shore on several occasions for FUMO projects.  One time, an employee took the cherry picker to the shore to untangle a flag from the flag pole at FUMO's home.

i.  On one occasion, a Citizens Alliance employee was dispatched to deliver a 35" rear projection TV set to one of the tenants at the Monmouth Avenue location.

j.  On another occasion, two Citizens Alliance employees met ARNAO at a Lowe's in New Jersey.  They picked up propane tanks, which were taken to the Ventnor shed in a Citizens Alliance pickup (they would not fit in the Citizens Alliance-owned Jeep which ARNAO was driving).

k.  Citizens Alliance employees also performed various tasks for FUMO's close friend, Person No. 16, who spent her summers at the shore even while remaining on the Senate payroll.  Employees occasionally picked up trash at her house, moved furniture, moved dirt in her garden, tidied up, and returned a bicycle for her from the shore to Philadelphia.

53.  In total, Citizens Alliance employees made more than 80 trips to the Jersey shore during the period from 2000 through 2003.  Citizens Alliance paid all the gas expenses for the Citizens Alliance vehicles used on these trips, along with well over $1,000 in bridge and highway tolls.

54.  Citizens Alliance employees performed the following tasks, among others, related to FUMO's residences in the Harrisburg area, including his farm:

a.  Citizens Alliance employees ran some errands to Harrisburg before FUMO acquired the farm in 2003.  For example, a Citizens Alliance employee delivered a desk for FUMO to a house in the Harrisburg area, and another employee picked up exercise equipment there and brought it back to Philadelphia.

b.  Citizens Alliance employees delivered a great deal of equipment purchased by Citizens Alliance to the farm during the period when extensive construction and land clearing work was being performed there.  On one day in or about 2003, a caravan of vehicles, with at least five Citizens Alliance employees, took, among other items, a dump truck, a Bobcat, and a lawn tractor.  At some point, either on this trip or another, Citizens Alliance's Polaris ATV was delivered to the farm, from which it never returned, and Citizens Alliance's backhoe was also delivered to the farm.

c.  Citizens Alliance employees also were dispatched to deliver boxes and other items to FUMO's farm.

55.  Citizens Alliance employees performed the following tasks, among others, related to FUMO's Philadelphia residence at 2220 Green Street:

a.  Citizens Alliance employees were regularly dispatched to FUMO's Philadelphia home to pick up trash, even though the City provided regular pick-up.  One employee later stated, "That would be like a mandatory thing before the day even got started.  If he had trash, we had to go there and get the trash."

- 113 -

     b. Citizens Alliance employees cleared snow in both the front and back of the house. Although FUMO had a sidewalk-heating system at his house, it often did not work, and regular snow removal efforts were therefore required. While Citizens Alliance cleared snow as part of its mission, the employees had a priority list for snow days, which required that the crew first proceed to FUMO's house, ARNAO's house, a Philadelphia City Councilman's rental property, the Citizens Alliance garage, another warehouse/garage at 237 Tasker Street, the Senate office's parking lot at 12th and Tasker Streets, and 10 or 15 Citizens Alliance properties along Passyunk Avenue.

     c. In an annual endeavor, employees delivered a huge amount of Christmas decorations which FUMO kept in the Citizens Alliance warehouse. There were so many decorations that the entire crew had to make two trips in two Citizens Alliance vehicles. At the end of the holiday season, the workers returned to pick up and store the decorations.

     d. On one occasion, workers moved dirt when a second floor deck was being constructed at the residence. It took five Citizens Alliance employees almost a week to clear the area of dirt so that concrete could be laid. That week only, Citizens Alliance paid the men $100 a day, an amount that was higher than their regular pay.

     e. On numerous occasions, employees delivered boxes from Citizens Alliance's warehouse to Green Street, including tools purchased from Grainger's and paid for by Citizens Alliance. On one occasion, an employee delivered part of FUMO's basement gun rack.

     f. Citizens Alliance employees helped to dismantle a storage shed on the roof deck.

g.  Citizens Alliance employees pressure washed the deck and a brick patio.

56.  Besides these jobs for FUMO, Citizens Alliance employees, among other tasks, picked up trash at ARNAO's home in Philadelphia (although less frequently than the trash pickups at FUMO's Green Street home), and helped her move furniture in her home.  Citizens Alliance workers spent approximately two weeks installing hardwood floors and performing other tasks at various times in connection with the refurbishment of a property in South Philadelphia that was owned by two of FUMO's allies: a Philadelphia City Councilman and his son, Person No. 30.  The Citizens Alliance laborers also carried out political tasks.  For example, on two or three occasions, a Citizens Alliance employee was given campaign posters and lawn signs for political candidates, and was instructed to place them in various parts of Philadelphia.

57.  Prior to the time that FUMO and ARNAO became aware of the investigation, with very few exceptions (specifically, FUMO's use of storage space at the Citizens Alliance warehouse and the Tasker Street office), Citizens Alliance was not reimbursed for any of these extensive services.  Moreover, the Citizens Alliance employees did not receive any compensation for any of these tasks other than their regular daily pay from Citizens Alliance.  FUMO and ARNAO never tipped the employees for any tasks.

58.  While most e-mails in which this conduct was organized were destroyed, as part of the conspiracy to obstruct justice described in a separate count of this superseding indictment, some have been located, and confirm FUMO's and ARNAO's direction of the use of Citizens Alliance employees for personal purposes.  For instance, on or about September 16, 1999, a relative of FUMO wrote to FUMO, who was on vacation, about a significant storm at the

Jersey shore, and the relative's efforts to secure their boats and other equipment.  At one point,

FUMO replied, "DO you want to take the expedition or the new 150 truck?  If so tell Ruth I said

OK."  Then, the relative wrote that he raised items off the floor in the garage, but was not sure

what to do because the garage was "packed to the top with the lawn stuff."  FUMO replied,

"Have Ruth send the boys back and move the lawn furniture out and put the stuff up off the floor

and then put the furniture back in!"

       59.  On or about October 7, 1999, FUMO wrote to the relative:  "we have to

winterize the docks VERY soon.  The temperature is starting to go below freezing.  please let me

now when you want to do this and how much help you will need. (ie. the boys from Philly or just

Brian or what)!"  FUMO's relative responded that he would do it on the 16th or 17th.  "I will

need some help to lift heavy things on the afternoon of one of those days.  Perhaps you can give

me a number to call when I know which day."  FUMO answered:

> I will cc Ruth on this so she can arrange the boys coming down to remove the garage
> stuff!  RUTH PLEASE DO THAT!
>
> When you let me know what day, I will tell [his girlfriend, Person No. 39] and see if [her
> son] can be there and if not, Ruth will have to line up someone!
>
> I have asked that the [boats] FIA and GG be taken out ASAP.  I will cc [Person No. 22,
> FUMO's Senate secretary] and see if that is going to be done by then as well!

       60.  FUMO began to relent in his extensive use of these employees for personal

purposes only after he became aware of media interest and the federal investigation.  For

example, on or about February 1, 2005, in an e-mail to a contractor on the farm, Person No. 42,

after Person No. 42 stated he could use "the table saw from your shop," FUMO replied, "Can you

hire some guys to come down and pick it up as well as some of the other stuff. We can rent a truck to do it. I'd rather not use Citizen's guys, etc. So we can just do it on our own. OK?"

**E.    Bulldozer and Other Farm Equipment.**

61. FUMO used for free at his farm, for various and extended periods of time, many pieces of expensive equipment that were purchased and owned by Citizens Alliance, including a bulldozer, a backhoe, a Ford F-150 pickup, a Bobcat, a lawn tractor, an ATV, and a dump truck.

62. "Bobcat" is the generic name for a skid loader often used in construction and farm work. It is a small, maneuverable vehicle with long lift arms, to which may be attached a variety of tools or other attachments. For example, attachments may be used for digging, lifting, excavating, and snow removal. Citizens Alliance gave one of its Bobcats to FUMO for his use at the farm. Citizens Alliance owned two, and dropped off one at the farm for an extended period of time.

63. On or about June 5, 1996, Citizens Alliance purchased from Waterfront Marine a Polaris all-terrain vehicle ("ATV"), for $8,050.39. Citizens Alliance had little or no use for it, however. The ATV eventually made its way to the farm, where it remained permanently after being taken there in 2003 and was used for recreation and other tasks.

64. In or about 2001, Citizens Alliance acquired a new John Deere/Sabre riding tractor, with a snow thrower attachment and cart. A Citizens Alliance employee delivered it to the house where FUMO was staying near Harrisburg. FUMO never returned it, and it eventually was used on the farm, where it remained.

65. Between at least April and October 2003, a backhoe owned by Citizens Alliance was used continuously and extensively in the development of the farm. Citizens Alliance also paid approximately $1,200, between April and October 2003, to Person No. 42 and his business for maintenance charges related to the Citizens Alliance backhoe that was being used at the farm by Person No. 42 on several projects. Person No. 42 was directed to bill Citizens Alliance for maintenance-related charges for the backhoe by Senate Contractor No. 4, the contractor who oversaw the development of the farm on behalf of FUMO.

66. The Ford F-150 pickup truck owned by Citizens Alliance was taken by FUMO for use at the farm in or about 2003, and remained in the Harrisburg area continuously thereafter.

67. FUMO needed a bulldozer to clear land at his new farm for various planned improvements. Citizens Alliance paid for it. On or about July 21, 2003, Citizens Alliance paid $27,000 for a used Caterpillar 951 Traxcavator. Citizens Alliance had no use for this bulldozer; indeed, it employed no one who was even qualified to operate such heavy equipment. Within a few months of its purchase, the bulldozer broke down, and Citizens Alliance paid an additional $16,000 to repair it.

68. The bulldozer never left the FUMO farm. On or about November 19, 2003, a Senate employee wrote a check to Citizens Alliance from the farm's bank account, for $3,000, with the memo notation "Aug., Sept. & Oct. 2003." Next to the memo line, in seemingly different handwriting, is written "Bull Dozer." The check was deposited by Citizens Alliance on or about December 2, 2003. This check was written three days after the first substantial negative article about Citizens Alliance appeared in the *Philadelphia Inquirer*.

69. Later, when the federal investigation intensified, FUMO took further steps to cover his tracks. On or about March 4, 2004, FUMO arranged for his long-time friend, Senate Contractor No. 4, who oversaw the farm (and who received over $280,000 from the Senate from 1999 through 2003 and $220,000 from the Pennsylvania Turnpike Commission in 2003 and 2004 for little or no work), to buy from Citizens Alliance some of the equipment which FUMO had fraudulently acquired. On that date, Senate Contractor No. 4 gave a check to Citizens Alliance for $25,000 (memo: "Bulldozer"). On or about May 10, 2004, Senate Contractor No. 4 wrote an additional check to Citizens Alliance for $2,000, for the final payment on the bulldozer, thus giving Citizens Alliance back the $27,000 it originally paid. Thereafter, the bulldozer remained on FUMO's farm.

70. In addition to the bulldozer, Senate Contractor No. 4 also took other fraudulently obtained equipment off Citizens Alliance's books. On or about March 4, 2004, he paid $10,000 for the Ford F-150 pickup FUMO had taken for the farm, and on or about May 19, 2004, he paid $2,155 for a deposit on the Polaris ATV.

71. This money was funneled to Senate Contractor No. 4 from Person No. 31, a friend and wealthy benefactor of FUMO. In a January 22, 2004 e-mail, from Person No. 31 to FUMO, Person No. 31 asked: "Who should I make the 35 out to?" FUMO responded: "[Senate Contractor No. 4]." Bank records for the accounts of Person No. 31 and Senate Contractor No. 4 confirm that Person No. 31 loaned or gave $35,000 to Senate Contractor No. 4, which Senate Contractor No. 4 used to write the two checks dated March 4, 2004, which totaled $35,000.

F.     **Political Polling.**

72.  FUMO and ARNAO used over $250,000 of Citizens Alliance's money to pay for political polling in connection with races in which FUMO was interested.  These expenditures were well outside Citizens Alliance's mission, and violated the legal restrictions on its activities as a tax-exempt nonprofit corporation.

73.  FUMO used these polls to determine, along with his political advisers and allies, the viability and performance of potential candidates in races in which FUMO was interested or assisting, and to test the strength of different messages prior to and during the course of campaigns.

i.     **The Kiley Polls.**

74.  The first polls at issue were conducted in or about March 2002 by Kiley & Co., an opinion research firm located in Boston.  The purpose was to test the strength of Philadelphia's incumbent mayor, whom FUMO occasionally opposed and who would be up for reelection in November 2003, and to gauge the strength of various candidates in four Philadelphia City Council districts which had recently been redrawn.

75.  One poll focused on City Council races, and resulted in a report entitled "A Survey of Attitudes in Four Proposed City Council Districts in Philadelphia."  The report concerned voters in redrawn districts 1, 5, 7, and 10.  The questions focused on the voters' appraisals of the Mayor and of the relevant incumbent councilman in each district.  The report provided voters' assessments of the strengths and weaknesses of these candidates and officeholders.

76. This poll not only sought to gauge the strength of each officeholder and candidate, but also to influence the attitudes of the voters who were questioned. Candidates whom FUMO did not favor -- the incumbents in districts 5, 7, and 10 -- were presented in a negative light, for example, by asking how respondents were affected by the proposition that "[the Seventh District incumbent] has repeatedly been accused of making statements about Irish, Latino and Jewish people that some consider to be ethnic slurs." In contrast, the incumbent in the First District, an ally of FUMO, was cast in a favorable light in the questions presented in his district.

77. The second Kiley poll focused on the mayor's race. The resulting report by Kiley & Co. was entitled, "A Survey of Attitudes Among Philadelphia Voters." The survey asked for voters' attitudes toward the Mayor, and then inquired regarding hypothetical 2003 matchups between the incumbent mayor and five possible opponents (the unsuccessful 1999 opponent, three City Council members, and FUMO himself).

78. Kiley's invoice for the mayoral poll was dated March 14, 2002, and read, "Full payment for professional services in connection with the conduct of a survey of 600 Philadelphia voters." The charge was $28,000. Kiley's invoice for the City Council poll, dated March 19, 2002, referred to "Full payment for professional services in connection with the conduct of four surveys of 200 residents each in the following 'new' city council districts in Philadelphia: 1, 5, 7 and 10." The charge was $16,800. Both of the invoices were paid by CA Holdings, using money which was transferred to it by Citizens Alliance.

79.  Although ARNAO paid the expenses for these polls, at FUMO's direction, Citizens Alliance itself never received or had any use for the poll results, which were used exclusively by FUMO and his political team.

80.  The survey results were sent by Federal Express on or about March 18, 2002, and March 19, 2002, from Kiley & Company in Boston to Person No. 2 (a political consultant used by FUMO), at his home address in Phoenixville, Pennsylvania.

**ii.**    **The Global Polls.**

81.  Citizens Alliance also supplied the funds for numerous polls conducted by Global Strategy Group, a New York firm.  All of these polls focused on the strength of candidates in races in which FUMO was interested and/or involved.  The polls were conducted at various stages of campaigns, and included "viability" surveys, typically conducted at the outset of a campaign; "brushfire" surveys, typically conducted during the course of a campaign; and "tracking" surveys, which usually assess the state of a race at set intervals during a campaign.

82.  The polling included polls regarding races outside the Philadelphia area, including contests in the 12th Senatorial District in Pennsylvania, which spanned parts of Bucks and Montgomery Counties; the 24th Senatorial District, which covered parts of Montgomery, Bucks, Lehigh, and Northampton Counties; the 25th Senatorial District, which covered many counties in north-central Pennsylvania; and the 27th Senatorial District, which included part of Dauphin County and other counties to the north of Dauphin County in central Pennsylvania.

83.  The invoices for the polls, which were sent by United States mail from Global Strategy Group in New York City to Citizens Alliance in Philadelphia, bore the following dates, descriptions of services, and amounts:

| 4-24-02 | Primary Statewide Survey 800 Interviews | $16,950.00 |
| 8-2-02 | Survey PA State Senate District 26 Crumlish: 400 interviews | $14,500.00 |
| 8-6-02 | Philadelphia Survey: 800 interviews | $34,250.00 |
| 9-6-02 | Brushfire Survey PA SD 12: 400 Interviews | $10,000.00 |
| 10-21-02 | Research Tracking Survey: PA SD 24 - 400 Interviews | $6,500.00 |
| 12-3-02 | Philadelphia Council Surveys 1200 Interviews | $32,000.00 |
| 1-9-03 | Philadelphia Council Additional Survey: 300 Interviews | $5,500.00 |
| 4-23-03 | City Council District 7 Brushfire: 400 interviews | $13,000.00 |
| 5-13-03 | City Council 7: 26932 Automated calls | $2,943.20 |
| 5-13-03 | City Council #7 ID Calls: 3093 Calls | $3,093.00 |
| 5-13-03 | CC #7 Tracking Research Summary: 300 interviews | $4,500.00 |
| 8-1-03 | Viability Survey SD 27: 400 interviews | $10,000.00 |
| 9-9-03 | Philadelphia Mayoral Tracking: Four Surveys | $32,000.00 |
| 9-23-03 | City Council Research Survey - McCarthy: 400 Interviews | $10,000.00 |

| | | |
|---|---|---|
| 9-30-03 | "Reimbursable Expenses": | |
| | McCarthy sample list | $543.68 |
| | Tracker #2 sample list | $581.25 |
| | | |
| 10-2-03 | Bucks County Survey: | |
| | 400 Interviews | $11,000.00 |

84.  All of these invoices were paid by CA Holdings, using funds provided by

Citizens Alliance.  ARNAO directed that the checks be prepared, and she signed the checks.

She, in turn, was instructed by FUMO to pay these invoices in this manner.  Citizens Alliance,

however, never received and had no use for the poll results, which were used by FUMO and his

political team.

iii.     **False and Omitted IRS Tax Filings.**

85.  FUMO and ARNAO caused Citizens Alliance to make false tax filings to the

Internal Revenue Service in order to conceal their use of Citizens Alliance funds for their

personal and political benefit, and at the same time to maintain Citizens Alliance's tax-exempt

status.  For these same purposes, FUMO and ARNAO further failed to make required tax filings.

86.  Over the course of Citizens Alliance's existence, defendants VINCENT J.

FUMO and RUTH ARNAO were often informed by Citizens Alliance's independent accountants

regarding the strict limitations placed by federal law on the activities of a tax-exempt nonprofit

corporation, and of such a corporation's annual obligation to file an IRS Form 990, Return of

Organization Exempt From Income Tax.

87.  For example, on or about August 15, 1996, one of the accountants, Person

No. 40, wrote directly to Person No. 10, FUMO's SDAC counsel, because, according to the

letter, "You [i.e. Person No. 10] have asked for guidance concerning the federal tax issues raised

by nonprofit corporations having for-profit subsidiaries."  Person No. 40 then provided an overview to Person No. 10 of the applicable IRS rules and guidelines applicable to the establishment of a for-profit subsidiary by a nonprofit corporation.  Significantly, this letter provided examples of the manner in which for-profit subsidiaries have been used, including to "[r]emove unrelated business activities from the nonprofit parent, reducing exposure to loss of exemption for the parent," "[i]nsulate the assets of the parent from risky activities of the subsidiary," "[p]rovide a vehicle in which key executives can be compensated, based upon net profits or through nonqualified, unfunded deferred compensation arrangements," and "[s]hield sensitive salary information . . ."  However, Person No. 40 advised Person No. 10 that the IRS had rules requiring that for-profit subsidiaries of nonprofit organizations must have a separate existence, and that the indicia of such a separate existence included, among others, that "[t]he subsidiary must have a business purpose that is separate and distinct from its parent," "the overlap of the board of directors should be avoided where possible and a majority of the subsidiary's board should consist of outsiders," "[t]he officer responsible for the day to day activities should not be a member of the parent's board," "[e]ach entity should observe all corporate formalities, including separate meetings of its board of directors . . . ," and "[t]ransactions between the entities should be done on an arm's length basis."

88.  Despite the fact that it had been in existence since 1991 and had, during the years that followed, received various state grants, Citizens Alliance did not file any tax returns with the IRS until on or about June 13, 1999.  On or about that date, Citizens Alliance filed Form 990 returns for the years 1991 through 1997.  The 1998 Form 990 return was filed with IRS on or about November 21, 1999.

89. Despite the fact that it had received, in prior years, state grants and charitable contributions from PECO, Citizens Alliance had never even applied to the IRS to be recognized as a tax-exempt 501(c)(3) organization until on or about June 17, 1999. The IRS granted Citizens Alliance's request for tax-exempt status on or about August 13, 1999, but noted that its decision to grant tax-exempt status to Citizens Alliance was "[b]ased on information supplied, and assuming your operations will be as stated in your application for recognition of exemption."

90. On or about September 11, 1999, just months after Citizens Alliance's first-ever filing of tax returns that would become partially available to the public, FUMO sent a memorandum marked "CONFIDENTIAL" to Person No. 10 (FUMO's SDAC counsel), several members of FUMO's staff in Harrisburg, with a cc to ARNAO and another Senate employee, Person No. 13. In this memorandum, FUMO expressed concerns that Citizens Alliance's filing of a Form 990 return, most of which would be available to the public, would result in adverse publicity. FUMO requested that Person No. 10 and the others do the following:

> Please take a close look at the Non Profit Form 990's that have to be filed. I did not realize that they require a schedule for 'public money' received which is open to the public. There is another place in the form where you can list other money received and file a schedule but it DOES NOT HAVE TO BE RELEASED TO THE PUBLIC (ie. Press).

FUMO was concerned as to whether it would be necessary to disclose grants from the Philadelphia Industrial Development Corporation and Penn's Landing Corporation, noting that "[w]ith the newspapers all over our asses I do not think we should give them the slightest bit of information if we don't strictly have to." He told the memorandum's recipients to "try desperately, if you have to, to get us to where we want to be":

> But while I know he [a press aide for FUMO] will say that we should be as open as possible.  In this case I don't think we should.  The Inquirer will go absolutely BALLISTIC if they ever really find out about the DRPA money and PJOC etc.  We really don't need a never ending series of bullshit from them on their next Pulitzer quest!  PA ASAP TY

In this memorandum, FUMO made it clear that the money that Citizens Alliance had received from PECO should not be publicly disclosed:  "Also, obviously any money received from PECO would be on the non public schedule."

91.  In the spring of 2003, accountants at Stockton Bates, Citizens Alliance's independent accounting firm, undertook to prepare required tax filings.  Specifically, they commenced the preparation of a Form 990 for 2002.  Citizens Alliance was required to file such a return with the IRS every year, and to profess on that form compliance with all applicable rules and regulations, in order to maintain its status as a tax-exempt charitable organization.  The accountants also undertook the preparation of the Form 1120 (U.S. Corporation Income Tax Return) of CA Holdings, Inc., the for-profit subsidiary of Citizens Alliance.

92.  The accountants, in reviewing the books and records of Citizens Alliance, immediately saw the polling expenditures which occurred in 2002, and, aware of the impropriety of political expenditures by Citizens Alliance, questioned ARNAO about their purpose.  The accountants questioned ARNAO several times, but each time she did not respond.  Finally, ARNAO requested that Stockton Bates send her an e-mail presenting the question, and she asked that the accountants copy FUMO on the e-mail.

93.  Accordingly, on or about May 6, 2003, an accountant at Stockton Bates sent an e-mail to ARNAO and FUMO which read:

> We paid Global Strategies for polling

> What is the polling for????
> We also paid Kiley & CO for polling
> What is the polling for????

Subsequently, according to the accountant's notes, ARNAO falsely replied that the polls were "community surveys of residents to determine what activities they would want the nonprofit to perform." Based on this false information, the accountants completed the required federal returns.

94. At the same time that FUMO and ARNAO misled the accountants, and thereby caused the filing of a false tax return that affirmatively denied that Citizens Alliance had made any political expenditures, FUMO and ARNAO continued for months thereafter to direct that polls by Global Strategies be paid by Citizens Alliance, including polling in the same month of May 2003 in the hotly contested Philadelphia City Council race in the Seventh District, in which FUMO supported one of the candidates.

95. ARNAO signed the Form 990 of Citizens Alliance on or about May 15, 2003, and mailed it to the Internal Revenue Service in Ogden, Utah. The return reported revenue of $14,496,254, consisting primarily of $11,039,584 in "public support" and $2,786,083 in government contributions. The return included the following false statements and material omissions:

a. On line 23, "Specific assistance to individuals," nothing was entered. This omission was fraudulent in light of the extensive benefits provided to FUMO and ARNAO during 2002.

b. On line 76, ARNAO answered "no" in response to the question, "Did the organization engage in any activity not previously reported to the IRS?" The answer was

false in light of the fact that Citizens Alliance engaged in extensive political activities in 2002 in addition to its extensive involvement in supporting the personal needs of FUMO and ARNAO, none of which was ever disclosed to the IRS.

c.  On line 80(a), ARNAO answered "no" to the question, "Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization?"  This answer was false because ARNAO, an officer and board member of Citizens Alliance, was also the treasurer of Fumo for Senate and a member of FUMO's Senate staff at the time that she signed the return.

d.  On line 81, "Enter direct or indirect political expenditures," nothing was entered.  This omission was fraudulent in light of the political expenditures by Citizens Alliance during 2002.

e.  On line 89(b), "Did the organization engage in any section 4958 excess benefit transaction during the year . . .?", the answer given was no.  This statement was false, in that the expenditures by Citizens Alliance for political polling, and for FUMO's and ARNAO's benefit, qualified as such transactions.

Truthful answers to all of these questions would have subjected Citizens Alliance, FUMO, and ARNAO to additional taxes and penalties, and jeopardized Citizens Alliance's tax-exempt status with respect to all of its more than $14 million in revenue during 2002.

96.  ARNAO signed the Form 1120 return of CA Holdings Inc. on or about September 12, 2003, and it was then filed with the IRS.  On that return, polling expenses during

2002 (as well as the payments to Senate Contractor No. 1 addressed in paragraph 138 below) were falsely deducted as "Community Development Consulting" on Statement 16 of the return.

97. In 2004, the same questions arose, as Citizens Alliance's accountants uncovered the additional polling expenses paid during 2003 and again sought an explanation from ARNAO in order to prepare the required 2003 Form 990 return. The accountants, over the course of many months, repeatedly asked ARNAO to explain the purpose of the polls, and to provide them with a copy of the polling results themselves. ARNAO never answered these inquiries, and the Form 990 for 2003 was never filed.

### iv.    Efforts to Thwart Investigation and Conceal the Fraud.

98. In or about December 2004, in an attempt to deflect the federal investigation and to conceal the fraud on Citizens Alliance, FUMO endeavored to repay Citizens Alliance for the illicit polling expenditures. He asked supporters to donate over $200,000, which was deposited into the bank account of Committee for a Democratic Majority ("CDM"), a political action committee FUMO controlled. One of the donations, for $30,000, came from the campaign account of a Philadelphia City Councilman of which Person No. 9, the Senate employee on FUMO's staff, was the treasurer. An additional $41,000 was paid to Citizens Alliance by Democratic State Senate Campaign Committee, another PAC over which FUMO exercised control. CDM then paid $215,161.11 to CA Holdings on or about December 31, 2004.

99. At the same time in 2004 that she did not answer the accountants' questions concerning Citizens Alliance's 2003 polling expenditures, ARNAO endeavored to obtain copies of the poll results to provide to defense attorneys (given that she and Citizens Alliance, although paying for the polls, had never received the results). She also tried to create a false defense by

writing an e-mail to Person No. 2, the political consultant who had ordered the polling on

FUMO's behalf:

> I emailed you the other day asking for all the stuff from Global strategies the ones that do the polling for us.  In need the questioners and outcomes from them and who was polled etc.  I will talk to you in person why they need it but I need it right away.  You remember all the stuff I told you we shouldn't be paying for etc.

In truth, ARNAO had never told Person No. 2 that Citizens Alliance should not be paying for the

polls; to the contrary, she personally directed that checks of CA Holdings be written to pay all of

the polls, at FUMO's direction.

**G.     Jubelirer Lawsuit.**

      100.  FUMO used $20,000 of Citizens Alliance's funds to covertly finance a

lawsuit challenging one of FUMO's political rivals elsewhere in Pennsylvania.  This political

endeavor was well outside Citizens Alliance's tax-exempt mission.

      101.  In September 2001, after the terrorist attacks, the President of the United

States named Pennsylvania Governor Tom Ridge as the national Director of Homeland Security.

Upon Ridge's resignation as governor, Lt. Governor Mark Schweiker succeeded to the position,

while Robert C. Jubelirer, then the president pro tempore of the Senate, became lieutenant

governor.  The lawsuit in question was a constitutional challenge to Jubelirer's retention of the

position of both Senator and lieutenant governor.  The lawsuit asserted that the Senate seat of

Jubelirer should be declared vacant and subject to a special election.

      102.  One of the named plaintiffs was Rep. John A. Lawless, who represented a

Montgomery County district in the General Assembly from 1991 to 2003.  Lawless' opposition

to Jubelirer was well known.  FUMO and his staff reached out to Lawless to encourage him to

file the lawsuit, as Jubelirer was also a political rival of FUMO.  Lawless had a brief

conversation with FUMO, who stated that his attorney, Person No. 10 (a full-time Senate

employee as counsel to the Senate Democratic Appropriations Committee), would call Lawless.

Person No. 10 did so.

103.  Lawless told Person No. 10 he could not afford to pay for the lawsuit, but

Person No. 10 told him that there were contributors to FUMO who wanted to help but who also

wanted to remain anonymous.  Person No. 10 also identified an attorney in Tunkhannock,

Pennsylvania, Person No. 45, as the person who would represent the plaintiffs.  Person No. 10

also stated that he would review the attorney's work.

104.  FUMO and Person No. 10 endeavored to conceal their instigating role in the

lawsuit.  Indeed, after the suit was filed, Person No. 10, on FUMO's behalf, prepared an amicus

brief filed in state court which addressed the jurisdictional question whether the court could

consider the suit.  The brief encouraged the state court to consider the matter, but stated that

"Senator Fumo does not take a position" on the underlying legal issue regarding Senator

Jubelirer's retention of two offices.  This representation was false in that FUMO did, in fact,

support the lawsuit filed against Jubelirer by initiating it and causing Citizens Alliance to pay for

Lawless' counsel fees.

105.  To conceal their role in the lawsuit, FUMO and his staff obtained the legal

fees from Citizens Alliance, and directed the funds to Lawless' attorney, Person No. 45, through

an additional conduit.  On or about October 17, 2001, ARNAO prepared a check payable to

"[Company No. 1]" for $20,000.

- 132 -

106. Company No. 1 was the consulting firm of Senate Contractor No. 2, the political consultant who was given a lucrative Senate contract by FUMO. Senate Contractor No. 2, upon receiving the $20,000 check from Citizens Alliance, deposited the check into his business account and then wrote a $17,000 check from that account to Person No. 45 for the legal fees, which Person No. 10 had negotiated with Person No. 45. Senate Contractor No. 2 kept the remaining $3,000 for himself. Person No. 45 was not told by anyone involved in the transaction that Citizens Alliance had actually provided the funds to pay his fees.

## H.    <u>Ventnor Dunes Project.</u>

107. Similarly, FUMO used a substantial amount of Citizens Alliance's money to further his own interests in a political cause in New Jersey, which had no connection to Citizens Alliance's permissible activities.

108. The New Jersey matter involved a plan by the Army Corps of Engineers and the New Jersey Department of Environmental Protection to build sand dunes along the beaches on Absecon Island, beginning in Atlantic City and moving south toward Ventnor and Margate. Some residents of the affected communities (Atlantic City, Ventnor, Margate, and Longport) formed a grass-roots organization called DUNE (Don't Upset Natural Environment), to oppose the dune plan. The group's goal was to prevent the dunes from ever being constructed and, as part of that effort, to attempt to force a ballot referendum on the question.

109. FUMO's girlfriend at the time, Person No. 39, was a resident of Ventnor. In or about November 2000, she introduced FUMO to one of the group's leaders, Person No. 38. FUMO agreed to assist the effort, motivated by a concern that his own ocean view in Margate would ultimately be affected, thereby decreasing the value of his beach house.

110.  FUMO took several steps to use Pennsylvania Senate and Citizens Alliance resources to help the DUNE members.  In part, FUMO delegated Person No. 10, the counsel to the Senate Democratic Appropriations Committee who was a full-time Senate employee, to help the New Jerseyans set up nonprofit corporations, to which FUMO could then direct Citizens Alliance's funds or Pennsylvania state grants.  Person No. 10 endeavored to base the new corporations in Pennsylvania in order to conceal the impropriety of Citizens Alliance or the Commonwealth of Pennsylvania giving money to a New Jersey campaign.

111.  With respect to one of the corporations which was established, on or about October 28, 2001, FUMO wrote to Person No. 10:  "I would like to set up the 'Downbeach Community Development Corporation'.  What info do you need. PA TY"  On or about Monday, October 29, 2001, beginning at 9:01 a.m., Person No. 10 wrote a response, and FUMO replied to each statement:

| | |
|---|---|
| Person No. 10: | Ugh.  It is getting both expensive and difficult to get IRS designation for a 501(c)(3).  But, I'll do whatever you want on this. |
| FUMO: | TY |
| Person No. 10: | I need a detailed purpose . . . |
| FUMO: | They will do community development in Atlantic County, NJ. |
| Person No. 10: | . . . three officers . . . |
| FUMO: | [FUMO's girlfriend, Person No. 39] will be the President |
| Person No. 10: | . . . an address . . . |
| FUMO: | Can we use a PO Box? |
| Person No. 10: | . . . and a reliable contact person who is competent and can work with me to get the hugh amount of paperwork completed. |

FUMO:                    Ruthie. BTW, can she be one of the officers even though she does
                         not live in NJ and also is an officer in Citizens who will be starting
                         off the funding of this CDC.

                    PA TY

112.    Earlier, Person No. 10 had corresponded with Person No. 38, a member of
the New Jersey group, regarding establishing another corporation which could receive funds.  At
one point, the New Jersey resident suggested that that nonprofit entity be called Save Our
Beaches, Inc.  On or about Wednesday, January 24, 2001, at 11:04 a.m., Person No. 10 replied:
"My problem is that there are no 'beaches' in Pennsylvania.  It is initially a PA corporation.  How
about . . . 'Riparian Rights League' or 'Riparian Rights Defense Fund' as alternatives?  It would
be nice to get the name settled soon."

113.    They settled on the name of Riparian Defense Fund, Inc.  Over the next
several months, Person No. 10 assisted in establishing the corporation and complying with the
legal requirements of filings and advertising.  In carrying out these tasks, he retained a prominent
Philadelphia law firm, and directed that law firm to send its bills for legal work on the Ventnor
Dunes Project to Citizens Alliance for payment.  As a consequence, all of the legal bills and other
costs initiated by Person No. 10 regarding the Ventnor Dunes Project, which totaled more than
$20,000, were paid by Citizens Alliance.

114.    The IRS Form 1023 application submitted by Person No. 10 to the IRS
requesting that Riparian Defense Fund, Inc. be granted tax-exempt status failed to disclose the
corporation's true purpose.  It misleadingly stated:

        The purpose of the Organization is to educate the public about environmental concerns
        related to property that has access to natural waterways.  These waterways are within the
        Delaware Valley, Chesapeake Bay Estuary, and the Mid-Atlantic States Tidal Basin, and

include rivers, lakes, and oceans.  The Organization will publish newsletters and distribute other information concerning the protection and conservation of natural waterways.

The Organization may engage in litigation as a plaintiff to protect the wetlands and waterways from activities that threaten or disturb them.

In truth, the sole purpose of the organizers of the corporation was to oppose the dunes project on Absecon Island, New Jersey.  Person No. 10 also established other corporations, Environmental Defense Fund, Inc., Environmental Awareness Fund, and Downbeach Community Development Corporation, in order to support the dune opposition efforts.

115.  Once the entities were created, at FUMO's direction, Citizens Alliance contributed its support.  On or about July 25, 2001, at FUMO's direction, Citizens Alliance gave $30,000 to Environmental Defense Fund.  The check's memo line noted "study," and, while the New Jersey dune opponents did commission a study, this check was not used to pay for that. Rather, the money went to a Fleet Bank account in the name of The Riparian Defense Fund, Inc. In November 2001, Person No. 38 wrote to Person No. 10 that $15,467.04 went to a law firm for environmental law assistance.  The remaining $14,661.67 was given to a 9-11 fund.  At the time, Person No. 38, one of DUNE's leaders, believing that the dunes project had been delayed, concluded that the group had no more need for money and would dissolve.

116.  However, there was new activity in 2002.  A ballot referendum regarding the dunes was scheduled in November 2002.  FUMO then delegated his political consultants, Person No. 2 and Senate Contractor No. 2 (both of whom were being paid by the Pennsylvania Senate), to assist the anti-dune forces.

117.  Senate Contractor No. 2 arranged for postcards to be printed opposing the dunes, and mailed to area voters.  He used Kennedy Printing Co., a Philadelphia-based firm which he often used for political printing (and from which he earned a sizable commission for business he referred there).  Kennedy Printing also assisted in a phone bank effort regarding the Ventnor referendum.

118.  Kennedy Printing's bills for these New Jersey campaign efforts, totaling approximately $9,395, were paid by CA Holdings, the subsidiary of Citizens Alliance.  One of the bills, which is dated October 16, 2002, for $2,341, refers to a postcard entitled "The bureaucrats in Trenton want to hold all cards."  The payments to Kennedy Printing were an inappropriate use of the Philadelphia nonprofit's funds.

119.  In total, Citizens Alliance and its subsidiary spent over $60,000 for donations, legal fees, and campaign costs relating to the anti-dune effort at the New Jersey shore.

**I.     Cuba Trips Funded by Citizens Alliance.**

120.  FUMO and ARNAO caused Citizens Alliance to spend tens of thousands of dollars to send FUMO and five of his closest friends to Cuba, a mission well outside Citizens Alliance's tax-exempt purpose "[t]o promote public health, housing, safety and education in the City and County of Philadelphia."

121.  The organizer of the trips was Person No. 28, the president of an organization, the Alliance for Responsible Cuba Policy (the "Cuba Alliance"), which advocated an end to the American embargo of Cuba.  Person No. 28 obtained licenses from the U.S. government to lead trips to Cuba, and had done so many times to promote understanding of

Cuba.  He arranged itineraries which included meetings with Cuban government and business leaders, and escorted American political leaders on a number of these trips.

    **i.**    **The November 2001 Trip of FUMO and Senate Contractor No. 5.**

    122.  Between November 17 and 20, 2001, FUMO went on a trip to Cuba with Senate Contractor No. 5, who was FUMO's close friend and ARNAO's boyfriend (later husband).  In order for FUMO and Senate Contractor No. 5 to travel with the delegation to Cuba, Citizens Alliance's subsidiary, CA Holdings, made a $12,000 payment to the Cuba Alliance. Less than two months after returning from Cuba, FUMO pledged an additional $10,000 to the Cuba Alliance, which was also paid by CA Holdings.  On or about January 3, 2002, FUMO directed ARNAO as follows: "Ruth, please get [Person No. 28] a check from Citizens (PECO money) for $10,000 ASAP."  ARNAO followed FUMO's instructions, and the $10,000 check from CA Holdings to the Cuba Alliance was issued by ARNAO on or about January 7, 2002.

    **ii.**    **The February 2002 Trip of Person No. 29 and Person No. 32.**

    123.  On or about January 7, 2002, at 6:56 p.m., FUMO wrote to ARNAO:

> BTW, did you send [Person No. 28] his $10,000 yet?  As soon as he gets it I want to have him invite [Person No. 33] and [Person No. 29] to go to Cuba, we'll pay their $3k@ from Citizens.

ARNAO replied, in part:

> i fed ex that money yesterday so he should have it today, so you can call him of give me his info and i will get in touch with him.  just let me know what you want me to do.

    124.  As instructed, ARNAO invited Person No. 33 and Person No. 29, two close friends of FUMO who were part of a social circle which regularly met at the Jersey shore, to travel to Cuba.  Person No. 33 could not go, so Person No. 32, an Atlantic City attorney,

accompanied Person No. 29 instead.  Person No. 29 and Person No. 32 went to Cuba from February 14-17, 2002.

125.  At the time of the trip, Person No. 29 was a resident of Ventnor, New Jersey, who worked for a national construction company at an office in Atlantic City.  He spent little time in the Philadelphia area.  Person No. 32 was an attorney who handled occasional cases in the Philadelphia area, but had a practice based 95% in New Jersey.  The sponsorship of this trip had nothing to do with the City of Philadelphia, and was a misappropriation of Citizens Alliance's funds just to benefit FUMO's New Jersey friends.

126.  Person No. 29 and Person No. 32 were permitted to go on the trip because of the $10,000 contribution Citizens Alliance made to the Cuba Alliance at FUMO's direction, yet neither had any idea that Citizens Alliance had made the payment or otherwise had any interest or involvement in the trip.  Neither of these travelers was ever asked to report back to Citizens Alliance on their experiences in Cuba.

### iii.    September 2002 Trip of Person No. 33 and Person No. 34.

127.  On or about September 26, 2002, several months later, Citizens Alliance paid $7,000 to the Cuba Alliance.  The payment was made by ARNAO in order to send Person No. 33, the close personal friend of both FUMO and ARNAO who had been unable to go on the February 2002 trip, and Person No. 34, a Philadelphia florist who was also a very close friend of FUMO and ARNAO, on a trip to Cuba from September 27-29, 2002.

128.  Neither Person No. 33 nor Person No. 34 had any idea that Citizens Alliance had paid the Cuba Alliance so that they would be able to travel to Cuba or had otherwise played any role in facilitating their ability to travel there.  In fact, neither of these travelers was ever

asked to report back to Citizens Alliance on their experiences in Cuba or to otherwise share what they had learned there with others who could benefit from the experience.

### iv.    Additional Payments by Citizens Alliance to Cuba Alliance.

129.  Within a short time after the return of Person No. 33 and Person No. 34 from Cuba, on or about November 5, 2002, at FUMO's direction, CA Holdings made another contribution to the Cuba Alliance for $5,000.  After the Cuba Alliance's leader wrote to FUMO again in 2003 to ask for additional financial support from FUMO, ARNAO sent another $5,000 check from CA Holdings on or about September 10, 2003.

130.  In or about October 2003, FUMO was scheduled to return to Cuba, along with another elected public official in Pennsylvania, but both cancelled during the preceding week due to scheduling conflicts.

131.  In sum, Citizens Alliance paid a total of approximately $39,000 to the Alliance for Responsible Cuba Policy in order to fund trips to Cuba for FUMO and his close personal friends, and also in order to satisfy pledges made by FUMO to the organization.

### J.    Bristol Township War Dog Memorial.

132.  In order to bolster a candidate he was supporting in a state Senate race in Bucks County in 2001, FUMO directed ARNAO to pay $50,000 of Citizens Alliance's funds to support  the construction of a memorial statue to "war dogs" in Bristol, Pennsylvania.

133.  The Bristol Township War Dog Memorial is one of a number in the United States and its territories which honor the thousands of dogs referred to by the military as "military working dogs," who were trained and used throughout the 20th century by U.S. armed forces in the field for numerous purposes, including acting as sentries at bases and installations,

and scouting for mines, explosives, booby traps, enemy snipers and troops, downed pilots, and other missing or wounded personnel.

134.  FUMO agreed to give money to the memorial fund, in order to benefit Person No. 36, whom FUMO supported for a State Senate seat in Bucks County.  The mayor in Bristol wanted to build the war dog memorial, and FUMO believed that the mayor might support Person No. 36 (or at least not oppose him) if Person No. 36 received credit for helping advance the memorial.  The $50,000 which Citizens Alliance donated to the memorial was the largest contribution it received as of that date.

135.  On or about Wednesday, November 14, 2001, at 12:22 p.m., Person No. 19 (a Senate aide) wrote to FUMO, "Senator, [a FUMO supporter] needs money for the dog statute in Bristol that we promised him.  Where are we going to take this from?"  FUMO asked whether he had a nonprofit set up, and how much he needed.  Person No. 19 stated that there was a nonprofit, which needed $100,000, but only $50,000 to start.  Person No. 19 also wrote, "If you recall we met with [the supporter] and [Person No. 36] here in the DO to discuss this and other related items.  BTW are we running [Person No. 36]?"  FUMO answered, "Probably, based on [the supporter's] assessment.  We have to poll in there again with the new lines."

136.  After Person No. 19 said the cost was $100,000, this exchange ensued:

| | |
|---|---|
| FUMO: | Isn't that an awful lot for a statue of a DOG?????  I don't remember saying I would go for that much! |
| Person No. 19: | Senator, I would agree that this price is a bit high but we did agree to get him the money. |
| FUMO: | Yes, I remember that but did we agree to $100K?  PA |
| Person No. 19: | Senator, yes we agreed to $100k |

- 141 -

| FUMO: | For the 3rd time, does he have a 501(c)3 to receive the money??? PA |
| Person No. 19: | I said yes each time.  [The supporter] does have a 501(c)3 set-up to receive the funds.  How do you want to proceed.  PA Thank you. |
| FUMO: | Have Ruth cut a check for $50K from PECO money to start to his non profit. |

A check from CA Holdings for $50,000, was written on or about November 15, 2001, to "Bristol Township PA Wardog Mem. Fund," a project having nothing to do with Citizens Alliance's mission "[t]o promote public health, housing, safety and education in the City and County of Philadelphia," and motivated only by political considerations.

137.  When the memorial was constructed, a prominent plaque was placed in front, stating "A Special Thanks to Our Sponsors," the first of whom named was "Senator Vincent J. Fumo."

**K.    Other Improper Expenditures by Citizens Alliance.**

138.  As discussed at length in Count 1 of this superseding indictment, at paragraphs 24-41, the Senate paid Senate Contractor No. 1 over $40,000 per year and more for private investigation services, though Senate Contractor No. 1 spent most of his time on this contract doing personal and political work for FUMO.  CA Holdings itself gave two checks to Senate Contractor No. 1 for political surveillance, which had nothing to do with Citizens Alliance's mission and was contrary to the legal restrictions attendant to its tax-exempt status. The funds, which came from Citizens Alliance, totaled $3,250, and were paid in or about April and May 2002.  These payments were then falsely reported on CA Holdings' 2002 federal tax filing (Form 1120) as "Community Development Consulting."

139.  In another matter, in or about October 2003, FUMO committed $150,000 of Citizens Alliance's funds to commission a maritime painting, to be loaned to the Independence Seaport Museum (ISM), even though the Independence Seaport Museum never expressed an interest in it.  At the same time, FUMO directed Citizens Alliance to pay $10,000 to support an art show at the Independence Seaport Museum of a painter's work, because FUMO could then display at the show two paintings by the artist which FUMO personally owned, and thereby enhance their value.

140.  FUMO also arranged for Citizens Alliance to pay $11,000 for bar review courses taken by two of his Senate employees, Person No. 11 and Person No. 19.  FUMO first directed that each be given $4,000.  Because Person No. 19 had previously done some work on Citizens Alliance-related projects (though only paid by the Senate), FUMO stated that a check for $8,000 could be given to Person No. 19 by Citizens Alliance, and then Person No. 19 could split it with Person No. 11.  In an e-mail on or about Tuesday, March 5, 2002, at 1:03 p.m., FUMO wrote to ARNAO, "Please pay [Person No. 19] $8,000 for his work on High Tech Ventures and Passyunk Ave. ASAP."  On or about March 6, 2002, identical $4,000 checks to Person No. 19 were written from Citizens Alliance's subsidiaries Real Estate Property Two, Inc. (Hi-Tech Ventures) and Real Estate Three Corp. (Passyunk Avenue Revitalization, Inc.) accounts.  Person No. 19 then sent Person No. 11 a personal $4,000 check, dated March 7, 2002, by overnight mail.

141.  Person No. 11 took the bar exam in May 2002 and did not pass.  FUMO then encouraged him to take it again, but Person No. 11 told FUMO he could not afford it. FUMO told Person No. 11 not to worry.  Shortly thereafter, Person No. 9, the Senate employee who handled the Citizens Alliance accounts as well as FUMO's personal accounts, called Person

No. 11 and requested an invoice from him for $3,000 to CA Holdings.  Person No. 11 created a phony invoice for "computer consulting services," which he had never provided, and sent the invoice, dated November 10, 2002, to Person No. 9.  A short time later, Person No. 11 received a check from CA Holdings for $3,000, which enabled him to take the bar review course again.

### Overt Acts

In furtherance of the conspiracy, defendants VINCENT J. FUMO and RUTH ARNAO, and others known and unknown to the grand jury, committed the following overt acts in the Eastern District of Pennsylvania, and elsewhere:

142.  On or about May 7, 1999, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the purchase of a 1999 Ford F-150 pickup truck for approximately $17,195.

143.  On or about June 12, 1999, defendant VINCENT J. FUMO sent an e-mail to defendant RUTH ARNAO stating, "We need the following from Grangers.  Please have them shipped to the office or the Wharton ST. garage and then have the boys deliver it to the dock garage ASAP."

144.  On or about August 14, 1999, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase "Polo for Men" clothing for $325.58 at Lord & Taylor.

145.  On or about August 16, 1999, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase a portable CD player, a DVD player, and computer games for $639.42 at Best Buy in Wilmington, Delaware.

146.  On or about August 16, 1999, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase housewares and gifts for $540.86 at Service Merchandise in Wilmington, Delaware.

147.  On or about January 26, 2000, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of $15,000 to Whitemarsh Interiors in connection with the purchase by Citizens Alliance of more than $22,000 worth of high-end furniture for defendant VINCENT J. FUMO's office and conference room at the Tasker Street district office.

148.  On or about March 1, 2000, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase an Oreck vacuum cleaner and floor machine for $958.08 from Brookstone.

149.  On or about March 16, 2000, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the purchase of a 2000 Lincoln Navigator for approximately $52,788.

150.  On or about April 3, 2000, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the purchase of a Thule luggage carrier for $540.56 from BikeSport.

151.  On or about May 26, 2000, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $1,477.20 worth of food and other personal items including, among other items, Lipton tea, band-aids, Neosporin, three Makita drills (each of which cost $99.88), a spotlight, five DVDs, Pantene conditioner and shampoo, a gemstone globe (which cost $299.99), razors, toothpaste, Oil of Olay, Advil, Tylenol, Sudafed, two chaise lounges (each of which cost

$114.98), three books, after sun lotion, vitamins, and other tools.  Citizens Alliance paid for all of these items.

152.  On or about June 11, 2000, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $909.88 worth of food and other personal items including, among other items, two security cameras (each of which cost $219.97), two sets of steak knives, soda, toilet paper, two ice buckets, wash cloths, hand towels, ground beef, buns and rolls, cleaning supplies, steak seasoning, cups, potato chips, biscotti, iced tea mix, ravioli, and paper plates.  Citizens Alliance paid for all of these items.

153.  On or about July 8, 2000, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $415.08 worth of food and other personal items including, among other items, a chaise lounge (which cost $114.98), a "multi-cooker," forks, a cutlery pack, paper plates, trash bags, napkins, laundry detergent, iced tea mix, and two DVDs.  Citizens Alliance paid for all of these items.

154.  On or about August 19, 2000, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $1,195.95 worth of food and other personal items including, among other items, wash cloths, bath towels, bed sheets, biscotti, cookies, cashews, six DVDs, Perrier sparkling

water, a portable generator (which cost $99), a night vision scope (which cost $199.98), a folding bench, storage crates, and numerous chairs.  Citizens Alliance paid for all of these items.

155.  On or about September 3, 2000, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $1,487.55 worth of food and other personal items including, among other items, milk, cheese, chairs, a pop-up cabana, olives, steak seasoning, a hair dryer, clothing, a 27" color television (which cost $299.96), two children's activity totes (each of which cost $19.93), ten DVDs, salad mix, ground beef, sausage, baked beans, tomatoes, books, buns, and two canopies (each of which cost $199.98).  Citizens Alliance paid for all of these items.

156.  On or about September 10, 2000, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $792.64 worth of food and other personal items including, among other items, two 65 watt floodlights, two canopies (each of which cost $199.98), clothing, a knife set, tools, batteries, and six DVDs.  Citizens Alliance paid for all of these items.

157.  On or about September 13, 2000, defendant RUTH ARNAO, using Citizens Alliance's funds, purchased 14 cans of Hascolac Brilliant White imported paint from Old City Paint in Philadelphia for $881.86.

158.  On or about October 25, 2000, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase two mosquito magnets for $2,609.95 from Frontgate.

- 147 -

159. On or about November 3, 2000, defendant RUTH ARNAO authorized the payment by Citizens Alliance of $93.50 for a citation issued to Senate Contractor No. 2 by the Tredyffrin Township Police Department for driving a Ford truck, which was owned by Citizens Alliance, with an expired registration.

160. On or about December 4, 2000, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase six Oreck vacuum cleaners for $2,441.10 from Singer Milano Sew N Vac.

161. On or about January 19, 2001, Person No. 10 wrote to Person No. 38 and described the Pennsylvania forms which were required in order to establish the Riparian Defense Fund, Inc., the nonprofit created at defendant VINCENT J. FUMO's direction in order to oppose the plan to build sand dunes on Absecon Island, New Jersey that would obscure the ocean views of homeowners there, including defendant VINCENT J. FUMO, and repeated the need for the name and address of a Pennsylvania resident.

162. On or about February 7, 2001, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase approximately $1,675.90 worth of tools for defendant VINCENT J. FUMO from Tool Crib of the North.

163. On or about March 16, 2001, Senate secretary Person No. 22, at defendant VINCENT J. FUMO's direction, sent the following e-mail to defendant RUTH ARNAO, with a copy to defendant VINCENT J. FUMO:

> Just have [a Citizens Alliance employee] pick up the washer/dryer at Donatucci's on Monday and bring it to the garage on Wharton St until Tuesday - then we can pick up the bed and frame on Tuesday from McLaughlin's Warehouse - 1245 North American St. ask for Mike or Mike, Jr. (half block north of Girard Ave between 2nd and 3rd St.) between 9:30 and 10:00 am and bring it to Hummelstown.  Apparently [Senate Contractor No. 4]

is having the rugs put in on Monday and would rather have the boys on Tuesday they can also help [Senate Contractor No. 4] with the box spring/mattress and chairs that are in his garage and help him move everything to the second floor.

164.  On or about March 19, 2001, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the purchase of a silver 2001 Chrysler Town and Country minivan for approximately $36,697.

165.  On or about April 18, 2001, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase four Oreck vacuum cleaners for $1,084.55 from Oreck Floor Care Center.

166.  On or about May 11, 2001, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase a mosquito magnet for $1,319.95 from Frontgate.

167.  On or about July 25, 2001, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized a payment of $30,000 to "Environmental Defense Fund" in order to support the efforts of defendant VINCENT J. FUMO and other property owners in Margate and Ventnor, New Jersey who were opposing the creation of sand dunes that could obstruct views of the ocean.

168.  On or about July 27, 2001, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $305.66 worth of food and other personal items, including trash bags, biscotti, chairs, soap, conditioner and shampoo, laundry detergent, toilet paper, soda, vitamins, batteries, salt and pepper shakers, socks and napkins.  Citizens Alliance paid for all of these items.

169.  On or about August 25, 2001, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $431.19 worth of food and other personal items including, among other items, potato chips, a cutlery set, toilet paper, ground beef, sausage, pork butt, lamb, stuffed peppers, cheese, barbecue sauce, lettuce, tomatoes, salad mix, party mix, buns, vitamins, laundry detergent, and nine DVDs.  Citizens Alliance paid for all of these items.

170.  On or about August 29, 2001, defendant RUTH ARNAO used a Discover credit card to purchase, among other items, DVDs, CDs, and magazines for $315.42 from Best Buy in Mays Landing, New Jersey.  Citizens Alliance paid for all of these items.

171.  On or about August 29, 2001, defendant RUTH ARNAO, at the Sam's Club superstore in Pleasantville, New Jersey, used a Discover credit card and purchased for her own personal benefit and the benefit of others, including defendant VINCENT J. FUMO, approximately $413.02 worth of food and other personal items including, among other items, two pairs of jeans, denim shorts, twill shorts, volley shorts, four knit tops, four nylon jackets, a four piece bowl set, and socks.  Citizens Alliance paid for all of these items.

172.  On or about September 18, 2001, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase accessories for a turkey fryer for $124.91 from Cabela's.

173.  On or about October 17, 2001, defendant RUTH ARNAO authorized a $20,000 payment from Citizens Alliance's funds to Company No. 1 for the purpose of funding a lawsuit, secretly initiated and supported by defendant VINCENT J. FUMO, which was filed by

- 150 -

Rep. John Lawless and others against Senate President Pro Tempore Robert C. Jubelirer, and which sought a court ruling that Jubelirer must vacate his Senate seat in order to hold the position of Lieutenant Governor.

174.  On or about October 24, 2001, defendant RUTH ARNAO, at the direction of defendant VINCENT J. FUMO, authorized a $6,000 payment from Citizens Alliance's funds to the Alliance for a Responsible Cuba Policy so that defendant VINCENT J. FUMO and Senate Contractor No. 5 could travel to Cuba.

175.  On or about October 28, 2001, defendant VINCENT J. FUMO sent an e-mail to Person No. 10 (forwarded to Person No. 39 and ARNAO on October 30, 2001) instructing him to help set up the "Downbeach Community Development Corporation."

176.  As part of an effort to support the construction of a war dog memorial in Bristol Township, Pennsylvania and thereby attempt to win political support for a candidate that defendant VINCENT J. FUMO was supporting in a state Senate race, on or about November 14, 2001, FUMO sent an e-mail to Person No. 19 instructing him to "Have Ruth cut a check for $50K from PECO money to start his non profit."

177.  On or about November 15, 2001, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of $50,000 (CA Holdings check no. 144) to the "Bristol Township, PA Wardog Mem. Fund."

178.  On or about November 27, 2001, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase fish tape/flex leader and fish line for $110.89 from Grainger and requested that these items be shipped to defendant VINCENT J. FUMO's vacation home in Hobe Sound, Florida.

179.  On or about January 3, 2002, defendant VINCENT J. FUMO instructed defendant RUTH ARNAO to pay $10,000 from Citizens Alliance's funds to the Alliance for a Responsible Cuba Policy.

180.  On or about January 3, 2002, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase two Oreck vacuum cleaners for $549.75 from Oreck Floor Care Center.

181.  On or about January 7, 2002, defendant RUTH ARNAO complied with defendant VINCENT J. FUMO's instruction and issued a $10,000 check to the Alliance for a Responsible Cuba Policy.

182.  On or about February 25, 2002, defendants VINCENT J. FUMO and RUTH ARNAO caused Company No. 2, a construction contractor, to transmit by U.S. mail invoices from 12 Verduci Drive, Newtown, Pennsylvania to Pine Tree Realty, 1217 Sansom Street, Philadelphia, Pennsylvania, for $99,890, for charges related to the construction of a six-space parking lot near the district office at 12th and Tasker Streets.

183.  On or about March 5, 2002, at 1:03 p.m., defendant VINCENT J. FUMO sent an e-mail to defendant RUTH ARNAO with the following instruction: "Please pay [Person No. 19] $8,000 for his work on High Tech Ventures and Passyunk Ave. ASAP."

184.  On or about March 6, 2002, defendant RUTH ARNAO complied with defendant VINCENT J. FUMO's instruction and caused identical $4,000 checks to Person No. 19 to be written from the accounts of Citizens Alliance's subsidiaries Real Estate Property Two, Inc. (Hi-Tech Ventures) and Real Estate Three Corp. (Passyunk Avenue Revitalization, Inc.).

185.  On or about March 15, 2002, Kiley & Co. in Boston, Massachusetts faxed to Citizens an invoice for $28,000 for a poll of Philadelphia voters that it had conducted at the request of defendant VINCENT J. FUMO and Person No. 2.

186.  On or about April 3, 2002, defendant RUTH ARNAO sent a FedEx priority overnight shipment from 1208 Tasker Street, Philadelphia, PA 19148 to Tom Kiley, Kiley & Co., 667 Boylston Street, Boston, MA 02116, containing a check for $28,000 for polling work.

187.  On or about April 3, 2002, Kiley & Co. in Boston, Massachusetts faxed to Citizens Alliance an invoice for $16,800 for a poll relating to four Philadelphia City Council districts that it performed at the request of defendant VINCENT J. FUMO and Person No. 2.

188.  On or about April 25, 2002, Person No. 51 faxed from Marlton, New Jersey to Senate Contractor No. 1 in Flourtown, Pennsylvania, ten pages consisting of construction permits issued in Wildwood, New Jersey in connection with the construction of a home suspected by FUMO to be intended for Person No. 50.

189.  On or about April 26, 2002, defendant RUTH ARNAO sent a FedEx priority overnight shipment from 1208 Tasker Street, Philadelphia, PA 19148 to Tom Kiley, Kiley & Co., 667 Boylston Street, Boston, MA 02116, containing  a check for $16,800 for polling work.

190.  On or about April 26, 2002, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of $1,000 (CA Holdings check no. 244) to Senate Contractor No. 1, a private investigator who was assigned by defendant VINCENT J. FUMO to investigate one of FUMO's chief political rivals and to perform surveillance in connection with the gubernatorial primary election.

- 153 -

191.  On or about May 10, 2002, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of $2,250 (CA Holdings check no. 254) to Senate Contractor No. 1, a private investigator who was assigned by defendant VINCENT J. FUMO to investigate one of FUMO's chief political rivals and to perform surveillance in connection with the gubernatorial primary election.

192.  On or about May 18, 2002, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the purchase of a yellow 2002 Jeep Wrangler for approximately $25,630.

193.  On or about May 31, 2002, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of Global Strategy Group invoice no. 4095 in the amount of $16,950, for a primary statewide survey and other services.

194.  On or about June 13, 2002, defendant RUTH ARNAO caused to be sent, by American Express, by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania, a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase on or about May 21, 2002 of an Oreck floor machine for $523.50 from Oreck.com.

195.  On or about June 16, 2002, defendant RUTH ARNAO caused to be sent, by Discover Card, by U.S. mail from Memphis, Tennessee to RUTH ARNAO, 1108 Rodman Street, Philadelphia, Pennsylvania, a monthly statement for RUTH ARNAO's credit card that reflected, among other transactions, the purchase on or about May 28, 2002, from Sam's Club, of approximately $450.48 worth of food and other personal items, including laundry detergent,

toilet paper, trash bags, shampoo and conditioner, dishwasher detergent, a flashlight, three pairs of cargo shorts, and four DVDs.

196.  On or about June 17, 2002, defendant RUTH ARNAO sent an e-mail to defendant VINCENT J. FUMO regarding outstanding legal bills from the law firm that represented Citizens Alliance in connection with that firm's legal work for the Riparian Defense Fund, stating: "there were some minor charges for the reparian defense fund.  Do we really still need this...the issue is dead now.  Please advise.  Thanks."

197.  On or about June 17, 2002, defendant VINCENT J. FUMO responded to defendant RUTH ARNAO's request for guidance relating to payment by Citizens Alliance of the legal bills for the Riparian Defense Fund, Inc. by stating, "We should pay the bill and then we are out of that."

198.  On or about July 14, 2002, defendant RUTH ARNAO caused to be sent, by American Express, by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania, a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase at the Egg Harbor, New Jersey Lowe's store on or about June 22, 2002 of door chimes for $78.43 and two mirrors, a tool set, and other items for $197.84.

199.  On or about August 14, 2002, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by FedEx ground shipment from Jensen Tools, Inc. to Citizens Alliance in Philadelphia, Pennsylvania, a package containing approximately $1,025.91 of merchandise (Order No. 7104556-00).

200.  On or about August 28, 2002, defendant RUTH ARNAO authorized the issuance of CA Holdings check no. 325 for $401.23 to MBNA America to pay for the purchase

of a GPS system for defendant VINCENT J. FUMO, which had been purchased by Person No. 9 using her own credit card.

201.  On or about September 14, 2002, defendant RUTH ARNAO caused to be sent, by American Express, by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania, a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase on or about August 19, 2002 of mapping software for $2,301.57 from Map Info, the purchase on or about August 20, 2002 of clothing, tools, and the "Encyclopedia for Country Living" for $210.87 from Duluth Trading Co., and the purchase on or about August 26, 2002 of a 1/2" impact wrench kit, impact sockets, two fish tape flex leaders, an 18 volt drill kit, and a 18 volt plate joiner kit for $1,155.61 from W.W. Grainger.

202.  On or about September 20, 2002, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of Global Strategy Group invoice no. 4483 in the amount of $10,000, for a "Brushfire Survey PA SD 12: 400 Interviews."

203.  On or about September 20, 2002, defendant RUTH ARNAO sent a fax from Philadelphia, Pennsylvania to Person No. 28 in Washington, DC, enclosing a copy of a fax from Person No. 33 to ARNAO that same day which attached a copy of Person No. 33's passport, which was needed for him to be able to travel to Cuba.

204.  On or about September 26, 2002, Person No. 9 sent a Federal Express package, on the Senate account, from FUMO's office at 1208 Tasker Street, Philadelphia, Pennsylvania to Person No. 28, Alliance for Responsible Cuba Policy, 1501 M Street NW, Ste 700, Washington, DC 20005, containing a CA Holdings check for $7,000, dated September 26, 2002, to pay for the trip to Cuba of Person Nos. 33 and 34.

205.  On or about October 2, 2002, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by U.S. mail, CA Holdings check no. 373 in the amount of $64.13, from Citizens Alliance in Philadelphia, Pennsylvania to Cingular Wireless, 15901 East Skelly Drive, Tulsa, Oklahoma, to pay for monthly cell phone charges incurred by FUMO's oldest daughter.

206.  On or about October 7, 2002, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by FedEx shipment from Kennedy Printing Co., 5534 Baltimore Avenue, Philadelphia, PA 19143 to Sheinkopf Communications, 379 West Broadway, New York, NY 10012, a package containing a disk of names and phone numbers to be used in a phone bank regarding the Ventnor dunes referendum.

207.  On or about October 18, 2002, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized a payment of $2,341 (CA Holdings check no. 394) to Kennedy Printing Co. for the costs incurred in connection with the printing and mailing of 4,500 post cards titled "The bureaucrats in Trenton want to hold all cards" in order to support the efforts of defendant VINCENT J. FUMO and other property owners in Margate and Ventnor, New Jersey who were opposing the creation of sand dunes that could obstruct views of the ocean.

208.  On or about October 18, 2002, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the partial payment of Global Strategy Group invoice no. 4361, for a "Survey PA State Senate District 26 Crumlish: 400 interviews; 18 minutes in length," in the amount of $5,500.

209.  On or about October 25, 2002, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of Global Strategy Group invoice no. 4648 in the amount of $15,500, for a "Research Tracking Survey: PA SD 24."

210.  On or about November 13, 2002, defendant RUTH ARNAO caused the issuance of a check from CA Holdings for $3,000 to Person No. 11 in connection with a fraudulent invoice prepared and submitted to Citizens Alliance by Person No. 11, which falsely stated that Person No. 11 had provided consulting services to Citizens Alliance.

211.  On or about February 7, 2003, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of Global Strategy Group invoice nos. 3559, 4800, 4765, and 4830, in the amount of $39,899.47, for polls conducted in Philadelphia and in the 26th Senatorial District in Pennsylvania.

212.  On or about February 23, 2003, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by Discover Card, by U.S. mail from Memphis, Tennessee to Person No. 24 in Philadelphia, Pennsylvania, a monthly statement for the credit card account of Person No. 24, which reflected, among other transactions, the purchase on or about February 21, 2003 at Metro Chrysler Plymouth Jeep Subaru of a winch, off road light bar, trailer hitch and wiring, and front fog lamps, for the 2002 Jeep Wrangler owned by Citizens Alliance, for a total of $1,007.94.

213.  On or about March 19, 2003, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the purchase of a 2003 Cadillac Escalade for approximately $54,135.

214.  On or about May 12, 2003, defendant RUTH ARNAO sent an Eastern Leasing Corp. check for $29,683, by U.S. mail from Citizens Alliance in Philadelphia,

Pennsylvania to The Hartford, P.O. Box 2907, Hartford, CT 06104-2907, for, in part, the annual

insurance premium for the 1999 Ford F-150 moved to FUMO's farm, the 2000 Lincoln Navigator

used by FUMO's staff, the 2001 Town and Country used by FUMO, and the 2002 Jeep Wrangler

used by ARNAO.

215.  On or about May 15, 2003, defendants VINCENT J. FUMO and RUTH

ARNAO caused to be sent, by U.S. mail, CA Holdings check no. 529 in the amount of $295.02

to Nextel Communications, P.O. Box 17621, Baltimore, Maryland, to pay for cell phone charges

incurred between April 3, 2003 and May 2, 2003 by Person No. 24 and Person No. 25, who were

both FUMO's drivers and not employees of Citizens Alliance or CA Holdings.

216.  On or about May 15, 2003, defendant RUTH ARNAO signed under penalty

of perjury and sent by first-class U.S. mail to the IRS Service Center in Ogden, Utah the original

IRS Form 990 Return of Organization Exempt from Income Tax for the year 2002 in which she

falsely declared, among other things, that Citizens Alliance had not incurred any direct or indirect

political expenditures in 2002.

217.  On or about July 15, 2003, defendant RUTH ARNAO, using Citizens

Alliance's funds, authorized the payment of $127.57 in charges associated with the maintenance

of a backhoe owned by Citizens Alliance but which was being used at defendant VINCENT J.

FUMO's farm in Halifax, Pennsylvania at the time.

218.  On or about July 15, 2003, defendant RUTH ARNAO caused to be sent, by

American Express, by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia,

Pennsylvania, a monthly statement for Citizens Alliance's American Express credit card that

reflected, among other transactions, the purchase on or about July 10, 2003 of accessories for the

Ford F-150 pickup truck and the Polaris ATV, for $3,555.82, from Cabela's, and the purchase on or about June 30, 2003 of a motorcycle/ATV jack in the amount of $174.40 from Sears.com.

219.  On or about July 21, 2003, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the purchase of a used Caterpillar 951 Traxcavator bulldozer in Halifax, Pennsylvania for approximately $27,000.

220.  On or about July 28, 2003, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by UPS ground shipment from Grainger, 819 Eastgate Drive, Mt. Laurel, New Jersey to Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147, packages containing, among other things, five tool cabinets, a workbench shelf, and a workbench back/end for $5,654.95.

221.  On or about August 14, 2003, defendant RUTH ARNAO used or authorized the use of Citizens Alliance's American Express credit card to purchase a meat saw and grinder for $449.99 from Northern Tool & Equipment.

222.  On or about August 11, 2003, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by Pitt Ohio Express shipment from Grainger, 819 Eastgate Drive, Mt. Laurel, New Jersey to Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147, packages containing, among other things, an air compressor, a steel creeper, a service jack, and a tire inflator for $1,001.25.

223.  On or about August 27, 2003, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by UPS shipment from McMaster-Carr, 473 Ridge Road, Dayton, New Jersey to Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147, a package

containing, among other things, stainless steel concrete screws, high visibility light duty bench, hammer drill bits, and other hardware for $470.26.

224.  On or about September 5, 2003, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by UPS shipment from Amazon.com to Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147, a package containing a DeWalt 12-volt 3/8" right-angle drill, for $189.99.

225.  On or about September 12, 2003, defendant RUTH ARNAO signed under penalty of perjury and sent by U.S. mail to the IRS in Cincinnati, Ohio the original IRS Form 1120 U.S. Corporation Income Tax Return of CA Holdings Inc. for the year 2002, in which she falsely declared a business expense deduction for "Community Development Consulting" of what were actually improper political expenditures.

226.  On or about September 12, 2003, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of Global Strategy Group invoice nos. 5020, 5059, 5060, 5067, and 5277, in the amount of $33,536, for polls conducted in the Seventh Councilmanic District in Philadelphia.

227.  On or about September 14, 2003, defendant RUTH ARNAO caused to be sent, by American Express, by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania, a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchases on or about September 4 and 5, 2003 of a Fein Turbo III portable vacuum, a Fein multi-master electric variable speed kit, including a flush cutting blade and scraper, a Paslode T250-F16 finish nailer, and a DeWalt 12-volt 3/8" right-angle drill, for a total of $829.96 from Amazon.com.

- 161 -

228.  On or about October 3, 2003, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of Global Strategy Group invoice nos. 101, 114, 139, and 138, in the amount of $54,124.91, for polls conducted in Philadelphia and Bucks County.

229.  On or about October 16, 2003, defendant RUTH ARNAO caused to be sent, by Discover Card, by U.S. mail from Memphis, Tennessee to RUTH ARNAO, 1108 Rodman Street, Philadelphia, Pennsylvania, a monthly statement for RUTH ARNAO's credit card that reflected, among other transactions, the purchase on or about October 8, 2003 of tiki torches and votives for $171.06 from Frank's Nursery.

230.  On or about October 21, 2003, defendants VINCENT J. FUMO and RUTH ARNAO caused to be sent, by the Senate of Pennsylvania, by U.S. mail, check no. 05154940 for $1,500, drawn on Mellon Bank, Pittsburgh, Pennsylvania, and mailed to 1210 Enterprises, Inc., 1218 Chestnut Street, Philadelphia, Pennsylvania, for the monthly rental of 1208 Tasker Street in Philadelphia.

231.  On or about December 9, 2003, at approximately 11:14 a.m., Person No. 18 wrote an e-mail to defendant RUTH ARNAO:  "I need a check for $16,000 made out to Cleveland Brothers in order for them to fix the bulldozer.  They have the new motor ready to install but won't install it until they have the check in hand.  They would like to install it on Thursday."

232.  On or about December 11, 2003, defendant RUTH ARNAO, using Citizens Alliance's funds, authorized the payment of $16,000 to Cleveland Brothers for repairs to the bulldozer purchased for and used on defendant VINCENT J. FUMO's farm.

- 162 -

233.  On or about March 16, 2004, defendant RUTH ARNAO caused to be sent, by Discover Card, by U.S. mail from Memphis, Tennessee to RUTH ARNAO, 1108 Rodman Street, Philadelphia, Pennsylvania, a monthly statement for RUTH ARNAO's credit card that reflected, among other transactions, the purchase on or about February 19, 2004 of four sets of ratchet tools and other tools for $499.95 from Link Tools at the Miami Boat Show.

234.  On or about July 15, 2004, defendant RUTH ARNAO caused to be sent, by American Express, by U.S. mail from Westin, Florida to 1137 Wharton Street, Philadelphia, Pennsylvania a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase on or about June 25, 2004 of deck clips for $190.38 (including shipping costs of $55.38 for Saturday delivery by UPS to 6601 Monmouth Avenue, Ventnor, NJ 08406) from McFeely's Square Drive Screws.

All in violation of Title 18, United States Code, Section 371.

## COUNTS SIXTY-SIX THROUGH SEVENTY-FIVE

### (Mail Fraud - Citizens Alliance)

**THE GRAND JURY FURTHER CHARGES THAT:**

### Introduction

1.  Paragraphs 1, 2, and 4-141 of Count 65 of this superseding indictment are incorporated here.

### The Scheme to Defraud

2.  Between in or about August 1991, and in or about December 2005, defendants

**VINCENT J. FUMO and
RUTH ARNAO**

devised and intended to devise a scheme to defraud Citizens Alliance for Better Neighborhoods ("Citizens Alliance"), and to obtain money and property from Citizens Alliance by means of knowingly false and fraudulent pretenses, representations, and promises.

3.  It was the object of the scheme described in paragraph 2 for defendants VINCENT J. FUMO and RUTH ARNAO to use the funds and resources of Citizens Alliance, including its employees and equipment, for their personal and political benefit.

### Manner and Means

4.  It was part of the scheme to defraud that defendants VINCENT J. FUMO and RUTH ARNAO engaged in the manner and means described in paragraphs 4-141 of Count 65 of this superseding indictment.

5.  On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendants

- 164 -

**VINCENT J. FUMO and**
**RUTH ARNAO,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, knowingly caused to be delivered by the commercial interstate carriers

identified below, according to the directions thereon, the items described below:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 66 | April 3, 2002 | FedEx priority overnight shipment from Ruth Arnao, 1208 Tasker Street, Philadelphia, PA 19148 to Tom Kiley, Kiley & Co., 667 Boylston Street, Boston, MA 02116, containing a check for $28,000 for polling work. |
| 67 | April 26, 2002 | FedEx priority overnight shipment (Tracking ID No. 831666796279) from Ruth Arnao, 1208 Tasker Street, Philadelphia, PA 19148 to Tom Kiley, Kiley & Co., 667 Boylston Street, Boston, MA 02116, containing a check for $16,800 for polling work. |
| 68 | August 14, 2002 | FedEx ground shipment from Jensen Tools, Inc. to Citizens Alliance in Philadelphia, Pennsylvania, containing approximately $1,025.91 of merchandise (Order No. 7104556-00). |
| 69 | August 20, 2002 | FedEx ground shipment from Duluth Trading Co., 170 Countryside Drive, P.O. Box 409, Belleville, WI 53508 to Ruth Arnao, Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147, containing approximately $210.87 of merchandise (Order No. 10141210). |
| 70 | September 26, 2002 | Federal Express package, on the Senate account, from Person No. 9 to Person No. 28, Alliance for Responsible Cuba Policy, 1501 M Street NW, Ste 700, Washington, DC 20005, containing a CA Holdings check for $7,000, dated September 26, 2002, to pay for the trip to Cuba of Person Nos. 33 and 34. |
| 71 | October 7, 2002 | FedEx shipment from Kennedy Printing Co., 5534 Baltimore Avenue, Philadelphia, PA 19143 to Sheinkopf Communications, 379 West Broadway, New York, NY 10012, containing a disk of names and phone numbers to be used in a phone bank regarding the Ventnor dunes ballot referendum. |

| 72 | July 28, 2003 | UPS ground shipment from Grainger, 819 Eastgate Drive, Mt. Laurel, New Jersey to Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147, containing, among other things, five tool cabinets, a workbench shelf, and a workbench back/end for $5,654.95. |
| 73 | August 11, 2003 | Pitt Ohio Express shipment from Grainger, 819 Eastgate Drive, Mt. Laurel, New Jersey to Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147, containing among other things, an air compressor, a steel creeper, a service jack, and a tire inflator for $1,001.25. |
| 74 | August 27, 2003 | UPS shipment from McMaster-Carr, 473 Ridge Road, Dayton, New Jersey to Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147, containing, among other things, stainless steel concrete screws, high visibility light duty bench, hammer drill bits, and other hardware for $470.26. |
| 75 | September 5, 2003 | UPS shipment from Amazon.com to Citizens Alliance, 1131-37 Wharton Street, Philadelphia, PA 19147 containing a DeWalt 12-volt 3/8" right-angle drill, for $189.99. |

All in violation of Title 18, United States Code, Section 1341.

## COUNTS SEVENTY-SIX THROUGH NINETY

### (Mail Fraud - Citizens Alliance)

**THE GRAND JURY FURTHER CHARGES THAT:**

### Introduction

1. Paragraphs 1, 2, and 4-141 of Count 65 of this superseding indictment are incorporated here.

### The Scheme to Defraud

2. Between in or about August 1991, and in or about December 2005, defendants

### VINCENT J. FUMO and
### RUTH ARNAO

devised and intended to devise a scheme to defraud Citizens Alliance for Better Neighborhoods ("Citizens Alliance"), and to obtain money and property from Citizens Alliance by means of knowingly false and fraudulent pretenses, representations, and promises.

3. It was the object of the scheme described in paragraph 2 for defendants VINCENT J. FUMO and RUTH ARNAO to use the funds and resources of Citizens Alliance, including its employees and equipment, for their personal and political benefit.

### Manner and Means

4. It was part of the scheme to defraud that defendants VINCENT J. FUMO and RUTH ARNAO engaged in the manner and means described in paragraphs 4-141 of Count 65 of this superseding indictment.

5. On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendants

- 167 -

**VINCENT J. FUMO and**
**RUTH ARNAO,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, knowingly caused to be delivered by the United States Postal Service,

according to the directions thereon, the items described below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 76 | February 25, 2002 | Company No. 2, a construction contractor, transmitted by U.S. mail invoices from 12 Verduci Drive, Newtown, Pennsylvania to Pine Tree Realty, 1217 Sansom Street, Philadelphia, Pennsylvania for $99,890 for charges related to the construction of a parking lot near the district office at 12th and Tasker Streets. |
| 77 | June 13, 2002 | American Express sent by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase on or about May 21, 2002 of an Oreck floor machine for $523.50 from Oreck.com. |
| 78 | June 16, 2002 | Discover Card sent by U.S. mail from Memphis, Tennessee to RUTH ARNAO, 1108 Rodman Street, Philadelphia, Pennsylvania, a monthly statement for RUTH ARNAO's credit card that reflected, among other transactions, the purchase on or about May 28, 2002, from Sam's Club, of approximately $450.48 worth of food and other personal items, including laundry detergent, toilet paper, trash bags, shampoo and conditioner, dishwasher detergent, a flashlight, three pairs of cargo shorts, and four DVDs. |
| 79 | July 14, 2002 | American Express sent by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase at the Egg Harbor, New Jersey Lowe's store on or about June 22, 2002 of door chimes for $78.43 and two mirrors, a tool set, and other items for $197.84. |

- 168 -

| 80 | September 14, 2002 | American Express sent by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase on or about August 19, 2002 of mapping software for $2,301.57 from Map Info., the purchase on or about August 20, 2002 of clothing, tools, and the "Encyclopedia for Country Living" for $210.87 from Duluth Trading Co., and the purchase on or about August 26, 2002 of a 1/2" impact wrench kit, impact sockets, two fish tape flex leaders, an 18 volt drill kit, and a 18 volt plate joiner kit for $1,155.61 from W.W. Grainger. |
|---|---|---|
| 81 | October 2, 2002 | CA Holdings check no. 373 in the amount of $64.13 sent by U.S. mail from Philadelphia to Cingular Wireless, 15901 East Skelly Drive, Tulsa, Oklahoma, to pay for monthly cell phone charges incurred by FUMO's oldest daughter. |
| 82 | February 23, 2003 | Discover Card sent by U.S. mail from Memphis, Tennessee to Person No. 24 in Philadelphia, Pennsylvania, a monthly statement for the credit card account of Person No. 24, which reflected, among other transactions, the purchase on or about February 21, 2003 at Metro Chrysler Plymouth Jeep Subaru of a winch, off road light bar, trailer hitch and wiring, and front fog lamps, for the 2002 Jeep Wrangler owned by Citizens Alliance, for a total of $1,007.94. |
| 83 | May 12, 2003 | Eastern Leasing Corp. check no. 439 for $29,683 mailed from Citizens Alliance in Philadelphia, Pennsylvania to The Hartford, P.O. Box 2907, Hartford, CT 06104-2907, for, in part, the annual insurance premium for the 1999 Ford F-150 moved to FUMO's farm, the 2000 Lincoln Navigator used by FUMO's staff, the 2001 Town and Country used by FUMO, and the 2002 Jeep Wrangler used by ARNAO. |
| 84 | May 15, 2003 | CA Holdings check no. 529 in the amount of $295.02 mailed to Nextel Communications, P.O. Box 17621, Baltimore, Maryland to pay for cell phone charges incurred between April 3, 2003 and May 2, 2003 by Person No. 24 and Person No. 25, who were both FUMO's drivers and not employees of Citizens Alliance or CA Holdings. |

| 85 | July 15, 2003 | American Express sent by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase on or about July 10, 2003 of accessories for the Ford F-150 pickup truck and the Polaris ATV, for $3,555.82, from Cabela's, and the purchase on or about June 30, 2003 of a motorcycle/ATV jack in the amount of $174.40 from Sears.com. |
| --- | --- | --- |
| 86 | September 14, 2003 | American Express sent by U.S. mail from Westin, Florida to 1208 Tasker Street, Philadelphia, Pennsylvania a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchases on or about September 4 and 5, 2003 of a Fein Turbo III portable vacuum, a Fein multi-master electric variable speed kit, including a flush cutting blade and scraper, a Paslode T250-F16 finish nailer, and a DeWalt 12-volt 3/8" right-angle drill, for a total of $829.96 from Amazon.com. |
| 87 | October 16, 2003 | Discover Card sent by U.S. mail from Memphis, Tennessee to RUTH ARNAO, 1108 Rodman Street, Philadelphia, Pennsylvania, a monthly statement for RUTH ARNAO's credit card that reflected, among others, the purchase on or about October 8, 2003 of tiki torches and votives for $171.06 from Frank's Nursery. |
| 88 | October 21, 2003 | Senate of Pennsylvania caused the issuance of check no. 05154940 for $1,500, drawn on Mellon Bank, Pittsburgh, Pennsylvania, and mailed to 1210 Enterprises, Inc., 1218 Chestnut Street, Philadelphia, Pennsylvania, for the monthly rental of 1208 Tasker Street in Philadelphia. |
| 89 | March 16, 2004 | Discover Card sent by U.S. mail from Memphis, Tennessee to RUTH ARNAO, 1108 Rodman Street, Philadelphia, Pennsylvania, a monthly statement for RUTH ARNAO's credit card that reflected, among other transactions, the purchase on or about February 19, 2004 of four sets of ratchet tools and other tools for $499.95 from Link Tools at the Miami Boat Show. |

| 90 | July 15, 2004 | American Express sent by U.S. mail from Westin, Florida to 1137 Wharton Street, Philadelphia, Pennsylvania a monthly statement for Citizens Alliance's credit card that reflected, among other transactions, the purchase on or about June 25, 2004 of deck clips for $190.38 (including shipping costs of $55.38 for Saturday delivery by UPS to 6601 Monmouth Avenue, Ventnor, NJ  08406) from McFeely's Square Drive Screws. |
|---|---|---|

All in violation of Title 18, United States Code, Section 1341.

## COUNTS NINETY-ONE THROUGH NINETY-EIGHT

### (Wire Fraud - Citizens Alliance)

**THE GRAND JURY FURTHER CHARGES THAT:**

### Introduction

1.  Paragraphs 1, 2, and 4-141 of Count 65 of this superseding indictment are incorporated here.

### The Scheme to Defraud

2.  Between in or about August 1991, and in or about December 2005, defendants

**VINCENT J. FUMO and**
**RUTH ARNAO**

devised and intended to devise a scheme to defraud Citizens Alliance for Better Neighborhoods ("Citizens Alliance"), and to obtain money and property from Citizens Alliance by means of knowingly false and fraudulent pretenses, representations, and promises.

3.  It was the object of the scheme described in paragraph 2 for defendants VINCENT J. FUMO and RUTH ARNAO to use the funds and resources of Citizens Alliance, including its employees and equipment, for their personal and political benefit.

### Manner and Means

4.  It was part of the scheme to defraud that defendants VINCENT J. FUMO and RUTH ARNAO engaged in the manner and means described in paragraphs 4-141 of Count 65 of this superseding indictment.

5.  On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendants

- 172 -

**VINCENT J. FUMO and**
**RUTH ARNAO,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, caused to be transmitted by means of wire communication in interstate

commerce the signals and sounds described below for each count, each transmission constituting

a separate count:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 91 | March 15, 2002 | Kiley & Co. in Boston, Massachusetts faxed to Citizens Alliance in Philadelphia, Pennsylvania an invoice for $28,000 for a poll of Philadelphia voters that it had conducted at the request of FUMO and Person No. 2. |
| 92 | April 3, 2002 | Kiley & Co. in Boston, Massachusetts faxed to Citizens Alliance in Philadelphia, Pennsylvania an invoice for $16,800 for a poll relating to four Philadelphia City Council district races that it performed at the request of FUMO and Person No. 2. |
| 93 | April 25, 2002 | Person No. 51 faxed from Marlton, New Jersey to Senate Contractor No. 1 in Flourtown, Pennsylvania ten pages consisting of construction permits issued in Wildwood, New Jersey in connection with the construction of a home suspected by FUMO to be intended for Person No. 50. |
| 94 | June 17, 2002 | ARNAO sent an e-mail to FUMO regarding outstanding legal bills from the law firm that represented Citizens Alliance in connection with that firm's legal work for the Riparian Defense Fund, stating: "there were some minor charges for the reparian defense fund.  Do we really still need this...the issue is dead now.  Please advise.  Thanks," to which FUMO responded, "We should pay the bill and then we are out of that." |
| 95 | September 20, 2002 | Fax from RUTH ARNAO  in Philadelphia, Pennsylvania to Person No. 28 in Washington, DC enclosing a copy of a fax from Person No. 33 to ARNAO that same day which attached a copy of Person No. 33's passport, which was needed for him to be able to travel to Cuba. |

| 96 | February 5, 2003 | Global Strategy Group in New York, New York faxed to Citizens Alliance in Philadelphia, Pennsylvania a summary billing statement dated 1/31/03 that referenced the following invoices, all of which were unpaid at the time: <u>Invoice no. 3559 dated 5/1/01 for $168.87</u>: "Reimbursable Expenses" for transportation and Federal Express expenses related to the SD 26 race incurred between 12/00 and 3/01; <u>Invoice no. 4800 dated 11/30/02 for $210.70</u>: "Reimbursable Expenses" for transportation related to Jefrey Pollock's trip to Philadelphia; <u>Invoice no. 4765 dated 12/3/02 for $33,000</u>: "Philadelphia Council Surveys: 1200 Interviews; 10 minutes (full amount)" - $32,000; "Deposit against expenses" - $1,000; <u>Invoice no. 4830 dated 1/9/03 for $5,500</u>: "Philadelphia Council Additional Survey: 300 Interviews; 7 minutes" |
| 97 | September 10, 2003 | Global Strategy Group in New York, New York faxed to Citizens Alliance in Philadelphia, Pennsylvania the following invoices, which were unpaid at the time: <u>Invoice no. 5020 dated 4/23/03 for $13,000</u>: "City Council District 7 Brushfire: 400 interviews; 15 minutes (full amount)"; <u>Invoice no. 5059 dated 5/13/03 for $2,943.20</u>: "City Council 7: 26932 Automated calls (3 calls * 7489 and one call * 4465) * .10" and "Setup fee"; <u>Invoice no. 5060 dated 5/13/03 for $3,093</u>: "City Council #7 ID Calls: 3093 Calls"; <u>Invoice no. 5067 dated 5/15/03 for $4,500</u>: "CC #7 Tracking Research Summary: 300 interviews; 5 minutes (full amount)"; <u>Invoice no. 5277 dated 8/1/03 for $10,000</u>: "Viability Survey SD 27: 400 interviews; 10 minutes (full amount)." |
| 98 | December 9, 2003 | E-mail from Person No. 18 to RUTH ARNAO, stating in part, "I need a check for $16,000 made out to Cleveland Brothers in order for them to fix the bulldozer." |

All in violation of Title 18, United States Code, Section 1343.

## COUNT NINETY-NINE

### (Conspiracy to Obstruct the Internal Revenue Service)

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1, 2, and 4-141 of Count 65 are incorporated here.

### The Conspiracy

    2.  Between in or about August 1999, and in or about December 2005, defendants

### VINCENT J. FUMO and
### RUTH ARNAO

conspired and agreed, together and with others known and unknown to the grand jury, to

knowingly defraud the United States for the purpose of impeding, impairing, obstructing, and

defeating the lawful government functions of the Internal Revenue Service of the Department of

the Treasury in the ascertainment, computation, assessment, and collection of taxes, in violation

of Title 18, United States Code, Section 371.

### Manner and Means

    It was part of the conspiracy that:

    3.  Defendants VINCENT J. FUMO and RUTH ARNAO, in violation of federal

law, used a total of more than $250,000 during the years 2002 and 2003 in funds contributed to

Citizens Alliance for Better Neighborhoods ("Citizens Alliance"), a nonprofit corporation that

was exempt from federal income tax, in order to pay for political polling expenditures in

connection with political races in which FUMO had an interest, and for other political and

personal expenses for FUMO and ARNAO's benefit.

- 175 -

4.   Defendants VINCENT J. FUMO and RUTH ARNAO endeavored, through false filings and the intentional failure to file returns with the Internal Revenue Service, to prevent the IRS from ascertaining that Citizens Alliance engaged in political and other expenditures which are impermissible for a tax-exempt nonprofit organization, and thereby questioning the tax-exempt status of the organization and subjecting Citizens Alliance, and FUMO and ARNAO personally, to liability for income and excise taxes.

5.   The defendants accomplished this purpose through the means explained in paragraphs 85-97 of Count 65 of this superseding indictment.

## Overt Acts

In furtherance of the conspiracy, defendants VINCENT J. FUMO and RUTH ARNAO, and others known and unknown to the grand jury, committed the following overt acts in the Eastern District of Pennsylvania, and elsewhere:

6.   On or about May 6, 2003, defendant RUTH ARNAO, acting at the direction of defendant VINCENT J. FUMO, falsely advised the independent accountants for Citizens Alliance that the polling expenditures paid in 2002 by Citizens Alliance and a subsidiary were community surveys of residents to determine what activities they would want the nonprofit to perform.

7.   On or about May 15, 2003, defendant RUTH ARNAO signed and caused to be filed with the IRS the Form 990 (Return of Organization Exempt from Income Tax) of Citizens Alliance for 2002, which, among other statements, falsely stated that Citizens Alliance had made no direct or indirect political expenditures in 2002.

8.  On or about September 12, 2003, defendant RUTH ARNAO signed and caused to be filed with the IRS the Form 1120 (U.S. Corporation Income Tax Return) of CA Holdings, Inc., for 2002, which falsely claimed approximately $66,700 in expenditures during 2002 for political polling, and $3,250 in expenditures for political surveillance, as deductible business expenses of CA Holdings for "Community Development Consulting."

9.  In or about 2004 and subsequent years, defendants VINCENT J. FUMO and RUTH ARNAO determined not to file a Form 990 for Citizens Alliance for 2003, so as not to inform Citizens Alliance's accountants or the IRS of additional political polling and other unlawful expenditures during 2003 by Citizens Alliance on behalf of FUMO and ARNAO's political and personal interests, which would jeopardize Citizens Alliance's tax-exempt status and subject Citizens Alliance, FUMO, and ARNAO to substantial income and excise taxes.

All in violation of Title 18, United States Code, Section 371.

## COUNT ONE HUNDRED

**(False Tax Return -- 2002 Form 990 of Citizens)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 and 3-9 of Count 99 are incorporated here.

2. On or about May 15, 2003, in the Eastern District of Pennsylvania, defendant

**RUTH ARNAO**

willfully made and subscribed a United States Return of Organization Exempt from Income Tax, Form 990, for 2002, on behalf and as the executive director of Citizens Alliance for Better Neighborhoods ("Citizens Alliance"), which was verified by a written declaration that it was made under the penalty of perjury and filed with the Internal Revenue Service, which defendant RUTH ARNAO did not believe to be true and correct as to every material matter, in that the return stated that Citizens Alliance had not provided any assistance outside the ordinary course of its nonprofit mission to individuals, had not made any "direct or indirect political expenditures," and had not engaged in any Section 4958 excess benefit transaction during the year, when in fact, as defendant RUTH ARNAO well knew, these representations were false, as explained in paragraphs 95 and 96 of Count 65 of this superseding indictment.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT ONE HUNDRED AND ONE

**(Aiding and Assisting the Filing of a False Tax Return -- 2002 Form 990 of Citizens)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 and 3-9 of Count 99 are incorporated here.

2. On or about May 15, 2003, in the Eastern District of Pennsylvania, defendant

**VINCENT J. FUMO**

willfully aided and assisted in, procured, counseled, and advised the preparation and presentation

to the Internal Revenue Service, of a United States Return of Organization Exempt from Income

Tax, Form 990, of Citizens Alliance for Better Neighborhoods ("Citizens Alliance"), for the

calendar year 2002, which was false and fraudulent as to material matters, in that the return stated

that Citizens Alliance had not provided any assistance outside the ordinary course of its nonprofit

mission to individuals, had not made any "direct or indirect political expenditures," and had not

engaged in any Section 4958 excess benefit transaction during the year, when in fact, as

defendant VINCENT J. FUMO well knew, these representations were false, as explained in

paragraphs 95 and 96 of Count 65 of this superseding indictment.

In violation of Title 26, United States Code, Section 7206(2).

## COUNT ONE HUNDRED AND TWO

### (Filing a False Tax Return -- 2002 Form 1120 of CA Holdings, Inc.)

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1 and 3-9 of Count 99 are incorporated here.

    2.  On or about September 12, 2003, in the Eastern District of Pennsylvania,

defendant

### RUTH ARNAO

willfully made and subscribed a U.S. Corporation Income Tax Return, Form 1120, for 2002, on

behalf and as an officer of CA Holdings, Inc., which was verified by a written declaration that it

was made under the penalty of perjury and filed with the Internal Revenue Service, which

defendant RUTH ARNAO did not believe to be true and correct as to every material matter, in

that the return declared a deduction of $151,425 for "Community Development Consulting,"

when in fact, as defendant RUTH ARNAO well knew, this deduction was false and fraudulent, in

that this sum included expenditures for political polling and other political campaign expenses

which were not "community development consulting" expenses and were not deductible.

    In violation of Title 26, United States Code, Section 7206(1).

## COUNT ONE HUNDRED AND THREE

**(Aiding and Assisting the Filing of a False Tax Return --
2002 Form 1120 of CA Holdings, Inc.)**

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1 and 3-9 of Count 99 are incorporated here.

    2.  On or about September 12, 2003, in the Eastern District of Pennsylvania,

defendant

### VINCENT J. FUMO

willfully aided and assisted in, procured, counseled, and advised the preparation and presentation

to the Internal Revenue Service, of a U.S. Corporation Income Tax Return, Form 1120, of CA

Holdings, Inc., for the calendar year 2002, which was false and fraudulent as to a material matter,

in that the return declared a deduction of $151,425 for "Community Development Consulting,"

when in fact, as defendant VINCENT J. FUMO well knew, this deduction was false and

fraudulent, in that this sum included expenditures for political polling and other political

campaign expenses which were not "community development consulting" expenses and were not

deductible.

    In violation of Title 26, United States Code, Section 7206(2).

**COUNTS ONE HUNDRED AND FOUR THROUGH ONE HUNDRED AND SIX**

**(Mail Fraud - Independence Seaport Museum)**

**THE GRAND JURY FURTHER CHARGES THAT:**

**Introduction**

    1.  Paragraphs 1 and 3-138 of Count 1 of this superseding indictment are incorporated here.

    2.  At all times relevant to this superseding indictment:

        a.  The Independence Seaport Museum ("ISM" or "the museum") was a museum located on the historic Penn's Landing waterfront in Philadelphia, dedicated to displaying, preserving, and educating the public regarding the maritime history of the region. The museum, which was accredited by the American Association of Museums, included galleries as well as preserved, notable vessels.  The museum was a nonprofit organization, supported by government grants, private contributions, and admission and other revenue.

        b.  The museum, at various times, owned two historic yachts, the *Principia* and the *Enticer*, which the Independence Seaport Museum endeavored to charter to private customers in order to raise funds for the museum.  The Independence Seaport Museum contracted with a Florida company, Priscilla Yacht Management ("PYM"), to arrange the charters of the *Principia* and *Enticer*.  The boats were most often chartered for four-hour cruises (referred to as "daily" charters), at a cost of $3,500 per charter or more.  Term charters, lasting for one or more days, were also available for a daily charge of one-sixth of the weekly rate.  PYM received a commission of 10-15% on each charter.

- 182 -

c.  The museum was governed by a board of directors (referred to as the "Board of Port Wardens"), on which defendant VINCENT J. FUMO served.  The directors, including FUMO, owed a fiduciary duty to the museum and were required to adhere to a code of ethics, adopted in or about 1996, which provided, among other rules, the following:

> Port Wardens serve the Independence Seaport Museum and its public.  They should not attempt to derive any personal material advantages from their connection with the Museum.  Port Wardens must use Museum property only for official purposes, and make no personal use of the Museum's collection, property, or services in a manner not available to a comparable member of the general public.

**The Scheme to Defraud**

3.  Between on or about January 1, 1996, and on or about April 15, 2004, defendant

**VINCENT J. FUMO**

devised and intended to devise a scheme to defraud the Independence Seaport Museum, and to obtain money and property from the museum by means of knowingly false and fraudulent pretenses, representations, and promises.

4.  It was the object of the scheme described in paragraph 3 for defendant VINCENT J. FUMO to use resources of the museum, including the use of the yachts *Principia* and *Enticer*, for his personal benefit, without compensating the museum.

**Manner and Means**

It was part of the scheme to defraud that:

5.  Consistent with his philosophy of spending "other people's money," and his misuse of public and nonprofit resources he controlled, defendant VINCENT J. FUMO took improper advantage of his position as a member of the board of directors of the nonprofit

- 183 -

Independence Seaport Museum to obtain numerous, valuable pleasure cruises on the museum's historic yachts, without paying.  In addition, FUMO took other benefits from the museum, including expensive ship models he used as decorations in his offices.  FUMO took all of these benefits without disclosing to his fellow directors the material fact that he did not intend to and did not pay for any of them.

6.  Every August between 1996 and 2003, FUMO took a vacation in Martha's Vineyard, Massachusetts.  Each vacation followed a similar plan.  FUMO would rent a house there, and for part of the vacation, invite friends to join him, including Ruth Arnao and Arnao's boyfriend at the time, Senate Contractor No. 5.  Immediately prior to these trips, FUMO directed employees of the Pennsylvania Senate to drive two vehicles (including vehicles purchased for FUMO by Citizens Alliance) from the area of Margate, New Jersey and/or Philadelphia to Martha's Vineyard, loaded with the luggage of FUMO and some or all of his guests.  FUMO and his guests then traveled to Martha's Vineyard on a private plane.  At the conclusion of their stay in the rented house, Senate employees (and, on one occasion, Person No. 5) returned to Martha's Vineyard to drive the vehicles and luggage back to the Pennsylvania-New Jersey area, while FUMO and some of his guests, keeping a few of their belongings with them, embarked on a two-to four-day stay on one of the museum's yachts.  At the end of each cruise, FUMO and his guests returned to the Philadelphia area on a private plane.

7.  On each occasion, FUMO requested that the *Principia* or *Enticer* be available for his use on specific days.  To accommodate him, the operators of the yachts were at times required to reposition a yacht, and to cancel charters booked by paying customers.  The museum did not agree to permit FUMO to use the yachts for free solely for his personal pleasure.  Rather,

- 184 -

he was permitted to use the yachts, like other directors, with the understanding that he would

engage in efforts while using the yachts to raise contributions and support for the Independence

Seaport Museum and its yachts, a fundraising practice known as "development."  However,

FUMO's use of the yachts during his August vacations was in fact for his personal pleasure

alone, and he never intended to and did not engage in any development efforts during these

cruises.  At the times he requested the use of the yachts, he never disclosed these material facts to

the museum and its directors.

        8.  The museum also paid for numerous incidental expenses during the cruises,

including food and other charges, totaling thousands of dollars, which FUMO never reimbursed

to the museum.  FUMO rarely tipped the crews of the yachts, and thus the Independence Seaport

Museum usually paid those expenses as well.

        9.  Further, on one occasion, in 2001, when neither of the museum's yachts was

available, and thus there could not be a conceivable development purpose to FUMO's Martha's

Vineyard trip, the museum at FUMO's request chartered another yacht for FUMO's use during

his annual trip.  The museum paid $13,375 for the charter, and FUMO did not reimburse the

museum until April 2004, after FUMO became aware of a federal investigation and after the

*Philadelphia Inquirer* published on or about March 17, 2004 an article titled, "FBI probes

Fumo's use of yacht; Investigators want to know if the senator paid for trips on a Phila. museum-

owned boat."

        10.  FUMO also used the yachts on occasion in Florida, for lunch or dinner cruises

with friends, for the ostensible purpose of fundraising and development.  But in fact, no

solicitations were made in connection with these cruises, either, which were designed largely for

- 185 -

the enjoyment of FUMO and his guests.  For example, on or about February 21, 2000, FUMO

hosted a dinner cruise on *Enticer* for 14 people, near Fisher Island, Florida.  The cost to the

Independence Seaport Museum was at least $5,249.26, which included a $2,539.98 catering bill,

for a lavish French meal, which the Independence Seaport Museum paid after FUMO did not.

The guests included FUMO's girlfriend, Person No. 39, as well as Arnao (who devised the

menu), her boyfriend, and other close friends of FUMO.

   11.  In total, FUMO's personal use of the yachts caused a loss to the Independence

Seaport Museum in excess of $100,000.  Specifically, as part of the scheme to defraud, the

following summer cruises occurred:

    a.  FUMO, along with personal friends, used the *Principia* on or about

August 7 and 8, 1996, boarding in Vineyard Haven, Massachusetts.

    b.  FUMO, along with personal friends, used the *Principia* again,

beginning in Vineyard Haven, on or about August 12 and 13, 1997.

    c.  FUMO, along with personal friends, again sailed on the *Principia* from

Vineyard Haven on or about August 16 and 17, 1998.  The president of the Independence Seaport

Museum, Person No. 46, who also vacationed in the area, stopped by to visit, and purchased

items for the boat which he charged to the museum.  For this trip as the others, the Independence

Seaport Museum paid for numerous charges which are ordinarily owed by the charterer of the

vessel.  On this occasion, Independence Seaport Museum paid such charges, including $800 in

tips for the crew, $632 in dockage charges, and lesser amounts for meals, liquor, snacks,

newspapers, and morning bagels.

d.  FUMO sailed for the last time on the *Principia* (which was later sold by the museum) from on or about August 7 to 10, 1999, between Martha's Vineyard and Nantucket, Massachusetts.  He was accompanied for the first time by a new girlfriend, Person No. 39. Reflecting his use of the yachts for solely his personal pleasure (a fact he never disclosed to the museum's directors), FUMO wrote to Person No. 39 shortly before the vacation about his soon-to-be ex-wife's reaction, stating:

> [FUMO's adult daughter] apparently told her that we are all going on the Principia and she is devastated because she says that was always the high point of all of her vacations and now you will be there with me!

The passengers on the cruise were FUMO, Person No. 39, Arnao, her boyfriend at the time (Senate Contractor No. 5), and two other close friends of FUMO.  The trip involved no business or development activities at all.

e.  From on or about August 10 to 13, 2000, FUMO and five close friends used the *Enticer* as part of their vacation.  This was the first of four annual vacations during which the same group of six people went on the free cruises -- FUMO; a girlfriend, Person No. 39; Arnao; Arnao's boyfriend at the time, Senate Contractor No. 5; and a Philadelphia-area couple, Person No. 34 and Person No. 35.  This group regularly socialized in New Jersey and Florida as well.  In 2000, the operators of the *Enticer* were required to cancel other scheduled charters, and move the vessel from its summer berth near Annapolis, Maryland to accommodate FUMO.  To permit FUMO's cruise, the *Enticer* had no other charter business between on or about July 27 and August 26, 2000.  The Independence Seaport Museum suffered not only the loss of charter income, but also paid the following expenses, among others, for the FUMO cruise, none of which FUMO reimbursed:

| | |
|---|---|
| Dockage | $2,475.42 |
| Fuel | $775.89 |
| Car rental (for transportation to or from the boat) | $139.00 |
| John's Fish market | $87.16 |
| Newspapers/Trash and Ice | $83.00 |
| Launch Tickets | $75.00 |
| Reliable Market (food) | $65.31 |
| A&P (food) | $57.26 |
| Crabtree & Evelyn (soap and shampoo) | $51.30 |
| Laundry | $40.00 |
| Murray Beverage | $33.00 |
| Vineyard Wine and Cheese | $31.88 |
| Coffee | $10.14 |
| Gas | $6.13 |

f.  In 2001, the *Enticer* was up for repairs, and the Independence Seaport Museum had sold *Principia*.  FUMO requested that the Independence Seaport Museum arrange another boat for his use.  The Independence Seaport Museum contacted its broker, Priscilla Yacht Management, and arranged for the charter of another vessel, *Sweet Distraction*. FUMO and his party sailed on *Sweet Distraction* from on or about August 12 to 14, 2001.  The Independence Seaport Museum paid $13,375 for this charter, and FUMO did not pay the Independence Seaport Museum back.  Only on or about April 15, 2004, after federal authorities commenced an investigation regarding FUMO's free use of the Independence Seaport Museum's yachts, and after the *Philadelphia Inquirer* published an article regarding the subject, did FUMO pay $13,375 to the Independence Seaport Museum for the *Sweet Distraction* cruise.  FUMO never paid for any of the free personal trips he and his friends took on *Enticer* and *Principia*.

g.  On or about August 20 and 21, 2002, FUMO and the same five friends who had accompanied him in 2000 and 2001 traveled on *Enticer*, from Vineyard Haven, Massachusetts to Newport, Rhode Island (from where the group flew home to Philadelphia).

- 188 -

h.  On or about August 10 to 14, 2003, FUMO and the same five friends took a cruise on *Enticer* from Vineyard Haven.  This was the longest of FUMO's free summer cruises, reaching as far north as Bar Harbor, Maine, and including a stop on Block Island before the party was dropped off in Bristol, Rhode Island.  This was the last of eight annual free personal cruises, before exposure in the *Philadelphia Inquirer* in 2004 and the commencement of a federal investigation brought FUMO's scheme to defraud to an end.  Once again, the Independence Seaport Museum paid for many incidental expenses of the cruise, including tips for the crew, and a $245 charge for a car service to take the FUMO party to the airport in Bristol.

12.  On or about each of the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendant

**VINCENT J. FUMO,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and abetting its execution, knowingly caused to be delivered by the United States Postal Service, according to the directions thereon, the items described below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 104 | August 30, 2002 | First Union transmitted by U.S. mail the Enticer Corp.'s business checking account statement from First Union's operations center in New Brunswick, New Jersey to 211 South Columbus Blvd., Philadelphia, Pennsylvania, which reflected, among other transactions, a debit card purchase of groceries at the A&P Food Market in Nantucket, Massachusetts for $153.00 on or about August 20, 2002 and a debit card purchase of wine at French & Braun in Camden, Maine for $302.25 on or about August 18, 2002, in connection with the use of the *Enticer* by FUMO for a vacation. |

| 105 | September 11, 2002 | Citibank USA, N.A. transmitted from Omaha, Nebraska by U.S. mail the Enticer Corp.'s MasterCard credit card account statement to 211 South Columbus Blvd., Philadelphia, Pennsylvania, which reflected, among other transactions, a purchase of diesel fuel at the Nantucket Boat Basin in Nantucket, Massachusetts for a net cost of $794.04 on or about August 21, 2002, in connection with the use of the *Enticer* by FUMO for a vacation. |
| --- | --- | --- |
| 106 | August 29, 2003 | First Union transmitted by U.S. mail the Enticer Corp.'s business checking account statement from First Union's operations center in New Brunswick, New Jersey to 211 South Columbus Blvd., Philadelphia, Pennsylvania, which reflected, among other transactions, a debit card payment of $245.00 for the Prestige Limousine Service to pick up the FUMO party (six persons plus extra luggage) at the Herreshoff Museum and drop them off at the Quonsett Airport on or about August 14, 2003, in connection with the use of the *Enticer* by FUMO for a vacation. |

All in violation of Title 18, United States Code, Section 1341.

## COUNTS ONE HUNDRED AND SEVEN
## THROUGH ONE HUNDRED AND EIGHT

**(Wire Fraud - Independence Seaport Museum)**

**THE GRAND JURY FURTHER CHARGES THAT:**

### Introduction

1.  Paragraphs 1, 2, and 5-11 of Counts 104-106 of this superseding indictment are incorporated here.

### The Scheme to Defraud

2.  Between on or about January 1, 1996, and on or about April 15, 2004, defendant

### VINCENT J. FUMO

devised and intended to devise a scheme to defraud the Independence Seaport Museum, and to obtain money and property from the museum by means of knowingly false and fraudulent pretenses, representations, and promises.

3.  It was the object of the scheme described in paragraph 3 for defendant VINCENT J. FUMO to use resources of the museum, including the use of the yachts *Principia* and *Enticer*, for his personal benefit, without compensating the museum.

### Manner and Means

4.  It was part of the scheme to defraud that defendant VINCENT J. FUMO engaged in the manner and means described in paragraphs 5-11 of Counts 104-106 of this superseding indictment.

- 191 -

5.  On or about each of the dates set forth below, in the Eastern District of

Pennsylvania, and elsewhere, defendant

**VINCENT J. FUMO,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, caused to be transmitted by means of wire communication in interstate

commerce the signals and sounds described below for each count, each transmission constituting

a separate count:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 107 | August 12, 2003 | Fax from proprietor of PYM, in Florida, to Person No. 46, Person No. 48, and Person No. 49 at the Independence Seaport Museum in Philadelphia, Pennsylvania, confirming that FUMO was scheduled for a trip on *Enticer* at Martha's Vineyard on August 10-14, 2003. |
| 108 | August 26, 2003 | Person No. 44's invoice no. 69073 for $625 for five days of work on FUMO's trip on *Enticer* on August 10-14, 2003, faxed by Person No. 49 (the captain of *Enticer*) in Rhode Island to Person No. 47 (an employee of the Independence Seaport Museum) in Philadelphia, Pennsylvania. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT ONE HUNDRED AND NINE

**(Conspiracy to Obstruct Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1 and 3-138 of Count 1; paragraphs 4-141 of Count 65; paragraphs 3-9 of Count 99; and paragraphs 5-11 of Counts 104-106 are incorporated here.

      2.  At all times material to this superseding indictment:

        a.  Special agents of the FBI and special agents of the IRS, beginning in early 2003, conducted a criminal investigation into the activities of defendant VINCENT J. FUMO, the nonprofit organization, Citizens Alliance for Better Neighborhoods ("Citizens Alliance"), which he controlled, as well as other companies and individuals associated with FUMO and Citizens Alliance, including defendant RUTH ARNAO, the executive director of Citizens Alliance.

        b.  A related grand jury investigation regarding these matters began in approximately February 2003, first regarding Citizens Alliance, and then expanded to address the other subjects outlined above.  The investigation of the grand jury and of the FBI and IRS is referred to collectively in this superseding indictment as "the investigation."

        c.  The investigation focused on whether, as charged elsewhere in this superseding indictment, FUMO, in violation of federal law, used the personnel and resources of the Pennsylvania Senate for his personal and political benefit; whether he did the same with personnel and resources of Citizens Alliance; whether he defrauded the Independence Seaport Museum through the use of its resources for his personal benefit, in violation of federal law;

whether he and his associates violated the Internal Revenue laws; and whether FUMO conspired with anyone else in federal criminal offenses.

d.  FUMO's office and Citizens Alliance were nominally independent entities.  However, a central question in this investigation was the extent of control which FUMO exercised over Citizens Alliance, in order to direct its expenditures.

e.  The investigation also sought to determine whether FUMO and others engaged in extortion, in violation of the Hobbs Act, Title 18, United States Code, Section 1951, through demands presented to PECO Energy Corp. ("PECO") and to Verizon's Pennsylvania subsidiary ("Verizon").  Specifically, federal officials and the grand jury examined events which began in 1997 and unfolded over the course of several years, wherein FUMO (using SDAC counsel, Person No. 10), became involved in litigation against PECO in FUMO's personal and official capacity, in order to, among many other complex issues, influence the deregulation of the energy industry occurring at that time.  A secret and non-public part of the eventual settlement with PECO provided that PECO would pay  $1 million per year for a total of seven years to Citizens Alliance, as well as promise to bury underground the utility wires in the neighborhood in Philadelphia where FUMO lived.  In 2002, when PECO determined that it was not logistically or economically feasible to bury the wires underground, FUMO agreed that PECO could instead satisfy its commitment by giving Citizens Alliance another $10 million in a lump sum.

f.  In 1999 and again in 2000, FUMO sought to likewise obtain benefits from Verizon in relation to another regulatory matter in which FUMO had intervened.  That matter involved various telecommunications issues of enormous importance to Verizon.  To stop his opposition to Verizon, FUMO requested a $15 million payment to Citizens Alliance, but

- 194 -

Verizon refused.  FUMO's list of demands to Verizon included a total of approximately $100 million of requested payments to a variety of organizations in which FUMO had an interest, which Verizon, with limited exceptions, refused.  One of the requests that FUMO made was that Verizon provide as much as $2.5 million of its legal business to the law firm with which FUMO was associated, a payment from which FUMO would ultimately benefit as the originator of the business.  The investigation therefore endeavored to determine whether FUMO engaged in extortion in demanding benefits from PECO and Verizon, that is, by demanding benefits in exchange for legislative or other action.

g.  Between approximately February 2003 and May 2003, the government issued grand jury subpoenas to more than 20 third-party institutions seeking financial records regarding Citizens Alliance.

h.  Aspects of the matters under investigation came to broad public attention through a series of front-page articles in the *Philadelphia Inquirer*, which commenced on Sunday, November 16, 2003.  Many subsequent articles about the conduct of FUMO and of Citizens Alliance were published in the *Philadelphia Inquirer,* the *Philadelphia Daily News,* and the *City Paper*, until the present date.  FUMO and other members of his staff closely monitored these articles.

i.  FUMO was very computer-savvy, and corresponded with ARNAO as well as all other members of his staff and others extensively by e-mail, using personal computers, laptop computers, and Blackberry communication devices.  Indeed, FUMO often preferred to communicate with others via e-mail rather than in person.  Therefore, in conducting this

- 195 -

investigation, the government sought to obtain all pertinent e-mail and other correspondence involving FUMO which would shed light on all of the matters under investigation.

j.  FUMO maintained an office in Harrisburg inside the State Capitol and a legislative district office at 1208 Tasker Street in Philadelphia.  He received computer equipment and technical support from an entity of the State Senate called Senate Democratic Computer Services (SDCS), which also provided computer assistance to the other Democratic members of the Senate.  FUMO exercised oversight authority over the activities of SDCS.  The executive director of SDCS, Person No. 4, reported directly to FUMO.

k.  Two Senate employees assigned to SDCS, defendant LEONARD P. LUCHKO and Person No. 1, were assigned to FUMO's Philadelphia district office on Tasker Street on a full-time basis in order to assist FUMO and his staff.

l.  Defendant MARK C. EISTER, another Senate employee assigned to SDCS, assisted FUMO and his staff at FUMO's office in the State Capitol in Harrisburg.

m.  Prior to the commencement of the investigation, FUMO and members of his staff both in Harrisburg and Philadelphia maintained a general policy of deleting e-mails on a regular basis when those e-mails were no longer needed for work purposes; of "wiping" the contents of a computer if the computer was damaged, or after the user left Senate employment; and of periodically upgrading equipment, which at times had the effect of deleting earlier files. However, prior to the investigation, FUMO and his staff never implemented a systematic practice of deleting all e-mail to and from FUMO, nor of "wiping" computers of existing users.  Indeed, FUMO himself, as of February 2006, maintained a PC card containing over 10,500 e-mails and other documents, meticulously organized into folders by topic, which dated back to 1996.  Senate

employees on FUMO's staff, as of February 18, 2005, possessed some e-mail dating back to

1999.

### The Conspiracy

3.  From in or about November 2003 through in or about October 2005, in the

Eastern District of Pennsylvania and elsewhere, defendants

**VINCENT J. FUMO,
RUTH ARNAO,
LEONARD P. LUCHKO, and
MARK C. EISTER**

conspired and agreed, together and with each other, and with others known and unknown to the

grand jury, to commit an offense against the United States, that is, to obstruct justice by

destroying electronic evidence, including e-mail communications pertaining to matters within the

scope of a federal criminal investigation, and engaged in various overt acts in furtherance of the

conspiracy, in violation of Title 18, United States Code, Sections 1512(b)(2)(B), 1512(c)(1), and

1519.

### Manner and Means

4.  It was a part of the conspiracy that, in both contemplation of and with actual

knowledge of the investigation described above, and for the purpose of destroying e-mail and

other electronic evidence in order to prevent the FBI, the IRS, and this federal grand jury from

receiving or reviewing such evidence in the course of the investigation, defendants VINCENT J.

FUMO, RUTH ARNAO, LEONARD P. LUCHKO, MARK C. EISTER, Person No. 1, Person

No. 11, and other persons, both known and unknown to the grand jury (collectively, "the

conspirators"), (a) systematically destroyed e-mail communications sent to or received from

FUMO and ARNAO; (b) created and implemented a formal schedule to run specialized computer programs known as Secure Clean Deep Clean and PGP Free Space Wipe that erased any trace of deleted electronic files on computer hard drives, servers, PC cards, and other electronic storage devices; (c) instructed FUMO's employees that under no circumstances, without FUMO's permission, were they permitted to save any e-mail sent to or received from FUMO; (d) logged into the e-mail accounts of FUMO's employees to scan their e-mail to determine that they were, in fact, not saving any e-mail relating to FUMO; and (e) deleted and wiped other electronic equipment, such as the Blackberry communication devices used by FUMO and ARNAO, among other persons.

   5.  It was part of the conspiracy that, in carrying out these acts to destroy electronic evidence pertinent to the investigation, all conspirators acted at the direction of FUMO, with his knowledge and approval, and for his benefit.  The purpose of the conspiracy was to assure that electronic evidence relevant to the investigation and potentially harmful to FUMO and his associates was permanently deleted and therefore unavailable to the grand jury and the federal investigators.

   6.  It further was part of the conspiracy that the conspirators succeeded in deleting and destroying substantial amounts of electronic evidence relevant to the investigation. Specifically, the conspirators permanently erased virtually all e-mails predating 2005 which had been stored on all computers used by Citizens Alliance and ARNAO, its executive director; virtually all e-mail predating 2005 in which FUMO was a sender or recipient, which had been held on FUMO's server in Harrisburg, and on the computer equipment used by his staff in Harrisburg and Philadelphia; and virtually all e-mail referencing Citizens Alliance which was

held on computer equipment used by FUMO. The conspiracy also succeeded in destroying

virtually all e-mail evidence regarding the PECO and Verizon matters, thwarting the

investigators' ability to determine whether federal crimes were committed in connection with

those matters.

### Overt Acts

In furtherance of the conspiracy, defendants VINCENT J. FUMO, RUTH ARNAO,

LEONARD P. LUCHKO, and MARK C. EISTER, and others known and unknown to the grand

jury, committed the following overt acts in the Eastern District of Pennsylvania, and elsewhere:

7. On or about December 1, 2003, defendant LEONARD P. LUCHKO wrote an e-

mail (a cc of which was sent to FUMO ) to 24 members of FUMO's staff and Senate contractors

in Philadelphia, including ARNAO, who also was FUMO's deputy chief of staff at the time:

> This is to inform all of you that under ANY circumstance are you to save any email from
> or to the Senator. This would include all mail you receive from him in your "IN" box and
> all mail you sent to him that is stored in your "Sent Items". If you need help getting rid of
> this mail or you need help checking your "IN Box or SENT ITEMS Box contact [Person
> No. 1] or myself.

8. Defendant RUTH ARNAO replied directly to defendant LEONARD P.

LUCHKO in response to this e-mail, and inquired, "What's this about again??"  LUCHKO then

replied to ARNAO as follows:

> VJF called me into his office today and told me to start going around and checking
> everyone's Computer and make sure they were not saving his mail. I am just sending this
> email to give everyone a heads up. He also told me to check for sensitive Excel files but I
> am not doing that because how the hell I am supposed to know what is or is not sensitive.

9. On or about Friday, January 23, 2004, Person No. 11, who was at the time one

of FUMO's aides in Harrisburg and who had some involvement in maintaining office computers

there, authored an e-mail to defendant LEONARD P. LUCHKO requesting information on the

"anti-key logger" program[6] that LUCHKO uses "for the boss," stating that "I want to get up to

speed on how that shit works."

    10.  On or about Saturday, January 24, 2004, FUMO and his aides learned of an

article scheduled to appear the next day in the *Philadelphia Inquirer* stating that FUMO was the

subject of an FBI investigation, and they arranged a conference call for Sunday at 2 p.m. to

discuss the matter, to be joined by, among others, FUMO, his Senate counsel (Person No. 10),

his personal defense attorneys, and his political consultants (Person No. 2 and Senate Contractor

No. 2).

    11.  On or about Sunday, January 25, 2004, in response to the *Philadelphia*

*Inquirer* front-page news article headlined, "FBI Probes Fumo Deal," and concerns that FUMO

was under investigation by the FBI, defendant LEONARD P. LUCHKO and Person No. 1

(LUCHKO's colleague on the computer staff in FUMO's Philadelphia office), traded e-mails in

which LUCHKO asked if Person No. 1 had a scanner available.  Defendant LUCHKO wrote at

approximately 2:14 p.m., "Bring the scanner to work he waants me to keep a scanner at home

because I am on 24 7 call.  I am on my way to Work now to scan articles out of the Sunday

paper."  Person No. 1 then asked, "What's the big deal with the paper anyway," and LUCHKO

answered, "He is being investigated by the FBI."

---

    [6]       Anti-key logger programs are used to detect key-logging software and hardware
devices.  Key-logging utilities are used to capture every keystroke that is pressed onto a
keyboard.  They are often utilized to capture user's passwords or any information that the user
inputs into the computer system.  Anti-key logger programs are designed to detect these
applications and make the user aware of their existence.  Individuals who may suspect that their
computer system is vulnerable to this technology may install this anti-key logging software for
added security measures.

12.  At approximately 10:20 p.m. that evening, defendant LUCHKO sent an e-mail to many staff members and Senate contractors, with a copy to FUMO.  It stated:

The Senator asked me to inform the staff that until further notice we will be stepping up security.

• All email sent to Fumo until further notice should be sent using PGP.[7]
• Anyone who is currently using a Blackberry is to refrain from sending ANY sensitive information on it.
• Anyone who is using a Blackberry is to set up a time with [Person No. 1] or myself so we can wipe them.
• Anyone who is using a Laptop is to set up a time with [Person No. 1] or myself so we can run security updates.
If anyone has ANY questions contact [Person No. 1] or myself and we will be happy to answer them for you.

13.  At about the same time, defendant LEONARD P. LUCHKO sent a separate message to Person No. 1, defendant MARK C. EISTER, and Person No. 11:

The FBI probe into the Senator has really set him off he wants us to do a number of security checks starting tomorrow.  Mark I told him you were in training but he wants you to check all of our machines in Harrisburg and the servers as well.  Perhaps we can get [Person No. 11] to check his personal computers and you can check the other stuff when you get back from Training.  He wants all of the Blackberries wiped and [Person No. 1] and I have to bring in all laptops and do DOD wipes on them etc.  Shit has defiantly hit the fan.

---

[7]        PGP, an acronym for "Pretty Good Privacy," is a program that allows e-mail users to encrypt their e-mail correspondence and provides users with the ability to "wipe" or permanently erase deleted e-mail from the hard drive of their computers.  A "wipe" involves the use of a program to assure that deleted e-mails and other files cannot be recovered from a computer.  When a computer user empties his or her deleted items folder, all or part of such a document may and usually does remain in "unallocated space" on the computer's hard drive, and remains there unless that space is later used.  A "wipe" endeavors to scramble the entire unallocated space so that no deleted materials may be recovered.  A "DOD wipe" refers to a wipe meeting Department of Defense standards, which involves seven passes on the hard drive to assure that nothing recoverable remains.

14. Person No. 11 responded: "I will take care of the personal pc's in harrisburg tomorrow. Mark - give me a call tomorrow and we can discuss the best way to go about taking care of the other stuff."

15. At approximately 10:29 p.m. that same evening, Person No. 11 authored an e-mail to defendant LEONARD P. LUCHKO in which he inquired whether LUCHKO had sent the e-mail instructing staff to delete FUMO's e-mail to FUMO's staff members in Harrisburg, to which LUCHKO then responded four minutes later: "Just our staff in Philly. I don't know who has what equipment in Harrisburg." Person No. 11 replied two minutes later and stated: "Neither do I . . . I will have to get with Mark and make sure we get this message to the staff."

16. On or about Monday, January 26, 2004, FUMO wrote to Person No. 1, defendant LEONARD P. LUCHKO, and defendant MARK C. EISTER: "As I was encrypting a simple e-mail to Ruth the program shut down. This has not happened in a while but now that we are stepping up security I will be using PGP a lot more!"

17. On or about January 26, 2004, Person No. 11 wrote an e-mail to defendant LEONARD P. LUCHKO at 1:12 p.m. in which he requested that LUCHKO e-mail to him the anti-key-logger software "in case it is not loaded on his laptop in Hummelstown," which, at the time, was the location of FUMO's former residence in Hummelstown, Pennsylvania.

18. The following day, when defendant LEONARD P. LUCHKO stated that he was working on FUMO's e-mail problem, FUMO wrote, "For some reason it is working much better now! ??? Maybe the Feds have finished setting up their taps! :-)"

19. Defendant MARK C. EISTER then wrote, "I updated the email gateway software. That was the fix." FUMO replied, "OK But maybe I am paranoid but how did it

happen in the first place and what security measures do we currently have in place both physical and electronic???" Defendant LEONARD P. LUCHKO wrote, "[Person No. 1] and I have no idea what security is in place in Harrisburg that would be a question for Mark." FUMO responded, "Well get on it NOW!!!!"

20.    Defendant MARK C. EISTER then wrote a long e-mail evaluating the problem. He said, "I wish I was in the office this week but this training is security training and will be very usefull in the current situation. I have a few new ideas on securing the network from just the past two days." EISTER explained that FUMO's e-mail traffic had been "safe" through the domain utilized by FUMO, but that use of cable modems had created problems. "If email gets locked down by ISPs due to spam concerns and you must use their email server you are vuneralbe to Carnivore email scanning by the feds." EISTER proposed a solution, and FUMO replied, "I don't understand a lot of this because it is beyond my Computer competence and I have no idea what a VPN connection is but if it enhances security then let's go with it ASAP!!!!"

21.    On or about Tuesday, January 27, 2004, at approximately 9:39 a.m., in response to a complaint by defendant MARK C. EISTER that his Blackberry could not receive messages, defendant LEONARD P. LUCHKO wrote to EISTER, "OK I was able to wipe most of our Blackberries without incident."

22.    Among the Blackberries which LUCHKO wiped at that time was the device used by Person No. 9, the Senate employee whose duties consisted of many personal and political tasks on behalf of FUMO, as described in paragraphs 17-23 of Count 1 of this superseding indictment.

- 203 -

23.  On or about January 27, 2004, FUMO delegated his Senate counsel, Person No. 10, to determine what e-mail remained on Senate systems.  Accordingly, Person No. 10 questioned Person No. 4, the director of SDCS, and she in turn sent the following e-mail to defendant MARK C. EISTER at 10:08 a.m.:

I have been asked to have information as to the following - and I need it this morning:

1) What is the present protocol with email as far as once deleted from a person's desktop at work - is it gone? - what about if it is purged?  Is it ever retrievable?

2) are there any backups of the email so that someone can retrieve them at a later time?

3) What if they are at home, and delete them - or purge them?  Are they retrievable, and if so, for how long?

EISTER provided Person No. 4 with the answers to these questions, and Person No. 4 in turn advised Person No. 10.

24.  On or about February 4, 2004, at approximately 9:32 a.m., Person No. 11 authored an e-mail to Person No. 1 and defendant MARK C. EISTER in which he suggested a conference call to discuss "security concerns."  In response, Person No. 1 stated that the persons who should be on the conference call should include Person No. 11, Person No. 1, EISTER, and defendant LEONARD P. LUCHKO.

25.  On or about February 12, 2004, at approximately 9:05 a.m., defendant LEONARD P. LUCHKO wrote an e-mail to defendant RUTH ARNAO in which he stated, "I am going to have to get my hands on your Blackberry in order to wipe it I have to then resync it over here when is a good time for me to come and get it."

26.  On or about March 4, 2004, defendant LEONARD P. LUCHKO corresponded with an executive at the company that makes the PGP software, and inquired

whether, following a "7 Pass PGP frees space wipe," someone could tell when the wipe was run: "f I wiped a computer and the next day someone confiscated would they be able to tell it was wiped at all?"  The executive replied that an examiner would see that the drive was wiped given the absence of data.  The executive wrote:  "I can't help you . . . Lets hope they are not sophisticated enough to notice."[8]

       27.  Defendant LEONARD P. LUCHKO had additional, similar correspondence with other PGP employees the following week, and stated that the wipe in question was run on Wednesday, March 3, 2004.  Another PGP employee wrote, "There would be no data older than last Wednesday, which would make a sophisticated party suspicious that a wipe might have been run."

       28.  On or about March 9, 2004, in response to a *Philadelphia Inquirer* news story headlined, "Prosecutors widen probe of Fumo deals," which reported on grand jury subpoenas issued to a public utility company, FUMO's communications and political consultant, Person No. 2, e-mailed the story to FUMO that same day and an exchange of e-mail ensued concerning the story and the fact that the public utility company -- not FUMO -- had received grand jury subpoenas.

---

    [8]    When the PGP Free Space Wipe utility is executed, a temporary file is created. This temporary file contains random characters which are used to over-write unallocated clusters and file slack.  When created, all date and time stamps are captured, i.e. "Creation," "Modified," and "Accessed."  The temporary file name "pgpwipepattern.tmp" is normally deleted upon completion of the wiping process.  However, the file name, attributes, and content are recoverable through expert forensic analysis.  Therefore, it is possible to determine the last date on which the PGP Free Space Wipe utility was executed even though the wiping process over-writes the hard drive and results in the deletion of even the temporary PGP file.

29.  On or about April 6, 2004, defendant LEONARD P. LUCHKO wrote an e-mail to Person No. 1 regarding the computer equipment assigned to two of the staff members of FUMO: "I ran pgp wipe on [Person No. 8, Person No. 9 (Senate employees who did personal and/or political tasks for FUMO)] and Fumo's PC make sure they finished."

30.  On or about April 28, 2004, Citizens Alliance received a grand jury subpoena requesting, among other things, e-mail communications among and between FUMO, ARNAO, and other persons regarding, among other matters, the approval and payment of certain expenses incurred by Citizens Alliance.

31.  Within just a few days after the April 28, 2004 grand jury subpoena was served on Citizens Alliance, FUMO had in his possession a copy of the subpoena and spoke to a close friend and attorney, Person No. 14, about the subpoena.

32.  In response to the grand jury subpoena, Citizens Alliance produced, over a period of several months, more than 10 boxes of records, including original invoices, checks, and bank records, but made no search of any of its computer equipment, e-mail exchange server, or other electronic media, even though such evidence was specifically requested in the grand jury subpoena.

33.  During the time that Citizens Alliance was gathering its records in order to attempt to respond to the grand jury subpoena, on or about May 5, 2004, the district office computer of Person No. 9, a member of FUMO's Philadelphia office staff, was again wiped using the PGP wiping utility.

34.  On or about that same day, the district office computer of Person No. 6, another member of FUMO's Philadelphia district office staff, was wiped with the PGP wipe utility.

35.  On or about May 6, 2004, a date on which the *Philadelphia Inquirer* and *Philadelphia Daily News* both reported that additional grand jury subpoenas were being served on a number of persons and entities concerning matters relevant to the investigation, a PGP wipe was run on FUMO's office computer on Tasker Street.

36.  On or about May 10, 2004, defendant LEONARD P. LUCHKO wrote to Senate Contractor No. 3, a person who had engaged in extensive political campaign work on FUMO's behalf while being compensated through a Senate contract (as explained in paragraphs 44 and 45 of Count 1 of this superseding indictment):

> You need to clean your mailbox up.  You have over 1200 unopened emails and you also have email to and from Fumo you absolutely have to get rid of that.  If you want we can set your laptops up to pull mail that way you wouldn't accumulate so much mail on the main PC but that mail from the Boss needs to be deleted!

After Senate Contractor No. 3 apologized, LUCHKO wrote, "You really have to clean your mailbox up this is the kind of shit that can get us in trouble."

37.  On or about May 21, 2004, the *Philadelphia Inquirer* published a story with the headline "Fumo Probe Moves to Harrisburg" and which stated in part: "Federal investigators have extended their probe into Fumo's dealings to the state Capitol, where FBI agents this week began trying to unravel the taxpayer grants the powerful legislator helped funnel to a Philadelphia maritime museum."  In the weeks following publication of this article, defendants LEONARD P. LUCHKO and MARK C. EISTER, along with other persons, both known and

- 207 -

unknown, began to focus and intensify their efforts to delete e-mail and wipe computers in

FUMO's Harrisburg office.

38. On or about May 25, 2004, defendant LEONARD P. LUCHKO wrote to

Person No. 4, the supervisor of Senate Democratic Computer Services in Harrisburg:

> The Senator wants us to get some type of utility to really clean our PC's and laptops we are currently using PGP Free Space wipe and that works well but he wants us to be able to do a more thorough cleaning Registry Keys orphan files etc. We also have to be able to use it on active computers.

He then suggested that SecureClean was a good product, and Person No. 4 replied to ask how

many copies he wanted.

39. The SecureClean[9] wipe program was purchased, installed, and used by

defendants LEONARD P. LUCHKO and MARK C. EISTER, among others, to wipe computers

and PC cards of FUMO's staff in both Harrisburg and Philadelphia.

40. On or about June 7, 2004, just four days after FBI and IRS agents requested

that Citizens Alliance produce more than ten boxes of records to the grand jury, defendant

LEONARD P. LUCHKO wrote to defendant MARK C. EISTER,

> The Boss said the one thing he wants done in Harrisburg is to make sure email to and from him is deleted on a Weekly basis so whatever you put in your email to him and me make sure that is addressed.

---

[9] With respect to SecureClean, when this wiping utility is executed, a temporary file is created. When created, all date and time stamps are captured, i.e. "Created," "Modified," and "Accessed." The temporary file named "SC00###.T~P" is deleted upon completion. The file's name and attributes appear to be the only recoverable traces of its existence. This would indicate the temporary file is created, deleted, and wiped by its own function. The file's name and attributes are recoverable only because this data resides in a different location on the hard drive. In addition, SecureClean log files are created when the utility is executed and it is therefore possible to determine the dates on which the utility is run.

41. On the same day, Person No. 4 wrote to defendant LEONARD P. LUCHKO, "Is fumo there?" When LUCHKO replied that he was, Person No. 4 answered, "good - because [Person No. 1] shared with [Person No. 12, an employee of SDCS] that 'HE' was driving him nuts and I figured it was you -- must be Fumo." LUCHKO replied, "Boss is driving us ALL nuts with this FBI madness. I life just got so complicated it isn't even funny and the killer is I can't tell anyone about it."[10]

42. Person No. 4 sent an e-mail a few minutes later stating:

> Just say the word and we'll get what you need.
> Don't you think there is a self destruct software that your PC goes belly up and writes all over itself if you don't key in a password every 48 hours? -
> How imminent is this threat?

Defendant LEONARD P. LUCHKO answered:

> I really don't want to go into it what you don't know can't hurt you we have everything under control its just going to be a real pain for [Person No. 1] and I. That's just the way it has to be for now they (FBI) won't be around forever. Then we can go back to our normal routine.

---

[10] During this same time period, in a June 8, 2004 e-mail exchange between FUMO and one of his political consultants, Senate Contractor No. 2, FUMO wanted Senate Contractor No. 2 to try to find out from an attorney representing one of the companies that settled PUC litigation against FUMO, which litigation was a subject of this investigation, what its employees were telling the government. When Senate Contractor No. 2 reported back to FUMO that the attorney would probably not tell him anything because of concerns about attorney-client privilege, FUMO responded angrily:

> I understand that. That is what they told our guys already!!! FRIENDS are supposed to help FRIENDS!!! Not give them that kind of bullshit!!! NO ONE is ever going to tell the fucking client AnYTHING!!! But if that is the way they want to be to a freind then fuck them. Ask anyway, so that we will know if we have a future friend or an enemy in your current friend!!! There is no middle ground on this one!! You know how serious and almost life threatening this is. So let them know that and if they still want to fuck us or stand by and watch as we get fucked then so be it. We will nevver forget. One way or the other. And right now they owe us big time!!! TY.

Person No. 4 then stated:

> Can you give me anything that we should be doing here that is imperative.  We are doing
> no backups -- but as far as the people -- they are difficult to control what they have on t
> heir own PC's.

Defendant LEONARD P. LUCHKO replied:

> I already had a talk with Mark, Fumo actually wanted me to go up there for 3 days and
> make recommendations to him I told him no (Can you believe that) I said Mark knows
> what has to be done and he will send him (Fumo) an email tomorrow he asked me about
> Mark's loyalty and I told him it is impeccable because in my opinion it is. Fumo is
> REALLY concerned about the Fumo Staff in Harrisburg holding email to and from him
> we are not allowed to do that down here and Mark has a plan in motion.

      43.  Later that evening, at 7:28 p.m., defendant LEONARD P. LUCHKO wrote an

e-mail to Person No. 4 titled  "Venting," complaining that an unspecified personal emotional

problem and "this FBI crap on top of that" made it "one of the toughest days I ever had at work."

He continued:

> He has us doing stuff that I know is going to come back and bite us in the ass.  Example
> we had a perfect I mean perfect system for backing up the PCMCIA card with all of the
> Quicken, CERS, FFS everything and I had to destroy that system.  I created that system
> and destroying it REALLY hurt because I know something is going to happen and we are
> going to have to go back and look at something and boom were screwed and you know
> who takes the heat when Data Processing things get messed up US!  I am walking 1
> backup tape in at a time and then bringing it home I am literally walking around with files
> in my pocket.that's insane, hopefully this will blow over soon but right now I am stressed.
> I don't blame Fumo the FBI is really coming at him hard and he is innocent I truly believe
> that or I wouldn't do this I have delt with the FBI before at the Navy Yard and when they
> can't find anything wrong they try to manufacutre stuff so they can justify the man hours
> and money spent on a fruitless investigation.

Later, LUCHKO added regarding this e-mail, "delete it after you read it."

      44.  On or about June 8, 2004, Person No. 4 wrote an e-mail sympathizing with

defendant LEONARD P. LUCHKO, and offering an ear.  She concluded:

> WE have our job cut out for us today - I am concerned about security up here - staff here don't listen at all - staff has months of email and won't listen to deleting it - they just don't seem to care. If by days end we aren't satisfied and have backing from Fumo to just erase stuff for them, we might need you - I am having Mark rewrite the email to fumo to get some nitty gritty to the point stuff across and we'll go from there.

LUCHKO answered:

> Fumo is going to give you authority to do anything you want that's what he did with me. He REALLY wants that mail gone. The way it worked down here was if Senior staff had to keep mail for a reason such as they needed it to reference a job request or a purchase they had to check with him and he would say if it was OK but anything else he wants gone.

> Put it to them this way if Fumo goes done we all go down it worked down here.[11]

45. Defendant MARK C. EISTER was given the task of assuring the deletion of e-mail in the Harrisburg office, and on or about June 8, 2004, he sent FUMO an explanation of the problem and a proposed plan of action. EISTER explained that there was presently no e-mail retention policy, and that e-mail remained on the server until deleted by the user. "There is no retention policy in place so mail can be stored indefinitely," he wrote. He added (italics in original):

> *We want to enforce an email retention policy. If you approve I can verify email is deleted by logging into individual email boxes to look until I can come up with an automatic deletion procedure.*

> *With a new email policy how do I handle all old email currently in users Inboxes? Do I ask them to clean it up or just delete an old email past a certain date? I recommend we announce all email older than 7 days will be deleted in 48 hours. That gives them a window to make notes of what they need to but not enough time to procrastinate and forget about it.*

46. Also on or about June 8, 2004, defendant LUCHKO wrote:

---

[11]    Defendant LEONARD P. LUCHKO told Person No. 1 that, in the event that FUMO were to be charged, both he and Person No. 1 would likely lose their jobs.

Boss didn't think to ask you about this yesterday.  What do you want to do about PITS[12] electronically there is very little I can do it's a stand alone Network if they (FBI) come in they have what is there I have no idea what [an employee of a Senate contractor] keeps upstairs as far as Hard Copy but all those filing cabinets look full to me and she has all kinds of Floppy disks up there and I have no idea what they are for.  I asked her if she has any sensitive data on her PC and she said no.  PA

47.  On or about Wednesday, June 9, 2004 at approximately 9:34 p.m., Eister wrote an e-mail to FUMO in which he stated: "Senator, I assume you have reviewed the Harrisburg staff and server security notes by now and no response is tacit approval.  I?d be happy to meet to review any questions or concerns you may have.  A few words are often clearer than long emails.  Thanks, Mark".

48.  Approximately ten minutes later, FUMO responded to Eister and stated: "Please review this with Lenny and get his input as well.  Then we will QUICKLY develop a strategy!"

49.  On or about June 10, 2004, a wipe was run on one of defendant MARK C. EISTER's desktop computers using PGP Free Space Wipe.

50.  On or about June 11, 2004, a wipe was run on defendant LEONARD P. LUCHKO's office computer at the Tasker Street office using SecureClean.

51.  On or about Saturday and Sunday, June 12 and 13, 2004, Eister and FUMO corresponded further regarding the plan to delete e-mail in Harrisburg:

EISTER:    I have talked to Lenny about the security procedures and we are in
           agreement on practices with one exception.  Lenny maintains a policy with
           the Tasker staff that no email from you can be kept beyond a reasonable

---

[12]    PITS is a specialized database of campaign finance information that is maintained for Fumo by an outside Senate contractor and which Fumo uses to track campaign contributions to public officials and political action committees throughout Pennsylvania.

time frame.  If anybody wants exceptions they need the OK from you.  I do not currently hold this policy with the Harrisburg staff.

I can announce this policy at the Monday morning Harrisburg staff meeting.  I will tell the staff the all email from you must be removed from the mail system within 7 days.  Any exceptions must be cleared with you first.

Should I implement and announce this policy to Harrisburg staff?

FUMO:         Who will be at the staff meeting?  I want the policy implement but I don't want the world to know as we will get some bad press!

Also, I no longer want any e-mails from me printed without permission in both Philly and Harrisburg.

EISTER:       The staff meeting is only the Harrisburg staff; [Person No. 4] and myself.  These take place in the conference room with the door closed.

FUMO:         My staff???

PA TY

EISTER:       Yes.  Only your staff.

52.  On or about Monday, June 14, 2004, Person No. 17, the executive director of the Senate Democratic Appropriations Committee, second-in-command to FUMO in FUMO's Harrisburg office, learned of MARK C. EISTER's plan to announce to the staff that morning that e-mail to and from FUMO must be deleted, and that EISTER would inspect individuals' computers to assure compliance; upon learning of this plan, Person No. 17 told EISTER that the plan was unacceptable and directed him not to announce it.

53.  Defendant MARK C. EISTER nevertheless proceeded to the regular Monday staff meeting that occurred in FUMO's office in the State Capitol, and, as FUMO had approved, instructed the Harrisburg staff members that they should delete all e-mail to and from FUMO.

- 213 -

EISTER explained that, if a staff member sent an e-mail to FUMO, he or she should then go into the "Sent Items" folder in their e-mail program and delete that e-mail to FUMO.

54.   Defendant MARK C. EISTER also told the staff at the meeting that he would be inspecting each person's computer to make sure that everyone was following this instruction and also to ensure that each staff member's "Deleted Items" folder was being compacted or emptied.

55.   During subsequent months, defendant MARK C. EISTER in fact inspected e-mail accounts in Harrisburg to assure compliance with FUMO's directive.

56.   On or about Monday, June 14, 2004, in an e-mail exchange between defendants MARK C. EISTER and LEONARD P. LUCHKO, defendant EISTER reported to LUCHKO that: "I made the announcement this morning at the Fumo staff meeting and I'm not the most popular person with the staff right now," to which  LUCHKO responded: "This is what I do whenever I have to pass something that is unpopular with the staff I put it all on VJF and that seems to keep everyone civil to me.  It REALLY works."

57.   Also, on or about June 14, 2004, defendant LEONARD P. LUCHKO wrote another e-mail to Senate Contractor No. 3, the political aide to FUMO, indicating that LUCHKO was again not pleased with the results of his review of Senate Contractor No. 3's e-mail files:

> The Server did a scan on everyone's PST and found your PST file had a total of 249 emails in it that were to or from the Senator.
>
> 156 IN Box emails to vjf@fumo.com or v8@fumo.com
>
> 93 SENT ITEMS email to VJF@fumo.com or V8@fumo.com

You have to address this TODAY because the next email I sent you he gets CC on
because VJF wants the results of these scans and I really don't want to do that.  Please
Advise

58.  Senate Contractor No. 3 responded as follows: "Please tell me what I need to

do.  Do I need to come into the office?  I'm in conshohocken for the access course."  Defendant

LEONARD P. LUCHKO then replied, "I can delete them for you," to which Senate Contractor

No. 3 responded, "Please Do!  Thank you!!"  LUCHKO then responded: "Just make sure you

check both of your laptops.  Also make sure you check for mail that was CC to vjf@fumo.com

and v8@fumo.comthat hasd to be deleted also."

59.  Following this e-mail exchange, e-mail related to FUMO, *i.e.* e-mail

communications sent to, received from, or copied to FUMO, was in fact deleted from the e-mail

accounts of Senate Contractor No. 3.

60.  At approximately 10:01 p.m. on or about June 14, 2004, defendant

LEONARD P. LUCHKO wrote an e-mail to EISTER, which states in part:

How did you.make out with your security measures?  He had us delete every email I ever
sent him received from him or CC and it killed me to do it because it was all technicle
stuff that I use for rreference.  Everybody down here did the same thing.  He is serious
about this emial thing.  I could care less if the FBI came in tomorrow and took every PC
in the place.

61.  On or about June 14, 2004, the SecureClean wipe program was run on the

defendant RUTH ARNAO's desktop computer at Citizens Alliance's office.

62.  On or about July 25, 2004, defendant MARK C. EISTER wrote to defendant

LEONARD P. LUCHKO:

The server has not been wiped in 3+ weeks.  The users are emailed to remind them they
will be email audited and to keep things clean.  I have made a walk though of the office to

check the inboxes but people were out that day so I have no seen every inbox for sometime now.

63.  On or about August 6, 2004, a SecureClean wipe was run on defendant RUTH ARNAO's computer at Citizens Alliance and PC card.  On or about the same day, such a wipe was also run on one of defendant LEONARD P. LUCHKO's computers at the Tasker Street office.

64.  On or about August 7, 2004, defendant LEONARD P. LUCHKO wrote to defendant MARK C. EISTER, in part:

> this weather we have been having is so lousy I have been running extra security checks on everyone's webmail (can't be too careful) you will be happy to know that no one from Tasker Street or our mobile users is storing mail on the server and everyone at the office is getting rid of VJF mail ASAP.  How are you making out up there?  How's the new house coming along?

65.  Defendant MARK C. EISTER replied, "Staff is being very good about the email.  There are a handful of emails when I do the check but they are always recent," to which defendant LEONARD P. LUCHKO responded about ten minutes later: "I know at first Its a pain everyone gives you dirty looks at first but once everyone starts cooperating then its fine and now you have a very tight ship and one less thing to worry about."

66.  Defendants MARK C. EISTER and LEONARD P. LUCHKO then exchanged e-mails about the security of the Blackberry server.  EISTER wrote a long message about how that server stores and overwrites files, to which LUCHKO replied, "Wow that sounds really secure so if The FBI were to seize that server all they would see would be the last email to pass through is that correct?"

- 216 -

67. On or about August 26, 2004, defendant LEONARD P. LUCHKO wrote an e-mail to Person No. 20 (FUMO's chief-of-staff in Philadelphia) in which he reported his concerns that Person No. 13, a Senate employee in Philadelphia, was not deleting e-mail to or from FUMO:

> [Person No. 13] called us yesterday to see if we could fix the PC she has at her office. The hard drive was bad but we managed to recover most of her files. She is ordering a new PC and in the meantime we are moving her files to her laptop. While I was setting her laptop up and moving the recovered email from her bad hard drive I noticed she had quite a bit of VJF mail on both the laptop and the file we recovered from her PC. All of the mail was from 10-2001 to 5-2002 which leads me to believe we didn't recover all of her email from the bad hard drive but it also tells me that she is not deleting the Senator's mail like she is supposed to I deleted all of it and wiped the Outlook file to remove all traces. There is no way I can check to see if she is holding more recent mail on her machine at home. I am supposed to notify the Boss if anyone is holding his mail but if I do he is going to go through the roof and I don't want to get anybody in trouble. I have told [Person No. 13] just like I have told everyone else not to save the boss's mail evidently she is not listing to me can you talk to her about it or should I just tell the Boss and let him deal with it PA.

> PS She is not the only one that uses this machine up at that office so any of VJF mail she saves is available to anyone who has access to the computer.

68. On or about the next day, August 27, 2004, Person No. 20 replied: "I will talk to her. Also I'm going to tell her you will check he units periodically until I'm assured she is complying with policy. Please see me about this. TY."

69. On or about October 28, 2004, defendant LEONARD P. LUCHKO sent an e-mail to all of FUMO's Philadelphia staff, several Senate contractors, and ARNAO, with a cc to FUMO:

> This is a reminder to EVERYONE that under no circumstances are you to save any email in your IN Box or Sent Items that is sent to or received from VJF. If you have mail that you think you need to save you have to contact VJF and ask him about it. If you need help getting rid of your mail or just checking to see if you have any mail that you shouldn't have contact Lenny or [Person No. 1].

- 217 -

PS Make sure you clean out your "Deleted Items" as well.

70.  On or about November 6, 2004, the file server at FUMO's district office on Tasker Street was wiped using PGP Free Space Wipe.

71.  On or about November 15, 2004, defendant LEONARD P. LUCHKO wrote a message to defendant MARK C. EISTER which stated, in part:  "He is back on the email kick he had me check every PC in here to make sure no one is saving his mail.  How are you making out with that up there?"  EISTER responded, "People are doing a really good job of policing themselves.  That makes me happy."  LUCHKO answered, "I would let VJF know."

72.  On or about December 9, 2004, a SecureClean wipe program known as "Deep Clean" was run on the desktop computer and PC card of RUTH ARNAO.

73.  Between on or about December 8, 2004 and on or about February 4, 2005, eight of the desktop computers located at FUMO's Harrisburg office were subjected to operating system software upgrades to Microsoft Windows XP, which had the same effect as a wipe.  The procedures utilized to upgrade the Harrisburg office computers' operating systems also made it impossible to determine if and when a wipe utility was installed or executed on those computers prior to the upgrade taking place.

74.  On or about December 29, 2004, Person No. 1's computer at FUMO's district office was wiped using the PGP wipe utility.

75.  On or about December 30, 2004, the district office computer of Person No. 8, a member of FUMO's Philadelphia staff who handled personal tasks for FUMO on Senate time, was wiped using the PGP wipe utility.

76. On or about January 19, 2005, government counsel sent a new subpoena to Citizens Alliance, along with a letter to its counsel, explaining the paucity of e-mail produced in response to the April 28, 2004 subpoena. The letter stated in part the following:

> In reviewing all of the records that your client, Citizens Alliance for Better Neighborhoods ("CABN") produced in response to the grand jury subpoena, we noticed that very little in the way of email was produced to us. The email that was produced to us appears to be email that was printed out in hard copy form and included in a file or otherwise attached to another document, such as an invoice. As you know, the grand jury subpoena that was served upon CABN required that it produce all responsive documents, including electronically stored data and email. Your client was required to search all of its electronic files for responsive records and email, even if the email was not actually printed out on a piece of paper and stored in a folder or filing cabinet or some other place.
>
> We have obtained through our investigation from third parties and other sources numerous emails sent to or from your client that would fall well within the scope of the subpoena but which have not been produced to us by your client. We need to understand why this email was not produced to us by CABN, and therefore request an explanation from your client. Was a search of your client's computer hard drives and email servers conducted by a qualified data recovery expert? If so, we need to understand the procedures that were employed to search for electronic evidence and where the searches were conducted. If no search for electronic evidence was conducted, we need an explanation of why that is so. In addition, in our experience, it is often the case that email and other electronic evidence that is deleted can often be recovered and restored. FBI and IRS both have computer experts who are trained in the recovery of electronically stored communications and files, and I would like to get them involved in this process to ensure that all responsive evidence in your client's possession or control is searched for and produced to us.

In response to this letter, defendants VINCENT J. FUMO, RUTH ARNAO, LEONARD P. LUCHKO, MARK C. EISTER, and others, both known and unknown to the grand jury, intensified their efforts to delete e-mail and wipe computers related to Citizens Alliance.

77. Just two days after the January 19, 2005 letter and subpoena were sent by government counsel to Citizens Alliance, on or about January 21, 2005, at approximately 9:08 a.m., defendant LEONARD P. LUCHKO sent an e-mail to defendant RUTH ARNAO,

- 219 -

which began, "After our conversation yesterday I have been giving your situation some thought."

LUCHKO then summarized the extensive wiping he had previously done on her computer at

Citizens Alliance.  LUCHKO stated, "Now I would like to do the same thing to your computers

at home and the shore but you are going to have to let me know if it is OK."  LUCHKO also

addressed two things he said that ARNAO should be worried about:

> 1) You have a lot of old files in your My Documents folder on all of your machines.  You
> should let me delete all of these files except the ones on the Card and you should then go
> through the My Documents folder and get rid of things you don't need!  You have some
> files that are a couple of years old!
>
> 2) You are still using a lot of Senate equipment and software.  3 laptops, 1 Desktop a
> printer plus all of your wireless equipment belongs to the Senate.  I am pretty sure the
> wireless equipment is not marked but the computers and printer are defiantly marked.  If
> they want to they can hassle you behind this because I think it is a crime for non senate
> people to use senate equipment isn't it?  The software I am not going to worry about if
> they are going to get that specific than they are going to find something else.
>
> Remember I am just playing the devils advocate here I don't want you to get blindsided.

78.  Although no wipe of ARNAO's computer and PC card was performed after

the government's January 19, 2005 letter and subpoena, steps were taken at that time by

defendant LEONARD P. LUCHKO and other persons, both known and unknown, to assure that

no further wipe would be necessary.  Specifically, a SecureClean scan was run on or about

January 26, 2005, which provided LUCHKO and other persons involved in the conspiracy a

snapshot of what would be found on the computer equipment.[13]

---

[13]    The following text is from the SecureClean program that details what the scan
will do when executed.

> SecureClean can scan your computer for data that has not been cleaned from your
> computer. By using the SecureClean Scanner, you can quickly determine what private
> information is hidden on your drives and where it is located. This tool is particularly
> useful in making sure that specific items have been securely erased following a Clean or a

79.  Later on or about January 21, 2005, at approximately 3:49 p.m., defendant LEONARD P. LUCHKO sent an e-mail to defendant MARK C. EISTER entitled "One More thing," which stated:  "Remember Ruth Arnao her user name was ruth@fumo.com if you have anything remotely related to her a folder whatever PGP wipe it."

80.  On or about Monday, January 24, 2005, at approximately 2:16 p.m., defendant MARK C. EISTER wrote to defendant LEONARD P. LUCHKO, "I seached the system before I left for the day on Friday and there was no trace of the 'ruth' account to take care of; everything was already gone."

81.  On or about January 26, 2005, one week after the January 19 letter and subpoena was issued to Citizens Alliance and the same date on which a SecureClean scan was performed on ARNAO's computer to determine what would be recoverable on it, defendant LEONARD P. LUCHKO wrote to ARNAO, "I forgot to tell you that compacting your PST would not be necessary because of the WIPE I did on your PC the Secure Clean wipe cleans your PST file of all left over mail fragments." A "PST file" is one in which Microsoft Outlook e-mail is kept.

82.  Also on or about January 26, 2005, defendant LEONARD P. LUCHKO sent another directive to all of FUMO's Philadelphia staff and to ARNAO (at Citizens Alliance) instructing them to destroy all e-mail involving FUMO:

> This is a remainder to everyone to get rid of any mail you Received or Sent to VJF I have also noticed that some of you have don't have your DELETED ITEMS set to empty when OUTLOOK closes this is OK but you have to make sure you empty it manually from time to time.  Also your mailbox needs to be COMPACTED after you have deleted a large

Quick Clean.

- 221 -

amount of mail.  This procedure cleans up any traces of email that may still be residing in the space you just created by deleting your email.  I usually take care of this myself but if you happen to delete a large amount of mail let me know and I will do it immediately for you.

83.  On or about January 28, 2005, within less than three hours after the start of a meeting between counsel for the government, counsel for Citizens Alliance, and counsel for defendant RUTH ARNAO to discuss the government's desire to conduct a forensic examination of ARNAO's computer in order to attempt to retrieve deleted e-mail and other stored electronic communications, at approximately 1:26 p.m., defendant LEONARD P. LUCHKO wrote to ARNAO, "I am getting rid of this copy of your email file OK[.]"

84.  On or about January 31, 2005, defendant LEONARD P. LUCHKO's office computer at the Tasker Street office was wiped using SecureClean.

85.  In an e-mail created on or about February 3, 2005, at approximately 7:46 p.m., defendant LEONARD P. LUCHKO wrote to defendant MARK C. EISTER, "I met with my lawyer today and the FBI tomorrow if I were you I would make sure everything is clean on the Fumo server they were asking me about our email where is the server etc."

86.  Seven minutes later, at approximately 7:53 p.m., defendant LEONARD P. LUCHKO added, "They are looking for emails to and from Ruth Arnao and they are pissed because I wiped her PC and destroyed her old card.  I thing their last gasp is email that might have been left on the server but she hasn't used Fumo.com since last February so I can't imagine anything from her is still around.  Right[.]"

87.  At approximately 7:57 p.m., defendant MARK C. EISTER replied, "Should have PGP's this one and not the email about PGP v8.1.  I will check out the new version. Ruth

has been gone a year and there is nothing left of her.  I will go through the servers tonight to verify everything is looking good.  Give me an update tomorrow when you done with everything."  Defendant LEONARD P. LUCHKO answered, "I see them at 2:45 so I will email you when I am out of there."

88.    The next day, on or about February 4, 2005, at approximately 10:12 a.m., defendant LEONARD P. LUCHKO wrote an e-mail to defendant MARK C. EISTER in which he stated, "VJF will be in Harrisburg on Tuesday and Wednesday I need you to get a backup and compact his PST file OK."  EISTER responded: "OK.  I catch him as early as possible on Tuesday."[14]

89.    As mentioned in his February 3, 2005 e-mail to defendant MARK C. EISTER, defendant LEONARD P. LUCHKO became involved in direct discussions with the government regarding the January 19, 2005 subpoena to Citizens Alliance.

90.    During a February 4, 2005 conference call involving, among others, defendant LEONARD P. LUCHKO, his counsel, FBI special agents, and government counsel, the purpose of which was to again discuss the government's desire to conduct a forensic examination of defendant RUTH ARNAO's computer and to discuss technical issues regarding the examination, LUCHKO stated that he had downloaded from the Internet a program that

---

[14]        "Compacting a PST file" means deleting or emptying the items from the Deleted Items folder in order to permanently delete them.  A PST file is a database of e-mail files.  The e-mail files are records within the database and there is an index that points to each item. When a e-mail user empties the Deleted Items folder, the Microsoft Outlook program does not actually delete the e-mails; rather, it just deletes their listings from the index.  The e-mail is still in the PST, but unrecoverable because Microsoft Outlook cannot find it without the pointer in the index.  The space that each e-mail item takes up is called "whitespace."  When an e-mail user compacts a PST, the item is finally and permanently removed and the whitespace is recovered, thereby shrinking the size of the PST.

would enable him to attempt to recover deleted e-mail but did not at any time indicate that he had given instructions to FUMO's employees or ARNAO to delete or destroy e-mail.

91.  As a result of this phone call, Citizens Alliance and ARNAO agreed to permit an FBI forensic examiner to "image" or make an exact copy of the hard drive of ARNAO's computer and PC card.

92.  On the same day of the conference call concerning the FBI's request to examine ARNAO's computer in order to attempt to recover e-mail and other electronic evidence, FUMO's office computer on Tasker Street was wiped using the SecureClean utility.

93.  On or about the next day, Saturday, February 5, 2005, defendants LEONARD P. LUCHKO and MARK C. EISTER discussed a problem with the Blackberry server.  At approximately 3:06 p.m., LUCHKO wrote:

> I met with the FBI on Friday they asked me who I worked for and what department.  They asked me questioned about the Citizens Alliance network.  They asked me if I ever tried to recover mail from Ruth's PC and how much mail I was able to recover.  I have to meet with them on Wednesday night at Citizens.  I think they are going to ghost Ruth's PC and try to recover email.  Good Luck to them because they are going to need it.

94.  At approximately 3:14 p.m., defendant MARK C. EISTER stated, in part, "As far as the FBI, glad to here they don't want to look at the server; yet.  I hope it stays that way."

At approximately 3:18 p.m., defendant LEONARD P. LUCHKO wrote:

> They can't look at are stuff without probable cause that is why they are questioning me and hassling Citizens Alliance they are looking for a way in.  I think they are going to be completely surprised when they check out Ruth's PC when they get a load of the Card setup and the Keystroke monitor detector's and Secure Clean Software along with PGP.  They aren't getting shit off that PC and once they look it over it's the last time anyone uses that PC who knows what they might try and slip in it or on it we are not taking any chances.

- 224 -

95.  On or about February 10, 2005, defendant LEONARD P. LUCHKO was present at the office of Citizens Alliance and observed an FBI forensic examiner make an image of the hard drive of ARNAO's computer and her PC card.  At approximately 10:59 p.m. that night, LUCHKO reported his observations directly to FUMO:

> Finished with the FBI for now they showed up about 7:10 PM.  There were 2 techs, Jim S, Jerald Ruth's lawyer and myself.  They wanted to image all of the computers but Jim and Gerald said no because they only asked for Ruth's so they imaged Ruth's computer and they imaged the Card.  Jim told them he wanted copied of everything they took at first they didn't want to give then up but they did Gerald Ruth's lawyer has the copies.  They finished up around 9 and then after they left I moved the computer into the closet and then went out to the trunk of my car and got Ruth's new computer and set it up I have her old card and will give it to her next week when she gets back from Florida.  I didn't want to leave it in the old computer because the closet I put it in wasn't locked.  I am off to the shore tomorrow to update your computers and wipe them as well I am also going to wipe the computers at Monmouth Ave.[15]

96.  FUMO replied at approximately 11:04 p.m.: "OK TY Give Ruth a NEW card as well since they may have screwed with that as well.  Were you there when they did their work or did they do it in secret?  PA TY"

97.  The next morning, on or about February 11, 2005, at approximately 6:59 a.m., defendant LEONARD P. LUCHKO wrote to Person No. 1 about defendant RUTH ARNAO's Blackberry:  "After you sync her BB this morning tell her I think you should wipe it as well before the FBI ask for it."  Person No. 1 complied with this request, and wiped ARNAO's Blackberry.

98.  Defendant LEONARD P. LUCHKO wrote to FUMO at approximately 11:43 a.m. on or about February 11, 2005:

---

[15]    "Monmouth Ave." is a reference to ARNAO's shore residence.

I updated and wiped all of your computers at the shore including Ruth's at Monmoth
Ave. I wasn't able to renew the virus software because I don't have the new
subscriptions yet but yours doesn't expire for another 3 weeks and when I get the new
subscriptions I will just come back down and take care of them.

99. FUMO replied:

OK I have had that renewal problem on a number of the computers that I use. I think the
one down here is up in a few days as well. Don't we have one master subscription?

100. On or about February 11, 2005, a SecureClean wipe was performed on the

computer used by ARNAO at her shore residence.

101. In an e-mail titled "Laptop Mania" and created at approximately 1:15 p.m.

that same day, defendant LEONARD P. LUCHKO reported to Person No. 1 that the full wipe

damaged the "Kenyon Ave laptop"[16] -- it "did the exact same thing Ruth's did they are both

fucked!"

102. On or about Saturday, February 12, 2005, defendant LEONARD P.

LUCHKO wrote an e-mail to Person No. 1, with a copy to defendant MARK C. EISTER,

explaining how he was planning to repartition the laptops to permit faster wipes.[17] At

approximately 8:36 p.m. that same day, in an e-mail exchange with defendant MARK C.

EISTER, defendant LEONARD P. LUCHKO stated, "if I see one more laptop tonight I will go

crazy I have been working on these things since last night almost done they are running really

well now plus they are very clean . . . ."

---

[16]     FUMO's home in Margate, New Jersey was located on Kenyon Avenue.

[17]     A computer hard disk may be "partitioned" into sections or drives. Such drives
on a Windows system are commonly referred to by letter, such as "C:", "D:", "E:," etc.
"Repartitioning" is the process of creating or changing the size and sequence of partitions on the
disk.

103. FUMO's IBM laptop hard drive, which he kept at his residence in Philadelphia, was wiped using SecureClean on February 12, 2005 and February 16, 2005, dates which are just two days after the FBI imaged defendant RUTH ARNAO's computer and PC card at Citizens Alliance and just two days before the search warrant of FUMO's legislative office was executed.

104. On or about February 19, 2005, just one day after a federal search warrant[18] was executed at FUMO's district office in Philadelphia seeking evidence of and concerning, among other things, deleted e-mail and electronic evidence, defendant LEONARD P. LUCHKO performed a PGP Free Space Wipe on the PC card that he kept at his home.

105. On or about February 27, 2005, just nine days after the FBI and IRS executed the search warrant at FUMO's district office and obtained FUMO's e-mail exchange server from the State Capitol, defendant LEONARD P. LUCHKO sent an e-mail to defendant MARK C. EISTER that stated in part, "The Boss told me that he doesn't want ANY mail stored on our server in Harrisburg." LUCHKO then described a proposed policy in which EISTER would set up a procedure on FUMO's server that would delete any e-mail left on the server for more than seven days. In response to this e-mail, EISTER replied in part:

> . . . First off I want to say to you this is fucking ridiculous. If this happens again they will still take the goddamn server on top of taking a whole fleet of computers as that is where the email really is spread out to. . . . I'm a little pissed right now. I don't like moving backward to accommodate paranoia. Use fucking PGP and if you don't trust that then

---

[18]      On February 18, 2005, defendant LEONARD P. LUCHKO initiated a SecureClean wipe on his own office computer, and the program was running at the time that the search warrant was executed at the Tasker Street office.

don't type it into a fucking computer.  That's the ONLY way to guarantee data safety; don't create the fucking data in the first place!

106.  On or about March 8, 2005, Person No. 4 wrote to defendant LEONARD P. LUCHKO, Person No. 1, and defendant MARK C. EISTER:

Just got back from seeing him:
Roe and Chris -
they are to keep their mail popped to their card. Fumo assumes they use it EXACTLY as he does - where at all locations they use their card - on their laptop, on their home pc and that NO mail is saved anywhere else.

107.  The desktop hard drive of Person No. 11, a member of FUMO's staff in Harrisburg, was wiped using PGP wipe utility on or about March 15, 2005.

108.  On or about March 18, 2005, defendant LEONARD P. LUCHKO wrote an e-mail to defendant MARK C. EISTER stating that he wiped the Blackberry of Person No. 6, who was one of FUMO's legislative assistants in Philadelphia who had some involvement in matters that are relevant to this investigation.

109.  On or about March 21, 2005, Person No. 4 sent an e-mail to three of her subordinates in SDCS describing an "Email Project" that FUMO wanted her to undertake:

The email project has taken a turn.  Here are the new specs, as per Vince Fumo.

1) I am to talk individually to each Senator.  Each Senator will determine what their retention period is suppose to be.

2) Fumo wants a guarentee that all mail that is deleted cannot be recovered. - that means we have work to do - because from what I understand, if you delete it, but the receipient doesn't, or vice versa, it is still really there - so, how do we accomplish his demand????

Lenny apparently does a purge - total wipe - of his server so that things that are deleted are actually gone and can't be recovered - Fumo wants assurance that this is also the case with email deleted off the GW system.

110.  On or about March 23, 2005, defendant MARK C. EISTER sent an e-mail to FUMO, with a copy to defendant LEONARD P. LUCHKO, Person No. 1, and Person No. 4, stating that he had been researching security for the e-mail server.  EISTER explained that a complete wipe of e-mail takes time, requires the server to be offline for a portion of the time, and slows down the system for anywhere from 8-24 hours.  EISTER suggested that he do this weekly, on the weekend.  LUCHKO replied to EISTER and FUMO, with a copy to Person No. 1 and Person No. 4:

> I agree with Mark on a PGP free space wipe once a week.  Doing PGP wipe on a daily basis just isn't practical.  You have to remember just what a PGP free Space wipe entails you are literally overwriting the entire hard drive 7 times you do that every day and your hardware just will not take it.  We did a once a week PGP free space wipe at Tasker street and it worked fine our main vulnerability was that we had to manually check to make sure VJF mail was deleted and not stored on the server.  This problem is being addressed with the auto delete of VJF mail feature.  I don't know a lot about this FBI investigation but from what I have observed is the FBI are not looking for mail that was sent this week or last week or even last month but from 2002.  If we are wiping the server once a week and the VJF mail is getting auto deleted then the only mail they are going to get is going to be under a week old is it perfect no but I don't think you can get perfect and be practical.

111.  Defendants LEONARD P. LUCHKO, MARK C. EISTER, Person No. 1, and other persons, both known and unknown, continued to delete e-mail and wipe computers and other electronic devices of FUMO and members of his staff for months after the execution of the search warrant at FUMO's district office.

112.  FUMO's desktop and laptop computers that were maintained at his shore house on Kenyon Avenue in Margate, New Jersey received operating system upgrades to Microsoft Windows XP on or about June 14, 2005 (laptop) and on or about August 3, 2005 (desktop) that resulted in a complete wipe of the hard drives and which therefore made it impossible to determine when or if earlier wipes had been performed.

113. FUMO's desktop computer that he used at his vacation home in Florida received a Microsoft Windows XP upgrade on or about June 14, 2005 that resulted in a complete wipe of the hard drive and therefore made it impossible to determine when or if earlier wipes had been performed.

114. One of FUMO's PC cards was wiped using the SecureClean utility on or about June 17, 2005.

115. On or about September 2, 2005, defendant LEONARD P. LUCHKO wiped a laptop computer, which was later seized by the FBI from his home, using the SecureClean wipe utility.

116. On or about October 20, 2005, and in the months that preceded it, defendant LEONARD P. LUCHKO concealed inside of his home in Collingdale, Pennsylvania certain Senate computer equipment and other electronic evidence that had been subpoenaed (but never received) by the grand jury and which had been sought by the FBI and IRS during the search of FUMO's district office on February 18, 2005, including six PC cards, LUCHKO's Blackberry device, and LUCHKO's Senate issued laptop computer.

All in violation of Title 18, United States Code, Section 371.

## COUNT ONE HUNDRED AND TEN

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about December 1, 2003, in the Eastern District of Pennsylvania, defendants

### VINCENT J. FUMO and
### LEONARD P. LUCHKO

corruptly persuaded, attempted to corruptly persuade, and engaged in misleading conduct toward approximately 24 members of FUMO's staff and Senate contractors, including Ruth Arnao, and aided, abetted, counseled, commanded, induced, and procured the same, by sending to these persons an e-mail communication, that instructed each person to delete all e-mail communications to and from FUMO, with the intent to cause and induce all of these persons to alter, destroy, mutilate, or conceal e-mail communications to and from FUMO with the intent to impair the integrity and availability of the e-mail communications and electronic evidence for use in a federal grand jury investigation.

      In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

## COUNT ONE HUNDRED AND ELEVEN

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about January 25, 2004, in the Eastern District of Pennsylvania,

defendants

### VINCENT J. FUMO and
### LEONARD P. LUCHKO

corruptly persuaded, attempted to corruptly persuade, and engaged in misleading conduct toward

approximately 29 members of FUMO's staff and Senate contractors, including Ruth Arnao, and

aided, abetted, counseled, commanded, induced, and procured the same, by sending to these

persons an e-mail, that instructed each person to, among other things, "set up a time with [Person

No. 1] or myself so we can wipe" the Blackberry communications devices used by these persons

and also to "set up a time with [Person No. 1] or myself so we can run security updates" on the

Senate issued laptops used by these persons, with the intent to cause and induce all of these

persons to alter, destroy, mutilate, and conceal e-mail communications to and from FUMO and

other electronic evidence with the intent to impair the integrity and availability of these e-mail

communications and electronic evidence for use in a federal grand jury investigation.

      In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

## COUNT ONE HUNDRED AND TWELVE

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about April 6, 2004, in the Eastern District of Pennsylvania, defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects, that is, data held on computer equipment issued to Person No. 8, Person No. 9, and FUMO, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND THIRTEEN

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about May 10, 2004, in the Eastern District of Pennsylvania, defendants

**VINCENT J. FUMO and**
**LEONARD P. LUCHKO**

corruptly persuaded, attempted to corruptly persuade, and engaged in misleading conduct toward Senate Contractor No. 3, and aided, abetted, counseled, commanded, induced, and procured the same, by sending to this person an e-mail communication that instructed Senate Contractor No. 3 that he must delete all e-mail communications to and from FUMO, with the intent to cause and induce Senate Contractor No. 3 to alter, destroy, mutilate, or conceal e-mail communications to and from FUMO with the intent to impair the integrity and availability of the e-mail communications and electronic evidence for use in a federal grand jury investigation.

In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

## COUNT ONE HUNDRED AND FOURTEEN

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about June 10, 2004, in the Eastern District of Pennsylvania and elsewhere, defendants

### VINCENT J. FUMO and
### MARK C. EISTER

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects, that is, data held on computer equipment issued to defendant EISTER, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND FIFTEEN

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2.  On or about June 11, 2004, in the Eastern District of Pennsylvania, defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects, that is, data held on computer equipment issued to defendant LUCHKO, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND SIXTEEN

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about June 14, 2004, in the Eastern District of Pennsylvania and elsewhere, defendants

### VINCENT J. FUMO and
### MARK C. EISTER

corruptly persuaded, and attempted to corruptly persuade, and engaged in misleading conduct toward the members of FUMO's staff in Harrisburg, and aided, abetted, counseled, commanded, induced, and procured the same, by instructing the staff members that they must delete all e-mail communications to and from FUMO and that they must take steps to ensure that such e-mail is permanently deleted, with the intent to cause and induce FUMO's Harrisburg staff members to alter, destroy, mutilate, or conceal e-mail communications to and from FUMO with the intent to impair the integrity and availability of the e-mail communications and electronic evidence for use in a federal grand jury investigation.

      In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

## COUNT ONE HUNDRED AND SEVENTEEN

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

    2.  On or about June 14, 2004, in the Eastern District of Pennsylvania and elsewhere, defendants

### VINCENT J. FUMO and
### MARK C. EISTER

did corruptly aid and abet the alteration, destruction, mutilation or concealment of records, documents, or other objects, that is, e-mail communications to and from FUMO that were stored on computer equipment issued to or used by FUMO's staff members in Harrisburg, with the intent to impair the integrity or availability of the e-mail communications for use in an official proceeding, and aided, abetted, counseled, commanded, induced, and procured the same.

    In violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

## COUNT ONE HUNDRED AND EIGHTEEN

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about June 14, 2004, in the Eastern District of Pennsylvania and elsewhere, defendants

**VINCENT J. FUMO and**
**MARK C. EISTER**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects, that is, e-mail communications to and from FUMO that were stored on computer equipment issued to or used by FUMO's staff members in Harrisburg, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND NINETEEN

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about June 14, 2004, in the Eastern District of Pennsylvania, defendants

**VINCENT J. FUMO and**
**LEONARD P. LUCHKO**

corruptly persuaded, attempted to corruptly persuade, and engaged in misleading conduct toward Senate Contractor No. 3, and aided, abetted, counseled, commanded, induced, and procured the same, by sending to this person an e-mail communication that instructed Senate Contractor No. 3 that he must delete all e-mail communications to and from FUMO, with the intent to cause and induce Senate Contractor No. 3 to alter, destroy, mutilate, or conceal e-mail communications to and from FUMO with the intent to impair the integrity and availability of the e-mail communications and electronic evidence for use in a federal grand jury investigation.

In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

## COUNT ONE HUNDRED AND TWENTY

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about August 6, 2004, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on computer equipment issued to defendant LUCHKO, with the intent to

impede, obstruct, and influence the investigation and proper administration of a matter within the

jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are

agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured

the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND TWENTY-ONE

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

    2.  On or about August 6, 2004, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO,**
**RUTH ARNAO, and**
**LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on computer equipment issued to and used by ARNAO, with the intent to

impede, obstruct, and influence the investigation and proper administration of a matter within the

jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are

agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured

the same.

    In violation of Title 18, United States Code, Sections 1519 and 2.

- 242 -

## COUNT ONE HUNDRED AND TWENTY-TWO

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

    2.  On or about August 26, 2004, in the Eastern District of Pennsylvania,

defendants

### VINCENT J. FUMO and
### LEONARD P. LUCHKO

corruptly persuaded, attempted to corruptly persuade, and engaged in misleading conduct toward

Person No. 20 and Person No. 13, and aided, abetted, counseled, commanded, induced, and

procured the same, by sending to Person No. 20 an e-mail communication that notified Person

No. 20 that Person No. 13 was not deleting all of her e-mail communications to and from FUMO

and that requested that Person No. 20 communicate with Person No. 13 to ensure that Person No.

13 deleted all of her e-mail communications to and from FUMO, with the intent to cause and

induce Person No. 20 and Person No. 13 to alter, destroy, mutilate, or conceal e-mail

communications to and from FUMO with the intent to impair the integrity and availability of the

e-mail communications and electronic evidence for use in a federal grand jury investigation.

    In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

- 243 -

## COUNT ONE HUNDRED AND TWENTY-THREE

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about October 28, 2004, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO and**
**LEONARD P. LUCHKO**

corruptly persuaded, attempted to corruptly persuade, and engaged in misleading conduct toward

approximately 24 members of FUMO's staff and Senate contractors, including Ruth Arnao at

Citizens Alliance, and aided, abetted, counseled, commanded, induced, and procured the same,

by sending to these persons an e-mail communication, that instructed each person that, "under no

circumstances" were they, without the approval of FUMO, permitted "to save any email in your

IN box or Sent Items that is sent to or received from Fumo," and also instructing each person to

"[m]ake sure you clean out your 'Deleted Items' as well," with the intent to cause and induce

these persons to alter, destroy, mutilate, and conceal e-mail communications to and from FUMO

and other electronic evidence with the intent to impair the integrity and availability of these e-

mail communications and electronic evidence for use in a federal grand jury investigation.

      In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

## COUNT ONE HUNDRED AND TWENTY-FOUR

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about December 9, 2004, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO,**
**RUTH ARNAO, and**
**LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on computer equipment issued to and used by ARNAO, with the intent to

impede, obstruct, and influence the investigation and proper administration of a matter within the

jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are

agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured

the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

- 245 -

## COUNT ONE HUNDRED AND TWENTY-FIVE

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about December 30, 2004, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO and**
**LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on computer equipment issued to Person No. 8 for her use at FUMO's district

office, with the intent to impede, obstruct, and influence the investigation and proper

administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the

Internal Revenue Service, which are agencies of the United States, and aided, abetted, counseled,

commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

- 246 -

## COUNT ONE HUNDRED AND TWENTY-SIX

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about January 21, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO,**
**RUTH ARNAO, and**
**LEONARD P. LUCHKO**

did corruptly aid and abet the alteration, destruction, mutilation or concealment of records,

documents, or other objects, that is, computer files and other electronic evidence held on

computer equipment issued to or used by Arnao at and on behalf of Citizens Alliance, with the

intent to impair the integrity or availability of that evidence for use in an official proceeding and

aided, abetted, counseled, commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

## COUNT ONE HUNDRED AND TWENTY-SEVEN

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about January 21, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO,**
**RUTH ARNAO, and**
**LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, computer files and other electronic evidence that was stored on computer equipment

issued to or used by ARNAO at and on behalf of Citizens Alliance, with the intent to impede,

obstruct, and influence the investigation and proper administration of a matter within the

jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are

agencies of the United States and aided, abetted, counseled, commanded, induced, and procured

the same.

      In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND TWENTY-EIGHT

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about January 26, 2005, in the Eastern District of Pennsylvania, defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

corruptly persuaded, attempted to corruptly persuade, and engaged in misleading conduct toward approximately 19 members of FUMO's staff, including Ruth Arnao at Citizens Alliance, and aided, abetted, counseled, commanded, induced, and procured the same, by sending to these persons an e-mail communication that instructed, among other things, that each person must "get rid of any mail you Received or Sent to Fumo," and must manually empty their deleted e-mail items folder in order to "clean[] up any traces of email that may still be residing in the space you just created by deleting your email," with the intent to cause and induce these persons to alter, destroy, mutilate, and conceal e-mail communications to and from FUMO and other electronic evidence with the intent to impair the integrity and availability of these e-mail communications and electronic evidence for use in a federal grand jury investigation.

In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

- 249 -

## COUNT ONE HUNDRED AND TWENTY-NINE

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

    2.  On or about January 28, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO,**
**RUTH ARNAO, and**
**LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, an e-mail file that was stored on computer equipment issued to ARNAO as the executive

director of Citizens Alliance, with the intent to impede, obstruct, and influence the investigation

and proper administration of a matter within the jurisdiction of the Federal Bureau of

Investigation and the Internal Revenue Service, which are agencies of the United States and

aided, abetted, counseled, commanded, induced, and procured the same.

    In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND THIRTY

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

    2.  On or about January 31, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO and**
**LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on computer equipment issued to and used by defendant LUCHKO, with the

intent to impede, obstruct, and influence the investigation and proper administration of a matter

within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service,

which are agencies of the United States, and aided, abetted, counseled, commanded, induced, and

procured the same.

    In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND THIRTY-ONE

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about February 4, 2005, in the Eastern District of Pennsylvania,

defendants

### VINCENT J. FUMO and
### LEONARD P. LUCHKO

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on computer equipment issued to FUMO for his use at FUMO's district office,

with the intent to impede, obstruct, and influence the investigation and proper administration of a

matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue

Service, which are agencies of the United States, and aided, abetted, counseled, commanded,

induced, and procured the same.

      In violation of Title 18, United States Code, Sections 1519 and 2.

- 252 -

## COUNT ONE HUNDRED AND THIRTY-TWO

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

    2.  On or about February 11, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO,**
**RUTH ARNAO, and**
**LEONARD P. LUCHKO**

corruptly persuaded, attempted to corruptly persuade, and engaged in misleading conduct toward

Person No. 1, and aided, abetted, counseled, commanded, induced, and procured the same, by

sending to this person an e-mail communication that, among things, instructed him that, "[a]fter

you sync her [i.e. ARNAO's] BB this morning tell her I think you should wipe it as well before

the FBI ask for it," with the intent to cause and induce Person No. 1 to alter, destroy, mutilate, or

conceal e-mail communications to and from FUMO and ARNAO, along with other electronic

evidence, with the intent to impair the integrity and availability of the e-mail communications

and electronic evidence for use in a federal grand jury investigation.

    In violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

## COUNT ONE HUNDRED AND THIRTY-THREE

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about February 11, 2005, in the Eastern District of Pennsylvania and elsewhere, defendants

**VINCENT J. FUMO and**
**LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects, that is, data held on computer equipment issued to FUMO for his use at FUMO's vacation home in New Jersey, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are agencies of the United States and aided, abetted, counseled, commanded, induced, and procured the same.

      In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND THIRTY-FOUR

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about February 11, 2005, in the Eastern District of Pennsylvania and elsewhere, defendants

**VINCENT J. FUMO,**
**RUTH ARNAO, and**
**LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects, that is, data held on computer equipment used by ARNAO at her vacation home in New Jersey, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are agencies of the United States and aided, abetted, counseled, commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND THIRTY-FIVE

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2.  On or about February 12, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on computer equipment issued to FUMO for his use at his residence in

Philadelphia, with the intent to impede, obstruct, and influence the investigation and proper

administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the

Internal Revenue Service, which are agencies of the United States and aided, abetted, counseled,

commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND THIRTY-SIX

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about February 16, 2005, in the Eastern District of Pennsylvania,

defendants

### VINCENT J. FUMO and
### LEONARD P. LUCHKO

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on computer equipment issued to FUMO for his use at his residence in

Philadelphia, with the intent to impede, obstruct, and influence the investigation and proper

administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the

Internal Revenue Service, which are agencies of the United States and aided, abetted, counseled,

commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

- 257 -

## COUNT ONE HUNDRED AND THIRTY-SEVEN

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

    2.  On or about February 19, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on a PC card issued to and used by defendant LUCHKO, with the intent to

impede, obstruct, and influence the investigation and proper administration of a matter within the

jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are

agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured

the same.

    In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND THIRTY-EIGHT

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2. On or about March 18, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on a Blackberry communications device issued to and used by Person No. 6,

with the intent to impede, obstruct, and influence the investigation and proper administration of a

matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue

Service, which are agencies of the United States, and aided, abetted, counseled, commanded,

induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

- 259 -

## COUNT ONE HUNDRED AND THIRTY-NINE

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

2.  On or about June 17, 2005, in the Eastern District of Pennsylvania, defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects, that is, data held on a PC card issued to and used by FUMO, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured the same.

In violation of Title 18, United States Code, Sections 1519 and 2.

- 260 -

## COUNT ONE HUNDRED AND FORTY

**(Obstruction of Justice)**

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about September 2, 2005, in the Eastern District of Pennsylvania,

defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, data held on a laptop computer issued to and used by defendant LUCHKO, with the intent

to impede, obstruct, and influence the investigation and proper administration of a matter within

the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which

are agencies of the United States, and aided, abetted, counseled, commanded, induced, and

procured the same.

      In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT ONE HUNDRED AND FORTY-ONE

### (Obstruction of Justice)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.  Paragraphs 1, 2, and 4-116 of Count 109 are incorporated here.

      2.  On or about October 20, 2005, in the Eastern District of Pennsylvania, the

defendants

**VINCENT J. FUMO and
LEONARD P. LUCHKO**

knowingly altered, destroyed, mutilated, and concealed records, documents, and tangible objects,

that is, 6 PC cards containing electronic files of Senate staff members, defendant LUCHKO's

Blackberry device, and defendant LUCHKO's Senate issued laptop computer, with the intent to

impede, obstruct, and influence the investigation and proper administration of a matter within the

jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service, which are

agencies of the United States, and aided, abetted, counseled, commanded, induced, and procured

the same.

      In violation of Title 18, United States Code, Sections 1519 and 2.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  As a result of the violations of Title 18, United States Code, Sections 371 (Conspiracy to Commit Mail and Wire Fraud), 1341 (Mail Fraud), and 1343 (Wire Fraud), set forth in this superseding indictment, defendants

**VINCENT J. FUMO and**
**RUTH ARNAO**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses, including, but not limited to, the sum of $2 million.

2.  If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided

        without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

- 263 -

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

**A TRUE BILL:**

_____

**GRAND JURY FOREPERSON**

_____

**PATRICK L. MEEHAN**
**UNITED STATES ATTORNEY**

- 264 -

**Table of Unnamed Persons and Entities in Superseding Indictment**

| Person | Description |
|--------|-------------|
| 1 | Computer technician in FUMO's Tasker Street district office |
| 2 | Political consultant to FUMO |
| 3 | Senate budget analyst in Harrisburg |
| 4 | Director of Senate Democratic Computer Services ("SDCS") |
| 5 | Computer technician in Tasker Street office; employee of Senate contractor |
| 6 | Senate aide in Tasker Street office |
| 7 | Senate aide in Tasker Street office |
| 8 | Senate aide and assistant to Person No. 16 in Tasker Street office |
| 9 | Senate aide and assistant to ARNAO in Tasker Street office |
| 10 | Counsel to Senate Democratic Appropriations Committee ("SDAC") |
| 11 | Senate aide in Harrisburg |
| 12 | Employee of SDCS in Harrisburg |
| 13 | Senate aide in Philadelphia |
| 14 | Attorney and close friend of FUMO |
| 15 | Senate aide and assistant to ARNAO in Tasker Street office |
| 16 | Close friend of FUMO and aide in Tasker Street office |
| 17 | Executive director of SDAC in Harrisburg |
| 18 | FUMO's Senate secretary in Harrisburg |
| 19 | Senate aide in Tasker Street office |

| | |
|---|---|
| 20 | Chief of staff in Tasker Street office |
| 21 | Senate aide to FUMO in Philadelphia |
| 22 | FUMO's Senate secretary in Philadelphia |
| 23 | Housecleaner hired by FUMO in or about May 2002 |
| 24 | Senate driver in Philadelphia |
| 25 | Senate driver in Philadelphia |
| 26 | Senate aide and driver in Harrisburg who lived on farm |
| 27 | Senate budget analyst in Harrisburg |
| 28 | President of the Alliance for Responsible Cuba Policy |
| 29 | New Jersey friend of FUMO |
| 30 | Senate aide who succeeded ARNAO as executive director of Citizens Alliance |
| 31 | Friend and benefactor of FUMO |
| 32 | New Jersey attorney |
| 33 | Friend of FUMO |
| 34 | Friend of FUMO |
| 35 | Friend of FUMO; wife of Person No. 34 |
| 36 | Senate candidate in Bucks County |
| 37 | Security alarm and electronics contractor |
| 38 | Leader of DUNE |
| 39 | A girlfriend of FUMO |
| 40 | Independent accountant to Citizens Alliance |
| 41 | Agricultural expert from Penn State |

| 42 | Contractor on farm |
| 43 | A girlfriend of FUMO |
| 44 | FUMO's personal valet |
| 45 | Attorney retained to represent plaintiffs in Jubelirer litigation |
| 46 | President of the Independence Seaport Museum ("ISM") |
| 47 | Employee of the Independence Seaport Museum |
| 48 | Employee of the Independence Seaport Museum |
| 49 | Captain of *Enticer* |
| 50 | Union official and rival of FUMO |
| 51 | Private investigator hired by Senate Contractor No. 1 |

| **Senate Contractor** | **Description** |
|---|---|
| 1 | Private investigator |
| 2 | Political consultant |
| 3 | Political consultant |
| 4 | Friend of FUMO; overseer of farm work |
| 5 | Friend of FUMO and boyfriend of ARNAO |

| **Company** | **Description** |
|---|---|
| 1 | Company owned by Senate Contractor No. 2 |
| 2 | Construction contractor |