

**U.S. Department of Justice**

**United States Attorney**

**Eastern District of Pennsylvania**

*Robert A. Zauzmer*
*Direct Dial: (215) 861-8568*
*Facsimile: (215) 861-8497*
*E-mail Address: bob.zauzmer@usdoj.gov*

*615 Chestnut Street*

*Suite 1250*
*Philadelphia, Pennsylvania 19106-4476*
*(215) 861-8200*

August 18, 2008

The Honorable William H. Yohn, Jr.
United States District Judge
14613 United States Courthouse
601 Market Street
Philadelphia, PA  19106-1753

> Re:   United States v. Vincent J. Fumo and Ruth Arnao
>        Criminal No. 06-00319

Dear Judge Yohn:

I enclose for the Court's convenience a copy of the following pleadings:

1.    Government's Trial Memorandum.

2.    Government's Motion in Limine to Preclude Evidence or Argument Regarding Alleged Selective Prosecution.

3.    Government's Motion in Limine Seeking Rulings, Outside the Presence of the Jury, Regarding the Admissibility of Defense Exhibits.

4.    Government's Motion in Limine to Compel the Defense to Identify the Extent of Waiver of the Attorney-Client Privilege.

5.    Government's  Motion in Limine to Exclude Evidence of Rosanne Anthony's Prior Conviction under Rule 609(b).

At an earlier conference with the Court, the government stated that it did not intend to file a trial memorandum.  However, in preparing these pleadings, we came to appreciate that certain legal issues we believe merit discussion are appropriately addressed in a trial memorandum rather than motions in limine, in that the government

does not seek relief on these legal points at this time but merely seeks to advise the Court regarding the government's view on legal points which are likely to arise during the trial.

Respectfully yours,

LAURIE MAGID
Acting United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney


cc:    See Certificate of Service

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NO. 06-319** |
| | **:** | |
| **VINCENT J. FUMO** | **:** | |
| **RUTH ARNAO** | **:** | |

## <u>GOVERNMENT'S TRIAL MEMORANDUM</u>

## Table of Contents

Overview of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Discussion of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.      Elements of Obstruction of Justice.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           A.    The Obstruction Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           B.    Relevance of Prior Practice.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           C.    Relevance of Timing of Subpoena to Fumo Office... . . . . . . . . . . . 20

    II.    Admissibility of Out-of-Court Statements.. . . . . . . . . . . . . . . . . . . . . 21

    III.   Admissibility of Lay Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    IV.   Designation of Witnesses as Hostile. . . . . . . . . . . . . . . . . . . . . . . . . 29

    V.    Rule 608(b) Precludes Defendants from Attacking the Character
         of Government Witnesses in Matters Unrelated to Veracity. . . . . . . . . . . 31

    VI.   Limitations on the Nature and Number of the Defendants'
         Character Evidence at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

           A.    Limitations on Number of Character Witnesses.. . . . . . . . . . . . . 37

           B.    Character Evidence at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

                 1.    Character Evidence Under the Federal Rules
                     of Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

                 2.    The Differences Between the Cross-Examination of
                     Reputation Witnesses and of Opinion Witnesses. . . . . . . . . 43

                       a.    The Reputation Witness. . . . . . . . . . . . . . . . . . . . . 43

                       b.    The Opinion Witness. . . . . . . . . . . . . . . . . . . . . . . 51

**Overview of the Case**

Defendants Vincent J. Fumo and Ruth Arnao face trial on extensive charges of fraud and obstruction of justice.  The pertinent facts are set forth in exhaustive detail in the superseding indictment in this case, and are summarized only briefly here.

Senate scheme.  First, the indictment alleges that Fumo conspired with others to defraud the Pennsylvania State Senate.  The government charges that Fumo, a state senator since 1978, used his position of power and influence to defraud the State Senate.  The indictment asserts that, in using Senate funds and the large staff he was provided, Fumo observed no distinction whatsoever between public and private tasks.  He used an enormous amount of public funds to wage political campaigns, satisfy his personal needs, and reward his friends.

In part, Fumo demanded that Senate employees serve him in any manner he desired, even during nights and weekends, to further his political goals and attend to his personal wants.  He rewarded them for their blind loyalty.  Fumo routinely approved salaries for the staff members who provided personal and political services on his behalf which were substantially in excess of those designated by a Senate committee (on which Fumo served) for the actual Senate jobs for which the employees were retained.  In this manner, Fumo disbursed hundreds of thousands of dollars more than warranted for these employees.

The indictment states that Fumo's Philadelphia staffers acted as both his legislative and campaign staff, in violation of state law.  Two employees, Gina Novelli and Jamie Spagna, in succession, were given virtually no Senate duties at all.  Instead (in

exchange for Senate salaries of $30,000 per year and more), each organized Fumo's fundraisers, handled his political mailings, and paid Fumo's personal bills.  Each also handled the campaign account of a Philadelphia City Councilman who was close to Fumo, during regular Senate business hours.  Superseding Indictment at ("Ind.") 10-14. When Fumo was not running for election, the staff performed similar tasks for other candidates Fumo favored.  For example, in 2002, Fumo pressed his staff into service for the unsuccessful gubernatorial campaign of Bob Casey.  Ind. 15-16, 19, 23.

Fumo similarly used his Senate employees for all of his personal needs, according to the indictment.  Secretaries and aides handled all of his personal finances, and countless and myriad personal tasks.  Strikingly, one $31,000 a year aide, Lisa Costello, was used as Fumo's housekeeper, regularly cleaning his Fairmount mansion. Ind. 29-31.  Another assistant, Christian Marrone, spent much of the first 18 months of his tenure on the Senate staff as the "project manager" for the refurbishment of Fumo's 33-room mansion.  Ind. at 24-29.  Fumo had three drivers on his payroll (two in Philadelphia and one in Harrisburg), and when they were not driving Fumo to all of his Senate, political, and personal events and appointments, they ran personal errands for him such as, among many others, servicing his cars, picking up and delivering packages of merchandise Fumo acquired, and transporting Fumo's dry cleaning to and from the home of Richard Sprague.  When Fumo took his annual vacations in Martha's Vineyard, Massachusetts, aides drove two vehicles there for him from Philadelphia, loaded with the

luggage of Fumo and his guests, while the Fumo party traveled on a private plane.  At the end of the vacations, two staffers returned to drive the vehicles home.  Ind. 5-6, 48-53.

When Fumo acquired a Harrisburg-area farm in 2003, the indictment charges, he delegated several Harrisburg employees to undertake the numerous tasks involved in establishing the farm as a residential and commercial enterprise.  Ind. 32-44.

He gave Senate equipment, including laptop computers, to non-Senate employees, including his valet, Senate contractors, girlfriends, and family members, and then delegated his computer aides to assist those people with their computer related problems as well as perform their Senate duties.  Ind. 52-61.

Besides exploiting his employees, Fumo abused his authority to use his Senate funds to hire "contractors" for legislative-related tasks.  For example, Fumo gave a state contract, which ultimately reached over $40,000 a year, to private investigator Frank Wallace.  Wallace's duty, supposedly, was to act as an investigator for the Appropriations Committee on issues relevant to pending legislation.  But while the investigator assisted with a few such tasks, in the main Fumo set him loose on personal and political missions, such as conducting surveillance on Fumo's former wife and girlfriends, as well as the new boyfriends whom ex-girlfriends dated; and endeavoring to dig up defamatory information regarding Fumo's political rivals during campaigns and at other times.  All of this was compensated with state money.  Ind. 14-21.

Similarly, Fumo gave a state contract, which reached over $80,000 a year, to consultant Howard Cain, whose primary role was to assist Fumo in numerous political

races.  Ind. 21-23.  And Fumo used state contracts to compensate his friends, making

them ghost employees.  One, Michael Palermo, was retained for $45,000 a year and more

to provide alleged transportation expertise, but did virtually nothing other than assist

Fumo in managing Fumo's farm.  Ind. 41-43.  Another, Mitchell Rubin, was the

boyfriend and later husband of Fumo's aide, defendant Ruth Arnao, who was paid

$30,000 per year for five years, in return for no work at all.  Ind. 41-45.

In all, according to Counts 1 through 64 of the indictment, the state paid

well over $1 million to state employees and contractors to work on Fumo's personal and

political errands and satisfy his whims.[1]

Citizens Alliance scheme.  The indictment alleges that Fumo and his staff

created Citizens Alliance, and operated it from his Senate district office, with the goal of

benefitting their neighborhood and also gaining political credit for its good works.  The

indictment further explains that Citizens Alliance received nearly all of its funding due to

Fumo's influence as a State Senator.  He directed grants to Citizens Alliance from the

state and other entities over which he had influence, and then, beginning in 1998, gained

$17 million from PECO for Citizens Alliance, as part of a settlement of claims Fumo

brought against the utility in his capacity as a Senator and individually.  Ind. 88-90.

---

[1]  At trial, as summarized in Government Exhibit 1636, the government will prove that
the loss to the Pennsylvania Senate arising from Fumo's criminal activities is
approximately $1.95 million.

Citizens Alliance was started in 1991, under a different name, by Fumo's Philadelphia office.  The stated purpose was to better the neighborhoods in Philadelphia, particularly in Fumo's district, by providing services which the City was unable or unwilling to provide.  Citizens Alliance has indeed undertaken many notable tasks.  With a small staff of laborers and a fleet of work vehicles, it has cleaned streets, trimmed trees, cleared snow, and tidied abandoned alleys and lots.  When the PECO money began to arrive, Citizens Alliance took on grander missions.  It acquired properties in need of renovation along the Passyunk Avenue corridor in South Philadelphia; opened a charter school in South Philadelphia; attempted to create an office building for high-technology companies; and one year paid for the imperiled local television broadcast of the Mummers Parade.  Ind. 87-90.

At the same time, according to the indictment, Fumo and co-defendant Ruth Arnao (a Fumo staff member who was the nominal director of Citizens Alliance) persistently and routinely skimmed from Citizens Alliance's accounts for their personal benefit, causing a loss to Citizens Alliance substantially in excess of $1 million.[2]  Ind. 96. In Counts 65 through 98, Fumo and Arnao are charged with defrauding Citizens Alliance.

In part, Citizens Alliance paid for an astonishing number of power and other tools, costing more than $75,000, that Fumo (a tool aficionado) stashed in his four

---

[2]  The government conservatively estimates, and will prove at trial, that the approximate loss to Citizens Alliance resulting from the criminal activities of Fumo and Arnao is $1.43 million.  Trial Exh. 1636.

homes.  It bought 19 Oreck vacuum cleaners and floor machines, for $6,528.28, which

went to every floor of every one of Fumo's houses.  It paid for shopping sprees at the

Jersey shore, during the summer months, when Fumo and Arnao met at Sam's Club,

Home Depot, and Lowe's locations near Atlantic City to stock up on thousands of dollars

of goods for their summer residences.  Ind. 96-101.

Citizens Alliance supplied Fumo and his Senate office with expensive

vehicles (despite the fact that Fumo always had a leased Cadillac properly paid for by the

state).  Citizens Alliance bought a new, fully loaded $36,000 minivan which Fumo used

at the shore during the summers.  It bought a fully appointed, $52,000 SUV, complete

with navigation devices and video screens, for use by Fumo's drivers at the Philadelphia

Senate office.  It bought a $25,000 Jeep for Arnao's personal use, among other vehicles.

Ind. 101-07.  In total, Citizens Alliance spent $387,325.19 on the acquisition,

maintenance, and insurance of luxury vehicles for the personal use of Fumo, Arnao, and

those they favored.

Citizens Alliance also became the landlord of the Senator's Tasker Street

district office, and then spent extraordinary sums to lavishly furnish and appoint Fumo's

office.  Although the Senate paid only $90,000 in rent during a five-year period, Citizens

Alliance spent over $600,000 to create what had to be the most extravagantly furnished

district office in the Commonwealth.  Further, this office also served as Fumo's campaign

office and 39A Ward headquarters, yet for most of the relevant period Fumo's campaign

committee paid no rent at all.  Citizens Alliance also paid for cell phones for many of

Fumo's Senate employees in Philadelphia.  Ind. 107-09.  It also paid for a cell phone for

Fumo's adult daughter.  Id. at 94.

As with his Senate staff, Fumo used Citizens Alliance's employees as his

personal minions.  The laborers were at his beck and call.  They routinely traveled during

work hours to the Jersey shore, where they repaired and painted his dock and deck,

undertook construction tasks at the Ventnor location, picked up trash, and provided other

assistance.  They were dispatched to his Fairmount home, to pick up trash, clear snow,

power-wash his deck, deliver his large amount of Christmas decorations, and more.  They

traveled to the Harrisburg-area farm, to deliver Citizens Alliance equipment and other

personal items obtained by Fumo.  For the most part, Fumo did not pay for any of this

assistance.  Ind. 110-17.

The equipment purchased by Citizens Alliance which Fumo used at his

farm included a bulldozer, obtained by Citizens Alliance in 2003 at a cost of $27,000

(plus another $16,000 for repairs a few months later) because Fumo needed to clear parts

of the farm; a lawn tractor; a dump truck; an ATV; and a Ford F-150 pickup truck.  Ind.

117-19.

Fumo used Citizens Alliance money not only to enrich himself, but also to

further political goals, in stark violation of the federal limitations on Citizens Alliance's

activities as a 501(c)(3) tax-exempt charitable organization.  In part, Citizens Alliance

paid over $250,000 for political polling which Fumo desired to gauge the strength of

various candidates.  Ind. 120-31.  It paid $20,000 so that Fumo could surreptitiously

sponsor a lawsuit against a Senate rival, Robert Jubelirer.  Ind. 131-33.  It paid for

expenses of the private investigator Fumo used in relation to the 2002 Casey

gubernatorial campaign.  It paid over $68,000 to support the efforts of a grassroots group

which endeavored to stop the government's construction of dunes at the Jersey shore,

which Fumo feared would block his ocean view from his Margate home.  Ind. 133-37.

Citizens Alliance paid $39,000 to permit Fumo and five of his friends to

travel to Cuba.  Ind. 137-41.  And it paid for other programs outside Philadelphia, such as

$50,000 for the construction of a "war dog" memorial in Bucks County, because those

endeavors stood to reflect positively on candidates whom Fumo supported in those areas.

Ind. 141-42.  In total, the government will establish that Fumo, with Arnao's assistance,

defrauded Citizens Alliance of more than $1.4 million.

Tax Violations.  The indictment charges in Counts 99 through 103 that

Fumo and Arnao caused the filing of a false Form 990 (the standard annual form for a

tax-exempt nonprofit organization) for Citizens Alliance for 2002, and a false Form 1120

corporate return for the same year for CA Holdings, Inc., a subsidiary of Citizens

Alliance.  According to the indictment, the returns falsely described impermissible

political polling and other campaign expenses as permissible "community development

consulting" expenses, and provided other false information which concealed extensive

expenditures made by Citizens Alliance during 2002 which benefitted Fumo and Arnao

personally and politically.

Fraud on the Independence Seaport Museum.  The indictment alleges (Counts 104 through108) that Fumo, a member of the board of the Independence Seaport Museum, defrauded the museum by repeatedly using its historic yachts, *Enticer* and *Principia*, for pleasure cruises for which he did not pay.  In addition, Fumo took other benefits from the museum, including expensive ship models he used as decorations in his offices.  Fumo took all of these benefits, totaling more than $100,000, without disclosing to his fellow directors the material fact that he did not intend to and did not pay for any of them.

Obstruction of Justice.  Fumo and Arnao are charged with conspiracy to obstruct justice, and and substantive counts of obstruction of justice, in violation of various statutes (Counts 109 through 141).  The indictment alleges federal authorities commenced an investigation in early 2003 of the substantive matters charged in the indictment, as well as whether Fumo engaged in attempted extortion in demanding payments from PECO and Verizon to Citizens Alliance.  The indictment charges that, anticipating and then learning of the investigation, Fumo, Arnao, and other aides engaged in a persistent effort to destroy all e-mail communications involving Fumo in general and Citizens Alliance in particular, as well as other evidence.  Ind. 193-230.  Additional facts regarding the obstruction portion of the case are discussed in the next section of this memorandum.

## Discussion of Issues

### I.   Elements of Obstruction of Justice.

The offenses charged in the indictment -- conspiracy, mail fraud, wire fraud, and filing false tax returns -- are familiar in federal prosecutions.  The government will not belabor here the pertinent elements, which will be addressed in proposed jury instructions.

Issues regarding the obstruction charges merit discussion.  The defendants and their counsel have suggested that their defense may rest on a claim that, even though the defendants knowingly destroyed computer evidence with the intent to keep it out of the hands of law enforcement authorities, they are not culpable either because (a) this course of conduct began before the investigation, and represented merely business as usual in the Fumo offices; and (b) the conduct occurred prior to the actual service of a subpoena on Fumo's office, even though numerous grand jury subpoenas were served elsewhere.  Both arguments are unavailing as a matter of law, and the jury should be so instructed.

The evidence will show that the first grand jury subpoenas in the investigation were served beginning on February 20, 2003, to a variety of financial institutions and a credit reporting agency, seeking information regarding Citizens Alliance and Arnao (government trial exh. 1454).  The first subpoena to Citizens Alliance itself was served on April 28, 2004 (exh. 1498).  On February 18, 2005, the government executed a search warrant on the Senate offices of Senator Fumo, and also served a grand

jury subpoena on Fumo's office on that date.  Throughout this two-year period, FBI and

IRS agents conducted numerous interviews and served numerous additional grand jury

subpoenas.  Moreover, witnesses and documents will attest, the defendants were aware of

each of these steps in the investigation, usually within days of their occurrence.

Fumo had always instructed the aides in his Philadelphia office, who

performed the bulk of the illicit personal and political tasks on his behalf, not to preserve

e-mail which he sent them and they sent to him.  He did so, the government will argue,

because he was persistently engaged in criminal activity in the years that preceded the

investigation that led to the charges in this case, and during the investigation as well.

However, before 2003, his level of concern about federal investigations, while always

present, was muted.  During that period, Fumo and his aides never engaged in any

systematic effort to assure compliance with the directive not to preserve e-mail, and this

edict was never given at all to Fumo's Harrisburg staff.

All this changed when, in November 2003, the *Philadelphia Inquirer* began

a series of front-page articles questioning the financing of Citizens Alliance (exh. 1136),

and then, on January 25, 2004, reported that the FBI had begun an investigation of Fumo

and Citizens Alliance (exh. 1471).  Immediately, Fumo and Arnao began extensive efforts

to change and cover up their illegal conduct, and Fumo directed a systematic effort to

destroy electronic evidence.  For example, on January 25, 2004, at Fumo's direction,

Senate computer aide Leonard Luchko sent an e-mail to Fumo's Philadelphia staff stating

that they were "stepping up security," by wiping Blackberry devices and other measures

(exh. 1476).[3]  In the months that followed, the directive not to save Fumo e-mail spread to the Harrisburg staff as well, and Fumo and his aides began a regular course of "wiping" computers and servers to eradicate all traces of the deleted electronic evidence.[4]  In e-mails which survived the purge, they regularly cited the federal investigation as the reason for their conduct.

A.     **The Obstruction Charges.**

The indictment presents obstruction charges based on three statutes (as well as a conspiracy allegation):  18 U.S.C. § 1512(b)(2)(B) (9 counts); 18 U.S.C. § 1512(c)(1) (2 counts); and 18 U.S.C. § 1519 (21 counts).

Section 1512(b)(2)(B) provides as follows:

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . .

---

[3]  Luchko has pled guilty to the obstruction charges in this case.  It is anticipated that, on August 19, 2008, co-defendant Mark Eister, another Senate computer aide who carried out Fumo's directions to destroy evidence, will do the same.  It is expected that both will testify as witnesses for the government, and will confirm that their obstructive actions were the direct result of explicit instructions given to them by Fumo.

[4]  The government's expert will explain at trial that when e-mail is "deleted" by a computer user, all or part of the message is likely to remain on the hard drive indefinitely, where it may be recovered by an investigator even if can no longer be seen by the average user.  Thus, Fumo and his computer aides appreciated, the remedy after learning of the investigation was to go further and "wipe" the staff's computers, using specialized programs to erase the parts of a hard drive where deleted materials could reside.  Systematic wiping had never occurred in the Fumo offices before the defendants learned of the federal investigation.  Computers had been wiped only occasionally, usually when an employee left the office and turned in his or her equipment.

(2) cause or induce any person to . . .

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding [commits an offense].

The gravamen of the 1512(b)(2)(B) charges in this case is that the defendants corruptly persuaded others (i.e., the employees and contractors of the Fumo office) to destroy e-mails and other electronic evidence with the intent to prevent the materials from being presented to the grand jury.

Section 1512(c) provides:

Whoever corruptly -- (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding [commits an offense].

The two 1512(c)(1) charges in this case involve the actions of Mark Eister (Count 117) and Leonard Luchko and Ruth Arnao (Count 126) to destroy electronic evidence.

Finally, Section 1519 provides:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.[5]

---

[5]   In an earlier decision in this case, this Court rejected the argument that Section 1519 is unduly vague, finding its meaning clear:

As applied to Senator Fumo, the statute requires knowing destruction, alteration, or concealment of records, documents, or tangible objects, and the intent to "impede, obstruct, or influence the investigation or proper administration of any matter

(continued...)

- 13 -

There are two distinctions between the Section 1512 offenses and violations of Section 1519 which are pertinent in this case.

First, Section 1512 requires that the defendant act "corruptly."  The recently adopted Third Circuit Pattern Jury Instructions provide:  "To 'corruptly persuade' means to corrupt another person by persuading (him)(her) to violate a legal duty, to accomplish an unlawful end or unlawful result, or to accomplish some otherwise lawful end or lawful result in an unlawful manner."  Third Circuit Inst. 6.18.1512B.  In contrast, Section 1519 has no "corrupt persuasion" requirement.  Nevertheless, the difference is insignificant here.  With respect to all charges in this case, the government must prove that a defendant acted with the intent to prevent the government from obtaining materials to which the government was entitled pursuant to legal process in its investigation.  Such proof satisfies both the "corrupt persuasion" element of Section 1512 and the intent requirement of Section 1519.[6]

_____

[5] (...continued)
within the jurisdiction of any department or agency of the United States."  The statute "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly" and "provide[s] explicit standards for those who apply them."

United States v. Fumo, 2007 WL 3132816, *18 (E.D. Pa. 2007) (footnote omitted; quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)).

[6]   See also Arthur Andersen LLP v. United States, 544 U.S. 696, 706 (2005) (corrupt persuasion requires proof that the defendant was "conscious of wrongdoing").  Following
(continued...)

- 14 -

Second, Section 1512 requires that the obstruction be in relation to an "official proceeding."  Section 1515(a)(1)(A) defines an "official proceeding" as including a proceeding before a federal grand jury.  In contrast, Section 1519 more broadly applies to "the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States," and thus encompasses an FBI or IRS investigation even where no grand jury is involved.  In this case, again, the distinction is immaterial, in that the agents' and the grand jury investigations coincided and were conducted jointly.[7]

---

[6] (...continued)
Arthur Andersen, in United States v. Vampire Nation, 451 F.3d 189, 205 (3d Cir. 2006), the Court found no error in the following instruction regarding a 1512(b) offense: "The second element the Government must prove beyond a reasonable doubt is that the Defendant acted knowingly and with the specific intent to cause or induce any person to withhold a record document or other object from an official proceeding. By 'specific intent,' I mean that the Defendant must have acted with the unlawful intent to cause or induce Warren Do to withhold evidence from an official proceeding.  It is not necessary for the Government to prove the Defendant knew he was breaking any particular criminal law, nor need the government prove that the Defendant knew that the official proceeding was before a federal grand jury.  An official proceeding includes a proceeding before a federal grand jury.  The grand jury proceeding need not be pending or about to be instituted at the time of the offense."  Id. at 205.

[7] Further, evidence that the defendant knew that an FBI investigation was pending is circumstantial evidence that he anticipated a grand jury investigation and later trial, bringing the matter within Section 1512(b).  United States v. Frankhauser, 80 F.3d 641, 652 (1st Cir. 1996).

B.      **Relevance of Prior Practice.**

        The fact that Fumo had a preexisting practice of asking his Philadelphia

staff to delete e-mails to or from Fumo is largely irrelevant to the question of the

defendants' guilt for the charged crimes.  Under the plain terms of the statutes, it is

unlawful to destroy evidence with the intent to prevent that information from being used

in a government proceeding.  Whatever happened earlier, destruction of materials must

stop once the defendant is aware of or contemplates an investigation and seeks to impede

that investigation.

        The Supreme Court's <u>Arthur Andersen</u> decision is instructive.  In that case,

the Arthur Andersen accounting firm was prosecuted for directing its employees, after

learning of an SEC investigation of Enron Corp., to destroy documents related to audits of

Enron, pursuant to the accounting firm's "document retention policy."  The case rested in

part on a statement of an Andersen partner, at a time that the SEC investigation was

contemplated but had not yet formally begun, advising employees that "if it's destroyed

in the course of [the] normal policy and litigation is filed the next day, that's great . . . .

[W]e've followed our own policy, and whatever there was that might have been of

interest to somebody is gone and irretrievable."  544 U.S. at 700.  After being notified of

the actual investigation, an in-house attorney told workers during a conference call,

"[m]ake sure to follow the [document] policy."  544 U.S. at 701.  After these and similar

communications, Andersen employees destroyed a substantial amount of documents.  <u>Id.</u>

The prosecution was brought under 18 U.S.C. § 1512(b)(2)(A) and (B).  In assessing the case, the Supreme Court did not question that an individual firm may be guilty of obstruction for continuing a document destruction policy after learning of or expecting an investigation.  However, the Court emphasized that guilty conduct must meet the "corruptly persuade" requirement, and must relate to a particular official proceeding.[8]

Section 1512 provides that "an official proceeding need not be pending or about to be instituted at the time of the offense . . . ."  18 U.S.C. § 1512(f)(1).[9]  Likewise, Section 1519 applies where the defendant merely "contemplates" an investigation he aims to obstruct, even if no investigation exists.  See, e.g., United States v. Hunt, 526 F.3d 739, 745 (11th Cir. 2008) (evidence that detective knew that claims of excess force would ultimately be investigated by the FBI were sufficient to support jury's decision that he intended to obstruct the investigation when he made false claims in a police report, in violation of § 1519); United States v. Ionia Management S.A., 526 F. Supp. 2d 319, 329 (D. Conn. 2007); United States v. Kun Yun Jho, 465 F. Supp. 2d 618, 636 (E.D. Tex. 2006).  However, with regard to Section 1512, the Supreme Court held that there must be

_____

[8]  The Court held that the jury instructions in the case were infirm in that they required no criminal intent at all.  Arthur Andersen, 544 U.S. at 706.  That error does not appear in the Third Circuit pattern instructions, and will not be repeated in this case.

[9]  In contrast, the omnibus obstruction statute, 18 U.S.C. § 1503, which is not charged in this case, requires that the judicial proceeding which is the target of the obstructive conduct be actually pending at the time of the offense.  See United States v. Davis, 183 F.3d 231, 239, 248 (3d Cir. 1999) (explaining this distinction between §§ 1503 and 1512).

a nexus between the obstructive conduct and the proceeding which the defendant aims to

impede.  The Court stated:

> It is, however, one thing to say that a proceeding "need not be pending or about to
> be instituted at the time of the offense," and quite another to say a proceeding need
> not even be foreseen.  A "knowingly . . . corrup[t] persaude[r]" cannot be someone
> who persuades others to shred documents under a document retention policy when
> he does not have in contemplation any particular official proceeding in which
> those documents might be material.

Arthur Andersen, 544 U.S. at 707-08.

The import of these authorities is clear.  To prove guilt, the government

must show that the defendants acted knowingly to destroy materials with the intent to

prevent their use in a particular pending or contemplated grand jury investigation (for

purposes of Section 1512) or other federal investigation (for purposes of Section 1519).

If such an act is proven, it is irrelevant that the defendants may have deleted e-mails

earlier pursuant to a standard practice, before the time they learned of or came to

contemplate the investigation at issue.[10]

---

[10]   The legislative history of Section 1519 supports the view that, in contrast to
Section 1512, unlawful conduct need not relate to a particular proceeding to violate
Section 1519.  Senator Patrick Leahy, the author of the new statute, said so explicitly.
148 Cong. Rec. S7418-01, at S7419 (July 26, 2002) ("This statute is specifically meant
not to include any technical requirement, which some courts have read into other
obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent
proceeding or matter by intent or otherwise. . . . The intent of the provision is simple;
people should not be destroying, altering, or falsifying documents to obstruct any
government function.").

The government does not press the point here, because the allegation in this case is
that the defendants acted to obstruct a specific investigation of the grand jury and the FBI

(continued...)

- 18 -

Indeed, Congress adopted Section 1519 explicitly in response to the widely publicized Arthur Andersen/Enron scandal.  See 148 Cong. Rec. H1544-02, at H1554 (Apr. 24, 2002) (Rep. Douglas Bereuter, an original co-sponsor of the legislation, explained on the House floor:  "In large part, H.R. 3763 is a response to the grossly negligent activities by Arthur Andersen in their accounting audit of the Enron Corporation. . . . [A]fter the Securities and Exchange Commission, SEC, began investigating the Enron matter, Arthur Andersen nonetheless allegedly continued to destroy documents and e-mails related to its audit of Enron.").  Thus, it is apparent that continuance of a "document retention policy" is unlawful if carried out with the intent to obstruct a pending or contemplated investigation (putting aside the fact that Fumo's effort greatly expanded on the earlier deletion practices).  There can be no doubt that the statute is aimed at exactly the type of conduct Fumo and Arnao may claim they engaged in -- continuing a preexisting policy to destroy evidence after learning of an investigation.

---

[10] (...continued)
and the IRS at times that the investigation was actually pending.  See United States v. Fumo, 2007 WL 3132816, *18 (E.D. Pa. 2007) (this Court finds that the 1519 charge is not vague as to Fumo's conduct in that "[t]he indictment does not allege that Senator Fumo acted in response to a 'contemplated' investigation; all of the allegations relate to an actual, ongoing investigation of which Senator Fumo allegedly had knowledge.  The beginning of the criminal investigation and widespread publicity about it preceded all of the conduct allegedly criminal under § 1519. . . . Taking the government's allegations, and inferences from those allegations, as true, there can be no doubt that Senator Fumo was aware that his conduct was relevant to a federal investigation at least as early as November 2003.").

### C.   Relevance of Timing of Subpoena to Fumo Office.

Fumo, through counsel, has also suggested that his defense may rest on the fact that Fumo's office itself was not searched or provided with a grand jury subpoena until February 18, 2005, after almost all of the obstructive conduct which the government will prove in this case.  But that fact is largely irrelevant.

The evidence will show that the moment that Fumo learned or came to suspect that there was an ongoing federal investigation regarding Citizens Alliance, he directed his staff to delete e-mails and wipe computers, with a particular focus on e-mails linking Fumo and Citizens Alliance.  As a result, the government will show, Citizens Alliance, a multi-million dollar business, was left with no e-mail records at all; and Fumo maintained on his PC card (where he kept all of his files) only seven e-mails even mentioning Citizens Alliance, all of them purporting to show (falsely) that Fumo had no control of Citizens Alliance (government trial exhibit 1010).

Clearly, the fact that Fumo himself did not receive a subpoena earlier is immaterial.  The statutes prohibit any act to destroy evidence to impede an investigation; it is irrelevant whether the defendant himself receives the legal process.  Indeed, under the plain language of the law, even an interloper with nothing at stake in a case may be guilty of obstruction by endeavoring to impede an investigation of someone else.  See, e.g., United States v. Cross, 258 F. Supp. 2d 432 (E.D. Va. 2003) (conviction for threatening witness who was expected to testify against the defendant's nephew).

In sum, the defendants are guilty if they took steps to destroy evidence with the intent to prevent its use in the ongoing investigation.

## II.   Admissibility of Out-of-Court Statements.

The government anticipates that a number of out-of-court statements will be offered, which are admissible because, as set forth in Federal Rule of Evidence 801, they do not constitute hearsay.

Some statements -- such as directions given by one person to another, or statements offered to explain why a person then took a pertinent action -- will be admissible because not offered for proof of the truth of the matter asserted.  See, e.g., Fed. R. Evid. 801(c) ("hearsay" is a statement "offered in evidence to prove the truth of the matter asserted"); 1972 Advisory Committee Note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); United States v. Mitchell, 365 F.3d 215, 258 (3d Cir. 2004) (evidence offered to show that a matter was discussed was not submitted to prove the truth of the statements).

Other statements will be admissible as statements of the defendants themselves.  See Rule 801(d)(2)(A).

The government will offer a number of statements under the co-conspirator exception to the hearsay rule, Fed. R. Evid. 801(d)(2)(E), particularly with respect to the alleged Senate fraud.  The government charged only Senator Fumo with defrauding the

- 21 -

Senate by using its resources for his political and personal benefit.  The government exercised its prosecutorial discretion in not criminally charging the numerous Senate employees and contractors who knowingly abetted this scheme, by furthering Fumo's personal and political goals while on Senate time and in exchange for Senate compensation, because all of their conduct was largely for Fumo's benefit alone. Nevertheless, the evidence will clearly show, as the indictment alleges, that Fumo had many co-conspirators.

This proof is necessary, of course, to convict Fumo of conspiracy, given the requirement under 18 U.S.C. § 371 to prove conspiratorial action by two or more persons. In addition, the evidence will allow the admission of all statements made by co-conspirators during and in furtherance of the conspiracy.

In order to offer co-conspirator statements, the government must establish by a preponderance of the evidence that "(1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy."  United States v. Ellis, 156 F.3d 493, 496 (3d Cir. 1998). The declarant need not be called as a witness.  United States v. Tyler, 281 F.3d 84, 100 (3d Cir. 2002).

It has long been settled that the co-conspirator exception may apply regardless of whether any conspiracy charge is presented.  The Third Circuit held:  "The absence of a conspiracy count . . . is without legal significance in determining whether

[defendant] Green's statements were admissible against [defendant] Trowery.  The Government need only prove a conspiracy in fact between Green and Trowery to make the words of one, spoken in furtherance of some joint purpose, the words of the other as well."  United States v. Trowery, 542 F.2d 623, 626-27 (3d Cir. 1976).  For the same reasons, the statement of a non-defendant may be admitted if the government establishes by a preponderance that the person was a conspirator and that the other requirements of the rule are met with respect to the statement.  See, e.g., United States v. Weaver, 507 F.3d 178, 187-88 (3d Cir. 2007).

In Trowery, the Third Circuit explained:

> The distinction should be noted between "conspiracy" as a crime and the co-conspirator exception to the hearsay rule.  Conspiracy as a crime comprehends more than mere joint enterprise.  It also includes other elements, such as a meeting of the minds, criminal intent and, where required by statute, an overt act.  When these elements are established, the crime of conspiracy is proved.

> The co-conspirator exception to the hearsay rule, on the other hand, is merely a rule of evidence founded, to some extent, on concepts of agency law.  It may be applied in both civil and criminal cases.  Its rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not.

> When the co-conspirator rule of evidence is invoked, either in civil or criminal proceedings, its applicability is for the court to decide as a question of the competence of evidence.  To determine whether the evidence is competent as against the nondeclarant, the trial judge determines whether it has been proved, by a preponderance of the evidence, that a joint undertaking existed at the time of the statement or action.

Trowery, 542 F.2d at 626-27.  On this basis, the government will offer a number of co-conspirator statements at trial.

- 23 -

III.     **Admissibility of Lay Opinion.**

There are aspects of the relationship among the defendants and others that are critical in explaining the events at issue.  The relationship between defendants Fumo and Arnao provides a good example.  Witnesses will explain that Arnao was entirely subservient to Fumo, and took his direction regarding all matters concerning Citizens Alliance (despite the fact that she was nominally its executive director and he, on paper, had no position in the organization).  Witnesses will further explain that Arnao never took any significant step without Fumo's knowledge and approval.  Knowledge of the nature of their relationship is significant in understanding why Arnao spent a vast amount of Citizens Alliance's funds for Fumo's benefit, and in concluding that Fumo directed these actions.  Similarly, witnesses will explain that Fumo was demanding of all his employees, making all manner of requests with the expectation that they would be satisfied promptly without question, regardless of their propriety; and that Fumo's employees were loyal minions who readily complied.

Such testimony -- providing opinions regarding the characteristics observed by the witness, and not simply dry, fact-by-fact recitations of specific acts -- is permissible and, indeed, encouraged.

Pursuant to Rule 701, a witness may offer lay opinions.  That rule provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and

(c) not based on scientific, technical, or other specialized knowledge within the
scope of Rule 702.

> Federal law states a preference for admissibility of lay opinions.

> The "modern trend favors admissibility of opinion testimony." Leo, 941 F.2d at
> 193 (quoting Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir.1980)).
> The relaxation of the standards governing the admissibility of opinion testimony
> relies on cross- examination to reveal any weaknesses in the witness' conclusions.
> Fed.R.Evid. 701(b) advisory committee's note.  If circumstances can be presented
> with greater clarity by stating an opinion, then that opinion is helpful to the trier of
> fact.  See United States v. Skeet, 665 F.2d 983, 985 (9th Cir.1982).  Allowing
> witnesses to state their opinions instead of describing all of their observations has
> the further benefit of leaving witnesses free to speak in ordinary language.

Government of Virgin Islands v. Knight, 989 F.2d 619, 630 (3d Cir. 1990).

With regard to personal characteristics, this rule recognizes that the opinion

of a lay witness based on months or years of observation is helpful to a jury, even at a

time when the average person can no longer remember the untold number of observed

gestures, statements, and other nuances which informed the opinion.

In the Third Circuit, the definitive case recognizing this principle is United

States v. Polishan, 336 F.3d 234 (3d Cir. 2003).  There, the defendant, Paul Polishan, the

chief financial officer of a company at which accounting irregularities were discovered,

was charged with securities fraud and other offenses.  A key government witness was

Polishan's direct subordinate, Donald Kenia, who had initially taken full responsibility

for the wrongdoing.  "The ultimate issue at trial was whether Polishan knew of and

directed the accounting irregularities at LFC."  Id. at 242.

In Polishan, the Court stated that so long as the witness does not

"explicitly" opine on the defendant's criminal knowledge, the witness is allowed by Rule

701 to offer opinion testimony regarding the "corporate culture" and other matters from

which guilty knowledge may be inferred.  Thus, the Court held that the following

testimony by people familiar with the defendant's business operations were

"unobjectionable":

> 1. Vallecorse: Kenia was "totally committed" to, and "would do anything to
> please," Polishan.  Polishan was the "puppet master" and Kenia was "subservient."
> Polishan had the "dominant personality" and Kenia "walked on egg shells"
> because he was "afraid."
>
> 2. Falkowitz: "Paul Polishan knew about anything and everything that went on in
> our company."
>
> 3. Pomerantz: Polishan was "completely knowledgeable about what was going on
> in my divisions" and "incredibly . . . knowledgeable about the — all financial
> aspects of the business and intimately knew the details."

Id. at 243.  The Third Circuit concluded:  "These statements are based on the witness's

day-to-day knowledge of his or her business.  And they are statements that left the

ultimate conclusion about whether Polishan knew about the accounting irregularities to

the fact finder.  In this context they are unobjectionable."  Id.[11]

---

[11]   The Court stated that only this observation, contained in an exhibit, was
objectionable:  "[i]t is difficult to believe . . . , given the culture in Hanover, that Don
Kenia would have altered financials, without Paul's knowledge or direction."  Id. at 243.
The Court noted that no objection was presented to this document, and it found no plain
error given the strength of the evidence.  The government will not offer such an opinion
in this case.

In this case, therefore, it is clear that witnesses who participated in the daily affairs of Fumo's life and enterprises may offer opinions regarding aspects of his personality and relationship with others which are relevant to the case

In United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982), on which the Third Circuit relied in Knight, the court explained:

> Opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion.  If it is impossible or difficult to reproduce the data observed by the witnesses, or the facts are difficult of explanation, or complex, or are of a combination of circumstances and appearances which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based upon what he observed.  It is a means of conveying to the jury what the witness has seen or heard . . . . Because it is sometimes difficult to describe the mental or physical condition of a person, his character or reputation, [or] the emotions manifest by his acts . . . witnesses may relate their opinions or conclusions of what they observed.

Id. at 985.  See also United States v. Anderskow, 88 F.3d 245, 250 (3d Cir. 1996) (lay opinion testimony appropriately based on experience gained during weekly telephone and fax communication in the operation of a business over the course of several months).  What remains is merely a subject for cross-examination, in which counsel may discount the opinion by attempting to show that it is based on insufficient observation.  The Advisory Committee held:

> The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than the broad assertion, and a lawyer can be expected to display his witness to the best advantage.  If he fails to do so, cross-examination and argument will point up the weakness.

- 27 -

Note to Rule 701.

   The courts in other circuits are also unanimous in permitting the introduction of evidence regarding business relationships and attitudes.  For instance, this type of issue frequently arises in cases based on employment and similar discrimination.  Courts have widely held that an employee with experience in the organization is qualified to offer an opinion regarding the practices and mindset of employers alleged to have engaged in discrimination.  See, e.g., Gossett v. Oklahoma ex rel. Bd. of Regents for Langston University, 245 F.3d 1172, 1179-80 (10th Cir. 2001) (citing cases).  In Gossett, a discrimination action by a male nursing student, an instructor in the nursing school was prepared to testify to her opinion that she "witnessed routine mistreatment of the male nursing students" by the dean, that "[t]he female faculty is very hard on the male students," that the plaintiff "was ridiculed, belittled, and mocked by the female faculty," that the dean's treatment of male students "could best be described as tyrannical and discriminatory," and that grading decisions were "arbitrary and capricious in nature."  Id. at 1178 n.2.  Gossett held that the district court had abused its discretion in not considering this affidavit and instead granting summary judgment to the defendant.  The appellate court held that because the witness had "the opportunity to observe firsthand for several years the School's policies and practices with respect to its treatment of male students," her opinion testimony was admissible as "a means of conveying her impression based on what she had herself perceived, and it was predicated upon concrete facts within her own observation and recollection."  Id. at 1180.

- 28 -

Similarly, in United States v. Santos, 201 F.3d 953, 963 (7th Cir. 2000), the court held that employees may testify that their boss' management style was "intrusive and dictatorial." See also Samples on Behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1334 (11th Cir. 1988) (district court erred, in action against police for shooting, of excluding opinion of 19-year veteran of the force that the police force had a policy of encouraging police brutality; the opinion was "clearly admissible"); United States v. Freeman, 619 F.2d 1112, 1120 (5th Cir. 1980) (witness may offer "impression" and "understanding" of appellants' relationship to each other and to different companies).

## IV.   Designation of Witnesses as Hostile.

The government anticipates that, in the course of presenting witness testimony during its case-in-chief, certain witnesses will demonstrate hostility, which may manifest itself in a variety of forms, including a surly disposition, an unwillingness to respond directly to questions, and feigned forgetfulness, among others.  When this occurs, the government will request that, pursuant to Federal Rule of Evidence 611(c), it be permitted to question hostile witnesses with leading questions as if on cross-examination.

When a witness is identified as having a relationship with an adverse party, the court has discretion to permit the government to ask leading questions on direct.  See United States v. Hicks, 748 F.2d 854, 859 (4th Cir. 1984); Hainey v. Mizell Memorial Hospital, 744 F.2d 1467, 1477-78 (11th Cir. 1984) (actual hostility not required if witness is "identified with" opposing party); Ellis v. Chicago, 667 F.2d 606, 612 (7th Cir. 1981);

cf. United States v. Salameh, 152 F.3d 88, 128 (2d Cir. 1998) (court may allow leading

questions on direct examination to develop nervous witness' testimony).

> Whether a witness is hostile or identified with an adverse party involves a

variety of factors, including the witness' relationship with a party, demeanor, facial

expression, voice inflections, and whether the witness' answers are evasive.  See, e.g.,

United States v. Tunnell, 667 F.2d 1182, 1188 (5th Cir. 1982); United States v. Brown,

603 F.2d 1022, 1025 (1st Cir. 1979) (witness was close friend of defendant).  Moreover,

where a witness may have been a participant, however innocent, in some of the events

that are related to the criminal activity, the trial court has discretion to permit the

government to ask leading questions as if on cross.  See Brown, 603 F.2d at 1026.

Furthermore, a hostile witness can be one who feigns memory loss or is reluctant to

divulge memory.  United States v. Cisneros-Gutierrez, 517 F.3d 751, 762 (5th Cir. 2008).

> Many of the government's trial witnesses were participants in events that

are directly related to the crimes charged in the indictment.  Some are still currently

employed by defendant Fumo or maintain close ties to him in other ways.  A number of

these individuals have already demonstrated hostility in the course of their dealings with

government agents and prosecutors during the grand jury phase of this investigation,

where it became difficult at times to secure cooperation and, at times, honest answers.  In

short, some of Fumo's aides have demonstrated in their interaction with authorities the

same blind loyalty which led them to perform illicit tasks on Fumo's behalf in the first

place.[12]

Recently, in the course of preparation for trial, several of the witnesses,

including at least two who previously testified before the grand jury under a grant of

immunity, have refused to meet with or even talk to the undersigned prosecutors for the

purpose of discussing their anticipated trial testimony.  Courts have held that a witness'

refusal to talk to counsel may be brought out at trial in that it may be evidence which

relates to the witness' possible bias.  United States v. Crouch, 478 F. Supp. 867, 871

(E.D. Cal. 1979).

If, as the government anticipates, certain witnesses demonstrate the

characteristics that courts generally have recognized evince hostility, government counsel

will request that the Court declare the witness to be hostile and allow the government to

use leading questions during the direct examination of the witnesses.


**V.     Rule 608(b) Precludes Defendants from Attacking the Character of
        Government Witnesses in Matters Unrelated to Veracity.**

The general evidentiary rule is that character evidence is inadmissible for

purposes of showing that a person "acted in conformity therewith on a particular

---

[12]  This is not true of every Fumo employee and aide.  Some have understood the
requirement of providing honest answers to investigators' questions and have exhibited
no bias.  The matter must be addressed on a witness-by-witness basis.

occasion."  <u>United States v. Bocra</u>, 623 F.2d 281, 287 (3d Cir. 1980).  Federal Rule of

Evidence 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or
> supporting his credibility, other than conviction of crime as provided in rule 609,
> may not be proved by extrinsic evidence.  They may, however, in the discretion of
> the court, if probative of truthfulness or untruthfulness, be inquired into on
> cross-examination of the witness (1) concerning his character for truthfulness or
> untruthfulness. . . .

Weinstein states: "Since Rule 608(b) is intended to be restrictive . . .  the inquiry on

cross-examination should be limited to . . . specific modes of conduct which are generally

agreed to indicate a lack of truthfulness."[13]  3 Weinstein, <u>supra</u>, ¶ 608(05) at 608-28.  The

Advisory Committee note to Rule 608(b) comments:

> Particular instances of conduct . . .  may be inquired into on cross- examination of
> the principal witness himself . . . .  Effective cross- examination demands that
> some allowance be made for going into matters of this kind, but the possibilities of
> abuse are substantial.  Consequently safeguards are erected in the form of specific
> requirements that the instances inquired into be probative of truthfulness or its
> opposite . . . .  Also, the overriding protection of Rule 403 requires that probative
> value not be outweighed by danger of unfair prejudice, confusion of issues, or
> misleading the jury . . . .

"From the foregoing, it is evident that the type of inquiry into specific conduct of the

witness for impeachment purposes is quite limited."  <u>Bocra</u>, 623 F.2d at 288.  "The classic

example of a permissible inquiry would be an incident in which the witness had lied."  <u>Id.</u>

---

[13]   "Acts probative of truthfulness under Rule 608(b) include such acts as forgery,
perjury, and fraud."  <u>Ad-Vantage Telephone Directory Consultants, Inc. v. GTE
Directories Corporation</u>, 37 F.3d 1460, 1464-65 (11th Cir. 1994) (citing 3 Jack B.
Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 608[5] at 608-45 - 608-46
(1994)).

While the Sixth Amendment guarantees a defendant the right to cross-examine witnesses, it allows a trial judge to place reasonable limits on the cross-examination. United States v. Mussare, 405 F.3d 161, 169 (3d Cir. 2005) (a district court retains "'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'") (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)). "The court balances a question's relevance to honesty and veracity with its prejudicial impact." United States v. Dennis, 625 F.2d 782, 798 (8th Cir. 1980).

In Bocra, the Third Circuit considered the defendant's claim that the defendant should be permitted to cross-examine an IRS agent regarding the agent's involvement in other bribery cases in order to attempt to show that the agent was a solicitor of bribes. The defendant claimed that he was entrapped by the agent, and needed to introduce evidence of the IRS agent's involvement in other bribery cases to show a pattern of solicitation by the agent which would cast doubt on the defendant's predisposition to commit bribery. Id. at 285. The district court banned any such cross-examination because it determined that the marginal probative value of the testimony was outweighed by the risks of jury confusion. Id. at 287-88.

On appeal, the Third Circuit determined that any cross-examination of the agent with respect to his involvement with other taxpayer bribes was "only marginally

probative of truthfulness" and that the "probative value of the cross-examination was outweighed by the risk of confusing the jury by collateral exploration." Id. at 288.

In United States v. Nelson, 39 F.3d 705 (7th Cir. 1994), the court determined that the district court properly excluded cross-examination concerning other robberies that were supposedly committed by two government witnesses. Defendants claimed that there was an implicit, unspoken bargain: the authorities ignored the other robberies in return for the cooperating witnesses' testimony against the defendants, arguing that evidence of other robberies would have shown that the witnesses might have had an additional motive to lie. Id. at 709. The court rejected this argument, noting that "[e]vidence of other robberies would have been entirely peripheral to the defendants' rights to confront witnesses. . . . This sort of repetitive, profitless cross-examination is exactly that type of peripheral examination which falls within the trial court's discretion to limit." Id. (citing Van Arsdall, 475 U.S. at 679).

As in Bocra and Nelson, the defendants should not be permitted to unfairly attack the character of witnesses at trial in matters that are unrelated to veracity, and may not present extrinsic evidence unrelated to veracity that is designed to attempt to attack the character of the witness. Other courts have quite properly limited or excluded altogether improper cross-examinations of witnesses designed to confuse the jury and cause unfair prejudice. See, e.g., United States v. Townsend, 31 F.3d 262, 267-69 (5th Cir. 1994) (district court properly restricted defendant's cross-examination of various government witnesses regarding falsification of corporate records and bad business

- 34 -

practices, finding that it "would only serve to mislead and confuse the jury, and prolong the trial"); Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp., 37 F.3d 1460, 1464-65 (11th Cir. 1994) ("Anton's borrowing from his clients, while ethically questionable, is likewise irrelevant to his truthfulness as an expert.  To infer untruthfulness from any unethical act 'paves the way to the exception which will swallow the Rule.'" (internal citation omitted));  Telum, Inc. v. E.F. Hutton Credit Corp., 859 F.2d 835, 839 (10th Cir. 1988) (probative value of evidence showing that one of defendant's agents embezzled $40,000 in connection with plaintiff's lease was greatly outweighed by risk of unfair prejudice); United States v. Dennis, 625 F.2d 782, 798 (8th Cir. 1980) (proper to exclude defendant from cross-examining victim-witness on prior arrest for tax problems because not related to veracity); Tigges v. Cataldo, 611 F.2d 936, 938 (1st Cir. 1979) (plaintiff could not cross-examine defendant on a prior episode of administrative discipline because not probative of truthfulness);  United States v. Hill, 550 F. Supp. 983, 989 (E.D. Pa. 1982) (in prosecution for distributing heroin, it was proper to refuse to allow inquiry into charges of misconduct against DEA agent who directed investigation where challenged conduct was unrelated to investigation, agent was cleared of wrongdoing, and nature of charges was not related to agent's character for veracity).

"Trials are about charges in the indictment, not the character of the witnesses.  Thus, although Federal Rule of Evidence 608(a) permits a party to introduce evidence regarding a witness's reputation for truthfulness, Rule 608(b) does not permit specific instances of a witness's conduct to be proved by extrinsic evidence." United

- 35 -

States v. Miller, 91 F.3d 1160, 1163 (8th Cir. 1996) (internal quotations and citations omitted).  See also United States v. McNeill, 887 F.2d 448, 453 (3d Cir. 1989)  ("This court has construed Rule 608(b) as requiring the exclusion of extrinsic impeachment evidence concerning a witness' prior instances of conduct.").  The Federal Rules of Evidence prohibit the harassment and undue embarrassment of witnesses.  Fed. R. Evid. 611.  See also McCormick, Evidence § 41 at 139-40 (4th ed. 1992) ("[T]he danger of victimizing witnesses and of undue prejudice to the parties has led most of our courts which permit the showing of acts of misconduct under the rules mentioned above, to recognize that cross-examination concerning acts of misconduct is subject to discretionary control by the trial judge.  Some of the factors that may, it seems, sway discretion are (1) whether the testimony of the witness under attack is crucial or unimportant, (2) the relevancy of the act of misconduct to truthfulness, depending upon the rule followed in the jurisdiction in that respect, (3) the nearness or remoteness of the misconduct to the time of trial, (4) whether the matter inquired into is such as to lead to time-consuming and distracting explanations on cross-examination or re-examination, (5) whether there is undue humiliation of the witness and undue prejudice.").  Accord McCormick, Evidence § 41 at 154 (5th ed. 1999).

        In the course of preparing for trial, the government has learned that the defendants may attempt to pursue cross-examination that is designed to unfairly attack the character of one or more of the government's trial witnesses in matters that are not related to veracity, and may otherwise attempt to introduce extrinsic evidence designed to

- 36 -

accomplish those objectives.  If this occurs at trial, the government will interpose

appropriate objections and will ask the Court to preclude such efforts based on the

authorities set forth in this memorandum.

VI.    **Limitations on the Nature and Number of the Defendants' Character Evidence at Trial.**

    A.    **Limitations on Number of Character Witnesses.**

        Based on a review of the defense trial witness list, which contains 268

names, it appears that the vast majority are presented as character witnesses to attest to

the defendants' good character, in the form of reputation or opinion evidence.  The

government believes that this is a grossly excessive number of character witnesses.  As

explained in more detail below, it is within the Court's discretion to limit the presentation

of character evidence.[14]

        The Court has broad discretion to limit the number of character witnesses

allowed the defendant.  See United States v. Sullivan, 803 F.2d 87, 90 (3d Cir. 1986)

(district court did not abuse its discretion in excluding defendants' judicial character

witnesses on grounds that testimony was cumulative); United States v. Johnson, 730 F.2d

683, 688 (11th Cir. 1984) (affirming district court's decision to limit number of character

witnesses to three).  Limiting the number of defense character witnesses is a common

_____

[14]    The number of actual defense witnesses is unknown.  Brief inquiries of some of
the witnesses on the list has suggested that few if any have been contacted by the defense
or agreed at this stage to testify.

practice and has been held to be within the trial court's discretion.  United States v. Gray,

105 F.3d 956, 963 (5th Cir. 1997) (affirming district court's decision to limit defendant to

two character witnesses and noting that "[t]his court has repeatedly allowed a maximum

of three character witnesses"); United States v. Benefield, 889 F.2d 1061, 1065 (11th Cir.

1989) (affirming decision to reduce the defendant's character witnesses from 10 to 5);

United States v. Koessel, 706 F.2d 271, 275 (8th Cir. 1983) (affirming district court's

limit of three character witnesses).

       In this case, while the government does not suggest to the Court a specific

number of character witnesses, it believes that allowing testimony from dozens of such

witnesses is excessive and unreasonable, particularly if their testimony will be

cumulative.  Accordingly, the government asks the Court to require the defendants at the

appropriate time to make an offer of proof as to these witnesses' testimony, and to limit

the number of character witnesses based on that proffer.

    **B.**    **Character Evidence at Trial.**

        **1.**    **Character Evidence Under the Federal Rules of Evidence.**

       The Court also must maintain restrictions on character testimony, as

provided in the applicable rules.  The Federal Rules of Evidence permit an accused to

offer his good character into evidence to show, by inference, that the act with which he is

charged is inconsistent with his overall character.  See Fed. R. Evid. 404(a)(1); 1A J.

Wigmore, Evidence § 56, at 1161 (Tillers rev. 1983).  While character evidence is admissible and potentially probative, the Federal Rules of Evidence limit its use.[15]

Pursuant to Rule 405(a),[16] a witness called to testify regarding a person's character may not address specific instances of conduct.  However, according to the rule, "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." Questions as to such "specific instances of conduct," which would otherwise be inadmissible, are relevant on cross-examination of the character witness for the purpose of testing the character witness' knowledge or opinion of the defendant – that is, the witness's knowledge of the defendant's reputation in the community or the witness' opinion of the defendant.

In Michelson v. United States, 335 U.S. 469 (1948), the defendant, charged with bribing a revenue agent, called five witnesses to testify to his good reputation.  On cross-examination of four of the witnesses the government asked them if they had heard that the defendant had been convicted 20 years before of violating the trademark laws.  In

---

[15]   The two Federal Rules of Evidence that are most pertinent are Rules 404 and 405. Rule 404 is an admissibility test that dictates when character evidence can be used.  Rule 405, which comes into play only after the criteria of Rule 404 have been met, delineates the methods by which character evidence may be introduced.

[16]   Rule 405(a) states:

**Reputation or opinion.**  In all cases in which evidence of character or a trait of character of a defendant person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion.  On cross-examination, inquiry is allowable into relevant specific instances of conduct.

addition, the government asked four of the witnesses if they had heard of the defendant's

arrest 27 years before for receiving stolen goods.  The Supreme Court held that this cross-

examination was permissible.  After discussing in detail the various rules governing the

use of character evidence and the advantages those rules afford the criminal defendant,

the Court stated:

> The price a defendant must pay for attempting to prove his good name is to
> throw open the entire subject which the law has kept closed for his benefit
> and to make himself vulnerable where the law otherwise shields him.  The
> prosecution may pursue the inquiry with contradictory witnesses to show
> that damaging rumors, whether or not well-grounded, were afloat -- for it is
> not the man that he is, but the name that he has which is put in issue.
> Another hazard is that his own witness is subject to cross-examination as to
> the contents and extent of the hearsay on which he bases his conclusions,
> and he may be required to disclose rumors and reports that are current even
> if they do not affect his own conclusion.  It may test the sufficiency of his
> knowledge by asking what stories were circulating concerning events, such
> as one's arrest, about which people normally comment and speculate.  Thus,
> while the law gives defendant the option to show as a fact that his
> reputation reflects a life and habit incompatible with commission of the
> offense charged, it subjects his proof to tests of credibility designed to
> prevent him from profiting by a mere parade of partisans.

335 U.S. at 477.

Rule 405 describes the methods that may be used to prove character.

Specifically, Rule 405(a) permits proof by testimony as to reputation or in the form of an

opinion in all cases where evidence of character or of a character trait is admissible.[17]  On

---

[17]   Unlike Rule 405(a), which limits the offering of character evidence to reputation or
opinion, Rule 405(b) provides a vehicle for permitting testimony about specific instances
of conduct.  Rule 405(b) comes into play, however, only when a particular character trait
is directly in issue.  The Federal Advisory Committee noted, in connection with Rule

(continued...)

direct examination, proof may not be given in the form of specific instances of conduct.

Michelson, 335 U.S. at 477;  Koessel, 706 F.2d at 275 ("Character testimony is limited to the reputation of a defendant, not to specific instances of behavior.").  The defendants may not seek to establish their innocence by proof of their failure to commit criminal acts on other occasions. Government of Virgin Islands v. Grant, 775 F.2d 508, 512-13 (3d Cir. 1985) (testimony of absence of prior arrests was not admissible as character evidence and did not entitle defendant to good character charge; court properly refused to permit defendant to testify that he had no prior arrests as part of background evidence);  United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990); United States v. O'Connor, 580 F.2d 38, 43 (2d Cir. 1978).

Evidence of a defendant's good conduct is not pertinent or admissible when used to attempt to show or infer a lack of criminal intent.  See United States v. Ellisor, 522 F.3d 1255, 1267 (11th Cir. 2008) (evidence of defendant's purportedly legitimate business activities was irrelevant, and thus inadmissible, during his mail fraud

---

[17] (...continued)
405(b):

> Of the three methods of proving character provided by the rule, evidence of specific instances of conduct is the most convincing.  At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time.  Consequently the rule confines the use of evidence of this kind to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry.  When character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion.

prosecution; evidence that defendant purportedly produced other shows did not bear on his intent to defraud with respect to show in question); United States v. Marrero, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment."). That is why, as explained in a separate motion filed today, Fumo and Arnao's proffered defense exhibits are for the most part objectionable. As explained there, the 908 defense exhibits include numerous tributes by others to the defendants' good works and claimed virtues, regarding activities not charged in the case. Putting aside their hearsay nature, these exhibits are nothing but improper character testimony regarding specific instances of purportedly good conduct.

Under Rule 405(a), the government may inquire into relevant specific instances of conduct in order to show the jury that the evidence presented by a defendant's good character witnesses paints an incomplete picture. By pointing to instances of a defendant's misconduct, the government can discredit the defendant's character witnesses by showing that they are too biased or too uninformed to portray the defendant accurately. On cross-examination, courts have regularly permitted the prosecutor to ask the defendant's character witnesses if he has heard about, or if his opinion would be affected by, certain past instances of the defendant's misconduct, as long as the prosecutor has a good faith basis for his information. See United States v. Williams, 738 F.2d 172, 176-77 n.6 (7th Cir. 1984); United States v. McCollom, 664 F.2d 56, 58 (5th Cir. 1981).

- 42 -

2.    **The Differences Between the Cross-Examination of
Reputation Witnesses and of Opinion Witnesses.**

a.    **The Reputation Witness.**

Reputation evidence is presented by calling a witness to the stand who is familiar with the reputation of the defendant, and asking the witness to state what the reputation is in the community where the defendant lives.[18]  In Michelson v. United States, 335 U.S. at 477, the Supreme Court stated:

> The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits . . . The witness is, however, allowed to summarize what he has heard in the community, although much of it may have been said by persons less qualified to judge than himself.  The evidence which the law permits is not as to the personality of defendant but only as to the shadow of his daily life has cast in his neighborhood.  This has been well described in a different connection as "the slow growth of months and years, the resultant picture of forgotten incidents, passing events, habitual and daily conduct, presumably honest because disinterested, and safer to be trusted because prone to suspect.* * * It is for that reason that such general repute is permitted to be proven.  It sums up a multitude of trivial details.  It compacts into the brief phrase of a verdict the teaching of many incidents and the conduct of years.  It is the average intelligence drawing its conclusion.

"The prosecution may cross-examine a witness who has testified to the accused's reputation in order to probe the witness' knowledge of the community opinion, not only generally, but specifically as to whether the witness 'has heard' that the

---

[18]   The community is described as the one in which the defendant resides, but some courts have broadened this to include "where he works or commonly associates."  1 S. Saltzburg & M. Martin, Federal Rules of Evidence Manual, at 446-47 (6th ed. 1994); 1A J. Wigmore, Evidence § 1615, at 589-90 (Tillers rev. 1983); C. McCormick, McCormick on Evidence § 191, at 815 (4th ed. 1992).

defendant has committed particular prior criminal acts that conflict with the reputation vouched for on direct examination."  McCormick, Evidence § 191, at 816 (4th ed. 1992). "Once the defendant has opened the door to a discussion of his character by calling character witnesses under Rule 404(a)(1), the prosecution may both cross-examine defendant's witnesses and call its own witnesses in rebuttal."  Weinstein, Evidence, ¶ 405[02], at 405-23.[19]  See United States v. Manos, 848 F.2d 1427, 1429-31 (7th Cir. 1988) (in prosecution of city inspector for taking bribes from restaurant owners, trial court properly allowed the government to ask defendant's character witness whether he was aware that defendant had been reprimanded for falsifying time sheets; court stated that "both opinion and reputation witnesses are subject to cross-examination regarding specific instances of conduct" and that such questioning is permissible whether the direct testimony is offered pursuant to Rule 405(a) or (b)).

The law is clear that the prosecution may ask a defendant's character witnesses whether they have heard about or know about specific acts committed by the defendant in order to test their knowledge and standards for good reputation.  See United

---

[19]   When a rebuttal witness is called by the government to testify as to the defendant's reputation or opinion, testimony pertaining to specific acts by a defendant is not allowed. United States v. Herman, 589 F.2d 1191, 1197 (3d Cir. 1978) (government may not call witnesses to testify to specific evidence of conduct in order to rebut testimony of character witnesses).

States v. Alvarez, 860 F.2d 801, 826-28 (7th Cir. 1988); Manos, 848 F.2d at 1429-31;

United States v. Collins, 779 F.2d 1520, 1532 (11th Cir. 1986).[20]

The "specific act" cross-examination of a defendant's reputation witness is
allowed not for the purpose of proving that a defendant committed particular bad acts.
Rather, it is permitted so that the government may test the knowledge and credibility of
the witness.  "The rationale given for allowing such questions is that, if answered
affirmatively, they might cast serious doubt on the witness's testimony, thus serving a
legitimate rebuttal function, and that, if answered negatively, they would show that the
witness did not know enough about the accused's reputation to testify."  Awkard v.
United States, 352 F.2d 641, 643 n.4 (D.C. Cir. 1965) (quoting Note, "Other Crimes
Evidence at Trial: Of Balancing and Other Matters," 70 Yale L.J. 763, 779 (1961)).

In United States v. Curtis, 644 F.2d 263 (3d Cir. 1981), the defendant
admitted distributing drugs while carrying illegal firearms but claimed entrapment.  The
defense called character witnesses who testified only to the defendant's good reputation
in the community.  On cross-examination, the prosecution was permitted over objection
to ask whether the witnesses would be surprised, and would change their opinions, if they

---

[20]   See also United States v. Leeseberg, 767 F. Supp. 1091 (D. Kan. 1991) (in
prosecution for willful misapplication of bank funds, defendant called character witnesses
to testify to his reputation for truth and honesty; government was properly permitted to
ask the witnesses on cross-examination whether they were aware of civil suits pending
against the defendant brought by former customers of the bank, to test the witnesses'
knowledge and credibility with regard to the defendant's reputation; court noted that the
pending lawsuits were based on facts similar to those charged in the criminal proceeding.)

knew that the defendant had admitted participation in the charged transaction.  The Third

Circuit found this impeaching cross-examination of character witnesses was improper.

Since the witnesses had testified only to the defendant's reputation, they could not be

asked about their own opinions.  "[During cross-examination of a reputation witness],

inquiry may be made about conduct, and even about charges, which may have come to

the attention of the relevant community."  Curtis, 644 F.2d at 268.  The Court then stated:

> If, on the other hand, opinion evidence is offered in proof of character,
> relevant cross examination is only that which bears on the fact or factual
> basis for formation of the opinion.

Id. at 268.

The court further noted that Rule 405(a) had not "effected a merger between

reputation and opinion evidence.," id. at 269, and that cross-examination on specific

instances of conduct must be relevant to the type of testimony offered on direct

examination.  The Court then stated:

> Thus an opinion witness can be cross examined only on matters bearing on
> his opinion, while a reputation witness can only be examined on matters
> reasonably proximate to the time of the alleged offense and likely to have
> been known to the relevant community at the time.

Id. at 269.

Moreover, the cross-examination must be confined to conduct relevant to

the character trait to which the direct testimony was directed."  Id.[21]  In United States v.

---

[21]   Although the court in Curtis found that this error alone would not have warranted a
reversal, in conjunction with an improper comment on the defendant's silence, a new trial
(continued...)

Kellogg, 510 F.3d 188, 195-96 (3d Cir. 2007), the court held that it is improper for the

government to pose guilt-assuming hypothetical questions to reputation character

witnesses.  The court reasoned that, since reputation witnesses can only testify about the

defendant's reputation in the community, it would be pure speculation for the reputation

witness to testify about how information regarding the crime would affect the

community's assessment of the defendant's reputation.  Id. at 196.  See also United States

v. Polsinelli, 649 F.2d 793 (10th Cir. 1981) (error to ask character witnesses testifying as

to community reputation whether their opinion of community reputation would be altered

if defendant was guilty of charged crime; majority reserved decision on whether question

would constitute error if witnesses had testified to their opinion; concurring opinion

would have found error in either case).

Generally, the cross-examination of a reputation witness includes questions

of the "have you heard . . .?" variety, because the basis of the reputation witness'

testimony is what he has heard about the defendant in the community.  "Have you

heard?" questions elicit whether the witness has become aware of the existence of certain

facts or matters by way of the community grapevine.  This type of question merely

determines whether the information has come to the witness' attention, and has no

---

[21] (...continued)
was ordered.  Id. at 269-70.  The dissenting judge did not find the cross-examination of
the defendants' character witnesses to be improper.  Id. at 273-74.

bearing on whether the facts contained in the questions are true.  This scope of cross-examination is clearly permissible in a criminal case.

For example, in United States v. Apfelbaum, 621 F.2d 62 (3d Cir. 1980), the defendant was charged with knowingly making false material declarations before a grand jury in violation of 18 U.S.C. § 1623 (1976).  The defendant, then an administrative assistant to the District Attorney in Philadelphia, had appeared as an immunized witness before a federal grand jury investigating racketeering and extortion in the operation of a Philadelphia automobile dealership.  Following his conviction, the defendant challenged on appeal a ruling of the district court on the permissible scope of cross-examination by the government of certain defense witnesses.  The defendant intended to call a number of character witnesses to testify to his excellent reputation in the community for truth and veracity.  The government stated that if the defendant called character witnesses, it intended to cross-examine these witnesses by inquiring into their familiarity with a newspaper article appearing in the *Philadelphia Inquirer* on July 11, 1975.  The article described charges made by an assistant district attorney in Philadelphia that the defendant, an administrative assistant to the Philadelphia District Attorney, had attempted to "fix" a case, and recounted the defendant's flat denials of these allegations.

The district court ruled that the government would be allowed to confront the witnesses with this article and to use the article in cross-examination.  The ruling resulted in the defendant's decision not to call the character witnesses.  In disagreeing

with the defendant's argument that the trial judge's ruling constituted reversible error, the

Court stated:

> Rulings on the permissible scope of cross-examination in this context are
> within the sound discretion of the district court, and may only be reversed
> for abuse of that discretion.  We find no abuse here.  [The defendant]
> offered the character witnesses to testify to his reputation for truth and
> veracity.  The article, to the extent that it relates [the defendant's] denial of
> a public accusation, concerns an event that implicates his reputation for
> veracity.  Thus, the familiarity of these witnesses with the substance of this
> article is relevant to their qualifications to testify on [the defendant's]
> reputation for truth and veracity.  Therefore, cross-examination to
> determine their familiarity with the charges contained in the article is not
> improper per se, though, of course, careful instructions to the jury as to the
> appropriate use of such cross-examination would be required, if [the
> defendant] had called his character witnesses and the government had cross-
> examined them in the proposed fashion.

Id. at 65.   See also United States v. Boone, 279 F.3d 163, 174-76 (3d Cir. 2002) (in drug

trafficking prosecution, district court did not abuse its discretion by permitting cross-

examination of reputation character witness regarding whether witness was aware of the

defendant's prior drug trafficking conviction and that a search warrant was executed at

defendant's night club by narcotics agents).

            In the present case, testing a reputation witness' credibility will involve

three interconnected considerations:  (1) foundation; (2) fabrication; and (3) standards.

Foundation may be evaluated by assessing the witness' awareness of reports involving a

defendant's reputation.  If the witness has not heard any reports about a defendant, the

jury may determine that the witness has inadequate knowledge of the defendant's

character and may thereby discount his testimony.  In fact, the absence of foundation

should lead the court to preclude the testimony entirely; a witness who has never discussed the defendant's reputation with others should not be allowed to present personal opinion in the guise of reputation evidence.[22]  Fabrication involves inquiring into whether the witness' testimony regarding a defendant's reputation is a product of the witness' own imagination.  For example, when a witness has heard of specific acts inconsistent with his testimony, a jury may find that the asserted reputation is a fabrication.  Finally, the standards criterion involve those personal ideals and principles that govern the witness' perceptions.  If the witness has heard of inconsistent acts and still believes that the defendant's reputation is good, the jury may find that the witness's standards for good character are too low.

---

[22]  In addressing Fed. R. Evid. 803(19), an analogous rule which permits reputation testimony regarding family history, the Third Circuit declared a "clear principle: A witness who wishes to testify about someone's reputation within a community must demonstrate that he or she knows of the person and is truly familiar with the 'community' in which the reputation has been formed, and that the basis of the reputation is one that is likely to be reliable.  Where the alleged reputation is based on nothing more than rumors of unknown origins, or a single instance of 'someone told me so,' a proper foundation has not been laid for admitting such evidence under Rule 803(19)."  Blackburn v. United Parcel Service, Inc., 179 F.3d 81, 101 (3d Cir. 1999).

b.      **The Opinion Witness**.

Unlike the reputation witness, the opinion witness need not testify to the defendant's reputation in the community.[23]  Instead, the opinion witness gives his personal opinion of the defendant.  When the witness testifies as to his opinion, rather than as to reputation, he may be cross-examined about what he knows, rather than what he has heard.

Because an opinion witness testifies about opinions that he himself has formed, the questions asked of an opinion witness need not be phrased in the "have you heard . . .?" manner.  Instead, the witness may be asked what he knows rather than what he has heard.

On cross-examination, the prosecution may inquire into specific instances of conduct.  In addition, because an opinion witness testifies as to his present opinion, inquiry into any specific instance of conduct up to the moment when the opinion witness gives his testimony is fair play.  See United States v. Furst, 886 F.2d 558, 577 (3d Cir. 1989); United States v. Morgan, 554 F.2d 31, 32-33 (2d Cir. 1977).  Furthermore, the witness can be asked whether his opinion would change if additional facts came to his attention.

---

[23]   Any given character witness may testify both as to his opinion of the defendant and as to the defendant's reputation in the community.  It is only when a witness testifies to one and not the other that the distinction is important because the appropriate form of the questions differs between the two types.

In United States v. Kellogg, 510 F3d 188 (3d Cir. 2007), the Court examined the extent to which it is permissible to pose guilt-assuming questions to opinion character witnesses.  In Kellogg, the defendant was charged with fraud in connection with his alleged failure to conduct certain environmental laboratory testing procedures.  On cross-examination, the defendant's first opinion character witness was asked the following question: "Do you have any knowledge about the way Mr. Kellogg ran his environmental laboratory back in 1998?", thus alluding to the subject of the criminal matter being tried.  The district court overruled the defendant's objection to this question that it prejudiced the defendant by assuming his guilt.  On appeal, the Court in Kellogg affirmed, holding that the question was proper because the prosecution was entitled to test the extent of the witness' knowledge of the defendant's business practices, as it was relevant to the jury's understanding of the foundation for the witness' opinion.  Id. at 192.

Here, when defendants Fumo and Arnao present opinion character testimony at trial, the government fully intends to explore with these witnesses the bases for their opinions.  Kellogg makes clear that the government is permitted to test the foundation for opinion character testimony by exploring the extent to which each of the witnesses has knowledge of the defendants' practices with respect to matters that are presented at trial.

The Court in Kellogg also went a step further and specifically acknowledged that even guilt-assuming questions (such as, "would it change your opinion

if you knew that Senator Fumo paid $150,000 of Senate money to a friend in exchange

for no work?") may properly be posed to opinion character witnesses:

> In our view, there is nothing inherent in guilt-assuming hypotheticals, in the
> abstract, that makes them unfairly prejudicial, let alone so prejudicial as to
> constitute a per se violation of due process. . . . [A] person testifying regarding a
> present opinion should be open to cross-examination on how additional facts
> would affect that opinion.  In the context of opinion character testimony cross-
> examination about the charged crime tests "both the witness' bias and the witness'
> own standards by asking whether the witness would retain a favorable opinion of
> the defendant even if the evidence at trial proved guilt."

Id. at 196 (quoting United States v. Oshatz, 912 F.2d 534, 544 (2d Cir. 1990)).  In

Kellogg, the question that the Third Circuit agreed was permissible was as follows:

> Q. Sir, would you agree with me that a person who knows that a laboratory used
> one particular analytical method, but then who reports out a completely different
> analytical method on final reports of analysis to its customers, would your opinion
> be different about that person being [a] law abiding citizen?

Id. at 192.

The government in this case anticipates, based on the massive size of the

defense witness list, that numerous opinion character witnesses will be presented at trial.

As in Kellogg, it is essential in probing the credibility of these witnesses that the

government be permitted to test whether their opinions would change if the evidence at

trial establishes that the defendants are guilty of the crimes charged.  As in Kellogg, the

government will make it clear that the question is purely hypothetical, and this Court

- 53 -

should, as in <u>Kellogg</u>, provide an appropriate instruction to the jury that the question is

permitted for a limited purpose.  <u>Id</u>. at 192.

Respectfully submitted,

LAURIE MAGID
United Acting States Attorney


*/s John J. Pease* _____
JOHN J. PEASE
Assistant United States Attorney


*/s Robert A. Zauzmer* _____
ROBERT A. ZAUZMER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be delivered by electronic filing to the

Clerk of Court (resulting in an e-mail copy sent to counsel by the Clerk of Court), and by

direct e-mail, a true and correct copy of the foregoing pleading, to the following:

Dennis J. Cogan, Esq.
2000 Market Street, Suite 2925
Philadelphia, PA  19103

Stephen R. LaCheen, Esq.
LaCheen Dixon Wittels & Greenberg, LLP
1429 Walnut Street, 13th Floor
Philadelphia, PA 19102

Peter Goldberger, Esq.
50 Rittenhouse Place
Ardmore, PA 19003

    Counsel for Defendant Vincent J. Fumo

Edwin J. Jacobs, Jr., Esq.
Jacobs and Barbone, P.A.
1125 Pacific Avenue
Atlantic City, NJ  08401

    Counsel for Defendant Ruth Arnao


*/s John J. Pease*
JOHN J. PEASE
Assistant United States Attorney

Dated:  August 18, 2008.