IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :

V.                           :     CRIMINAL NO. 06-319

VINCENT J. FUMO              :

## UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION
## TO DEFENDANT FUMO'S MOTION REGARDING GOVERNMENT EXHIBITS

The United States of America, by its counsel, Laurie Magid, Acting United States Attorney for the Eastern District of Pennsylvania, and John J. Pease and Robert A. Zauzmer, Assistant United States Attorneys, respectfully submits this brief in opposition to Defendant Fumo's "Memorandum Regarding Irrelevant, Prejudicial, and Cumulative Government Email Exhibits That Will Be Objected to at Trial."

Defendant Vincent J. Fumo has filed a memorandum "to advise this Honorable Court of the multitude of irrelevant, prejudicial, and cumulative email exhibits that have been pre-marked by the government and whose introduction will be objected to by the defense at trial as deemed appropriate." Br. 1. Fumo does not specify any particular government exhibit which is objectionable, but rather sketches three possible bases for the exclusion of government evidence. The government provides this brief

1

response to afford this Court the pertinent background of the issues suggested by Fumo, which will be further addressed at trial.[1]

First, Fumo states:

> One is hard-pressed to stretch even the limits of imagination in an effort to find relevance in the proposed email exhibits between Senator Fumo and his former girlfriend which contain exchanges reflecting intimacy as well as the hurt that accompanies the break-up of any relationship. Equally challenging to the imagination are the proposed email exhibits in which Senator Fumo expresses sentiments about his ex-wife. Prejudice, however, most definitely abounds in both. As the presentation of such personal emails contravenes the stated intent of Rules 401 and 403, the defense will be requesting rulings of admissibility on such emails at the appropriate time during trial.

Br. 2.

This statement does not reflect the considerable joint effort which the parties have already made to address this concern. The Court should be aware that, in August, the defense provided the government with a list of e-mails which it believed intruded on personal matters and were largely or entirely irrelevant. In response, the government agreed with many of the defense suggestions, and redacted personal or otherwise intemperate exchanges from nine exhibits, and withdrew two exhibits entirely.

---

[1] Fumo states that while "the government previously insisted that the Court prejudge this case and make advance rulings regarding the proposed defense exhibits, the defense is not joining that march." Br. 1. That is inaccurate. As the Court is aware, the government did not request pretrial rulings regarding defense exhibits, but rather, consistent with the Court's pretrial scheduling order, merely advised the Court that it seeks an opportunity, before the defense case and outside the presence of the jury, to object to particular exhibits. Judge Yohn stated that such an opportunity would be afforded, and this Court suggested that it would follow the same course at the appropriate time.

The government also explained its view as to why other exhibits to which the defense objected are relevant and necessary. In our detailed letter to counsel setting forth the redactions, dated August 22, 2008, we concluded by promising to consider and respond to any further defense comments along these lines regarding the government's exhibits. No such additional comments have been forthcoming.[2]

What presently remains is admissible evidence. As a general matter, while the government agrees that purely personal communications between Fumo and his girlfriends, or referring to his loved ones, are often irrelevant, in this case there are a number of such communications which are highly relevant. That is because Fumo is accused of extensively using the resources of the Senate for his private benefit and personal causes. For example, with regard to the girlfriend to which Fumo's memorandum refers, Dorothy Egrie-Wilcox, the government will prove, in part, that: (a) Fumo used a private investigator paid with Senate funds to follow Egrie-Wilcox, and to seek defamatory information regarding men Egrie-Wilcox dated, when Fumo's relationship with Egrie-Wilcox soured; (b) Fumo directed Senate computer aides to assist Fumo in intercepting and reviewing Egrie-Wilcox's personal e-mail communications without her knowledge or consent; (c) during happier times, Fumo provided Egrie-Wilcox

---

[2] A copy of the government's August 22, 2008, letter is being provided to the Court along with its courtesy copy of this response. We will not file the letter publicly so as not to prejudice the defendants by reference to materials which the government has agreed not to introduce.

3

with valuable Senate computers and other equipment for her personal use, and delegated Senate aides to service that equipment on a regular basis; and (d) Fumo delegated other Senate staff to assist Egrie in personal tasks and in a business dispute. To prove these matters, clearly, it is essential to set forth the context and the status at various times of Fumo and Egrie-Wilcox's relationship.

Likewise, the end of the marriage of Fumo and his wife, Jane, is relevant because Fumo directed Senate staff members to take steps related to that occurrence, all on Senate time and in exchange for Senate compensation. For example, in Exhibit 283, an e-mail dated October 25, 2000, Fumo directed two Senate employees: "I want a locksmith to come to Green Street [the marital home being vacated by Jane Fumo] and change all of the locks, the day that Jane moves out. I would like to have a Master key that works both Green St. and the shore, with separate keys for both locations. I also want all of Jane's codes and any one else she has in the alarm system removed that day as well." One of the employees, Christian Marrone, responded two days later to advise the Senator of the steps he took to assure this project would be carried out, and Fumo replied, "OK Great!" See also Exh. 329 (on December 18, 2000, Fumo directed Marrone to change the lock on the Green Street mailbox, as Jane may have the only key and may be removing the mail).

The Court will thus see that, while the government has been careful to include only exhibits which are relevant to the charges, some of those exhibits necessarily reference areas of Fumo's personal life for which he misused Senate resources.

Fumo's second general contention in his memorandum is as follows:

> Another area in which irrelevance and prejudice run rampant is the universe of proposed government email exhibits containing offensive language. Despite defense requests, the government has refused to redact this language from the email exhibits and, therefore, has illuminated the undeniable fact that its decision to prejudice the jury is by design. At the time that these emails were sent, they were intended to be viewed by people who were close to the Senator and who knew him well. Offensive language in that context carries with it a much different flavor than a cold, clinical presentation of offensive language to people who are strangers to him but nevertheless directing his fate. Other than to evoke negative feelings in the jurors toward the Senator for using such language, there can be no other purpose for the attempted admission of unredacted versions.

Br. 2-3.

Fumo is correct that a number of his e-mails are laced with profanity. It is not necessary or appropriate to redact these words.

Fumo used profanity for emphasis. A reasonable jury will be able to conclude that Fumo used such language when he was most passionate about an issue, and thus revealing his true intent. This is most relevant in numerous e-mails when Fumo makes insistent demands of his staff to carry out improper tasks.

Moreover, in many instances the use of profane or derogatory language is so pervasive that redacting the exhibits at issue would leave them riddled with blank

5

spaces, and indeed meaningless, leaving a befuddled jury likely to suspect the conduct of the government as the presenter of the evidence and the bearer of the burden of proof.

Most importantly, this language does not cause prejudice, that is, a likelihood of a verdict based on inappropriate reasoning. The language often used by Fumo is pervasive in modern culture, particularly in popular film and television media. The notion that a modern jury would convict him because of the use of such language is spurious.

The defense also raised this issue before Judge Yohn. In response, the government advised the Court that the same issue arose before Judge Baylson, in the 2005 trial of <u>United States v. Corey Kemp, et al.</u> (known as the City Hall corruption trial). In that case as well, the defendants, whose conversations were recorded, peppered their speech with profanities, in a manner which resisted redaction. Judge Baylson elected to address the issue in jury selection, inquiring of the venire whether any would be offended by profane language. Any potential juror who answered affirmatively was excused. The Court then rejected the defense request for wholesale redaction of the government's evidence.

Judge Yohn elected to follow the same sensible course. In the prospective jury questionnaire he employed, the jurors were asked:

> 48. Some of the evidence you will hear and see in this case, including that reflected in the form of e-mail communications, may reflect the use of language that could be considered vulgar or profane. The use of such language, of course, is not itself illegal, and cannot be the basis of

> conviction on any charge simply because the language used is vulgar or profane. Will you be able to put aside whatever personal views you might have regarding the use of profane or vulgar language and evaluate the evidence fairly and impartially?

Juror Questionnaire, at p. 11. Very few of the panelists answered this question in the affirmative, and none of those remain in the jury pool from which the parties will make their strikes next week. Thus, as in Kemp, any possibility of prejudice has been eliminated.

The analysis of the Fifth Circuit on the same issue was consistent. In United States v. Bright, 630 F.2d 804 (5th Cir. 1980), a RICO prosecution, the key evidence consisted of secretly recorded conversations between FBI agents and the defendants. The agents and the defendants used racial slurs and profane expletives in those conversations. The Court of Appeals held that redaction of the conversations was unnecessary, explaining:

> We agree that evidence of the racial feelings of the defendants is not probative on the issue of guilt. We disagree, however, over the impact of the racial slurs and other "offensive language" on the tapes. Any prejudicial effect from the language on the tapes was minimized by questions on voir dire which asked prospective jurors whether they could absolutely disregard race as a factor in the trial and whether they would be prejudiced against an individual who used "offensive language." Those prospective jurors who indicated offensive language would influence their judgment or who could not disregard race were excused for cause.
>
> Furthermore, the court finds it difficult to believe that even the defendants thought they would be overly prejudiced by the language as no defendant raised any objection to that aspect of the tapes until jury selection began although they had transcripts of the tapes months before trial. Had a motion been made earlier, it is possible the government could have selectively deleted language not necessary to the gist of the conversations. This is not to say, however, that the defendants were

7

> entitled to such selective deletion. We are not unaware of the problems caused by such deletions and thus would be extremely reluctant to order them. Furthermore, as to the "offensive language" (not the racial slurs), we are not convinced that given the mores of today's society the presence of such language would prejudice the jury against the defendant.

Id. at 814. In a footnote, the Court added: "The primary problem with selectively deleting portions of a tape of a running conversation is that it breaks the flow of the conversation thus decreasing the usefulness of the evidence. Also, selective deletion permits the jury to speculate erroneously as to what was said in the deleted portion." Id. at 814 n.16. The same reasoning applies to e-mail correspondence.

Other courts are in agreement that the mere presence of foul language does not warrant revision of pertinent evidence. See, e.g., United States v. Currier, 836 F.2d 11, 18 (1st Cir. 1987); United States v. DiMuro, 540 F.2d 503, 513 n.17 (1st Cir. 1977) ("To say in the light of present day mores that appellants were unduly prejudiced by a failure to clean up their language is frivolous, not to mention the burden the government might have run to avoid the inference that it was omitting something material."); United States v. Whitaker, 372 F. Supp. 154, 164 (M.D. Pa.), aff'd mem., 503 F.2d 1399 (3d Cir. 1974).

For these reasons, there is no basis for deleting the defendant's own language from the government's e-mail exhibits.

Third, Fumo's memorandum states:

> Next come the multitude of emails of a repetitive nature. When evaluated by topic, it becomes apparent that the government intends to wear down the jury, the

8

Court, and the defense through the sheer repetition of the same issues addressed in multiple emails.

Br. 3.

As the Court will learn at trial, this very general accusation is untrue. It is correct, as Fumo states, that the government has marked over 1,000 e-mails as exhibits. But these exhibits collectively comprise the government's evidence regarding the scores of separate schemes alleged in the voluminous indictments. In many instances, the government aims to present only a handful of e-mails related to a particular fraudulent effort. (Often, that is of necessity, given the fact that, as alleged in the obstruction of justice charges in the indictment, Fumo led a deliberate effort to destroy vast quantities of pertinent computer records, leaving the government only with select items it was able to retrieve from sources not controlled by Fumo.).

In addition, Fumo is charged with misusing state employees to perform myriad personal and political tasks for his private benefit, some of which, when viewed purely in isolation, may have taken little time to complete but, when considered in their proper context, demonstrate a gross abuse of power and blatant misuse of state resources. As charged in the superseding indictment, Fumo tasked a number of his employees with repeatedly performing many personal tasks on a regular basis, day in and day out, for years on end. For example, Christian Marrone, a former Fumo staff member in the Philadelphia office, will testify that he spent approximately 80% of his time during the first 18 months of his employment as the project manager who oversaw the renovation

9

and rehabilitation of Fumo's gigantic mansion on Green Street in Philadelphia. Of the 1,000+ e-mails on the government's trial exhibit list, more than 100 of them reflect work that, at Fumo's direction, Marrone performed for Fumo's private benefit during the course of the work day. These e-mails not only reflect the extraordinary variety of improper personal projects that Fumo assigned to Marrone,[3] but also the sheer volume of the communications also demonstrates that this was an all-consuming effort to which Marrone devoted nearly his full-time effort over the course of an 18-month period, during which time his only compensation was his Senate paycheck.

As with the Marrone e-mail communications, the government will also present hundreds of additional e-mail communications at trial that reflect many other personal tasks performed at Fumo's direction for his private benefit by state employees during the course of the workday, and at other such times as Fumo directed. These e-mail communications reflect both the breadth and variety of personal tasks assigned to Fumo's employees, but also the enormous volume and repetition of such tasks, all of which are necessary for the jury to understand that what happened here was no mistake, and was part of a pattern of fraud perpetrated by Fumo. For example, Trial Exhibit 511, attached to this memorandum, is a summary that reflects the many different projects that Fumo

---

[3] Government Trial Exhibit 261, attached to this memorandum, is a Rule 1006 summary of the e-mails which reflect the many different aspects of the Green Street project manager role that Fumo assigned to Marrone during his tenure as a Fumo employee.

staff members improperly worked on regarding the development of Fumo's farm in Halifax, Pennsylvania including, among many others, alpacas, construction of barns, planting of crops, maintenance of farm animals, fencing, and acquisition of fuel tanks. Trial Exhibit 671, also attached to this memorandum, is a summary that reflects communications concerning the many improper personal tasks that Fumo's computer technicians performed at his direction including, among many others, assistance to Fumo's girlfriends, butler, daughter, son, personal friends, and to election campaigns.

The purpose of defendant Fumo's motion is to ask the Court to limit the amount of evidence of wrongdoing that is shown to the jury in the hope that Fumo can argue that the amount of time that his staff spent on these outrageous personal tasks is de minimis and therefore not unlawful, or that the amount of time his staff devoted to pursuing Fumo's private benefit over the public good is minimal in comparison with the other work that was undertaken during that time period. This tactic should not be permitted, as Fumo's daily misuse of Senate resources over many years, as reflected in the surviving e-mail communications the government intends to introduce as evidence at trial, is central to the charges described in Counts 1-64 of the superseding indictment, and is directly probative of Fumo's intent to defraud.

The government is very mindful of the need not to burden the jury, and to present its case in the most efficient and timely manner possible. But the government also faces a substantial burden in proving Fumo's knowledge of the many illegal acts

described in the indictment, a task often not properly carried out through the admission of only one or two e-mails on a subject. With all of these considerations in mind, the government carefully selected each of its trial exhibits, and we believe that the propriety of its effort will be clear as the trial progresses.[4]

                              Respectfully submitted,

                              LAURIE MAGID
                              Acting United States Attorney


                              */s John J. Pease*
                              JOHN J. PEASE
                              Assistant United States Attorney


                              */s Robert A. Zauzmer*
                              ROBERT A. ZAUZMER
                              Assistant United States Attorney

---

[4] As for Fumo, he cannot claim prejudice simply from the fact that the government has numerous examples of his illegal conduct. His only complaint in this portion of his memorandum is that the government has too much evidence of guilt. Essentially, he requests an undue windfall, hoping that the Court will exclude clear evidence of his culpability for the sole purpose of expediting the trial. That request is disingenous, and also not productive. Almost all of the e-mails in the case are brief and will be introduced in very little time.

## Summary of Green Street Projects Handled by Christian Marrone

| Project Type | Trial Exh. No. |
|---|---|
| Barking dog | 264, 308, 374, 375, 376 |
| Carpentry work | 305, 307, 315, 325, 333, 345, 347 |
| Electrical work | 270, 316, 318, 319, 320, 322, 323, 325, 334, 352, 647 |
| Elevator | 266, 272, 294, 317, 348, 351, 361, 366 |
| Fireplace | 368, 373, 377 |
| Flooring | 287, 298 |
| General work | 267, 288, 289, 321, 350, 359 |
| Heating, ventilation and air conditioning (HVAC) | 266, 272, 292, 294, 295, 302, 306, 322, 327, 332, 333, 338, 344, 345, 345, 346, 351, 354 |
| Landscaping/fountains | 284, 294, 298, 367, 369, 1271 |
| Lighting | 265, 271, 290, 297, 298, 309, 311, 316, 319, 335, 649, 650 |
| Locks | 266, 283, 286, 297, 335, 342, 345, 378, 395 |
| Mailbox | 326, 329, 340, 353 |
| Painting | 280, 282, 285, 286, 290, 292, 296, 298, 323, 333, 357 |
| Plumbing | 281, 282, 286, 293, 295, 302, 306, 323, 327, 337, 340, 346, 358, 397 |
| Roof deck | 310 |
| Security/alarms/locks/phones | 269, 283, 290, 299, 302, 303, 304, 311, 318, 326, 330, 331, 353, 363, 648 |
| Sidewalk/driveway | 282, 322, 337, 338, 345, 360, 364 |
| TV/Stereo | 279, 290, 312, 313, 314, 334, 365, 370, 372 |



| Walls | 270 |
|---|---|
| Water leaks | 274, 276, 278, 280, 282, 286, 292, 294, 298, 300, 308, 324, 328, 337, 340, 343, 345, 366 |
| Windows and doors | 269, 273, 318, 332, 336, 339, 349 |
| Wine rack/wine cellar | 355, 378 |

## Summary of E-Mails With Senate Employees and Contractor Related to Farm

| Type of Project | Trial Exh. No. |
|---|---|
| Accounting | 479 |
| Alpacas | 421, 433 |
| Bank account and bill paying | 442, 495, 499, 505 |
| Barns | 439, 440, 444, 445, 448, 453, 463, 464, 465, 466, 471, 486, 488, 489, 493, 494 |
| Bulldozer | 1138 |
| Cable TV and Internet | 509, 510, 765 |
| Crops | 427, 434, 437, 440, 446, 481, 484, 485 |
| Development and engineering plans | 420, 421, 422, 423, 428, 432, 433, 434, 437, 482, 1128 |
| Electricity | 443, 447, 465, 469, 470, 482, 486 |
| Eviction of tenants | 425, 429, 430 |
| Farm animals | 420, 467, 472, 473, 499 |
| Farm equipment | 439, 440, 441, 458, 476, 485, 486, 488, 489, 490, 500, 1128 |
| Farm insurance | 438 |
| Fencing | 463, 466, 489, 493 |
| Fuel tanks | 441, 452, 455, 456 |
| Goats | 487, 489, 490, 491, 492, 498, 500, 501, 506 |
| House for Sholders | 431, 434, 449, 459 |
| Government oversight and subsidies | 424, 426, 428, 468, 502 |
| Lumber account | 503 |



| | |
|---|---|
| Mounted deer head | 457 |
| Neighboring land | 428, 433, 434, 450, 461, 490, 500 |
| Office equipment | 504, 508, 510 |
| Other buildings | 496, 497, 498, 500, 506, 507 |
| P.O. box | 442 |
| Rental of stalls | 507 |
| Road | 451 |
| Sholders' performance | 475, 477, 478, 482 |
| Supplies for animals | 466, 467 |
| Surface for horses | 480, 494 |
| Tools | 507 |
| Truck | 499 |

# Summary of E-Mails Regarding
# Fumo's Tasks Assigned to Computer Aides

| Type of Project | Trial Exh. No. |
|---|---|
| Accessories for boats | 41, 680, 725, 726, 732, 734, 745 |
| Accessories for Citizens Alliance vehicles | 1067, 1068, 1078, 1079 |
| Accessories for personal vehicles | 645, 677, 714, 718, 719, 724 |
| Assistance at shore | 735, 736 |
| Assistance in Florida | 41, 644, 645, 646, 719, 720, 721, 762 |
| Butler's computer | 814, 815, 816, 834 |
| Campaign fundraising | 34, 710 |
| Campaign video | 695, 696 |
| Campaign web site | 43, 54, 55, 55a, 60 |
| Casey campaign | 1, 13-19, 22, 24, 25, 27-29, 33, 38, 39, 791, 796 |
| Citizens Alliance support | 676, 711, 722, 730, 755, 831 |
| Computers for Arnao (after Senate employment) and her children | 808, 818, 820, 824, 835 |
| Computers for contractors and other non-Senate employees | 788, 789, 790, 793, 819, 825, 826, 838 |
| Daughter's computer and accessories | 670, 674, 688, 689, 729, 758, 759, 797-802 |
| Daughter's Palm device | 701 |
| Daughter's TV | 753 |
| Driving to Martha's Vineyard | 41, 398, 707, 708 |
| Election assistance | 30, 44, 46, 221 |
| E-mail for Councilman James Kenney | 684, 829 |



| Girlfriends' computers | 673, 682, 683, 693, 700, 728, 743, 746, 752, 756, 758, 760, 781, 782, 783, 784, 786, 812, 813, 828, 832, 833, 837, 840, 1467 |
|---|---|
| Girlfriend's Palm device | 720 |
| Girlfriends' phones | 705, 830 |
| GPS in girlfriend's vehicle | 691 |
| Home movies | 694, 695 |
| Kerry campaign | 749 |
| Law office | 687 |
| Michael Palermo (after Senate contract) | 740 |
| Mitchell Rubin (after Senate contract) | 731, 757 |
| Personal bank accounts | 62, 67, 70 |
| Personal computer programs | 679, 681 |
| Phones in various homes | 692, 703, 750, 751, 766 |
| Public address system for campaigning | 50 |
| Security camera at shore | 712, 716, 717, 718 |
| Son's e-mail | 836 |
| Television (including satellite and cable service) in various homes | 509, 510, 569, 589, 686, 690, 713, 738, 764, 765, 1068 |
| Township solicitor re farm | 468 |
| Travel assistance | 684, 761 |
| Video game system at Green St. | 690 |
| XM radio at various locations | 734 |

2

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be delivered by electronic filing to the Clerk of Court (resulting in an e-mail copy sent to counsel by the Clerk of Court), and by direct e-mail, a true and correct copy of the foregoing pleading, to the following:

>Dennis J. Cogan, Esq.
>2000 Market Street, Suite 2925
>Philadelphia, PA  19103
>
>Stephen R. LaCheen, Esq.
>LaCheen Dixon Wittels & Greenberg, LLP
>1429 Walnut Street, 13th Floor
>Philadelphia, PA 19102
>
>Peter Goldberger, Esq.
>50 Rittenhouse Place
>Ardmore, PA 19003
>
>   Counsel for Defendant Vincent J. Fumo
>
>Edwin J. Jacobs, Jr., Esq.
>Jacobs and Barbone, P.A.
>1125 Pacific Avenue
>Atlantic City, NJ  08401
>
>   Counsel for Defendant Ruth Arnao

>*/s John J. Pease*
>JOHN J. PEASE
>Assistant United States Attorney

Dated: October 15, 2008.