**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


UNITED STATES OF AMERICA      :
                                    :      CRIMINAL ACTION
           v.                    :
                                    :
VINCENT J. FUMO,            :
                                    :      NO. 06-319
                   Defendant.     :


**MEMORANDUM**

BUCKWALTER, S.J.                                              June 17, 2009

      Currently pending before the Court is the Motion of Defendant Vincent J. Fumo, and the

Joinder of Defendant Ruth Arnao, for Judgments of Acquittal or a New Trial.  For the reasons set

forth below, the Motion is denied in its entirety as to both Defendants.

**I.        PROCEDURAL BACKGROUND**

      On February 6, 2007, the Government filed a superseding indictment ("the Indictment"),

which contained 141 counts charging Defendants Vincent J. Fumo, Ruth Arnao, Leonard

Luchko, and Mark Eister in connection with five areas of wrongdoing:  (1) fraud and conspiracy

to defraud the Pennsylvania Senate; (2) fraud and conspiracy to defraud Citizens Alliance for

Better Neighborhoods ("Citizens Alliance"); (3) conspiracy to defraud the United States Internal

Revenue Service ("IRS"); (4) fraud related to the Independence Seaport Museum ("ISM"); and

(4) obstruction of justice and conspiracy to obstruct justice.  Defendants Luchko and Eister pled

guilty, leaving only Defendants Fumo and Arnao to stand trial.  The trial commenced on October

22, 2008, and lasted approximately five months.  On March 16, 2009, a jury found Fumo guilty

of 137 of the original 139 counts against him, and Defendant Arnao guilty of all forty-five counts against her.

The present Motion by Defendant Fumo, and joined by Defendant Arnao, comes before the Court on the heels of those convictions and seeks both: (1) a judgment of acquittal, on the basis of sufficiency of the evidence, as to Counts 1 to 108; and (2) a new trial on eight grounds challenging closing arguments, jury instructions, evidentiary rulings, and other Court decisions. Defendants' legal argument setting forth the basis for these claims encompasses a mere fourteen pages. Notwithstanding the cursory nature of the arguments, with their virtually non-existent citations to the record or legal authority, the Court has carefully considered each claim, together with the Government's Response, under the pertinent jurisprudence as well as the standard of review, set forth below.

## II.  STANDARDS OF REVIEW

### A.  <u>Motion for Judgment of Acquittal</u>

Federal Rule of Criminal Procedure 29(a) provides, in pertinent part: "[t]he court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." FED. R. CRIM. P. 29(a). A motion for judgment of acquittal under Rule 29 may only be granted where the evidence is insufficient to sustain the conviction. <u>United States v. Gonzales</u>, 918 F.2d 1129, 1132 (3d Cir. 1990). The court must therefore inquire whether the Government has adduced "substantial evidence to support the jury's guilty verdict." <u>United States v. Wexler</u>, 838 F.2d 88, 90 (3d Cir. 1988).

The burden on the moving defendant, however, is substantial.  To deny such a motion, the district court need only determine that any rational trier of fact could have found proof of guilt beyond a reasonable doubt based upon the available evidence presented.  United States v. Smith, 294 F.3d 473, 476-77 (3d Cir. 2002).  In deciding whether a jury verdict rests on legally sufficient evidence, the court is not permitted to weigh the evidence or determine the credibility of witnesses.  "[A]ll issues of credibility within the province of the jury must be viewed in the light most favorable to the government."  Gonzales, 918 F.2d at 1132.  "Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury."  United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).  Further, to sustain the jury's verdict, "the evidence does not need to be inconsistent with every conclusion save that of guilt." Gonzales, 918 F.2d at 1132.  A finding of insufficient evidence to convict should be confined to cases where the prosecution's failure is clear.  Id.  Viewing the evidence in its entirety and in the light most favorable to the government, a judgment of acquittal is warranted only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.  United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987).

### B.  Motion for New Trial

Federal Rule of Criminal Procedure 33(a) provides, in pertinent part:  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a). "Whether to grant a Rule 33 motion lies within the

district court's sound discretion." United States v. Pellitory, Crim. A. No. 97-383, 1998 WL 634921, at *4 (E.D. Pa. Sept. 16, 1998) (citing United States v. Maestro, 570 F. Supp. 1388, 1390 (E.D. Pa. 1983)).

As a general rule, the court may grant a Rule 33 motion on one of two bases. First, the court may grant the motion if, after weighing the evidence, it determines that there has been a miscarriage of justice" – that is, an innocent person has been convicted. United States v. Brennan, 326 F.3d 176, 188 (3d Cir. 2003) (quotations omitted); see also United States v. Telingo, Crim. A. No. 99-525, 2001 WL 474407, at *1 (E.D. Pa. April 30, 2001). Unlike a motion for judgment of acquittal, a motion for new trial based upon the weight of the evidence allows the court to weigh the evidence and consider the credibility of witnesses. See United States v. Smith, 619 F. Supp. 1441, 1443 (M.D. Pa. 1985). "Motions for a new trial based on the weight of the evidence [however] are not favored. Such motions are to be granted sparingly and only in exceptional cases." Brennan, 326 F.3d at 188 (quoting Gov't of V.I. v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)).

Second, the court must grant a new trial if errors occurred during trial and it is reasonably possible that such errors or a combination of errors had a substantial influence on the verdict. United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993). The defendant bears the burden of proving that a new trial ought to be granted. United States v. Sass, 59 F.3d 341, 350 (2d Cir.1995); 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Criminal 2d § 551 (1982). "The decision whether to grant a motion for a new trial under Rule 33 is committed to the sound discretion of the trial court." United States v. Daniels, Crim. A. No. 95-369, 1996 WL 311444, at *4 (E.D. Pa. June 6, 1996).

**III.     MOTION FOR JUDGMENT OF ACQUITTAL**

**A.     <u>Scheme to Defraud the Pennsylvania Senate (Defendant Fumo)</u>**

Defendant Fumo's first challenge to his conviction asserts that the evidence presented at trial was insufficient for any reasonable jury to convict him on the alleged scheme to defraud the Pennsylvania Senate.  Specifically, Counts one to sixty-four of the Indictment charge mail and wire fraud on the Pennsylvania Senate.  The mail fraud statute, 18 U.S.C. § 1341, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier . . . or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years or both.

18 U.S.C. § 1343.  Similarly, the wire fraud statue, 18 U.S.C. § 1343, states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned nor more than 20 years, or both.

18 U.S.C. § 1343.

A conviction under either of these statutes requires proof beyond a reasonable doubt of three elements:  (1) a scheme to defraud; (2) the use of the mails or wires for the purpose of

executing the scheme; and (3) participation by the defendant in the scheme with the intent to defraud. United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002). The Third Circuit has broadly defined a scheme to defraud as involving any effort at deceit which aims, in part, to deprive another of money or property.[1] United States v. Hedaithy, 392 F.3d 580, 590-91 (3d Cir. 2004). In evaluating whether there is a "scheme" to defraud, the Third Circuit has not required a scheme to be "fraudulent on its face"; rather, it "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 528 (3d Cir. 1998) (quoting Kehl Packages, Inc. v. Fidelcor, 926 F.2d 1406, 1415 (3d Cir. 1991)). Moreover, the defendant must have the specific intent to defraud, which "may be found from a material misstatement of fact made with reckless disregard for the truth." United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995) (quoting United States v. Hannigan, 27 F.3d 890, 892 n.1 (3d Cir. 1994)).

As to Counts 1-64, Fumo makes four arguments in support of his Motion for Judgment of Acquittal. First, he asserts the evidence did not show beyond a reasonable doubt that Senator Fumo devised, or intended to devise, any "scheme or artifice to defraud" the Senate of any of its "money or property" by means of "false or fraudulent pretenses" or by concealment of material facts. More precisely, Fumo contends that the Government failed to prove that any fact that was "misrepresented" or concealed was "material," either as properly defined or as defined in the

---

[1] The definition has since been expanded to include schemes to deprive a victim of the benefit of "honest services." United States v. Gordon, 183 Fed. Appx. 202, 207 (3d Cir. 2006). Honest services fraud, however, is not at issue in the Indictment before the Court.

Court's instructions.  Second, he claims that as to the charges of mail fraud (Counts 7-17, 19-20, 22-26, 28, and 30-33), the FedEx packages at issue were not shown to have been sent interstate, as required by 18 U.S.C. § 1341.  Third, as to the charges of wire fraud (Counts 34, 37, 38, 41, 47, 55-58, and 61-63), he asserts that the e-mails were not shown to have been sent interstate, as required by 18 U.S.C. § 1343.  Finally, with respect to the Government's voluntarily dismissed Counts 36 and 38, Defendant Fumo seeks a judgment of acquittal rather than mere dismissal.  The Court addresses each contention individually.

### 1. Whether the Government Proved that Any Fact that Was "Misrepresented" or "Concealed" Was Material

In support of his first basis for judgment of acquittal, Defendant Fumo makes a sole argument:  "[t]he testimony of Pennsylvania Senate Clerk Faber, taken with all the other pertinent evidence, showed that the Senate would not have done anything different with respect to Senator Fumo's committee budget, his payroll, his assignment of duties to employees, or his contracting authority had each and every fact made known through the evidence at trial been openly disclosed at the time."  (Defs.' Mem. Supp. Mot. for Judg. of Acquittal and for New Trial ("Defs.' Mem.") 2.)  He goes on to conclude that "no cognizable 'fraud' existed because no concealment or 'misrepresentation' was legally material."  (Id. at 3.)

This argument disregards the wealth of evidence presented by the Government setting forth Fumo's scheme to defraud the Senate, which consisted of at least four components:  (1) payment of Senate employees for doing personal or political work for Defendant Fumo during time compensated by the Senate; (2) Fumo's false classification of Senate employees' duties to assure that his loyal Senate employees obtained better-paying positions than their Senate duties

justified; (3) Fumo's use of independent contractors, compensated by the Senate, for personal or political services; and (4) Fumo's use of Senate resources, such as computer equipment, for personal and political campaign benefit. As to each of these components, the Government offered more than sufficient evidence on which a jury could find Defendant Fumo guilty beyond a reasonable doubt.

First, as to Fumo's use of his Senate-paid staff for personal and political work,[2] the Government presented multiple witnesses. Senate employee, Jamie Spagna, revealed that during the time period between 2001-2003, she spent the majority of her time organizing Fumo fundraisers, handling political mailings, paying Fumo's personal bills, and handling the campaign account of a city councilman who was Fumo's ally – all during regular Senate business hours. Aide Lisa Costello, paid $31,000 a year by the Senate, cleaned Fumo's Philadelphia mansion on a weekly basis. Assistant Christian Marrone, while performing some ministerial Senate tasks during his first eighteen months on task, spent the majority of his Senate-compensated time as the "project manager" for the renovation of Fumo's Philadelphia mansion. The three drivers on Fumo's Senate payroll testified to running personal errands for Fumo and driving the cars to Martha's Vineyard for Fumo's annual vacation, while Fumo traveled by private plane. Senate employees working in Fumo's Harrisburg office, Gerald Sabol, Charles Sholders, and Sue

---

[2] The Motion for Judgment of Acquittal and for New Trial provides little to no direct citation to the trial transcript. In response, the Government has cited only to the portions of the record that are relevant to the facts disputed by Defendants in the Motion. Given the excessive length of the trial and the accompanying transcripts, the Court, having witnessed the trial in its entirety and having reviewed much of the testimony via audio file, provides limited direct citation to the transcript where the particular facts being referenced are not in dispute. Where, however, the facts at issue are in dispute or are particularly crucial to analyzing Defendants' arguments, the Court specifically cites the pertinent testimony.

Skotnicki, spent extensive time, during Senate-compensated hours, performing various tasks at Fumo's Harrisburg farm.

Second, as to Fumo's false classification of loyal employees to assure that they obtained better compensation from the Senate, the Government presented substantial evidence that Fumo, with the assistance of his chief aide, Paul Dlugolecki, submitted multiple false job descriptions to the Clerk of the Senate to justify the employees' salaries, even though those jobs were not actually performed by them. For example, Roseann Pauciello was classified as "chief of staff," despite the fact that Fumo already had a chief of staff. Working in that purported position in 2005, she earned a salary of over $106,000. (Govt. Ex. 144.) Several witnesses indicated that while Ms. Pauciello would assist certain influential constituents who came to the senator's district office, her primary duties involved handling many of Fumo's personal affairs. Similarly, Jamie Spagna's job description indicated that, for the requested $30,000 per year, she would "[a]ssist with constituent services. Review and prepare correspondence. Attend meetings with Senator. Research legislation." (Govt. Ex. 104, 5.) As noted above, however, Ms. Spagna testified that the majority of her time was spent on non-Senate-related tasks. Similar evidence was presented for numerous other employees, such as Lisa Costello, Christian Marrone, Gina Novelli, and Gerald Sabol.

Third, the Government offered sufficient evidence for a jury to conclude, beyond a reasonable doubt, that Fumo used Senate, and thus taxpayer, funds to hire "independent contractors" for improper purposes. Although these contractors were purportedly hired for Senate-related tasks, in actuality, they mainly performed only personal or political work for Fumo. In an example identified by the Government, Frank Wallace was hired as an investigator

for the Senate Democratic Appropriations Committee, chaired by Fumo, for issues relevant to pending legislation. While Wallace performed some of these duties, he was also paid with Senate money to act as Fumo's private investigator, trailing his former wife and girlfriends, and researching damaging information on Fumo's political rivals. Likewise, Fumo also gave state contracts to Howard Cain at over $80,000 per year, and Philip Press, at over $42,000, both of whom spent the majority of their time assisting with Fumo's political races. Finally, Fumo gave state contracts to both Michael Palermo, at $45,000 per year, and Mitchell Rubin, at $30,000 per year, for virtually no work other than political tasks or providing some assistance at the Harrisburg farm.

Finally, the evidence was more than satisfactory for a jury to find that Fumo used many other Senate resources for his own benefit. He gave laptop computers to non-Senate employees, including family and personal aides. Further, Fumo directed that Senate computer personnel assist these non-Senate employees in the use of the computers.

The Motion for Judgment of Acquittal does not attempt to undermine the evidence establishing the above-described actions by Fumo – using Senate employees, contractors, and resources for his personal and political benefit, while representing to the Senate that they were actually performing purely Senate-related tasks. Nor does Fumo currently claim, as he did at trial, that these expenditures were justified because they allowed him to spend more time being an effective Senator – an argument properly rejected by the jury upon becoming privy to evidence that Fumo spent more than four months a year on vacation during which time he continued to seek services from his Senate employees. Finally, Fumo does not argue, as he did at trial, that the employees each devoted a full 37.5 hour workweek to Senate duties, and whatever

personal or campaign work that was performed was done as "after-hours favors" by the employees or independent contractors.  At this juncture of the case, Fumo appears to have abandoned these defenses.

Instead, Defendant Fumo now contends that none of these actions, with their accompanying false representations in contracts and employment forms submitted to the Senate, constitute "material" misrepresentations as defined in the law.  To support this claim, he argues that the testimony of Chief Clerk of the Pennsylvania Senate, W. Russell Faber, taken with "other pertinent evidence," showed that the Senate would not have done anything different as to Fumo's expenditures even if all facts at trial had been known.  (Defs.' Mem. 2.)

The Court must disagree.  In general, a false statement is "material" if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  Neder v. United States, 527 U.S. 1, 16 (1999) (quotations omitted). The Third Circuit has interpreted this definition broadly, acknowledging that although "a false statement that actually affects or is capable of affecting a *specific* decision by an agency makes for an easier materiality determination, . . . both the language of the materiality standard and the decisions applying that standard require only that the false statement at issue be of a type capable of influencing a *reasonable* decisionmaker."  United States v. McBane, 433 F.3d 344, 351 (3d Cir. 2005).  Whether or not the decisionmaker was actually influenced by the statement is immaterial.  Id.  Rather, the Court identified the relevant inquiry as "whether the falsehood was of a type that one would normally predict would influence the given decisionmaking body."  Id.

A reasonable jury was clearly capable of finding that the misrepresentations by Fumo were capable of influencing a reasonable decisionmaker – in this case, the Pennsylvania Senate. Contrary to Defendant Fumo's unsupported argument, Chief Clerk Faber testified that although a senator has discretion in delegating and directing staff to do things, there is an unofficial or unwritten rule that these assignments must serve a legislative purpose or involve conducting legislative activities. (N.T. Faber 76-77, Oct. 22, 2008.) A senator does not have unlimited discretion to use funds and delegate employees. Further, in order for a Senate employee to be paid, (1) the appropriate purpose for hiring the employee must exist under the pay management plan, (2) the employee must be classified on a job classification report, and (3) the employee must specifically perform those tasks. (Id. at 25-26.) The Senate would not pay for an employee to perform personal tasks on behalf of a senator because they are not legislative duties; and, if Faber saw a job classification report indicating that someone was going to be hired for doing personal duties, he would not approve it. (Id. at 27-28.) Similarly, an independent contractor may be legitimately hired by the Senate only to perform legislative duties relating to the hiring member's position as a member or a chairman of a committee. (Id.) Finally, Faber would question personal tasks done during private time, but on Senate property. (Id. at 31-32.) He explained that under the Pennsylvania Ethics Act, a public official cannot use his position for private pecuniary gain, and a senator's hiring of an employee to do personal tasks on a regular basis violates that provision. (Id. at 29-31.)

Following this testimony, the prosecutor then listed a series of tasks and asked Faber whether the Senate would approve payment for either an employee or independent contractor regularly performing these tasks on Senate time or paid for with Senate funds. These tasks

included: cleaning a senator's house; doing weekly grocery shopping; ordering personal goods for a senator and waiting at a senator's house during the workday for the items; arranging for the senator's home repairs; regularly picking up the senator's dry cleaning; driving the senator's children to and from school; using a Senate-paid private investigator to investigate family members or political rivals; taking care of personal automobiles including maintenance, repairs and purchasing; handling a senator's personal finances and banking; managing a rental business and dealing with tenants; managing a farm; handling private legal matters; operating a charitable organization; and driving vehicles and luggage to another state to facilitate a senator's vacation. (Id. at 32-43.) As to each task, Faber unequivocally answered that the Senate would not pay for the performance of such duties on any type of regular basis.[3] (Id.) Moreover, Faber was emphatic that the Senate would not pay for laptops or computer equipment to be given to a senator's family and friends, or for Senate employees to provide technical assistance for such equipment on Senate time. (Id. at 40.) When asked about claims that a senator's use of employees for personal tasks enables him/her to be a more effective senator, Faber commented that such use of Senate funds would be impermissible because it would allow the senator to realize an inappropriate financial relief of charges that he might otherwise have to incur. (Id. at 38.) Ultimately, Faber concluded that, contrary to Defendant Fumo's theory, a senator does not have unlimited discretion to use funds and delegate employees to do things to help out a senator in a personal nature. (Id. at 43.)

---

[3] Faber explained that if a senator's employee were to pick up the senator's dry cleaning or help out with a senator's personal affairs on a very infrequent basis, no more than one time per month, it would not be a problem. If, however, those tasks were performed with any regularity, it would raise a concern. (Id. at 36.)

Viewing such testimony in the light most favorable to the Government, the Court finds that a reasonable jury could conclude that Fumo's representations to the Senate, including his misstatements on job classification reports and contracts for independent contractors, were misleading and material. Faber testified that the Senate would not have approved employee hirings or independent contracts for such individuals. Fumo, through his staff, nonetheless submitted job classification reports and sought payment for independent contractors, indicating that the employees and/or contractors were going to be performing legislative functions, when, in reality, they were going to be regularly performing personal and political tasks for Fumo. Fumo does not, at this juncture, contest that such statements were false. A jury could conclude, beyond a reasonable doubt, that such misrepresentations were material, as they resulted in the Senate's approval and payment of these employees and independent contractors. A jury could further infer that the simple fact that Fumo chose to make these misrepresentations reflected an awareness of the falsehoods on his part and an intent to advance his scheme to defraud the Senate. As such, the Court denies the Motion on this ground.

### 2. Whether the Mail Fraud Statute Requires Proof that the Mailings Were Sent Interstate

Defendant Fumo's second challenge to the conviction for his scheme to defraud the Pennsylvania Senate asserts that, as to the mail fraud charges in Counts 7-17, 19-20, 22-26, 28, and 30-33, the FedEx shipments at issue were sent from one address in Pennsylvania to another. As noted above, section 1341 of Title 18 of the United States Code states, in pertinent part,

> Whoever, having devised or intending to devise any scheme or artifice to defraud . . . deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives

14

> therefrom, any such matter or thing, or knowingly causes to be delivered by mail
> or such carrier according to the direction thereon, or at the place at which it is
> directed to be delivered by the person to whom it is addressed, any such matter or
> thing, shall be fined under this title or imprisoned not more than 20 years, or both.

Id.  Citing to United States v. Lopez, 514 U.S. 549, 562 (1995), Defendant Fumo contends that to avoid constitutional questions under the Commerce Clause, this provision must be construed "as reaching only interstate shipments, and not to cover all shipments sent by the use of a 'private or commercial' company which happens to operate in interstate commerce."  (Defs.' Mem. 3.) Because the mailings were sent by a private/commercial carrier and were not "interstate" shipments, as required by 18 U.S.C. § 1341, Defendant Fumo contends that a judgment of acquittal must be entered on those counts.

Defendant's argument is flawed on several grounds.  First, the plain language of the statute only refers to use of "any private or commercial interstate carrier."  It requires solely that the carrier generally operate on an interstate basis.  The statute imposes no requirement that the actual mailing be interstate.

Second, in Lopez, the United States Supreme Court expressly recognized three broad categories of activity that Congress may regulate under this commerce power:  (1) "Congress may regulate the use of the channels of interstate commerce"; (2) "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, *even though the threat may come only from intrastate activities*"; and (3) "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce."  Id. at 558-59 (emphasis added).  Hence, the Supreme Court expressly acknowledged that Congress maintains the authority to regulate

instrumentalities of interstate commerce, such as commercial mail carriers like FedEx and UPS, even if the activities that are part of the mail fraud are purely intrastate.

Finally, this Court's review of the relevant jurisprudence reveals that, seemingly without exception, every Court of Appeals facing Defendant's precise argument has rejected it.  See United States v. Gil, 297 F.3d 93, 100 (2d Cir. 2002) ("[A]pplication of the mail fraud statute to intrastate mailings sent or delivered by private or commercial interstate carriers, is a permissible exercise of Congress's power."); United States v. Photogrammetric Data Servs., Inc., 259 F.3d 229, 249-52 (4th Cir. 2001) (concluding that private and commercial interstate carriers are instrumentalities of interstate commerce, which Congress can regulate and protect from harm, even where the conduct at issue was intrastate), abrogated on other grounds, 541 U.S. 36 (2004); United States v. Hasner, 340 F.3d 1261, 1270 (11th Cir. 2003) (finding that the jurisdictional requirement of the mail fraud statute was satisfied where payment was sent to defendant via private interstate carrier, even though only intrastate delivery was involved).

In short, this Court finds no jurisprudential basis for Defendant's argument that, in order to maintain a conviction under 18 U.S.C. § 1341, the Government was required to prove that the FedEx shipments at issue were sent interstate.  It suffices that the Government proved that Defendant Fumo used commercial interstate carriers in furtherance of his scheme to defraud.

**3.      Whether the Wire Fraud Statute Requires Proof that the E-mails at Issue Were Sent Interstate**

Defendant Fumo similarly challenges the wire fraud convictions (Counts 34, 37, 39, 41, 47, 55-99, and 61-63), on the grounds that the e-mails were sent from one person in Pennsylvania

to another.  As the wire fraud statute is limited to communications in interstate or foreign

commerce, Defendant argues that he is entitled to a judgment of acquittal on these counts.[4]

As noted above, under <u>Lopez</u>, Congress may regulate the instrumentalities of interstate

commerce and those activities having a substantial relation to interstate commerce, even though

the threat only comes from interstate activities.  <u>Id.</u> at 558-59.  Interpreting this regulatory

authority, the Third Circuit, in <u>United States v. MacEwan</u>, 445 F.3d 237 (3d Cir. 2006), found

that the transmission of child pornography images over the Internet clearly fell within the

confines of at least the first two <u>Lopez</u> categories.  <u>Id.</u> at 244.  In that case, the defendant

downloaded child pornography images from the Internet and was subsequently charged with a

violation of 18 U.S.C. § 2252(a)(2)(B), which, like the wire fraud statute, applied to "any

material that contains child pornography that has been mailed, or shipped or transported in

interstate or foreign commerce by any means, including by computer. . . ."  <u>Id.</u> at 243.  The Third

Circuit noted that nothing in the statute required that the images crossed state lines; rather it

mandated only that the material had been mailed, shipped, or transported in interstate commerce

by any means.  <u>Id.</u> at 243-44.  Crediting the government's expert witness, the court found that

"[b]ecause of fluctuations in the volume of Internet traffic and determinations by the systems as

to what line constitutes the 'Shortest Path First,' a website connection request can travel entirely

intrastate or partially intrastate."  <u>Id.</u> at 244.  As both the means to engage in commerce and the

method by which transactions occur, "the Internet is an instrumentality and channel of interstate

---

[4]  The Government argues that in many of the counts of wire fraud challenged by
Defendant Fumo, the prosecutor introduced sufficient evidence that the e-mails at issue did, in
fact, travel across state lines.  As the Court finds that such a showing is unnecessary, however,
we need not address this point.

commerce." Id. at 245. Ultimately, the court held that it "does not matter whether [defendant] downloaded the images from a server located within Pennsylvania or whether those images were transmitted across state lines. It is sufficient that [defendant] downloaded those images from the Internet, a system that is inexorably intertwined with interstate commerce." Id. at 245; see also United States v. Schade, Crim. A. No. 08-2388, 2009 WL 808308, at *3 (3d Cir. Mar. 30, 2009) (reaffirming MacEwan). Other courts have similarly found that use of the Internet for transmission of images or messages satisfies the requirement of interstate commerce. See, e.g., United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997) ("Transmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce."); United States v. Pomerico, Crim. A. No. 06-113, 2008 WL 4469465, at *3 (E.D.N.Y. Oct. 30, 2008) ("use of the Internet satisfies the interstate commerce element of [the child pornography statute],18 U.S.C. § 2252A(a)(2)(B).").

Accepting the Third Circuit's definition of "interstate commerce," as this Court is bound to do, a judgment of acquittal on the challenged wire fraud counts is inappropriate. As noted above, the Internet, standing alone, is an instrumentality of interstate commerce. Undisputedly, the e-mails at issue were sent via the Internet. Regardless of whether an e-mail is sent and received within the same state, "fluctuations in internet traffic" could result in the e-mail actually crossing state lines prior to reaching is final destination.[5] Because such a determination is impossible, it is legally sufficient for purposes of the "interstate commerce" requirement that the

---

[5] At trial, the Government presented the testimony of an expert forensic examiner, who testified that even if an e-mail is sent from one room in a building to another room in that same building, it could conceivably travel to different states in the Unites States or to other servers around the world via "the path of least resistance." (N.T. D. Justin Price 92-93, Jan. 15, 2009.)

e-mails at issue were sent and received through the Internet. To hold otherwise would "conflat[e] 'interstate commerce' with 'interstate transmission' and confuse the nature of the jurisdictional basis for [the] charged offense." MacEwan, 445 F.3d at 243. As Congress may regulate both the use of the channels of interstate commerce and instrumentalities of interstate commerce, even if the threat may come only from intrastate activities, the Court finds that Defendant Fumo's use of the Internet to send the charged e-mails satisfies the "interstate commerce" element of the wire fraud statute.

**4.  Whether Defendant Fumo is Entitled to a Judgment of Acquittal in Lieu of a Dismissal of Counts 36 and 38**

Defendant Fumo's final challenge to the counts involving the conspiracy to defraud the Pennsylvania Senate seeks a judgment of acquittal on Counts 36 and 38. Specifically, on February 16, 2009, the Government filed a motion to dismiss the two counts, stating that "[t]he basis for this motion is that the government did not present evidence during the trial of this matter to sustain a conviction on either of these two counts. Therefore, for this reason, the United States of America respectfully requests that Counts 36 and 38 be dismissed with prejudice." (Government's Motion to Dismiss, U.S. v. Fumo, Crim. A. No. 06-319, 2-3 (Feb. 16, 2009).) Defendant Fumo made no objection to this motion at the time, and the Court did not submit the counts to the jury. Defendant Fumo now contends that he is entitled to an acquittal on these counts to avoid being placed in double jeopardy within the meaning of the Fifth Amendment.

Defendant's argument is misplaced. Federal Rule of Criminal Procedure 48(a) states that, "[t]he government may, with leave of court, dismiss an indictment, information, or complaint.

The government may not dismiss the prosecution during trial without the defendant's consent." FED. R. CRIM. P. 48. "The primary purpose of this requirement is 'to prevent harassment of a defendant by charging, dismissing and recharging without placing a defendant in jeopardy.'" United States v. Welborn, 849 F.2d 980, 983 (5th Cir. 1988) (quotations omitted). A dismissal with prejudice, however, constitutes an adjudication barring another prosecution for the same offense, thereby foreclosing this risk. As Defendant Fumo did not timely oppose the Government's motion, the Court grants the Government's Motion to Dismiss Counts 36 and 38 and dismisses those Counts with prejudice. Given this, Defendant's request for acquittal on these Counts is moot.

**B.      Scheme to Defraud Citizens Alliance (Defendants Fumo and Arnao)**

Defendants Fumo and Arnao jointly seek a Judgment of Acquittal on Counts 65-98 of the Superseding Indictment, which allege that both Defendants conspired to knowingly devise a scheme to defraud the non-profit organization Citizens Alliance of money and property by means of false and fraudulent pretenses and representations, and to use the U.S. mails, commercial interstate carriers, and interstate wire communications to further the scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343. Challenging the sufficiency of the evidence, Defendants contend that: (1) "the Government did not show beyond a reasonable doubt that any facts were misrepresented by Senator Fumo to [Citizens Alliance] or concealed from [Citizens Alliance], as would be required to prove any mail or wire fraud scheme" and (2) the e-mails at issue in the wire fraud counts were not shown to have been sent interstate as required by 18 U.S.C. § 1343. (Defs.' Mem. 4-5.) As the Court has already dismissed the latter contention above, we focus solely on the first point.

Defendants' entire argument regarding this claim states as follows:

> All material facts were known to Ms. Arnao, whom the Board of Directors had appointed as Executive Director. She had day-to-day authority to act on behalf of [Citizens Alliance], and all expenditures charged in the indictment were within the scope of her discretion to approve.

(Id. at 4.) Accordingly, Defendants seek judgments of acquittal on Counts 65-98.

As noted above, in order to obtain a conviction based on mail or wire fraud, the Government must prove, beyond a reasonable doubt: (1) a scheme to defraud; (2) the use of the mails or wires for the purpose of executing the scheme; and (3) participation by the defendant in the scheme with the intent to defraud. Pharis, 298 F.3d at 234. A scheme must involve "a departure from fundamental honesty, moral uprightedness, or fair play and candid dealings in the general light of the community." United States v. Dobson, 419 F.3d 231, 239 (3d Cir. 2003). "The government need not, of course, prove that the scheme was successful in order to sustain a conviction for mail fraud." United States v. Zauber, 857 F.2d 137, 142 (3d Cir. 1988). "[O]nce a property right is found to exist, section 1341's language 'any scheme or artifice to defraud' is to be interpreted broadly." United States v. Wallach, 935 F.2d 445, 464 (2d Cir. 1991) (quoting United States v. Evans, 844 F.2d 36, 40 (2d Cir. 1988)).

At trial, the Government proved that both Fumo and Arnao repeatedly and persistently used Citizens Alliance's financial assets and property for their personal benefit, causing a loss of more than one million dollars to the organization. The evidence reflected that Fumo and his Philadelphia staff first established Citizens Alliance under a different name in 1991. The original intent of the organization was the betterment of neighborhoods in Philadelphia by renovating properties, cleaning streets, clearing snow, supporting charter schools, and other public works.

As demonstrated at trial, however, Fumo and Arnao treated Citizens Alliance's bank accounts as their own. For example, Citizens Alliance purchased multiple expensive vehicles, which were fully loaded with navigation systems and radar detectors, for personal use by Fumo and his staff; it paid to furnish Fumo's Philadelphia Senate and campaign office with items such as lavish office furniture, a Sub-Zero refrigerator, and mahogany doors; it provided money for cell phones and pagers for members of Fumo's Senate staff and Fumo's daughter; Citizens Alliance employees performed multiple personal services for Arnao's shore house and for Fumo at his shore house, Philadelphia mansion, and Harrisburg farm, including picking up trash, power washing decks, moving hot tubs and furniture, and delivering personal items; Citizens Alliance purchased a tractor, dump truck, and ATV for use at Fumo's farm; Citizen's Alliance money was used to fund $250,000 in political polling and for the services of a private investigator to assist a 2002 gubernatorial campaign; Citizens Alliance helped fund a grassroots effort to stop construction of dunes at the Jersey shore that would block Fumo's ocean view from his home; it paid for Fumo's travel, with five friends, to Cuba; and it paid for Fumo's and Arnao's shopping sprees to purchase goods for their homes, such as vacuum cleaners and home improvement materials.

Defendants do not now challenge the sufficiency of evidence to prove that such events and actions occurred, effectively abandoning the pre-trial defense that Fumo received nothing from Citizens Alliance. Nor does Fumo pursue his trial defense that the items were "gifts" or "compensation." Rather, Defendants rest solely on the claim that all of these expenditures were lawful because Arnao, as Executive Director of Citizens Alliance, appropriately utilized her authority to approve such expenditures.

This argument is untenable. A general requirement exists that an officer or director of a corporation "shall perform his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa. Cons. Stat. § 512(c). An officer or director of a corporation must avoid committing *ultra vires* acts. Gearhart Indus., Inc. v. Smith Int'l, 741 F.3d 707, 719 (5th Cir. 1984). *Ultra vires* acts are defined as those acts that exceed the scope of the powers of a corporation as defined by its charter or the state. Id.; see also 7A W. Fletcher, Cyclopedia § 3399 (1989) (An *ultra vires* act is one that is beyond the powers of a corporation as defined by its charter, its by-laws, and the law). Further, "[o]fficers and directors of a corporation stand in a fiduciary relationship to that corporation and even in close, family owned corporations, directors are liable if they act in such a way as to profit their individual and other corporate enterprises at the expense of the corporation." In re Truco, Inc., 110 B.R. 150, 152-53 (Bankr. M.D. Pa. 1989).

In this case, the evidence at trial revealed that Defendant Arnao's actions exceeded the bounds of her authority as Executive Director of Citizens Alliance in two different manners. First, the Government introduced into evidence the Articles of Incorporation for Citizens Alliance, which declared that the purposes of the corporation were:

> To promote public health, housing, safety and education in the City and County of Philadelphia. Such purposes shall be accomplished, in part, by contributing to the improvement, maintenance and control of appropriate sanitation and other conditions that could endanger public health and safety. Such purposes shall be accomplished, in part, through the acquisition of real estate and/or equipment to be used in the provision of housing, the provision of educational facilities or to be used directly in the furnishing of services. Such purposes shall be accomplished,

in part, through the performance of activities which m[a]y include, but are not limited to, investigation, research, examination, training, demonstrations and direct provision of services.

(Govt. Ex. 900, 9.)

The above actions, however, clearly overstepped that purpose. Many of the expenditures occurred outside of Citizens Alliance's defined territory of Philadelphia. Moreover, the Government demonstrated that the Citizens Alliance-funded shopping sprees for improvements and supplies at Fumo's and Arnao's residences, and use of Citizens Alliance employees and assets to perform personal services at these residences did not fall within the established corporate purpose of "promot[ing] public health, housing, safety and education."

Second, the Articles of Incorporation expressly state that "[t]he following limitations shall apply to the organization and operation of the corporation and to its members and board of trustees":

A. Notwithstanding any other provision of these articles, the corporation is organized exclusively for one or more of the purposes as specified in Section 501(c)(3) of the Internal Revenue Code of 1986, and shall not carry on any activities not permitted to be carried on by a corporation exempt from Federal Income tax under Internal Revenue code Section 501(c)(3) or corresponding provisions of any subsequent Federal tax laws.

B. No part of the net earnings of the corporation shall inure to the benefit of any member, trustee, director, officer, *or any private individual* (except that reasonable compensation may be paid for services rendered to or on behalf of the corporation), and no member, trustee, director, officer of the corporation, or any private individual shall be entitled to share in the distribution of any of the corporate assets upon dissolution of the corporation.

(Id. (emphasis added).) Similarly, the By-laws of Citizens Alliance clearly indicate that "[n]o part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its

members, trustees, directors, *officers, or other private persons . . .*"  (Govt. Ex. 900, 20

(emphasis added).)  Such Articles and By-laws fully comport with Section 501(c)(3) of the

Internal Revenue Code, which indicate that "[i]n order to qualify for a § 501(c)(3) exemption,

'no part of an organization's net earnings may inure to the benefit of any private shareholder or

individual.'"  Presbyterian and Reformed Publ'g. Co. v. C.I.R., 743 F.2d 148, 153 (3d Cir. 1984)

(quoting 26 U.S.C. § 501(c)(3)).  "'Private shareholder or individual' is broadly defined as any

person 'having a personal and private interest in the activities of the organization.'"  Id. (quoting

26 C.F.R. § 1.501(a)-1(c) (1984)).

Without repeating the extensive list of actions at issue, the Court notes that a reasonable

jury could have readily found that Arnao's approval of the various expenditures inured to the

benefit of both herself and Defendant Fumo, in direct violation of the above provisions.  Indeed,

Defendants do not now suggest that such expenditures had any purpose other than to personally

enrich Fumo and Arnao.  As both Defendants fall within the regulations' broad brush definition

of an "individual," such actions were expressly prohibited by the Articles of Incorporation, the

By-laws, and the federal tax law, which granted Citizens Alliance its tax-exempt status.[6]

---

[6]  The Government also suggests that Arnao was precluded from acting without the
express direction of the Board of Directors.  Specifically, the Government cites the portions of
the By-laws that state, "[t]he business and affairs of the Corporation shall be managed by a Board
of one or more Directors . . . ."  (Govt. Ex. 900, 22.)  Additionally, it references the By-law
stating that, "[t]he President shall have general and active management of the Corporation, shall
preside as the Chair at all meetings of the Board and Committees, shall see that all orders and
resolutions of the Board are carried into effect, and shall perform such other duties as the Board
may from time to time assign to her or him."  (Id. at 25.)  It then goes on to cite the testimony of
several Board members who indicated that they had no knowledge of any of the decisions at
issue in this case and were not consulted about any of them.  (Govt. Resp. Mot. Judg. Acquittal
and for New Trial ("Govt. Resp.") 33-34.)
    The Government, however, omits reference to the By-law that states, "[t]he President
shall have sufficiently broad authority to enable him or her to carry out his or her responsibilities

As Arnao was unable to legally authorize any of the payments and expenditures described in detail above, a reasonable jury could infer from the very fact of those expenditures that she, together with Fumo, engaged in a scheme to defraud Citizens Alliance of its money and property. Arnao's liability is clear, as she was the corporate officer who made the questioned decisions to expend Citizens Alliance funds for the benefit of Fumo and herself.

As to Defendant Fumo, the United States Supreme Court has held that one who aids or abets the commission of an offense is equally liable as a principal, so long as the aider and abettor associates himself with the unlawful venture and participates in it with the intent that its illegal objective be attained. United States v. Pearlstein, 576 F.2d 531, 546 (3d Cir. 1978). "Such an awareness can be inferred from evidence of collaboration between the defendants and the principals but it must be established that the defendants facilitated the principals' crime with the intent to do so." Id. at 546. The evidence at trial demonstrated that while Arnao was the titular Executive Director of Citizen's Alliance, Fumo exercised ultimate control over both Arnao, who was also a member of his Senate staff, and Citizens Alliance itself. Fumo testified that he "viewed [Citizens Alliance] as [his] entity, [his] baby. Gave it birth and nursed it along, got involved more with strategy and ideas" and that he "ran it out of [his Senate] office." (N.T. Fumo 18-19, Feb. 10, 2009.) He indicated that he maintained "substantial influence over the organization," directed the expenditure of various funds on items for his personal use, had significant influence on Arnao's receipt of a salary, and dictated the hiring of the organization's

_____

and he or she shall act as the duly authorized representative of the Corporation whenever appropriate." (Id.) Accordingly, the Court does not find that Arnao's mere failure to consult with the Board on her daily decisions rendered those decisions *ultra vires*. Rather, it was her blatant disregard of her corporate authority that deprived her decisions of any legal validity.

outside legal services.  (N.T. Fumo 21, 26-27, 43, 47, Feb. 17, 2009.)  Repeatedly, the testimony revealed that Fumo conspired with Arnao, and aided and abetted her efforts to fraudulently use Citizens Alliance's assets in order to obtain personal vehicles, cell phones for his family, improvement and repair services at his various residences, farm equipment, political polling, a trip to Cuba, and shopping trips for personal supplies.

In short, taking the evidence in the light most favorable to the Government, the Court finds that neither Defendant is entitled to a judgment of acquittal on these Counts.[7]  Accordingly, Defendants' joint motion is denied.

### C.   Scheme to Defraud the United States and to File False Returns in Relation to the Taxation of Citizens Alliance (Defendants Fumo and Arnao)

Defendants Fumo and Arnao next contest their convictions as to the scheme to defraud the United States in relation to the tax treatment of Citizens Alliance by the Internal Revenue Service ("IRS") (Counts 99-103)[8].  The sum and substance of these Counts charged the two

---

[7]  Defendants' Motion does not challenge the sufficiency of the evidence to prove either a conspiracy between Fumo and Arnao, or that Fumo aided and abetted Arnao.  Accordingly, the Court does not address these elements in any detail.

Moreover, the Government's Response goes into some detail as to the misrepresentations made to others to further their scheme to defraud.  While a scheme to defraud, for purposes of the mail and wire fraud statutes, "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension," Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 528 (3d Cir. 1998), Defendants again do not challenge the sufficiency of the evidence on this point.  Given the Court's satisfaction that the evidence established, beyond a reasonable doubt, that both Defendants made material misrepresentations regarding their attempts to defraud Citizens Alliance, and absent any challenge by Defendants on this point, we decline to rehash the evidence.

[8]  Count 99 charges both Fumo and Arnao with a conspiracy to obstruct the IRS.  Count 100 charges Defendant Arnao with filing of a false tax return which failed to disclose that Citizens Alliance had provided assistance outside the ordinary course of its non-profit mission to individuals, had made "direct or indirect political expenditures," and had not engaged in any Section 4958 excess benefit transactions during the calendar year 2002.  Count 101 charges

Defendants with conspiring to cause false tax returns to be filed with the IRS on behalf of Citizens Alliance, which would conceal from the IRS activities by Defendants that jeopardized Citizens Alliance's tax-exempt status. To support their Motion for Judgment of Acquittal on these Counts, the Defendants put forth several arguments, with no further elaboration. First, they claim that the evidence did not prove, beyond a reasonable doubt, that either Defendant agreed with any other person to defraud the United States. Second, Fumo and Arnao separately claim that the evidence did not show, beyond a reasonable doubt, that either Defendant intended to violate any known legal duty under the Internal Revenue Code. Third, Defendant Fumo challenges Counts 101 and 103 on the grounds that the evidence failed to prove, beyond a reasonable doubt, that he committed any act that aided, assisted, solicited, facilitated, or encouraged the filing of a false tax return for Citizens Alliance by any other person, as required to convict him. Finally, both Defendants contend that the evidence was insufficient to show that either individual knew that the statements on the tax return, which are the subject of Counts 100 to 103, were "false," in the pertinent sense. The Court addresses each claim individually.

>   1.    **Whether the Evidence Was Sufficient to Establish, Beyond a Reasonable Doubt, that the Defendants Agreed With Each Other or With Another Person to Violate a Known Legal Duty Under the Internal Revenue Code**

---

Defendant Fumo with aiding and assisting the filing of a false tax return, which failed to disclose that Citizens Alliance had provided assistance outside the ordinary course of its non-profit mission to individuals, had made "direct or indirect political expenditures," and had engaged in any Section 4958 excess benefit transactions during the calendar year 2002. Count 102 charges Defendant Arnao with filing a false tax return for CA Holdings, Inc., which declared a deduction of $151,425 for "Community Development Consulting," when, in fact, Arnao knew that this sum included expenditures for political polling and other political campaign expenditures that were not deductible. Count 103 charges Defendant Fumo with aiding and abetting the filling of a false tax return based on the same false statement described in Count 102.

Defendants' first two arguments contend that the evidence at trial did not show, beyond a reasonable doubt, any agreement between Fumo or Arnao, or between either Defendant and any other person to violate any known legal duty under federal tax law. In the absence of any such agreement, Defendants assert that no conspiracy was shown and an acquittal must be entered. The Court disagrees.

The Counts at issue are charged as violations of 18 U.S.C. § 371, which states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. This section encompasses two types of conspiracies: (1) a conspiracy to commit a substantive offense under a separate criminal statute; and (2) a conspiracy to defraud the United States, without reference to another criminal statute. United States v. Alston, 77 F.3d 713, 718 (3d Cir. 1996).

The Counts at issue in this case fall within the second of the two categories, as they allege a conspiracy to defraud the IRS. A conspiracy to frustrate the lawful information-gathering function of the IRS is commonly referred to as a "Klein conspiracy," named after the Second Circuit's landmark decision in United States v. Klein, 247 F.2d 908 (2d Cir. 1957). "A Klein conspiracy consists of three elements: (1) existence of an agreement to accomplish an illegal or unlawful objective against the United States; (2) commission of an overt act by conspirators in furtherance of conspiracy; and (3) intent by the defendant to agree to the conspiracy and to defraud the United States." United States v. Gambone, 125 F. Supp. 2d 128, 131 (E.D. Pa. 2000). "While many conspiracies are by their nature complex, a Klein conspiracy does not

require a particular level of complexity." Id. at 132. It is sufficient simply for all three elements to be present. Id.

Defendants' initial challenges to their convictions on grounds of tax fraud focus on the first and third elements of a Klein conspiracy – the existence of an agreement and an intent to violate a known legal duty. To prove a defendant's participation in a conspiracy, the government must first establish an agreement between the alleged conspirators. United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007). Direct evidence of the agreement is not required. Id. "Rather, a conspiratorial agreement can be proven circumstantially based upon reasonable inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme." Id.; see also United States v. Smith, 294 F.3d 473, 478 (3d Cir. 2002) (finding that a reasonable juror could certainly conclude that a tacit agreement exists amongst a group of people when they engage in "so many unusual acts."). Indeed, as recognized by the Third Circuit, "common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract. Rather, the illegal agreement can be, and almost always is, an implicit agreement among the parties to the conspiracy." McKee, 506 F.3d at 238.

Moreover, the government must establish that the conspirators shared "a 'unity of purpose,' the intent to achieve a common goal and an agreement to work together toward the goal." United States v. Wexler, 838 F.2d 88, 90-91 (3d Cir. 1988). For a Klein conspiracy, that common goal must involve an agreed upon objective to impede the IRS. United States v. Gricco, 277 F.3d 339, 348 (3d Cir. 2002). "This need not be the sole or even a major objective of the conspiracy." Id. "In addition, impeding the IRS need not be an objective that is sought as an end

in itself: an intent to hide unlawful income from the IRS in order to conceal an underlying crime is enough." Id. "[A]s in other conspiracy prosecutions, the objectives of the conspiracy may sometimes be inferred from the conduct of the participants." Id. "In the end, however, the evidence must be sufficient to prove beyond a reasonable doubt that impeding the IRS was one of the conspiracy's objects and not merely a foreseeable consequence or collateral effect." Id.

As noted above, the Indictment alleged that the agreed-upon objective for the conspiracy between Arnao and Fumo was their desire to have false tax filings submitted to the IRS, on behalf of Citizens Alliance, to prevent the IRS from discovering that Citizens Alliance was not qualified for tax-exempt status. Due to the complexity of this charge, some fundamental understanding of the Tax Code is necessary. To qualify for a section 501(c)(3) tax exemption, an organization must meet four requirements: (1) the organization must "engage primarily in activities which accomplish one or more of the exempt purposes specified in § 501(c)(3);" (2) "the organization's net earnings may not inure to the benefit of private shareholders or individuals;" (3) the organization must not engage in substantial political or lobbying activities; and (4) the organization "must serve a valid public purpose and confer a public benefit." Church of Scientology v. C.I.R., 823 F.2d 1310, 1315 (9th Cir. 1987) (citations omitted). As noted above, the Third Circuit has particularly emphasized that "no part of an organization's net earnings may inure to the benefit of any private shareholder or individual.'" Presbyterian and Reformed Publ'g. Co., 743 F.2d at 153 (quoting 26 U.S.C. § 501(c)(3)). "Treasury regulations apply this rule to define an organization as 'not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals.'" Id. (quoting 26 C.F.R. § 1.501(c)(3)-1(c)(2) (1984)). "'Private shareholder or

31

individual' is broadly defined as any person 'having a personal and private interest in the activities of the organization.'" Id. (quoting 26 C.F.R. § 1.501(a)-1(c) (1984)). "The policy underpinnings of the non-inurement rule derive from the common law belief that charities should promote the public good rather than private benefit." Id.

Notably, "an organization's net earnings may inure to the benefit of private individuals in ways other than by the actual distribution of dividends or payment of excessive salaries." Id. (quoting Founding Church of Scientology v. United States, 412 F.2d 1197 (Cl. Ct. 1969)). "The potential for abuse may also exist when the founder of an exempt organization also controls other non-exempt entities and those entities interact, if the exempt entities operate to benefit the non-exempt entities." Airlie Found., Inc. v. United States, 826 F. Supp. 537, 550 (D.D.C. 1993), aff'd 55 F.3d 684 (D.C. Cir. 1995). "Upon a conclusion that relevant facts reveal private benefit, the organization will not qualify as operating primarily for exempt purposes 'absent a showing that no more than an insubstantial part of its activities further the private interests or any other nonexempt purposes.'" Rameses Sch. of San Antonio, Tex. v. C.I.R., No. 23228-04X, 2007 WL 1061871, at *7 (U.S. Tax. Ct. 2007) (quoting Am. Campaign Acad. v. C.I.R., 92 T.C. 1053, 1066 (1989)).

Moreover, the Tax Code is clear that an organization cannot qualify for tax-exempt status if it engages in certain prohibited political activity. Specifically:

> An organization is not operated exclusively for one or more exempt purposes if it is an action organization as defined in subdivisions (ii), (iii), or (iv) of this subparagraph.
>
> * * *
>
> (iii)  An organization is an action organization if it participates or intervenes, directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for

public office.

> The term candidate for public office means an individual who offers himself, or is proposed by others, as a contestant for an elective public office, whether such office be national, State, or local. Activities which constitute participation or intervention in a political campaign on behalf of or in opposition to a candidate include, but are not limited to, the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate.

26 C.F.R. § 1.501(c)(3)-1(c)(3). Thus, the exemption is lost "'by participation in any political campaign on behalf of *any* candidate for public office. It need not form a *substantial* part of the organization's activities.'" Ass'n of Bar of City of N.Y. v. C.I.R., 858 F.2d 876 (2d Cir. 1988) (quoting United States v. Dykema, 666 F.2d 1096, 1101 (7th Cir. 1981)).

Finally, pursuant to the Internal Revenue Code, every organization exempt from taxation under 26 U.S.C. § 501(a) shall file an annual return. 26 U.S.C. § 6033(a)(1). This section requires that the annual return specifically state "the items of gross income, receipts, and disbursements, and such other information for the purpose of carrying out the internal revenue laws as the Secretary may by forms or regulations prescribe . . ." Id. It "imposes no taxes upon the affected tax exempt organizations, but merely requires such organizations to disclose information to the IRS that is considered relevant to the organization's continuing qualification for exempt status." Lutheran Children and Family Serv. of E. Pa. v. United States, Civ. A. No. 83-5305, 1986 WL 7834, at *2 (E.D. Pa. Jul. 10, 1986).

Taking all evidence, in the present case, in the light most favorable to the Government, a reasonable jury could have found that Defendants entered into an agreement with the intent to violate these known legal duties under the Internal Revenue Code. Primarily, the evidence presented at trial established that both Fumo and Arnao fully understood the above-described

33

legal requirements of forming and maintaining a tax-exempt organization. As to Fumo, the Government proved that Citizens Alliance's outside accountant, Ronald Beckman, sent a memorandum to Fumo on June 29, 1996, describing and including IRS Form 1023 - Application for Recognition of Exemption, and IRS Form 990 - Annual Return of Organization Exemption from Income Tax, as well as Rev. Proc. 95-48. (Govt. Ex. 1318.) The purpose of the memorandum and its enclosures was to give Fumo "a good overview of the applicable filing and disclosure requirements related to exempt organizations." (Id.) Subsequently, in August of 1996, Beckman provided Fumo and his Senate counsel, Christopher Craig, information regarding federal tax issues raised by nonprofit corporations that own for-profit subsidiaries, explaining that "501(c)(3) organizations may still be exempt and may own for-profit subsidiaries if their involvement in the day to day management of the subsidiaries is not a substantial part of the nonprofit's overall activities and the subsidiary is established for a bona fide business purpose." (Govt. Ex. 1319.) The letter set forth several factors upon which the IRS focuses to determine whether a for-profit subsidiary maintains an identity separate and apart from a tax-exempt parent. (Id.) Beckman stressed that care must be taken "to ensure that the relationship between the exempt parent and the non exempt subsidiary does not reach that of a principal and an agent," that "[t]ransactions between the subsidiary and the tax exempt parent are conducted on an arm's length basis," and that "[t]he subsidiary must have a business purpose that is separate and distinct from its parent." (Id.)

Further, the evidence indicated that although Arnao was the ultimate signatory on the tax returns, Fumo was intimately involved with and effectively controlled the efforts to obtain approval of and maintain Citizens Alliance as a tax-exempt organization. During the approval

process, Beckman communicated directly with Fumo about the status of his efforts to obtain

expedited approval.  (Govt. Ex. 1327.)  In addition, in an e-mail sent on September 11, 1999,

after Citizens Alliance had obtained approval of its section 501(c)(3) application, Fumo

expressed concern over public disclosure of the Non Profit Federal Form 990's that had to be

filed, and directed Citizens Alliance staff to devise creative ways to satisfy Citizens Alliance's

filing requirements.  (Govt. Ex. 1330).[9]

---

[9] Specifically, this e-mail stated:

CONFIDENTIAL
Please take a close look at the Non Profit Federal Form 990's that have to be filed.
I did not realize that they require a schedule for "public money" received which is
open to the public.  There is another place in the form where you can list other
money received and file a schedule but it DOES NOT HAVE TO BE RELEASED
TO THE PUBLIC (ie. Press).  We must be able to justify listing only public
money in the strictest terms.  I see this as "tax payer" money.  Such as a direct
WAM.  However, I am not sure that the strict definition would apply to sources
like "The Fund for Philadelphia" which receives money from a WAM but also
raises a lot of money on it's own from corporations and individuals.  This would
seem to be a mixed source and therefore we might be able to list it on the "non
public" schedule.  Also, obviously any money received from PECO would be on
the non public schedule.  Then there remains the issue of money from PJOC and
DVREC.  These monies come from PIDC and Penns Landing and they have
gotten these monies from the DRPA - which is not taxpayer money!  Also
DVREC's monies from PECO would seem to me to be clearly non public as well
and only have to be listed on the IRS schedule and not the public one.

Because we are going to file all of the appropriate information with the IRS I
think we might be able to use the strict definition on what goes on what schedule
in the form.  With the newspapers all over our asses I do not think we should give
them the slightest bit of information if we don't strictly have to.  I also, realize
that with the PECO money to DVREC we will have to file something with the
PUC but that is different and I accept that.

Also I believe that Penns landing and PIDC do not have to report on the public
schedule of their 990s, the DRPA money as well.

Please take a careful look at this and try desperately, if you have to, to get us to

As to Arnao's knowledge of the requisite tax laws, the trial evidence established that she was the Executive Director of Citizens Alliance and the primary contact point between Citizens Alliance and the outside attorneys and accountants. Steve Kobasa, Citizens Alliance's accountant after Beckman, testified that Arnao had signed all of Citizens Alliance's tax returns, was intimately aware of Citizens Alliance's finances and funding, and understood how to classify the corporation's expenses. (N.T. Kobasa 8-9, Dec. 15, 2008.) Kobasa's partner, Arthur Amelio, indicated that for each audit he did on behalf of Citizens Alliance, he sat down with Arnao and discussed whether there was any fraud or misappropriation and the effect that would have on the organization's tax-exempt status. (N.T. Amelio 76-79, Dec. 29, 2009.) Lisa Petkun, Citizen's Alliance outside tax counsel, sent a March 28, 2000 memorandum to Ruth Arnao describing Form 990's disclosure requirements, such as compensation to employees and independent contractors over $50,000. (Govt. Ex. 1010.) Similarly, a November 13, 2002 e-mail from Petkun to Arnao, and carbon copied to both Kobasa and Fumo, indicated that Form 990, as well as financial statements, required disclosure of every type of transaction between Citizens Alliance and a Related Entity. (Govt. Ex. 1332.)

Upon proving both Defendants' knowledge of the prerequisites for a tax-exempt organization, the Government then established that Fumo and Arnao violated, on a recurring and persistent basis, the requirements for maintaining and reporting Citizens Alliance's tax-exempt

where we want to be. If you need to you can consult Gary as well. But while I know he will say that we should be as open as possible. In this case I don't think we should. The Inquirer will go absolutely BALLISTIC if they ever really found out about the DRPA money and PJOC, etc. We really don't need a never ending series of bullshit from them on their next Pulitzer quest! PA ASAP TY

(Govt. Ex. 1330.)

status. As discussed in detail with respect to the scheme to defraud Citizens Alliance, both Fumo and Arnao repeatedly used the assets of Citizens Alliance as their own. Citizens Alliance purchased expensive vehicles, several of which were solely used for Fumo's and Arnao's personal benefit. Citizens Alliance employees performed personal services at Fumo's and Arnao's homes, and Fumo and Arnao jointly engaged in shopping trips for their residences using the Citizens Alliance credit card.[10] Finally, Citizens Alliance performed various political polling activities for sole benefit of Fumo's political agenda. All of these expenditures were in direct contravention of what Fumo and Arnao knew to be the requirements of section 501(c)(3). Had such activities been fully disclosed to the IRS, as required by the regulations, Citizens Alliance's section 501(c)(3) status would have been jeopardized.

Thereafter, the Government proved, beyond a reasonable doubt, that Fumo and Arnao actively and jointly made numerous efforts to hide their pilfering and other offending activities. For example, Citizens Alliance created for-profit subsidiaries in 2000, which the Government established were nothing more than sham corporations designed to hide the activities of Citizens Alliance that were not in conformity with its status as a 501(c)(3) corporation, such as the purchase of the cars for the personal use of Fumo and his staff. In a March 23, 2000 memorandum from Arnao to Fumo, Arnao revealed that the two were working in close conjunction to create these sham corporations, with false corporate addresses and purely titular corporate officers:

---

[10] As noted above, Fumo conceded that he had "substantial influence" over Citizens Alliance and thus was a "disqualified person" for purpose of receiving an "excess benefit transaction" – *i.e.* a payment or gift to a controlling insider – under the tax code regulations pertinent to tax-exempt organizations. (N.T. Fumo 19-21, Dec. 17, 2008.)

So if I know that I am right and am doing the right thing lets go over this one more time.

1.     Citizens Alliance will stay the same as it is right now.
2.     CA Holdings will stay the same and also in Citizens address.  I am the sole officer of this co.
3.     Eastern Leasing Corp.  Will either get an address in hbg [Harrisburg] or we will use the office space I will lease in Mitchell's [Arnao's husband's] bldg.  Or Kenny's bldg.  We don't have a name for the sole officer
4.     Passyunk Real Estate Corp Joe Russo will be president of this using his home address
5.     Moyamensing Real Estate Corp. John Travelina will be president of this using his home address
6.     1208 (I will come up with a name) Harry Feinberg will be president of this using the center city address.
7.     High Tech Inc. Chris Marrone will be president of this using his home address.

Now on these accts that other people are going to be president do you still want me to be secty/treas so that I take care of the checking accts.  We will have all the mail going to their houses and offices etc and they will make weekly drop offs to me.  Or do you want them to handle everything.  Just let me know.

(Govt. Ex. 1344.)  Such structuring of the for-profit subsidiaries was directly contrary to what

Fumo understood, based on Beckman's prior memorandum to him, as the federal tax

requirements for nonprofit corporations that own for-profit subsidiaries.

As a further example of such collaboration, Arnao and Fumo jointly failed to disclose –

for purposes of both Citizens Alliance's Form 990's and Fumo's personal income tax returns –

any compensation received by Fumo from Citizens Alliance.  As Kobasa testified, the

accountants relied heavily on Arnao to collect all of the information needed to complete their

audits of Citizens Alliance and all of the accountants' information came directly from the

organization's financial statements.  (N.T. Kobasa 31-32, Dec. 15, 2008.)  Yet, despite Arnao's

certification to the accountants that there were "no material transactions that have not been

properly recorded in the accounting records underlying the financial statements," and despite

Kobasa's emphasis that he needed to know whether Citizens Alliance was spending its funds in

accordance with its tax-exempt purpose, at no point did Arnao disclose to Kobasa any

compensation or any other form of payments to Fumo, lobbying expenses (such as those spent to

oppose construction of dunes in New Jersey), or any political activity or polling funded by

Citizens Alliance, all of which may have jeopardized its tax-exempt status. (Id. at 38, 51, 53-55,

57, 59, 74-75, 80-81; see also N.T. Amelio 48, Dec. 29, 2008.) Moreover, none of the payments

to Fumo, including those in the form of goods or services, were disclosed in Citizen Alliance's

general ledger or any other books or records. (N.T. Kobasa 58, Dec. 15, 2008.) During the same

time period (1999-2002), Kobasa also prepared Fumo's individual tax returns. Via a seemingly

coordinated effort, no compensation, payments, or gifts from Citizens Alliance were reported on

Fumo's returns in any of those years. (Id. at 57-58.) Aside from themselves being illegal, the

omissions on Fumo's returns suggested a calculated effort to ensure that such expenditures by

Citizens Alliance remained hidden from the IRS. Such identical failures to disclose legally-

required information by both Arnao and Fumo constituted strong circumstantial evidence of their

conspiracy.

Finally, the Government established the Defendants' intent via the introduction of

evidence exposing Defendants' coordinated and affirmative misrepresentations to the

accountants in order to have false tax returns filed. In a prime example cited by the Government,

Kobasa began to question Arnao and Fumo about money paid to companies by the name of

Global Strategies and Kiley and Co. for "polling." (Id. at 95.) Kobasa explained that based on

the invoices he had, the polling appeared to be political in nature. (Id. at 99.) Afterward, Kobasa

and his partner Arthur Amelio met with Arnao and asked for a copy of the survey questionnaire and the results.  (Govt. Ex. 1336.)  Arnao said she could not immediately produce the requested information –  which was the first time that the accountants had asked her for information that she could not immediately provide.  (N.T. Kobasa 98, Dec. 15, 2008.)  Instead, Arnao asked Kobasa to send her an e-mail repeating his inquiries, and to carbon copy Fumo.  (Id. at 61; Govt. Ex. 1334.)  He did so and, the following day, Kobasa received an e-mail from Arnao indicating that these expenses were for "community development services," which he took to mean polling the community for services that they wanted or improvements they needed.  (Kobasa 62-63, Dec. 15, 2008.)  Upon receipt of the e-mail, Kobasa concluded, albeit incorrectly, that the invoices were not for political polling and, as such, he included this information in financial statements and the Citizens Alliance's 2002 Form 990.  (Id. at 63; Govt. Ex. 1170, 44.)  A logical and permissible inference from such evidence is that Fumo and Arnao collaborated as to how to successfully misrepresent to the accountants the nature of the prohibited political polling expenditures.

In an alternative example, Amelio testified that, in 2003, he had determined that Fumo was somebody who had influence over the organization, reflected by his ability to get grants for the organization from PECO and the Pennsylvania Department of Community and Economic Development.  (N.T. Amelio 47, Dec. 29, 2008.)  Amelio had a direct conversation with Arnao about whether Fumo received anything of value in that particular year.  (Id.)  She replied that "at times that they [Citizens Alliance employees] had shoveled his driveway for him, if he needed to get – needed to go somewhere that they may have done that.  And that he compensated the organization for that, and that at times he used some of the – I think it was for some storage and

he had compensated the organization for storage." (Id.) Amelio understood this statement to mean that all of the benefits received by Fumo were being paid for by him. (Id. at 48.) This information was disclosed[11] on the Form 990. (Id. at 63.)

Ultimately, based on this evidence, a jury could determine, beyond a reasonable doubt, that Defendants Fumo and Arnao had full knowledge of the requirements with which Citizens Alliance had to comply in order to maintain its tax-exempt status. With and despite such knowledge, they chose to improperly pilfer substantial assets from the organization and use them for purposes far outside the bounds of Citizens Alliance's declared mission with the intent to gain private benefit. Taking their scheme one step further, Fumo, who exercised significant control over Citizens Alliance, and Arnao, who was the Executive Director of Citizens Alliance, jointly withheld information from the organization's outside accountants with the inferable intention of defrauding the IRS and preventing it from discovering information that would lead to a revocation of Citizens Alliance's section 501(c)(3) status. Moreover, the evidence revealed that the two Defendants conspired to affirmatively misrepresent information to the accountants with the knowledge that such information would ultimately reach the IRS. Given the Court's deferential standard of review, and in light of such uncontroverted evidence, we decline to find any basis for granting a judgment of acquittal on these counts.[12]

---

[11] Specifically, the return stated, "Occasionally the organization has provided, directly or indirectly, incidental services, trash removal, snow removal and graffiti removal to or for the benefit of an officer, director or a taxable organization with which such person is affiliated. In each case such services were provided in exchange for no less than full and fair consideration in money or monies worth." (Id. at 63.)

[12] In further support of their Motion on these counts, Defendants cite, without explanation, two cases from the Third Circuit, United States v. McKee, 506 F.3d 225 (3d Cir. 2007) and United States v. Gricco, 277 F.3d 339, 348 (3d Cir. 2002). The Court does not find

## 2. Whether the Evidence Was Sufficient to Prove, Beyond a Reasonable Doubt, that Fumo Committed Any Act that Aided, Assisted, Solicited, Facilitated, or Encouraged the Filing of a False Tax Return for Citizens Alliance by Any Other Person

Via an alternative challenge to the tax fraud counts, Defendant Fumo claims that, as to

Counts 101 and 103, the evidence did not show beyond a reasonable doubt that he committed any

act that aided, assisted, solicited, facilitated, or encouraged the filing of a false tax return for

Citizens Alliance by any other person. As such a showing is required for a conviction as an aider

---

either case to benefit Defendants' argument. In McKee, the Third Circuit reiterated that "[w]hen the government relies upon circumstantial evidence to establish a tax conspiracy, the circumstances must be such as to warrant a jury's finding that the alleged conspirators had some common design with unity of purpose to impede the IRS." Id. at 239. The Court found that although there was no *direct* evidence of an agreement among the defendants, there was evidence that: (1) all three defendants were involved in leadership positions with RIY - a group that counseled its members on how to conceal audit-trails in order to avoid detection by the IRS; and (2) the moving defendant did not file his personal federal income taxes. Id. at 24041. Ultimately, the court determined that the evidence was sufficient for a reasonable jury to find that the moving defendant had agreed with this co-defendants "to engage in practices that interfered with the government's ability to collect taxes from the members of RIY who were employed by the Partnership." Id. at 241.

Similarly, in Gricco, the defendants were convicted of, among other things, a Klein conspiracy to defraud the IRS based on their participation in a scheme to steal millions of dollars from the Philadelphia Parking Authority. 277 F.3d at 346-47. The sole evidence in support of the alleged agreement to not report the illegal income to the IRS was: (1) the parallel action of all defendants in not reporting their income; (2) one of the defendant's structuring his real estate transactions to avoid reportable income; and (3) one defendant telling another not to put too much money into one bank to avoid the bank generating a report that would be sent to the IRS. Id. at 349. Although the Third Circuit recognized that, based on this evidence, the question of sufficiency of the evidence to support a conspiracy was "close," it ultimately found that a reasonable jury could infer that the defendants "agreed upon the objective of not reporting or paying taxes on the illicit income because to do so would have created a risk of discovery." Id. at 349-50.

In the case presently before the Court, the evidence proved far more than parallel actions by the Defendants – it established coordinated activity between them to defraud the IRS by hiding their illicit spending and use of Citizens Alliance assets in order to preserve the organization's tax-exempt status. Given that this evidence was far more substantial than that presented in either Gricco and McKee, neither case alters the Court's decision.

or abetter, under 26 U.S.C. § 7206(2), Defendant Fumo contends that he is entitled to a judgment of acquittal on these counts.

Section 7206(2) provides:

Any person who--

* * *

Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document;

shall be guilty of a felony . . .

26 U.S.C. § 7206(2). "To establish aiding and abetting the filing of a false tax return there must exist some affirmative participation which at least encourages the perpetrator." United States v. Graham, 758 F.2d 879, 885 (3d Cir. 1985) (internal quotation marks omitted). Under this section, however, "[i]t is not necessary to show that the defendant himself prepared the false document in order to sustain a conviction under § 7206(2)." United States v. Cutler, 948 F.2d 691, 695 (10th Cir. 1991). Nor must a person actually sign a tax return to aid in its preparation. United States v. Covney, 995 F.2d 578, 588 (5th Cir. 1993). Rather, "[s]ection 7206(2) prohibits willfully aiding or assisting in, procuring, counseling or advising the preparation or presentation of such a document." Id. Thus, "when a form relating to a taxpayer is required to be filed by an intermediary rather than the taxpayer, an offense under § 7206(2) is complete when the document or information has been presented to the entity required by law to transmit the information to the IRS." Cutler, 948 F.2d at 695; see also Gambone, 314 F.3d at 172 (recognizing various cases

where section 7206(2) was violated by a defendant's provision of false information to a taxpayer or tax preparer).

The Indictment in this case charged Defendant Fumo with causing the filing of a false Form 990 for Citizens Alliance in 2002 (Count 101), and a false Form 1120 corporate return for CA Holdings, Inc., a subsidiary of Citizens Alliance and parent company to a series of for-profit subsidiaries, in 2002 (Count 102). As set forth in detail above, the evidence presented at trial proved that both forms fraudulently described the impermissible political polling as "community development" polling expenses. Further, Citizen Alliance's Form 990 failed to disclose the payments to Fumo, who was a controlling party, as well as the expenditures outside its declared tax-exempt purpose. Finally, Form 1120 of CA Holdings claimed close to $70,000 in political expenditures as deductible business expenses by labeling it "Community Development Consulting."

This evidence was sufficient for a jury to find, beyond a reasonable doubt, that Fumo committed some act that aided or assisted in, procured, counseled, or advised the preparation or presentation of the false tax forms. As noted above, the Government introduce substantial proof that Fumo controlled Citizens Alliance and was intimately involved with its tax filings. Moreover, the evidence, detailed in the previous section of this Memorandum, allowed the reasonable inference that Fumo instructed Arnao to tell the accountants that Citizen Alliance's improper political polling expenditures were for "community development." As a direct result of that instruction, the accountants included this false information on tax forms, thereby hiding expenditures of Citizens Alliance that would have jeopardized its 501(c)(3) status. Finally, the jury could have concluded from the evidence that Fumo directed Arnao to hide all of Citizens

Alliance's payments or other types of compensation to him from the accountants.  In short, there was abundant evidence to prove that Fumo provided willful assistance in the preparation of a false return.

### 3. Whether Either Defendant Knew that the Statement on the Tax Return, Which is the Subject of Counts 100 to 103, Was "False"

In their final, and somewhat repetitive challenge to the Counts charging the scheme to defraud the IRS, Defendants contend that "the evidence did not show beyond a reasonable doubt, in relation to the conduct charged in Counts 100-103, that either defendant knew that the referenced statement on the tax return which is the subject of that Count was 'false.'" (Defs.' Mem. 6.)  They argue that "[t]o be 'false' in the pertinent sense, the statement must have been both untrue as a matter of fact and incorrect as a matter of law, and each defendant must be shown to have known this."  (Id.)  Because of the lack of such evidence, Defendants argue that the convictions cannot stand.

The Court, again, finds no merit to this claim.  The crimes alleged in these Counts are crimes of specific intent, meaning that they may be negated by a good-faith misunderstanding of the law or a good-faith belief that one is not violating the law.  Cheek v. United States, 498 U.S. 192, 202 (1994); United States v. Morris, 20 F.3d 1111, 1115 (11th Cir. 1994).  The term "willful" in this section, however, simply means a voluntary, intentional violation of a known legal duty; there is no requirement of showing "evil motive" beyond a specific intent to violate the law.  United States v. Pomponio, 429 U.S. 10, 12 (1976).  The government may prove willfulness through direct or circumstantial evidence.  As the Third Circuit has explained:

> In the majority of criminal cases, the element of intent is inferred from
> circumstantial evidence. . . . The rule is no different in tax evasion prosecutions.

> The Supreme Court . . . [has] stated that "any conduct, the *likely* effect of which *would be* to mislead or conceal," is sufficient to satisfy the "affirmative act" element. . . . The[] cases simply require that there be some evidence from which a jury could infer an intent to mislead or conceal beyond mere failure to pay assessed taxes; it is for the jury to determine, as a matter of fact, whether the affirmative act was undertaken, in part, to conceal funds from or mislead the government.

United States v. Voigt, 89 F.3d 1050, 1090 (3d Cir. 1996) (internal citations omitted) (emphasis in original). "The government may show willfulness by pointing to evidence that the defendant kept a double set of books, made false entries or alterations in his books of accounting, created false invoices or documents, concealed assets or covered up sources of income, or did 'any conduct, the likely effect of which would be to mislead or to conceal.'" United States v. Ringwalt, 213 F. Supp. 2d 499, 504 (E.D. Pa. 2002) (quoting Spies v. United States, 317 U.S. 492, 499 (1943)), aff'd 66 Fed Appx. 446 (3d Cir. 2003).[13]

---

[13] Numerous other courts have found that willfulness or specific intent may be inferred from the circumstances surrounding the false tax form. See, e.g., United States v. Wilson, 887 F.2d 69, 72-73 (5th Cir. 1989) (holding that a jury finding that defendants, charged with filing a false tax return, acted willfully and with belief that returns were false was sufficiently supported by evidence that defendants had failed to report transfer of corporate funds to themselves on their individual tax returns, and had filed false corporate returns in an effort to avoid evidence of unreported transfers); United States v. Mohney, 949 F.2d 1397, 1407-08 (6th Cir. 1991) (holding that evidence, which indicated that defendant was aware of and involved in tax preparation, that he knew of money allegedly skimmed from his corporation and the falsity of his individual and corporate tax returns, and that defendant was in possession and control of diverted funds, supported his convictions for filing false individual income tax returns and aiding and assisting in filing false corporate tax returns); United States v. Mandell, 722 F. Supp. 1208, 1213 (E.D. Pa. 1989) (finding sufficient evidence of willfulness for conviction of aiding and abetting preparation of false tax return, where jury could have concluded that defendant knowingly approved payment of personal invoices with related corporation's funds, rather than directing that they be paid from his personal loan account, and that defendant willfully caused a corporation to file a false tax return claiming payment as a business expense).

The Government, in this case, adduced more than sufficient evidence of willfulness on the part of both Defendants. As to Defendant Fumo, the evidence summarized above established that he was fully aware of the requirements for maintenance of a section 501(c)(3) corporation, yet he purposely directed the use of Citizens Alliance assets for purposes beyond those allowed by the IRS. In an effort to avoid disclosure of such expenditures to the IRS, Fumo worked with Arnao and other members of his staff to: (1) establish sham for-profit subsidiaries in order to purchase various goods for his personal benefit; and (2) provide false information to the accountants regarding the political polling expenditures. Finally, and as direct evidence of his willfulness and knowledge that the tax returns of Citizens Alliance were false, the Government produced evidence that Fumo failed to report the transfer of Citizens Alliance funds or assets to himself on his individual tax returns.

Similarly, as to Arnao, the outside accountants testified that she had full knowledge of the financial workings of Citizens Alliance as well as the tax requirements for a section 501(c)(3) corporation. Yet, in maintaining the financial records of Citizens Alliance, she failed to disclose any payments of goods and services to Fumo of which she was fully aware. Indeed, as described above, she affirmatively misrepresented the extent of those expenditures and falsely indicated that Citizens Alliance was reimbursed by Fumo for any goods or services it provided to him. Moreover, she worked alongside of Fumo to establish the sham for-profit corporations and directly conveyed the false information regarding the political polling expenditures to the outside accountants.

In short, viewing this evidence in the light most favorable to the Government, any reasonable jury could find, beyond a reasonable doubt, that both Defendants knew that the

statements on the tax returns, which were the subject of Counts 100-103, were "false" in the sense of being untrue both in fact and law. As such, the Court declines to grant Defendants' Motion on this ground.

### D. Scheme to Defraud the Independence Seaport Museum (Defendant Fumo)

In his final effort to obtain a judgment of acquittal, Defendant Fumo challenges the sufficiency of the evidence with respect to the scheme to defraud the Independence Seaport Museum ("ISM") (Counts 104 to 108). Specifically, Fumo offers two bases for his Motion. First, he argues that there was no federally cognizable fraud since all material facts were known to John Carter, whom the Board of Directors had appointed as President of the Museum and who had day-to-day authority to act on behalf of ISM. Because all transactions were authorized by Carter, consistent with ISM's By-laws and Ethics Statement, and were fully disclosed in ISM's books and records, Fumo claims that his actions were not fraudulent. Second, he claims that none of the mailings or wires alleged in Counts 104 to 108 were caused "for the purpose of executing the scheme," as construed in the governing case law. Again, the Court discusses each of these arguments individually.

#### 1. Whether the Evidence Was Sufficient to Establish, Beyond a Reasonable Doubt, that Fumo Had a Scheme to Defraud the ISM

Counts 104 to 108 of the Indictment, charged Defendant Fumo with mail and wire fraud, under 18 U.S.C. §§ 1341 and 1343, in furtherance of a scheme to defraud the non-profit ISM. In particular, the Indictment alleged that Fumo took advantage of his position as a member of the Board of Directors of the non-profit organization to obtain numerous free pleasure cruises on the museum's historic yachts, and acquire free, expensive ship models to be used as decoration in his office, without disclosing such benefits to the full Board of Directors. Reviewing the evidence

48

introduced at trial in the light most favorable to the Government, the Court finds that the evidence was sufficient for the jury to convict Defendant Fumo on these counts.

At trial, the Government proved, without contradiction, that from 1996 to 2003, Fumo was a member of the Board of Directors, known as the "Board of Port Wardens," of ISM. Board members were not compensated, either monetarily or in-kind. (N.T. Meigs 15, Dec. 17, 2008.) Rather, they were expected to engage in fundraising or "development" on the Museum's behalf. (Id.) While Fumo obtained only few donations for the museum, either from his own funds or from his associates, he nonetheless provided substantial state and other public grants. (Govt. Ex. 1403.)

Notwithstanding the fact that none of the other Board members received any compensation, gifts, or rewards for their service,[14] the evidence at trial established that Fumo received extensive benefits. Every year, and sometimes more than one time per year, for a period of eight years, Fumo took a cruise to Martha's Vineyard on a yacht owned by the ISM. During these cruises, the Museum paid, not only for the cost of the ship, but for additional expenses such as groceries, supplies, and catered meals. One year, the Museum canceled bookings for one of its yachts to allow Fumo to take his cruise at his preferred time. On another occasion, when none of its yachts were available, the Museum chartered another yacht for Fumo's personal use. In sum, the Government established, and the Defense does not now dispute, that Fumo took a total of

---

[14] Board member Peter McCauseland testified that he never received any free use of the Museum's ships and, in fact, on two occasions had actually paid to charter an ISM yacht. (N.T. McCauseland 20-21, 27, Dec. 15, 2008.) Board member John Meigs did not recall receiving any compensation for being on the Board during any of the years he was a Board member, except for a little box of Christmas cards with a maritime theme and a calendar with pictures of sailboats and powerboats on it. (N.T. Meigs, 15, Dec. 17, 2008.)

twelve free yacht voyages over eight years, with accompanying services and supplies, at a total cost to the Museum of $115,306.88.  (Govt. Ex. 1370 (showing each yacht, date, length of time used, guests, charter fee, gratuity, delivery fee, food, and other incidentals)).  All of the yacht trips were authorized by ISM President, John Carter.

Aside from the yacht trips, Fumo received models of the ISM ships, *Enticer* and *Principa*, for which the Museum paid thousands of dollars.  John Carter also authorized the Museum's payment of more than $10,000 for two model renderings of Fumo's personal boat.  (Govt. Ex. 1410.)

Other members of the Board of Port Wardens had no knowledge of the benefits being given to Fumo.  John Meigs testified that prior to learning of the Government's charges against Fumo, he was not aware of Fumo ever being given free use of ISM's yachts or ISM's chartering of another yacht for Fumo's use.  (N.T. Meigs 15, Dec. 17, 2008.)  Walter D'Alessio, who was Chairman of the Board, was not aware of any decision by the Board to compensate or provide other financial benefits to Fumo for his work in steering grants to the Museum.  (N.T. D'Alessio 8, Dec. 17, 2008.)  During the period when he was Chairman, from 1992 to 2005, D'Alessio also had no knowledge that Fumo was being provided the free use of any of the Museum's historic yachts.  (Id. at 10.)  At no time, according to D'Alessio, was the Board ever asked to authorize any Board member's free use of the Museum's yachts for vacations or other personal benefits.  (Id. at 11.)  Finally, Peter McCauseland, current Chairman of the ISM Board and Board member during Fumo's tenure, indicated that he had no knowledge of any Board member's gratuitous use of the Museum's yachts for personal vacations and had no knowledge of such benefits being authorized by the Board.  (N.T. McCauseland 20-21, Dec. 15, 2008.)  Until reading about it in

the newspaper, he was not aware of Fumo's free use of the Museum's yachts or the Museum's chartering of another boat. (Id.)

At trial, Fumo did not dispute that he received such gratuitous benefits, but rather argued that, consistent with the Museum's rules, he used the yachts for soliciting contributors to the Museum. Faced with the Government's evidence and testimony from Fumo's guests on the trip that the cruises were nothing more than pleasure cruises, Fumo effectively abandoned this defense and raised the following contention, both mid-trial and during post-trial motions:

> The evidence did not show beyond a reasonable doubt that any facts were misrepresented by Senator Fumo to or concealed from ISM, as alleged. All material facts were known to John Carter, whom the Board of Directors had appointed as President of the Museum. Carter had day-to-day authority to act on behalf of ISM. Moreover, all transactions were fully disclosed in the ISM's books and records, as the evidence revealed. For lack of any cognizable "fraud," judgments of acquittal must therefore be entered on Counts 104-108.

> The defendant also renews his motion for judgment of acquittal on these counts made when the government rested its case. No reasonable jury could have found beyond a reasonable doubt that ISM was defrauded in allowing of Senator Fumo to use its yachts, or in any other manner, as each trip and expenditure was authorized by Carter, consistent with a fair reading of the ISM Board's by-laws and ethics policy.

(Defs.' Mem. 6-7.)

The Court, however, finds this argument to have no merit in light of the substantial evidence to the contrary. As noted above, the law is well-established that an officer or director of a corporation should avoid committing *ultra vires* acts. Gearhart Indus., Inc., 741 F.2d at 719. In addition, a corporate officer must perform his duties "as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would under similar circumstances." 15 Pa. Cons. Stat. § 512(c).

51

The Government established that John Carter's authorization of Fumo's yacht cruises at the expense of the Museum was outside of and in direct contravention of his authority under the ISM's By-laws and other governing documents.[15]  Section 4.15 of the ISM By-laws contains an express prohibition on compensation to Board members:

> Port Wardens shall not receive compensation for their services on the Board of Port Wardens; provided, however, that the Board of Port Wardens may authorize the reimbursement to any Port Warden of expenses necessarily incurred by him or her in the performance of his or her duties as Port Warden.  Nothing herein contained shall be construed to preclude any Port Warden from serving the corporation in any other capacity and receiving compensation therefor.

(Def. Ex. 1055.1, 4.)  In addition, Article X of the By-laws provides that:

> No contract or transaction in which a Port Warden or officer has a financial interest shall be knowingly entered into by the Corporation unless it has been authorized in good faith by the Board of Port Wardens pursuant to Section 5728 of the Nonprofit Corporation Law of 1988.[[16]]

---

[15]  Notably, the mere fact that Carter was not charged with any crimes for his purported participation in this scheme to defraud is irrelevant to Defendant Fumo's guilt.  In the criminal justice system, the Government retains "broad discretion" as to whom to prosecute. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  Wayte v. United States, 470 U.S. 598, 606 (1985).

[16]  15 Pa.C.S. § 5728 states:

No contract or transaction between a nonprofit corporation and one or more of its members, directors or officers or between a nonprofit corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for such reason, or solely because the member, director or officer is present at or participates in the meeting of the board of directors which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) the material facts as to the relationship or interest and as to the contract or

52

(Def. Ex. 10551, 11-12.)  Finally, section 11.06 of the By-laws precludes personal financial gain

to any director from the ISM:

> No part of the income or profits of the Corporation shall be paid, distributed or otherwise inure to the benefit or use of its Port Wardens or officers or other private persons except that the Corporation shall be authorized to pay compensation in reasonable amounts to its officers for services rendered and to make payments and distributions in furtherance of its general corporate purposes including contributions and donations for charitable purposes.

(Def. Ex. 1055.1, 13.)

Similarly, the ISM Ethics Statement, approved by the Board of Port Wardens in

December 1996, also places a general prohibition on Board members' receipt of personal benefits

from the Museum, as follows:

> Port Wardens hold the ultimate fiduciary responsibility for the Independence Seaport Museum and for the protection and nurturing of its various assets:  the collections and related documentation, the plant and financial assets.  They must develop and define the purposes and related policies of the institution, and ensure that all of the Museum's assets are properly and effectively used for public purposes.

---

> transaction are disclosed or are known to the board of directors and the board in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors even though the disinterested directors are less than a quorum;
>
> (2) the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the members entitled to vote thereon, if any, and the contract or transaction is specifically approved in good faith by vote of such members; or
>
> (3) the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or the members.

Id.

(Govt. Ex. 1373, 6-7.)

> Port Wardens serve the Independence Seaport Museum and its public. They should not attempt to derive any personal material advantages from their connection with the Museum. Port Wardens must use the Museum property only for official purposes, and make no personal use of the Museum's collection, property, or services in a manner not available to a comparable member of the general public.

(Govt. Ex. 1373, 12.)

Finally, the Ethics Statement emphasizes that the President does not have complete discretion to act, but rather is subject to the policies defined by the Board through the By-laws and Ethics Statement, as follows:

> Port Wardens have the obligation to define the limits, powers, and duties of the President of the Independence Seaport Museum.
>
> * * *
>
> The President has an obligation to provide the Board of Port Wardens with current and complete financial information in comprehensible form; to bring before the Board any matters involving the policy questions not already determined; and to keep them informed on a timely basis of all other significant or substantial matters or intended actions affecting the institution.
>
> The President carries out the policies established by the Port Wardens, and adheres to the budget approved by the Board. Whenever it is necessary to deviate from established policies or to alter or exceed budget guidelines, the President should notify the Board in advance.

(Govt. Ex. 1373, 12-13.)

In its Motion, the Defense reiterates its trial argument, which relies on a sentence in the Ethics Statement that, "[n]o person may use the Museum's collection, facilities, personnel or services in any non-Museum matter or context without the express prior consent of the President." (Govt. Ex. 1373, 18.) The Defense argues that a fair reading of such a statement explicitly reveals that the President maintained full power to authorize use of Museum assets.

54

As we did at trial, however, the Court finds that the Defense's interpretation improperly attempts to convert a negative and prohibitory statement into an affirmative vesting of power. The more logical, and indeed the only plausible, reading of this statement is that before any person uses Museum resources in a non-Museum manner, he or she must obtain authorization from the President. It does not stand for the alternate conclusion that just because the President gives his consent, that such use automatically becomes valid under the By-laws. This latter interpretation would completely conflict with the prior sections that Port Wardens may not use Museum property for personal use, and that the President must carry out the policies established by the Board of Wardens. See generally St. Paul Fire & Marine Ins. Co. v. Turner Constr. Co., Civ. A. No. 07-270, 1998 WL 901709, at *4 (E.D. Pa. Apr. 2, 2009) ("a contradiction within the terms of a contract must be avoided if the terms can be read as consistent with one another."), aff'd, 2009 WL 738768 (3d Cir. Mar. 23, 2009). Indeed, as testified to by long time Board member Peter McCauseland, "I don't read this as an exception [to the principles regarding use of ISM boats by board members]. I think it's more an administrative matter saying that no one person can use the facilities of the museum or the assets of the museum without the president knowing about it. It's sort of, I think, an administrative rule the way I read it." (N.T. McCauseland 26, Dec. 15, 2008.) Certainly, given this testimony, as well as common sense, the jury was free to disregard the Defense's alternative interpretation.[17]

_____

[17] As further evidence of Carter's inability to authorize Fumo's free use of ISM's yachts, as well as Carter's knowledge that he was not permitted to provide such authorization, the Government also introduced a letter written by Carter in 2004, during the FBI investigation, but backdated to 2001. (Govt. Ex. 1370j, 21.) The letter purported to bill Fumo for his last cruise and indicated that Fumo would be paying for future cruises. The natural inference from this letter is that Carter, knowing that he had acted outside the scope of his authority, sought to conceal his misdeeds from the ongoing FBI investigation.

As there was sufficient evidence that Carter had no authority to allow the expenditures to Fumo, the Court must then consider whether Fumo's actions were part of a scheme to defraud. "[E]very scheme to defraud describes an implicit, if not explicit, breach of the defendant's fiduciary duty or duty of good faith to the alleged victim of the fraud." United States v. Johns, 742 F. Supp. 196, 204 n.6 (E.D. Pa. 1990), aff'd, 972 F.2d 1333 (3d Cir. 1991). As noted previously, "[o]fficers and directors of a corporation stand in a fiduciary relationship to that corporation and even in close, family owned corporations, directors are liable if they act in such a way as to profit their individual and other corporate enterprises at the expense of the corporation." In re Truco, Inc., 110 B.R. at 152-53; see also 15 PA. CONS. STAT. 512(a). Embezzlement, or the "fraudulent appropriation to one's own use of money or goods entrusted to one's care," by a fiduciary constitutes a scheme to defraud within the meaning of the statutes. United States v. Altman, 48 F.3d 96, 101 (3d Cir. 1995) (quoting Carpenter v. United States, 484 U.S. 19, 27 (1987)).

The above By-laws and Ethics Statement permit a reasonable juror to determine that Fumo had a legal and fiduciary duty, as a member of the Board of Port Wardens, to not use the Museum's assets or its resources for his own personal benefit, unless such use was fully disclosed to and approved by the Board.[18] Moreover, Carter, as President, had no authority to deviate from such rules and could not, within the bounds of his authority, unilaterally permit any

---

Defendants challenge the admission of this letter in their Motion for New Trial and the Court addresses it later in this Memorandum.

[18] Board members McCauseland, D'Alessio, and Meigs all testified to a similar understanding of the Museum's rules and policies. (See generally N.T. McCauseland 12-13, 67, Dec. 15, 2008, N.T. Meigs 13, Dec. 17, 2008; N.T. D'Alessio 8-9, 28, Dec. 17, 2008.)

transaction that would result in a private benefit, at the expense of the Museum, to any member of the Board. In direct contravention of these mandates, as well as his fiduciary duty, Fumo took over $100,000 worth of the Museum's assets and services for purely personal use.

As further proof of the intent to defraud, the Government introduced sufficient evidence that Fumo took steps to conceal the discovery of his misdeeds. See United States v. Pinto, 548 F. Supp. 236, 245 (E.D. Pa. 1982) ("[t]he Government may satisfy the requirement that it demonstrate a specific intent to defraud attributable to a particular defendant by offering evidence of instances when the particular defendant took actions preventing the discovery of his misdeeds or . . . his breach of a fiduciary duty."). As detailed above, the evidence supported a finding that Defendant Fumo engaged in such acts while repeatedly and consistently, over the course of eight years, failing to disclose any such benefits to the Board – a particularly glaring omission in light of the fact that he himself sat as a member of the Board and associated with the other members during Board meetings. (See N.T. D'Alessio 8, Dec. 17, 2008; N.T. McCauseland 11-12, Dec. 15, 2008.) Moreover, when confronted in a radio interview about his use of the Museum's yachts, Fumo dodged the questions or offered ambiguous answers, reflecting a further effort to conceal his illicit dealings. (Govt. Ex. 921.)

Given such evidence of Defendant Fumo's intent to defraud and the clear showing that Carter had no authority to permit such transactions, a reasonable jury could have concluded, beyond a reasonable doubt, that ISM was defrauded by Fumo's gratuitous and unauthorized use of its yachts. Finding no basis for Defendant Fumo's arguments, the Court declines to grant a judgment of acquittal on this ground.

### 2. Whether There Was Sufficient Evidence that the Charged Mailings and Wires Were Sent for the Purpose of Executing the Scheme to Defraud

Defendant Fumo's final challenge to the charged scheme to defraud the ISM alleges, with little explanation, that none of the mailings or wires set forth in Counts 104-108 were made "for the purpose of executing the scheme," as construed in the governing case law. (Defs.' Mem. 7.) Having considered the evidence and the pertinent jurisprudence, the Court finds no merit to this claim.

"To support a mail fraud conviction, a mailing must further scheme to defraud or be incident to an essential part of that scheme."[19] United States v. Ruuska, 883 F.2d 262, 264 (3d Cir. 1999). The crucial question is whether these uses of the mails or wires "were sufficiently closely related to the respondent's scheme to bring [defendant's] conduct within the statute." United States v. Maze, 414 U.S. 395, 399 (1974). Thus, to "be part of the execution of the fraud . . . the use of the [wires] need not be an essential element of the scheme," but rather incidental to the scheme or just a "step in [the] plot." Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (internal citations omitted).

"[A] party cannot resist a charge of mail fraud by showing that the communications upon which the charge is predicated were themselves 'innocent,' if it is shown that the communications were part of a 'scheme or artifice to defraud.'" Odesser v. Vogel, Civ. A. No. 85-6931, 1986 WL 12769, at *4 (E.D. Pa. Nov. 7, 1986). Moreover, the scheme itself does not have to contemplate the use of mails. Pharis, 298 F.3d at 234. "All that is required is that the

---

[19] Notably, "'the cases construing the mail fraud statute are applicable to the wire fraud statute as well.'" United States v. Frey, 42 F.3d 795, 797 (3d Cir. 1994) (quoting United States v. Tarnopol, 561 F.2d 466, 475 (3d Cir. 1977)).

defendants knowingly participated in a scheme to defraud and caused a mailing to be used in furtherance of the scheme." Id. (citing United States v. Sturm, 671 F.2d 749, 751 (3d Cir. 1982) and Pearlstein, 576 F.2d at 534)). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended, then he 'causes' the mails to be used." Pereira v. United States, 347 U.S. 1, 8-9 (1954) (citing United States v. Kenofskey, 243 U.S. 440 (1917)). Finally, it remains settled that "acts occurring after the defrauding defendant already controls the proceeds of the fraud may . . . further the fraud." United States v. Morelli, 169 F.3d 798 (3d Cir. 1999) (citing United States v. Allen, 76 F.3d 1348, 1362 (5th Cir. 1996)). Thus, "[u]se of the mails or wires even after money has been obtained through allegedly fraudulent means may come within the statute if it serves to lull the alleged victim into a false sense of security and prevent detection." In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig., Civ. A. Nos. 04-2535, 05-2101, 05-3588, 2007 WL 2541216, at *22 (E.D. Pa. Aug. 29, 2007) (citing United States v. Sampson, 371 U.S. 75, 81, 83 (1962)).

For example, in Carpenter v. United States, 484 U.S. 19 (1987), a newspaper reporter for the *Wall Street Journal* and a stockbroker were charged with a scheme to defraud the newspaper by making stock trades based on financial information, which was to be discussed in a later publication of the paper. Id. at 22-23. The United States Supreme Court rejected defendants' argument that the newspaper's use of the wires and the mail to print and send the *Wall Street Journal* to its customers did not satisfy the requirement that those mediums be used to execute the scheme at issue. Id. at 28. In so ruling, the court found that circulation of the misappropriated information was both anticipated and an essential part of the scheme since,

"[h]ad the column not been made available to Journal customers, there would have been no effect on stock prices and no likelihood of profiting from the information leaked."  Id.

Likewise, in Schmuck v. United States, supra, the defendant had created a scheme wherein he rolled back odometers on cars and sold them as new to car dealers.  The dealer would then mail a title application form to the state government.  489 U.S. at 707.  The United States Supreme Court found that such mailings, although innocently done by unknowing dealers, were sufficient to support a mail and/or wire fraud conviction against defendant.  Id. at 712. Specifically, it stated that "[a] rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relationship with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers."  Id. at 711-12.  "[A]lthough the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme."  Id. at 712.

Finally, in United States v. Tiller, 302 F.3d 98 (3d Cir. 2002), the defendant was a managed care caseworker hired to monitor medical care provided under insurance policies.  Id. at 100.  She was paid a base salary, as well as a bonus for every visit to a claimant that she made. Id.  She devised and executed a scheme to obtain additional bonuses by stating that she had visited certain Philadelphia Housing Authority workers compensation claimants when in fact she had not.  Id.  Unaware of this fraud, defendant's employer then billed the Philadelphia Housing Authority for these visits in invoices it submitted to its third-party administrator, who then mailed the employer checks for visits that had never occurred.  Id.  Upon a post-conviction

60

challenge to the mail fraud counts, the Third Circuit noted that had defendant submitted a single false report, been paid, and then moved on to another employer, the use of the mails as support for the mail fraud scheme would have been questionable. Id. at 102. It found, however, that defendant's scheme was ongoing, similar to that in Schmuck. Id. Accordingly, it held that "a rational jury could have concluded that [defendant]'s fraud depended on her continued harmonious relationship and good reputation with her employer, which in turn depended on her employer's ability to continue to receive payment from Crawford by mail for the claims that [defendant] submitted." Id. at 103.

The Indictment, in this case, sets forth five instances of mail and/or wire fraud in connection with the scheme to defraud the ISM, as follows:

- Count 104 - First Union transmitted by U.S. mail, on August 30, 2002, the Enticer Corp.'s business checking account statement from First Union's operation center in New Brunswick, NJ to 211 South Columbus Blvd., Philadelphia, Pennsylvania, which reflected, in part, a debit card purchase of groceries at the A&P Food Market in Nantucket, MA for $153, made on August 20, 2002, and a debit card purchase of wine at French & Braun in Camden, ME for $302.25, made on August 18, 2002, in connection with the use of the *Enticer* by Defendant Fumo for a vacation.

- Count 105 - Citibank USA, N.A. transmitted from Omaha, Nebraska by U.S. mail, on September 11, 2002, the Enticer Corp's MasterCard credit card account statement to 211 South Columbus Blvd., Philadelphia, PA, which reflected, in part, a purchase of diesel fuel at the Nantucket Boat Basin in Nantucket, MA for a cost of $794.04, on August 21, 2002, in connection with the use of the *Enticer* by Defendant Fumo for a vacation.

- Count 106 - First Union transmitted by U.S. mail, on August 29, 2003, the Enticer Corp's business checking account statement from First Union's operations center in New Brunswick, NJ to 211 South Columbus Blvd., Philadelphia, PA, which reflected, in part, a debit card payment of $245 for the Prestige Limousine Service to pick up the Fumo party (six people and their luggage) at the Herreshoff Museum and drop them off at the

61

Quonsett Airport on or about August 14, 2003, in connection with the use of the *Enticer* by Defendant Fumo for a vacation.

- Count 107 - Proprietor of PYM, in Florida, sent a fax, on August 12, 2003, to John Carter, Denise Baker, and Bret Todd at the Independence Seaport Museum in Philadelphia, Pennsylvania, confirming that Defendant Fumo was scheduled for a trip on *Enticer* at Martha's Vineyard on August 10-14, 2003.

- Count 108 - Bret Todd (captain of the *Enticer*) sent a fax from Rhode Island to Carol McMahon (employee of ISM) in Philadelphia, PA, on August 26, 2003, containing Matthew Fonseca's invoice no. 69073 for $625 for five days of work on Defendant Fumo's trip on the *Enticer*, from August 10-14, 2003.

(Indictment 189-192.) The Government introduced evidence at trial of each of these mailings or wires. (Govt. Exs. 1370k, 10-14; 1370k, 27; 1370l, 13-15, 1391; 1370l, 7-8.)

Count 107 is the sole communication occurring prior to completion of the fraudulent transaction. That Count alleges that the fax was sent by the Museum's yacht broker to the Museum to confirm that the *Enticer* was going to be held for Fumo's use from August 10, 2003 to August 14, 2003. Undoubtedly, this wire was in furtherance of, and indeed essential to, the scheme to defraud, as it directly allowed Fumo to make free use of the *Enticer*. Moreover, the mere fact that the mailing was innocently done by a third party is irrelevant, since such a mailing was both caused by the scheme to defraud and reasonably foreseeable by Defendant Fumo.

The remaining four Counts involved transmissions occurring after the completion of the cruise, wherein various third-parties were either billing ISM or reflecting withdrawals from ISM's accounts for charges incurred by Defendant Fumo during his cruises on ISM's yachts. A reasonable jury, applying the law as given, could clearly have found that the use of the

wires/mails was in furtherance of the scheme to defraud. As set forth above, the fact that such communications occurred after the completion of the cruises is irrelevant as they were incidental to the scheme and resulted in ISM's payment of such expenses on Fumo's behalf. The repeated billings and ISM's payment of those bills were, as in <u>Schmuck</u>, part of an ongoing fraudulent scheme lasting over a period of years. Had these mailings or wires not occurred, and had the billings not been timely paid, Fumo would have been unable to continue his practice of free cruises on ISM's vessels. Although Fumo may not have intended the communications to occur, a jury could have easily found that his scheme to defraud was done either with knowledge that the use of mails would follow in the ordinary course of business, or that the use of the mails was reasonably foreseeable. Such evidence was sufficient for a reasonable jury to conclude that he "caused" the mails to be used.

Defendant Fumo cites, without further explanation, several cases in support of his argument. The Court finds these cases inapposite. First, in <u>United States v. Al-Ame</u>, 434 F.3d 614 (3d Cir. 2006), the defendant had dispatched an imposter to take an English as a second language test for him. <u>Id.</u> at 615. The imposter's scores were then both reported to colleges and universities as the defendant's own, and mailed to defendant's home address. <u>Id.</u> at 615. The Third Circuit, citing to the Supreme Court case of <u>Parr v. United States</u>, 363 U.S. 370, 391 (1960), noted that where the relevant mailings would have been made regardless of whether or not the conspiracy existed, and would have performed precisely the same function in the absence of the conspiracy that they performed during its continuance, no mail or wire fraud existed. <u>Id.</u> at 618. Distinguishing that case, however, the Third Circuit found that the Educational Testing

Service's mailing of a score to him on the fraudulently taken test was caused by his scheme to defraud.  Id. at 618.

Far from supporting the Defense, Al-Ame bolsters the Government's position.  In this case, had Fumo not used the Museum's yachts, neither the fax from the Museum's yacht broker nor the billings reflecting charges by Defendant Fumo would have been mailed.  Rather, the billings were a "step in the plan" by Fumo to have the Museum cover his expenses during the cruises, instead of using his own funds to pay for them.

The other cited opinion, United States v. Maze, 414 U.S. 395 (1974), likewise has no bearing on this case.  In that matter, the defendant had stolen the victim's credit card and made several purchases at various motels with it.  Id. at 396.  The motels then transmitted the bills to the bank that had issued the credit, while, the following day, the victim notified the bank that his card had been stolen.  Id.  The Supreme Court reversed the mail fraud convictions finding that the mailings were not in furtherance of the scheme, but rather that "the successful completion of the mailings from the motel owners to the Louisville bank increased the probability that respondent would be detected and apprehended."  Id. at 403.  It held that the fraud did not turn on which of the potential victims – the various motels, the bank, or the owner of the credit card – actually bore the loss.  Id. at 402.

The facts of this case are distinguishable.  The mailings at issue were not made to the bank by those seeking payment.  Rather, they were from the bank to the intended victim, ISM, in order to obtain payment from the ISM for Fumo's fraudulently obtained expenses.  More importantly, unlike in Maze, the mailings were not part of a one-time attempt to fraudulently obtain goods or assets from various random victims.  Instead, they were part of an on-going and

64

persistent scheme to defraud ISM. <u>Tiller</u>, 302 F.3d at 102-103 (distinguishing <u>Maze</u> on the basis of a one-time fraud versus and ongoing scheme to defraud). As in <u>Schmuck</u>, and unlike the scheme in <u>Maze</u>, it was essential to Defendant Fumo's scheme that each transaction be completed in an orderly fashion, *i.e.* each of the bills for the yacht cruises be timely paid by the ISM. Fumo's success depended on the ISM's continued harmonious relationship with its suppliers of goods during these cruises. Accordingly, the Government proved that the mailings and wires were sufficiently closely related to the schemes to defraud.

### E.       Conclusion as to Motion for Judgment of Acquittal

As emphasized above, "[c]ourts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." <u>Brodie</u>, 403 F.3d at 133. A finding of insufficient evidence to convict should be confined to cases where the prosecution's failure is clear. <u>Id.</u> A mere determination by the Court that an alternative verdict was possible does not provide a permissible basis on which to grant a judgment of acquittal.

Viewing the evidence in its entirety and in the light most favorable to the Government, this Court holds that a reasonable jury could have found, beyond a reasonable doubt, that Defendants were guilty of the aforementioned charges. In light of Defendants' failure to satisfy their heavy burden at this stage of the proceedings, the Court denies the Motion for Judgment of Acquittal in its entirety.

## IV.     MOTION FOR NEW TRIAL

### _____A.       Whether the Theory of Counts 1-64 Was Flawed

In his primary challenge to the fairness of his trial, Defendant Fumo generally argues that the Government's theory underlying Counts 1 to 64 was flawed at its core. His precise argument contends that:

> [t]he government misapplied the general provisions of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, to make federal crime out of Senator Fumo's management of his state legislative office staff budget, among other theories. It cast the state Senate as a "victim" which was "deprived" of its "money or property" by "fraud" in a matter which no agency of state government has ever treated as a violation of any kind. The jury could not have found beyond a reasonable doubt that the Senate pay plan was mandatory, yet that assumption was the premise of the government's theory on "misclassification" of employees – a federal imposition on the internal workings of state government that the framers of the federal mail fraud statute would never have authorized. Because the jury may have relied on this confused, novel, and constitutionally inappropriate theory, a new trial must be granted.

(Defs.' Mem. 8.) Read in more detail, this claim appears to raise two separate arguments: (1) that the Government's theory of Fumo's scheme to defraud the Pennsylvania Senate was flawed, in that it made a federal crime out of a purported violation of state ethics that has never been acted upon by any agency of state government; and (2) that the evidence was insufficient for a jury to find, beyond a reasonable doubt, that the play plan was mandatory, and thus could not support a showing of fraud on the Senate. Neither of these propositions have any merit.

### 1. Whether the Government's Theory of Mail and Wire Fraud Based on a Scheme to Defraud the Senate Was Inherently Flawed

As to the first aspect of Defendant Fumo's claim, this argument was fully considered and addressed by the Court in a previous decision. While this case was still pending before the Honorable William H. Yohn, Defendant Fumo filed a motion, pursuant to Federal Rule of Criminal Procedure 12(b), to dismiss various counts of the Superseding Indictment against him.

With respect to the charged scheme to defraud the Pennsylvania Senate, Defendant argued, as he does now, that "the government has failed to allege that the Senate employees and contractors referenced in the . . . [i]ndictment failed to provide the legislative services for which they were paid," as "[n]either the Pennsylvania Public Official and Employee Ethics Act . . . nor the Rules of the Senate regulate work hours of Senate employees." United States v. Fumo, Crim. A. No. 06-319, 2007 WL 3132816, at *6 (E.D. Pa. Oct. 26, 2007). The Government responded by pointing to numerous instances where Fumo misused Senate employees during regular business hours. Id.

The Court rejected Fumo's argument as follows:

The indictment has alleged that [Fumo's] conduct was wrongful, namely because Senator Fumo violated state law – 65 Pa. Cons. Stat. § 1103, a prohibition on conflicts of interest – in his use of legislative employees for his personal and political benefit. The law supports this allegation: The Pennsylvania State Ethics Commission found a violation of the conflict of interest prohibition where a state representative's former employees testified that, "while in the employment by the Commonwealth, they participated in non-legislative activities conducted at the Harrisburg and primarily at the district office of [the representative]," including for "campaign, election, and fundraising purposes." In re Habay, Order No. 1313, at 32, 36 (Pa. State Ethics Comm'n Mar. 11, 2004). These activities took place "in [the representative's] legislative offices during normal office hours using Commonwealth equipment and supplies." Id. at 37. The same conduct led to the representative's conviction for violating § 1103. The conviction was recently upheld by the Pennsylvania Superior Court, which concluded that the representative "while a public official, knowingly and intentionally used the authority of his office to derive pecuniary gain in more than a de minimis fashion. Commonwealth v. Habay, No. 1518 WDA 2006, 2007 WL 29664427, at *4 (Pa. Super. Ct. Oct. 10, 2007). In the current indictment, the government appropriately relies on § 1103 in support of its allegations that the Senate does not approve of this type of conduct.

A Second Circuit case confirms that using state legislative employees for non-legislative tasks, while compensating them with state money, wrongfully deprives the legislature of its money or property. In United States v. Rubin, the defendant, who was "a special counsel to the Speaker of the New York State Assembly,"

67

challenged the sufficiency of the evidence supporting a jury's verdict finding him guilty of mail fraud. 844 F.2d 979, 980 (2d Cir. 1988). The Second Circuit found that the evidence, including the following, was sufficient: the secretaries "regularly submitted false certifications that they were performing specified Assembly jobs" an Assembly member "submitted certificates and vouchers affirming that [the secretaries] were providing the services called for in the designated positions"; and the secretaries spent "only 1% and 2% of their time on Assembly work." *Id.* at 984.

Differences between the conduct described in *Habay* and *Rubin* and Senator Fumo's alleged conduct are of degree, not kind. The proportion of time Senator Fumo's employees and contractors spent on legislative matters versus Senator Fumo's personal and political matters is a question of fact. As the indictment contains sufficient allegations of the wrongful conduct, I will deny the motion to dismiss.

Id. at *6-7 (footnotes omitted). In short, Judge Yohn found that the Government's theory of the case – that Fumo used state Senate employees, paid for with state funds, to perform work for his own personal and political benefit – to be a sound basis on which to rest federal mail and wire fraud charges. The sole question remaining was the quality of the evidence to support the Government's theory.

The Court now sees no basis on which to disturb this ruling or to re-evaluate an argument that has already been given thorough judicial review. Such an analysis is properly done on a timely filed motion for reconsideration. Even assuming Defendant had made such a motion, however, it is well-established that, given a court's interest in the finality of its judgments, "[m]otions for . . . reconsideration should be granted sparingly and may not be used to rehash arguments which have already been briefed by the parties and considered and decided by the Court." Kennedy Indus., Inc. v. Aparo, Civ. A. No. 04-5967, 2006 WL 1892685, at *1 (E.D. Pa. Jul. 6, 2006) (quoting Ciena Corp. v. Corvis Corp., 352 F. Supp. 2d 526, 527 (D. Del. 2005)).

Reconsideration is not permitted simply to allow a "second bite at the apple." See Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1231 (3d Cir. 1995). Litigants who fail in their "first attempt to persuade a court to adopt its position may not use a motion for reconsideration either to attempt a new approach or correct mistakes it made in its previous one . . . . [or] to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." Kennedy Indus., 2006 WL 1892685, at *1 (quotation omitted).

The Third Circuit has stated that the party seeking reconsideration must demonstrate "at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . .; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Max's Seafood Café by Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). Defendant Fumo fails to point to any of these grounds and, in fact, identifies no errors whatsoever in the prior analysis. Declining to allow Defendant Fumo to take a second bite at the apple, the Court simply rejects this portion of the Motion for New Trial for the reasons set forth in Judge Yohn's well-reasoned opinion.

**2.      Whether the Evidence Was Sufficient for a Jury to Find, Beyond a Reasonable Doubt, that the Pennsylvania Senate Pay Plan Was Mandatory and, Thus, Supportive of a Showing of Fraud on the Senate**

Alternatively, Defendant Fumo contends that the evidence adduced at trial was insufficient for a reasonable jury to find that the Senate pay plan was mandatory. Fumo specifically challenges the portion of the Government's charged scheme to defraud alleging that Fumo sought to have loyal Senate employees overpaid by falsely classifying them in better-

paying positions than their Senate duties justified. As this claim sounds entirely in a sufficiency of the evidence argument, the Court considers it under the standard set forth above for a motion seeking a judgment of acquittal.

The original pay plan (effective prior to 2004) and current pay plan (effective since 2004) of the Pennsylvania Senate were initially described at trial by Chief Clerk of the Senate, W. Russell Faber. (Govt. Exs. 101, 102.) Faber discussed the nature of these play plans and their efforts to classify every Senate employee into specific categories, in order to determine their salary range. He explained, as follows:

Q.    What is a job classification form?

A.    It is a form that delineates the job classification that the employee should be classified as that relates to the duties and responsibilities. It also indicates whether the employee is working in Harrisburg or in the district, whether they are full-time, part-time. If part-time, the number of hours per day or per week.

Q.    Now, is there any rule with regard to the appropriate purpose for hiring an employee? Does an employee have to do certain type of work in order to get paid?

A.    The Senate has a pay management plan in which all employees are classified based on their responsibilities of the job.

Q.    And the pay management plan – we'll look at that in a little bit. You're saying that classifies what employees do and get paid for?

A.    Yes.

Q.    Now, I'm going to ask you about employees doing personal tasks on behalf of the senator. As a general rule, can an employee be hired in order

> to be a personal assistant to a senator, say, to handle shopping and household errands and things like that?
>
> A.    No.
>
> Q.    Why is that?
>
> A.    Because they're not legislative duties.

(N.T. Faber 26-27, Oct. 22, 2008.)

Faber went on to explain that the entire book of job classifications, both as it previously existed and as it was amended, had been fully approved by the Committee on Management Organizations ("COMO"). (Id. at 70.) When asked whether the old plan was mandatory, he explained:

> Q.    Now the old plan that existed at the time, was this mandatory? Was it required that senators follow this plan?
>
> A.    Yes.
>
> Q.    Did anyone ever suggest to you that the plan was discretionary, that somebody could look at this as guidance, but pay an employee whatever they wanted?
>
> A.    No.
>
> Q.    And the idea in creating a new pay plan was the goal still to have a mandatory plan, but one that more met the values you were talking about?
>
> A.    Yes.

(Id. at 71-72.) Subsequently, Faber confirmed the same about the new plan:

Q.   You testified yesterday that the original plan was mandatory, was required – that this is how people classify their employees, correct?

A.   Yes.

Q.   Is this plan mandatory as well?

A.   Yes.

Q.   Now, what if you had a situation where someone – their description fell within the administrative group but the member just wanted to pay them more, maybe have an administrative worker who is just incredibly wonderful and the top – the highest he can go is fifty something thousand dollars a year on this chart and wants to give him 60,000.  Can a member do that?

A.   Pay above the range?

Q.   Yes.

A.   No.

Q.   And can a member – now, what we do then see if we're looking at the chart that my hypothetical, if you want to go from 50,000 to 60,000, you really need to get into a constituent relations, CR4.  Do you agree with that?

A.   Or one of the other classifications.

Q.   So if you had somebody who was doing administrative work, could you just reclassify them as constituent relations, CR4, so you can pay them what you want to pay them?

A.   Unless their duties have changed to encompass those of constituent relations, no.

(N.T. Faber 20-21, Oct. 23, 2008.)  Such testimony, standing alone, was sufficient for a jury to

find that the Senate pay plan was mandatory and that a violation of that pay plan constituted a

fraud on the Senate.

Nonetheless, that testimony was bolstered by concessions made by Defendant Fumo.  On

direct examination, he claimed, contrary to the testimony of Faber, that the pay plans were

merely advisory and not mandatory.  On cross-examination, however, he testified that COMO

designed the pay plan and was a "kind of rule making body."  (N.T. Fumo 151, Feb. 12, 2009.)

The new pay plan, currently in effect, was adopted and approved by COMO on January 27, 2004.

(Govt. Ex. 1804, 111.)  At the same meeting, COMO also established a new procedure for new

employee reclassification requests.  (Id. at 112.)  Fumo admitted that the reclassification

procedure established by COMO was one that had to be followed:

Q.      All right.  Essentially, what's described here is a process that COMO has
        set forth for the reclassification of employees, is that right?

A.      Yes.

Q.      And when you want to do that, it requires these approvals that we see
        identified here, correct?

A.      And this was one of the reasons why I was against it –

* * *

Q.      So this means that, essentially, this is the process that has to be followed if
        you're going to reclassify an employee correct?

A.      For reclassification, yes.

(N.T. Fumo 160-61, Feb. 12, 2009.)  Fumo thereafter admitted that, on multiple occasions, he

actually sought approval from COMO for exceptions to the pay plan requirements.  (Id. at 161-

65; Govt. Exs. 58, 66, 83, 89, 94, 97, 106, 109.)

      Ultimately, Fumo conceded that he was obligated to follow the COMO pay plans:

> Q.      All right.  But here's – I guess, here's the point.  You'd agree with me,
> wouldn't you, that the decisions to grant exceptions from the pay plan are
> presented to COMO and voted on by COMO, correct?

> A.      Yes.

> Q.      And COMO is the committee of the Senate that is sort of the – is the rule-
> making body, I think you said, that allows for or rejects these types of
> requests, correct?

> A.      They're in some – in a sense a rule-making body, yes.

> Q.      Okay.

> A.      The official Committee on Rules is different than COMO but COMO has
> that responsibility.  Exactly what it is, Committee on Management
> Operations.

> Q.      And so if you want to pay somebody more than what the pay plan would
> otherwise permit you present your request to COMO, it's considered by
> the members and it's voted on.  It's voted on either up or down, right?

> A.      That's correct.  If you can't find any other way to do it then you go to
> COMO.  COMO is a last resort.

(N.T. Fumo 167-68, Feb. 12, 2009.)  Further, Fumo agreed that although you could look for

creative ways to get an employee a particular salary, you could not just "make up" an employee's

job description.  If you could not find some honest and accurate justification for getting that

employee in that particular job range, then you would have to go to COMO to seek a reclassification request.  (Id. at 170-72.)  Finally, Fumo explicitly conceded that the employee reclassification procedure had the full force of law, that the procedure was mandatory for senators, and that "with respect to reclassifying employees, [he was] required to follow the procedure that is set forth in these Senate resolutions that were passed by the full Senate."  (Id. at 184-85.)  Moreover, nothing would have stopped him from approaching COMO with a request to create a new job category, such as that of "driver," in order to properly classify several of his Senate employees.  (Id. at 185.)

Considering all of this evidence, a reasonable juror was free to reject Fumo's original testimony that the Senate pay plans were not binding, and to accept both Faber's testimony and Fumo's cross-examination testimony that the pay plans were actually mandatory.  Once the jury found the pay plans to be mandatory, there was more than sufficient evidence, as set forth in detail above, that Fumo intentionally violated the Senate rules by submitting improper classifications for employees in order to obtain salaries for them that were not merited by their actual job duties.  The Court thus rejects this claim.

**B.      Whether the Court Improperly Allowed the Government to Introduce Evidence and Present Argument Regarding the State Ethics Act**

Defendant Fumo's second basis for his request for a new trial challenges the admission of evidence regarding the Pennsylvania Public Official and Employee Ethics Act, 65 Pa. Cons. Stat. 1101, *et seq.* ("Ethics Act").  In particular, Defendant asserts that this Court erred, under the Federal Rules of Evidence 403, 404(b), and 702, when it permitted John Contino, Executive Director of the State Ethics Commission – the body charged with enforcing the Act – to testify as

an expert witness on Pennsylvania's Ethics Act.  Defendant argues that, "[t]hrough Contino, and over objection, the government succeeded in placing before the jury numerous abridged versions of Ethics Commission opinions that were not binding in this case, as well as the 'fact' that violation of the Act is a 'felony.'" (Defs.' Mem. 8.)  According to Defendant, the Court's error in allowing this testimony was compounded by the Government's extensive cross-examination of Fumo on the same subject.  Ultimately, Defendants contend that, in light of these errors, the Court's cautionary instruction failed to mitigate the "repeated insinuation" at closing "that Senator's Fumo's conduct violated state law, would be deemed 'unethical' by his colleagues in state government, revealed a lack of knowledge of ethics rules of which he should have been aware, and amounted to a 'felony.'" (Defs. Mem. 9.)  The Court finds that none of these evidentiary rulings were either incorrect or prejudicial.

The Pennsylvania Ethics Act specifically prohibits a public official or public employee from engaging in conduct that constitutes a conflict of interest.  65 Pa. Cons. Stat. § 1103.  A "conflict of interest" is defined by the Act in part as "[u]se by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated."  Id. at § 1102.  Accordingly, the Ethics Act, which applies directly to members of the Pennsylvania Senate, went to the heart of the Government's alleged scheme to defraud – Fumo improperly used Senate employees, contractors, and equipment for his personal and political gain and then misrepresented the nature of their work to the Senate itself in order to avoid a violation of state law.  See Dobson, 419 F.3d at 239 (a scheme to defraud must involve

"a departure from fundamental honesty, moral uprightedness, or fair play and candid dealings in the general light of the community.").

In order to establish Defendant Fumo's violation of the Ethics Act, the Government introduced, as an expert witness, John J. Contino, the Executive Director of the State Ethics Commission, the body charged with enforcing the Act. Federal Rule of Evidence 702 permits expert witnesses when their testimony will assist the trier of fact and is based upon sufficient facts, the result of reliable methods, and the witness appropriately applies those facts and methods to the case at hand. FED. R. EVID. 702. As explained by the Third circuit, Federal Rule of Evidence 702's restriction addresses three concerns: qualifications, reliability, and fit. Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).

> Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." . . . Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." . . . Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). The United States Supreme Court has "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and. . . clarified that this gatekeeper function applies to all expert testimony." FED. R. EVID. 702, advisory committee's note (2000) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)).

Defendants' claims regarding the inappropriateness of Contino's testimony are without basis. As Executive Director of the Pennsylvania's State Ethics Commission – the body charged with enforcing the Commonwealth's Ethics Act – Contino was particularly well-suited to testify as an expert witness. Indeed, prior to the start of this trial, the parties argued before Judge Yohn about whether Contino could testify. Judge Yohn agreed that he could, stating that Contino was "well-qualified," making it "appropriate for him to talk about the Ethics Act." (Audio File of Hearing, June 30, 2008.)[20] More importantly, Judge Yohn found that Contino's testimony was reliable, relevant, and probative of the issues, and that it would be:

> helpful for the jury to have a description of the Ethics Act from somebody who knows about it. Certainly with a lot of effort, I could instruct the jury but that will be at the end of the trial. It would be helpful during the course of the trial to have somebody talk about the Act subject to cross-examination.

(Id.)

Subsequently at trial, Contino, consistent with Government's earlier proffer, provided his thorough knowledge of ethics laws and the ways in which legislative members were apprised of these laws. He further explained how and to whom the ethics laws applied and whether they were mandatory in nature. At no point did he express an opinion as to whether Fumo's actions violated the Ethics Act. During Contino's testimony, this Court received objections from both parties and, where appropriate, confined his responses so that they remained consistent with the demands of Rule 702. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 749 (3d Cir. 1994) (noting that determination of whether to exclude expert evidence is committed to the court's

---

[20] This testimony was transcribed from the audio file of the hearing.

discretion).  As such, in accordance with the Federal Rules of Evidence, the Court performed its gatekeeping function, determining that Contino's testimony was appropriate.

Likewise, the Court finds no error in allowing Contino to reference abridged versions of State Ethics Commission opinions, which summarized violations heard and ruled upon by the Commission.  It is well-established that evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  FED. R. EVID. 401.  Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger that it will be unduly prejudicial, confusing, or misleading to the jury.  FED. R. EVID. 403.  The trial judge may also exclude or limit relevant evidence if he concludes that its probative value is outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  FED R. EVID. 403.  The trial court's balancing of these factors should not be disturbed absent evidence of abuse of discretion.  See Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 146 n.2 (3d Cir. 2002) ("We review a district court's evidentiary rulings for abuse of discretion.  Moreover, where the applicable evidentiary rule is itself discretionary . . . we give the trial court's ruling substantial deference.") (citing Abrams v. Lightolier Inc., 50 F.3d 1204, 1213 (3d Cir. 1995)).

Repeatedly, courts have found that references to violations of other statutes, regulations, and rules, even though such violations are uncharged by the indictment, are relevant in defining an overall scheme to defraud.  See, e.g., United States v. Brown, 912 F.2d 1040, 1042 (9th Cir. 1990) (recognizing that reference to violations of civil banking regulations "helped form the backdrop of defendants' activities and to outline a motive for their convoluted financial

transactions," which were intended to defraud a bank of substantial sums of money); United States v. Bulei, Crim. A. No. 98-267, 1998 WL 544958, at *3 (E.D. Pa. Aug. 26, 1998) (finding that references in an indictment to the postal statute and regulation prohibiting the mailing of solicitations in the guise of bills, invoices, and statements of account are relevant to define the overall scheme to defraud, and are not inflammatory or prejudicial); United States v. Marker, Crim. A. No. 94-40002, 1994 WL 192018, at *10-11 (D. Kan. Apr. 15, 1994) (finding, with respect to an indictment charging mail and bank fraud, that reference to violations of federal regulations and internal civil policies and procedures was relevant to the defendants' intent and motive in structuring the transactions as they did).

Although Defendant Fumo now challenges this testimony as more unfairly prejudicial than probative, the Court disagrees. Just as the Articles of Incorporation of Citizens Alliance and the By-laws of the Independence Seaport Museum were relevant to the schemes to defraud those organizations, the ethics laws and rules of Pennsylvania were essential to clarify what expenditures and actions by Pennsylvania legislators are and are not permitted. At trial, the Defense sought to establish that Fumo's use of state employees and Senate resources for his personal and political benefit was permitted under the Senate rules. The ethics opinions introduced by the Government, through Contino, were probative in discrediting that defense. Further, they went directly to whether Fumo possessed the requisite criminal intent to actively participate in a scheme to defraud the Pennsylvania Senate. The Defense was provided a full opportunity to cross-examine Mr. Contino as to his understanding of these opinions. At appropriate points during both sides' questioning of Mr. Contino, the Court sustained and

overruled, as necessary, the various objections that were raised, in an effort to confine the testimony to its relevant and probative limits.

Moreover, the Court remained cognizant of the potential prejudice and the well-established law that references to the Ethics Act could be improper if their purpose or effect were to suggest to the jury that it could find Defendant Fumo guilty simply by reason of his violation of those laws.  United States  v. McElroy, 910 F.2d 1016, 1023-24 (2d Cir. 1990); United States v. Wolf, 820 F.2d 1499, 1505 (9th Cir. 1987).  To that end, this Court, at the conclusion of the trial, went to extreme lengths to mitigate any potential prejudice by instructing the jury as follows:

> You have heard evidence in this case regarding the provision of ethics laws affecting public officials of the State of Pennsylvania.   You have heard about two such laws, the Ethics Act and the Legislative Code of Ethics.  You may consider the evidence you heard in this regard to the extent that you find it sheds light on questions of willfulness, intent to defraud, and good faith.
>
> \*\*\*
>
> The opinions of the State Ethics Commission are rendered in individual cases, on specific sets of facts, and are published and distributed only for the general guidance of state employees.
>
> As I have already emphasized, the Defendants before you are not on trial for violating any laws other than the federal criminal laws cited in this indictment.  Specifically, any violation of these state ethics laws should not be considered by you as implying a violation of federal criminal law.  You may not convict Fumo of any of the counts alleging that he conspired or attempted to execute a scheme to defraud the Senate of money or property simply on the basis of a conclusion that he may have violated a state ethics law.  You may, however, consider evidence of any knowing violations of state law as you would any other evidence in determining whether Defendant Fumo devised a scheme to defraud the Senate of money or property, and whether he acted with the intent to defraud, as I have defined those terms.

(Jury Charge Prior to Closing Arguments, Feb. 23, 2009.)

Defendant Fumo now argues that "the jury cannot realistically be expected to have disregarded the repeated insinuation of these questions that Defendant Fumo's conduct violated state law [and] would be deemed 'unethical' by his colleagues in state government." (Defs.' Mem. 9.) This argument, however, ignores the fundamental presumption in the Third Circuit that juries generally follow the instructions given by the District Court. <u>United States v. Hakim</u>, 344 F.3d 324, 326 (3d Cir. 2003); <u>see</u> <u>also</u> <u>Francis v. Franklin</u>, 471 U.S. 307, 324 (1985) ("The [law] presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.").

Finally, the Court finds no error in the Government's cross-examination of Defendant Fumo regarding the Ethics Opinions. Defendant argues, in part, that:

> Once Mr. Fumo testified that he had no particular knowledge of the Ethics Commission opinions which the prosecutor was asking about and the prosecution had no basis to suggest otherwise, the repetition of these unfair questions and the defendant's patient efforts to give reasonable and truthful answers was far more unfairly prejudicial and confusing than it was probative of any relevant fact.

(Defs.' Mem. 9.)

This contention stands on tenuous grounds. In an effort to establish Fumo's awareness of these ethics rules, the Government, through Contino's testimony, introduced the Pennsylvania State Ethics Commission Annual Reports, which contain the summaries of the cases such as the ones discussed by Contino. (Govt. Ex. 850c.) Fumo's awareness of such reports was highly probative of his knowledge of the rules and intent to evade them, thereby bolstering the Government's charged scheme to defraud. Although these reports were distributed to all members of the legislature, and although Fumo had previously served on the Senate Ethics

Committee, Fumo repeatedly denied reading any of them. The Government appropriately chose to press the issue. Nothing in the Federal Rules either requires a prosecutor to placidly accept a defendant's answer or prohibits a prosecutor from probing a witness where there is reason to believe that the witness's answers are not entirely truthful.[21]

Nonetheless, out of an abundance of caution, the Court provided a limiting instruction reminding the jury that Fumo was not required to familiarize himself with Ethics Commission opinions, as follows:

> no law requires a Pennsylvania legislator to study the annual reports of the Ethics Commission, or of any of the many other commission and boards which submit annual reports to the Legislature, and the fact that a particular public official may or may not have read these reports does not constitute proof of any material fact in the present case.

(Jury Charge Prior to Closing Arguments, Feb. 23, 2009.)

In short, it was appropriate for the Government to present Contino as an expert witness. Such expert testimony clearly fit within the criteria provided for by Federal Rule of Evidence 702 and was relevant under Rule 403. Likewise, the cross-examination of Fumo regarding his awareness of the ethics opinions was also proper as it explained and provided context for Defendant's actions. In both instances, the Court's jury instructions appropriately cabined the permissible uses of Contino's testimony and the Government's cross-examination of Fumo. As the Court finds no error which had any influence, let alone a substantial influence, on the verdict, Defendant's Motion for a New Trial on this ground is denied.

---

[21] The Court finds it unnecessary to address the Government's lengthy discussion of the numerous ways in which Fumo's testimony was "riddled with falsehoods."

**C.** **Whether the Court Erred in Allowing the Government to (1) Introduce as Evidence the Fabricated Letter from John Carter and (2) Present Argument Regarding Fumo and Carter's Relationship**

Via his next claim, Defendant Fumo argues that the Court erred, under Federal Rule of Evidence 403, "when it allowed into evidence, over objection, a fabricated letter written by John Carter, with which Defendant Fumo was shown to have had no involvement." (Defs.' Mem. 10.) He goes on to claim that the prejudice caused by the letter's admission was compounded when this Court first permitted the Government to speculate, "without any basis in evidence, whether Fumo had committed some uncharged crime such as extortion or bribery to obtain the free use of ISM vessels," and then refused to give a "meaningful curative instruction or admonition." (Id.) The Court addresses these points individually.

**1.** **Introduction of the Carter Letter**

As discussed in detail above, the Government argued at trial that the President of the ISM, John Carter, improperly provided Defendant Fumo with $125,000 worth of perks, including free yacht cruises and ship models that he was not authorized to provide absent disclosure to the ISM Board of Port Wardens. The Government used a September 12, 2001 letter as evidence of a conspiracy between Defendant Fumo and Carter to defraud the ISM. The letter, from Carter to Fumo, stated:

> Dear Senator:
>
> Enclosed please find copies of the billings for the Hatteras SWEET DISTRACTION from your charter in August. Please remit the amount directly to the business office as the museum paid for the charter. I am assuming that you took care of the tip. I hope that the boat was all it was supposed to be, it looked good from the brochures that Priscilla sent me.

In the future you can deal directly with her in chartering vessels.  I enclose contact information for her in Florida and Newport in the summer.  She manages about 30 boats and has access to just about anything else.  A charter through her directly would mean that you wouldn't have to pay a charter broker fee to a broker for the charter (typically 5-10%).

At any rate I hope you enjoyed yourself and I look forward to seeing you in the near future.

(Govt. Ex. 1370j.)

Both Carter's production and the unique origin of the letter aroused considerable suspicion.  William Hill, an attorney retained by the ISM in Spring 2004, after the Museum received a grand jury subpoena, testified that he reviewed the Museum's records and did not find the September 12, 2001 letter in the Museum's files.  Further, Carter's administrative assistant stated that, unlike letters which she wrote, this letter did not include her initials suggesting that the letter had a provenance outside the customary Museum protocols.  Further, the administrative assistant never saw the letter prior to 2004.  Indeed, the first time anyone affiliated with the Museum – other than Carter – saw this letter was in 2004, when Carter provided the letter to Mr. Hill while FBI agents were at the Museum searching for records dealing with this case. Ultimately, at trial, the Government successfully established that the letter was created in 2004, but backdated to 2001.

At trial, Fumo did not dispute that the letter was false or had been backdated.  Rather, he asserted that he never saw the letter, that he played no role in its authorship and, as such, it was irrelevant and prejudicial to the case against him.  Such arguments however, do not detract from the relevance and obvious probative value of the letter.  It went directly to the heart of the Government's claim that Fumo defrauded the Museum with the assistance of Carter.  More

importantly, it helped disprove the crux of Fumo's defense, offered both at trial and in these post-trial motions, that Carter was authorized to allow Fumo free use of the Museum's yachts. Simply put, had Carter truly retained such authority, he would not have felt compelled, in the face of an FBI probe, to draft a letter falsely claiming to have billed Fumo for the yacht cruises back in 2001.

Additionally, Defendant Fumo has failed to establish that the probative value of this evidence was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. That evidence is unfairly prejudicial means that it possesses "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." FED. R. EVID. 403, advisory committee's note (1972). Rule 403 requires the judge to go through a:

> conscious process of balancing the costs of the evidence against its benefits. Unless the judge concludes that the probative worth of the evidence is "substantially outweighed" by one or more of the countervailing factors, there is no discretion to exclude; the evidence must be admitted. If, on the other hand, the balance goes against probative worth, the judge is not required to exclude the evidence but he "may" do so. In other words, the process of balancing is a prerequisite to the exercise of discretion but it is not a formula for its exercise; the rule presupposes a two-step process—balancing, then the discretionary judgment.

22 CHARLES ALAN WRIGHT AND KENNETH W. GRAHAM, JR., FED. PRAC. & PROC. EVID. § 5214 (2009).

The September 12, 2001 letter from Carter established that Carter knew of his lack of authority to provide the various benefits to Fumo. In turn, because Fumo's primary defense to the charged scheme to defraud the ISM rested on Carter's authority, the jury was free to use this

evidence as a piece of the overall puzzle regarding Fumo's intent to defraud. While the admission of the letter was detrimental to Defendant's case, it was not unfairly prejudicial, much less prejudicial to the point of substantially outweighing the obvious probative value.

### 2. Whether the Government Erred in Arguing, During Closing Arguments, that Fumo had Bribed Carter

Aside from disputing the Court's admission of the Carter letter, Defendant argues that "[u]nfair prejudice to the defense was ensured when the prosecutor, over objection, was permitted in closing argument to openly speculate, without any basis in evidence, whether Fumo had committed some uncharged crime such as extortion or bribery to obtain the free use of ISM vessels." (Defs.' Mem. 10.) As the Court refused to give meaningful curative instructions on this argument, Defendant now claims that he is entitled to a new trial.

The Court disagrees with Defendant. During closing, the prosecutor argued:

MR. ZAUZMER:    There is no other answer here other than he's taking for himself what he can get [from the ISM]. Does John Carter help him do it [defraud the ISM]? Absolutely. This doesn't happen without John Carter. And we don't know from the evidence in this trial why that is. There are possibilities you could think of. Maybe Mr. Fumo is deceiving Mr. Carter. Maybe he's telling him he is doing development, when he's not. Maybe Mr. Carter in some way, there's some kind of bribery or extortion going on – if I give you the yacht, I want to see more grants. Maybe –

MR. COGAN:    Objected to.

THE COURT:    Basis of the objection?

MR. COGAN:    Maybe there is bribery or extortion going on here?

| THE COURT: | Well, this is probably a fair, I think, maybe a comment on the evidence, or lack of evidence with regard to Mr. Carter. I think it's not objectionable but I would ask you to move past that. |
|---|---|
| MR. ZAUZMER: | I will do that, Your Honor, and moving away from that, the other maybe I was going to say, that is totally different, is maybe they just like each other. Maybe they like each other, and they're helping each other out. |
| | But the answer is, the point I'm getting at, is that none of that matters. Because for whatever reason John Carter has decided to help out Vince Fumo, John Carter can't do it either, and he knows that, and I'm going to show you that as we go through more evidence. |
| | Both Mr. Carter and Mr. Fumo are acting together here, doing things that both know they cannot do, in committing this fraud on the Independence Seaport Museum. |

(Audio File of Trial, Closing Arguments, Feb. 25, 2009.)[22]

Nothing in Defendant's Motion convinces this Court that the ruling at trial was mistaken. The prosecutor simply indicated that the jury could ponder any number of reasons for the dealings between Carter and Fumo, offering a few suggestions such as deceit, bribery, extortion, or perhaps a good friendship. At no point did the prosecutor accuse or ask the jury to find Fumo guilty of any uncharged crime. Indeed, he explicitly stated that nothing in the trial evidence allowed any clear explanation for the relationship between Carter and Fumo. Rather, the prosecutor concluded that regardless of why Carter gave Fumo free use of ISM's assets, the fact remained that the two men, acting in conjunction and without authority, fraudulently converted

---

[22] As this portion of the trial was not transcribed, the Court has reviewed the challenged argument via the audio tape and confirmed the Government's transcription of that argument.

some of ISM's assets for Fumo's personal use.  Such argument caused no unfair prejudice warranting a new trial.

### D.     Whether the Jury Instructions on the Elements of Fraud Contained Prejudicial Error

Defendants' next series of claims set forth various alleged errors in the jury instructions, which, they claim, entitle them to a new trial.  In determining whether jury charges are so misleading or inadequate as to be sufficiently prejudicial to warrant a new trial, they are to be viewed as a whole.  Savarese v. Agress, 883 F.2d 1194, 1202 (3d Cir. 1989).  "No error is present where either:  (1) the challenged instructions accurately state the law relating to the particular issue under scrutiny or (2) the instructions to which the moving party objects are practically identical to the proposed jury instructions submitted by the movant."  Drames v. Sun River Inv., S.A., 820 F. Supp. 209, 215-16 (E.D. Pa. 1993).  Which instructions are given and the language in which they are given are matters left to the sound discretion of the trial court.  United States. v. Simon, 995 F.2d 1236, 1243 n.11 (3d Cir. 1993).  "A defendant is not entitled to the jury instruction of his choosing or in his particular language."  United States v. Carter, 966 F. Supp. 336, 349 (E.D. Pa. 1997).  Ultimately, the trial court's jury instruction will not comprise reversible error if, "taken as a whole and viewed in the light of the evidence, [the instruction] fairly and adequately submits the issues in the case to the jury [without confusing or misleading the jurors]."  Simon, 995 F.2d at 1243 (quotations omitted).

In their first challenge to the jury instructions, Defendants assert that this "Court erred in charging the jury, under the mail and wire fraud law, in two ways."  (Defs.' Mem. 10.)  First, "the Court refused to instruct that any misrepresentations and concealments of material facts must

have been made to or kept from the named victim." Second, the Court again "refused" to instruct the jury that, that in order to be "'material' any misrepresentations and concealments of facts must be judged by reference to a person 'in the position of the alleged victim specified in the scheme at issue,' and that the alleged misrepresentations or concealments must be such as 'would' be important to the alleged victim." (Id. at 11.) Defendants' arguments are without merit.

<div style="margin-left:2em">

**1.      Whether the Court Erred When it Refrained from Instructing the Jury that Misrepresentations and Concealments Must Have Been Made to or Kept from the Named Victim**

</div>

Defendants' Motion for New Trial argues that this Court erred when it "refused to instruct that any misrepresentations and concealments of material facts must have been made to or kept *from the named victims.*"[23]  (Defs.' Mem. 10 (emphasis added).)  Instead, Defendants note that this Court instructed the jury that "defendants could be convicted if they misrepresented material facts to or concealed material facts *from a third party*, in furtherance of a scheme or artifice to defraud the named victim." (Id. at 10 (emphasis added).)  Defendants' Motion for a New Trial on this point simply incorporates and reiterates arguments raised in Defendants' Motion to Dismiss – a motion which Judge Yohn rejected.  (Id.)  Given that Defendants have

_____

[23] Defendants' assertion that this Court "refused to instruct that any misrepresentations and concealments must have been made to or kept from the named victim" suggests that Defendants objected to the proffered instruction and offered the instruction which they now suggest in their Motion for a New Trial.  Such is not the case.  Defendants never objected to this Court's jury instruction stating that "[a] misrepresentation in furtherance of a scheme to defraud need not be made directly to the victim of the fraud.  Thus, a misrepresentation made to a third party may be sufficient if made to further the fraud, and the other requirements of misrepresentation which I have explained are met."  (Jury Charge Prior to Closing Arguments, Feb. 23, 2009.)

only repeated their prior arguments, they are effectively seeking this Court's reconsideration of its prior decision.

As noted above, given a court's interest in the finality of its judgments, "[m]otions for . . . reconsideration should be granted sparingly and may not be used to rehash arguments which have already been briefed by the parties and considered and decided by the Court."  Kennedy Indus, 2006 WL 1892685, at *1 (quoting Ciena Corp., 352 F. Supp. 2d at 527).  Litigants who fail in their "first attempt to persuade a court to adopt its position may not use a motion for reconsideration either to attempt a new approach or correct mistakes it made in its previous one. . . . [or] to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided."  Id. (quotation omitted).

Judge Yohn directly examined and rejected Defendants' argument that "any misrepresentations and concealments of material facts must have been made to or kept from the named victim."  Specifically, the Court noted that:

> to support the charges, misrepresentations need not be made directly to the victim. In *United States v. Olatunji*, the defendant argued that "an indictment alleging 'false and fraudulent pretenses and representations' under 18 U.S.C. § 1341 must specifically allege that such false statements and representations were made directly to the ultimate victim."  872 F.2d at 1168.  The Third Circuit rejected that argument, declining to create "a special pleading rule for indictments under section 1341."  *Id.*; *accord United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998); *United States v. Pepper*, 51 F.3d 469, 472-73 (5th Cir. 1995).  Therefore, the allegations that Senator Fumo made misrepresentations and directed others to make representations to third parties – for example, to Citizens Alliance's accountants (Ind. 127-28), to the IRS (Ind. 128-30), to the state court that handled litigation involving Senator Fumo's political rival (Ind. 132-33), and to the Secretary of State of Pennsylvania in corporate filings (Ind. 134) – are sufficient. Thus, I will not dismiss Counts 65 through 98 for failure to allege misrepresentations or deliberate concealment.

Fumo, 2007 WL 3132816, at *14.  In challenging that ruling at this juncture, Defendants have

failed to show the existence of:  (1) an intervening change in the controlling law; (2) new

evidence, or (3) the existence of clear errors of law or fact that must be corrected to prevent

manifest injustice.  Max's Seafood Café, 176 F.3d at 677.  Accordingly, nothing warrants this

Court's reconsideration of its prior ruling that misrepresentation need not be made directly to the

victim.

Nonetheless, even this Court's independent examination of the merits of Defendants'

argument fails to reveal any error in the instructions.  Defendants cite no law supporting their

claim that such a scheme to defraud hinges upon the assertion that misrepresentations or

concealments be made to the named victims.  Quite to the contrary, many circuits have found that

to make misrepresentations to or concealments from a third party is to engage in conduct that

violates 18 U.S.C. § 1341.  See e.g. United States v. Olatunji, 872 F.2d 1161, 1168 (3d Cir.

1989) (rejecting defendant's argument that, for purposes of 18 U.S.C. § 1341, false statements

and representations must be made directly to the ultimate victim); United States v. Consentino,

869 F.2d 301, 307 (7th Cir. 1989) (holding that misrepresentations to Department of Insurance to

allow scheme to defraud insurance company and policyholders to go undetected was sufficient

for purposes of mail fraud); United States v. Blumeyer, 114 F.3d 758, 767-68 (8th Cir. 1997)

(noting that a scheme to defraud could include false statements to a third party, in these cases,

state regulators.); see also United States v. Christopher, 142 F.3d 46, 54 (1st Cir. 1998) (rejecting

the convergence theory and noting that "nothing in the mail or wire fraud statute requires that the

party deprived of money or property be the same party who is actually deceived.")  Given this

well-established principle, the Court's jury instruction was appropriate when it charged that "a

misrepresentation made to a third party may be sufficient if made to further the fraud, and the other requirements of misrepresentation which I have explained are met." (Jury Charge Prior to Closing Arguments, Feb. 23, 2009.)

### 2.    Whether the Court Failed to Properly Instruct on Materiality

The second prong of Defendants' challenge focuses on the proper vantage point to be assumed by the jurors when determining the materiality of misrepresentations or concealments. Defendants' critique rests on two separate points. First, Defendants assert that the charging instructions erred when stating that misrepresentations or concealments "might" be important to the alleged victim, as opposed to "would" be important. (Defs.' Mem. 11.) Second, Defendants argue that although materiality must be examined from the "position of the alleged victim specified in the scheme at issue," the Court mistakenly "instructed on materiality only in relation to a generic 'reasonable and prudent person.'" (Id.) Ultimately, Defendants argue that the combination of these errors resulted in jury instructions that run counter to the Supreme Court's decision in Neder v. United States, 527 U.S. 1, 20-22 (1999).

Notably, this Court's instructions were taken, verbatim, from the Third Circuit's Criminal Model Jury Instructions. Specifically, the Model Jury Instructions (and this Court's instructions) state that:

> [a] material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision. This means that if you find that a particular statement of fact was false, you must determine whether that statement was one that a reasonable person might have considered important in making his or her decision.

Third Circuit Criminal Model Rules § 6.18.1341-1 (2009); (Jury Charge Prior to Closing Arguments, Feb. 23, 2009.) This Court's reference to a "reasonable and prudent person" as well

its use of the word "might" are consistent with the Third Circuit's Criminal Model Jury Instructions.  That said, however, the Court recognizes that reliance upon these instructions, is not sufficient to rebut Defendants' assertions.  See generally Virginia v. Black, 538 U.S. 343, 377 (2003) (noting that model instructions which are neither promulgated by the legislature nor adopted by the highest court, and which do not accurately state law, are erroneous and should be refused).  Accordingly, this Court will independently analyze Defendants' two arguments.

> **a.** **This Court's Use of "Might" as Opposed to "Would" is Not in Error**

Defendants' reliance upon Neder v. United States, supra, for the proposition that the word "would" instead of the word "might" was required in the jury instructions regarding materiality is misplaced.[24]  Neder instructs only that, a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  Neder, 527 U.S. at 16.  A statement that "might" influence a jury is one that by definition and pure common sense possesses a "natural tendency to influence" or "is capable of influencing" jurors.  As such, contrary to Defendants' assertions, the use of "might" in the jury instructions remains consistent with Neder's understanding of materiality.

---

[24] Regarding the portion of Neder cited by Defendants, this Court cannot discern its relevance.  In these sections, the Supreme Court announced a holding that is seemingly contrary to Defendants' argument, namely that harmless error analysis "block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial."  Id. at 19-20 (citing Chapman v. California, 386 U.S. 18, 22 (1967).)  Accordingly, the Supreme Court held that the "District Court's failure to submit the element of materiality to the jury with respect to the tax charges was harmless error."  Id. at 19-20.  Likewise, this Court believes that use of "might" instead of "would" is, at most, just the sort of "small error" that the Supreme Court determined to be harmless because it had little, if any, likelihood of changing the trial result.

Moreover, even assuming *arguendo* that Defendants' argument is correct, this Court finds that use of "might" instead of "would" constitutes harmless error. The United States Supreme Court has noted that harmless error analysis asks "whether the error itself had substantial influence. If so, or if one is left in grave doubt," the ruling cannot stand. Kotteakos v. United States, 328 U.S. 750, 765 (1946). Harmless error analysis requires that there be some prejudice due to the error. United States v. Cedeno, Crim. A. No. 05-215, 2008 WL 4415600, at *5 (M.D. Pa., Sept. 26, 2008) (citing United States v. Stevens, 223 F.3d 239, 246 (3d Cir. 2000)). The Supreme Court, in Neder v. United States, remarked that when conducting harmless error analysis, the court "asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is 'no,' holding the error harmless does not 'reflec[t] a denigration of the constitutional rights involved.'" 527 U.S. 1, 20 (1999) (quoting Rose v. Clark, 478 U.S. 570, 577 (1986)).

This Court has found only one case addressing the "might" and "would" distinction. In that non-binding, albeit informative, opinion, the Missouri Court of Appeals addressed appellant's claim that when determining materiality, the jury instructions should have stated that evidence was material if the evidence concealed "would have" influenced the defendant. Meeker v. Shelter Mut. Ins. Co., 766 S.W. 2d 733, 743 (Mo. Ct. App. 1989.) Instead the jury instructions asked whether the evidence "might reasonably have" influenced the defendant. Id. The court paid no heed to the "might" or "would" distinction, instead noting that "[t]he instruction is a proper definition of the word 'material' under the facts of this case. The point has no merit." Id.

Likewise, this Court believes that fixation on "might" or "would" in this context "has no merit," as Defendants have not shown what role, if any, that word choice could have played

much less that the effect would have been "substantial." Defendants parsing of "might" versus "would" amounts to analyzing a distinction without a difference. In the context of a one hundred thirty-seven count indictment, it is unreasonable to think that the jurors, when conducting their fraud analysis, sought to discern "whether that statement was one that a reasonable person *might* have considered important" as opposed to "whether that statement was one that a reasonable person *would* have considered important."

Defendants have not argued, much less shown, that the use of the word "might" instead of "would" had any effect on the jury verdict. This Court is hard-pressed to see how use of "would" may have led to a contrary finding by the jury. As noted above, "a defendant is not entitled to the jury instruction of his choosing or in his particular language." <u>Carter</u>, 966 F. Supp. at 349. Accordingly, any error is entirely harmless.

### b. Reasonable Person or Alleged Victim

Defendants next argue that this Court should have instructed that materiality must be examined from the "position of the alleged victim specified in the scheme at issue." (Defs.' Mem. 11.) Instead of offering this instruction, however, the "Court instructed on materiality only in relation to a generic 'reasonable and prudent person.'" (<u>Id.</u>)

Defendants' argument finds no basis in any jurisprudence. First, Defendants' citation to <u>Neder</u> is again misplaced. Nowhere does <u>Neder</u> state that the proper basis for examining materiality is from the vantage of the alleged victim instead of from the repose of the law's favorite strawman: the reasonable person. In fact, <u>Neder</u> suggests just the opposite. The Supreme Court expressly adopted the Restatement (Second) of Torts, which provides that a matter is material if "*a reasonable man* would attach importance to its existence or nonexistence

96

in determining his choice of action in the transaction in question." Neder, 527 U.S. at 22 n.5 (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 538 (1977)).

Courts in this Circuit have followed Neder's lead in utilizing the "reasonable person" standard. For example, in United States v. Zomber, 358 F. Supp. 2d 442 (E.D. Pa. 2005), the district court denied defendant's Motion to Vacate His Conviction and for Entry of Judgment of Acquittal or a New Trial. Id. at 458-59. As in the present case, defendant was convicted under 18 U.S.C. §§ 1341, 1343. He objected to the court's jury instructions regarding the materiality of misrepresentations on the basis that they predicated a finding of materiality on the determinations of a "reasonable person." Id. at 459. The Zomber court rejected defendant's proposed jury instructions, finding that the "instructions on materiality adequately conveyed to the jury that the fraudulent misrepresentations must have been misleading to a reasonable person under the circumstances." Id.; see also Braunstein v. Benjamin Berman, Inc., Civ. A. No. 89-5344, 1990 WL 192547, at *16 (D.N.J. 1990) ("The test for materiality is 'whether the existence or non-existence of the fact in question is a matter to which a reasonable [person] would attach importance in determining [a] choice of action.'") (citing Casella v. Webb, 833 F.2d 805, 807 (9th Cir. 1989)).

Looking at the jury instructions in context of the entire indictment, Savarese, 883 F.2d at 1202, the Court's use of "reasonable person" was entirely appropriate for two reasons. First, as the Government suggests, the reference to a reasonable person functions as a form of shorthand. (Govt. Resp. 123.) The Indictment alleged separate schemes to defraud different entities. In this context, the jury instructions, relying upon the Model Instruction's reference to a "reasonable and prudent person" utilized this standard in the specific situation of each charge. Thus, the

"reasonable and prudent person" did not create an abstraction wholly divorced from the specifics of this suit, rather it suggested a "reasonable and prudent person" from the vantage point of each scheme.

Second, Defendants' demand for the jury instruction to focus upon "alleged victims" is in error given the very nature of many schemes to defraud. As noted above, a scheme to defraud need not involve misrepresentations to or concealments from the alleged victim(s). Schemes to defraud may be carried out by deceiving third parties. In such cases, the person being deceived and the alleged victim may be different, yet Defendants propose that the jury instruction should have focused upon the alleged victim instead of the one being deceived. To view these misrepresentations from the vantage of the "alleged victim specified in the scheme at issue" would make no sense, as the victim and the one being deceived are not necessarily the same. Certainly, the fraud statutes do not lose their teeth simply because the alleged victim, relying upon trusted third parties, believes that everything was fine. As this Court noted previously, "the Third Circuit has expressly rejected the proposition that as a matter of law . . . an Indictment alleging 'false and fraudulent pretenses and representations' under 18 U.S.C. § 1341 must specifically allege that such false statements and representations were made *directly* to the ultimate victim." United States v. Bryant, 556 F. Supp. 2d 378, 436 (D.N.J. 2008) (citing United States v. Olatunji, 872 F.2d 1161, 1168 (3d Cir. 1989) (emphasis in original; some internal quotation marks omitted)); see also Fumo, 2007 WL 3132816 at *10.

This Circuit's Model Rules impliedly acknowledge this point when they provide that a scheme to defraud is "any plan, device, or course of action to deprive another of money or property, or of the intangible right of honest services, by means of false or fraudulent pretenses,

representations or promises reasonably calculated to deceive persons of average prudence." Third Circuit Criminal Model Jury Instructions § 6.18.1341-1 (2009). The Model Instructions further note that the indictment alleges that "the scheme to defraud was carried out by making false (*or fraudulent*) statements." Id. (emphasis in original). Having instructed verbatim from this Rule and finding that this Rule accurately states the law, this Court finds that use of the "reasonable person" standard was appropriate.

E. **Whether the Court Erred in Refusing to Charge on "Good Faith," Which Was Defendants' Theory of the Case**

Alternatively, Defendants assert that the "Court should have exercised its discretion, under all the circumstances of this case to charge the jury that the defendants' 'good faith' belief that their conduct was permissible was a valid defense, as to which the government bore the burden to refute beyond a reasonable doubt." (Defs.' Mem. 11.) Defendants' argue that this defense applied, "in one or another form, to all counts in this case," and that the "lack of a supporting jury instruction requires a new trial." (Id.)

Although the burden of proving state of mind rests with the Government, nothing in the Third Circuit case law mandates a good faith instruction where a defendant presents "good faith" as a defense. In United States v. Gross, the Third Circuit sided with the majority of circuits in holding that "an instruction setting forth all of the elements of a 'knowledge' crime is sufficient and, hence . . . a district court does not abuse its discretion in refusing to instruct on the good faith defense." 961 F.2d 1097, 1103 (3d Cir. 1992). The Third Circuit noted that "[w]e are persuaded by the majority view, and agree that a jury finding of good faith is inconsistent with a finding that the defendant acted knowingly and willfully." Id. By way of further explanation, it indicated that,

"if an instruction already contains a specific statement of the government's burden to prove these elements of the crime, the good faith instruction is simply a redundant version of the instruction on those elements." Id. at 1103. The court concluded that "[w]hile it was not reversible error for the district court to refuse to give the good faith instruction in this case, we commend to the district judges in the exercise of their discretion its use as a supplement to the 'knowing and willful' charge in future cases." Id.; see also United States v. Leahy, 445 F.3d 634, 651-52 (3d Cir. 2006) (reaffirming Gross); United States v. Rudolph, Crim. A. No. 06-001, 2006 WL 1120680, at *2-3 (W.D. Pa., Ap. 26, 2006) (looking at the elements of the crimes charged, and overruling defendant's objection to the lack of an instruction on a separate "good faith" defense).[25]

This case involved one hundred thirty-seven counts, four conspiracies, and several fraud schemes. The jurors faced an arduous task – to sift through reams of evidence and a web of charges in order to reach a verdict on each one of these counts. This Court, in the exercise of its discretion and per the Third Circuit's directives, carefully gave the jury specific instructions providing detailed descriptions of the elements of each alleged crime. These instructions reminded the jury that it needed to find the requisite mental element for each charge. These requisite mental states imply the opposite of good faith. Superimposing a good faith defense atop

---

[25] The majority opinion has been espoused by United States v. McElroy, 910 F.2d 1016, 1025-26 (2d Cir. 1990); United States v. Rochester, 898 F.2d 971, 978-79 (5th Cir. 1990); United States v. Nivica, 887 F.2d 1110, 1125 (1st Cir. 1989); United States v. Green, 745 F.2d 1205, 1209 (9th Cir. 1984); United States v. McGuire, 744 F.2d 1197, 1201-02 (6th Cir. 1984); United States v. Gambler, 662 F.2d 834, 837 (D.C. Cir. 1981). The two circuits finding it an abuse of discretion to not give an abuse of discretion instruction, even though instructions giving the element of crime have been provided are the Eighth Circuit, United States v. Casperson, 773 F.2d 216, 223-24 (8th Cir. 1985), and the Tenth Circuit, United States v. Hopkins, 744 F.2d 716, 718 (10th Cir. 1984), overruled on other grounds, United States v. Cooper, 992 F.2d 1223 (10th Cir. 1993).

of this Court's instructions would have been unnecessary surplusage and would have only served to confuse the jury. Accordingly, this Court did not err in declining to offer Defendants' proposed "good faith" instruction.

**F.      Whether the Court Erred in Its Instructions on the Obstruction of Justice Counts**

In their final challenge to the jury instructions, Defendants Fumo and Arnao argue that this Court erred in two respects when instructing the jury on the obstruction of justice charges. First, Defendants contend that the Court should have charged the jury, as required by <u>Arthur Andersen LLP v. United States</u>, 544 U.S. 696 (2005), that to be guilty on any count the Defendants must have acted with a "subjective consciousness of wrongdoing." (Defs.' Mem. 12.) Second, Defendants assert that the Court, while informing the jury that document retention policies which are "created in part to keep certain information from getting into the hands of others" are "common in business" and not inherently wrongful, omitted the key phrase "including the government" after the phrase "hands of others." In so doing, Defendants argue that the Court may have "misled the jury into giving too little weight to the defense presentation concerning the obstruction counts in this case." (<u>Id.</u>) The Court finds no error in the instructions.

**1.      Whether the Court Properly Instructed the Jury as to the Required State of Mind for Obstruction of Justice**

The Government's obstruction of justice charges are based upon three different statutes: (1) 18 U.S.C. § 1512(b)(2); (2) 18 U.S.C. § 1519; and (3) 18 U.S.C. § 1512(c)(1). Defendants assert that per <u>Arthur Andersen</u>, this Court should have charged the jury that "to be guilty on any count the defendants must have acted with a subjective consciousness of wrongdoing." (<u>Id.</u>)

Examination of the instructions provided reveals no error, as they addressed the requisite *mens rea* and level of culpability.

### a.      18 U.S.C. § 1512(b)(2)(B)[26]

This Court's instructions as to this statute noted that in order to find a defendant guilty, the Government must show, beyond a reasonable doubt, that "[t]he defendant knowingly corruptly persuaded another person." (Jury Charge Prior to Closing Arguments, Feb. 23, 2009.) The jury instructions defined "corruptly persuade" as "to corrupt another person by persuading him or her to violate a legal duty, to accomplish an unlawful end or unlawful result, or to accomplish some otherwise lawful end or lawful result in an unlawful manner." (Id.) Further, "[a] person acts 'corruptly' if he acts without legal basis to cause or induce another person to withhold evidence from an official proceeding . . . which has been instituted or contemplated." (Id. at 53.)

This language is consistent with Arthur Andersen. In that case, the Supreme Court examined a district court's jury instructions that "failed to convey the requisite consciousness of wrongdoing" necessary to find a conviction based upon 18 U.S.C. § 1512(b)(2). Arthur Andersen, 544 U.S. 696, 698. These erroneous instructions provided that the elements of obstruction could be satisfied by showing that the alleged actions were taken to "subvert,

---

[26] 18 U.S.C. 1512(b)(2)(B) provides that:

[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--cause or induce any person to-- alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding.

18 U.S.C. § 1512(b)(2)(B).

undermine or impede" the underlying proceeding.  Id. at 706.  The Supreme Court rejected such instructions as they failed to inform the jury of the required *mens rea*.  Id.  In the process, the Court engaged in a lengthy examination of document retention policies, as well as the plain language interpretation of contested terms in the statue; specifically "knowingly" and "corruptly persuading."  Id. at 703-06.  The Court noted that document retention policies that withhold documents from the Government are neither "inherently malign" nor "necessarily corrupt."  Id. at 703.  As such, the Court determined that instructions which stated that the obstruction statute could be satisfied if the jurors determined that defendant's withholding of documents from the Government may have impeded a governmental proceeding were in error.  Id. at 706-07.  Such instructions not only lacked the requisite *mens rea* but also had the effect of diluting what constituted acting "corruptly."  Id. at 706.  The instructions deviated from the language of 18 U.S.C. § 1512(b)(2)(B), which defined as criminal those actions that "knowingly . . . corruptly persuad[ed]" another.  Id. at 704.  The Court further noted that as "knowingly" precedes the listed actions, it should be read as modifying those actions, including "corruptly persuading."  Id. at 705.

In the present case, this Court's instructions made clear that a conviction under 18 U.S.C. § 1512(b)(2), requires a finding that defendant "knowingly corruptly persuaded another . . . to violate a legal duty, to accomplish an unlawful end or unlawful result, or to accomplish some otherwise unlawful end or lawful result in an unlawful manner."  (Jury Charge Prior to Closing Arguments, Feb. 23, 2009.)  Unlike the jury instructions in Arthur Andersen, this Court's jury instructions conveyed both "the requisite consciousness of wrongdoing," and was tailored so that it did not allow a jury to punish subjectively innocent behavior.  Id. at 706.

### b.    18 U.S.C. § 1519

The language and structure of section 1519 largely mirrors that of 18 U.S.C.

§1512(b)(2)(B). Like section 1512(b)(2)(B), section 1519 requires that in order to be convicted it

must shown that the accused acted "knowingly." Specifically, the statute provides that:

> [w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or
> makes a false entry in any record, document, or tangible object with the intent to
> impede, obstruct, or influence the investigation or proper administration of any
> matter within the jurisdiction of any department or agency of the United States or
> any case filed under title 11, or in relation to or contemplation of any such matter
> or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519. While section 1519 was authored after the Supreme Court's decision in <u>Arthur</u>

<u>Andersen</u>, that case serves as a touchstone for measuring the appropriateness of this Court's jury

instructions regarding obstruction claims based upon other statutes.

This Court's jury instructions were clearly consistent with <u>Arthur Andersen</u> in that they

required a determination that the accused possessed the appropriate *mens rea*. Specifically, the

instructions noted that the first element necessary for a finding that section 1519 was violated was

that "[t]he defendant knowingly altered, destroyed, mutilated, or concealed the record, document,

or tangible object charged in that count." (Jury Charge Prior to Closing Arguments, February 23,

2009.) The instructions noted how section 1519, unlike section 1512, provides that "the

government need not prove . . . that the defendant acted 'corruptly.'" (<u>Id</u>.) The instructions,

however, stated that

> to prove a violate of Section 1519, the government must prove beyond a reasonable
> doubt that the defendant acted knowingly, that is with awareness of what he or she
> was doing; and that he or she acted with the intent to impeded, obstruct, or
> influence an FBI or IRS investigation which he or she either knew of or
> contemplated.

(Id.)  Such language tracks both the statute and Arthur Andersen's requirement that the jury instructions "convey the requisite consciousness of wrongdoing," as well as culpability.  Arthur Andersen, 544 U.S. at 706.

### c.    18 U.S.C. § 1512(c)(1)

Finally, 18 U.S.C. § 1512(c)(1) applies to a person who "corruptly" alters, destroys, or conceals documents in an effort to impair that document's availability for a grand jury.  18 U.S.C. § 1515(c)(1).  More precisely, the statute provides that "[w]hoever corruptly – alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding . . . shall be fined under this title or imprisoned not more than 20 years, or both."  18 U.S.C. § 1512(c)(1).

While the statute makes no reference to the accused's "knowledge," this Court did not ignore the need to show "subjective consciousness of wrongdoing."  The jury instructions conformed to the elements of 18 U.S.C. § 1512(c)(1), stating that the elements of a violation under this statute required a finding that the "[t]he defendant corruptly altered, destroyed, mutilated, or concealed a record, document, or other object" and "acted with the intent to impair the object's integrity or availability for use in a federal grand jury investigation."  (Jury Charge Prior to Closing Arguments, February 23, 2009.)  In short, the jury instructions, consistent with Arthur Andersen, reiterated that "to act 'corruptly' means to act *purposefully* to violate a legal duty, to accomplish an unlawful end or unlawful result, or to accomplish some otherwise lawful end or lawful result in an unlawful manner."  (Id. (emphasis added).)  This Court's jury instructions appropriately focused upon both the "corrupt" nature of the actions, as well as purposefulness indicating a "subjective consciousness of wrongdoing."  As with the jury

instructions regarding sections 1512(b)(2)(B) and 1519, Defendants' claim that this Court's jury instructions failed to instruct that "defendants must have been acted (*sic*) with a subjective consciousness of wrongdoing" is without any basis.

>    **2.**    **Whether the Court Properly Instructed the Jury by Failing to Include the Phrase "Including the Government"**

Finally, Defendants assert that the jury instructions, which provided that document retention policies "created in part to keep certain information from getting into the hands of others" are "common in business" and not inherently wrongful, omitted the key phrase "including the government" after the phrase "hands of others." As a result, Defendants argue that the Court may have "misled the jury into giving too little weight to the defense presentation concerning the obstruction counts in this case." (Defs.' Mem. 12.) Defendants' arguments are unavailing.

In Arthur Andersen, 544 U.S. at 705-06, the United States Supreme Court explained that "'Document retention policies,' which are created in part to keep certain information from getting into the hands of others, *including the Government*, are common in business." 544 U.S. at 705-06 (emphasis added). The substance of this Court's instructions effectively mirrored the statement in Arthur Andersen. Indeed, reading the instruction in its entirety provides context and underscores the weakness of Defendants' argument:

>    The fact that a defendant had a prior practice of deleting or destroying documents, e-mails, or other materials, before he or she knew of or contemplated any investigation, is not in and of itself a defense to a charge of obstruction of justice. *'Persuad[ing]' a person 'with intent to . . . cause' that person to keep documents away from a government proceeding or government official is not inherently wrongful. 'Document retention policies,' which are created in part to keep certain information from getting into the hands of others are common in business.*
>
>    You certainly may consider evidence of a defendant's prior practice in determining whether he or she at the time or times alleged in any count acted with the intent to obstruct justice, as I have explained that requirement with regard to each statute.

> But if the government proves beyond a reasonable doubt that, once a defendant learned of or came to contemplate an investigation, he or she acted to destroy documents or other objects with the intent to obstruct or impede that particular investigation, you may find the defendant guilty of an obstruction offense, regardless of his or her prior practice. If upon careful consideration of all the evidence, including evidence of any defendant's past practices with regard to record retention or disposition, you are left with a reasonable doubt whether that defendant at the time alleged in any count harbored the specific intent required for conviction, then you must return a verdict of not guilty on that count.

(Jury Charge Prior to Closing Arguments, Feb. 23, 2009 (emphasis added).) Given this context, it is clear that the instruction informed the jury that a policy which keeps documents from the government or its officials "is not inherently wrongful." (Id.) Placement of the phrase "including the government" after "the hands of others" would have been unnecessarily redundant, as the sentence immediately prior noted that, under Section 1519, withholding documents from the Government is not "inherently wrongful."

This Court's instructions properly and thoroughly addressed Defendants' concerns and explained that, absent the requisite *mens rea*, a long-standing, good-faith document retention policy that withheld documents from the government could not be used to convict Defendants of obstruction of justice. Accordingly, Defendants' argument is without basis.

**G.** **Whether the Court Abused Its Discretion in Allowing the Jury to Use the Unredacted Indictment as a Guide to Its Deliberations**

Defendants next claim that the Court erred in permitting the jury to take the unredacted Indictment with it into the jury deliberation room. Specifically, Defendants argue as follows:

> The Court should not have allowed the grossly overwritten, argumentative, and unnecessarily detailed indictment in this case to be sent out into the jury room. The defense had produced a carefully and fairly redacted indictment and detailed verdict sheet which would have allowed the full nature of the charges, including all the excessively numerous overt acts, to be known to the jury without unfair

107

prejudice. Instead, when coupled with a verdict slip which did not specify what was charged in each count, the supplying of the highly unusual, evidence-quoting indictment (the antithesis of a "plain, concise and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1)) ensured that the jury would use the government's version and theory of the case as its essential guide to their deliberations. This abuse of discretion, see United States v. Todaro, 448 F.2d 64, 66 (3d Cir. 1971), requires a new trial.

(Defs.' Mem. 12-13). Having fully considered this issue, the Court finds that this claim does not support the grant of a new trial.

The Third Circuit has affirmatively recognized that a trial judge retains the discretion to allow jurors to have a copy of the indictment with them during their deliberations, so long as it is subject to a limiting instruction that the indictment does not constitute evidence and is only an accusation. U.S. v. Todaro, 448 F.2d 64, 66 (3d Cir. 1971). Similarly, other Courts of Appeals have acknowledged that it is common practice to either read the indictment to the jury or allow the jury to take a copy of the indictment into the deliberation room. See, e.g., United States v. Crossland, 642 F.2d 1113, 1115 (10th Cir. 1981) (allowing copy of indictment to go to jury); United States v. Long, 706 F.2d 1044, 1056 (9th Cir. 1983) (finding no error in judge reading indictment to jury where jury was instructed that it was not evidence); United States v. Jones, 587 F.2d 802, 805-06 (5th Cir. 1979) (finding no abuse of discretion in reading part of indictment to jury and instructing jury to read the rest).

Even if the trial court errs, however, in allowing an improperly redacted indictment or an indictment containing some prejudicial information to go to the jury, a new trial is not warranted if the error is harmless. If the error does not involve a violation of a constitutional right, as in the case of a submitted indictment, the court may affirm "so long as there is a 'high probability' the error did not contribute to the conviction." United States v. Molina-Guevara, 96 F.3d 698, 703

(3d Cir. 1996). Courts have generally found no prejudicial error in the submission of the indictment where the jury was instructed that the indictment was not evidence. See United States v. Tunick, 48 Fed. Appx. 420, 422 (3d Cir. 2002) ("[t]he District Court's explicit warning to the jury that the indictment was not evidence cured any potential for prejudice created by giving the indictment to the jury. Moreover overwhelming evidence of [defendant's] guilt supported the jury's verdict."); United States v. England, 966 F.2d 403, 408 (8th Cir. 1992) (where court "admonished" the jury that the allegations contained in the indictment were not evidence and there was no reason to believe jury did not follow this instruction, any error in reading and submitting indictment to the jury was harmless); United States v. Klein, 93 F.3d 698, 704 (10th Cir. 1996) ("a proper covering instruction with respect to the indictment goes a long way toward curing any potential for prejudice created by giving the indictment to the jury." ).

In the current case, the Court finds no error in allowing the jury to take a copy of the Indictment into the deliberation room. This case involved 137 Counts, charging four different schemes to defraud and multiple counts of obstruction of justice against two different defendants. The alleged crimes occurred over a period of multiple years. The trial against Defendants lasted approximately five months, involving testimony from numerous witnesses, as well as over two thousand exhibits. Specific dates, times, names, e-mails, FedEx shipments, and other mailings were excessive and very much at issue. It was challenging for the Court, let alone a jury comprised of lay persons, to manage this abundance of information.

Given these circumstances, the Court determined that the Indictment, albeit an overwhelming 264 pages, provided a necessary roadmap through a complex legal and factual morass. This Indictment aided in a fair and deliberate consideration of all of the evidence and

mitigated the chances of jury guessing as to the basis for each count.  Finally, it allowed the jury to match the charged conduct with the elements of the crime defined by the Court, without any dictation of the ultimate outcome.

Defendants offered a redacted version of the Indictment prior to the start of deliberations.  The Court, however, declined to use this redacted version since it improperly and unfairly truncated the charges and omitted many of the crucial background accusations forming the basis of the various mail and wire frauds.  This redacted indictment, far from providing a roadmap to the jury, would have worked to the jury's detriment and likely caused confusion with respect to the precise nature of the charges.  Accordingly, the Court properly exercised its discretion in allowing the jury to consider the full Indictment, as opposed to the version presented by the Defense.

Even assuming *arguendo* that the Court's decision was error, that error was harmless.  First, the Indictment removed all references to "Person No. ___" and replaced them with the actual person's name.  It was further amended to remove Counts 36 and 38, which were voluntarily withdrawn by the Government.  In addition, prior to allowing the Indictment in the jury room, the Court instructed that "[t]he indictment itself is not evidence of any kind.  It merely describes the charges against Mr. Fumo and Ms. Arnao.  It is an accusation only."  (Jury Charge Prior to Deliberations, Mar. 4, 2009.)  In an abundance of caution, the Court also clearly labeled, in large, bold print, the following statement on the front of the jury's copy of the Indictment: "The Indictment itself is a document written by the government.  It is not evidence of any kind.  It merely describes the charges against Mr. Fumo and Ms. Arnao.  It is an accusation only."

Finally, although the Indictment was detailed, Defendants point to no statements or descriptions of evidence made in the Indictment that were not ultimately proven at trial. Indeed, as set forth in great detail above, the evidence was more than sufficient for a reasonable jury to convict Defendants of the charged crimes beyond a reasonable doubt. Aside from a general challenge to the allowance of the Indictment in the jury room, coupled with a claim of unfair prejudice, Defendants have failed to show precisely what prejudice was suffered. Accordingly, the Court denies the Motion for New Trial on this ground.

### H. Whether the Court Abused its Discretion in Refusing to Remove Juror Eric Wuest

Defendants' final ground for requesting a new trial involves the missteps of Juror Eric Wuest. On March 15, 2009, after jury deliberations in the case had been well underway, a local television station reported on Internet postings made by one of the jurors in the trial of Vincent Fumo and Ruth Arnao. Wuest, the juror in question, coincidentally happened to be watching this newscast and "panicked" by deleting the relevant comments from his Facebook page. (*In Camera Hearing* 34, Mar. 16, 2009.) Subsequently, on March 15, 2009, Defendants Fumo and Arnao filed a motion bringing the Court's attention to the fact that Wuest had posted messages about the trial on the Facebook and Twitter websites.[27] Defendants moved to disqualify Wuest from the jury.

---

[27]"Facebook's mission is to give people the power to share and make the world more open and connected. Millions of people use Facebook everyday to keep up with friends, upload an unlimited number of photos, share links and videos, and learn more about the people they meet." Facebook Mission Statement: http://www.facebook.com/facebook?ref=pf#/facebook?v=info&viewas=0 (last visited Jun. 3, 2009).

"Twitter is a privately funded startup with offices in the SoMA neighborhood of San Francisco, CA. Started as a side project in March of 2006, Twitter has grown into a real-time short messaging service that works over multiple networks and devices. In countries all around the world, people follow the sources most relevant to them and access information via Twitter as it happens—from breaking world news to updates from friends." About Twitter:

In light of this motion, this Court held an *in camera* review on March 16, 2009.  During the hearing, the Court extensively questioned Wuest about his activities related to his use of the Internet, social networking sites, as well as his general media consumption during the trial. Counsel for Defendants and the Government likewise had the opportunity to question Wuest.  As a result of these questions, this Court was able to gauge the scope, breadth, and significance of Wuest's actions and determine that he had not engaged in any prejudicial actions, as follows:

> THE COURT: I just - - honestly, want to make sure my thoughts are on the record about this guy.  My take on him is entirely different.  My take on him is this is one conscientious guy trying very much to comply with all the rules and regulations that I've established, more so then I would ever imagine that a juror would do. And I think that, you know, I've heard him and I don't have any trouble with keeping him on the jury.

(Id. at 55.)  At that time, Defendants' counsel expressed their opposition to the Court's rulings and the Court allowed Defendants' counsel to express their concerns and preserve documents so that any later review of this decision could be based upon a full record.

In their Motion for New Trial, Defendants now claim, without citation to legal authority, that the Court abused its discretion in refusing to remove juror Eric Wuest, after it was revealed that he viewed a news report about the trial and made public postings on Facebook, Twitter, and his websites/blogs.  Defendants claim that both Wuest's behavior and his "utterly incredible testimony" undermined his impartiality as juror.  (Defs.' Mem. 14.)  They believe that Wuest was

---

http://twitter.com/about#about (last visited Jun. 3, 2009).

Each domain allows a user to post messages for other users to view and at times, respond. With respect to Facebook, a user creates a "page" that allows the user to provide personal information, their thoughts, and pictures to other users viewing his "page."  There are confidentiality options that allow a user to select who can view his or her "page."  Once a person is selected by the user to view his or her "page," that person is then considered to be that user's "friend."

caught in several contradictions about his use of the Internet and suggest that his testimony regarding the news report was highly dubious.  Further, Defendants assert that "[i]n order to bring out what happened, it was necessary for defense counsel to ask the juror questions which might have been taken as hostile or accusatory, despite counsel's best efforts."  (Id.)  They note that "the options of proceeding with eleven jurors or of replacing the problem juror with an alternate remained readily available at that time."  (Id.)  Given that this Court did not pursue either of these options, Defendants ask the Court to acknowledge its mistake – which they assert affected the essential fairness of the jury process – and grant a new trial.  Upon review, this Court finds Defendants' arguments unavailing.

The Third Circuit has noted that "extra-record influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the safeguards of the judicial process."  United States v. Resko, 3 F.3d 684, 690 (3d Cir. 1993).  As such, the trial court must analyze the effect, if any, the challenged events had upon the juror's ability to deliberate free of outside influence.  Id.  Nonetheless, the Third Circuit has granted District Courts considerable discretion in making such determinations.  Gov't of V.I. v. Dowling, 814 F.2d 134, 137-38 (3d Cir. 1987) (recognizing the district court's discretion regarding method for addressing allegations of extraneous influence on the jury).  This discretion extends to the determination of whether prejudice has been demonstrated.  See United States v. Clapps, 732 F.2d 1148, 1152 (3d Cir. 1984) (holding that the trial court did not abuse its discretion in denying defendants' motion for mistrial based on alleged juror misconduct, in absence of showing that there was a likelihood of actual prejudice arising out of jurors' alleged discussion of the case prior to closing arguments).  More concisely,

> [t]he basic questions when jury misconduct is alleged are whether there was misconduct, and whether it resulted in prejudice. It must be shown that misconduct in fact occurred, rather than circumstances that merely put suspicion on the verdict. A party is prejudiced by juror misconduct if it is of a kind that makes it probable that a juror's mind was influenced by it so as to render that person an unfair and prejudicial juror.

75B AM. JUR. 2D TRIAL § 1303 (2009); see also 66 C.J.S. NEW TRIAL § 65 (stating that juror misconduct warrants a new trial only where the verdict was, or probably was, influenced to the prejudice of the complaining party).

"The proper procedure for a district court to follow when juror misconduct has been alleged is first, to determine whether the misconduct actually occurred and then, to determine whether the misconduct, if any, is prejudicial." United States v. Rodriguez, 151 Fed. Appx. 182, 184 (3d Cir. 2005). This Circuit has noted that "[j]uror questioning is a permissible tool where juror misconduct is alleged, and we have encouraged its use in such investigations." United States v. Boone, 458 F.3d 321, 327 (3d Cir. 2006); see United States v. Console, 13 F.3d 641, 667 (3d Cir. 1993) (noting that individual juror questioning is the "method of inquiry . . . we have preferred '[w]here there is a significant possibility that a juror or potential juror has been exposed to prejudicial extra-record information' ") (quoting Dowling, 814 F.2d at 137). "An individualized examination is the most effective manner by which to discover latent prejudices on the part of a particular juror." Dowling, 814 F.2d at 137. This preference for juror questioning results, in part, from the fact that "the trial judge develops a relationship with the jury during the course of a trial that places him or her in a far better position than an appellate court to measure what a given situation requires." Id.; see also Resko 3 F.3d at 690 (3d Cir. 1993) ("As we have explained, '[t]he trial court is obviously in a better position (than the appellate court) to observe the impact of premature jury discussions of guilt, and to make a considered judgement as to the

effectiveness of a cautionary instruction.'") (quoting <u>United States v. Pantone</u>, 609 F.2d 675, 679

(3d Cir. 1979)).

The issues regarding Wuest can be broken down into four separate types of alleged

misconduct:  (1) his viewing of the news on television and general media consumption during the

trial; (2) his postings on Twitter; (3) his postings on Facebook; and (4) his websites/blogs.  This

Court will address these four matters separately.

### 1. <u>Wuest's Television Viewing and Media Consumption</u>

On Sunday March 15, 2009, Wuest claims to have been watching "The Family Guy," and

other shows on the Fox network, when the local news began.  It was at this time that he learned

that his postings on Facebook and Twitter were receiving media scrutiny.  (*In camera* Hearing 16-

17, Mar. 16, 2009.)  Despite this inadvertent glimpse of the news broadcast, Wuest asserts that,

prior to that evening, he had been scrupulous in avoiding television news.  (<u>Id.</u> at 17.)

As to his general media consumption, Wuest stated that:

> I have restricted myself completely from reading any newspapers.  I've restricted
> myself from even watching TV at night.  I've - - I have children at home so I don't
> get to watch very much of my own TV anyway.  My life is based on Nickelodeon
> and Disney.  And in the mornings driving in I listen to cassette tapes in my car.  I
> have an iPod that I listen to on the train.  And I have not watched very much news
> at all, except maybe the national news, because I did not think that there would be
> anything in this.  But even that, I don't home until late much at night so - -

(<u>Id.</u> at 16.)  He further explained that he worked in a human resources position at a law firm and

went to work on Fridays, when court was not in session.  For five months, he stated that "I have

100 percent absolutely secluded myself from everybody else.  The human resources department is

in a separate area, not on a floor with any other attorneys."  (<u>Id.</u> at 11.)  Similarly, Wuest avoided

reading the *Metro*, a free daily newspaper given out at train stations, "since the case began." (Id. at 37.)

At the hearing, the Court's primary concern was whether something beyond the in-court proceedings tainted the legitimacy of the judicial process and improperly affect the jury's verdict. After questioning Wuest, the Court was – and still remains – convinced that he was never subject to any outside influence from the news media, that his impartiality remained untainted, and that he tried to carry out his jury duties with diligence and propriety. The Court has no basis on which to disbelieve Wuest's testimony and, in fact, finds his comments about his media consumption habits entirely credible.

Moreover, Wuest's viewing of the specific television report in question had no prejudicial effect on the trial. His glimpse of the news was, according to his credible testimony, entirely accidental. The newscast focused primarily upon Wuest's own social networking and not upon any factual details of the case which could affect his impartiality. Most importantly, as was revealed at the hearing, this news report was issued after the jury had effectively reached its verdict. As such, this television episode could not have had any impact on trial deliberations.

In short, there is no evidence that Wuest obtained any news or information that could have prejudiced his actions. Rather, it appears that he diligently avoided any outside influences. As this Court noted during the *in camera* hearing, "[t]he thing I'm worried about is he [Fumo] prejudiced by anything that is - - is your client prejudiced by anything that happened here? And I haven't found anything to suggest that this juror [Wuest] was doing other than trying to do his duty as a juror, not getting any outside influence about this." (Id. at 47.) Nothing in Defendants' Motion has altered that conclusion.

## 2.     **Wuest's Twitter Postings**

In March 2009, Wuest posted a message on his Twitter account referencing this case. Twitter is a real-time messaging service that allows users to post messages, not exceeding 140 characters. Although it is feasible to respond to Twitter postings, Wuest testified that he did not use that function on the site. (Id. at 19.) Instead, he used it as a brief, stream-of-consciousness diary of his thoughts. (Id.) The Twitter message at issue simply stated, "This is it . . . no looking back now!" (Govt.'s Resp. 141.)

The Court finds that such a comment could not serve as a source of outside influence because, even if another user had responded to Wuest's Twitter postings (of which there was no evidence), his sole message suggested that the jury's decision had been made and that it was too late to influence him. Moreover, Wuest's comment caused no discernible prejudice. It was so vague as to be unclear. Wuest raised no specific facts dealing with the trial, and nothing in his comment directly referred to the trial or indicated any disposition toward anyone involved in this suit. Finally, there is no evidence that he discussed any of these matters with any of his fellow jurors. Hence, the Court declines to grant the motion on this ground.

## 3.     **Wuest's Facebook Postings**

During the course of the trial, Wuest also made several postings on his Facebook page. These updates were short and perfunctory "status updates," as follows:

- Sept. 18, 2008 (apparently upon continuance of trial judge due to judge's illness): "Eric Wuest is glad he got a 5 week reprieve, but could use the money . . ."

- Jan. 11, 2009 (apparently referring to the end of the government's case): "Eric Wuest is wondering if this could be the week to end Part 1?"

- Jan. 21, 2009: "Eric Wuest wonders if today will really be the end of Part 1???"

- Mar. 4, 2009 (conclusion of closing arguments): "Eric Wuest can't believe tomorrow may actually be the end!!!!"

- Mar. 8, 2009 (Sunday evening before second day of deliberations): "Eric Wuest is not sure about tomorrow . . ."

- Mar. 9, 2009 (end of second day of deliberations): "Eric Wuest says today was much better than expected and tomorrow looks promising too!"

- Mar. 13, 2009 (Friday after completion of week of deliberations): "Stay tuned for the big announcement on Monday everyone!"

(Govt.'s Resp. 141.) The tone and tenor of these comments were consistent with his other general status updates unrelated to this trial.

Once status updates, such as these, are posted by a user on Facebook, those viewing the Facebook page can see this changed status. Wuest had his Facebook account configured so that he belonged to the Philadelphia network, which has 600,000 members, and so that anyone in the Philadelphia network could visit his page and see his status updates. (*In Camera* Hearing 40-42, Mar. 16, 2009.) However, without officially becoming Wuest's "friend" – a process that involves contacting Wuest for permission – members of the Philadelphia network could not respond to his status updates by posting on his wall. (Id.) Wuest's established Facebook "friends," had two ways to respond to status updates: (1) by posting on his Facebook wall – with their comments appearing below his status updates or (2) by privately contacting Wuest through what is "essentially almost an e-mail feature." (Id. at 23.)

During *in camera* review, counsel for Defendant Fumo asked Wuest, "[i]f you are on Facebook and you have friends out there and you say 'Eric Weist is not sure about tomorrow,' for

118

whose benefit is that written?"[28]  (Id. at 20.)  Wuest responded that, "[i]t's more for my benefit to just get it out of my head, similar to a blog posting or somebody journaling something.  It's just to get it out there.  And that's what a lot of Facebook . . . it's just to get — a way to electronically gets thoughts off your mind."  (Id. at 20.)  Defense counsel then asked Wuest specifically about the March 9th Facebook posting that "Eric Weist says today was much better than expected, and tomorrow looks promising too."  (Id.)  Wuest explained that this posting was:

> strictly based on the fact that we had a day of deliberations and we made a lot of progress on that day, instead of doing one day, one count.  We did several dozen the second day. And we'd gotten into a groove, we understood, you know, how to go through things.  Because there was, I believe, two of us maybe that had ever been through this process before. . . [t]he day was good and tomorrow looked promising because we got ourselves into as rhythm.

> MR. COGAN: Well, my question is for whose benefit is this written "Eric Weist says today was much better than expected and tomorrow it looks promising, too." This is not on Twitter this is on Facebook.

> JUROR: Again, it was just really for my own benefit to get it out.  And it was kind of a sigh of relief that everything went out.  But I don't remember if there was any responses to it.

(Id. at 20-21.)

Counsel's questioning then turned to whether Wuest was ever subject to outside influence due to his postings.  Wuest testified that no "non-friend" individuals from the Philadelphia network ever contacted him:

> MR. ZAUZMER: So my last question the is, have you ever - - I think the answer is obvious, but have you ever gotten a posting on your wall or an e-mail from a non-friend on anything, let alone these things?

---

[28] The transcript of the *in camera* examination of Wuest spells his last name as Weist. This Court did not correct the mis-spelling when quoting the transcript.

JUROR: No. Because - - again, because they have to be someone that I befriended in order to be able to post on the wall. Whether or not they can see it, I'm not sure. But I know they can't post on it without being one of my friends.

(Id. at 42-43.) Further, Wuest noted that he "never received any personal – private response through e-mail." (Id. at 24.) Counsel noted, however, that Wuest did, in fact, receive one wall posting response to a Facebook status update. Specifically, in response to his March 9, 2009 status update that "Eric Wuest is not sure about tomorrow . . .," a friend wrote "Why?" (Govt.'s Resp. 141.) Wuest simply replied, "think of the last five months dear." (Id.)

Wuest's posting that first achieved notoriety was a status update, posted just prior to the announcement of the jury verdict, stating, "[s]tay tuned for a big announcement on Monday everyone!" (Govt.'s Resp. 141.) Reviewing this posting, Defense counsel asked the logical question "[w]ho's everyone?" (*In Camera* Hearing 24, Mar. 16, 2009.) Wuest replied, "[e]veryone that, you know, could possibly view my page. And my thought was the big announcement was that I'm done. I never divulged any of the information of what our decision was to anybody." (Id. at 24.) Defense counsel followed up asking:

MR. GOLDBERGER: So there were thousands or tens of thousands of Facebook members who are in the Philadelphia network?

JUROR: That's quite possible.

MR. GOLDBERGER: Right.

JUROR: But the chance of them knowing what I was talking about, because everything was so vague, it could have been - - you know, a big announcement was my wife was pregnant or a big announcement is I'm leaving my job.

(Id. at 25-26.) Further, Defendant Arnao's counsel inquired:

MR. JACOBS: I don't understand how any of these hundred or so people would know what in the world you're talking about when you post something like "today

was not so bad, tomorrow would be better." How would they have any clue that you're talking about how well or how poorly you did in the deliberative process?

JUROR: Most people don't and that's kind of - - that's almost a little bit of the appeal of Facebook. Because some people use it for connection between other people. I use it, personally, as a way to journal my thoughts and get everything out. . . [s]o nobody could know exactly what I was talking about without actually, you know, either directly asking me or, you know, knowing exactly what's going on. But, you know, it's just a random thought and that's sort of the - - I don't know if you want to say the appeal of the whole Facebook and the whole Twitter thing, but it's just a random thought that you just put out there and most people don't know what anybody's talking about if you were to look at other people's postings and what they're discussing.

(Id. at 26-27.) Learning that the media was aware of his Facebook postings, Wuest admitted that he "panicked" and erased the March posts dealing with jury deliberations since he "couldn't believe that somebody had actually been searching on my stuff."[29] (Id. at 34.)

Given the entirety of this testimony, the Court finds no evidence that Wuest received outside influence due to his Facebook postings. The evidence established that no random individual from the Philadelphia network ever contacted Wuest to remark on any of this Facebook postings, much less the jury duty postings. Second, the Facebook status updates in question were so opaque that there was no possible way that members of the Philadelphia network could read them and have any obvious understanding of his discussion. Third, of all his "friends" who could

----

[29] In their Motion, Defendants liken this action to their own conduct charged in the obstruction of justice Counts of the Indictment. They claim that since Wuest's erasure of information from his Facebook page was "directly analogous to what the defendant was accused of in the case, Wuest's impartiality could no[] longer be trusted." (Defs.' Mem. 13.)

Such an argument is completely baseless. The Court finds little comparison between a juror's deletion of harmless Facebook and Twitter postings in the face of embarrassment from media scrutiny and Defendants' criminal deletion of inculpatory e-mails in the face of an on-going FBI felony investigation.

comment on his status updates, Wuest received a solitary response.[30]  As noted above, when

Wuest posted, on March 9, 2009, that he was "not sure about tomorrow," a friend wrote, "Why?"

(Govt.'s Resp. 141.)  His answer – "think of the last five months dear" – in no way suggests any

outside influence, much less prejudice, bias, or impartiality.

Finally, although Wuest had violated the Court's  instruction to not discuss the case

outside of the jury room, his Facebook postings, like his Twitter comment, were nothing more

than harmless ramblings having no prejudicial effect.  They were so vague as to be virtually

meaningless.  Wuest raised no specific facts dealing with the trial, and nothing in these comments

indicated any disposition toward anyone involved in the suit.  Even a "friend" was so clueless

about the significance of his March 9th comment that she was compelled to inquire as to its

meaning.  His response to her query, by its very coyness, suggested that Wuest, while

acknowledging his jury duty, actively avoided discussing any details.  Certainly, he was under no

obligation to conceal the fact of his jury duty from friends or family, and there is no indication

that he discussed any of his Facebook postings with any of his fellow jurors.  In short, Defendants

do not suggest, and the Court does not find, any prejudice having any influence on the jury's

verdict.

## 4.       Wuest's Personal Webpages

---

[30] While neither party raised it in their briefs to this Court, it appears that there may have been another "friend" response to one of Wuest's Facebook postings about the trial.  On March 4, 2009, Wuest posted a status update stating that "Eric Wuest can't believe tomorrow may actually be the end!!!!"  A friend responded "of what?," to which Wuest replied:  "Can't say till tomorrow! LOL [Laugh out loud]."  (Exhibit from *In Camera* Hearing.)  This Court finds, that like the other Facebook comment analyzed in this Memorandum, this comment failed to show any outside influence or prejudice, or even that Wuest was communicating about the substance of trial.

Finally, Defendants take issue with Wuest's communications over the Internet via his personal webpages. Wuest noted that although he maintains a blog, "it has not been active – I couldn't even remember the last time I put anything on it. The only thing that I am still really mentioning anything on is Facebook and the Twitter page that I send something to once in a blue moon." (*In Camera* Hearing 15, Mar. 16 2009.) Under questioning from Defense counsel, he reiterated that "I do have a blog of my own but is has not been updated in quite a number of months." (<u>Id.</u> at 31.)

MR. GOLDBERGER: Did you post on your blog that your were on jury duty?

JUROR: Never. Never. And if I did, I would like to see where I posted that because I, you know - - aside from my wife and boss at work, so you know, she would keep my job for me during this time. They were some of the very few people that knew where I was.

MR. GOLDBERGER: And then was there a time when you had several blogs that you kept or maintained?

JUROR: That I've kept personally?

MR. GOLDBERGER: Yes.

JUROR: I have two, the one that I've used that I said I post a lot to. I have another that I use that's - - I call it a test blog because through blog - - it's called Blogspot, which is a service of Google, you can change the different formats of everything. And I learned early on that I would make changes to it and it would and it would mess up all the formatting. So I have another one called my test blog where I'll go and I'll mess around with the formatting but there's no actually posts on there. It's usually just gibberish in order to see how the format would come out with the new - - the new layout and design of the blog.

MR. GOLDBERGER: Do you have your own domain?

JUROR: I do. It's ericweist.com which I don't think has been updated since probably June or July.

* * *

MR. GOLDBERGER:  Is part of your blogging activity commenting on other blogs?

JUROR:  Not usually at all.  No.  Because I just like to read them and see the information that's on them.  But I will rarely comment on somebody else's blog.

MR. GOLDBERGER:  And do you have a comment feature on your own blog?

JUROR:  Comments are activated, yes.  But I think the only comments I ever usually got were from my wife or from my kids.  But it's not an active blog by any means.  It doesn't have a daily posting.  It's lucky if it has a seasonal posting because I've gotten away from that primarily with the advent of Facebook where you could get, you know, more updates from friends and everything.  My own blog was more of just something to have to say I could have it years ago when that was the thing to do.  And then MySpace came out and Facebook came out.  Everybody's moved to those types of formats for blogging, so to speak.

(Id. at 31-34.)

Questioning Wuest, the Government stated that, "it looks like that [the ericweust.com website] was just created once and forgotten about.  I mean, is that a correct statement?"  (Id. at 39.)  Wuest agreed, stating:

JUROR:  Pretty much.  Yes.  I mean it was created, I think, two years ago when there was a web promotion through Microsoft to get a free web domain and I had seen that ericweist.com was available and I said well I'm going to get it for free.

MR. ZAUZMER: So you've never really created anything there or posted anything there or anything like that?

JUROR: No.  I mean, I have a page of pictures which, I think, has my niece on it and a couple of my kids and the other - - there's a page that you can have updates.  But the whole thing through Microsoft is that it was designed for small business and I have a comment on the front page that boy, I don't think I should have used a business template for a personal site because it just wasn't fitting in with what I had hoped.  And it's - - that's why it's, kind of, been very dormant.  I don't use it very much because it's actually kind of hard to post to as opposed to Facebook where you can log on for three seconds and shoot out something.  This is a typical webpage where you have to format everything and move it all around.  But it's been very dormant and absolutely nothing on there since the trial.

(Id. at 39-40.)

124

After Wuest's testimony concluded, counsel for the parties argued their respective

positions before the Court.  At that time, Defendants presented print copies of what Wuest posted

on his Facebook page and his websites and, as a surprise to the Government, produced a

newsletter from www.ericwuest.com, stating that "I have neglected this site for a long time.  I've

been really busy with work and jury duty."  (Id. at 46.)  Counsel used this newsletter to attack

Wuest's credibility and challenge his previous statement that he had not updated his web page

since prior to the commencement of trial:

> MR. GOLDBERGER:  He lied to you, Judge.  He said he hadn't updated his
> website since - - since he first established it.  He was lead in with that leading
> question that he established this a couple of years ago and hasn't updated it since.
> And yet, what he says is I have neglected this - - on the top line of the website,
> welcome to ericweist.com.  Yes, this is said, I have neglected this site for a long
> time.  I've been really busy recently with work and jury duty.

(Id. at 45-46.)  Counsel for Defendants went on to argue:

> MR. COGAN:  But here you have this thing, right now.  He said he didn't tell
> anybody he had jury duty except his wife and his boss.
>
> THE COURT:  Uh-huh.
>
> MR. GOLDBERGER:  He told the world.
>
> MR. COGAN:  And he's not talking to himself on his - - no matter what he says,
> this is a way of getting it off his chest.

(Id. at 46-47.)

In response to the concerns expressed by Defendants' counsel, this Court noted that

> I think he's been called in here to answer questions that some of the answers might
> not be totally accurate just like any other witness.  But I don't think there's any
> major discrepancy here about the thing.  The thing I'm worried about is he
> prejudice by anything that is - - is your client prejudiced by anything that happened
> here?  And I haven't found anything to suggest that juror was doing anything other
> than trying to do his duty as a juror, not get any outside influence about this.
> That's what I think about it.

125

(Id. at 47-48.)

Notwithstanding Defense counsel's current and vigorous arguments to the contrary, nothing in the present Motion alters either the Court's perception of Mr. Wuest's veracity or the finding as to whether prejudice occurred.  First, the Court maintains no concern as to Wuest's credibility.  Although Wuest twice gave an emphatic "never" when asked if he had posted about jury duty on his blog, he immediately equivocated, stating, "[a]nd if I did, I would like to see where I posted that."  (Id. at 32.)  His prevarications could have been due to any number of innocent reasons – forgetfulness, mistake, misunderstanding.  Further, any inconsistencies were perfectly understandable, and indeed acceptable.  Wuest had been suddenly thrust into the middle of considerable public scrutiny and was facing questions from this Court and counsel with no advance preparation.  This Court, having fully witnessed Wuest's demeanor and general candor during the hearing, concludes, without hesitation, that Wuest did not intentionally "lie" or attempt to conceal information from the Court.[31]

---

[31]  As this Court noted at the hearing:

THE COURT:  Of course, you have no evidence that he's not telling the truth other than - -

MR. GOLDBERGER:  Yes, we do.

THE COURT: - - these suggestions that all this stuff that he does, at one or another he might have made an inconsistent statement.

MR. GOLDBERGER:  Yes, that he said - -

THE COURT:  Which, incidentally, happens in trials all the time.

MR. GOLDBERGER:  Of course.  Of course.

(Id. at 49-50.)

126

Moreover, and regardless of the basis for his inconsistency, his conflicting statements were not about postings regarding the substance of his jury duty or court proceedings, but rather whether he had updated his web page to reveal that he was serving on jury duty. Notably, Wuest never denied telling others about his jury service. Indeed, he stated that his boss and wife were "some of the very few people that knew where I was." (Id. at 31-32.) Moreover, via his Facebook postings, Wuest had informed others that he had been serving on a jury – a fact about which he was permitted to speak. Certainly, had Wuest intended to deceive the Court, he would have done so on an issue he had not already conceded.

Finally, and most importantly, the Court finds that Wuest was not the subject of any outside influence through his websites or blogs. As noted at the *in camera* examination, none of his websites/blogs are active "by any means." (Id. at 32.) Specifically, Wuest noted that he barely maintained this blog, that his blog at ericweust.com was created via a format that is suited for small businesses making it unwieldy to use as a personal blog, and that he really only uses Facebook and Twitter. (Id. at 31-32, 40.) Finally, although he had a comment section, there was no indication that anyone contacted him about this trial. (Id. at 33.) Like his Twitter and Facebook comments, Wuest's website comment about service on jury duty was similarly innocuous, as it provided no indication about the trial of which he was a part, much less his thoughts on that trial. The posted comment was a simple declarative statement. Given these circumstances, the Court discerns no prejudice, let alone prejudice that influenced the verdict.

### 5.        Conclusion as to Juror Eric Wuest

As the Court stated during the *in camera* hearing, despite violating the Court's admonition against discussing the details of the trial, Wuest was a trustworthy juror who was very

conscientious of his duties. There was no evidence presented by either party showing that his extra-jury misconduct had a prejudicial impact on the Defendants. The Court found, and still maintains, that Wuest's actions in no way affected his impartiality. Accordingly, the Court denies Defendants' request for a new trial as a result of juror Wuest's extra-jury misconduct.[32]

## V. CONCLUSION

The current matter presents a case of considerable complexity, much of which has to do with the length of the trial, the more than 100 witnesses, and the massive number of exhibits. It has resulted in multiple grave convictions against both Defendants. In accordance with its duty, the Court has carefully reviewed the trial transcripts, evidence, briefs of the parties, and pertinent jurisprudence. Having done so, we find nothing to support any of Defendants' challenges as to the sufficiency of the evidence or claims of trial error. Accordingly, the Court denies the Motion as to both Defendants in its entirety.

---

[32] As a final note, the Court acknowledges Defense counsels' concern that their questioning Wuest may have been construed as hostility towards the juror and may have biased his fair consideration of the defense case. Having been present for the questioning, however, the Court finds that Defendants' attorneys maintained the same professionalism and amiableness that they showed throughout the trial.