**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| VINCENT J. FUMO and | : | |
| RUTH ARNAO, | : | NO. 06-319 |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                    July 9, 2009

Defendant Vincent J. Fumo has filed a second Motion for New Trial based on newly

discovered evidence that, during the course of his trial, jurors were allegedly exposed to highly

prejudicial extraneous information regarding the case.  For the reasons which follow, the Court

denies the Motion.[1]

**I.      BACKGROUND**

As described in an Affidavit submitted by Fumo's trial counsel, Dennis Cogan, Esq.,

journalist Ralph Cipriano contacted Cogan regarding information he obtained during post-verdict

interviews with several jurors.  In these interviews, Cipriano purportedly learned of several

extrajudicial influences upon the jury.  First, by the morning of Monday, March 16, 2009 – the day

the verdict was delivered – all of the jurors allegedly heard media reports describing both juror Eric

Wuest's improper use of social networking sites during trial and the fact that he was being

questioned by the Court.  Second, one of the jurors indicated that, while at her workplace on a

---

[1] Defendant Ruth Arnao has sought to join this Motion.  While the Court permits the
joinder, we do not separately discuss any alleged prejudice to her case since the claimed
extraneous information had no bearing on any of the counts in which she was involved.  Nor
does her joinder attempt to illustrate any prejudice to her.

Friday during trial, several co-workers informed her of Fumo's prior prosecution and the conviction and imprisonment of John Carter, former president of the Independence Seaport Museum. In light of this newly-discovered information, Defendant Fumo seeks both an evidentiary hearing on the juror exposure to extraneous information and, in turn, a new trial.

By way of its Response, the Government contends that although Cipriano, a free-lance journalist, contacted defense attorney Cogan, he never attempted to contact Government counsel to relate his conversations with jurors regarding this outside information. When Government counsel first learned of this information upon receipt of Defendant's Motion on July 2, 2009, they telephoned Cipriano, who refused to discuss his contacts with jurors unless authorized by the editor of *Philadelphia Magazine*, in which Cipriano's article would be published.[2] Following an unsuccessful attempt to reach the editor of *Philadelphia Magazine*, Government counsel received a phone call from the magazine's counsel, who stated that Cipriano would not answer questions about the information learned in the article's preparation. In a subsequent telephone conversation between Cogan and Government counsel, Cogan stated that he had not sought Court permission to contact any jurors directly, but rather was relying solely on Cipriano's representations regarding juror statements. Cogan also indicated that he met with Cipriano and confirmed that Cipriano had met with several jurors after the trial. Finally, Cogan provided the name of the juror who allegedly learned information in her workplace.

---

[2] As of the filing of this Memorandum, Cipriano's article was published on the website for *Philadelphia Magazine*. See http://www.phillymag.com/articles/power_vince_fumo _after_the_fall/page1 (last visited July 8, 2009).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 33(b)(1) permits a criminal defendant to file a motion for new trial based on "newly discovered evidence." To grant a Rule 33 motion on the basis of newly discovered evidence, five requirements must be met: (1) the evidence must be in fact newly discovered, *i.e.*, discovered since trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal. United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000) (citing Govt. of the Virgin Islands v. Lima, 774 F.2d 1245, 1250 (3d Cir. 1985) (further citation omitted)). "The movant must meet all five of these requirements for the court to grant the motion for a new trial." United States v. Quiles, Crim A. No. 07-391, 2009 WL 466283, at *2 (E.D. Pa. Feb. 24, 2009). Furthermore, "[t]he movant has a 'heavy burden' in meeting these requirements." Saada, 212 F.3d at 216 (citing United States v. Ashfield, 735 F.2d 101, 112 (3d Cir. 1984)).

## III. WHETHER A HEARING IS APPROPRIATE

The primary issue before the Court is whether a hearing is appropriate to interrogate jurors and determine the extent to which the jurors were exposed to extraneous information during the course of trial. The subject of a Court's post-verdict inquiry into claims of juror misconduct or extrajudicial influence is governed by the careful balance of two competing policies. On the one hand, "when jurors are influenced by the media and other publicity, or when they engage in communications with third parties, these extra-record influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the

3

safeguards of the judicial process." <u>United States v. Resko</u>, 3 F.3d 684, 690 (3d Cir. 1993).  On the other hand:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.  *If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.*

<u>McDonald v. Pless</u>, 238 U.S. 264, 267-68 (1915) (emphasis added); <u>see</u> <u>also</u> Fed. R. Evid. 606, advisory committee note (1972).

Federal Rule of Evidence 606 "offers an accommodation between these competing considerations." Fed. R. Evid. 606, advisory committee note (1972).  Rule 606(b) states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.  But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

<u>Id.</u>  Thus, a court may inquire into the verdict if "'extraneous prejudicial information was improperly brought to the jury's attention or [if] any outside influence was improperly brought to bear upon any juror.'" <u>Wilson v. Vermont Castings, Inc.</u>, 170 F.3d 391, 394 (3d Cir. 1999) (quoting Fed. R. Evid. 606(b)).  However, "the court may only inquire into the existence of extraneous information," and not "into the subjective effect of such information on the particular jurors." <u>Id.</u>

Notwithstanding the ability of a court to voir dire jurors at its discretion, the Third Circuit has established a general reluctance to conducting post-verdict hearings to interrogate jurors regarding outside influences, absent a compelling showing of need or presumptive prejudice. In United States v. Gilsenan, 949 F.2d 90 (3d Cir. 1991), the Third Circuit examined the propriety of holding a post-verdict examination regarding juror misconduct where a juror, who had been excused from service after several weeks of trial, sent in an affidavit following the trial's conclusion concerning events occurring on the second day of trial. Id. at 93. Specifically, she recalled the jury discussing a highly publicized failed plea deal, wherein the parties had reached a tentative agreement, but the district court rejected the deal because the defendants would not have served any time. Id. The former juror indicated that although the jury was not supposed to have heard this information, several of the jurors may have seen a report about it either on television or in the newspaper. Id. Armed with this affidavit, defendants moved for a new trial. Id. The trial court ruled that the defendants were not entitled to a hearing or a new trial because the information did not prejudice them and did not even have the potential for prejudice. Id. at 94. Moreover, it found that even had there been prejudice, it was "clearly dissipated" as there was no allegation that the jurors discussed it after the time mentioned in the juror's affidavit. Id.

On appeal, the Third Circuit considered, in part, defendants' argument that the district court abused its discretion in refusing to conduct an evidentiary hearing to determine the precise, nature, quality, and extent of the jury breach. Distinguishing several Third Circuit cases in which the court found abuse of discretion in failure to conduct a hearing, the court noted that these cases dealt with information coming to light *during trial* regarding juror exposure to extraneous information. Id. at 96-97 (citing United States ex rel. Greene v. New Jersey, 519 F.2d 1356 (3d Cir. 1975); Govt. of the

<u>Virgin Islands v. Dowling</u>, 814 F.2d 134, 139 (3d Cir. 1987)).  The court cautioned that although judges are sometimes tempted to order hearings "to put matters to rest even if not strictly required" in a simple effort to ensure fairness, there are often "compelling reasons not to hold a hearing involving the recalling of discharged jurors."  <u>Id.</u>  at 97.  Quoting the Second Circuit, the court noted:

> We are always reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences."  As we have said before post-verdict inquiries may lead to evil consequences:  subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.

<u>Id.</u> (quoting <u>United States v. Ianniello</u>, 866 F.2d 540, 543 (2d Cir. 1989) (citations omitted)).  Recognizing that jurors may often be the subject of post-verdict intimidation, the Third Circuit went on to comment that, "[j]urors who complete their service should rarely, if at all, be recalled for proceedings such as those appellants propose here.  It is qualitatively a different thing to conduct a voir dire during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose."  <u>Id.</u> at 98.  Affirming the district court, the Third Circuit recalled the words of the United States Supreme Court that:

> There is little doubt that post-verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior.  It is not at all clear, however, that the jury system could survive such efforts to perfect it.  Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.

<u>Id.</u> (quoting <u>Tanner v. United States</u>, 483 U.S. 107, 120 (1987)).[3]

---

[3]  In his Reply Brief, Defendant attempts to undermine the import of <u>Gilsenan</u> by reliance on <u>Remmer v. United States</u>, 347 U.S. 227 (1954), a case Defendant describes as "the leading

Likewise, in <u>United States v. Moon</u>, 718 F.2d 1210 (2d Cir. 1983), the Second Circuit faced

a similar situation where, after trial concluded, claims surfaced that the jury might have been

---

Supreme Court case regarding extraneous influences on jurors." (Def.'s Reply Br. 3.)  In
<u>Remmer</u>, the defendant learned, for the first time after the verdict, that an unnamed person had
remarked to a juror, during trial, that he could profit by bringing in a verdict favorable to the
defendant. <u>Id.</u> at 228.  The juror informed the trial judge, who then consulted only with the
prosecuting attorneys. <u>Id.</u> The prosecutors then dispatched the FBI to investigate and prepare a
report, after which the judge determined, *ex parte*, that the remark was made in jest. <u>Id.</u> Neither
defendant nor his counsel knew of the remark, the FBI investigation, or the judge's decision until
after the trial. <u>Id.</u> On consideration of defendant's motion for a new trial, the Supreme Court
began its discussion by saying that "any private communication, contact, or tampering . . . with a
juror during a trial . . . is . . . deemed presumptively prejudicial," although it added that the
presumption is rebuttable. <u>Id.</u> at 229.  It went on to reverse the conviction, holding that the trial
court should not have taken final action *ex parte*, but should have "determine [d] the
circumstances, the impact thereof upon the juror, and whether or not it was prejudicial in a
hearing with all interested parties permitted to participate." <u>Id.</u> at 229-30

Defendant's reliance on <u>Remmer</u> as the "leading Supreme Court case" is misplaced on
several grounds.  First, several circuits have held that <u>Smith v. Phillips</u>, 455 U.S. 209, 216-17
(1982) and <u>United States v. Olano</u>, 507 U.S. 725, 739 (1993) either reinterpreted <u>Remmer</u> to shift
the burden of demonstrating prejudice to the defendant or abandoned it completely in certain
situations.  <u>See</u> <u>United States v. Sylvester</u>, 143 F.3d 923, 933-34 (5th Cir. 1988); <u>United States v.
Williams-Davis</u>, 90 F.3d 490, 496-97 (D.C. Cir. 1996); <u>United States v. Walker</u>, 1 F.3d 423, 431
(6th Cir. 1993); <u>United States v. Bradshaw</u>, 281 F.3d 278, 287-88 (1st Cir. 2002).

Second, <u>Remmer</u>'s demand for a hearing to determine "the circumstances, *the impact
thereof upon the juror*, and whether or not it was prejudicial" is directly contrary to the
subsequently enacted Federal Rule of Evidence 606.  That rule specifically prohibits inquiry "as
to any matter or statement occurring during the course of the jury's deliberations or to the effect
of anything upon that or any other juror's mind or emotions as influencing the juror to assent to
or dissent from the verdict or indictment or concerning the juror's mental processes in connection
therewith." Fed. R. Evid. 606(b).  As explained by the Advisory Committee, "[t]he mental
operations and emotional reactions of jurors in arriving at a given result would, if allowed as a
subject of inquiry, place every verdict at the mercy of jurors and invite tampering and
harassment." <u>Id.</u> advisory committee notes to subdivision (b) (1972).

Finally, the factual circumstances of <u>Remmer</u> are so extraordinary as to be virtually
uninstructive in this matter.  The extraneous influence in <u>Remmer</u> involved an alleged bribe and
the evidence of the improper contact was clear, coming directly from the juror.  The judge and
prosecutors, acting without informing defense counsel, unilaterally investigated and decided the
matter of prejudice.  By contrast, in this case the allegations of extrajudicial information are far
more benign and are not suggestive of any jury tampering.  Rather, the motion suggests only that
the jurors became privy to information that had been excluded from trial.  Further, no
investigations of the jurors were done during trial and the parties have had a full opportunity to
research and brief the issues.

exposed to extraneous prejudicial information and improper outside influences. <u>Id.</u> at 1233.

Affirming the district court's denial of a new trial, the Second Circuit held that "courts are, and

should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential

instances of bias, misconduct or extraneous influences." <u>Id.</u> at 1234. "[A] trial court is required to

hold a post-trial jury hearing only when reasonable grounds for investigation exist. Reasonable

grounds are present when there is clear, strong, substantial and incontrovertible evidence . . . that a

specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a

defendant." <u>Id.</u> (internal citations omitted). "A hearing is not held to afford a convicted defendant

the opportunity to 'conduct a fishing expedition.'" <u>Id.</u> (quoting <u>United States v. Moten</u>, 582 F.2d

654, 667 (2d Cir. 1978)).

Opinions from within and outside the Third Circuit have repeatedly reflected a general

disenchantment for post-verdict juror hearings, absent extraordinary circumstances. <u>See</u>, <u>e.g.</u> <u>United

States v. Anwo</u>, 97 Fed. Appx. 383, 387 (3d Cir. 2004) ("While a hearing may have alleviated some

of [defendant's] speculative concerns [about jury bias], because he has not and cannot present

'clear, strong, substantial and incontrovertible evidence' regarding those concerns, we cannot say

the District Court abused its discretion by declining to conduct a post-verdict voir dire of the jurors

in this case."); <u>United States. v. Barshov</u>, 733 F.2d 842, 851 (11th Cir. 1984) ("The duty to

investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic

influence to overcome the presumption of jury impartiality. . . . In other words, there must be

something more than mere speculation."); <u>United States. v. Stanfa</u>, Crim. A. No. 94-127, 1996 WL

368967, at *7 (E.D. Pa. Jul. 1, 1996) (holding, in a case where a post-verdict newspaper article

suggested that several jurors were exposed to prejudicial publicity during trial, that "I am not sure

what value should be assigned to a media account of anything, but responding in 'knee jerk' fashion (by scheduling a hearing) because of a newspaper story, without more, would be assigning to that story strong, substantial and incontrovertible evidence of juror misconduct.").

The Defendant's hearing request is precisely the sort of "fishing expedition" against which our jurisprudence has cautioned. Initially, it is worth noting the circumstances behind the claimed new evidence. According to the government, Ralph Cipriano, an independent journalist who was present for the duration of the trial, conducted interviews with several jurors in preparation of an article to be published in *Philadelphia Magazine*. Upon learning of the jurors' awareness of extraneous information, he immediately contacted defense counsel Dennis Cogan, without ever extending the same courtesy to Government counsel. When Government counsel attempted to speak with him regarding this new evidence, Cipriano, both directly and through his editor, declined to reveal any information about his interviews or the identity of the juror. By doing so, Cipriano and *Philadelphia Magazine* oddly chose not to balance the scales upon discovery of information that could affect the widely-publicized trial and conviction of a high-profile public figure.

Moreover, when filing the Motion for New Trial, the defense opted not to rely on either an affidavit from any particular juror[4] or on the affidavit of Cipriano, but rather on the affidavit of

---

[4] Notably, under Local Rule 24.1(c), defense counsel could have sought permission of the Court to communicate with the purportedly offending members of the jury. In their Reply Brief, the Defense argues that had they availed themselves of this rule, the Government, by its own admission, would have similarly requested permission to interview jurors directly, likely by sending FBI agents to the jurors' homes. (Def.'s Reply Br. 5.) The Defense contends that "[s]uch direct, duplicative, and potentially intimidating questioning of the jurors would be far more pernicious than the judicially controlled *voir dire* requested by Defendant Fumo." (Id.)

Defendant's logic is flawed. Had defense counsel truly believed that there was some truth to Cipriano's reports, they could have sought leave to directly interview the jurors for the purpose of filing a motion for new trial. At that juncture, the Court would have had concrete information upon which to decide the propriety of a hearing, instead of the speculative double

Cogan, who learned of the alleged juror misconduct only through Cipriano. Aside from the fact that such an affidavit is double hearsay,[5] it far from constitutes the clear, strong, substantial, and incontrovertible evidence that a specific, nonspeculative impropriety occurred, sufficient to justify a post-verdict interrogation of jurors. Recalling the jurors, on the basis of Cogan's affidavit alone, for a broad inquiry into what information they may or may not have received during the course of the five-month and extremely high-profile trial would, without valid justification, opens the door to jury harassment, undermine the finality of the jury verdict, inhibit the frankness of jury deliberation, and ultimately create uncertainty in the entire jury process.

Finally, and perhaps most importantly, a hearing is simply unnecessary. As noted by the Third Circuit,

> The purpose of a hearing is to determine what happened, that is to establish the historical record. Accordingly, a hearing need not be held at the behest of a party whose allegations if established would not entitle it to relief. . . . Here the district court assumed that the appellants could substantiate their allegations that the jury was exposed to the plea proposal information. Therefore a hearing was not needed to develop the facts and the court did not abuse its discretion in not holding one. Of course, under Fed. R. Evid. 606(b) a hearing could not be held for the court to ask the jury the effect of the information on its verdict.

---

hearsay upon which Defendant now relies. The Court would have not simply granted the Government unfettered access to the jurors in question.

 [5] "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801. Double hearsay, also known as hearsay within hearsay, occurs when a hearsay statement is used to introduce a second hearsay statement.

 Defendant argues that Rule 606(b) does not require that direct affidavits from jurors be produced. Rather, he notes that "Rule 606(b) refers to both a 'juror's affidavit *or evidence of any statement by the juror* . . . " (Def.'s Reply Br. 6-7 (quoting FED. R. EVID. 606(b) (emphasis added).) Defendant, however, miscites Rule 606(b), which actually provides that "[a] juror's affidavit or evidence of any statement by the juror *may not be received on a matter about which the juror would be precluded from testifying.*" FED. R. EVID. 606(b) (emphasis added).

Gilsenan, 949 F.2d at 97 (internal citations omitted).  As discussed in detail below, even taking as true all of the allegations in Cogan's affidavit, Defendant cannot prove prejudice.  A hearing to establish facts which the Court has already assumed for purposes of this motion would be superfluous.  Moreover, the Court cannot, under Rule 606(b), permit counsel to question the jury regarding any effect the extrajudicial information may have had on their deliberations or verdict.  To now require the jurors to be interrogated for no valid reason would disrupt the delicate balance of the aforementioned social considerations.  Accordingly, the Court declines to Defendant's request to grant such a hearing.[6]

---

[6]  The cases cited by Defendant in support of his request for a hearing are inapposite as they all deal with situations where juror misconduct was discovered *during the trial* and the trial judge refused to conduct a voir dire.  See Govt. of the Virgin Islands v. Weatherwax, 20 F.3d 572, 578 (3d Cir. 1994) (under the circumstances, where juror misconduct was discovered mid-trial but the district court did not adequately determine whether defendants were or were not prejudiced, vacation of the convictions and remand for a new trial was necessary); Waldorf v. Shuta, 3 F.3d 705, 710-11 (3d Cir. 1993) (granting new trial where trial judge failed to conduct voir dire where allegation was made during trial that jury had been exposed to a prejudicial newspaper article); Resko, 3 F.3d at 686, 695 (finding trial judge's failure to individually voir dire jurors regarding premature deliberations – an issue raised during trial – was grounds for a new trial; "[t]his appeal . . . raises an important issue concerning the appropriate remedy for juror misconduct discovered mid-trial."); Govt. of Virgin Islands v. Dowling, 814 F.2d 134, 137-141 (3d Cir. 1987) (where juror sent note to judge, on second day of trial, that jury had received extra-judicial information, trial court's failure to conduct searching inquiry into prejudice was error).

The Third Circuit has emphasized that the distinction between juror misconduct discovered during trial and misconduct discovered post-verdict is crucial.  Indeed, in Resko, a case relied upon by Defendant, the Court noted that "the balance of practical considerations counselling in favor of further investigation into intra-jury misconduct are much greater when the misconduct is alleged mid-trial rather than post-verdict, when the district court's inquiry will likely be less productive while consuming more time and resources."  Resko, 3 F.3d at 694-95.  Moreover, as the Third Circuit stated in Gilsenan, "[i]t is qualitatively a different thing to conduct a voir dire during an ongoing proceeding at which the jury is part of the adjudicative process than to recall a jury months or years later for that purpose."  949 F.2d at 98.

## IV.   WHETHER DEFENDANT FUMO IS ENTITLED TO A NEW TRIAL

Having declined to "haul" the jurors back into the courthouse at this post-verdict juncture of the litigation, the Court must now determine whether or not Defendant Fumo is entitled to a new trial.  Assuming *arguendo* that Cogan's affidavit is entirely truthful, *i.e.* that all jurors were immediately aware from media reports of the "Twittering juror" issue, and that one juror was privy to information regarding Fumo's prior prosecution and John Carter's unrelated conviction, the Court finds no prejudice warranting a new trial.

The United States Supreme Court has recognized that, "[t]he safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible" and "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. 209, 217 (1982).  As such, the trial judge remains obligated to determine the effect of potentially prejudicial occurrences.  Id.

A new trial is warranted if the defendant likely suffered "substantial prejudice" as a result of the jury's exposure to the extraneous information.  Gilsenan, 949 F.2d at 95.  To examine for prejudice, this Court must conduct "an objective analysis by considering the probable effect of the allegedly prejudicial information on a hypothetical average juror." Id.  "We look to see whether the allegedly prejudicial information influenced the jury 'when it deliberated and delivered its verdict, as we are concerned with the information's effect on the verdict rather than the information in the abstract.'" United States. v. Urban, 404 F.3d 754, 777 (3d Cir. 2005) (quoting Gilsenan, 949 F.2d at 96).  The party seeking the new trial bears the burden of demonstrating the likelihood of prejudice.  United States v. Lloyd, 269 F.3d 228, 238 (3d Cir. 2001).  Several factors relevant to the determination include:  (1) whether the extraneous information relates to an element of the case

decided against the moving party; (2) the extent of the jury's exposure to the extraneous information; (3) the time at which the jury receives the extraneous information; (4) the length of the jury's deliberations and the structure of its verdict; (5) whether the district court properly instructed the jury to consider only evidence presented at trial; and (6) whether there is a heavy volume of incriminating evidence. See generally United States v. Flemming, 223 Fed. Appx. 117, 124 (3d Cir. 2007); Urban, 404 F.3d at 778; Lloyd, 269 F.3d at 242; United States v. Youngblood, 56 F. Supp. 2d 518, 523 (E.D. Pa. 1999). "None of these factors is dispositive. Our determination of whether the defendant was prejudiced 'turns on all of the surrounding circumstances.'" Youngblood, 56 F. Supp. 2d at 523 (quoting Dowling, 814 F.2d at 138).

While some courts of appeals have applied a presumption of prejudice whenever a jury is exposed to extraneous information, the Third Circuit "has applied the presumption only when the extraneous information is of a considerably serious nature." Lloyd, 269 F.3d at 238. The court has tended to apply the presumption of prejudice when a juror is directly contacted by third-parties. Id. (citing United States v. Console, 13 F.3d 641, 666 (3d Cir. 1993)). In contrast, the Third Circuit will generally not apply the presumption to circumstances in which "the extraneous information at issue is a media report, such as a television story or newspaper article." Lloyd, 269 F.3d at 239 (citing cases). Nonetheless, the determination of whether the defendant was prejudiced is case-

specific; "each case must turn on its special facts."[7]  <u>Marshall v. United States</u>, 360 U.S. 310, 312 (1959).

As discussed above, the extraneous influences at issue take two forms:  (1) the admission that all jurors were privy to media reports regarding juror Eric Wuest's use of Facebook, Twitter, and personal web pages; and (2) the admission by one juror that she learned, from co-workers at her place of employment, of Fumo's previous overturned conviction and John Carter's conviction.  The Court addresses each individually.

**A.**　　**<u>Juror Knowledge of Media Reports Regarding Eric Wuest</u>**

With respect to the jurors' knowledge of media coverage regarding juror Eric Wuest's use of social networking websites during the trial, the Court finds no prejudice to Defendant Fumo.  As this Court described in detail in the Memorandum denying Defendants' first Motion for New Trial, Wuest's comments on Twitter, Facebook, and his personal web page were "innocuous," providing "no indication about the trial of which he was a part, much less his thoughts on that trial."  <u>United States v. Fumo</u>, Crim. A. No. 06-319, 2007 WL 1688482, *67 (E.D. Pa. Jun 17, 2009).  His statements about the fact of his service on jury duty were not prohibited.  <u>Id.</u>  Moreover, as this

---

[7] As succinctly noted by one jurist,

The considerations found controlling in one case involving an infiltration of extra record facts concerning a defendant on trial are not necessarily controlling in another case involving such infiltration.  And the considerations found controlling in cases involving coercion of jurors either by fellow jurors or by third parties are not necessarily compelling, or, indeed, even applicable in a case, as here, where no such allegations are made.  As the Court of Appeals for the Third Circuit has regularly noted, the citation of apparently pertinent language does not rise to the level of black letter law.

<u>United States v. Dinorscio</u>, 661 F. Supp. 1041, 1043 (D.N.J. 1987).

Court noted, his Twitter and Facebook postings "were nothing more than harmless ramblings having no prejudicial effect. They were so vague as to be virtually meaningless. Wuest raised no specific facts dealing with the trial, and nothing in these comments indicated any disposition toward anyone involved in the suit." Id. at *64. Finally, this Court determined that Wuest's viewing of the television report regarding his social networking had no prejudicial effect on the trial, reasoning that:

> His glimpse of the news was, according to his credible testimony, entirely accidental. The newscast focused primarily upon Wuest's own social networking and not upon any factual details of the case which could affect his impartiality. Most importantly, as was revealed at the hearing, this news report was issued after the jury had effectively reached its verdict. As such, this television episode could not have had any impact on trial deliberations.

Id. at *60. As the Court found that neither Wuest's postings nor his viewing of the television report regarding those postings subjected him to any outside influence, it is a logical inference that the remaining jurors knowledge of those postings and media scrutiny surrounding those events could similarly have had no impact on their verdict.

Defendant argues, however, that several jurors stated to Cipriano that all of the jurors watched or listed to media reports about Wuest's actions prior to their arrival at the courthouse on March 16, 2009. From this statement, Defendant makes the leap that "[t]his lays waste to the notion that the jurors had been scrupulously following the Court's instructions to avoid even inadvertent exposure to media stories about the trial – and to report an inadvertent exposure to such stories." (Def.'s Second Mot. New Trial 9.) He argues that "[t]he fact that all the jurors were aware of the 'Twittering juror' media reports cannot be squared with the notion that none of these jurors ever reported any earlier exposure to news about the trial. The most reasonable inference is that many

members of the jury on other occasions disregarded the Court's instructions to report such exposure." (Id.)

As noted above, however, "[t]he duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." Barshov, 733 F.2d at 851. "Reasonable grounds [for further investigation] are present when there is clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." Moon, 718 F.2d at 1234. "The allegations need not be irrebuttable but should be 'concrete' and specific." United States v. Lipari, Crim. A. No. 92-164, 1995 WL 84221, at *5 (D.N.J. Feb. 24, 1995) (quotations omitted), aff'd, 10 F.3d 1258 (3d Cir. 1995). A district court need not conduct an investigation into a jury taint where an adequate foundation has not been established. United States. v. Vento, 533 F.2d 838, 869-70 (3d Cir. 1975).

In this case, the basis for the Defendant's claim that all of the jurors heard the "Twittering juror" reports already rests on tenuous grounds, i.e. an affidavit by defense counsel that he spoke with a journalist, who spoke with six unnamed jurors regarding these events. The suggestion that this fact mandates an inference that all of the jurors must have listened to other media reports during the course of the trial is based on nothing more than unfounded speculation. Indeed, the Court notes that Wuest's postings about the trial were given a great deal of media attention via a series of unusually-rampant news flashes, during a period when the jurors – having already reached but not announced a verdict – may have already taken a more relaxed stance in both their avoidance of the media and their obligation to report inadvertent media exposure. "[M]ere speculation can hardly be considered 'clear, strong, substantial and incontrovertible evidence.'" United States v. Connolly,

341 F.3d 16, 35 (1st Cir. 2003) (quoting <u>Moon</u>, 718 F.2d at 1234). Accordingly, the Court declines to accept Defendant's argument that further jury polling on this issue is necessary.

### B.    One Juror's Awareness of Fumo's Prior Overturned Conviction and John Carter's Conviction

As described above, Cogan's affidavit also indicates that Cipriano spoke with an unnamed juror who revealed that she learned of Defendant Fumo's prior prosecution and John Carter's conviction from one of her co-workers while at work on a Friday when Court was in session. Defendant Fumo now argues that this evidence was highly prejudicial and gives rise to a presumption that it would affect the decision of a hypothetical average juror.

The parties agree that this Court precluded introduction of evidence revealing this information following argument by both sides. Moreover, the Court had instructed the jurors to report exposure to extraneous influences, even those that were accidental. Assuming Cogan's echoing of Cipriano's report to be accurate, the juror contravened the Court's instructions.

Nonetheless, the Court's obligation at this stage is not to discipline alleged juror missteps, but to consider the impact of this information – in the context of the entire trial – in order to discern whether Defendant suffered a prejudicial impact. "'[N]ot every exposure to extra-record information about the case will require a new trial.'" <u>Gilsenan</u>, 949 F.2d at 97 (quoting <u>Dowling</u>, 814 F.2d at 139). First, given the complexity of this case, which required five months of courtroom proceedings, over a hundred witnesses, and thousands of documents, any exposure to information regarding Fumo's prior prosecution and Carter's conviction on unrelated charges was merely a small part of the entire trial. The former evidence had no bearing on any element of the Government's case, particularly in light of the fact that Fumo was prosecuted and ultimately

acquitted.  The latter evidence regarding Carter had, at most, only a tangential bearing on five of the 137 counts at issue in the Superseding Indictment (those dealing with the scheme to defraud the Independence Seaport Museum).  In order to convict Fumo on these counts, however, the Government still had to prove that Fumo possessed the requisite *mens rea*, an element unaffected by an awareness of Carter's conviction.

Second, although this evidence was excluded as irrelevant and superfluous to issues in the case, the Court does not find that its admission at trial would have been clearly and unduly prejudicial to Defendant's case, such that a new trial would have been required.  While the Court could envision a scenario where such evidence might cast aspersions against Fumo,[8] the evidence could just as easily be deemed to work to Fumo's advantage.  Fumo's former prosecution occurred almost thirty years ago, his conviction was ultimately overturned on the basis of insufficiency of the evidence, and he remained in office, with no repercussion from voters, until the current prosecution. A hypothetical reasonable juror could have easily surmised from this information that, as before, the mere fact of prosecution did not require that Fumo be convicted of any crime.[9]  As to the Carter evidence, Carter was convicted of crimes entirely unrelated to the events at issue in this case.

---

[8]  Defendant argues, in his Reply Brief, that a juror could think that "someone previously prosecuted and found guilty, but ultimately not convicted (because of a post-trial ruling) had 'gotten away with' something.  Or worse, the juror(s) might think that they could rest easier finding the defendant guilty now because if they made a mistake some court would later (as happened last time) correct it for them."  (Def.'s Reply Br. 7-8.)

[9]  Defendant cites several cases for the proposition that information about a defendant's prior criminal convictions or activities is the kind of information that carries great potential for prejudicing the jury.  (Def.'s Second Mot. New Trial 8 (quoting Dowling, 814 F.2d 138; Marshall, 360 U.S. at 312; United States v. Gray, 468 F.2d 257, 260 (3d Cir. 1972)).  The Defense fails to recognize, however, that Fumo's jury conviction was vacated during post-trial motions, on the basis of insufficiency of the evidence, meaning that he was effectively acquitted on all charges.

Again, a hypothetical juror could have concluded that Carter – a convicted felon and, by inference, a dishonest individual – actually misled Fumo into believing that he had authority to permit Fumo's use of the yachts. In other words, and contrary to Defendant's argument, the extraneous evidence was not of such an obviously serious nature, such that the average hypothetical juror's deliberative process would be clearly affected.[10] "Putting aside any subjective effect the extraneous information had on [the affected juror], as we must under Rule 606(b), [the Court] believe[s] this information would not have had an impact on the hypothetical average juror's vote." Flemming, 223 Fed. Appx. at 125.

Third, Defendant makes no allegation that this juror shared any of this information with any other member of the jury. See Youngblood, 56 F. Supp. 2d at 523 (noting that, in discerning prejudice, the court must consider the extent to which the jury discussed the information). Indeed, Cogan's affidavit indicates that Cipriano spoke with six jurors and, although all six admitted to hearing of reports regarding juror Wuest's social networking, only one mentioned anything about other extraneous information. By inference, the Court can discern that none of the other jurors were privy to information regarding Fumo's former prosecution or Carter's conviction. This factor mitigates any prejudice that may have resulted from the information.

Fourth, as this Court described in detail in the Memorandum denying Defendant's original Motion to Dismiss, the evidence introduced at trial was more than sufficient for a jury to convict Fumo of all 137 counts. See United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993) (noting that

---

[10] Defendant equates the co-worker's statement to the juror with direct contact by a third party. The co-worker's statement relating information he or she heard about Fumo from a news source, however, is more akin to information received from a media report than to an individual's effort to directly influence a juror.

court must consider volume of incriminating evidence when determining prejudice from juror exposure to extraneous information). Indeed, in that Memorandum, the Court undertook a thorough review of the sufficiency of the evidence regarding the schemes to defraud the Pennsylvania Senate, Citizens Alliance, the Internal Revenue Service, and the Independent Seaport Museum. At the close of that analysis, we found that the evidence was more than adequate for a reasonable juror to convict Fumo, beyond a reasonable doubt, of all of the crimes with which he was charged. Fumo, 2009 WL 1688482, at *2-32. Thus, even absent the extraneous information, a finding of guilt on all counts was both possible and reasonable.

Finally, during the Court's charge, the jury was directly instructed to not consider any extraneous information. Specifically, this Court emphasized to the jury: "You must make your decision in this case based only on the evidence that you saw and heard in the courtroom. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way." (Jury Charge Following Closing Arguments (Mar. 4, 2009).) Any claim of prejudice is thus further undermined by "the district court's instruction 'to decide the case on the basis only of the evidence and not extrinsic information, an instruction the jury is presumed to have followed.'" Thornton, 1 F.3d at 156 (quoting Gilsenan, 949 F.2d at 96).

In sum, we agree with Defendant that the juror at issue should have, in the best exercise of judgment, informed the Court of her exposure to this extraneous information. Nonetheless, this Court simply cannot find that her failure to do so warrants relief for Defendant Fumo from the 137-count conviction. While none of the above factors taken individually carries particularly significant weight, their cumulative import requires the Court to find that Defendant suffered no prejudice that either necessitates further inquiry from the jurors or mandates a new trial.

20

## V. CONCLUSION

The Court remains cognizant of its duty to ensure a fair trial and stands vigilant in our efforts to avoid any presence of bias, unfairness, or improper influences on the trial. However, as noted by the United States Supreme Court:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

United States v. Olano, 507 U.S. 725, 738 (1993) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). In this case, the mere fact that some members of the jury may have been exposed to extrajudicial information does not rise to the level of prejudice. Moreover, the Court remains extremely reluctant, based on the paucity of information provided by Defendant, to "haul" the jurors back into court and subject them to questioning from the Court, the United States Attorneys, and multiple Defense attorneys. In lieu of such an intrusive process, the Court, upon careful consideration of the allegations set forth in attorney Cogan's affidavit, deems any alleged extrajudicial exposure to be harmless.[11] We thus deny the Motion in its entirety.

---

[11] Having read the *Philadelphia Magazine* article, the Court finds nothing earth-shattering that alters this decision. Specifically, in the course of a six-page article, Cipriano's discussion of the jury's exposure to extrajudicial information consists of the following:

> It was a challenge, however, [for the jury] to follow Judge Ronald Buckwalter's instructions not to discuss the case with anyone and to ignore the media. "The hardest thing was on the train," Guckin says. "People were talking about it and I would move my seat."

"I tried to stay open-minded all the time," says Joanne Pinkston, who as Juror No. 1 sat closest to the witness stand, and who became known as "the tissue lady" for dispensing Kleenex to sobbing witnesses. "Okay, maybe he did something good. But the more he said on the stand," she recalls thinking, "'You're hanging yourself, buddy.'" The mountain of prosecution evidence "was so clear."

But on Fridays, when court wasn't in session, Pinkston showed up at her job as a maintenance administrator at Verizon. Co-workers stopped by and talked about things in the media, such as Fumo's prior 1980 conviction, subsequently overturned by a judge, for hiring ghost employees. Judge Buckwalter repeatedly turned down prosecution requests to tell the jury about that prior conviction. But Pinkston found out anyway, even though she held up her hands and told co-workers: *Please don't talk to me, I can't discuss the case.* Co-workers also told her that John Carter, former president of the Independence Seaport Museum, and the guy who gave Fumo permission to take free yacht trips, was doing time for fraud. The judge didn't want the jury to know about Carter, either.

"Asking people to screen out the media for five months, that was a tremendous burden," says Karen White, a retired school psychologist from Bethlehem who was elected jury forewoman. "Asking people to shut down their communication, that was a tremendous burden on people for five months." White, however, says she brought a blank slate to the courthouse: "I felt a heavy responsibility to be fair and hear all sides of the case." What was remarkable about the jury, she says, was, "We were all respectful of each other and the system. That, I felt every single day."

*  *  *

Despite the judge's instructions to tune out the press, jury forewoman White also says on the last day of the trial she heard from the media that the defense in the Fumo case was objecting to postings on Twitter and Facebook by an unnamed juror (including one post that said, "Stay tuned for a big announcement on Monday everyone!"). White was driving in from Bethlehem on the Schuylkill Expressway that morning, "listening to traffic reports on KYW, and they kept blasting that" — the story about the Twittering juror. When she got to the courthouse, the word was out. "We [jurors] all knew. Some of them heard it on KYW, or the night before, on the news. This was the lead story in the Philadelphia area."

http://www.phillymag.com/articles/power_vince_fumo_after_the_fall (lasted visited July 8, 2009).