# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

            v.          :          **CRIMINAL NO. 06-319-03**

VINCENT J. FUMO          :


## GOVERNMENT'S REPLY MEMORANDUM REGARDING RESENTENCING

**Table of Contents**

I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   The New E-Mails. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Lack of Remorse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    Lack of Respect for Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    Blaming Ruth Arnao. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.    Settling Scores. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    E.    The Book. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    F.    Fumo's Plans for the Future. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.  Fumo Addresses Few of the Sentencing Factors. . . . . . . . . . . . . . . . . . . 27

IV.   Fumo is Not Entitled to a Downward Departure. . . . . . . . . . . . . . . . . . . 30

    A.    Age and Health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        1.    Age. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        2.    Health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    B.    Post-Offense Rehabilitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

V.    Fumo Should Not Receive the Enormous Variance He Seeks. . . . . . . . . . . 57

    A.    Good Works and Public Service. . . . . . . . . . . . . . . . . . . . . . . . . . 58

    B.    Validity of the Sentencing Guidelines. . . . . . . . . . . . . . . . . . . . . . . 68

        1.    The fraud guideline enjoys wide acceptance. . . . . . . . . . . . . . 68

        2.    No case supports the variance requested by Fumo. . . . . . . . . . 74

VI.   Fumo Should Be Ordered to Pay Full Restitution. . . . . . . . . . . . . . . . . . . 81

VII.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

I.       <u>Introduction</u>.

        An explosive trove of e-mails obtained by the government during the past

10 days confirms an uncomfortable but inescapable truth:  the benign portrayal of

defendant Vincent J. Fumo provided in his memorandum regarding resentencing bears no

relation to the actual person.

        The government just obtained voluminous e-mail correspondence from

Fumo's most recent six months in prison.  In those e-mails, Fumo reveals himself to be

unchanged, convinced that he committed no crime, wholly unrepentant, virulently hostile

toward the prosecutors and all other law enforcement officials (with the exception of the

sentencing judge who imposed a lenient sentence he hopes will be reimposed),

endeavoring to trick the Bureau of Prisons into granting an early release, anxious to

resume his lavish lifestyle using the remaining millions he does not want to pay in

restitution to his victims, and itching to write a book and exact revenge on all those who

opposed him and produced what he repeatedly calls a "travesty of justice."

        On June 2, 2011, he used this term in writing to a 9th grade student at a

Philadelphia high school, whose family is acquainted with Fumo and who has struck up

an e-mail correspondence with the defendant.  After the young man asked, what "travesty

of justice," Fumo replied:

> This whole nightmare of my case.  I never hurt anyone in my life.  There were no
> victims.  But because of who I was and the jealousies that swirl around my success
> and power, I was targeted.  In the end I got convicted of technical bull shit.  But
> the press started a feeding frenzy that has still not subsided.  So it cost me my

career, my pension, all of my cash (in legal fees and fines, etc.) and my freedom. If that isn't a travesty of justice, I don't know what is???? :-( [1]

With similar hubris and unbridled narcissism, Fumo rages in his e-mails, despite efforts by his attorneys and fiancee, knowing that the e-mails are subject to monitoring, to stop him.  Fumo reveals himself to be entirely remorseless, a likely recidivist, and wholly undeserving of leniency from this Court.

This memorandum sets forth the recent information, and responds as well to Fumo's baseless requests in his memorandum for a departure and a variance below the recommended guideline sentence of 210-262 months.  In part, as will be explained at length, one of Fumo's departure requests itself rests on false information, and provides yet another ground for enhanced punishment.

---

[1]   All of the punctuation, spelling, etc. quoted in this pleading is the same as in the originals.

In a June 14 e-mail to the same young man, Fumo even bragged about some of the criminal conduct of which he was convicted (i.e., using Senate and Citizens Alliance workers to further his vacations):

> And you must come and see Green Street some time!  It is spectacular.  It is the NICEST home in the city!  It took me 5 years and tons of $s to restore to its grandure as an 1890 Italianate Victorian Mansion! :-)

> I was able to keep my boats but I am trying to sell the Hinckley.  But the market sucks and I am not giving her away!

> The jet was the best perk I've ever had.  I really miss  that! :-(  When I used to go to the Vineyard with the plane, I would have my guys bring up the cars and have a captain bring up the boat, then they would all fly back on the plane which was deadheading home anyway and we would reverse it on the way back! :-)

II.     The New E-Mails.

   The government received the mass of e-mails on October 18, the same day it filed its memorandum regarding resentencing.  The Bureau of Prisons (BOP) was able to produce Fumo's e-mails for the period from April 20, 2011, to October 13, 2011.  The production consisted of 12,068 pages.  While there is much duplication (as e-mail strings grow longer), there are thousands of separate e-mails.

   The government has engaged in a determined effort to review all of the materials, which is not completed.  Within the next week, the government will provide copies to the Court of a sampling of the e-mails, along with any necessary further explanation.  Further, while the defense, we believe, already had all of these e-mails and more (given that attorneys are copied on a large proportion), the government today is producing to the defense a copy of the entire set it received.

   What we have is only a snapshot.  The government has obtained the last six months of Fumo's e-mails; it has not reviewed his postal correspondence, or his telephone calls.  One can only imagine.  But the impression left by this snapshot is unmistakable, and it is stunning -- in thousands of e-mails, even while he knows that his communications may be monitored, his personality and his schemes are defined once again in sharp relief.[2]

_____

  [2] The holding of Pepper v. United States, 131 S. Ct. 1229 (2011), that a court at resentencing may consider post-sentencing rehabilitation, cuts both ways.  The decision rested on the proposition that Congress has directed that a sentencing court consider all available information regarding an offender.  Id. at 1229.  Accordingly, the Supreme

(continued...)

Fumo participated in the Trust Fund Limited Inmate Computer System

(TRULINCS).  The pertinent BOP program statement, No. P5265.13 (Feb. 19, 2009),

provides:

> Each inmate's notice, acknowledgment, and voluntary consent must be
> documented on the Inmate Agreement for Participation in TRULINCS Electronic
> Messaging Program Form (BP-0934).  As a reminder to inmates, a warning banner
> appears each time an inmate participant accesses the system, indicating his/her
> consent to monitoring.
>
> Community persons' consent to Bureau staff monitoring of all TRULINCS
> messages and activity is obtained when a community person accepts the initial
> system-generated message notifying him/her the inmate wants to add him/her to
> their contact list, and with each subsequent message(s) from inmate participants.
>
> . . . .
>
> Inmates may only exchange electronic messages with persons in the community
> who have accepted the inmate's request to communicate. . . .
>
> NOTE: Inmates may place attorneys, "special mail" recipients, or other legal
> representatives on their electronic message contact list, with the acknowledgment
> that electronic messages exchanged with such individuals will not be treated as
> privileged communications and will be subject to monitoring.

Every time the inmate logs onto the system, a message is displayed which includes the

following statement, and which requires the inmate to click "I Agree" before proceeding:

> <u>Warning</u>:  This computer system is the property of the United States Department of
> Justice.  The Department may monitor any activity on the system and search and
> retrieve any information stored within the system.  By accessing and using this
> computer, I am consenting to such monitoring and information retrieval for law

---

[2](...continued)
Court stated, a resentencing court is equally entitled to consider post-sentencing
developments which call for a higher sentence than the one originally imposed.  <u>Id.</u> at
1249.  In Fumo's case, consideration of his post-sentencing views and conduct clearly
does not provide any basis for a sentencing reduction below the guideline range.

enforcement and other purposes.  I have no expectation of privacy as to any communication on or information stored within the system.

Fumo used the system with abandon, returning to his preferred method of communication from his Senate days.  On July 29, 2011, he explained:

E-mail is up and running from 6:15AM to 11:45PM every day.  It is only shut down from 4:00 to 4:30PM and 9:00 to 9:30PM daily and also from 10:00 to 10:30AM on weekends.  Otherwise we can use it as much as we want.  It costs us 5 cents per minute and if we want to print out stuff that costs 15 cents per page.  And its pretty convenient in that there are 2 computer stations in each unit (75 guys per unit) so there's rarely a line for it.  Then when we use it we can only use it for 30 minutes at a time and then we have to take 30 minutes off before we can go back on.

Fumo and his fellow correspondents repeatedly acknowledged that the messages were not privileged.  For example, this correspondence occurred on June 3, 2011, with Fumo's counsel Peter Goldberger, regarding the plan of Fumo and Ralph Cipriano to write a book (much more on that later) published by a corporation put in the name of Fumo's fiancee, Carolyn Zinni:

Goldberger:    Please try to keep in mind that CorrLinks e-mail is monitored and unprivileged.  I think this line of messages is a good example of a topic that is not suitable for discussion in this medium.  You might consider reminding Ralph the same.

Peter Goldberger, Atty

Fumo:    OK TY

Cipriano:    (To Fumo) Oops.  This is the kind of stuff that Dennis is worried about.

Fumo:    I guess so! :-)

On the same day, after Fumo promised to send a more in-depth analysis of the transcript of the oral argument in this case in the Court of Appeals, Goldberger wrote again:

> Thanks for your reaction.  I look forward to reading your further analysis, but NOT on the e-mail system.
> -Peter Goldberger, Atty

In many subsequent e-mails, Fumo acknowledged this,[3] but he continued to send copious e-mails to communicate his views and directions to others.  And despite warnings, Fumo never relented in posting his true feelings and desires to his group of correspondents, usually copying one or more of his attorneys as well as third parties on the same e-mails.[4]

For instance, on May 26, 2011, Fumo responded to a columnist's piece in the *Philadelphia Daily News* that day which praised prosecutors' pursuit of their appeal in this case; Fumo wrote a string of sexual epithets about the columnist so crude and

---

[3]     On August 2, 2011, Fumo wrote to his son:  "One last thing I also forgot to mention.  All of our e-mails are subject to being read and saved, etc."  On August 4, 2011, in a discussion with Goldberger about his effort to enter a drug treatment program (discussed at great length later in this memorandum), Fumo wrote, "I don't want to discuss my strategy or feeling in this e-mail for fear of BOP monitoring."  On September 13, 2011, in an exchange with Cipriano, Fumo stated:  "Ralph, whatever you find and are able to chart, do NOT e-mail it to me here since [acronym for AUSAs Pease and Zauzmer] can get access to it.  Just snail mail it  OK? TY VJF."

[4]     Mr. Goldberger's analysis was correct.  "Because the attorney-client privilege obstructs the truth-finding process, it is construed narrowly."  Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1423 (3d Cir. 1991).  It may be waived, and "voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege."  Id. at 1424 (citation omitted).

debased that we will not publish it here.  Attorney Cogan responded with a strident

request that Fumo refrain from expressing his feelings via e-mail.

Fumo's fiancee, Carolyn Zinni, pitched in.  On June 2, she wrote to Fumo,

"Remember what Dennis said last week..... SHH !  No calling ***anyone*** out.  Be a

good boy.  Ok?"  On June 3, after receiving another Fumo tirade about various legislators,

Zinni added:

> if you cant sensor don't cc me
> stop will ya????
> let them be, to address their own battles...
> We have our own problems !!!!!!!!! No More opinion
> I want you home!!!! do u get that ??
> shush up !! PLEASE

Fumo never took her advice, or that of his lawyers.[5]

A.    Lack of Remorse.

Fumo is as unrepentant and remorseless as any defendant we have

prosecuted in our decades of practice before the bench.

On August 26, 2011, after the Third Circuit remanded the case and Fumo

lamented the prospect of resentencing, he wrote:

> They will never quit or become reasonable.  This is about mob mentality and
> vindictiveness to the highest order!  It has absolutely nothing to do with Justice.  It
> is no longer about the "Crime" it is about me and it is personal!  This is the chance
> for every "liberal" and the media and my enemies and those that are jealous of
> what I was able to accomplish to revel in the mud of their prejudice!  And I am the
> victim now!  :-( VERY DEPRESSING

---

[5]    As recently as August 21, Peter Goldberger wrote to Fumo:  "I cannot discuss legal
strategy with you on CorrLinks."

In an April 21 e-mail, he stated, "I do feel Christlike in the injustice I have suffered throughout this whole nightmare!!! :-("  In an e-mail on May 28, 2011, he compared himself to Jews in concentration camps, prisoners at Guantanamo, and the Mubarak family on trial in Egypt.  "America has become just another fucked up banana republic in a fucked up world of banana republics that all call themselves free countries!," he wrote.  "The whole world has gone mad.  It's a feeding frenzy and we are just a small part of it."

Reading Fumo's own words provides a drastically different and far more accurate portrayal of the man than the sanitized claims in his sentencing pleadings.  On August 12, 2011, he wrote to Zinni, Cogan, and Cipriano:

> I have totally lost faith in the system.  How could I have any confidence in it considering of where I am for what I am alleged to have done!  :-( Even with the Judge dong to right thing, did I deserve all of the punishment I have so far endured?  55 months in prison, denial of the RDAP,[6] $2.4 million in fines and restitution, $3 million in legal fees, loss of my civil rights to ever posses a gun again, being thrown out of every big bank in the country, labeled as a Felon for the rest of my life, getting a new passport with the Scarlet Letter F emblazoned on it, the loss of the pension I worked 35 years for, etc. etc.  WTF,[7] because I sent David for my laundry and got some tools from CABN [Citizens Alliance for Better Neighborhoods] and a few boat rides from the museum!  How is that Justice by any means?  Getting found guilty by a jury that was dumb, corrupt and prejudiced?  Being hounded forever by evil prosecutors who run amok without any restraint!  Then to have the 3rd Circuit treat our appeal as they seem to have.  That is all the "system" and it is corrupt and unjust by its very existence.
>
> . . . . My so called crime grew exponentially throughout the trial.  I was only indicted with a loss figure of $2,000,000 and that was inflated for sensationalism.  By the time they were done with their bullshit charts and extrapolations, it grew to

---

[6]   The RDAP is the Residential Drug Abuse Treatment Program, to which Fumo was denied entry, for reasons explained later.

[7]   A frequently used acronym for "what the fuck."

over $5,000,000.  Meanwhile I never got a dime.  So if you look at that I should be in prison for 20 years PLUS!!!

For any other citizen, taking a fleet of brand new vehicles worth hundreds of thousands of dollars, or a bulldozer, or a pile of laptop computers, or $100,000 in other consumer goods and equipment, or any of the additional goods and services illegally taken by Fumo would result in years in prison.  But according to Fumo, these are "BS" crimes not worthy of prosecution at all because he was a State Senator and entitled to anything he took.  The need not only to punish Fumo, but to incapacitate him, could not be more clear.

In Fumo's mind, the only reason he was prosecuted for fraud, tax evasion, and obstruction of justice is because his adversaries in politics and the media turned on him.  On May 23, 2011, he wrote to his writing partner, Cipriano:  "I gave abut 35 years of my life to the Senate and the State and because Gore and Kerry lost an election in FL + Ohio, I get fucked over on BS by [derogatory acronym for AUSAs Pease and Zauzmer]!" After Cipriano agreed, and lamented, "But Vince, what choice do we ever have than to play the hand we're dealt?," Fumo replied, "I know but it would have been nice to have a few Aces come my way!"  Fumo went on to explain that he had made a deal to be permitted to select the United States Attorney in Philadelphia upon a Democratic presidential victory in 2004, suggesting that this would have terminated the investigation of his crimes.

- 9 -

He also regularly turns his wrath on the *Philadelphia Inquirer*, which has reported extensively on his extraordinary misdeeds.  On May 23, he stated, "The Inky will NEVER print the scenario that I am missed.  They put me here and are still trying to keep me here longer.  They absolutely HATE me.  Its amazing!!  But someone once said that you can tell the quality of a man buy the nature of his enemies.  So I guess I'm proud that they hate me so."[8]

      B.     <u>Lack of Respect for Authority</u>.

Fumo has no respect whatsoever for any law enforcement official, with the undersigned prosecutors at the top of his list.  The prosecutors in this case are habitually referred to as "pricks," "assholes," or by derogatory acronyms he created.

On May 12, 2011, he wrote to Zinni:

> I want to be with you so bad.  I am frustrated and tired of even dreaming.  These Mother fuckers in the federal government are evil and deserve to one day suffer.  I know Gos says that vengeance is His but I hope He gets some soon!

---

[8]    In an unintentionally humorous exchange with his son on May 26, 2011, Fumo instructed his son to stop sending him the online comments posted after every *Inquirer* article about this case, which always are numerous and almost unanimously deride Fumo's conduct and the earlier sentence in this case.  Fumo wrote:

> please don't send me any more of those ass hole anonymous blogs any more.  OK? And if you want to do me a favor, make up what appears to be a legitimate phony name like John Smith and challenge them to expose themselves and give their names next time.  Call them pussys if they don't!  Love, Dad XO

His son replied, ""I've done that before.. It doesn't make any difference.  Ok.  I won't send anymore..  Thought you wanted to be fully informed.."

In his e-mails, he refers to numerous prosecutors by name, including the current and two predecessor United States Attorneys, always in graphically derogatory terms, even treating likewise prosecutors not involved in this case at all. He celebrates any victory by a criminal defendant he reads about, whether he knows anything about the case or not. For example, on May 14, 2011, after reading about the disqualification of a prosecutor in a case in Mississippi, he wrote, "FInally a victory for the Good Guys! :-)"

In an August 17 e-mail, he accused Judge Davis of this Court of ethical violations (Judge Davis ruled against him on numerous legal challenges to the conduct of the criminal investigation as the assigned district judge responsible for supervising the grand jury proceedings). Reflecting no understanding of the applicable law, Fumo wrote, "if he had recused the whole Grand Jury would have been invalid and they would have to have stared all over again and their case would have folded."

The only official who escapes his derision is Judge Buckwalter. Fumo regularly expresses the hope and confidence that he will receive the same sentence from the Court; undoubtedly, his attitude toward the Court will change as well if he is incorrect.

C.   <u>Blaming Ruth Arnao</u>.

Fumo even rewrites history and blames his aide and co-defendant, Ruth Arnao, for the crimes she committed on his behalf for which he reaped the vast share of the benefit.

On May 22, addressing his concern that his selected steward of his political action committee was stealing his money (more on that below), Fumo wrote to Cipriano and Zinni:

> I can't believe I had a life surrounded by such scum!  :-( That is a HUGE disappointment.  I guess I was too trusting and too busy getting shit done to suspect that others were such low life at heart! :-(  That is what happened at CABN.  I trusted Ruth and the others to do the right thing and found that they created a disaster of petty theft.  But I was the one with the image of being the "Brains of the Outfit" so I was an easy scape goat!  Wow!  What a fuking disaster!!!  I feel like Caesar and Christ all tied into one with Brutus and Judas both stabbing me in the back with Herod ([derogatory acronym for Pease and Zauzmer] & The INKY) Crucify me!  Where is Marc Antony when I need him? :-(

Not only is this new delusion inconsistent with the overwhelming evidence introduced at trial, but it even contradicts Fumo's own perjurious testimony at trial (which asserted that he knowingly received almost everything he was charged with and was entitled to all of it as a "perk" for aiding Citizens Alliance).

What happened is that, after the trial, Ruth Arnao and her husband, Mitchell Rubin, accepted responsibility for their conduct (Arnao in her sentencing submissions to this Court, and Rubin in pleading guilty to an information charging aiding the obstruction of justice).  They were Fumo's longtime friends, who had abetted his schemes and traveled extensively with him to enjoy his ill-gotten gains.  Now, Fumo turned on them with the characteristic vengeance and fury he has always shown to rivals.

In part, a host of disputes arose regarding the Ventnor condominiums controlled by Fumo, one of which was purchased by Rubin and Arnao.  In happier times,

- 12 -

as the Court learned at trial, Citizens Alliance workers were sent by Arnao to labor on the

property and docks for Fumo's benefit.  But now, on May 25, 2011, Fumo wrote a

lengthy e-mail to his son about managing the condominiums, stating in part:

> Also, I think that [another unit owner] and Mitchell and Ruth are going to the
> shore for this weekend.  Make sure that there is no electric turned on on the docks
> (turn off all of the breakers for the hot tub, etc.) except where it is absolutely
> necessary, for example [Fumo friend's] boat and the boat that is renting the slip,
> etc.
>
> Also, keep the cameras on and if you see anyone on the deck or the docks, record it
> and let me know and I will write a letter for you to send to them.

Then, on July 25, Fumo wrote to the lawyer representing him in the

condominium dispute, to fill him in on a bizarre and false version of the Citizens Alliance

fraud which landed him in prison.  In attempting to falsely claim that the Citizens

Alliance board members made their own independent decisions and were not beholden to

Fumo, facts with are directly refuted by the evidence at trial in this case, Fumo wrote:

> And as I told you that board, while they may have chosen not to act prudently, by
> their own testimony did whatever RUTH told them to do, they were not
> incompetent people.  There were a number of College Graduates as well as at least
> FOUR lawyers on the board.  So they cannot say that they did this for me.  In fact
> all of their testimony in the criminal case was consistent in that all said that they
> did whatever RUTH asked them to do.  I was never mentioned by them in that
> regard.

Fumo neglected to report the consistent trial testimony that the Citizens Alliance board

members never met until late 2003, after and only because the misconduct began to come

to light, and were never asked to contemporaneously approve the hundreds of thousands

of dollars of expenditures which Fumo ordered Arnao to make for his benefit.

Fumo continued his false account:

> Ruth paid for some of the stuff at the docks with $s from CABN.  (I have already
> deposited the $s for restitution in the Federal Court Escrow account for those
> expenses).  I didn't find that out until after the indictment.  She handled all of my
> $s so she would pay whatever was necessary for anything including the expenses
> at the docks.  Sorry this is all so vague but if I had better control of my finances I
> most probably wouldn't be in here.  She and others on my staff ran all of my $s.
> Big Mistake in retrospect-(

In another e-mail about Rubin on July 25, this one to the same lawyer, a CPA, and a

person Fumo has retained to help him in personal affairs, Fumo lied further:

> He is now an EXTREMELY BITTER person because the Feds indicted him in
> regards to my case.  And his wife was a co-conspirator in my case who went to
> prison for a year and a day.  And they are now taking out their anger at themselves
> on me.  Believe me, if a crime was committed it was Ruth who committed it.

On July 26, Fumo advised attorney Cogan, "I also hear that Mitchell is enraged with his

anger towards me!  What a fucking piece of shit he is.  he was NOTHING until I made

him.  FEA!!!"[9]  In this same e-mail and others, Fumo stated that he paid the initial

restitution order but planned to sue Arnao for half -- despite the fact that he reaped the

vast amount of the benefits from the thefts![10]

    D.    <u>Settling Scores</u>.

        Fumo writes often of hopes to exact vengeance on the many people

involved in this case and elsewhere who he believes wronged him.  Mitchell Rubin is

---

[9]    Fumo's frequently used acronym for "fuck 'em all."

[10]    On July 24, Fumo wrote the same sentiments to another friend:  "Well Mitchell is
an ungrateful & disloyal prick.  He is bitter that he and Ruth got jammed up with me in
this mess.  However, he forgets that most of this shit was his and Ruth's fault.  FEA!!!"

high on that list, along with Carmen DiCamillo, one of their mutual former friends from the high-living days (who testified at trial -- he went on one of the trips to Cuba illegally paid for by Citizens Alliance -- and at trial was sympathetic to the defense).  On April 16, 2011, anticipating the condominium litigation, Fumo wrote, "as soon as the appeal is finished we can go on the attack with Mitchell and Carmen!"

On May 17, Fumo targeted James Schwartzman, the attorney who represented Leonard Luchko in this case.  During the Fumo trial, in a sterling act of professional ethics and dedication to his client, it was Schwartzman who alerted the government that Luchko had continued to communicate with Fumo during the trial, aborting at the last minute testimony by Luchko that would have ultimately been devastating to Luchko.  Now, Fumo wrote to a member of the Philadelphia delegation in the State Senate who continues to correspond with Fumo:

> Jim Schwartzman is still on the SEPTA Board as the Senate D appointment.  I put him there.  He stabbed me in the back during my trial stuff.  There is absolutely no reason for him to be representing the South Eastern PA Democrats since he is a Republican from Montgomery County!  And he is very close to the Rs.  You guys should find a replacement and demand that [Senate Democratic leader] Costa replace him asap.

At the same time, Fumo was going to bat for a former employee who lost the Senate job he arranged for her after his resignation.  In an e-mail to another aide, Fumo lamented the difficulties Fumo had in placing his aides after his resignation.  He wrote, "I will repay all of those ass holes some day!"

On June 16, 2011, Fumo wrote about another elected official in

Philadelphia, unhindered by Zinni's effort to silence him on e-mail from stating his true

feelings:

> Fumo:   I can't wait for this shit to be over so I can speak out against this fucking hypocrite.  He is an ungrateful, disloyal piece of shit that I made from nothing and he will be nothing again by the time I am done with him!!!
>
> Zinni:   I know you hope the best for him and when you say nothing I know that you mean that the Inky does not hound you when you are nothing so I know what your statement of nothing means.
>
> We will talk more when I see you ok?????????????????????????????????????????????????????? Manage a la medaca !!!!!!!!! remember what counsel recommended ? [11]
>
> Fumo:   I understand that but I don't mind the world knowing that he is a hypocritical piece of adulterous drunken shit!!!  And the feds should look into his conflicts of interest with his job and his elected position!!!  FEA!!! XO XO XO

On September 23, he wrote to Ralph Cipriano,

There is another list that I will start to send you soon.  It will be called the "Et Tu Brute" list.  It will be all the people I helped who fucked me over.  Starting with Sprague, Geoff Johnson, Bob Scandone and Jim Kenny.  Just to name a few.  I want them listed with their stories as well.  FEA!!!

Fumo referred to his former attorneys who testified in the government's redirect case

(Sprague, Scandone, and Johnson), and the Philadelphia City Councilman who was a

former member of Fumo's staff.

---

[11]   The government has been unable to translate "Manage a la medaca," which is probably an imprecise spelling or transliteration.  Italian speakers consulted by the undersigned believe that "manage" is a misspelling of "mannaggia," which means "damn," but disagree regarding the remainder of the phrase.

These e-mails make abundantly clear that Fumo is unreformed and poses a continuing danger of engaging in illegal conduct if released, starting with efforts to retaliate against witnesses.  He is a vengeful, spiteful, and completely remorseless individual who is incapable of recognizing the wrongfulness of his actions, and who ascribes blame to anyone who does not comport themselves to his own delusional views of his plight.

    E.    <u>The Book</u>.

A key feature of Fumo's post-incarceration campaign will be, he plans, a book.  Tentative title:  "The Senator."[12]

Fumo plans to write the book with Ralph Cipriano.  The Court will recall Cipriano as the freelance journalist who contacted jurors after the trial, and then wrote an article in *Philadelphia Magazine* which formed the basis for an unsuccessful motion for a new trial (a ruling of this Court affirmed on appeal by the Third Circuit).[13]  Cipriano has

---

[12]   Fumo and Cipriano are still working on the subtitle, however.  One of the possible choices they discussed on August 9, 2011, is "The Senator: Vince Fumo, the most effective legislator in America and how he was undone by a bankrupt newspaper and an overzealous prosecution."

[13]   This Court wrote at the time:

> When Government counsel attempted to speak with him regarding this new evidence, Cipriano, both directly and through his editor, declined to reveal any information about his interviews or the identity of the juror.  By doing so, Cipriano and *Philadelphia Magazine* oddly chose not to balance the scales upon discovery of information that could affect the widely-publicized trial and conviction of a high-profile public figure.

(continued...)

since become a Fumo devotee and full member of Fumo's camp.  The e-mails reveal that he and Fumo have discussed an arrangement in which Cipriano will receive $100,000 to write the book, from a limited liability corporation established by Zinni, and then receive a percentage (in the neighborhood of 10-15%) from book sales and any future movie deal.

In a June 3, 2011, e-mail, Fumo stated that he and his son are "lending" the money "to the LLC and thereby 'underwriting' the endeavor and I have no intention of getting any $s from the LLC for telling my story except the repayment of the non recourse loan, if in fact there is that much money made."  Later, Fumo agreed that it might be a good public relations idea to pledge to give all the book profits to charity, but remain silent regarding movie profits.

On April 21, Cipriano outlined:

> The basic deal of any book is to show all facets of a fascinating character, like I did with Beasley, only you have many more facets, and have done even crazier things than he did.  People love to read about multi-faceted people who operate on the edge, because the vast majority of us are so boring.  So we have to capture you in all your glory.  Vince the shy only child, Vince the wonder boy of politics, Vince the power broker, Vince the master politician and deal maker, Vince the sailor, pilot, carpenter, electrician, chef, resauranteer, etc., Vince the crazy and ruthless when he's dealing with enemies, Vince the lover, Vince the statesman, and, at the end of the day, Vince the unrepentant master politician and best legislator the state ever had walking out of Kentucky with his head unbowed.

Fumo replied:  "Thanks Ralph.  Sounds right on to me! :-) See you soon!"

In numerous subsequent e-mails, Fumo and Cipriano discussed all the views summarized here and their plan to use the book to promote them, and to settle the score

---

[13](...continued)
July 9, 2009 opinion (docket entry 720), at 9.

with Fumo's rivals.  In fact, Fumo has the practice of copying his new biographer on many of his most intimate e-mails with his fiancee, his family, and his attorneys.  And first, Cipriano plans to write a newspaper opinion article to attempt to sway public opinion before resentencing.  From September 30, 2011:

> Cipriano:      Hey Vince, guess who's writing an op-ed for the Inquirer about Vince Fumo coming back to Philadelphia for re-sentencing?  Me.

> Fumo:      Terrific.  Do a great job for me will ya!  :-) I think along the lines of "enough is enough"; since I left the city and state have suffered; piling on is un-American; can't the feds find better things to do with our tax dollars, with just the money that has been wasted on the appeals they could have created 5 good paying jobs for people who are unemployed, or paid off the balances of 10 mortgages for people who were kicked out of their homes because of the economy. etc. Love, Vince

On October 1, 2011, Fumo added:

> Fumo:      BTW, you really have to run it by Dennis before you submit it.  OK?

> Cipriano:      Way ahead of you.  There won't be any surprises.

> F.      <u>Fumo's Plans for the Future</u>.

In a perfect world for Fumo, he will walk free in less than a year, having served about three years in prison for the 137 counts of fraud, tax evasion, and obstruction of justice for which he was convicted.  The hope turns on reimposition of the 55-month sentence, and persuading BOP to admit him to a drug treatment program for addictions he never had (discussed later in this memorandum).

Fumo and others write constantly of what he will do then, including finding a place to live in Philadelphia, restoring his beach home, and sailing.  He plans to

rehabilitate his farm, and perhaps add a marine service facility on the Susquehanna River which borders the farm.  From prison, he stays on top of and supervises the most minute details regarding maintenance and rehabilitation of his farm and other properties, and is shopping by e-mail for property in Key West.  He even writes about undertaking efforts to restore his right to own firearms.

His plan, stated in e-mails, is to sell his house in Fort Lauderdale, buy a less expensive house in the Florida Keys, and put aside $1 million to purchase a new yacht (a dream contingent on denying his victims an additional $1.8 million in restitution which they are owed, as discussed at the end of this memorandum).  He and his fiancee, Carolyn Zinni, exchange constant e-mails in which they appear certain and secure that the day of release and this new life is imminent.

Fumo's passionate interests in myriad activities, and shopping to support those interests, are undiminished.  Reading his current e-mails is a surreal experience; they are identical in tone and substance to the e-mails introduced at trial which survived his e-mail purge, in which he directed orders to Senate and Citizens Alliance employees to acquire a staggering amount of goods for him.  The only thing that has changed is the computer terminal from which the e-mails are written.

While, as will be seen later, the government finds much to question in the recent letter to BOP from Dr. Frederick Fisher, Fumo's treating psychotherapist for many years, Dr. Fisher got this much right:

- 20 -

Vincent J. Fumo experiences an insatiable urge to acquire power (political), people (women), ard objects (houses, cars, machinery) to compensate for his low sense of self-esteem.  This driven quality manifested throughout the treatment as an addictive force.  He would often describe the urge to acquire as uncontrollable and regretted his decisions after the fact.

Nothing has changed.  Here is a small sampling of his frequent correspondence about acquisitions.

On October 9, Fumo wrote to an assistant seeking information on a boat for sale for $825,000, and on Jeeps for sale Fumo would like for the shore and farm.  Earlier, on April 22, Fumo asked Zinni to order him a $129 "Farmall Pride Reversible Jacket." He explained:  "this one is for the farm so I can wear it WHEN I buy my antiques Farmall that will match the model of the one I had in my DIstrict Office! :-)  Love you!!!!  XO"[14]

On May 9, he wrote to Zinni:

The TV Cabinet in the living room was purchased through [redacted[15]].  He was my designer on most of my homes.  Please contact him and see if he has any idea how to get the cabinet fixed so it will go up and down again.  Tell him I said Hi as well.

Contact [redacted] and ask him who to contact at the THE LIGHTING GROUP regarding the lighting on the front of the house.  He recommended them to me years ago when I did the lighting.  Then find out from them if there are any newer and better lasting fixtures like the ones they originally specked for the facade. They might even still have the original working file for the house.

Contact [redacted] and see if she can either find a copy of the "Architectural Line Drawings of the Facade" of the house or get me a new set made.  She originally

---

[14]    Farmall was a prominent brand of tractors manufactured between the 1920s and 1970s.

[15]    The government redacts in this e-mail the names of persons who were not trial witnesses or the subject of testimony at trial.

had these done by a student or professor at the University of the Arts.  Also, ask her for an estimate of the costs first.

. . . .

The types of Antique tractors I am interested in are:

1 - A Farmall 1940 to 1953 model "H" (1943 - my birth year would be special)
2 - A Farmall 1936 to 1939 model "F-20"
3 - A John Deere Model 70 with narrow front wheels
4 - An old Blue Ford that you would like.  (I assume you never checked on the one in Ashland.)

You still have to get my Milwaukee jacket from [redacted] and order the Stud Finder

The car I had and loved was a 1962 Oldsmobile Starfire Convertible - White with a white top and red interior.

I started the description of Green Street and I am on page 13 already and am only just finishing up the 1st floor! :-)

PLEASE PRINT THIS OUT AND KEEP IT BY YOUR PHONE SO YOU HAVE A LIST!!! OK? :-)

Love and Miss you so very much!!! XO XO XO

Fumo recognizes that he will need some means of income in order to support his lifestyle in Philadelphia, on the farm, in New Jersey, and in Florida.  His plan is to set himself up as a lobbyist in Harrisburg.

For example, on April 21, 2011, he wrote to a current State Senator:

Fumo:        . . . How are you doing?  I guess things are pretty boring up there
             with Corbett as Governor and Costa as "leader"! :-(
             Sorry about that.  But as soon as I get home, I will try and straighten
             some things out for you guys! :-)

| Senator: | Haha!  Definitely.  Miss your leadership style, Vince.  'Boring' is way too kind at this point!  Can't wait to see ya. |
| --- | --- |
| Fumo: | Well as soon as I get home we will have a party at the farm and begin building again! :-) XO XO XO |

He writes to others in minute details with coarse and probing analyses of the strengths and weaknesses of candidates and campaigns.

It is therefore apparent that Fumo is manifestly wrong that "[t]here is virtually no risk of recidivism in this case."  Fumo Memo. 21.  To the contrary, Fumo plans to head right back to the scene of the crime, persuaded to his core that he never did anything wrong, foist his brand of legislative conduct on a new generation of legislators, and make as much money as he can to support his never-ending thirst for goods and acquisitions.  If that is not a recipe for disaster, it is hard to imagine another.  Fumo is especially likely to break the law because he has no conception or recognition whatsoever that his serial crimes were in any way improper.  At the very least, these facts demonstrate that there is no basis for sentencing leniency, and that consideration of all pertinent sentencing factors calls for a sentence at or near the guideline range.

To be fair, Fumo's e-mails do include brief and vague expressions of undertaking conduct to help others.  In this regard, the huge body of e-mails again matches all that is known about Fumo's earlier life -- he is largely focused on personal success, but does devote part of his time to good deeds.  This reconfirms, as will be addressed below, that Fumo is not entitled to any sentencing reduction for an extraordinary devotion to others of his own time or money, which never happened.

- 23 -

In a few e-mails, Fumo has expressed a desire after incarceration to help the families of the incarcerated. In the only full statement we have yet located, he wrote on June 13, 2011:

> I do intend to try the grass fed meat and organic farming when I get out and I want to hire some ex-offenders and give them room and board and a new start in life! :-) In fact I have a few business ideas to help ex-offenders. So I will be doing some good with the last years of my life! ANd I definitely have some idea about starting a political movement among all felons and their families in the US. I think they can be molded into a voting power greater than the NRA. If we can do that then we can bring some sense back to the American Criminal Justice System!

This e-mail appears in a sea of e-mails, described above, plotting schemes, and vengeance, and exhibiting no remorse or truthfulness in addressing his conduct. It is a mirror of all the evidence introduced at trial and the previous sentencing proceeding.

A final example for this memorandum, demonstrating Fumo's dishonesty and the danger he poses to public affairs, arose in May 2011. On May 21, the *Inquirer* published an article reporting that Fumo's political action committees were still flush with cash, most notably his principal campaign vehicle, Fumo for Senate, which controlled $365,000 at the end of 2009, after Fumo entered prison. The Fumo camp put on an innocent front. The article stated:

> But Fumo's lawyer, Dennis Cogan, said Fumo, 68, had no role in his old PACs and never would again.
>
> "He has nothing to do with the PACs anymore," Cogan said. "He has extricated himself from that world and doesn't intend to go back to it."

Behind the scenes, a very different story unfolded as the *Inquirer* investigated and

reported the article.  In truth, Fumo had installed a friend and loyalist, Andy Cosenza, to

oversee the fund and even enlarge it in Fumo's absence.

On May 19, in an e-mail entitled "FFS," Fumo and Cogan discussed the

matter, apparently referring to Fumo's hope to restock its war chest by obtaining

reimbursement from other politicians Fumo had previously supported:

> Fumo: Dennis who can Fumo For Senate hire as a lawyer to give us the opinion that we will eventually need?  We really need to get someone soon even though I have no intention of seeking re-imbursement for a while.  Also,we need to know if its ok to rename the committee without changing my right to be reimbursed from it.  PA TY
>
> Cogan: ok- and I'm sure you can now appreciate the wisdom of not seeking reimbursement while appeal pending as PAC is one of things press is asking Andy and others about
>
> Fumo: Yes agreed! :-)

On May 21, Fumo wrote to Cogan:

> Dennis I've not seen the INKY story yet but I understand that they dwell on FFS. We really need to change the name of it and get it under the radar for a while.  I don't mind taking hits over it if I am getting Big$s from it but I don't need or want hits about it if I'm just sitting here.  We really need a lawyer on this asap.  PA TY Love, Me

Then Fumo saw the article, which revealed that Cosenza had not exactly

followed orders.  On May 22, he wrote to Cosenza (copying Cipriano, Cogan, and Zinni):

> Andy, I just read the Inky smear article.  And I am PISSED!!!  While I expected them to smear me one way or the other, this story was overwhelmingly about FFS. I told you in specific and uncertain terms when you took over FFS NOT to spend 1 fukcing dime on anything except MAYBE a contribution to Larry +/or Frankie if

the wanted +/or needed it.[16]  You blew through $100,000 in just one year and a lot of it questionable and probably unexplainable.

He then directed Cosenza to recover expenditures listed in the article, lamenting the possible effect of this publicity on Fumo's appeal, and a possible criminal investigation. He wrote, "And my Appeal is coming up on Wednesday and this makes me look like a corrupt crook still in business from prison.  Its akin to Gotti running his mob operations from his jail cell.  Even Joey Merlino hasn't gotten this kind of fucking adverse press!!! Get this straightened up by the end of the week!  OK?"

Cosenza sent a conciliatory reply, but Fumo pursued the matter with Cogan, Zinni, and his son, writing to them later in the day, "Maybe this is the time to ask Andy to step aside from FFS?  If so who do we replace him with?  Andy ideas?"  After a discussion of possible replacements for Cosenza, Fumo wrote to his son, "OK Great.  Let me know and then we will figure out a way to gently replace Andy!"[17]

---

16   These references are to Larry Farnese, who was elected in 2008 to replace Fumo in the State Senate, and Frank DiCicco, the longtime City Councilman backed by Fumo who ultimately decided not to run for reelection in 2011.

17   By this month, Cosenza remained in place.  On October 12, after learning that there would be no new fundraiser soon for Fumo for Senate, Fumo wrote to Cosenza:

As to the fundraiser, that is very disappointing.  Especially since I left you with close to $400,000 in FFS and you were going to increase it.  Instead it is now around $300,000.  Now that hurts! :-(

I think that you and I should meet soon.  I have not seen you in many months!  We still have much to accomplish! :-)

In the meantime, at the end of a tense day on May 22, Cipriano sounded a consoling note: "I think Dennis did excellent damage control here and they came up empty. That's the important thing. Vince, you have to calm down over this. They came up with nothing."

And now, Fumo proposes to be released, 15 years short of the guideline sentence recommended for his gross offenses, and go back to business as usual. This Court should now recognize that defendant Fumo has learned nothing at all from his experience with the criminal justice system. In fact, those experiences have only emboldened him. Business as usual for Fumo, as the government proved at trial, means the criminal use of public money and that of nonprofit organizations for personal and political gain. Having failed to learn anything from his experience, and having demonstrated a brazen willingness to continue with business as usual, Fumo, by his own words, demonstrates more eloquently than any words the undersigned may use why he needs to be incarcerated for the long time recommended by the Guidelines.


III.    <u>Fumo Addresses Few of the Sentencing Factors.</u>

Ignoring and covering up all of the information presented above, defendant Fumo, as expected, seeks reimposition of the 55-month sentence which this Court imposed at a time it believed the guideline range was roughly half where it now stands. To achieve such a remarkable result, he advances various grounds for a departure and variance. All are entirely without merit, and the recommendations set forth in the

- 27 -

government's memorandum regarding resentencing should be adopted.  For all of the reasons set forth in the preceding section of this memorandum, and in the government's earlier memorandum, it is apparent that a guideline sentence is appropriate.

Step one of the required sentencing process, at least, is completed.  The parties agree that Fumo's guideline range, prior to any departure (step two), is 210-262 months.[18]  The parties further agree regarding the sequential procedure the Court must follow in first resolving step two (departures) and then step three (final sentence, including any variance).  See Fumo Memo. 3-5.

Fumo's memorandum is focused almost entirely on his entitlement to a departure and a variance.  It says almost nothing about the crimes he committed, Fumo's insistent lack of remorse, or many of the other sentencing factors which, the government has explained, demand imposition of a sentence at or near the guideline range of 210-262 months.

With regard to the offenses, all Fumo can muster is that there were "[n]o allegations of selling his elected office, bribery, acceptance of unlawful gratuities or honest services fraud."  Fumo Memo. 19.  That is a most unpersuasive basis for sentencing leniency.  He is being sentenced for what he did, not for what he is not

---

[18]    That is based in part on a loss of more than $2.5 million on the fraud table in Section 2B1.1.  Fumo states without explanation that the total loss without resolution of the Rubin issue (which the parties agree is moot) is $3,988,661.37.  Fumo Memo. 3.  The government believes that the correct sum is $4,038,661.72, based on the details set forth at pages 16-20 of the government's sentencing memorandum.  Unless a mathematical error by the government is identified, we request that the sums set forth in the government's memorandum be accepted.

accused of doing.  Fumo was an elected public official, entrusted by his constituents to manage their tax dollars and their public affairs, who pocketed goods and services valued at $4 million which came directly or indirectly from public money.  If that is not public corruption demanding, at the very least, a guideline sentence, we are not sure what is. Further, Fumo's crimes in fact involved greater abuse of public office.  He used part of the illegally taken money to finance political campaigns, turning his Senate office into a campaign office for himself and others, and $250,000 of Citizens Alliance's charitable funds for political polls in election campaigns.  Fumo's crimes struck at the heart of the democratic process, abusing the appropriations process he supervised to attempt to influence the outcome of elections.

This case involves nothing but egregious criminal conduct in public office, even before considering the tax and obstruction offenses Fumo also committed (which his memorandum does not mention at all).

Among the other sentencing factors to which Fumo gives short shrift is that requiring that unwarranted sentencing disparities be avoided.  His brief discussion merits attention only for the striking passage in which Fumo rejects comparison to the sentence imposed on Leonard Luchko in this case, because Luchko (along with John Carter, another defendant cited by the government) could not "point to a lifetime of good works to weigh against their wrongs."  Fumo Memo. 27.  No statement by Fumo better sums up the outrageousness of his position in this case, and the reason that the original sentence met such a storm of public criticism.  Fumo's view is that because he was a public

official, who was in a position to perform "good works," he is entitled to a staggering break for criminal offenses that is not available to an ordinary citizen such as the hapless Luchko.

Luchko presented the same creditable personal characteristics advanced by Fumo. Luchko was extremely devoted to his family, particularly to his elderly mother with whom he lived. No one could have been a more loyal employee than Luchko, who responded to Fumo's personal and professional requests literally around the clock (in fact, Luchko put in far more hours for the Senate than the part-time Fumo). Thus, the only difference between Luchko and Fumo is that Fumo was elected to public office, and Luchko was not. For that distinction, Fumo argues, he is entitled to receive a sentence barely 50% more than that imposed on Luchko, even though Luchko was convicted only of obstruction of justice; Fumo ordered Luchko to commit every single one of the acts of obstruction, solely for Fumo's benefit; and Fumo did so to shield an enormous theft of public and charitable funds from which Luchko did not receive one single penny. The disparity in this case advocated by Fumo would approach a miscarriage of justice.

Given that the government has previously addressed all of the sentencing factors, we turn to responding to Fumo's particular claims for a departure and a variance.


IV.     Fumo is Not Entitled to a Downward Departure.

Addressing step two of the sentencing process, Fumo seeks a departure of five levels based on his age and health, his efforts to help others in prison, and the

- 30 -

"totality of the circumstances." Fumo Memo. 8. This request should be denied. Fumo does not set forth any unusual circumstances regarding his age and health. He presents the same departure arguments which this Court previously rejected, with one notable exception -- the addition of a claim of drug and alcohol abuse which is fraudulent; the explanation, set forth below, speaks volumes about his mendacious character, and thus calls for more rather than less punishment. As for Fumo's post-sentencing conduct in prison, that cannot support a departure as a matter of law. Accordingly, no departure is warranted, and the guideline range remains at 210-262 months.

Before addressing these issues, it bears confirming that Fumo, at long last, has abandoned his request for a downward departure based on his public works. Fumo Memo. 7. The defendant thus finally implicitly admits that his public service was not "extraordinary" and cannot justify a departure, as the government has long maintained, under United States v. Serafini, 233 F.3d 758 (3d Cir. 2000), and its progeny.

Fumo has presented quite a moving target on this issue. At the original sentencing proceeding, he asked for a departure based on public service, inviting the Court to commit error. The Court obliged, then immediately after the hearing, trying to insulate the ruling from inevitable review and reversal, the defense filed a disingenuous motion suggesting that what the Court had done was really a variance. This led to the Court's post-sentencing addendum to the judgment and commitment order, stating that, while it used the term "departure," its action was "akin to that associated with a variance," a statement which in turn caused the Court of Appeals to vacate the sentence

due to the lack of clarity.  Fumo, for his part, argued to the Court of Appeals that the

reduction was a departure, continuing his dizzying changes of position.  Now, as the

government continues to press the plain unavailability of a departure, Fumo finally

surrenders and acknowledges that no departure should be given.

He is left with seeking a departure based on age and health, and post-

sentencing conduct.  Without any rational basis or link to the guidelines, he proposes a

five-level departure which -- what a coincidence -- produces the same guideline range of

121-151 months which the Court of Appeals found this Court erroneously applied at the

first hearing, on the basis of incorrect loss and other calculations.  Fumo is not entitled to

any departure at all.

A.    Age and Health.

Fumo is correct that, since the first sentencing proceeding in this case, the

Sentencing Commission changed the wording of the guidelines applicable to departures

for age and health.  Fumo Memo. 7-8.  The government does not object to application of

these revised provisions at this time.  But whether they present any change in the law is

debatable.  The guidelines, which previously stated that age and physical condition were

"not ordinarily relevant" in determining the sentence, now provide that these factors "may

be relevant in determining whether a departure is warranted, if the [factor], individually

or in combination with other offender characteristics, is present to an unusual degree and

distinguishes the case from the typical cases covered by the guidelines."  §§ 5H1.1,

5H1.4.

No court has yet articulated whether this change makes any practical difference.  One judge observed, "The Commission did not provide much guidance for judges in their efforts to differentiate 'exceptional' cases from merely 'unusual' ones, perhaps in the belief that a body of case law will grow up around these newly-articulated departure grounds."  United States v. Escobar-Arias, 2011 WL 133031, *1 (E.D.N.Y. 2011).  The court continued:  "Its stated impetus for slightly expanding these departure grounds in the 2010 amendments was 'an observed decrease in reliance on departure provisions in favor of an increased use of variances.'  U.S.S.G. Amend. 739."  Id.  In other words, if courts are going to reduce sentences based on age or health, the Commission would prefer courts do so as departures rather than variances.[19]

There is no doubt that the Commission intends for departures based on these personal characteristics to remain the exception rather than the rule.  The Commission at the same time amended the introductory note to Part H of the Guidelines, regarding departures, and stated:

> Although the court must consider "the history and characteristics of the defendant" among other factors, see 18 U.S.C. § 3553(a), in order to avoid unwarranted sentencing disparities the court should not give them excessive weight.  Generally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence outside the applicable guideline range but for other reasons, such as in determining the sentence within the applicable guideline range, the type of sentence (e.g., probation or imprisonment) within the sentencing options available for the applicable Zone on the Sentencing Table, and various other aspects of an appropriate sentence.  To avoid unwarranted sentencing

---

[19]   The Commission did not alter the rule that the defendant bears the burden of establishing the basis for a departure.  See United States v. Higgins, 967 F.2d 841, 846 & n.2 (3d Cir. 1992).

disparities among defendants with similar records who have been found guilty of similar conduct, see 18 U.S.C. § 3553(a)(6), 28 U.S.C. § 991(b)(1)(B), the guideline range, which reflects the defendant's criminal conduct and the defendant's criminal history, should continue to be "the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007).

Whatever the meaning of the new provisions, it remains the fact that the concerns presented by age or health must be "unusual," and Fumo's condition does not conceivably meet that test.[20]

      1.    Age.

Fumo is 68 years old, which is hardly exceptional for a criminal defendant, or in society at large.

In 2004, Fumo turned 61 years old. At the time, he was still defrauding the Senate, and still stealing from Citizens Alliance, as he had done for years. And he was embarking on an extensive campaign to obstruct justice, the likes of which are rarely seen.

If you are 61 years old and in the middle of a $4 million crime spree, and obstructing justice, there is a consequence. It means that you are likely to spend your advanced years in custody. In his sentencing memorandum, Fumo reports, "Independent studies reveal that rates of recidivism decline precipitously after the age of 40." Fumo Memo. 22. That is exactly correct. Crime rates drop significantly after age 40, and

---

[20]   In contrast to the provisions regarding age and health, the guideline provision discouraging a departure based on public service, on which Serafini was based, remains unchanged. In 2010, the Commission amended that guideline, § 5H1.11, to provide that military service "may be relevant" in allowing a departure, but public service remains "not ordinarily relevant." See Amendment 739.

certainly after 60, by which time almost every person has the sense to know right from wrong, and to appreciate the consequences of illegal behavior.  The few who do not, such as Fumo, must be incarcerated to punish them for their crimes and to protect the public.  The situation in which Fumo finds himself is entirely of his own making.  It does not provide an "unusual" circumstance calling for him to avoid the consequences of his actions.

That is certainly the law in this Circuit.  In United States v. Watson, 482 F.3d 269 (3d Cir. 2007), the Court unambiguously stated, "the mere fact that a defendant may not survive beyond his sentence does not provide a basis for a shorter sentence."  Id. at 273.  As Watson noted, a sentencing court "ha[s] to consider factors other than [the defendant's] health in reaching a reasonable sentence."  Id.  There, the Court addressed a 10-year sentence for a bank robber who was HIV-positive and had a short life expectancy, and affirmed, in light of the nature of the offense, his record, the need to promote respect for the law, the need to protect the public, and the need to deter him and others.

2.    Health.

Fumo's request for a downward departure based on health is equally unavailing.  He largely relies on exactly the same letters and diagnoses he submitted in 2009, see Fumo Memo. 16-19, which this Court found insufficient to justify a guideline departure.[21]  The government's argument against a downward departure on the same

---

[21]    Fumo, throughout his sentencing memorandum, repeatedly contends that this Court's prior rulings represent the "law of the case" except with regard to the specific

(continued...)

grounds was presented at length in its Memorandum Regarding Sentencing Calculations

(docket entry 711, July 6, 2009), at pages 112-121.  Much of the discussion there,

including the citation of numerous cases rejecting departures for defendants in far worse

shape than Fumo, remains pertinent.  Upon considering all of this information, this Court

denied a departure, stating (with accurate foresight) that Bureau of Prisons officials

would be able to care for Fumo's needs.

In fact, Fumo himself disagrees with the bleak assessment presented in his

sentencing memorandum.  Once again, his e-mails paint a picture totally different from

the defense representations to this Court.  In an e-mail on April 21, 2011, after a friend

inquired about his health, he responded:

> I'm feeling fine . . . . I have the only plan that is realistic at this point in my life and
> that is to try and do things in moderation and don't do something stupid or really
> dangerous!  Cook and eat fresh healthy food (even if I have to grow it myself!),
> etc.  I'm never going to be and Olympic Star at this point in my life.  No one will
> ever be able to change that much, certainly not me!  I am being realistic here.  I
> NEVER worked out in my WHOLE fucking life!  But I'm still in pretty damn
> good shape for my age and lifestyle!  FIA!!!

---

[21](...continued)

issues addressed by the Court of Appeals.  Fumo did not appeal this Court's denial of a
departure based on age and health, and therefore, by his logic, he cannot present the same
arguments now.  The government, however, recognizing that the Third Circuit vacated
this Court's judgment, believes that all sentencing issues are open for review.  See Pepper
v. United States, 131 S. Ct. 1229, 1251 (2011) (a general remand for resentencing
"wipe[s] the slate clean").  Fumo's departure request should be rejected not based on the
law of the case, but because he offers nothing to persuade this Court to change the
considered ruling it made on the basis of exactly the same evidence.

At the original sentencing hearing, Dr. John Manenti, the Bureau of Prisons Northeast Region Medical Director, testified that there are healthy and nutritional food choices available to inmates with every meal:

AUSA:    Can you talk for a moment about what types of opportunities are available at BOP facilities for patients like Mr. Fumo who have coronary artery disease, diabetes, and hypertension in terms of nutritional choices and other options?

Manenti:    This past year the medical director for the Bureau of Prison implemented a national healthy diet.  And the stereotypical prison rice and beans is in a sense what one conjures up when they think of a prison diet.  The reality is that we have, as I said earlier, thousands of people with a lot of significant morbidities; hypertension, diabetes, to name a few.  So how do we, in a sense, regulate or at least supply them with healthy choices?  We do that by providing the food service segment of the corrections with specific guidelines that actually have come out in what we call program statements.  And it talks about the purchasing, the preparation and the serving, and even the presentation with a card that lists the calories, the fat content, the salt content.  So when go through what we call the chow line, or the main line, at the prison, those individuals hopefully by that point in time have already received their diabetic education or their hypertensive education.  And they will be taken into a room, they will be counseled about lifestyle modifications.  And a perfect example is an individual with high cholesterol.  Are we going to be talking about sweet rolls, are we going to be talking about how many eggs we eat, how much butter we put on our bread?  That type of education leads to them making some good choices when they get to the chow line.  That's an example.  Diabetic education also talks about behavior modification which would include exercise, trying to watch one's weight, trying to lead a healthy lifestyle.  And that can be done internally as well as externally.

7-14-09 tr. at 34-36.  The BOP's national healthy diet plan is described in BOP Program

Statement 4700.06.[22]

        While in prison, Fumo has gained about 19 pounds.  The challenge he faces

is the same challenge that millions of other Americans face every day, whether they are in

prison, or (more often) not incarcerated.  It is whether to maintain a healthy diet and

select clearly labeled healthy choices, or choose otherwise.  The Bureau of Prisons

provides extensive education and options to allow inmates to make that choice.[23]

        Fumo has not shown any adverse effects from incarceration.  Rather, not

surprisingly, on July 29, 2011, Fumo wrote, "Being in here is mostly relaxing and I have

had a lot of time to devote to things that I always had to neglect on the outside.  I have

read over 100 books so far.  A better than 1 book/week average.  I've learned how to

shoot pool (I get lessons daily).  And I've been exercising, albeit not as much as I would

like. ;-)  I also found time to take a correspondence course in Boat and Yacht Design from

---

[22]   This program statement is publicly available at  www.bop.gov/DataSource/
execute/dsPolicyLoc.

[23]   The government has seen many e-mails showing Fumo facing this common
struggle.  In one e-mail, on May 29, 2011, Fumo wrote to Zinni and Cipriano:  "I am
taking care of my health.  I will do another 1/2 mile today and I am trying to eat more
healthy.  As I said I don't even eat the skin on chicken and I avoid bisquets and gravy, etc.
:-) XO"  On August 2, 2011, he wrote to Zinni, "They had a great breakfast this morning
so I didn't go.  It was fried eggs and bisquets and gravy which I love but it would have
killed my diet!"  Then on October 12, 2011, he treated himself, stating, "I have ice cream
her about once a month and I've eaten potato chips about 4 times in the last 2 years as
well.  Well today I lost control! :-(  I got a pint of strawberry ice cream and ate the whole
thing.  (BTW, they only sell pints and you have to eat it when you buy it).  And then the
new thing here is Pringles.  So I bought a tube and I ate the whole thing in one day! :-s."

the Westlawn Institute that I always wanted to do.  And I am now studding electronics

and am preparing to get my HAM Radio License when I get out!"  In another e-mail, he

stated that he subscribes to 55 magazines per month.  And by October 8, he reported in an

e-mail, his walking regimen was "up to 1 mile per day."

   Dr. Manenti anticipated this as well, testifying to this Court in July 2009

about prison life:  "So in some ways I'd say there's a silver lining and you can actually

reduce that stress level a little more than dealing with the rush-hour traffic, dealing with

the deadline.  So it's a cocoon effect."  7-14-09 tr. at 36-37.

   At his most recent checkup on September 22, 2011, Fumo's medical records

reflect that he was in good health and that, with respect to every medical condition with

which he had been diagnosed upon his entry date of August 31, 2009, his conditions had

either "Improved," or he was "At Treatment Goal."  That same day, in an email to Zinni,

Fumo stated, "The Doctor said I was doing well today. My blood numbers were good and

they also gave me some kind of special sophisticated blood test that prdicts the likelyhood

of another heart attack and I did very well on that as well."

   In fact, Fumo has become so comfortable with his improved health while at

Ashland FCI that he had become noncompliant in some respects regarding health

screenings and taking his medications.  For example, on September 30, 2010, and again

on October 27, 2010, BOP medical staff noted that, despite counseling Fumo to do so,

Fumo failed to return FOBT3 cards to staff so that a cancer screening could be conducted

on him.  On August 26, 2011, BOP medical staff noted that, despite the fact that Fumo's

Nitroglycerine tabs had expired in December 2010 -- more than eight months earlier --

Fumo had not refilled his prescription for that medication.  BOP staff noted that it would

ensure that Fumo refilled this prescription, which was issued to address chest pain that

could be the onset of a heart attack.  The bottom line is that Fumo's BOP medical records,

comprising more than 250 pages, clearly demonstrate that his health conditions have

improved, not worsened, and that, with respect to Fumo's weight gain -- a serious issue

for any person with his health problems -- he has only himself to blame for the poor

nutritional choices he has made and for his failure to follow a consistent exercise

regimen.

In addition, the vast body of e-mails reflects that Fumo has suffered the

ordinary pain of incarceration and separation from his loved ones, and some additional

anxiety due to uncertainty regarding his final sentence.  Other than that, he has adjusted

admirably, pursuing all of his ordinary projects, and new ones with vigor.  He is not

entitled to a downward departure based on his health.[24]

---

[24]   Notwithstanding Fumo's good health, there has been a debate in the defense camp
on how to posture him for resentencing.  On May 26, 2011, in an e-mail to Cipriano about
the rigors of return travel to Philadelphia for resentencing, Fumo stated, "Maybe I'll let
me hair grow very long again and let me beard grow as well.  I'll try to actually look like
the unibomber! :-)"

In a press conference after a hearing in this case on September 26, 2011, Cogan
made a point of telling the media that Fumo in fact grew a beard and was out of shape
(inaccurately stating that Fumo was not exercising).  The *Inquirer* reported:

> With his longer hair and beard (grown to hide a rash on his face), Cogan said,
> Fumo looks far different from the carefully coiffed power player with swept-back
> (continued...)

While Fumo's departure request largely rests on the 2009 submissions, the current application for a departure adds something new.  He states: "Effective treatment of Fumo's many serious conditions is further complicated by his history of alcohol and prescription drug abuse."  Fumo Memo. 17.  This brings us to a long but fascinating and revealing exposition of a new fraud perpetrated by Fumo, directed against the Bureau of Prisons, but now extended to this Court.

Fumo's new claim of drug and alcohol addiction was actually not developed for this proceeding, but for a separate effort by Fumo to enter a BOP program which provides a reduction in prison time.  For two years, Fumo has sought acceptance to the Residential Drug Abuse Treatment Program offered by BOP, because successful

_____

[24](...continued)
   hair he was in Pennsylvania.  In Ashland, Fumo has not embraced an exercise
   routine and has gained pounds, something the former senator blames on the
   carbs-heavy prison diet, Cogan said.

Phila. Inquirer, "Fumo's appearance, health deteriorating in prison, lawyer says," Sept. 27, 2011.  On September 27, 2011, Fumo's son endorsed this plan, advising his father: "I would not go wearing an expensive suit and looking all perfect.  I would go wearing your prison garb and your beard and your hair.  You want to look nothing like the person who left.  The photo will be front page and it will go a long way to public sentiment going forward.  You want the public to see you as you are now, not how you were.  You want them to see the toll prison has put on you!  Do not make this mistake."  That same day, Zinni demurred, writing:

   Dennis, Was it vital in your opinion to portray Vince as being overweight,
   depressed and bearded to conceal a facial rash ?  Look I am not a Lawyer nor a
   judge however it would look to me that he has little regard for himself as well as
   his family.  Is that what we want our judge to think of him as well as the public for
   that matter?  I'm a little confuse about this approach.  I just don't want it to back
   fire that he has the "don't give a shit attitude "  The truth is he has been walking
   and eating better. - Depressed yes-

completion of the program results in a sentencing reduction of up to one year.  He

calculates that he will be released less than a year from now if he is accepted.  BOP,

however, has repeatedly turned him down.

      The problem is that the inmate must demonstrate that he suffered from an

addiction during the one year prior to arrest, which in this case means the period from

February 2006 to February 2007, or present other reliable evidence specified by BOP

showing that a preexisting addiction existed.  In part, BOP officials rely on the inmate's

presentence report to sift legitimate claims of need from fraudulent bids for participation.

Fumo's PSR says not a word about substance abuse.  The problem Fumo faces is that he

thought of the drug treatment program, and the need for verification, too late.

      During the original sentencing proceedings, Fumo reported to the

presentence officer his history of heart ailments and back and neck surgery.  The PSR

provided a full summary, concluding with the treating cardiologist's opinion that "the

prognosis for the defendant is 'good.'"  PSR ¶¶ 538-543.

      In terms of mental and emotional health, Fumo described emotional and

psychological problems stemming from childhood and adolescence.  The report

continued:

> The defendant is presently receiving psychiatric treatment from Frederick Fisher,
> M.D., who is located at 2400 Chestnut Street, Apt. 1407 in Philadelphia.  Mr.
> Fumo has been seeing Dr. Fisher for approximately ten years.  According to
> records from Dr. Fisher, the defendant is diagnosed with Adjustment Disorder with
> Mixed Anxiety (309.28), and Depressed Mood, Obsessive-Compulsive Personality
> Disorder (301.4).  Dr. Fisher states that the defendant's prognosis is "fair to
> guarded" and that he is prescribing him Prozac.

PSR ¶ 544.

On the subject of substance abuse, the PSR stated this:

The defendant reports no history of drug or alcohol abuse and denies ever being treated for such a condition.  Mr. Fumo noted that he used cocaine on one occasion in the 1970's, but he has not used this drug since that time and has never experimented with any other illicit substances.  No information to the contrary has been uncovered in the course of this investigation.

PSR ¶ 545.

On June 23, 2009, counsel for Fumo provided a 20-page, single-spaced letter to the Probation Office objecting to numerous entries throughout the report, but not disputing any of these passages.  At pages 15-16, counsel added that a downward departure should be granted on the basis of Fumo's "serious heart condition."

Consistently, in Defendant Fumo's Memorandum in Aid of Sentencing, filed on July 10, 2009 (docket entry 724), Fumo sought a sentencing reduction on the basis of Fumo's health.  In this pleading, Fumo's medication was mentioned only to illustrate his "medical regimen" for a range of ailments which the defendant asserted would shorten his life in prison.  The memorandum provided a long list of ailments, and a comparably long list of prescription drugs that Fumo took to treat them.  Fumo Memo. 16.

Fumo also provided letters from two physicians, Dr. Nicolas DePace and Dr. Daniel McCormick, who opined regarding Fumo's prospects in prison in light of his cardiovascular disease.  Fumo then called no witnesses at the sentencing hearing

regarding the health issues.  This Court denied the request for a downward departure.[25]

Fumo's counsel then asserted:

> Now that Your Honor denied a departure on health grounds, we're seeking a
> variance.  And the variance isn't because Mr. Fumo is so sick that there is no
> possible way that the Bureau of Prisons can't take care of him.  The basis, Your
> Honor, is that because of his offender characteristics, because of his unique health
> situation, because of his age, the punishment will be harsher on him.  I
> fundamentally have to agree with the good doctor, Your Honor, that I believe it
> will be more difficult and more stressful for Mr. Fumo, with his medical
> conditions in his advanced age, to serve a sentence.  That it will have an impact on
> his health.  And I believe the opinions of his treating cardiologists who attempted
> to quantify that for Your Honor.

7-14-09 tr. at 147.

No one mentioned a word about any issue concerning prescription drugs,

until Mr. Cogan mentioned it in his lengthy closing argument, again in the context of

Fumo's other health problems:

> As part of his health problems he takes a regimen of medicine, including
> tranquilizers like Xanax, to get through the day, far too many as far as I'm
> concerned, because I've watched that.  Mr. Jacobs and I watched, in horror
> sometimes, as he was popping Xanax during the trial in order to protect himself

---

[25]   At the end of the hearing, the Court explained:

> And then I have to consider the need to provide the defendant with needed
> education or vocational training -- you don't need that -- medical care or other
> correctional treatment in the most effective manner. A great deal of time today was
> spent on the medical care aspect of it, but I do believe that the prison bureau works
> with diligence, like many people do in government, to do their job and to try to do
> it right.  And I think they will do that in terms of your medical care.  I will
> recommend that you be sent to a place where that treatment can be best -- the
> treatment as recommended and set forth in these various reports can best be
> effected.

7-14-09 tr. at 227.

from the things people were saying about him.  Because, as the member of the jury said, he had his game face on.

Id. at 207.  No defense attorney ever said anything at all about alcohol abuse.

Finally, at the very end of the day-long sentencing hearing, after sentence was imposed, attorney Goldberger rose to request that the Court recommend that Fumo be designated to the prison at Lewisburg, Pennsylvania, as it is "reasonably proximate to the Geisinger medical facilities with which the Bureau contracts in the system that we heard about this morning."  Id. at 233.  The Court stated that it would make the recommendation, and Goldberger replied, "And the related point is Lewisburg has the drug program and we think there's going to be some work to do in helping him get off his dependence -- on prescription drugs."  Id. at 233-34.  Thus began, literally at the very last minute, the effort to enter the drug treatment program.  Needless to say, the Bureau of Prisons has not been persuaded that Fumo ever had any addiction.

But the campaign was, quite belatedly, underway.  On August 17, 2009, attorney Buffone sent a letter to the Court (docket entry 809), attesting that Fumo suffered from substance abuse, and on that basis requested a delay of at least 60 days in his reporting to prison "in order to safely curtail his abuse of prescription drugs and alcohol."[26]

Mr. Buffone presented a letter from Dr. Nicholas DePace to Marsha Schwartz Klein, a "licensed professional counselor" specializing in mood disorders and

---

[26]   The defense moved for these materials to be considered under seal.  The government opposed that request, and the Court denied it.

addictions, in which Dr. DePace stated that he examined Fumo on August 4, 2009 (after sentencing).  Based on that examination, Dr. DePace reported that Fumo was "self medicating analgesics and Benzodiazepines compounds for some time," and also "consuming alcohol at an increased rate," and thus was in need of "drug and alcohol rehabilitation for addictions."

Apparently, Dr. DePace accepted Fumo's new statements at face value, even though they contradicted what Dr. DePace himself had written to the Court only a month earlier.  On July 8, 2009, Dr. DePace wrote that Fumo needed the 20 pharmacological agents he was prescribed, and the doctor disparaged the ability of prison officials to manage such a patient.  The defense claim at sentencing was that Fumo could not go to prison because he needed to <u>stay on</u> his medication.

The August 17 submission to the Court also included a declaration by counselor Klein.  She said that she met with Fumo on August 5, 2009, at which time he "admitted to a pattern of abuse of prescription drugs and alcohol.  He stated that he was taking drugs beyond their prescribed dosage and in combination with alcohol."  She reported that Fumo claimed that "he had valid prescriptions but that he would hoard pills and then take more than the prescribed dosage in order to self-medicate or take them in combinations, at excessive dosage levels or with alcohol, despite being advised that the drugs should not be used in this manner."  Ms. Klein, not having been exposed to any of the evidence in this case regarding obstruction of justice, or Fumo's serial perjury at trial, took these incredible statements at face value.  With nothing but Dr. DePace's report

(itself based on an interview with Fumo) and Fumo's statements, she determined:  "In my professional opinion, Mr. Fumo is addicted to prescription drugs and alcohol.  Further, there is a cumulative effect to Mr. Fumo's addictions as he is a poly-substance abuser."

Ms. Klein further opined that Fumo needed at least 60 days for "medical detoxification," to end his dependence on Xanax in particular, and that this could occur more safely out of prison under her supervision.

The government opposed the request for a delay, stating, "At worst, the new claims represent Fumo's latest effort to deceive the Court and manipulate the judicial process."  Docket entry 806 (Aug. 20, 2009), at 2.  The government pointed out that Fumo's "detoxification" claim contradicted the argument he made in favor of sentencing leniency at the hearing only a month earlier, when he argued that he needed all of his medication and would be harmed in prison without access to it.

The Court rejected the request.  See docket entries 807, 808.

In fact, Fumo had lied to DePace and Klein (a lie he continued to present to BOP, and now to this Court).  It appears that neither undertook the simple expedient of obtaining a blood test to verify Fumo's claims.  The Bureau of Prisons was not that gullible.

When he entered the Ashland FCI on August 31, 2009, Fumo reported to BOP doctors that he had a history of substance abuse and therefore wanted drug addiction treatment.  That same day, Fumo reported that he had a history of taking Xanax but had reduced his intake of that drug to 0.5 mg twice per day (the prescribed dosage) for the

prior two months.  Based on his statements about his prior drug usage, Fumo was advised that BOP medical staff would "taper" him with the drug Klonopin on an equivalency of 0.5 mg Xanax to 1 mg of Klonopin.  However, when he was examined on his first day in jail, BOP medical staff at Ashland FCI noted that there was no sign of any withdrawal symptoms at the time and that Fumo was in no apparent distress.  A toxicology screen was also performed on Fumo upon his arrival.

Based on Fumo's self-reported history of Xanax usage, BOP officials made the decision to taper Fumo with Klonopin, and the prescription was issued on September 2, 2009, just two days after his arrival.  However, when Fumo's toxicology screen taken upon his arrival came back on September 4 as entirely negative for the presence of opioids and benzodiazepines,[27] the Klonopin taper was immediately stopped because it was determined there was no need for it at all.

On September 10, 2009, just ten days after Fumo reported to prison, doctors at the Ashland FCI determined that Fumo's alleged "alcohol abuse" was "[w]ithout evidence of withdrawal, neurologic or clinical decompensation."  On that same day, with respect to Fumo's alleged drug dependence, BOP medical staff also concluded that there was "[n]o evidence of signs and symptoms of withdrawl [sic]."  In other words, Fumo did not need any detoxification at all, because he had never been addicted.  His stay in prison continued uneventfully.

---

[27]   A benzodiazepine is a psychoactive drug, such as Xanax, which is used to treat symptoms of anxiety.

Interestingly, on August 28, 2009, Dr. DePace wrote directly to the BOP medical staff, and said nothing about anything Fumo had told him and that he had relayed to Klein. Instead, Dr. DePace's letter merely listed 15 separate conditions, ranging from coronary artery disease to insomnia and gingival disease, and also listed the numerous medications Fumo was taking by prescription. The doctor made no reference to any concern or issue with respect to drug addiction or substance abuse.

Two other physicians also wrote letters directly to the health services administrator at the prison. In a letter dated August 27, 2009, Bradley W. Fenton, M.D. wrote that he is the "internist caring for Mr. Vincent Fumo whom I have known for many years." In his letter, Dr. Fenton reported that Fumo suffered from Type 2 diabetes mellitus, chronic renal insufficiency, hypertension, coronary artery disease, gastroesophageal reflux disease, anxiety/depression, and benign prostatic hypertrophy. Dr. Fenton described in his letter each of the medications that had been prescribed to treat each of these conditions. Notably, Dr. Fenton made no mention at all of any drug addiction or substance abuse problem.

Finally, Olga Maria Kabouridou, D.M.D., who at the time was Fumo's dentist, also took the time to write a letter to the prison in Ashland that is dated August 25, 2009. The letter describes several dental conditions and a proposed treatment plan but makes no mention of any issue or concern related to substance abuse or addiction to controlled substances.

Nevertheless, Fumo did not give up.  With the prospect of early release as an incentive, he has assiduously tried to enter the drug treatment program, even retaining a Virginia-based prison consultant to assist in his campaign, and discussing by e-mail efforts to secure the assistance of prominent public officials he knows.  Most recently, in 2011, Fumo obtained statements from three of his treating physicians about his alleged substances abuse, two of which are stunning in light of how profoundly inconsistent they are in contrast to letters from the same doctors presented to this Court in connection with sentencing in 2009, before Fumo thought to seek entry to the RDAP program.

The first of these physicians, Dr. Frederick Fisher, wrote a letter to this Court on June 1, 2009, stating that he had treated Fumo in weekly psychotherapy sessions during the previous ten years.  He discussed aspects of Fumo's history and psyche which he opined explained Fumo's public service and actions.  While presenting a generally positive account of Fumo's personality, Dr. Fisher mentioned not a word about prescription drugs, alcohol, or any addiction.

Yet on April 8, 2011, Dr. Fisher wrote a letter to a BOP official (which has now also been provided to the Court as part of Fumo's new request for a sentencing reduction), stating in part that Fumo had a "significant alcohol intake at night combined with dangerous cocktails of tranquilizers," and that "[t]he problem of drug and alcohol abuse continued as a theme throughout the treatment as did his inability to curb his food intake regardless of his health issues."  Dr. Fisher wrote, "of most concern to me, was his solitary drinking to excess without eating late at night when he had a tendency to use poor

judgment and mix medications with alcohol.  This issue was a focus of treatment that remained unresolved at the time of his incarceration."  None of this had been reported to this Court in 2009, or appeared anywhere in the records of Dr. Fisher reviewed by the Probation Officer at that time.

Dr. Fisher concluded:

> The question of admission to the Residential Drug Abuse Program has been raised. I would strongly recommend placement in such a program based on his diagnosis: Alcohol Dependence (303.90), Adjustment Disorder with Mood (309.0), and Generalized Anxiety Disorder (300.02).

Note that these diagnoses are entirely different from the diagnoses observed by the Probation Officer in Dr. Fisher's records in 2009.  PSR ¶ 544 ("Adjustment Disorder with Mixed Anxiety (309.28), and Depressed Mood, Obsessive-Compulsive Personality Disorder (301.4)").

BOP rejected Fisher's new letter out of hand, because he had no contemporaneous treatment notes supporting any of his new assertions.  Aware of this problem, Fumo told a BOP official that this was because Dr. Fisher, since the 1971 break-in to the office of antiwar activist Daniel Ellsberg's psychiatrist's office, Fisher never kept treatment notes regarding prominent patients!  Fumo persisted with this yarn in an e-mail with his prison consultant on April 22, 2011 (providing a copy to Cogan, Goldberger, and Zinni), regarding the need for a new affidavit from Fisher.

> Fumo:  OK Thanks. But I also told him not to forget that a KEY part of the affidavit has to be that he never wrote ANY treatment notes on me because he does not keep treatment notes on high profile/political patients since the Daniel Ellsberg case.  OK?

- 51 -

Consultant: Elleberg was 30 years ago - that isn't going to resonante with BOP.  I styled it the best I good.  DC can edit if he likes.  As can Fisher.  But the basic point in in there.  Enough with Ellsberg, ancient history and do one understands the point.  They think we only mean we are hiding something.

Fumo: All I was doing was saying why he doesn't have fucking treatment notes.  We were planning this fucking thing nefariously, I would have made him keep fucking notes!!!

Of course, Fumo did not "plan" this prior to his sentencing, because he and his team had not yet thought of his need for the addiction claim to reduce his sentence.

 Second, Fumo presented to BOP (and now to this Court) a letter from Dr. Frederick Simeone, who also wrote to this Court in 2009.

 In a letter dated June 23, 2009, addressed to Fumo's attorney, Stephen LaCheen, and provided to the Court, Dr. Simeone responded to LaCheen's "request for a report summarizing the conditions for which I treated Dr. Fumo."  In a two-page, single-spaced letter, Simeone described at length the symptoms and procedures endured by Fumo due to "significant degenerative changes in his spine, both cervical and lumbar."  In a second letter, on June 26, 2009, this one addressed directly to the Court, Dr. Simeone wrote another lengthy statement, describing himself as "more or less, his consulting physician."  Simeone again described Fumo's treatment for various spine and heart ailments, and also attested to Fumo's dedication to the community and public service, and to his good character.  In neither letter did Dr. Simeone say one word about any drug addiction, or even mention any prescription regimen.

- 52 -

In contrast, on May 6, 2011, Dr. Simeone wrote to a BOP physician in support of Fumo's campaign, stating that Fumo, during 2006 and 2007, was prescribed a "remarkable" amount of prescription medication, and developed "a habit pattern with a variety of drugs in large volumes typical of a 'polypharmaceutical personality.'"  As a result, Dr. Simeone now wrote,

> I would caution a subsequent treating physician that he has a history of polypharmaceutical abuse.  There were specific reasons for which each of these medications was prescribed and I am sure that to the prescribing physician these reasons were valid.  However they also indicate that Mr. Fumo tends to attempt to solve his perceived problems by demanding additional medications.  Patients such as this who rely on polypharmacy to reduce stress or to satisfy neuroses will often advance to a medical regimen which leads to permanent physical damage or dependency issues requiring complex treatment.
>
> Any drug rehabilitation which can mitigate the potential to abuse drugs, particularly those that are habituating, is strongly recommended.

Once again, BOP was not buying it.[28]

It is apparent from these records that the claim of addiction is being made up on the fly, after the fact.  Yet on the basis of this record, Fumo has the gall to state to this Court:

> And, notwithstanding a documented history of prescription drug and alcohol abuse, he was denied entry to the Residential Drug Abuse Program (RDAP), the BOP's most intensive substance abuse program.  Although Fumo successfully

---

[28]   Fumo also presented BOP with an affidavit from Dr. Julius Mingroni, who had not written to the Court at sentencing.  His underwhelming affidavit states that he prescribed various medication to Fumo, and "[t]he pharmaceutical print-outs speak for themselves, and document the consumption of these drugs during at least the one year period prior to his arrest."  He added, "I admonished him about his reported increased drinking of alcohol in combination with the use of his prescription drugs like Darvocet, Xanax and Ambien."  Dr. Mingroni did not report any addiction.

> completed a voluntary substance abuse program that spanned six months and met
> up to three times a week for two hours, the denial of more intensive treatment
> through RDAP highlights the shortcomings of BOP medical care.

Fumo Memo. 23.  This is a fraudulent effort to obtain leniency.  It is of a piece with

Fumo's efforts to obstruct justice by destroying massive amounts of records in 2004 and

2005, and his six days of perjury on the witness stand at trial in 2009.  It calls for more

punishment, not less.

Certainly, a downward departure must be denied.  Obviously, Fumo's

claims deserve no credence.  They did not persuade BOP, and should not persuade this

Court.  This Court previously ruled that Fumo's documented health conditions do not

warrant any sentencing leniency, and no credible evidence to disturb that conclusion has

arisen.  Fumo cannot on this highly dubious record carry his burden of demonstrating an

unusual health condition for a man of his age which would justify a departure.

A final note:  On October 12, 2011, Fumo wrote an e-mail to his attorneys,

"And lastly, please remember that we need the Judge to amazed[[29]] my PSR to include the

finding that I had the drug problem more than a year before my indictment!"  Needless to

say, no such amendment should be made.[30]

B.      Post-Offense Rehabilitation.

---

[29]    Probably intended to write "amend."

[30]    Fumo unsuccessfully appealed his denial of entry to the RDAP to the BOP
Regional Office that covers Ashland FCI.  He has now appealed the determination to the
BOP Central Office in Washington, DC.

Fumo also rests his request for a five-level departure on his post-sentencing conduct, specifically his efforts to tutor and teach courses to other inmates.  In Pepper v. United States, 131 S. Ct. 1229 (2011), the Court held that a sentencing court has discretion to grant a variance (step three of the sentencing process) based on post-sentencing rehabilitation,[31] but that has no relevance at step two of the sentencing process, where calculation of the guideline range remains at issue.  Here, the dictates of the Sentencing Guidelines remain controlling.

Section 5K2.19, which Fumo overlooks, provides:

Post-sentencing rehabilitative efforts, even if exceptional, undertaken by a defendant after imposition of a term of imprisonment for the instant offense are not an appropriate basis for a downward departure when resentencing the defendant for that offense.  (Such efforts may provide a basis for early termination of supervised release under 18 U.S.C. § 3583(e)(1).)

The commentary explains:

The Commission has determined that post-sentencing rehabilitative measures should not provide a basis for downward departure when resentencing a defendant initially sentenced to a term of imprisonment because such a departure would (1) be inconsistent with the policies established by Congress under 18 U.S.C. § 3624(b) and other statutory provisions for reducing the time to be served by an imprisoned person; and (2) inequitably benefit only those who gain the opportunity to be resentenced de novo.

---

[31]  The Pepper Court did make clear:  "Of course, we do not mean to imply that a district court must reduce a defendant's sentence upon any showing of postsentencing rehabilitation."  Id. at 1249 n.17.

Interestingly, Fumo's memorandum never uses the term "rehabilitation," or cites Pepper in support of such a claim.  Any such argument would be a farce in light of the information revealed in Fumo's e-mails regarding Fumo's utter lack of remorse and contrition.

The Sentencing Commission adopted Section 5K2.19 in 2000 to reject the holdings of the Third Circuit and others that allowed a downward departure for post-sentencing conduct in "extraordinary" situations.  See United States v. Yeaman, 248 F.3d 223, 228 (3d Cir. 2001) (explaining change in law, which did not apply in that case).  It bears noting that Fumo would not qualify under even the more permissive rule that applied earlier.  In Yeaman, the Third Circuit reversed downward departures given to defendants on the basis of post-sentencing rehabilitation.  One, Yeaman, "learned Spanish, participated in the prison choir, tutored other inmates, and generally behaved as a 'model prisoner.'"  Id. at 228-29.  The Third Circuit concluded:  "While Yeaman's activities, especially the tutoring of fellow inmates, were commendable, they do not support a finding of extraordinary rehabilitation. . . . Insofar as the District Court concluded that extraordinary rehabilitation occurred in Yeaman's case, it abused its discretion."  Id. at 229.[32]

Therefore, in sum, Fumo may not receive a departure on the basis of post-sentencing conduct as a matter of law, and his claim based on age and health (with or without his new bogus claim of addiction) should be denied for the same reasons found

---

[32]   The Sentencing Commission's disdain for post-sentencing rehabilitation is understandable, and should be kept in mind even following Pepper in deciding whether to grant a variance on this ground.  The existence of Pepper creates a roadmap for inmates whose cases are on appeal to engage in fleeting positive acts for the sole purpose of gaining leniency the second time around.  This case provides an example; in many e-mails, one sees Fumo and his team endeavoring to collect good works in prison which can be used at resentencing.

by the Court earlier.  This ends step two of the sentencing process, leaving the final

guideline range at 210-262 months.


V.     Fumo Should Not Receive the Enormous Variance He Seeks.

        Fumo next requests an extraordinary and unprecedented variance, from a

guideline-recommended sentence of at least 210 months to the term of 55 months which

the Court imposed when it believed the Sentencing Guideline calculation was much

lower.  As a basis, he advances "Fumo's history of good works, age and ailing health, the

flawed application of the § 2B1.1 loss adjustment, and the overarching requirement of

parsimony . . . ."  Fumo Memo. 9.  The request is meritless.[33]

        Consideration of all of the sentencing factors requires a sentence at or close

to the guideline range, for the reasons set forth at great length in the government's

sentencing memorandum.  We will not repeat that analysis here, focusing instead on

rebutting the defendant's baseless claims.

        The issues of age and health have already been discussed.  Fumo, by his

own admission in e-mails, as confirmed by current medical records which the government

_____

        [33]   As stated in the government's sentencing memorandum, should the Court grant
any downward departure, the government then moves for an upward variance on
numerous grounds.  These grounds are listed in the government's memorandum, and now
we add one more:  Fumo's false statements to this Court regarding drug and alcohol
addiction, in an effort to obtain sentencing leniency.  Even in the absence of a downward
departure, the Court must consider and address the government's arguments regarding
aggravating factors at step three of the sentencing process in determining the final
sentence.  See Gov't Memo. 40-49.

will present at sentencing, has tolerated prison extremely well and is in good health, remaining in the regular prison population.  There is no basis for any variance based on his age and health, for all the reasons discussed earlier.

This leaves Fumo's "history of good works," and his depreciation of the applicable Sentencing Guidelines.

A.    Good Works and Public Service.

As discussed earlier, Fumo at last has abandoned his claim that his public service and other good works were so extraordinary as to warrant a downward departure at step two of the sentencing process.  The holdings of United States v. Serafini, 233 F.3d 758 (3d Cir. 2000), and its progeny demand as much.  See Serafini, 233 F.3d at 733 ("Conceptually, if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants.").

While Fumo may nevertheless obtain a variance, and Serafini is not controlling on that point, we submit that its reasoning rests on eminent common sense and thus provides an indispensable guide in determining a reasonable sentence.  The Third Circuit's core holding in Serafini, as discussed and applied to this case at pages 23-38 of the government's memorandum regarding resentencing, is that public officials are elected and paid to do good works for the populace, and thus any leniency for criminal conduct should rest only on acts which involved expenditure of the defendant's personal time or

money.  When that sensible test is applied to Fumo, it is apparent that sentencing leniency for him is grossly inappropriate.

On this issue, Fumo has consistently presented a tide of hyperbole, both in his sentencing documents and in the many letters he submitted.  It is essential to parse the materials in search of hard facts, and what emerges is a clear picture of a person who did help others, but never to any notable degree on his own time or with his own money.

Fumo's presentation divides into these categories:  (a) personal service to others; (b) personal charity; and (c) time dedicated to his Senate job.  It is time to look at the details, not the hype, and separate the acts of personal kindness and generosity from the acts which were an expected and richly compensated part of his public job.[34]

(a) <u>Personal service to others</u>.  Fumo's memorandum explains that he cared for several family members in times of need; once chased a purse-snatcher; and once aided a friend in the midst of a bar fight.  Fumo Memo. 10-11.  These acts, while commendable, are spread over a 40-year period.  They do not depict remarkable conduct unlike that engaged in by most people under comparable circumstances, and are extremely isolated events.

---

[34]  The value of the letters themselves, as the product of an organized campaign, is highly dubious.  Notably, on August 26, 2011, Fumo himself wrote in an e-mail:

> Letters at the right time will definitely help.  Last time we got in over 350 (I think) and the Judge read every one of them.  We did that by e-mailing people and asking them to send in letters and giving them direction on how to do it.  I assume we have the old list and can try and generate even more this time.  I will have to ask my son Vincent to look into the old list, etc.

(b) <u>Personal charity</u>.  Fumo's presentation on this point is frivolous.  Two writers, Anna Catania and her employee, Rebecca Pritchard, asserted that, during holidays, Fumo would regularly have gifts, food, and Christmas trees delivered to underprivileged homes.  Catania (Fumo's very close friend, who traveled with him on the free yacht trips he took from the Independence Seaport Museum) added, "This act of selflessness was done from Senator Fumo's heart."  However, there is no evidence of any personal expenditures.  To the contrary, the government's comprehensive database of Fumo's financial records shows that, from 2000 through 2003, Fumo spent over $15,000 at Catania's florist shop in Philadelphia, Ten Pennies, making every last payment from Fumo for Senate, his political action committee.  In other words, Fumo is once again seeking to get credit for spending "other people's money."

Next, Fumo cites several letter-writers who wrote about Fumo volunteering at a homeless shelter one night a week.  He omits a key fact -- this conduct, according to the director of the program, took place from 1989 to 1993.  <u>See</u> Letter of Sr. Maria Christi Drysdale.  Fumo apparently has not engaged in any similar conduct since, and none during the times of the criminal conduct for which he was convicted.

Finally, Fumo cites letters from his long-time aides Christopher Craig and Paul Dlugolecki (Dlugolecki in particular gave false testimony at trial which was rejected by the jury in convicting Fumo) that Fumo made "anonymous contributions towards a child's high school or college tuition when a family fell on hard times or a mortgage payment when foreclosure was looming."  Fumo Memo. 12.  The writers provide no

details and no evidence to support these dubious claims, or establish any regular or

substantial pattern of giving, let alone any payment of Fumo's personal funds.

       To the contrary, Fumo's highly detailed, carefully prepared tax returns, year

after year, show that he was not a charitable person.  According to the presentence report,

Fumo's income exceeded $1 million in every year from 1999 through 2006.  PSR ¶ 592.

His tax returns reflect charitable contributions of only a tiny fraction of that income.  For

example, the 2003 return, which was introduced at trial as Exhibit 1716, reported adjusted

gross income of $629,195, and a mere $5,275 in charitable contributions (see pages 7,

91).  That is a rate of giving of 0.84% of income.  And the true percentage is actually far

lower, given that most of Fumo's wealth consisted not of annual income but tens of

millions of dollars in long-term interests.

       Even if all of the instances described by the letter-writers did occur --

making contributions to the poor (at a rate which was a tiny fraction of Fumo's

considerable income), serving weekly meals at a homeless shelter for a few years almost

20 years ago, and responding to the needs of friends and family members -- they

collectively amount to nothing more than the routine conduct of any citizen and family

member, other than the most dedicated miser.  These acts cannot conceivably justify

leniency at sentencing, and this Court at the original proceeding correctly did not purport

to depart or vary on these grounds when presented with the same materials.

       (c)  Personal time.  We thus reach the issue Fumo has long tried to avoid,

regarding whether he devoted his personal time in accomplishing the many good works

for which he is praised by his friends and allies.  After seeking to skirt this issue and Serafini at the original sentencing hearing, focusing instead on things like new hospitals and food warehouses obtained through the use of public money and with the assistance of his Senate-paid staff, Fumo now has to confront it, and has scoured the letters from his supporters looking for examples of use of personal time.

There are none to be found, certainly none which come close to contradicting the consistent and uncontradicted eyewitness testimony which the government offered at trial explaining how Fumo did his Senate work during part-time hours, interspersed with many months of vacation per year.  As this Court earlier ruled, in denying Fumo's post-trial motions, the jury rejected the notion that Fumo needed help with personal matters so he could devote his time to the Senate, "upon becoming privy to evidence that Fumo spent more than four months a year on vacation . . . ."  June 17, 2009 opinion (docket entry 700), at 17.

In an addendum to his memorandum regarding resentencing, Fumo now cites 21 letters.  Significantly, in contrast to the government witnesses at trial, not a single writer of one of the letters Fumo now cites worked with him in his office or traveled with him on vacation, and reported anything to contradict the observations which the trial witnesses made.  Fully nine of the letters -- from Cosenza, Dunston, Engelke, Freeland, Garaguso, Novelli, O'Neill, Treacy, and Verna -- present nothing but hyperbole.  Most common, as in Engelke's letter, is the "tireless" moniker which people seem to append to public officials and which the Third Circuit summarily dismissed in Serafini as a basis for

sentencing leniency.  <u>See</u> <u>Serafini</u>, 233 F.3d at 773.  Most amazingly, Fumo relies on the letter from John Garaguso that related that Garaguso "followed [Fumo's] career mostly through the media," and concluded that Fumo's "focus on and commitment to his job was paramount, with a 24/7 priority."  Fumo's addendum omits the first quotation from this letter.

Another letter now cited by Fumo (Reichner) stated nothing at all about Fumo's work hours.  Five more letters described wholly irrelevant time periods.  Jan Carroll dated Fumo from 1983-1987, then moved to Seattle.  Fred DiBona, III presented recollections that Fumo worked during family vacations when DiBona was a child, two decades ago.  Nick Serpentine related that his father was a student of Fumo's in the 1960s at a high school, and "would always tell us how people would call Vince at all hours of the night and he would answer, no matter what."  (Fumo's addendum leaves out the time reference.)  Maria and Konstantine Sepsis did not meet Fumo until after the criminal charges in this case were brought (and in any event, their observations about his work habits on vacation are consistent with the trial testimony).  Annette Villari, a grateful constituent and former neighbor in South Philadelphia, related that "[f]or close to 30 years, I watched him rush to Harrisburg on many early mornings and work constant late hours in his South Philadelphia office, taking so little time for himself," without explaining how this was possible, given that Fumo moved from her neighborhood before the events charged in the indictment began, only went to Harrisburg for the infrequent

session days (and stayed overnight once he was there), and resided outside of Pennsylvania for more than half of every year.

The remaining letter-writers (including, again, Freeland) confirmed what the trial witnesses stated -- that Fumo took a phone and other equipment with him wherever he went, and thus during the odd schedule he preferred often returned calls in the middle of the night, on weekends, and while on vacation.  See Letters of Freeland, Lessy, Nuzzi, Savitz, Simeone, Sobol, and Zappalla.

The evidence in this case is consistent that, for Fumo, serving as a Senator was a part-time job.  Aided by a huge staff, he was able to accomplish a great deal, while also vacationing extensively, pursuing numerous interests and hobbies, overseeing political campaigns, and attending to other business ventures like real estate, banking, and farming.  (In fact, all of the people who simply saw Fumo working on a computer or on the phone cannot attest which of his numerous ventures he was attending to.)[35]

As we have stated many times, the witnesses consistently reported that Fumo spent most of his time away from the Senate office, and on those days ordinarily worked on the computer in the morning and the evening (attending to all of his affairs, Senate and otherwise), and devoted the rest of his time to leisure pursuits.  Given this

---

[35]   Recalling his lifestyle, Fumo wrote to Zinni on May 28, 2011:  "And yes I so wish that I were down there with you probably going to Home Depot for shit and then going over to the garage at the dock!"

evidence, if he had not returned calls and e-mails during holidays, family meals, and vacations, as writers stated, he would not have returned many messages at all.

This is most clear in considering the statements of Gov. Edward Rendell. Fumo notes Rendell's statement in a letter that Fumo was "tireless," using that familiar encomium for a public official. But Fumo omits the fact that, unlike all of the letter-writers, Rendell testified as a defense witness at trial, a move which entirely backfired on Fumo, as the governor exposed the fallacy of the notion that a person who returns phone calls at odd hours on vacation is working a full-time job. At trial, Gov. Rendell said that "it wouldn't be unusual to get a call from him, you know, at 11:30 at night, nor would it be unusual to have meetings starting at 10, 10:30 on a Sunday night. It was just the way he was and the way he approached his work; he was always on." He then clarified: "I can't tell you how much on the clock Senator Fumo or anybody else puts in out [of] a twenty-four hour day because I'm just not with him that much. But in the sense that there was never a time that I needed to reach Senator Fumo that I couldn't reach Senator Fumo, I'd say go back to what I said. In that sense, he's virtually always on and always had the ability -- if we needed to find out information, he either could tell us on the phone or would find it and get back to us in four or five minutes." 2-9-09 tr. at 9. Rendell testified that most of his calls were five minutes long, sometimes longer, and testified:

> Q.  And when the senator is outside of Pennsylvania, whether it's in Florida or down the shore or in Martha's Vineyard, other than your direct phone call contacts with him, you have no idea what he's doing with the rest of his time, correct?

- 65 -

A.      I have no idea, no idea.

Id. at 14.[36]  Read in this proper light, it is obvious that there was not a single letter, and

certainly no testimony, which rebutted the clear testimony of witnesses and other records

regarding how Fumo actually spent his days.

Interestingly, the new trove of e-mails reviewed by the government,

regarding Fumo's recent months in prison, confirms all that is written here, and that Fumo

has not changed.  In prison, as he reports, he spends some time teaching classes, and

talking to other inmates, and then the vast majority of his time attending to his personal

affairs and his huge range of interests.  He spends his days sending missives to his

friends, family, and aides directing maintenance of his farm and other properties.  He is

shopping for real estate in the Florida Keys, and investigating the purchase of a new boat

and farm equipment.  He is devouring catalogs, magazines, and books on boating and

yachting, trucking, tractors, woodworking and carpentry,

geothermal and other heating systems, deep rock drilling, currency trading, electronics,

engineering, farming and ranching, fitness, architecture and home design, cooking, table

games, surveying, and of course, tools.  He is a true polymath, whose interests and time,

then and now, were never devoted full-time to public affairs.

---

[36]    Governor Rendell's appearance became even more devastating when a prosecutor
asked him on cross-examination to comment on the theory which underlay Fumo's
defense (and now forms the basis of his request for leniency) that Fumo was entitled to
rewards from the Senate and Citizens Alliance because of his alleged effectiveness.  The
governor stated:  "There are no exceptions for effectiveness and no exceptions for people
who spend a lot of time on their job.  The rules are the rules."  Id. at 15.

All that Fumo has left to support a variance, see Fumo Memo. 13-15, and all this Court relied on, is the list of public works and positions which Fumo undertook as a Senator.  The government maintains, as stated in our memorandum regarding resentencing, then it is fundamentally wrong to grant a substantial variance to a defendant for criminal acts because election to public office afforded him the opportunity and funds to do such work.

In an e-mail to a friend on June 20, 2011, Fumo summed up his unrepentant and passionate conviction that he should be freed in light of what his Senate office accomplished:  "Look at me.  Honestly, is there a Senate Office in America that accomplished as much?  When you put everything on a balance scale didn't we balance it overwhelmingly in favor of excellence, service and accomplishment?  And look at where I am now -- over bullshit."  The proposition is that if a Senator is "effective" and does his job well, he can steal.  This Court must not endorse that nefarious proposition.

The government has never belittled Fumo's contributions, or the gratitude of the recipients of his assistance.  To the extent that he effectively represented his constituents' interests, and encouraged his staff to help citizens, he deserves credit for properly carrying out the duties for which he was elected, and for which he reaped enormous financial rewards (both from the public and through his $1 million annual law firm salary).  But these acts cannot in any way justify his wholesale violation of the public trust and theft from the Senate and other institutions, nor his extensive efforts to obstruct justice.

- 67 -

A significant variance on this evidence, as we saw after the last sentencing hearing, only diminished public respect for the law.  To the contrary, Fumo's status as a trusted public official calls for greater punishment, not less.  As Judge Posner of the Seventh Circuit has observed, "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime."  See United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (rejecting departure argument based on white-collar defendant's claimed community services as "risible").  Fumo's request for a huge variance on this ground should be rejected.

B.     Validity of the Sentencing Guidelines.

Fumo asserts that he is also entitled to an enormous variance because the Sentencing Guidelines are not entitled to "substantial deference."  Fumo Memo. 24.  He states that "[t]he Commission's overemphasis on 'loss' often produces sentence recommendations, as in this case, out of proportion to the legitimate purposes of sentencing."  Id.[37]  Fumo is wrong.  The Sentencing Guidelines in general, and the fraud guidelines in particular, are widely accepted and applied, and to vary from them here to the extent suggested would cause a gross and impermissible disparity.

1.     The fraud guideline enjoys wide acceptance.

---

[37]   This is another substantial argument which Fumo did not raise at the earlier sentencing proceeding, and thus his pursuing it is inconsistent with his position that issues unaddressed by the Third Circuit are the "law of the case."  In the government's view, because the last sentence was vacated, arguments such as Fumo's new view of § 2B1.1 are fair game.

In support of his derision of the fraud guideline, Fumo either cites commentators who focus on extremely high loss levels not at issue in this case (such as $400 million, the current top of the guideline chart), or seeks to invoke statements clearly designed for routine offenses as if they apply to his exceptionally aggravated offense. For example, he repeatedly quotes the statement from a Sentencing Commission publication that the original intent of the Guidelines was "to impose 'a short but definite period of confinement' for white collar offenses." Fumo Memo. 25 (quoting Sent. Comm'n, Fifteen Years of Guidelines Sentencing 56 (2004)). Obviously, this statement refers to the well-known goal of the original Sentencing Reform Act and of the Guidelines to increase the rate of incarceration for white-collar offenses. But Fumo's notion, that the goal was "a short and definite period of confinement" for every white-collar offender, including a State Senator who stole $4 million from public and charitable institutions, violated tax laws, and obstructed justice, is specious. Nothing in any Guideline enactment or Sentencing Commission statement has ever suggested such a thing; rather, for 25 years, the Commission has advocated substantial punishment for criminals like Fumo.[38]

---

[38] While this is not the right forum for the debate, the commentators' concern is understandable that in an individual case there may not be sufficient difference between a fraudster who obtains $10 million, and another who perpetrates an insider trading scheme that causes losses to the market of $400 million, to justify application of the current guideline table, which produces a difference in the proposed sentences for those offenses that may be measured in decades as one reaches the higher ends of the incarceration table.

None of this remotely applies to Fumo. Fumo would need an offense level of 24
(continued...)

The core of Fumo's argument is his assertion that "[t]he § 2B1.1 loss adjustment did not result from empirical study by the Sentencing Commission . . . ." Fumo Memo. 4.  That is incorrect.  When it adopted the original fraud guideline, in 1987, the Commission expressly stated that it in fact conducted an empirical analysis.[39]  The background note stated:

> Empirical analyses of current practices show that the most important factors that determine sentence length are the amount of loss and whether the offense is an isolated crime of opportunity or is sophisticated or repeated.  Accordingly, although they are imperfect, these are the primary factors upon which the guideline has been based.

_____

[38](...continued)
to justify his preferred sentence of 55 months.  If all the other enhancements in this case apply, which raised his offense level by 13 levels, he would need an offense level based on loss alone of 11 -- which applies to a loss between $10,000 and $30,000.  Fumo's suggestion that he should be sentenced the same for his crimes as a person who stole $30,000 is simply shocking.  No court has ever applied such an analysis, before or after the advent of the Sentencing Guidelines.

[39]   Although he does not spell this out, see Fumo Memo. 25, Fumo's focus on the "empirical" grounding of § 2B1.1 is derived from the Supreme Court's decision in Kimbrough v. United States, 552 U.S. 85 (2007).  There, in explaining a court's authority to vary from the since-repudiated crack cocaine guidelines, the Supreme Court said that a guideline may be entitled to less deference if was the product of deference to a Congressional edict, rather than the Sentencing Commission's ordinary empirical analysis of sentencing practices.

The government has always found that notion troubling, as starkly anti-democratic.  The establish of sentences is a legislative function, yet the notion suggested in Kimbrough may lead to a conclusion that sentences are more appropriate when decreed by an appointed body rather than by the people's elected representatives.  The conundrum need not be solved here, because, as explained above, the fraud guidelines are in fact empirically grounded and have enjoyed almost universal acceptance in the courts.

The original guideline, § 2F1.1, provided an offense level of 21 for a crime involving more than $2.5 million, which included 2 levels for more than minimal planning or an offense involving more than one victim. Thus, even at the outset, resting on an empirical analysis, the Guidelines called for punishment of a crime like Fumo's far in excess of the one he now advocates.

In 2001, the guideline was merged into Section 2B1.1, the enhancement for more than minimal planning was removed, and the offense levels based on loss were generally increased. The offense level for an offense involving more than $2.5 million in loss became 24. In 2003, this offense level was increased to 25, as applied in Fumo's case.

The 2001 revision, Amendment 617, was a comprehensive restatement of the economic crimes guidelines, based on a six-year study conducted by the Commission. The Commission stated that it increased the offense levels at higher loss amounts for the following reasons:

> These higher penalty levels respond to comments from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that the offenses sentenced under the guidelines consolidated by this amendment under-punish individuals involved with moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines.

Plainly, Fumo's accusation that the guideline does not rest on empirical analysis is wrong.

The 2003 increase of one level was adopted in Amendment 653. At that time, the Commission stated that it was "continu[ing] its work to deter and punish economic and white collar crime," consistent with its exhaustive study and Congressional

directives.  With regard to this particular change, the Commission stated that it aimed to

implement Section 905(b)(2) of the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, which

directed the Commission to ensure that guidelines "are adequate in view of the statutory

increases in penalties contained in this Act."  The Commission observed:

> Section 903 of the Act, for example, quadrupled the statutory maximum penalties for wire fraud and mail fraud from five to 20 years' imprisonment, while section 902 made attempts and conspiracies subject to these same heightened penalties. Specifically, the amendment provides a new higher alternative base offense level of level 7 if the defendant was convicted of an offense referenced to § 2B1.1 and the offense carries a statutory term of imprisonment of 20 years or more.  The alternative base offense levels are intended to calibrate better the base guideline penalty to the seriousness of the wide variety of offenses referenced to that guideline, as reflected by statutory maximum penalties established by Congress.

Not only has the propriety of the fraud guideline repeatedly been studied

and endorsed by the Sentencing Commission for 25 years, but courts -- likely because the

Commission crafted the guideline based on such exhaustive studies of actual sentencing

practices -- have long accepted and faithfully applied it.[40]  Thus, while many defendants

---

[40]   The Court is not required to engage in the empirical assessment at all before applying the guidelines.  "[A] court is not required to engage in 'independent analysis' of the empirical justifications and deliberative undertakings that led to a particular Guideline."  United States v. Lopez-Reyes, 589 F.3d 667, 671 (3d Cir. 2009) (citations omitted).  Further, even if a court finds a guideline inconsistent with the underlying rationale, it is never required to vary.  United States v. Stabile, 633 F.3d 219, 247 (3d Cir. 2011).

Stabile involved application of the child pornography guideline.  The "empirical" attack on the Guidelines has found general success only in two areas -- crack cocaine and child pornography -- where a wide chorus of critics, including numerous judges, expressed concern about the severity of the guidelines.  No such criticism has ever been directed at the sentencing of multi-million dollar thiefs and tax cheats, let alone those who destroy evidence to thwart a federal investigation.

have raised Fumo's "empirical" argument in recent years in challenging the fraud

guideline, every court but one has rejected this argument as a basis for a variance.  See,

e.g., United States v. Murray, 648 F.3d 251, 257 (5th Cir. 2011) (affirming 20-year

sentence for securities fraud, 10 years below the guideline range); United States v. Snipes,

611 F.3d 855, 870 (11th Cir. 2010) (rejecting identical attack on the tax guideline, §

2T1.1, presented by one of Fumo's current attorneys); United States v. Dao, 424 Fed.

Appx. 576 (8th Cir. 2011) (per curiam; unpublished) (affirming within-guideline 12-year

sentence for fraud).  The only exception arose in a case where, the court found, loss was

an inappropriate measure of the defendant's wrongdoing in that she received only

$95,000 of the $1.4 million that was embezzled.  United States v. Lenagh, 2009 WL

296999, *6 (D. Neb. 2009).  That assessment obviously does not apply to Fumo.

Indeed, judges have expressed their support of the fraud guideline not only

in daily rulings, but in response to a scientific survey.[41]  In early 2010, to mark the 25th

anniversary of the Sentencing Reform Act, the Commission conducted its first survey of

federal judges regarding opinions concerning the Sentencing Guidelines.  In the survey,

65% expressed the opinion that the fraud guidelines were "generally appropriate"; 24%

said they were too low; and only 10% said they were too high.  This represented a level of

acceptance far higher than that for the drug and child pornography guidelines (70% found

the guidelines for possession of child pornography and for crack cocaine offenses too

---

[41]   See Sentencing Commission, "Results of Survey of United States District Judges,
January 2010 through March 2010," at 13, at www.ussc.gov/Research/Research_Projects/
Surveys/20100608_Judge_Survey.pdf.

high), and presented the highest level of acceptance for all offenses listed on the survey

other than murder, manslaughter, and assault.  (No questions were asked about the tax

and obstruction guidelines, which also apply in this case.)

        2.      <u>No case supports the variance requested by Fumo.</u>

Fumo's position is not only inconsistent with the wide acceptance of the

fraud guideline, but with the general acceptance of the Sentencing Guidelines as a whole

as a useful and necessary guide to assure uniform sentencing.  Thus, the staggering

variance he seeks, from a low term of 210 months to 55 months, would essentially be

unprecedented.

Nationally, it remains the case that the majority of sentences are within-

guideline range sentences, and below-guideline variances are not common.  Of all

sentences imposed nationally during fiscal year 2010, approximately 55% were within the

guideline range.  When the large number of government departure motions based on

cooperation are accounted for, defendants received below-guideline variances in only

13.6% of all cases, and a downward departure combined with a variance in only another

1.1% of cases.[42]

The fraud guideline, contrary to Fumo's criticism, enjoys similar

acceptance.  Of the 7,471 fraud sentences imposed in fiscal year 2010, there was a

---

[42]   <u>See</u>  http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_
Sourcebooks/2010/TableN.pdf.  The data provided here is from the Sentencing
Commission's annual sourcebook of sentencing statistics, for fiscal year 2010.  Other
years are comparable.

downward departure in 1.6%, a downward departure combined with a variance in 1.4%, and a downward variance alone in 17.7%. Those percentages are roughly comparable to the ratios seen for other types of crimes,[43] decisively rejecting Fumo's unsupported argument that abandonment of the fraud guidelines would not cause gross disparity on a national basis.

Even more important are the data regarding the extent of the variances, given the enormity of Fumo's proposal. Courts are not only varying from the fraud guideline on an irregular basis, but when they do so the variances are quite modest. In all fraud cases nationally in fiscal year 2010, the median decrease in months from the guideline range upon a departure was a mere 9 months.[44] For downward departures combined with a variance, the median decrease in months from the guideline range was 12 months.[45] For a variance alone in all fraud cases, the median decrease in months from the guideline range was 10 months.[46]

We can attest that the experience in this district since <u>Booker</u> was decided in January 2005 is identical. Courts grant variances in the minority of cases, and when

---

[43]   http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_ Sourcebooks/2010/Table27.pdf.

[44]   http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_ Sourcebooks/2010/Table31a.pdf.

[45]   http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_ Sourcebooks/2010/Table31b.pdf.

[46]   http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_ Sourcebooks/2010/Table31c.pdf.

they do, those variances tend to be exceedingly modest, rarely exceeding a year or two.[47]

This Court's practice has been the same. The extent of the variance requested by

defendant Fumo (and also by his co-defendant, Ruth Arnao) would substantially exceed

any variance that either this judge or any of his colleagues has previously granted. The

defendants have not set forth any circumstances which remotely entitle them to such

remarkable treatment. To the contrary, as explained at length in the government's

sentencing memorandum, this case involves serious crimes and severely aggravating

factors, which Fumo for the most part chooses to ignore.

    The government has determined that, since <u>Booker</u>, Judge Buckwalter has

imposed sentence in 26 cases not involving a government departure motion based on

cooperation (and also excluding the two sentences in this case). In those 26 cases, the

_____

[47]    In a typical case, the government this week is filing its brief in the appeal of
Lawrence Murray, USDC no. 10-16. In that case, Judge Tucker sentenced Murray to a
term of 170 months (14 years and 2 months), for fraud and tax offenses. Murray operated
an entity called "Tax Doctors" that aided clients in evading over $3 million in taxes. His
guideline calculation was similar to Fumo's in terms of the fraud and tax losses, and
because it also included enhancements for sophisticated means, leadership role, and
obstruction of justice. Many other aggravating factors found in Fumo's case were not
present (perjury at trial, violation of the public trust, theft from a charity, etc.). Murray's
final sentencing range was identical to Fumo's -- 210-262 months.

    Notably, Murray was 72 years old at the time of sentencing, and suffering from
significant conditions, including kidney failure and skin cancer. The court gave a modest
variance on this basis, imposing a 170-month sentence. (The government on appeal
conceded a 2-level mistake in the guideline calculation, and therefore a small reduction in
the sentence is likely, but clearly the term will still far exceed that originally imposed on
Fumo, a much healthier person, for markedly more serious crimes.)

Court has imposed 9 within-range sentences, 1 above-range sentence, and 16 below-range sentences.

The actual variances which the judge granted, like those of his colleagues, are routinely very modest.  In most of the 16 cases in which below-guideline sentences were imposed, the extent of the variance never exceeded four years, with most variances being extremely minor (such as a sentence of 30 months after a range of 40-51 months), as is consistent of all judges' practices in this district and nationally.  The only exceptions involved very high ranges, and in those cases, this Court has never granted a variance greater than 40% of the bottom of the properly calculated guideline range.

The Court, presented with a guideline range equaling or exceeding Fumo's (210-262) and Arnao's (108-135), did the following:  In Nos. 00-635 and 00-646, the Court granted variances based on the crack-powder disparity, from a guideline term of 240 months to a sentence of 135 months.  In No. 06-046, a bank robbery case, the Court varied from a range of 151-188 months to a sentence of 120 months.  And in No. 03-788, involving the Hobbs Act robbery of drug dealers, the Court granted a sentence of 65 months on a range of 108-135 months, because the defendant played only a subsidiary role as a lookout/driver.[48]

Thus, the suggestions being made by the defense in this case -- a 55-month sentence for Fumo, on a range of 210-262 months; and 12 months for Arnao, on a range

---

[48]   The sentence in the last case was ultimately reduced further, after the Court granted a defense motion for a new trial, and the government stipulated to a sentence of time served in exchange for maintenance of the verdict.

of 108-135 months -- are truly extraordinary, and if accepted would result in sentences extremely disparate to those imposed on all other offenders before this judge and in the district as a whole, not to mention nationally.

This is true even if the focus is narrowed to fraud cases.[49]  While Fumo in his sentencing memorandum denigrates the fraud guidelines, this Court has never embraced that view.  In other cases in which Section 2B1.1 has been the principally applicable guideline, this Court has imposed sentences at or near the guideline range.[50]

In sum, the variances proposed by Fumo and Arnao have no precedent, and would clearly create unwarranted disparities, whether sentencing is examined at the courtroom, district, or national level.

Further, as we have repeatedly argued, the crimes committed by Fumo and Arnao cannot even be described as ordinary fraud offenses.  They committed their offenses in a government office, using public and charity funds.  They violated tax laws,

---

[49]   The statistic favored by Fumo is that "most fraud offenses result in a sentence of around two years."  Fumo Memo. 27.  His effort to gain a sentence comparable to that given to people who committed a fraction of his crimes is beneath comment.

[50]   In No. 02-762, this Court imposed a sentence for securities fraud of 40 months, below the range of 57-71 months, because the defendant was 72 years old and ailing.  In No. 06-221, the Court imposed a 36-month sentence for identity theft, six months below the range, because the 21-year-old defendant came from a good family and was still maturing.  In No. 03-371, the Court imposed a within-guideline 42-month sentence for identity theft.  Finally, in No. 00-310, the Court varied from the range of 24-30 months and imposed probation, because the defendant was likely misled by his attorney, and suffered severe shame in his small religious community.  All of these variances were far more modest than what Fumo and Arnao propose, and their offenses (as reflected in the guideline calculations) were far more serious.

and systematically endeavored to obstruct justice.  All of these facts are, of course, aggravating factors, not mitigating factors.  The fact that their positions allowed them the opportunity, as part of their paid jobs, to do good works for others, cannot support the departures or variances they request.  There is no way to explain such leniency to the less fortunate people who come before this Court, represented in the data provided above, who are never afforded the benefits and opportunities which Fumo and Arnao had.

In sum, we attest to the Court that the degree of the reductions requested by the defendants -- from a range of 210-262 months to a sentence of 55 months (Fumo), and from a range of 108-135 months to 12 months (Arnao) -- have no precedent in sentences imposed in this district, and clearly are grossly inconsistent with the national experience.  If a variance is granted in either case, the only decision consistent with the result in other cases would be a reduction of no more than a few years.

These conclusions are also reflected in the government's appellate practice in this district.[51]  Given the government's recognition of the district courts' sentencing discretion, and because extreme variances are extremely rare, the government in this district has presented only a handful of appeals since Booker was decided in January 2005.  The government has appealed only extreme variances, as in this case, and

---

[51]   In an e-mail message on October 7, 2011, Fumo wrote to Cipriano, "Ralph, did you ever get Jimmy to see if he could get some research done at the Law School on the number/percentage of cases in which the government appealed the sentence of a defendant for being too lenient?"  Here, we save them the trouble.

prevailed in every appeal; all matters were remanded for resentencing.  The cases, besides

this one, are:[52]

> 1.  United States v. Ali, 508 F.3d 136 (3d Cir. 2007) -- appeal of probationary
> sentences in fraud case based on various guideline rulings and departures; reversed
> to correct legal errors and procedural error.

> 2.  United States v. Dollson, 229 Fed. Appx. 83 (3d Cir. 2007) (not precedential) --
> appeal in drug case of variance from range of 360-life to 192 months; reversed on
> procedural grounds.

> 3.  United States v. Baek, 181 Fed. Appx. 165 (3d Cir. 2006) -- departure in "chop
> shop" case from range of 70-87 months to 24 months; reversed on procedural
> grounds.

> 4.  United States v. DiAmbrosio, 251 Fed. Appx. 759 (3d Cir. 2007) (not
> precedential) -- appeal of probationary sentence in fraud case, below range of 46-
> 57 months; reversed due to error in guideline calculation.

> 5.  United States v. Hayes, 383 Fed. Appx. 204 (3d Cir. 2010) (not precedential) --
> sentence for possession of child pornography of six months' home confinement,
> below the guideline range of 51-63 months, held substantively unreasonable.

> 6.  United States v. Negroni, 638 F.3d 434 (3d Cir. 2011) -- in securities fraud
> case, appeal of failure to explain rejection of part of PSR as to one defendant, and
> of departure from 70-87 months to a sentence of home confinement for the other;
> both sentences reversed on procedural grounds.

Yet Fumo seeks a variance far greater than the exceptional variances at issue in each of

these cases.

---

[52]   Besides the cases listed here, the government appealed this Court's rulings in two
cases involving application of the former crack-powder cocaine ratio.  The government
prevailed in the Third Circuit in each case, but this Court's view was upheld and its
sentences were later reimposed on the basis of Kimbrough v. United States, 552 U.S. 85
(2007).  See United States v. Brito, 124 Fed. Appx. 752 (3d Cir. 2007) (not precedential);
United States v. Ricks, 494 F.3d 394 (3d Cir. 2007).

For all of these reasons, sentences in this case at or near the guideline ranges are required to avoid unwarranted disparity, as well as for the many other reasons set forth in the government's sentencing memorandum.

VI.     Fumo Should Be Ordered to Pay Full Restitution.

Fumo presents the disturbing argument that he should not be ordered to pay full restitution, because the incorrect sum of $2,340,839.46 ordered at the first hearing was affirmed on appeal.  Fumo Memo. 27-28.  The claim is meritless.

Notably, Fumo does not dispute that the correct loss total in this case, with prejudgment interest, exceeds $4 million, in light of the Third Circuit's rulings.  Rather, sifting words in the Third Circuit's opinion, he attempts to escape the consequences of its decision.

In parsing the opinion, Fumo fails to remind this Court that the Third Circuit was presented with a cross-appeal.  In Fumo's appeal, he asserted, in part, that this Court erred in imposing prejudgment interest on the restitution judgment.  The Third Circuit rejected this argument, and concluded that section of the opinion by stating, "We will therefore affirm the order of restitution, including prejudgment interest."  Fumo, 2011 WL 3672774, at *29.

Separately, the government appealed, and repeatedly advised the Court of Appeals that correction of the loss total must also result in a new order of restitution.  For example, the government's principal brief concluded, "For the reasons stated above, the

government respectfully requests that the Court vacate the sentences imposed on Vincent J. Fumo and Ruth Arnao, including the orders of restitution, and remand the case for resentencing." Gov't First-Step Br. in No. 09-3388 at 219.[53]

At the conclusion of its opinion, the Third Circuit stated: "For the foregoing reasons, we affirm Fumo's conviction, vacate the sentences of both Fumo and Arnao, and remand for further proceedings not inconsistent with this opinion." 2011 WL 3672774, at *31.

By vacating the sentences, the Court clearly allows this Court to reconsider all aspects of the judgment. That interpretation is set forth in Pepper v. United States, 131 S. Ct. 1229 (2011). There, the district court granted a 40% downward departure pursuant to Section 5K1.1, and imposed a sentence of 24 months. The sentence was vacated by the Court of Appeals, on grounds separate from the cooperation departure. On remand, the district court ruled that it was not bound by the earlier decision to grant a 40% departure, and instead granted only a 20% departure. Before the Supreme Court, the defendant argued that the law of the case doctrine required maintenance of the 40% reduction.

The Supreme Court dismissed the argument. The Court of Appeals, when remanding the case to the district court, had stated, "For the foregoing reasons, we again reverse and remand Pepper's case for resentencing consistent with this opinion." See United States v. Pepper, 518 F.3d 949, 953 (8th Cir. 2008) (Pepper III). The Supreme

---

[53]    Fumo's claim that, notwithstanding this explicit statement in the brief, the government was also required to mention restitution in its "Statement of Issues," is wrong. See United States v. Negroni, 638 F.3d 434, 444 n.9 (3d Cir. 2011).

Court described this and an earlier ruling in the same case as "general remand[s] for

resentencing," which "did not place any limitations on the discretion of the newly

assigned district court judge in resentencing Pepper." Pepper, 131 S. Ct. at 1250, quoting

Pepper III, 570 F.3d at 963.  The Supreme Court then explained:

> [T]he Court of Appeals in Pepper III set aside Pepper's entire sentence and
> remanded for a de novo resentencing.  See 518 F.3d, at 949, 953.  Thus, even
> assuming, arguendo, that the original sentencing court's decision to impose a 40
> percent departure was at one point law of the case, Pepper III effectively wiped the
> slate clean.  To be sure, Pepper III vacated Pepper's 24-month sentence on grounds
> unrelated to the substantial assistance departure, but that fact does not affect our
> conclusion.  "A criminal sentence is a package of sanctions that the district court
> utilizes to effectuate its sentencing intent." United States v. Stinson, 97 F.3d 466,
> 469 (C.A.11 1996) (per curiam).  Because a district court's "original sentencing
> intent may be undermined by altering one portion of the calculus," United States v.
> White, 406 F.3d 827, 832 (C.A.7 2005), an appellate court when reversing one part
> of a defendant's sentence "may vacate the entire sentence . . . so that, on remand,
> the trial court can reconfigure the sentencing plan . . . to satisfy the sentencing
> factors in 18 U.S.C. § 3553(a)," Greenlaw v. United States, 554 U.S. 237, 253 []
> (2008).  That is precisely what the Eighth Circuit did here.

Pepper, 131 S. Ct. at 1251.  Likewise in this case, the Third Circuit's action correcting the

loss calculation and vacating the judgments must be understood to allow this Court to

revisit the package of sentencing decisions affected, including restitution.

        To the extent there is any ambiguity in the appellate opinion, the Court's

mandate must be understood to allow this Court to revisit the restitution issue and provide

full restitution to the victims.  "Under 18 U.S.C. § 3663A, full restitution is mandatory

when an identifiable victim has suffered pecuniary loss and the defendant is convicted of

'an offense against property' under Title 18, including 'an offense committed by fraud or

deceit.' 18 U.S.C. § 3663A(a)(1), (c)(1); <u>see also</u> U.S.S.G. § 5E1.1(a)(1)." <u>United States</u>

<u>v. Lessner</u>, 498 F.3d 185, 201 (3d Cir. 2007).

        "As its name suggests, the Mandatory Victims Restitution Act, which was

enacted by Congress in 1996, mandates that defendants who are convicted of or plead

guilty to certain crimes pay restitution to their victims.  <u>See</u> 18 U.S.C. § 3663A(a)(1). . . .

[T]he purpose of . . . the MVRA is, to the extent possible, to make victims whole, to fully

compensate victims for their losses, and to restore victims to their original state of

well-being." <u>United States v. Simmonds</u>, 235 F.3d 826, 830 (3d Cir. 2000).

        Fumo nevertheless argues that he should not be directed to pay full

restitution to his victims, notwithstanding that he does not dispute that, according to the

Third Circuit, he took by fraud from the Senate and Citizens Alliance more than $1.6

million more than he has been ordered to repay (on which prejudgment interest is also

owed).  Essentially, he contends that the Third Circuit has ordered this Court to impose an

illegal judgment, which fails to restore to the victims all that was taken from them.  No

appellate mandate should be read to produce such a bizarre result.

        Finally, in <u>Pepper</u>, the Supreme Court held that the law-of-the-case doctrine

"directs a court's discretion, it does not limit the tribunal's power. . . . Accordingly, the

doctrine does not apply if the court is convinced that [its prior decision] is clearly

erroneous and would work a manifest injustice." <u>Pepper</u>, 131 S. Ct. at 1250-51 (citations

and internal quotation marks omitted).  To avoid a "manifest injustice" in this case, Fumo

must be ordered to pay full restitution to his victims as required by law.  The total sum is

$4,218,813.45, in the specific amounts set forth in the government's memorandum regarding resentencing, at pages 78-80.

VII.   Conclusion.

All of the sentencing factors in this case call for a sentence at or near the guideline range of 210-262 months, along with full restitution.  Fumo committed serious crimes, on a daily basis for many years, which abused his public office.  He has not set forth any basis for leniency; to the contrary, his private correspondence reveals a person who is unrepentant, convinced that he has never done anything wrong, and ready to resume his conduct the moment he is released.  His fraudulent effort to gain a downward departure based on a nonexistent addiction only reaffirms the nature of his character and his disdain for the rule of law.  Rather than allowing Fumo's premature release, the Court should impose a sentence consistent with the nature of the offenses and the offender,

which promotes respect for the law and serves all of the other statutory sentencing

factors.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


_/s/ John J. Pease_
JOHN J. PEASE
Assistant United States Attorney


_/s/ Robert A. Zauzmer_
ROBERT A. ZAUZMER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed this pleading with the Clerk of Court through the Electronic Case Filing system, thereby resulting in a copy automatically being sent to counsel of record by electronic mail.  Further, I have caused to be sent by electronic mail a true and correct copy of the foregoing pleading to the following:

> Samuel J. Buffone, Esquire
> Buckley Sandler LLP
> 1250 24th Street NW, Suite 700
> Washington, DC  20037
>
> Dennis J. Cogan, Esq.
> 2000 Market Street, Suite 2925
> Philadelphia, PA  19103
>
> Peter Goldberger, Esq.
> 50 Rittenhouse Place
> Ardmore, PA  19003

_/s/ John J. Pease_____
JOHN J. PEASE
Assistant United States Attorney

Date:  October 28, 2011.